1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3
   Criminal Action No. 21-CR-00229-RBJ
4

5    UNITED STATES OF AMERICA,

6           Plaintiff,

7           vs.

8    DAVITA, INC., and KENT THIRY,

9           Defendants.

10   -------------------------------------------------------------

11                     REPORTER'S TRANSCRIPT
                          Oral Argument
12
     -------------------------------------------------------------

13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
     Colorado, commencing on the 19th day of November, 2021, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                        APPEARANCES

17   For the Plaintiff:
     WILLIAM J. VIGEN and ANTHONY W. MARIANO and JAMES J. FREDRICKS
18   and SARA M. CLINGAN, U.S. Department of Justice, 450 5th St.
     N.W., Washington, DC 20530
19
     For the Defendants:
20   JOHN F. WALSH, III, WilmerHale, LLP, 1225 17th St., Ste. 2600,
     Denver, CO 80220
21
     SETH P. WAXMAN and DAVID LEHN, Wilmer Cutler Pickering Hale
22   and Dorr, LLP, 1875 Pennsylvania Ave. N.W., Washington, DC
     20006
23
     JOHN CLAYTON EVERETT, JR., Morgan Lewis & Bockius, LLP, 1111
24   Pennsylvania Ave. N.W., Washington, DC 20004

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
              Denver, CO 80294, 303-335-2108
         Proceedings reported by mechanical stenography;
              transcription produced via computer.

1    APPEARANCES Cont'd:

2    For the Defendants:
     JOHN C. DODDS, Morgan Lewis & Bockius LLP, 1701 Market St.,
3    Philadelphia, PA  19103

4    JEFFREY E. STONE, McDermott Will & Emery, LLP, 444 West Lake
     St., Ste. 4000, Chicago, IL  60606
5
     CLIFFORD B. STRICKLIN, King & Spalding, LLP, 1401 Lawrence
6    St., Ste. 1900, Denver, CO  80202

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

21-CR-00229-RBJ          Oral Argument          11/19/2021    3

 1               *        *        *        *        *

 2          (The proceedings commenced at 9:00 a.m.)

 3               THE COURT:  Good morning.  This is 21CR229, United

 4    States versus DaVita and Mr. Thiry, set for argument on the

 5    defendants' motion to dismiss.  Appearances, please.

 6               MR. VIGEN:  Your Honor, William Vigen on behalf of

 7    the United States.

 8               THE COURT:  Are you going to be the primary arguer,

 9    Mr. Vigen?

10               MR. VIGEN:  Yes, Your Honor.

11               THE COURT:  And how about your colleagues there?

12               MR. VIGEN:  I'm here with my colleagues James

13    Fredricks, Sara Clingan, and Anthony Mariano.

14               THE COURT:  Good morning.

15               MR. WALSH:  Good morning, Your Honor.  John Walsh

16    for DaVita.  I'd like to introduce as well Seth Waxman for

17    DaVita who will be the principal arguer today for both

18    defendants.  In addition I'd like to introduce my co-counsel

19    Clay Everett and Jack Dodds and David Lehn.  And I would

20    note that Kathleen Waters, the chief legal officer of

21    DaVita, is present as a client representative.

22               THE COURT:  Okay.

23               MR. STONE:  Good morning, Your Honor.  Jeffrey

24    Stone on behalf of Mr. Thiry who is present in court sitting

25    next to me, and also Mr. Cliff Stricklin who's co-counsel on

1   this case.

2          MR. STRICKLIN:  Good morning, Your Honor.

3          THE COURT:  Good morning.  And who's going to be

4   the primary arguer for Mr. Thiry?

5          MR. STONE:  We have agreed that Mr. Waxman for

6   reasons of efficiency and talent will be arguing on behalf

7   of both defendants.

8          MR. WAXMAN:  That's a fact not in evidence.

9          THE COURT:  I think there's a lot of talent in this

10  courtroom right now.  All right.

11         MR. STONE:  Thank you, Your Honor.

12         THE COURT:  The Court, that means me, has reviewed

13  your briefs, has reviewed the amicus briefs.  My two law

14  clerks sitting over there bright and able have reviewed your

15  briefs as well, so at least we have some understanding of

16  the issues.  I'm going to give each side approximately an

17  hour today to argue their case.  It seems to me that

18  although you can make any argument you want -- it's your

19  time -- the key issues, as I see them are, number one, are

20  these so-called poaching or no-hire agreements per se

21  violations of the Sherman Act.  Number two is the agreement

22  at issue in this case, which the defendants label as a

23  no-solicitation agreement but which has other features to

24  it, the substantive equivalent of the no-poaching

25  agreements.  And number three is is this a decision that is

1   per se versus rule of reason the Court needs to or even

2   should make at this stage of the case.  Those are the issues

3   that are on my mind, but you can try to convince me that the

4   Court's issues aren't the real issues or that there is

5   something else that's important that I have to listen to,

6   whatever you want.

7          It's the defendants' motion.  You may proceed,

8   Mr. Waxman.

9          MR. WAXMAN:  Thank you, Your Honor, and may it

10  please the Court.  I'd like to first express my appreciation

11  for the Court's courtesy in allowing me to argue this

12  morning pro hac.  It's an honor to be before you.  If the

13  Court permits, I'd like to reserve 15 minutes of my one hour

14  for rebuttal.

15         THE COURT:  Sure.  No problem.

16         MR. WAXMAN:  Okay.  Your Honor, I'm going to

17  directly answer all three of your questions very

18  straightforwardly and very simply, I think, and quite

19  definitively.  If the Court would permit, I'd like to just

20  put in context what is at issue here although I totally -- I

21  completely agree with the Court that the three questions you

22  asked are the bottom-line questions in this case.  And I'd

23  start first by saying that I recognize -- we recognize that

24  the grant of a motion to dismiss a criminal indictment is a

25  very, very rare thing, but this is a truly exceptional case.

21-CR-00229-RBJ          Oral Argument          11/19/2021     6

1        I can't think, and I haven't been able to find, and

2   I've been practicing criminal law as a defense lawyer and a

3   prosecutor for my whole life -- whole professional life -- I

4   can't think of another instance in the federal criminal code

5   in which there is such a thing called a per se crime.  That

6   is a crime that which once it is alleged there is strict

7   liability.  In every crime other than a very few instances

8   under the Sherman Act the Government is required to present

9   evidence to a grand jury and instruct the grand jury as to

10  the elements of the offense, and the Government is required

11  to prove beyond a reasonable doubt that each of those

12  elements is met, and what the Government purports to do here

13  is to sidestep all of that.

14       And so your decision on the last question that you

15  asked, is this the time to make the decision, the answer is

16  I think with respect you have to make the decision now, and

17  your decision is freighted with enormous significance.  The

18  Supreme Court has said over and over again that per se

19  treatment under the Sherman Act is the truly rare exception

20  that is appropriate only when, quote, long judicial

21  experience enables Courts to be confident that a category of

22  agreement is thoroughgoingly anticompetitive and without

23  setting off procompetitive benefits.  That's entirely as it

24  should be because excusing the prosecution from alleging and

25  proving the elements of a Sherman Act violation constrains a

Sarah K. Mitchell, RPR, CRR

1  bevy of Fifth and Sixth Amendment rights, and that provides

2  the basis for my contention that your decision today is

3  freighted with enormous significance.

4          Now, the Government asserts that agreements between

5  employers not to affirmatively solicit each other's

6  employees are per se unlawful because they constitute a

7  market allocation, but labeling something a market

8  allocation will not do.  Only agreements that, in fact,

9  allocate an antitrust market come within the per se rule,

10 and what the indictment here alleges is not an agreement

11 that did or would have allocated a labor market.  There is

12 no Court anywhere that has ever found that the mere

13 agreement not to affirmatively solicit each other's

14 employees violates the antitrust laws under any standard,

15 rule of reason or otherwise.

16         THE COURT:  But I don't think this is a mere

17 agreement not to solicit, Mr. Waxman.

18         MR. WAXMAN:  Well, with respect, Your Honor, the

19 relevant charging portions, and I guess this is your first

20 question asked -- the relevant charging portions of the

21 indictment are in -- the superseding indictment are in

22 Paragraphs 9, 17, and 25.  And looking first at Paragraph 9,

23 the allegation is that DaVita and Thiry entered and engaged

24 in a conspiracy with SCA to suppress competition between

25 them for the services of senior level employees by agreeing

1    not to solicit each other's senior level employees.

2              The Government's allegation as to each of the

3    counts in this case is not that this was a no-hire

4    agreement.  The Government acknowledges in the indictment

5    that employers were free to hire each other's employees and

6    that employees were free to move back and forth among the

7    alleged coconspirators, and the Government knows very well

8    that during the relevant period this happened many times

9    among the three companies alleged.  So what this case

10   involves --

11             THE COURT:  Speaking of the three companies

12   alleged, I don't know the names of what you call -- or they

13   call Companies B and C.  I mention that only because there

14   typically is a corporate disclosure agreement or corporate

15   disclosure document that is filed to enable us to know

16   whether we have any financial interest in a party, and I

17   have no problem with that in terms of DaVita or the company

18   that's been identified, but I don't know who Companies B and

19   C are.

20             MR. WAXMAN:  I mean, can we say who Companies B and

21   C are?  I mean, they're very small companies that are -- I'm

22   not even sure they're publicly traded.

23             THE COURT:  If that's the case, then I don't think

24   there's a problem.

25             MR. WAXMAN:  But I'm looking -- they are not.

1    They're very, very -- one is a software company based in I

2    think the Bay Area, and the other is a very small services

3    company based in Los Angeles, but they're private.  And so

4    what the -- I was saying that, you know, I don't think that

5    the Government will disagree, I mean, that this is a case

6    that alleges, as the indictment says, that the conspiracy to

7    suppress competition was by, quote, agreeing not to solicit

8    each other's senior level employees.

9           THE COURT:  Right.  I understand that, but both

10   sides have used the phrase or term non-solicitation or no

11   solicitation somewhat loosely.  What I have to deal with I

12   think is the agreement in this case, not the label.

13          MR. WAXMAN:  I completely agree.

14          THE COURT:  And that is why my second question asks

15   is this particular agreement the substantive equivalent of a

16   no-poaching or no-hire agreement.

17          MR. WAXMAN:  And my answer to you, just so that

18   we're very, very clear about this, I am not -- and I hope in

19   our briefs we did not use the word no solicit in a loose or

20   generic way.  There are cases that have addressed no

21   solicit, and there are cases that have addressed no hire.

22   The vague word that is quite indistinct is no poach.  But no

23   hire means that two different employers agree that they will

24   not hire each other's employees.

25          THE COURT:  I understand.  I get it.

                     Sarah K. Mitchell, RPR, CRR

 1          MR. WAXMAN:  Okay.

 2          THE COURT:  But this agreement not only says no

 3   solicitation, which also has implications for headhunters or

 4   recruiters, but it also has this provision that if an

 5   employee were to want to move to a -- to a competitor

 6   company they have to notify their employer.  That's a twist

 7   on the non-solicitation concept that I haven't seen in these

 8   other cases.

 9          MR. WAXMAN:  Right.  And so the alleged agreement

10   in Count 1 has two components.  One, assuming that the

11   allegation -- taking the allegations of the indictment as

12   true, that neither company will affirmatively recruit,

13   either directly or through a recruiter, the senior level

14   employees of the others, but that if an employee -- a senior

15   level employee of one or the other wishes to switch to the

16   other company, there is a requirement that the employee give

17   notice to the employer, and as we've explained in our

18   papers, that -- there is -- there is also no case ever that

19   has ever suggested that an -- that a requirement or an

20   agreement that before employees switch the individual

21   employer be notified so that the employer can make an effort

22   to retain the senior executive in whom it has expended

23   tremendous, you know, training, employment, and divulged

24   trade secrets.

25          THE COURT:  I understand.  I understand that

1  completely.

2          MR. WAXMAN:  Okay.

3          THE COURT:  The requirement that you contact your

4  present employer and tell him or her that you would like to

5  apply for a position with the other company also has, it

6  seems to me, a chilling effect on an employer's (sic)

7  likelihood of doing that, and that's part of the total mix

8  when I say does this amount to about the same thing.

9          MR. WAXMAN:  So let me -- let me be very responsive

10 to this.  We have -- you may be right, and the evidence

11 might show, although I think it would not be substantial,

12 that there is some chilling effect.  The evidence we have

13 alleged that the notice requirement actually has

14 procompetitive benefits, including the one I just

15 articulated, and we are entitled to fight that out in front

16 of the trier of fact and you at trial.  We are entitled to

17 -- the question in this case is there is -- I'll start off

18 by saying there is -- I know you know this, but it's a

19 predicate to the point I'm about to make.

20          There is no case anywhere including the one that

21 was addressed in the Government's notice yesterday for the

22 reasons we've explained in our responsive letter -- there is

23 no case in this country that has ever held that a no -- that

24 an agreement not to solicit each other's employees or an

25 agreement to -- that you won't hire another's employees

21-CR-00229-RBJ          Oral Argument          11/19/2021   12

1   without notice to the current employer is even illegal under

2   any standard whatsoever.  And therefore the notion that the

3   Government can proceed -- we're not here arguing whether

4   we're entitled to dismiss an indictment that reflects the

5   fact that the jury has been instructed on the elements of

6   the offense and has been presented evidence sufficient to

7   allow it to aver that there is a violation of the Sherman

8   Act under the rule of reason.

9        The Government is attempting to get you to say

10  this, for the very first time in any court in the history of

11  the United States under the Sherman Act, that an agreement

12  with these two characteristics or either one of them is

13  illegal under the Sherman Act and illegal per se such that

14  you will have, in essence, strict liability or a directed

15  verdict.  That is they want you to tell the jury at trial

16  that the indictment alleges an agreement with those two

17  characteristics, if you find that there was such an

18  agreement, you must convict, and that is an extraordinary

19  submission in the context of the Fifth and Sixth Amendment

20  protections.

21       THE COURT:  Well, there's no dispute that there was

22  the agreement, so what would there be for the jury to

23  decide?  Damages?  There are no damages in a criminal case.

24  What's there for the jury to decide?

25       MR. WAXMAN:  Your Honor, in order to prove a

1   violation of the antitrust laws, and certainly a criminal

2   violation of the antitrust laws, the Government has to --

3   the grand jury has to find and aver that, number one, there

4   was an agreement, to be sure, that the agreement allocated

5   the market in a relevant antitrust market.  We -- to this

6   very day the Government has not said exactly what it thinks

7   the relevant market is.  I mean, these are three companies

8   among the probably 100,000 or more companies in the health

9   services industry that the agreement was substantially and

10  unreasonably in restraint of trade in that relevant market

11  and that there are no offsetting procompetitive benefits.

12          Because under the standard Sherman Act analysis

13  under the rule of reason, it is the Government -- it was the

14  plaintiff's burden -- here the Government's burden -- to

15  prove what the relevant market is, that is a market that the

16  antitrust laws take cognizance of, that there was an

17  agreement that operated substantially to restrain trade in

18  that market, and if they show all those things the burden

19  shifts to the defendant to prove that there are, quote,

20  procompetitive benefits to the agreements.

21          There are lots and lots of cases establishing that

22  even agreements that substantially restrain trade are

23  nonetheless sufficiently procompetitive for some other

24  reason that they don't even violate the civil provisions.

25  But the notion here under the due process clause that

1   somebody could be held criminally liable for engaging in

2   this agreement, ipso facto, that is that all the jury would

3   have to find is did you have this agreement -- never mind

4   about what the market was or whether the market was actually

5   allocated or whether there are procompetitive benefits --

6   all you have to find is there was an agreement, and Kent

7   Thiry goes to prison.  I mean, the --

8           THE COURT:  Well, not necessarily.

9           MR. WAXMAN:  Well, not necessarily, but he stands

10  convicted under the criminal laws.  The fact of the matter

11  is that an ordinary businessman could have taken a year off

12  and read the entire 125 -- I think it's more than 125 years

13  of decisions under the Sherman Act, never found a single

14  case that ever found that an agreement with these two

15  characteristics was even illegal, and nonetheless would

16  conclude that if he signs such an agreement he would be

17  criminally liable per se, and that's what the Government is

18  asking you to do.  And the Supreme Court has -- you know, we

19  cited the --

20          THE COURT:  What happens if I agree with you and

21  say it's not a per se violation?  Then what happens?

22          MR. WAXMAN:  Well, the Government would then have

23  the option of going back and producing evidence and

24  instructions to the jury on the actual elements of the

25  Sherman Act and can bring this as a rule of reason case or

1    just -- it could also just allege that this is -- this is

2    what happened in the *Kemp Associates* case.  The Government

3    simply alleged that there was a violation of the antitrust

4    laws.  The defendant then moved to require the Government to

5    carry its burden under the rule of reason.  The Government

6    said no, this is -- which was a -- a totally different --

7    this was a genuine market -- allocation of product markets

8    --

9              THE COURT:  Heir locations.

10             MR. WAXMAN:  Excuse me?

11             THE COURT:  Heir locations.

12             MR. WAXMAN:  Heir locations, right.  Who knew?  The

13   trial judge said you haven't established that this is a per

14   se violation, and in any event, this case is barred by the

15   statute of limitations.  It went to the Court of Appeals.

16   The Court of Appeals said, Well, we don't have jurisdiction

17   here.  The statute of limitations isn't an issue, but we

18   don't have a final judgment because the district -- under

19   the district judge's ruling, the Government can still

20   proceed under a rule of reason theory.  Now, the Government

21   argued that it has a policy that it will not pursue criminal

22   cases under the rule of reason.

23             THE COURT:  And Judge Ebel said that doesn't

24   matter.

25             MR. WAXMAN:  Right.  It doesn't matter, and not

 1   only that, the Government can proceed civilly.  I mean, the

 2   notion that it is appropriate in the absence of any prior

 3   precedent finding an agreement with these characteristics to

 4   be illegal, much less per se illegal, to proceed under a per

 5   se theory in a criminal case where the defendant is

 6   manifestly denied notice that what he is doing is ipso facto

 7   per se strict liability guilty is extraordinary.

 8            THE COURT:  Well, that gets back to my second

 9   question, doesn't it, Mr. Waxman?  If, in fact, what we have

10   is a wolf in sheep's clothing, if we have what amounts to a

11   no-hire or no-poaching agreement just worded differently,

12   and if those kinds of agreements have been determined to be

13   per se violations, then a lot of the force of your due

14   process argument leaves the courtroom because it is known to

15   these defendants that those no-poaching agreements are no

16   good.

17            MR. WAXMAN:  Well --

18            THE COURT:  I don't have any doubt but that they

19   and their very able lawyers attempted to structure this

20   agreement to be different enough that the law wouldn't reach

21   it.  But to say that it's just totally unfair and a

22   violation of due process if they're just repackaging a

23   no-poaching agreement doesn't quite work.

24            MR. WAXMAN:  Well, I -- I want to respectfully --

25   very respectfully disagree with your conclusion, but let me

1    first --

2           THE COURT:  Well, it's not a conclusion.  I'm being

3    a devil's advocate with my questions --

4           MR. WAXMAN:  Let me --

5           THE COURT:  -- because I really want to get to the

6    bottom of this.  I know the importance of it.

7           MR. WAXMAN:  Let me say two things, and maybe this

8    will, if not help, at least clarify what our position is.

9    In the first place, even if this were a -- even if this

10   agreement -- even if the indictment alleged a conspiracy not

11   by an agreement not to solicit each other's senior level

12   employees, but an agreement never to hire each other's

13   senior level employees that is a real no-hire agreement, you

14   couldn't apply per se treatment here anyway because there is

15   no -- there is no, quote, long judicial experience holding

16   that no-hire agreements are per se unlawful.  As we

17   explained at pages I think it's eight through ten of our

18   motion, the case -- the Courts are in disagreement about

19   whether no-hire agreements are even unlawful, and the weight

20   of the authority is that they are not, and we've cited and

21   discussed those cases in our motion.

22          So even if this were a case that it's not, and it

23   were an agreement never to hire each other's employees, per

24   se treatment would be completely inappropriate in this case.

25   The Government could do what it has tried to do in other

1    cases in the civil context, which is to show that they are

2    illegal under the Sherman Act, taking into account the

3    elements of the crime.

4          THE COURT:  Well, that's your answer to my first

5    question then.

6          MR. WAXMAN:  That is -- in a roundabout way that is

7    my answer to the first question.  Well, the first question I

8    think was are these -- yes, right.  No-hire agreements are

9    not per se unlawful.  No Court has ever said that they are,

10   and the few Courts that have addressed no-hire agreements

11   have come to different conclusions about whether they are or

12   aren't unlawful, as we suggest, the predominance holding

13   that they are not.  And so for a Court in a criminal case to

14   just say, well, I'm not even going to put -- in light of

15   that nonagreement, no consensus among the lower courts, I'm

16   just going to allow the Government to proceed on a per se

17   basis is -- would be wrong even in a civil case, and it

18   certainly is wrong in a criminal case.

19         I mean, you know, thinking back to the Supreme

20   Court's long list of due process, you know, criminal cases,

21   Skilling and Governor McDonnell and the Kelly case that

22   involved the George Washington Bridgegate issue, nobody

23   doubted that what Governor McDonnell did and what Governor

24   Christie did was -- certainly seems unlawful, and they were

25   convicted.  The Supreme Court reversed decisively saying the

1    terms of the statute do not make collusively clear to the

2    defendant that that activity crossed the line, and we will

3    not permit a conviction under the due process clause for

4    those contents under this statute.

5          Now, here we don't even have a statute.  The

6    Supreme Court has agreed since the 19th century that the

7    words of the Sherman Act that all restraints on trade are

8    unlawful can't mean what it says, because there are -- there

9    are agreements that, quote, restrain trade all the time, and

10   so the standard is they are unlawful only if they

11   substantially and unreasonably restrain trade taking into

12   account procompetitive benefits.  And that's what we are

13   entitled under the due process clause, to have the grand

14   jury conclude and the Government prove at trial with our

15   full Fifth and Sixth Amendment rights to cross-examine and

16   put on our own evidence.

17         If the Government continues to insist that it's

18   entitled to an instruction to the jury on a per se theory,

19   you'll have to make that decision probably in a Rule 29

20   motion, or in any event, in a motion at the end of the

21   evidence as to whether to instruct the jury that it has to

22   find liability under the element, the Government has to

23   prove beyond a reasonable doubt all the elements of the

24   Sherman Act crime alleged, or whether all the jury has to

25   find is that there was this agreement.  And if the

21-CR-00229-RBJ          Oral Argument          11/19/2021    20

1   Government chooses to proceed that way under an indictment

2   that doesn't limit itself to a per se theory, you know, I

3   wouldn't say we're ready for trial, but we are pretty darn

4   ready for trial.

5          I just want to say one other thing, which is I

6   think I can't sit down without talking about the one case

7   that the Government -- that the Government has correctly

8   pointed out involved a no-solicitation agreement and found

9   it to be per se unlawful, and that's the Sixth Circuit

10  decision in the *Cooperative Theaters* case.  Again, I don't

11  want to repeat what we said in our briefs.  I know Your

12  Honor and Your Honor's law clerks have read it and

13  undoubtedly have read the case.  I want to emphasize just

14  three things about that.

15         Number one, it was important to the Sixth Circuit,

16  the per curiam Sixth Circuit, that the defendants in that

17  case never alleged, much less proved, that there were any

18  plausible procompetitive benefits to this -- to the

19  agreements that were enacted.  And the Supreme Court case

20  law is utterly clear that a horizontal restraint is not per

21  se unlawful if it does plausibly provide procompetitive

22  benefits.

23         THE COURT:  Does that get into what has been called

24  the ancillary?

25         MR. WAXMAN:  Yes and no.  Ancillary, for sure, and

Sarah K. Mitchell, RPR, CRR

1    that's an issue where even if you allow the Government to

2    proceed per se we could put on evidence at trial that these

3    agreements were ancillary to a broader agreement among the

4    companies to cooperate that was procompetitive.  But it's

5    not that.  It's not just that.  It is either that they are

6    ancillary, or that the procompetitive benefits outweigh the

7    anticompetitive effect such that there is no violation in

8    the first place.  And, you know, the U.S. Supreme Court has

9    said many, many times that the -- where there is -- where

10   there are -- in determining whether per se treatment is

11   allowed or not, where there are plausible procompetitive

12   benefits per se plausible -- we don't have to prove them at

13   this point, but if they are plausible, that per se treatment

14   is unlawful.  I mean --

15           THE COURT:  Well, the benefits in these cases such

16   as the *Cinnabon* case and some of the other cases aren't just

17   that by keeping the employees in house you don't waste your

18   time training them only to lose them to a competitor and so

19   forth.  I think the Courts have said that isn't the kind of

20   procompetitive benefits we're talking about.

21           MR. WAXMAN:  Oh, I guess I --

22           THE COURT:  Of course that's true.

23           MR. WAXMAN:  Well, the issue -- I don't think the

24   Courts have said that those aren't procompetitive benefits,

25   and I can cite you a long line of cases that have held that

1    they are, including the, you know, then Chief Judge Taft's

2    decision for the Sixth Circuit in *Addyston Pipe* and the

3    Supreme Court's decision in *Polk Brothers* and the Ninth

4    Circuit's decision in *Aya*.

5          THE COURT:  But those benefits go to the company

6    that retains the employees.  Of course there're going to be

7    benefits to retaining key employees.  But the issue here

8    isn't is it good for DaVita to retain key employees.  The

9    issue is whether it's unfair to DaVita's senior management

10   people and the other company's senior manager people to in

11   effect reduce their availability to either get a higher

12   paying job at the competitor company or negotiate a higher

13   salary with DaVita.

14         MR. WAXMAN:  I don't disagree with Your Honor at

15   all.  The question at this stage, at the pleading stage, is

16   whether -- and I agree the issue isn't only whether DaVita

17   would lose something by losing a valued employee to whom it

18   had entrusted trade secrets and invested all sorts of stuff

19   which heavily distinguishes this context from the goods

20   markets.  The Supreme Court and the lower courts have

21   recognized that there are benefits to competition which we

22   could explore at trial if we were allowed to put on evidence

23   about this at trial, not just to DaVita, but to competition,

24   to the employees themselves.  For example, I know that you

25   take the facts as alleged as true, but in Paragraph 11(e) of

1    the indictment, the Government has very selectively quoted

2    one portion of an e-mail involving one DaVita employee who

3    wanted to move or was thinking about moving.

4           THE COURT:  I won't do that to Kent.

5           MR. WAXMAN:  Right.  The Government knows darn well

6    that that employee when he told Kent was given a raise and

7    given a promotion and decided not to go to SCA in response

8    to its offer.  And, again, I'm not here to argue the facts.

9    All we have to do is to show you that there are plausible

10   procompetitive benefits to these agreements in order to

11   stand trial if the Government chooses under the rule of

12   reason.  Now, so my first -- I'm getting myself a little bit

13   off, but the first way I would distinguish *Cooperative*

14   *Theaters* is that we have alleged what the Courts have

15   recognized are at least plausible procompetitive benefits.

16   That was the Government -- the Court in *Cooperative Theaters*

17   said there was no such allegation, no such suggestion.

18          Number two, an agreement not to solicit in a goods

19   market cannot be automatically transferred to an agreement

20   not to solicit in the labor market .  Now, I will -- of

21   course we agree that the antitrust laws apply to labor

22   markets just as they do to goods markets.  But, again, the

23   Supreme Court has emphasized over and over and over again

24   that it is the, quote, context or practice that matters, and

25   the Supreme Court -- and, again, I'm quoting from the

1   Supreme Court's decision in *Leegin*, but the same point is

2   made in *Indiana Federation of Dentists*, that the

3   appropriateness of applying per se treatment requires a

4   careful examination, quote, of the context of the business

5   relations in which the practice occurs.

6          And the Government not only -- in terms of thinking

7   about the propriety of transmitting this 25-year-old per

8   curiam decision of the Sixth Circuit in a very different

9   context in a very different market to the employment context

10  is not only inappropriate because it is a very different

11  context.  You would think that if *Cooperative Theaters*

12  really stood for the proposition that in any kind of market

13  a non-solicitation agreement was per se unlawful that a

14  couple of Courts somewhere else in the country might have

15  said that.

16         The Government has marshalled a lot of cases in its

17  written submission to you.  It has cited two cases in which

18  *Cooperative Theaters* is even mentioned.  The first one,

19  *United States vs. Brown*, a Ninth Circuit case from 1991, is

20  cited by the Government for the proposition that the per se

21  rule typically applies to horizontal restraints such as

22  allocating or dividing markets.  Nothing whatsoever to do

23  with no solicitation.

24         The other case that they cite is the Tenth

25  Circuit's decision in *Suntar Roofing* in which, of course,

1   there was -- as Your Honor knows from reading the decision

2   -- there was no serious argument -- it was a product market

3   case in any event -- that the agreement was not horizontal

4   market allocation and was entitled to per se treatment.

5   That was -- that was not contested.  And the only thing the

6   Government cites -- the only reason that *Suntar Roofing* in

7   that very different product market context cites *Cooperative*

8   *Theaters* is that an agreement to allocate or divide

9   customers between competitors within the same horizontal

10   antitrust market constitutes a per se violation, which, of

11   course, we don't disagree with.

12          And so the notion that there is one case out there

13   in such a very different context where no procompetitive

14   benefits were alleged and has essentially fallen into a

15   complete black hole of American jurisprudence and has never

16   been applied or even cited in a case involving the

17   employment context could be the predicate for the

18   application of per se treatment here is -- I mean, it's --

19   this is just not even a close case.  It took the Supreme

20   Court years to find that bid rigging, price fixing are so

21   thoroughgoingly anticompetitive and so devoid of

22   procompetitive benefits that it was appropriate for Courts

23   to in effect create a new criminal statute, which is what

24   the per se rule does, to say price fixing is a crime under

25   -- in the United States, bid rigging is a crime under the --

 1   in the United States.  Not you have to weigh all these

 2   factors.  That's the only way you can understand these

 3   limited exceptions under the antitrust laws that you can

 4   reconcile them with the defendants' rights under the Fifth

 5   and Sixth Amendments, and we don't have -- we don't have --

 6   we're not even in the same time zone as that here.

 7           So I just want to -- you know, unless the Court has

 8   further questions, I'll just -- I'll just yield the podium

 9   to my friend Mr. Vigen on the other side with this thought.

10   This indictment is a dangerous and inappropriate overreach

11   of the criminal laws.  If the Government thinks that it can

12   show beyond a reasonable doubt that the agreements alleged

13   here substantially and unreasonably restrain trade in a

14   relevant antitrust market, it should be required to present

15   an indictment that alleges the requisite elements and then

16   prove them at trial, not just tell the jury, or the grand

17   jury for that matter, that it is so.  And I'll -- with the

18   Court's indulgence, I'll reserve the balance of my time.

19           THE COURT:  All right.  Thank you, Mr. Waxman.

20   Does anybody need a break before we proceed?  No.

21           Mr. Vigen.

22           MR. VIGEN:  Thank you, Your Honor.  Your Honor,

23   thank you.  The United States and defendants have a

24   fundamental disagreement over what the per se rule is and

25   how it should be applied here.  I think if you look at *Kemp*

1    and *Maricopa County* there can be no doubt that if there is a

2    horizontal agreement among direct competitors who agree not

3    to compete for a segment of the market, that that is per se

4    illegal, and it doesn't matter what industry you're in, and

5    it doesn't matter about procompetitive benefits or the

6    judicial experience in that industry.  *Maricopa County* and

7    *Kemp* stress that that is irrelevant.  We do not need to go

8    into the procompetitive justifications or if these were, in

9    fact, unreasonable.  They were unreasonable as a matter of

10   law, per se unreasonable.  That is what the Supreme Court

11   teaches, and let's make --

12          THE COURT:  Well, Mr. Waxman says this would be the

13   first case to ever so hold.

14          MR. VIGEN:  I disagree.  I disagree.  It would be

15   no different than the first case against the heir location

16   services.  Those were never determined before to be per se

17   illegal, yet the Tenth Circuit reminded the district court

18   that those procompetitive justifications even in that unique

19   heir location services market had no role in the analysis.

20   The analysis is what the practice is that is alleged that is

21   illegal.  And here the indictment alleges a classic per se

22   market allocation agreement, a naked agreement amongst

23   competitors at the same level of the market structure who

24   have agreed not to compete with each other in some way in

25   that market, thereby minimizing competition.  And defendants

1   did that here three times, three times over with other

2   companies.

3         They declared off limits employees who were not

4   actively looking for another job or who did not want to jump

5   through the hoops of the rules that these CEOs had between

6   each other for how they should treat competition for these

7   employees.  Those employees no longer received the benefit

8   of the free and open competition that our economy is based

9   on and that the Congress laid down as national policy in the

10  Sherman Act.

11        THE COURT:  Well, they can move to the other

12  company if they want to.

13        MR. VIGEN:  Not if they were not actually looking

14  for a job.  Those employees were allocated to their current

15  employer and the conspirators ceased competing for those

16  employees.

17        THE COURT:  We're talking about senior management

18  people.  They're pretty smart.  They can decide on their

19  own, can't they, if they want to apply for a job with a

20  different company if they think maybe they can use that for

21  negotiating leverage.  We're not talking about, you know,

22  the people that are running the kidney machine.  We're

23  talking about people at Mr. Thiry's level.

24        MR. VIGEN:  Well, Your Honor, with respect, that's

25  only accurate with respect to Count 1.  So Count 1 is

1   limited to senior employees.  Counts 2 and 3 cover employees

2   generally.  I also think, though, that that cessation of

3   competition has actual impact.  So, yes, they could in their

4   busy lives if they wanted to try to look out in the job

5   market and do that, but they no longer receive those cold

6   calls from recruiters that they could use to either -- if

7   they weren't aware of the opportunity, or even if they -- or

8   if they weren't aware of that opportunity and they weren't

9   interested in leaving, they could use that as leverage with

10   DaVita to try to obtain perhaps a raise or a promotion.  But

11   the whole point of this agreement is to cease that

12   competition, stop it in its tracks so that those employees

13   did not get the benefit of that competition so that they did

14   not have to compete over those employees.

15          THE COURT:  I think Mr. Waxman said that you know

16   that a number of management level or lower-level employees

17   have, in fact, despite this agreement moved.  Is that true?

18          MR. VIGEN:  There are examples that we are aware of

19   where that did happen.  But let me use an example from

20   Count 1 of the indictment between defendants and Surgical

21   Care Affiliates.  So in one of the means and methods the

22   recruiter at SCA -- or sorry -- the human resources

23   professional at SCA informed a recruiter that DaVita

24   employees were, quote, off limits to SCA.  So we will never

25   know how many employees at DaVita did not receive a

21-CR-00229-RBJ          Oral Argument          11/19/2021    30

1    solicitation or were informed about that job opportunity.

2    They weren't able to use that to go to their boss to obtain

3    leverage or switch companies because they didn't know about

4    it.  We'll never know how many people were not contacted

5    because of that single e-mail.

6          THE COURT:  Well, maybe that's one thing that you

7    explore in a rule of reason context preparing for trial.

8    You go out and find those people.

9          MR. VIGEN:  Well, Your Honor, respectfully, what

10   has been alleged here is a per se violation, that when

11   competitors who should be competing with each other instead

12   decide to cease competition, that that is a per se

13   violation, and we don't get into that.  And so I do agree

14   with defense counsel -- and this goes back to Your Honor's

15   third question, which is that this is the time to decide

16   this issue.  The indictment either alleges or does not

17   allege a per se violation.

18         THE COURT:  So if I decide that it's a per se

19   violation, in effect, I'm deciding that these people are

20   guilty.

21         MR. VIGEN:  Not at all, Your Honor.

22         THE COURT:  Why not?

23         MR. VIGEN:  Well, so we still have to meet the

24   elements of the Sherman Act.

25         THE COURT:  Which are?

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ          Oral Argument          11/19/2021    31

1              MR. VIGEN:  The elements of a per se crime we have

2    to prove that the agreement existed.

3              THE COURT:  That's not disputed.

4              MR. VIGEN:  I would -- that was the defense's

5    position here and they conceded that first element, but that

6    will be what the Government has to prove at trial, that the

7    agreement existed.

8              THE COURT:  It's undisputed.

9              MR. VIGEN:  That they knowingly entered into the

10   agreement.

11             THE COURT:  They what?

12             MR. VIGEN:  That they knowingly entered into the

13   agreement.

14             THE COURT:  That's obvious.

15             MR. VIGEN:  And that it affected interstate

16   commerce.

17             THE COURT:  Yes.  So if I find it's a per se

18   violation, they're guilty.

19             MR. VIGEN:  If those elements are met, and that is

20   no different than what the United States had to do in *United*

21   *States vs. Kemp* or in the *United States vs. Cooperative*

22   *Theaters.*  All that needed to be proved at trial and which

23   was in Cooperative Theaters' sense is that the agreement

24   existed.  That is where I think we have this fundamental

25   disagreement with defendants that that matters at all.

1                THE COURT:  Okay.

2                MR. VIGEN:  From the beginning of time --

3                THE COURT:  Let's have you show me a case, whether

4     it's a no-poaching case or a non-solicitation-type case, any

5     case where the Court on a motion such as this effectively

6     found the defendant guilty without trial, without an

7     opportunity to defend themselves, nothing.  Show me a case

8     like that.

9                MR. VIGEN:  Well, Your Honor, that is *Kemp*.  So the

10    district court on remand after being informed or instructed

11    by the Tenth Circuit said that the per se rule is going to

12    apply.  That's exactly what happened in *Kemp*.  And it

13    doesn't matter --

14                THE COURT:  So that's what you're hanging your hat

15    on is the *Kemp* case on remand.

16                MR. VIGEN:  Your Honor, it's no different than any

17    other criminal per se case where judges routinely uphold the

18    indictments and allow, for example, price fixing cases to go

19    forward.

20                THE COURT:  Okay.  I'm not talking about what

21    Courts do routinely in price fixing cases, Mr. Vigen.  I'm

22    talking about no-poach cases and non-solicitation cases

23    where you want the Court to say as a matter of law, in

24    effect, you're guilty, and then if I find it to be

25    appropriate, put Mr. Thiry in prison.  I'd like to know what

1  precedent there is for that.

2          MR. VIGEN:  In a criminal labor context, there is

3  -- there is not a case such as that.  This is one of the

4  first cases that we have brought in the criminal context

5  that is a market allocation --

6          THE COURT:  Well, it's the first case if there's no

7  such case.  It's the first case.  I know you've got the SCA

8  case down in Texas.  What's the status of that case?

9          MR. VIGEN:  So that is fully briefed on a motion to

10  dismiss, and there is currently not a hearing set, and it is

11  awaiting a ruling from the judge there.  There's also the

12  *United States vs. Hee* case in the District of Nevada.  That

13  one also recently was just heard on a motion to dismiss, and

14  the judge indicated he would be denying it.  But the fact

15  that this is the first --

16          THE COURT:  Which case?

17          MR. VIGEN:  Hee, *United States vs. Hee*, which is in

18  the District Court of Nevada.  I believe we referenced it in

19  a footnote of our brief.

20          THE COURT:  That's one that I don't remember.  I'm

21  sorry.  You cited quite a few cases.

22          MR. VIGEN:  Fair enough, Your Honor.  Fair enough.

23          THE COURT:  And so the Court indicated at argument

24  that the motion was going to be denied?

25          MR. VIGEN:  He took it under advisement, but

1   indicated that the parties -- that the case should proceed,

2   and I believe indicated he was likely to deny the motion.

3   And that --

4           THE COURT:  So you struck out in Nevada.  You're

5   waiting to hear in Texas.  But right now this is the first

6   case -- or it would be if I go your way, right?

7           MR. VIGEN:  Well, I disagree that we struck out in

8   Nevada.  I think it's that the judge is going to deny the

9   motion to dismiss, but I agree with Your Honor's fundamental

10  -- fundamental point.  But that's no different than the

11  first case that was brought by the United States criminally

12  for customer allocation cases, and this is what *Kemp*

13  teaches, that we're supposed to --

14          THE COURT:  Right.  One of the judges said there

15  has to be a first time.

16          MR. VIGEN:  There has to be a first for everything,

17  Your Honor, and what matters for purposes of due process and

18  for what the per se rule says is what the practice is, and

19  the practice are two employers who should be competing, they

20  should be competing aggressively, but deciding amongst

21  themselves, amongst the CEOs, you know what, it might be

22  best if we don't do that, and it's obvious why that would be

23  good for them, so they can avoid competition.  That's what

24  they're worried about.  It's obvious that they didn't do

25  this to provide more training to their employees.  It's

1   obvious that they didn't do this to protect trade secrets.

2   They know very well how to do that in employment agreements

3   with the actual employee, and that they can have a bargain

4   for exchange with the employee.

5        THE COURT:  What was the case -- it was in

6   California where the companies entered a series of bilateral

7   contracts to not poach, and at one point the executive -- I

8   think it was even Steven Jobs himself -- contacted some

9   company himself and said, Hey, you got to do this, and the

10  guy said, Wait a minute, it's not right, and it's probably

11  illegal.  Forget about it.

12       MR. VIGEN:  Right.  That would be one of the cases

13  from California.  I believe it's the *eBay* case.

14       THE COURT:  But that was a civil case, not a

15  criminal case.

16       MR. VIGEN:  That's correct.  But the Sherman Act

17  can be enforced both civilly and criminally, and the

18  Department of Justice's position is if it is a per se

19  violation we will proceed criminally, as we have here.  And

20  we have determined in our acts of prosecutorial discretion

21  that just as customer allocation agreements are per se

22  illegal, employee allocation agreements are per se illegal

23  and should be treated the same way.

24       THE COURT:  Well, your prosecutorial discretion is

25  if I have an easy win by having the judge call it per se we

1    go home and celebrate, and if we have to do the hard work of

2    proving unreasonable restraint of trade, we're not going to

3    do it.  We'll let someone else worry about it.

4           MR. VIGEN:  With respect, Your Honor, I do believe

5    you have that backwards, which is the Supreme Court has been

6    the one that has interpreted the Sherman Act as being

7    directly applicable in terms of per se agreements being the

8    worst evil violations of the Sherman Act.  So it is the per

9    se agreement that makes it the problem that price fixing,

10   market allocation, bid rigging, those are considered the

11   worst of the worst.  And so that is how the Supreme Court

12   has defined the statute -- or has explained the statute in

13   those contexts, and so consistent with that, the Department

14   of Justice believes that criminal prosecution is appropriate

15   for those types of agreements.  So it's not because we're

16   trying to avoid any type of showing.  It's because they have

17   been declared particularly pernicious by the Supreme Court.

18          THE COURT:  Well, what happens, Mr. Vigen, if I

19   disagree with you, and does that mean that the so-called

20   non-solicitation agreement is fine now?  No one 's going to

21   prosecute it.  No one's going to challenge it.  Because if

22   the Department of Justice isn't, who is?

23          MR. VIGEN:  So if you -- if you disagree with us

24   that it's not a per se violation, then the indictment should

25   be dismissed, and as a matter of prosecutorial discretion,

 1   we do not bring rule of reason cases criminally.  So it

 2   could proceed civilly, or private civil plaintiffs, as they

 3   have here, could sue on their behalf for damages.  But I do

 4   believe that there is a very important issue here, which is

 5   it is the policy of the Department of Justice to prosecute

 6   per se violations criminally.  We should be allowed to do

 7   that.  And this is a per se case.  This is an agreement

 8   between two competitors who have ceased competing over

 9   employees in some respect --

10        THE COURT:  When the judge in Nevada signaled that

11   he or she was going to deny the motion to dismiss, did that

12   judge explain what the reasoning was for that decision or is

13   that to be disclosed in some written document not yet

14   issued?

15        MR. VIGEN:  Right.  So I don't want to get too far

16   ahead of my skis in terms of relying on the Hee case.  It

17   did involve allegations of both wage fixing and no hire.  It

18   was a single count alleging suppression of competition in

19   the labor market based off of those two -- their sub

20   agreement.  So I don't want to overplay in terms of that

21   authority, but I do believe --

22        THE COURT:  So it was a different kind of an

23   agreement, you're saying.

24        MR. VIGEN:  At the end of the day it's the same

25   theory in terms of two horizontal competitors reaching a

1  naked agreement not to compete.  It doesn't matter if they

2  agree on wages.  It doesn't matter if they agree not to

3  hire.  It doesn't matter if they agree not to solicit.  That

4  suppressed competition, and there is no procompetitive

5  justification under the per se rule that can take them out

6  of the per se rule.

7        The reason for that is exactly -- when we talk

8  about naked allocation agreements.  I think Your Honor was

9  on to something there with the ancillarity issue.  You can

10 have an agreement among competitors not to compete in some

11 way, but the only thing that would save that is if it was

12 subordinate and collateral to a legitimate business

13 collaboration that those defendants have, and if the

14 agreement was necessary to further that legitimate business

15 collaboration.  So these cases that the defense cites about

16 business contexts, those cases when you actually look at

17 them arise in that type of context where there is some other

18 procompetitive business collaboration or vertical

19 relationship which the Supreme Court has acknowledged is a

20 different analysis than horizontal agreements.  That's the

21 business context they're talking about there.

22        There is no business context here that should save

23 an agreement amongst employees not to compete for employees.

24 What that is is an argument that they should be excepted --

25 they should have an exception for employer collusion under

1    the Sherman Act.  That's really what they're arguing.  And

2    if that's their argument, they need to go to Congress.  They

3    need to ask for an exemption.  And the Chamber of Commerce

4    can lobby Congress and ask for that.  But the Supreme Court

5    made clear in *Maricopa County* that if the practice is per se

6    illegal, it doesn't matter if it arises in a new market.

7    You don't consider the procompetitive justifications, and

8    the Tenth Circuit followed that in *Kemp*.

9          So if there was ever a business context perhaps

10   where you could avoid the per se rule it might have been the

11   heir location services or it might have been in *Maricopa*

12   *County* where doctors were fixing a maximum fee.  And the

13   Supreme Court said, We don't care that you're in the

14   healthcare industry or that you're doctors.  It doesn't

15   matter.  It doesn't matter if you don't have experience with

16   that.  And the Supreme Court said, You might be right,

17   Doctors.  Maybe -- maybe you are right that a full

18   examination of the rule of reason would prove the price

19   fixing there to be reasonable, because they argued that we

20   actually advanced consumer benefits by allowing better

21   insurance options.  The Supreme Court said doesn't matter.

22   What we have done is declared certain practices per se

23   illegal, and that we do not double guess that it arises in a

24   new context.  All of their cases about business context

25   relate to an entirely different situation, not naked

1    agreements among horizontal competitors not to compete.

2          I do want to spend a moment, if I could, on your

3    second question, which is is an agreement --

4          THE COURT:  Well, what's the answer to my first

5    question?

6          MR. VIGEN:  The answer to your first question, I

7    should have been more clear, I believe I was trying to

8    articulate this entire time which is, yes, a no-poach

9    agreement, a no-hire agreement, however you want to put it,

10   is a per se market allocation.

11         THE COURT:  And you rely on what case for that

12   argument?

13         MR. VIGEN:  So we rely on the district court cases

14   that we've cited in our brief, which themselves rely --

15         THE COURT:  I'm asking you what is your case, what

16   is your best case to answer yes to question number one.

17         MR. VIGEN:  So that is In re Railroad, and the

18   reason why that's the best case, that involved a no-poach,

19   no-hire.  But the Court there I believe in a very reasoned

20   way explained why a no-poach agreement is a market

21   allocation agreement, and that case even cites *Kemp* in

22   support of that question, because at bottom what's happening

23   here it is a naked allocation agreement between two

24   employers that should be competing who are agreeing not to

25   compete in some way.  That's what In re Railroad explains,

1    using these market allocations cases to explain why the

2    practice is per se illegal and that there is no labor market

3    exception.

4            THE COURT:  Was that a criminal case?

5            MR. VIGEN:  That was not a criminal case, but it

6    doesn't matter.  It is the practice that's declared per se

7    illegal, whether it's civilly or criminally, and once it's a

8    per se practice, that is a charge that we will pursue

9    criminally.

10           THE COURT:  Well, it might matter to this Court

11   because the rights that a defendant has in a criminal case

12   are rather different than the rights that a defendant has in

13   a civil case.

14           MR. VIGEN:  So I believe even if we didn't have In

15   re Railroad or *eBay* where the United States brought a civil

16   per se case and these district court cases upheld the per se

17   treatment or the per se allegation, and even if there wasn't

18   *United States vs. Cooperative Theaters* where they held that

19   a customer non-solicitation agreement was per se illegal in

20   a criminal context, even if there wasn't *Roman* in the Tenth

21   Circuit that said a no-poaching agreement was,

22   quote/unquote, an illegal agreement, even if we did not have

23   all those cases, this would still be a per se illegal market

24   allocation that defendant had fair notice of.

25           And that goes all the way back to *Addyston Pipe*

1   through to at least *Topco* where the Court has explained what

2   you can't do is have a naked agreement with your direct

3   competitor to stop competing in some way.  That is what

4   provided reasonable notice to the defendant here.  And as

5   Your Honor rightly noted, there's a first time for

6   everything.  That doesn't mean that the principals here have

7   not remained the same from the very beginning, and that is

8   why we're proceeding this way and the motion should be

9   denied.

10          So if there's not anything further on that, I do

11   want to talk about this distinction between no-hire

12   agreements and non-solicitation agreements.

13          THE COURT:  Well, I'm still on the first question.

14   Has the Government filed a per se criminal case on a

15   no-poaching contract other than this case?

16          MR. VIGEN:  In the labor market other than this

17   case and SCA and Hee, these are the first.

18          THE COURT:  Other than this case, SCA --

19          MR. VIGEN:  And Hee.

20          THE COURT:  And Hee in Nevada.

21          MR. VIGEN:  Criminally in the labor market these

22   are the first ones.

23          THE COURT:  So this -- this must be something new

24   for the Government because these types of agreements have

25   existed before.  Why are you now for the first time filing

1    these criminal cases and alleged per se violations?

2         MR. VIGEN:  So two answers to that, Your Honor.

3    One, I believe, as you might see in the district court

4    cases, you see an uptick in these civilly.  So we start with

5    the *High-Tech* case, *eBay*, Railroad.  Those are the cases

6    that are presenting these per se questions civilly, and so I

7    don't know if -- necessarily know that I agree with you that

8    if these type of agreements had existed for a long time that

9    folks were aware of them to try to root them out.

10        THE COURT:  Well, I guess I don't know that either,

11   to be honest.  I don't know when somebody came up with the

12   bright idea of having these no cold call, no-poaching,

13   no-hire agreements.  I didn't realize that that was some new

14   phenomena, but people are creative, and they come up with

15   things.

16        MR. VIGEN:  And then my second response to your

17   question would be to look at *United States vs. Cinemette*, a

18   movie theater case where for a long time this was out in the

19   open.  These movie theaters had agreed called -- they're

20   called split agreements -- had agreed not to compete for the

21   movie theaters distributing their movies.  So in a market

22   they would decide I get the X-Men movie and you get the

23   Wonder Woman movie, and so they would divide the market that

24   way.  And for a long time -- the *Cinemette* case explains the

25   defendants' arguments there -- those were not viewed as

1   illegal, or the United States Department of Justice did not

2   pursue them that way.

3          And, in fact, the defendants argued there that they

4   actually received a letter from the Department of Justice

5   saying that the Department of Justice would treat those

6   civilly, and the Court there said it didn't matter with

7   respect to due process.  The United States Department of

8   Justice did not need to proceed civilly first and rack up

9   per se wins in that context.  That it was a straightforward

10  agreement not to compete, and that's per se illegal, and you

11  had notice of that from those other cases even though there

12  weren't prior split agreement cases and even though this was

13  the first criminal split agreement case.  The Court there

14  said it didn't matter for due process reasons, and that's

15  because all that needs to be true for there not to be a

16  violation of due process is that the law was reasonably

17  clear that the conduct was criminal.  So what we believe was

18  reasonably clear here based off the judicial decisions is

19  that you can't agree with your horizontal competitor not to

20  compete over the very thing you should be competing over.

21          The other point I don't want to lose here, or

22  before I forget, is this idea that the labor market is

23  special in some way.  There's been no business context

24  that's been advanced by the defendants to believe that's

25  true.  And case after case in the Supreme Court, the Tenth

1  Circuit has held that the Sherman Act applies with equal

2  vigor, and that there's no reason to treat that type of

3  practice that's noncompetition practice any differently.

4          I don't know if Your Honor had any other questions

5  on the prior point, your first question, but I would like to

6  move on to the second question, if that's appropriate.

7          THE COURT:  Yeah, sure.

8          MR. VIGEN:  So -- and that is whether this sort of

9  non-solicitation practice, if it's equivalent of those

10  no-poaching cases, and I think Your Honor is right to focus

11  on the practicalities of this, and so that's the Tenth

12  Circuit standard for dismissing an indictment that -- you

13  need to look at the practical rather than technical

14  considerations.

15          THE COURT:  If this agreement didn't have the

16  you've-got-to-tell-your-boss piece to it, if it were simply

17  we won't solicit each other's employees, period, end of

18  agreement, would your position be the same?

19          MR. VIGEN:  Yes, Your Honor.  And so --

20          THE COURT:  So the second piece that seemed

21  significant to me is not to you.

22          MR. VIGEN:  Well, and I hope to clarify for why I

23  believe that to be the case.  So if you look at the market

24  allocation cases, with respect that's what's required to

25  show a market -- a per se market allocation agreement.  The

1   Supreme Court in *Topco* speaks only in terms of minimizing

2   competition.  In *Socony-Vacuum* the Supreme Court rejected an

3   argument as wholly immaterial that the conspiracy did not

4   eliminate all competition.  And there are a number of other

5   examples of the cases we cite in the briefs where the Court

6   applied a per se market allocation rule where competition

7   was only suppressed in some way rather than erased

8   altogether.

9           So we obviously have the *Cooperative Theaters* case

10  where they could still compete over unsolicited business and

11  that the Tenth Circuit relied on in *Suntar.*  But consider

12  *Kemp*.  So by all accounts those heir location services

13  companies competed heavily over finding the first heir.  It

14  was only after that that they agreed to split up the

15  remaining heirs of that estate.  So there was competition in

16  that market to some extent.  All competition in that market

17  did not cease.  Same in *Suntar Roofing*.  They competed over

18  new employees -- or sorry -- new customers.  They only

19  allocated established customers.

20          Or the case out of the Ninth Circuit, *United States*

21  *vs. Brown*, which I think is maybe the most drastic here.

22  Again, a criminal case where they stopped competing for --

23  these are billboard companies that put up billboards on the

24  side of the road, but they actually lease that space from

25  the landowners.  And the agreement was that they would not

1    compete over those leaseholds that had expired, and then

2    only up for a period of one year.  So they competed for

3    leaseholders around the world, around the country, and they

4    competed for leases after that one-year mark.

5            So this distinction that all competition must cease

6    I think is just a red herring in terms of what market

7    allocation -- per se market allocation violations require.

8    But I also think in a very real sense all competition did

9    cease for a segment of this market.  If you weren't looking

10   for a job, and if you didn't want to jump through the hoops

11   that the CEOs decided amongst themselves you should jump

12   through to get an offer, all competition ceased.  And that

13   is what *Midwest* in the Tenth Circuit talks about is the

14   hallmark of a market allocation agreement.

15           And I believe that's why the Ninth Circuit in *Aya*

16   found, quote, considerable merit, unquote, with the

17   antitrust division's position just a few months ago that

18   there was no distinction between non-solicitation and

19   no-hire agreements.  So in footnote three the Ninth Circuit

20   stated, The district court questioned whether the restraint

21   was a no-poaching agreement or a non-solicitation agreement

22   and concluded that it was a non-solicitation agreement.  The

23   United States argues that this distinction is not

24   determinative, and we agree.  But what the United States

25   argued as amicus --

1          THE COURT:  So that whole answer to my question

2  number two was treated in a footnote.

3          MR. VIGEN:  Yes, Your Honor.  That's how the Ninth

4  Circuit decided -- and that was because the Ninth Circuit

5  decided that case on the ancillary restraints doctrine and

6  noted that the no solicitation -- or non-solicit versus

7  no-hire was not determinative, and that's because citing the

8  United States that they agreed with the United States, and

9  that's because in the amicus brief the United States said

10  that there was no difference, that non-solicitation

11  agreements are per se illegal just as no-hire agreements are

12  per se illegal.  That was on page 21 where that was

13  explained more clearly.

14          THE COURT:  If they're per se illegal, then why

15  were they worried about ancillary agreements or effects?

16          MR. VIGEN:  Right.  So in *Aya* what you're talking

17  about is a vertical agreement for nurse -- nurse services.

18  And so one of the defenses to a per se allegation is this

19  ancillary defense, and so the Ninth Circuit held that there

20  because of the vertical nature of the agreement between

21  these two companies, one was subsourcing the other, and in

22  that contract there was a non-solicit agreement, that

23  because that supported the procompetitive venture itself,

24  the vertical relationship itself, that the ancillary

25  restraints doctrine was applicable, and therefore the rule

1   of reason applied.

2          But defendants here have disclaimed any argument of

3   ancillarity.  If they wanted to put on such a defense, just

4   like a murder defendant might put on self-defense, we would

5   go to trial.  The United States would put on its evidence

6   that this was a naked agreement, and they could put on its

7   evidence that, no, this is ancillary to some procompetitive

8   business venture.  We don't believe they're going to be able

9   to do that.

10          THE COURT:  I'm not sure they disclaimed it.  I

11   think they postponed it.

12          MR. VIGEN:  Postponed it.  For purposes of this

13   motion they disclaimed that argument.  And so if they have

14   that defense, it's perceived on the allegation, which is a

15   per se claim, because if it was naked it would be a per se

16   market allocation, and to get it out of that realm and to --

17   as a defense, they would be able -- allowed to put on

18   evidence of ancillarity at trial.  What they can't do and

19   what *Maricopa County* and *Kemp* explained is they can't just

20   put on procompetitive justifications as it relates just to

21   the agreement itself, because in the ancillarity context the

22   restraint needs to be subordinate and collateral to a

23   procompetitive business venture.

24          So they would need to show that.  We don't believe

25   they would be able to show that.  They would need to be able

21-CR-00229-RBJ          Oral Argument          11/19/2021     50

1   to show that the restraint was reasonably necessary to

2   achieving that procompetitive business collaboration, and we

3   don't believe they'll be able to show that.  Because even if

4   there was some -- let's say, one joint venture in Los

5   Angeles between these companies, that wouldn't justify a

6   companywide non-solicitation agreement.  Maybe it could

7   justify in the contract that people you meet on this project

8   you won't solicit, because that would be reasonably

9   necessary to making sure you want to enter into the project

10  to begin with, but it wouldn't justify this agreement as

11  alleged in the complaint, which is a companywide no-solicit

12  agreement.

13          I also want to talk for a moment, if I can, about

14  their arguments for procompetitive justifications.  So as

15  *Kemp* and *Maricopa County* explained, if the practice is

16  illegal, it doesn't matter that we arrive in a new industry

17  that these practices are being confronted, at least for a

18  judicial decision, for the first time in a new industry like

19  the labor market.

20          THE COURT REPORTER:  Can you slow down a little,

21  please.

22          MR. VIGEN:  Yeah, sure.

23          THE COURT:  You've got plenty of time left, so you

24  can relax.

25          MR. VIGEN:  I see your note here.

                        Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ          Oral Argument          11/19/2021   51

1          THE COURT:  Why don't you read that note out loud.

2          MR. VIGEN:  Just speak nice and slow, and nobody

3    gets hurt.

4          THE COURT:  That was the court reporter's note, by

5    the way.

6          MR. VIGEN:  I appreciate it.  Thank you.  So if the

7    practice is per se illegal, *Maricopa County* and *Kemp* teach

8    that the procompetitive justifications have no role.

9    They're not cognizable.  They should not be considered at

10   all.  But I do want to explain why that's the case

11   particularly here, and how these have been rejected --

12   similar arguments have been rejected in per se cases, but

13   first I want to back up and provide sort of an analogy here.

14          So in some sense market allocations are efficient,

15   all right?  Let's take the example of two private trash

16   collection companies, and they agree classic *Topco*

17   territorial market allocation.  You take west of I-25.

18   Company B takes east of I-25.  The per se rule would say

19   that that is illegal.  If the United States discovered that

20   here in Denver we would bring a per se -- after requisite

21   approval and grand jury approval -- we would bring it as a

22   per se case.  Their lawyers could not show up to court and

23   say, well, we shouldn't be treated as a per se rule strict

24   liability, show up to court, prove the agreement, and we go

25   to jail.  We should be able to show that this allocation is

1    procompetitive, that it has some efficiencies.

2           So Company A on the west side of town can center

3    their trash trucks on the west side of town.  Doesn't have

4    to cross I-25.  They can get to the houses faster.  They can

5    take shorter routes, which means they can charge the

6    customers less.  It's way more efficient to allocate the

7    market that way.  And there're great lawyers who can show up

8    and make those procompetitive arguments, but they would be

9    rejected.  They would be laughed out of court, and I think

10   the same type of arguments are being made here to justify a

11   naked agreement among competing employers not to compete.

12          So take training and opportunities.

13          THE COURT:  Well, I don't know if this is a naked

14   agreement or if it's just partially clothed.  That's my

15   second question.

16          MR. VIGEN:  What we talk about in terms of naked is

17   it's not collateral to a procompetitive business venture.

18   That's what that means, that it's not ancillary to something

19   that actually would be potential for benefits to the

20   consumer.  That's what that means in term of naked.  It's

21   not tied to anything else.  It's two CEOs getting together

22   in a room and deciding how they'll compete with each other.

23   And *Cadillac Overall Supply Company*, a case out of the

24   circuit rejected sort of an analogous argument in the sale

25   of goods context with regard to capital investment.  Found

1   that customer allocation there was per se illegal.  The

2   defendants raised this argument that, well, the garment

3   industry is a little unique because these aren't

4   off-the-shelf garments.  We need to retool our looms every

5   time that we get a new customer, so we have to put a lot of

6   money into retooling that and invest in those customers, and

7   so we should be able to keep those customers.  It's way more

8   efficient for us to do so.  And the Fifth Circuit said, no,

9   this is a per se case.  Those type of agreements aren't

10  cognizable because in every sense putting capital at risk is

11  how you compete, so you can't just rely on the agreement

12  itself as a procompetitive justification.  And the *Deslandes*

13  Court, the district court opinion dealing with a no-poach or

14  no-hire agreement in a franchise context, made the same

15  point.  Quote, every employer fears losing the employee that

16  is trained.  Employers have plenty of other means to

17  encourage their employees to stay without resorting to

18  unlawful market division.  Those options include paying

19  higher wages or salaries and contracting directly with each

20  employee to set an employment term.

21          THE COURT:  Well, I think that sounds like the

22  point I was making to Mr. Waxman.

23          MR. VIGEN:  I think that's correct.  What you can't

24  do is agree with your competitor not to compete, and then

25  you can't use that agreement to justify, you know, as

1    procompetitive arguments springing forth from that naked

2    horizontal agreement not to compete to justify the agreement

3    in the first place.  That's what *Cadillac* stands for, and

4    that's what my example using the trash collection companies,

5    I believe, tries to explain.

6            I also want to talk about the trade secrets point

7    they make, because I also think it's a very important idea

8    for this Court to understand the distinction between a

9    vertical and a horizontal restraint.  So the cases they cite

10   as a procompetitive justification for the trade secrets,

11   protecting trade secrets, are vertical agreements.  So it's

12   an agreement between an employer and an employee that one of

13   the benefits of that, of not soliciting or having that in

14   that contract is to protect trade secrets.  But that is in a

15   bargain for exchange.  So in exchange for giving up that

16   right, the employee has agreed to that limitation, and

17   defendants are free to make reasonable contracts like that

18   with their employees if they want to retain them or if they

19   want to protect trade secrets.

20           But in reply -- when we make that point in our

21   opposition or reply, the defendants say, well, that doesn't

22   matter that it was in a vertical context.  It was still

23   procompetitive.  That same procompetitive argument should

24   get us out of a horizontal per se agreement to avoid that

25   rule.  But that, frankly, is not the law.  I think the

1    Supreme Court case of *Continental vs. GTE* explains that most

2    clearly, and that's a case cited by defendants in their

3    opening brief, so if I can just take a moment to explain

4    that distinction.

5            So in that case there was a vertical restraint, a

6    vertical territorial restraint.  So a manufacturer of TVs

7    had identified retailers that it wanted to sell those TVs,

8    but very much like a franchise context, split them up by

9    territory, and they could only sell in their territory.  So

10   they sold to these retailers, and they could only sell in

11   their territory.  And the Supreme Court said because this is

12   vertical, there can be procompetitive justification for

13   that.  It allows for investment in these retailers, to

14   educate the consumer about the benefits of these TVs that

15   the manufacturer thought had a better quality, and it avoids

16   the free rider problem.

17           But the Supreme Court noted at footnote 28 that

18   there's no doubt that restrictions -- if those same

19   territorial restrictions had existed between the retailers

20   directly among themselves, there was no vertical element to

21   this agreement, there would be no doubt that that would be

22   illegal per se, and all of those procompetitive

23   justifications would not be heard because they can't spring

24   from the actual horizontal agreement itself.

25           And then finally I want to talk about this bidding

1   war example, and I think it also ties back in with what I

2   had been saying about the difference between

3   non-solicitation and no hire.  So, first of all, this idea

4   that it could spring a bidding war is outside the four

5   corners of the complaint, but very -- in a very real sense

6   there was no bidding war for employees who were never

7   solicited.  Those are the employees, and those employees who

8   refused to jump through the hoops that the CEOs decided they

9   needed to jump through before they had the benefit of some

10  sort of competitive process, there was no bidding war for

11  those people.

12          And, in addition, those employees, had they had an

13  offer, could always choose to go to their employer to

14  disclose that at a time and choice of their choosing.  And

15  in the reply they say, well, it might have spurred some

16  people on that otherwise might have done that.  That's

17  awfully paternalistic.  It's up to the employee to decide

18  when to do that, and our free market decides on individuals

19  making choices for themselves.  Employers who are supposed

20  to be competing with each other making the choice to compete

21  to provide a solicitation by themselves, not agreeing with

22  their competitor to stop that activity, to minimize

23  competition, and to cease competing over employees who are

24  not actively looking or who would not jump through their

25  hoops.

1          So for that reason, Your Honor, if you have no

2    further questions, I would ask that you deny the motion to

3    dismiss.

4          THE COURT:  Thank you.

5          MR. WAXMAN:  Your Honor, of course I'm up here

6    first and foremost to answer questions that you have, but

7    let me just make a few responses to Mr. Vigen's submission.

8    Mr. Vigen has cited -- has taken us through the Bataan Death

9    March of every case cited in his brief, and I'm not going to

10   reciprocate.  We've said what we have to say about the cases

11   they're relying on.  They've said what they have to say

12   about the cases we're relying on.  It's perfectly obvious

13   from this argument that Your Honor has read those cases and

14   will read those cases again.

15         They have made in large part lots and lots of

16   arguments about why the agreements that are alleged in this

17   complaint, and, you know, Mr. Vigen is quite right that the

18   agreement alleged in Count 1 is for senior level executives.

19   In Counts 2 and 3 it's for employees.  Interestingly, he

20   didn't mention that Counts 2 and 3 don't actually even

21   allege a bilateral undertaking.  They just allege a promise

22   by one of the two employers that it will not actively

23   solicit employees of the other without any reciprocity.

24         But the point here is that the Courts are open for

25   decision about whether non-solicit, as they call it naked

1   non-solicit agreements with a provision -- with or without a

2   provision that basically requires notice for employees who

3   are thinking about or have decided to move prior to actually

4   moving could be illegal.  Maybe under the circumstances,

5   maybe if it involved a real market that is a market under

6   the antitrust laws, and they could prove that those types of

7   agreements inevitably substantially and thoroughly restrain

8   trade, and that the argument that we're having back and

9   forth where I say there are plausible procompetitive

10  benefits, they say they're implausible, that's not -- you

11  don't have to decide now whether on balance, you know, in

12  the absence of this -- of these non-solicitation agreements

13  some executive might have -- some company might have

14  actually solicited another executive who wouldn't exercise

15  her or his own initiative to look for better employment.

16          If we have a rule of reason trial where they have

17  the burden to prove that there are, in fact -- plausible or

18  not -- there are, in fact, procompetitive benefits that

19  suffice to overcome the substantiality of the restraint of

20  trade in a relevant market, then we're going to lose at

21  trial.  But the fact that -- I mean, just looking at my

22  friend's answer to your question one, he says his best case

23  is In re Railroad -- Railway Employees Association.  Again,

24  if that's his best case for a pure non-solicitation

25  agreement, then it seems to me that the correct answer to

1    your question number one, which is is what is alleged here a

2    no-hire agreement and does -- do no-hire agreements violate

3    the antitrust laws, again, if we're talking about a pure

4    no-hire agreement, which we are not, but hypothetically if

5    we were, what you will find in the case law is some civil

6    cases saying, yes, you know, we've considered all the

7    evidence and this did violate the antitrust laws, and you'll

8    find some cases that say, no, this no-hire agreement didn't

9    violate the antitrust laws.

10          That fact, the existence of that state of the case

11   law precludes per se treatment much less per se treatment in

12   a criminal case.  If the case law is not clear, if long

13   judicial experience does not demonstrate a judicial

14   consensus that a particular kind of agreement is so

15   thoroughgoingly anticompetitive and devoid of procompetitive

16   justifications in the real world, then it's appropriate for

17   some Court to say I'm going to allow the plaintiff to

18   proceed under a per se theory.

19          Now, the Government basically says, well, just look

20   at *eBay*, just look at *High-Tech*, just look at *Cinemette*,

21   just look at *Roman*, well, *eBay*, which was a civil case,

22   which was a straight-out no-hire agreement, the Court in

23   that case said that it's not making a decision about whether

24   per se treatment is appropriate or not.  It is going to

25   permit discovery, and we'll take this up under -- you know,

1  at summary judgment, which, of course, is not an option

2  that's available to you, and subject to Rule 11 a civil

3  plaintiff can allege whatever it wants, but the Government

4  under the Fifth Amendment can't allege whatever it wants.

5          It is the grand jury that has to allege, and the

6  grand jury has to be instructed as to what the elements of

7  the crime are and what evidence there is to support probable

8  cause to believe that crime was submitted.  Now, neither you

9  nor I know what is in the grand jury transcript, but there

10  is nothing in this indictment to suggest that any member of

11  the grand jury was told what the elements of the Sherman Act

12  were or what the Government's evidence was as to what the

13  relevant market was, why the alleged procompetitive benefits

14  aren't, you know, et cetera, et cetera.

15          THE COURT:  I can imagine the grand jury's heads

16  were swimming if they heard these kinds of arguments.

17          MR. WAXMAN:  Well, you know, I would say that it's

18  highly unlikely -- in our system of prosecutorial -- of

19  adversary justice the grand jury is never -- I would say as

20  currently now a defense lawyer, sadly the defendant is never

21  -- the grand jury is never given the benefit of an argument

22  pro and con.  All it has to find is, okay, I know what the

23  elements are.  I've heard the prosecutors show me evidence

24  that there is some evidence to support each of the elements.

25  We find probable cause.

1       So -- but so the *eBay* case, no decision that it was

2  per se.  It was a flat-out no-hire agreement.  The *High-Tech*

3  case, which I think Your Honor was -- it was the case that

4  Your Honor was asking about, the do-not-cold-call case, I

5  mean, that was a case, first of all, that was not just do

6  not solicit.  It was also we will not compete on

7  compensation.  That is we won't engage in what happened

8  between these companies, which is a bidding war.  It was an

9  alleged conspiracy -- I'm quoting from the complaint -- I'm

10  quoting from the opinion -- to fix and suppress employee

11  competition and to restrain employee mobility.

12       And saliently for precedential purposes, the

13  defendants in that case didn't even argue that the agreement

14  didn't actually allocate the market or that it wasn't

15  otherwise subject to per se treatment.  The only argument

16  that the defendants were making is that they lacked

17  sufficient market power, and the Court's only statement was

18  -- at the motion to dismiss -- what's alleged is a per se

19  crime, you're not disputing that at this time, and if

20  something is a per se crime the Government -- the plaintiffs

21  don't have to show market power.  The Court said this

22  complaint survives a motion to dismiss because, quote, all

23  parties agree that the per se issue needs to be resolved

24  after discovery and briefing on summary judgment.  The Hee

25  case which the Government has now talked about --

1            THE COURT:  That was why I asked do I need to

2     decide this at this stage, and both sides said, yes, you do.

3            MR. WAXMAN:  So I think you certainly do, because

4     there is no -- let me put it this way.  If it wasn't for the

5     defect in the indictment itself, if you had an indictment in

6     this case like the indictment in *Aya*, which didn't allege

7     just this is a per se -- this is a per se crime, period, it

8     alleged that this was a violation of the Sherman Act and

9     left for subsequent argument between the parties before the

10    judge whether the Government could proceed under a per se

11    theory or not, if we had that indictment in this case, that

12    is not an indictment that commits to per se, you could say

13    that's fine.

14            As a matter of -- we'll have a trial.  At that

15    trial the jury will be the trier of fact, but if the

16    Government wants to proceed under a per se theory, as a

17    matter of law, I have to conclude that this was actually a

18    genuine allocation of a recognized antitrust market with no

19    countervailing procompetitive benefits.  Otherwise, I will

20    force the Government to submit the case to the jury under

21    the standard Sherman Act here are the elements, the

22    Government has the burden, et cetera, et cetera.

23            So you -- the consequence -- you have to decide now

24    whether you're going to allow them, and Mr. Vigen has been

25    quite candid about the fact that if you allow them to pursue

1    -- to go forward under a per se theory, they're going to

2    argue that our evidence that this wasn't, you know -- this

3    didn't actually allocate markets, that the market here is

4    not the market for -- even the market for healthcare

5    services, that we didn't have -- that there are

6    procompetitive benefits, et cetera, none of that -- under

7    their theory, none of that goes forward.  And so that's why

8    the decision at this point has to be made, and why it's so

9    freighted with significance.

10           If you deny their motion, they can go to the grand

11   jury, instruct the grand jury properly, and have the grand

12   jury come out and say, The grand jury alleges that this is a

13   crime under the Sherman Act because it, and then just recite

14   all the elements of the crime, and we could have a trial.

15   But they don't have that here, and they've told you that

16   they aren't going to proceed civilly if they have to proceed

17   under the rule of reason.

18           Now, as Mr. Vigen pointed out, of course they could

19   do what has always been done so far under this, quote, new

20   phenomenon, either of these employer agreements which cannot

21   possibly be new, but if they are it further demonstrates

22   there's no long judicial experience with them, they can --

23   they can put on evidence to prove what they are insisting to

24   you today, which is this was an agreement not to compete,

25   and agreements not to compete are per se illegal.  I can't

1   think of how many times Mr. Vigen said that.

2           Agreements not to compete are the essential

3   allegation of every Sherman Act case, civil or criminal,

4   under the rule of reason, the quick look per se, or

5   whatever.  Just because the Government says and might even

6   be able to prove at trial that something is an agreement not

7   to compete doesn't mean that they get to go through the trap

8   door of a directed verdict.  They are put to their proof.

9   Every complaint under Sherman 1 is there was an agreement

10  not to compete that unreasonably --

11          THE COURT:  Yes, but they're saying that this type

12  of horizontal market allocation agreement is a per se

13  violation.  They're not saying that every agreement not to

14  compete is.

15          MR. WAXMAN:  Right.  And, again, I am trying Your

16  Honor's patience by saying this so many times, that it

17  really is the fundamental issue in this case.  Even if you

18  thought, and I think, with respect, there would be no basis

19  to conclude, that the agreement here is no hire, because, in

20  fact, the indictment says the agreement was no solicit, and

21  the agreement acknowledges in Paragraphs 11 and 19 -- and I

22  can't remember the relevant paragraph in Count 3 -- that

23  employees were free to move, and employers were free to hire

24  each other's employees.  Now, the Government says, Well, you

25  know, maybe there were some executives or employees who

21-CR-00229-RBJ          Oral Argument          11/19/2021    65

1    would have moved if they'd been recruited.

2          THE COURT:  The Government says that as a practical

3    matter it's a no-hire, no-poaching agreement.

4          MR. WAXMAN:  Let them prove it.  And if they can

5    prove it, let them establish that that -- that was an

6    unreasonable restraint of trade.  That's where the facts

7    come in.  Even if this were a pure no-hire agreement, you

8    couldn't possibly allow this to go -- with respect -- of

9    course, you could possibly, but you shouldn't --

10          THE COURT:  I could, but I would be a dummy.

11          MR. WAXMAN:  You could, but you would be -- you

12    would be wrong, in my humble opinion, and I hope in the

13    opinion of the Tenth Circuit.  That even if this is a

14    no-hire agreement, when you look at the long judicial

15    experience with these agreements, you will find two things:

16    Number one, there is no long judicial experience; and,

17    number two, the experience to date is that there is no case

18    holding that such an agreement is entitled to per se

19    treatment, and that the cases are -- and that there's a

20    consensus -- there's no consensus it's entitled to per se

21    treatment and no consensus they're per se illegal under the

22    rule of reason because of the nature of markets and the

23    nature of the plausible procompetitive benefits.  So you

24    couldn't possibly say that long judicial experience allows

25    me to give the Government this essentially shortcut to a

1   conviction, particularly given the notice requirement that

2   is so at the center of the due process clause in criminal

3   cases.

4          Now, the Government says, Well, you know, it's true

5   I've cited a whole lot of cases involving goods or products

6   and not employers and employment agreements, but, you know,

7   the antitrust laws apply the same way.  As I think I said at

8   the outset, the Supreme Court has taught and the Tenth

9   Circuit has taught that what's relevant when you're talking

10  about two different kinds of markets that are both

11  conceivably subject to the Sherman Act, the proprietary of

12  relying on a per se treatment requires a careful examination

13  of the context of the business relations in which the

14  practice occurs.

15         We can't have -- and I suppose in front of Your

16  Honor we've had a lively debate about whether or not in the

17  real world a company's investment in training its

18  executives, in disclosing to executives trade secrets is or

19  is not on balance procompetitive, but the notion that what

20  one Court has said in the context of a goods market in which

21  the defense was, well, this agreement to allocate the

22  markets, because that wasn't what was at issue in that case,

23  shouldn't be subject to -- isn't illegal because we had the

24  procompetitive benefit -- had the procompetitive allowing us

25  to have sufficient inventory to meet our customers' needs,

1   and the Court said that's not going to be enough to save

2   this.

3              There is a substantial difference in the way in

4   which companies invest in and the consequence to them if

5   those investments turn out to be either lost, the company

6   doesn't have those talents on a going-forward basis, or

7   worse, they go to the service of a competitor.  Now, the

8   Government can say, Well, if that's the case, you know, you

9   could -- a company could basically have an agreement,

10  require employees to a noncompete clause, which within

11  reason are generally upheld.  This alleged agreement is much

12  less restrictive of trade than a noncompete clause because

13  they can compete.  Walmart doesn't have to train its

14  customers how to decide what product to buy.  It doesn't

15  have to train -- it doesn't have to give its customers trade

16  secrets in order to have them.  If it loses a customer, it's

17  lost the opportunity to get some revenue.  When a company

18  loses an executive, it's lost a major investment in its

19  going-forward ability to compete in the marketplace.

20             Now, there was some mention of the Hee case.  I

21  want to just provide the Court the citation in case, you

22  know, you can find the docket.  It's in the -- it was a

23  criminal case brought in the District of Nevada.  It's

24  number 2:21-CR-00098, and we can provide, if the Court

25  wishes -- and provide to the Court and the Government right

1   after this hearing an electronic copy of the transcript of

2   that argument in which I can assure you that the judge did

3   not say she was denying the motion, and -- or he, I'm sorry

4   -- he, that is the judge, and you will see that that was --

5   I think as the Government admits a very, very different

6   case.  I mean, it was a case that is flat-out no hire and

7   wage fixing.

8          THE COURT:  When was that case argued?

9          MR. WAXMAN:  A couple of weeks ago.  The indictment

10  -- as Mr. Vigen says, the indictment alleges that there was

11  a flat-out no-hire agreement that fixed wages of the

12  employees.  Neither of those is characteristic here, but,

13  you know, I think the actual oral argument colloquy is -- I

14  mean, if you're looking for a broad level education we can

15  provide you a copy of the transcript.

16         Finally, I'll just say I think you either asked or

17  somehow it came up -- in any event, it's in my notes -- have

18  Courts actually dismissed complaints or indictments that

19  proceeded under a per se theory because per se wasn't

20  appropriate.  You only have to look -- if you just want to

21  stay in this circuit, you only have to look at the Tenth

22  Circuit's decision in *Diaz* and *Cayman Exploration* which did

23  both of those things.  I mean, there are many, many cases

24  around the country, including a case I argued in the Third

25  Circuit long ago, which is cited, called *In re Insurance*

1   *Brokerage Industry*.  But, yes, Courts have said the

2   allegation here is pure per se.  The complaint doesn't

3   allege facts that could plausibly support per se illegality,

4   therefore it's dismissed.

5          Now, it is true that I can't cite you a criminal

6   case in this context because this is the -- as the

7   Government alleges, this is the first case -- this is among

8   two -- its companion case in the Northern District of Texas

9   are the first two cases in which they've even asked for in

10  any context the per se -- in the criminal context the per se

11  treatment here.  But what I can say is I think it's because

12  if you look at the case -- the criminal cases that the

13  antitrust division has brought over the decades, I would

14  venture to say that 90 percent of them at least are naked

15  bid rigging and price fixing cases that are not at issue

16  here.  There's nothing like what's at issue here.  It

17  doesn't involve the slightest inquiry into what the relevant

18  market is, you know, et cetera, et cetera.

19         Here their allegation is that what's alleged in

20  this indictment is an allocation of markets.  The definition

21  of what the market is and proof that the market was actually

22  allocated in an antitrust sense so as to preclude

23  competition is the very nature of the category that they're

24  simply asserting ipso facto exists.  And so I stand again by

25  my earlier submission that, you know, if Kent Thiry and

21-CR-00229-RBJ          Oral Argument          11/19/2021    70

1   DaVita's general counsel Kathleen Waters, who's also here,

2   had taken a year off, if they had become Areeda and

3   Hovenkamp on antitrust law, they would not have found a

4   single case ever that had found that the agreements of the

5   nature -- agreements of the nature charged in the indictment

6   were ever -- have ever even been found to be illegal, nor

7   have they ever previously been subject to per se treatment,

8   and therefore the notion that there would be no notice to

9   Mr. Thiry that if he signed such an agreement he would be

10  ipso facto guilty, that's it.  He voluntarily signed such

11  agreement, therefore you are guilty of a crime is an

12  apostasy under the Constitution.  Thank you.

13          THE COURT:  Thank you.  Mr. Vigen, you didn't use

14  all your time.  Mr. Waxman did.  Do you want to say anything

15  further?

16          MR. VIGEN:  No, Your Honor.  Thank you very much.

17          THE COURT:  All right.  The case will stand

18  submitted.  Thank you all.  Good day.

19          THE COURTROOM DEPUTY:  All rise.  Court is in

20  recess.

21      (The proceedings were concluded at 10:48 a.m.)

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

1                           REPORTER'S CERTIFICATE

2

3             I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10            Dated this 22nd day of November, 2021.

11

12

13

14            _____/s/ Sarah K. Mitchell_____

15                    SARAH K. MITCHELL
                     Official Court Reporter
16            Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR