1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLORADO

3
   Criminal Action No. 21-CR-00229-RBJ
4

5    UNITED STATES OF AMERICA,

6           Plaintiff,

7           vs.

8    DAVITA, INC., and KENT THIRY,

9           Defendants.

10   ----------------------------------------------------------------

11                        REPORTER'S TRANSCRIPT
                            *James* Hearing
12
     ----------------------------------------------------------------

13
             Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Judge, United States District Court for the District of
     Colorado, commencing on the 24th day of February, 2022, in
15   Courtroom A902, United States Courthouse, Denver, Colorado.

16                            APPEARANCES

17   For the Plaintiff:
     MEGAN S. LEWIS and SARA M. CLINGAN and ANTHONY W. MARIANO,
18   U.S. Department of Justice, 450 5th St. N.W., Washington, DC
     20530
19
     For the Defendants:
20   JOHN F. WALSH, III, WilmerHale, LLP, 1225 17th St., Ste. 2600,
     Denver, CO 80220
21
     THOMAS MELSHEIMER, Winston & Strawn, LLP, 2121 North Pearl
22   St., 9th Floor, Dallas, TX 75201

23   JOHN C. DODDS, Morgan Lewis & Bockius LLP, 1701 Market St.,
     Philadelphia, PA 19103
24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
                  Denver, CO 80294, 303-335-2108
           Proceedings reported by mechanical stenography;
                 transcription produced via computer.

21-CR-00229-RBJ          *James* Hearing          02/24/2022   2

1                            I N D E X

2    GOVERNMENT'S WITNESS                              PAGE

3    LAURA TIMENS

      Direct Examination By Ms. Clingan                8
4      Cross-Examination By Mr. Walsh                   60
       Cross-Examination By Mr. Melsheimer              84

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022      3

1                  *        *        *        *        *

2        (The proceedings commenced at 9:00 a.m.)

3              THE COURT:  This is 21CR229, United States versus

4    DaVita, set for a *James* hearing.  Would you go ahead and

5    enter your appearances and indicate who's going to be

6    doing the presentation.

7              MS. CLINGAN:  Good morning, Your Honor.  Sara

8    Clingan for the United States.  I'll be presenting for the

9    United States this morning.  And joining me at counsel

10   table are my colleagues from the antitrust division

11   Anthony Mariano, Assistant Chief Meg Lewis.  And we're

12   very fortunate to have two paralegals with us this

13   morning, Mary-Peyton Baskin and Ruth Teklu.

14             THE COURT:  Thank you.  And, Ms. Clingan, you're

15   going to be doing the oral today?

16             MS. CLINGAN:  That's correct, Your Honor.

17             THE COURT:  For DaVita, please.

18             MR. WALSH:  Good morning, Your Honor.  John Walsh

19   for DaVita, and I have with me Kathleen Waters, who is the

20   chief legal officer of DaVita as client representative,

21   and also Mr. Jack Dodds representing the company.  I'll be

22   doing the presenting on behalf of DaVita.  Mr. Melsheimer

23   will be presenting on behalf of Mr. Thiry, and we've

24   divided up topics.

25             MR. MELSHEIMER:  Your Honor, may it please the

21-CR-00229-RBJ      *James* Hearing         02/24/2022    4

1   Court, Tom Melsheimer.  Mr. Thiry is also here as well.

2          THE COURT:  Right.  Now, Julie, our courtroom

3   deputy, informed the Court just minutes ago that the

4   Government's plan is for a two-and-a-half-hour

5   presentation.  That literally will not work, so let's talk

6   logistics a minute before we jump in.  You set this case

7   for a half a day.  That's what you requested, and that's

8   what we set.  You've got a trial set on March 28th for

9   three weeks.  Here's what the Court's schedule is between

10  now and then.

11         After this morning, I have a complete afternoon

12  of hearings today.  I've got a completely booked day

13  tomorrow.  Monday I resume a bench trial -- no -- Monday I

14  have criminal hearings all day long.  Tuesday I resume a

15  civil bench trial.  Wednesday will be the civil bench

16  trial.  Thursday we're interrupting the bench trial

17  because you have set a half-day motions hearing on

18  Thursday.  By my count you've got some 18 motions pending,

19  plus you have just submitted proposed jury instructions.

20  I suppose you think that we can get through all of that in

21  half a day.  But that's what you set.

22         Friday I'm back in the civil bench trial.  Monday

23  I start a three-week civil jury trial concerning the

24  protests that arose out of the George Floyd incident.  And

25  then following that three-week trial I start your trial.

1    I'm telling you that if you seriously intend to go to

2    trial on March 28th, what I've got available for pretrial

3    purposes for you is this morning and next Thursday

4    morning.

5            MS. CLINGAN:  Understood, Your Honor.  So we are

6    ever mindful of the Court's schedule.  I think that we can

7    actually get through our presentation this morning pretty

8    quickly so that we can conclude today's hearing in the

9    time the Court has generously allotted.

10           THE COURT:  I want you also to understand that

11   what judges do in the courtroom is not even half of what

12   judges have to do.  For example, today.  You wanted a

13   *James* hearing.  A *James* hearing basically has two points

14   to it.  One, to force the Government to identify the

15   statements that it hopes to admit through the

16   coconspirator exception of the hearsay rule; and, second,

17   then to try to determine which of those statements is

18   going to be admitted, so notice and then decision.  Here

19   the Government has offered 161, something like that,

20   statements, and the defendant is claiming that not a

21   single one is admissible.  That isn't a terribly helpful

22   approach to a Court .

23           But assuming just for the sake of argument that

24   you are expecting the Court not only to determine that for

25   this purpose a conspiracy exists, that the declarants were

1    members of the conspiracy, and that the acts were in

2    furtherance of the conspiracy, but, indeed, to apply all

3    of that 161 times, now when do you suppose I'm going to

4    find time to do that?  Look at this courtroom, folks.

5    What do you see?  You see teams and teams of lawyers.

6    Now, look at our side.  What do you see?  One judge and

7    two law clerks.  Now, figure out the practicalities of

8    life.  That's what you're facing here.

9            Let's go ahead with our *James* hearing now, and to

10   be fair to both sides, if all we have is today, and you

11   don't want to use your morning next Thursday for this,

12   then I'll let each side have an hour and a quarter.  That

13   may not be what you want.  It may not be what you consider

14   necessary, but it's what I've got if you're going to trial

15   on March 28th.

16           All right.  Ms. Clingan, you may proceed.

17           MS. CLINGAN:  The United States calls Special

18   Agent Laura Timens.  And, Your Honor, while Agent Timens

19   is taking the stand, we have compiled all of the documents

20   that are cited on to our *James* log into a binder, and we

21   premarked them with exhibit numbers that correspond to the

22   *James* log entries.  So, for example, *James* log entry 14 is

23   Exhibit 14.  So with the Court's permission, we'd like to

24   enter those now and tender a copy to the Court.  And if

25   the clerks would like a copy, we're happy to provide them

1   a copy as well.

2          THE COURT:  And I suppose that binder is the,

3   looks like, five-inch thick binder.

4          MS. CLINGAN:  Yes.  If the Court sees the size of

5   the binder and says, oh goodness, we're going to be here

6   all night, we've been mindful of the Court's timing, and I

7   think we can proceed through these documents in a way

8   that's fairly expeditious.  I don't think that it's

9   necessary for us to read each and every document, but

10  simply to supply the Court with sufficient information to

11  determine by a preponderance of the evidence whether or

12  not the elements of 801(d)(2)(E) are met.

13         THE COURT REPORTER:  Could you also please slow

14  down.

15         MS. CLINGAN:  Sure.

16         THE COURT:  Yeah, it's not going to help us for

17  you to talk lickety-split to try to use more time.  It

18  reminds me of one of your former partners.  Actually, one

19  of Mr. Walsh's former partners in one of his earlier lives

20  who, among other things, devised such techniques as print

21  that you couldn't even read because it was so small,

22  margins that basically didn't exist, filing documents at

23  midnight.  All of that has changed in the age of

24  computers, but the point is your presentation has to be

25  something that the reporter and I, frankly, can follow.

21-CR-00229-RBJ        *James* Hearing        02/24/2022      8

1                              LAURA TIMENS

2    was called as a witness and, having been duly sworn, was

3    examined and testified as follows:

4              THE COURT:  Go ahead.  For today's purposes can

5    we assume that the tremendously thick pile of documents is

6    admitted for a limited purpose?

7              MR. WALSH:  No objection from DaVita or -- for

8    the defense.

9              THE COURT:  Thank you.  Done.

10                          DIRECT EXAMINATION

11   BY MS. CLINGAN:

12   Q.  Agent Timens, could you please state and spell your name

13   for the Court.

14   A.  Laura Timens.  L-a-u-r-a T-i-m-e-n-s.

15   Q.  And, Agent Timens, what is your current title?

16   A.  Special Agent.

17   Q.  With what agency?

18   A.  The Federal Bureau of Investigation.

19   Q.  And how long have you been a special agent with the

20   Federal Bureau of Investigation?

21   A.  For approximately five years.

22   Q.  Could you briefly describe for us your educational

23   background.

24   A.  I have a bachelor's degree and two masters' degrees.

25   Q.  Before you were with the FBI, what did you do?

1  A.  I'm a certified public accountant.  I worked for

2  PricewaterhouseCoopers in their advisory services practice.

3  Q.  And in your current role, what do you do?

4  A.  So I'm assigned to a squad that works violations of the

5  Foreign Corrupt Practices Act, kleptocracy, and antitrust law.

6  Q.  Are you assigned to the current investigation?

7  A.  I am.

8  Q.  And what is your role in the current investigation?

9  A.  I was brought on the investigation approximately two

10  months ago to assist in preparing the matter for trial.

11  Q.  Did you personally interview witnesses and review

12  documents relevant to this investigation?

13  A.  I have.

14  Q.  Did you personally collect all of the information to which

15  you will testify this morning?

16  A.  I have not.

17  Q.  Who participated besides yourself in the collection of

18  that information?

19  A.  Other special agents with the FBI.

20  Q.  In brief, could you just summarize what the investigation

21  has revealed.

22  A.  We've revealed multiple conspiracies in the healthcare

23  industry where companies colluded to violate U.S. antitrust

24  law in the form of non-solicitation agreements.

25  Q.  Agent Timens, are you familiar with the superseding

1    indictment in this case?

2    A.  I am.

3    Q.  Could you just give us a quick overview of the companies

4    who are involved in Count 1 of the superseding indictment?

5    A.  Count 1 involves DaVita and Surgical Care Affiliates.

6    Q.  And who does Count 2 involve?

7    A.  DaVita and Hazel Health.

8    Q.  And who does Count 3 involve?

9    A.  DaVita and Radiology Partners.

10   Q.  Are you aware of other conspiracies that the defendants

11   entered into?

12   A.  I am.

13   Q.  And with whom did the defendants enter those conspiracies?

14   A.  IntegraMed and Spectranetics.

15   Q.  Now, to be clear, have you identified other conspiracies

16   but those are the ones that we'll be discussing for purposes

17   of today's *James* hearing?

18   A.  That's correct.

19   Q.  Let's start with Count 1 of the superseding indictment,

20   which I believe you just testified involves a company called

21   SCA.

22            THE COURT REPORTER:  I'm sorry, Counsel.  It's

23   too fast for me.

24            THE COURT:  Take a look at the lectern.

25            MS. CLINGAN:  It says --

21-CR-00229-RBJ        *James* Hearing        02/24/2022   11

1            THE COURT:  What does it say there?

2            MS. CLINGAN:  It says just speak nice and slow

3    and nobody gets hurt.

4    Q.  (By MS. CLINGAN) Agent Timens, were DaVita and SCA

5    competitors for employees?

6    A.  They were.

7    Q.  How do you know that?

8    A.  I see that in the documents we've collected through the

9    course of the investigation, as well as statements made by

10   witnesses during interviews.

11   Q.  Could you just summarize the agreement between the

12   defendants and SCA?

13   A.  In this agreement the two companies agreed not to solicit

14   each other's senior level employees.

15   Q.  What was the goal of the agreement?

16   A.  To keep employees at their current employer.

17   Q.  How do you know about the existence of the agreement?

18   A.  Through documents that we've reviewed and through witness

19   statements.

20   Q.  Could you just give us a high-level summary of how the

21   conspiracy functions in practice.

22   A.  The two chief executive officers of the company agreed on

23   terms.  They then circulated that information to others within

24   their companies and to third-party recruiters as well, and the

25   two sides monitored and enforced the agreement.

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    12

1   Q.  I'd like to walk through the individuals who have been

2   identified as coconspirators for purposes of 801(d)(2)(E), and

3   I'd like to start with Andrew Hayek.

4            MS. CLINGAN:  Your Honor, we have some documents

5   that we're going to put on Trial Director.  I understand

6   we need the Court's permission in order to control the

7   monitor.

8            THE COURT:  Okay.

9   Q.  (By MS. CLINGAN) Agent Timens, let's start with Andrew

10  Hayek.  Do you know who Andrew Hayek is?

11  A.  Andrew Hayek was the chief executive officer of SCA.

12  Q.  Is he referenced in the superseding indictment?

13  A.  He is.

14  Q.  And how is he identified in the superceding indictment?

15  A.  As individual one.

16  Q.  Is he cooperating with this investigation?

17  A.  He is.

18  Q.  What, if anything, has he told you about the conspiracy?

19  A.  He recalled having a number of conversations with DaVita

20  Chief Executive Officer Kent Thiry where they came to the

21  agreement, and he recalled providing instructions to his

22  employees and to recruiting firms regarding the agreement.

23  Q.  And is an example of those types of conversations that

24  Mr. Hayek described with Mr. Thiry set forth in *James* log

25  entry one?

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ          *James* Hearing          02/24/2022    13

1   A.  It is.

2   Q.  Let's talk about the next individual, Dennis Kogod.  Who

3   is Dennis Kogod?

4   A.  Dennis Kogod was the chief operating officer of DaVita.

5   Q.  Is he cooperating with this investigation?

6   A.  He is.

7   Q.  What role, if any, did you determine that Mr. Kogod had in

8   this conspiracy?

9   A.  We see him participating in conversations on how to handle

10  candidates appropriately given the agreement.

11  Q.  Let's take a look at *James* log entry 19, please.  Agent

12  Timens, is this e-mail an example of the type of communication

13  involving Mr. Kogod that you were just describing?

14  A.  It is.

15  Q.  And what does Mr. Kogod advise in this communication?

16  A.  To pass on the candidates from SCA.

17  Q.  And is it clear from this document why Mr. Kogod advises

18  to pass on the candidates from SCA?

19  A.  Yes.

20  Q.  Why is that?

21  A.  Because of the agreement not to solicit each other's

22  employees.

23  Q.  Let's turn to the next individual identified as a

24  coconspirator for purposes of today's hearing, Javier

25  Rodriguez.  Who is Mr. Rodriguez?

1   A.   He was the chief executive officer of DaVita Kidney Care.

2   Q.   Is he identified in the superseding indictment?

3   A.   He is.

4   Q.   What role, if any, did you determine that he had in the

5   conspiracy?

6   A.   We see examples of him enforcing the agreement.

7   Q.   Let's take a look at *James* log entry 23.  Who is this

8   communication between?

9   A.   Dennis Kogod, Kent Thiry, and Javier Rodriguez.

10  Q.   What is Mr. Kogod's question in this communication?

11  A.   So in describing this particular candidate, he comes to

12  the conclusion that the hands-off is not applicable and asks

13  if the others on the communication agree.

14  Q.   And do you have an understanding of what hands-off means

15  in this e-mail?

16  A.   He's referring to the non-solicitation agreement.

17  Q.   And how does Mr. Rodriguez respond?

18  A.   Yes, but still good for KT to make the call.  Good

19  relationship building.

20  Q.   Do you have an understanding of who KT is in this context?

21  A.   Kent Thiry.

22  Q.   Let's turn to the next individual, Bridie Fanning.  Who is

23  Dr. Fanning?

24  A.   She was the chief talent officer at SCA.

25  Q.   Is Dr. Fanning cooperating with your investigation?

1    A.  She is.

2    Q.  What, if anything, did she tell investigators about the

3    conspiracy?

4    A.  She recalled the agreement existing and provided

5    instructions to employees at the company and third-party

6    recruiters relating to it.

7    Q.  Let's take a look at *James* log entry 28.  Is this an

8    example of the type of communication involving Dr. Fanning

9    that you were just describing?

10   A.  Yes.

11   Q.  What is the instruction that Dr. Fanning provides in this

12   document?

13   A.  She says we have an off-limits with DaVita.

14   Q.  And who does she provide that instruction to?

15   A.  Kristen Vosmaer of Cielo.

16   Q.  And who is Cielo?

17   A.  A recruiting firm.

18   Q.  And who is that recruiting firm employed by?

19   A.  SCA.

20   Q.  Do you have an understanding of why it was necessary for

21   Dr. Fanning to inform the recruiting firm about the existence

22   of a, quote, off-limits with DaVita?

23   A.  So that they wouldn't attempt to recruit candidates from

24   DaVita on behalf of SCA.

25   Q.  Let's turn to the next individual, Michael Rucker.  Who is

1   Michael Rucker?

2   A.  He was the chief operating officer of SCA.

3   Q.  What role, if any, did Mr. Rucker have in the conspiracy?

4   A.  He provided instructions to employees and the recruiters

5   on the terms of the agreement.

6   Q.  Is that reflected in *James* log entry eight?

7   A.  It is.

8   Q.  All right.  Let's turn to the next individual, Christian

9   Ellison.  Who is Mr. Ellison?

10  A.  He was an executive with SCA.

11  Q.  What role, if any, did he have in the conspiracy?

12  A.  We see an example of him policing the agreement.

13  Q.  Let's take a look at *James* log entry 46.  Is this document

14  an example of Mr. Ellison policing the agreement as you were

15  just describing?

16  A.  It is.

17  Q.  Could you just quickly summarize what happens in this

18  document.

19  A.  Mr. Ellison has received a reach-out from a recruiter on

20  behalf of DaVita, and he forwards the message to Michael

21  Rucker and references that he thought there was a gentleman's

22  agreement with DaVita.

23  Q.  And do you have an understanding from this document and

24  other documents you reviewed about whether or not that

25  prompted others to take action?

21-CR-00229-RBJ        *James* Hearing        02/24/2022      17

1    A.  Yes, it did.

2    Q.  It did?  What was that action?

3    A.  Michael Rucker then forwards this message to Andrew Hayek,

4    who then sends it over to Kent Thiry, who shares it with

5    executives and asks for the issue to be put on their next

6    agenda.

7    Q.  And is that communication set forth in *James* log entry 49?

8    A.  Yes.

9    Q.  Let's turn to the next individual, Goran Dragolovic.  Who

10   is Mr. Dragolovic?

11   A.  He was another executive at SCA.

12   Q.  What role, if any, did he have in the conspiracy?

13   A.  We see him seeking advice on how to handle a candidate

14   consistent with the agreement.

15   Q.  Okay.  We'll take a look at an example of that in *James*

16   log entry 33 in just a moment, but first let's get to the next

17   individual identified as a coconspirator for purposes of

18   today's *James* hearing, Carrie Mayhan.  Who is Ms. Mayhan?

19   A.  She was a recruiter with Spencer Stuart.

20   Q.  What was her role in the conspiracy, if any?

21   A.  She received instructions on how to handle recruiting

22   consistent with the agreement and then took steps to further

23   that.

24   Q.  Let's take a look at *James* log entry 48.  Agent Timens,

25   let me just ask, are you familiar with *James* log entry 47?

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ          *James* Hearing          02/24/2022   18

1    A.  I am.

2    Q.  Is it substantively any different than *James* log entry 48?

3    A.  It's not.

4    Q.  All right.  Then let's just take a look at *James* log entry

5    48 because I personally find it easier to read.  What are we

6    looking at here?

7    A.  This is an excerpt from a database that Spencer Stuart

8    used called Quest.  They used it to track clients and

9    candidates.

10   Q.  And from the document itself are you able to tell who

11   input comments into the database?

12   A.  Yes.

13   Q.  Let's take a look at page 2 of this document.  Referring

14   to the highlighted portion, who has input the comment here?

15   A.  Carrie Mayhan.

16   Q.  What is the comment that she has input?

17   A.  Asked for her thoughts.  Told her we can't go directly

18   into DaVita, but if anyone like herself, who has left, that

19   would be ideal.

20   Q.  Let's take a look at page 3.  Who has input that comment?

21   A.  Carrie Mayhan.

22   Q.  What is the comment she inputs here?

23   A.  Sent note back stating client cannot recruit from DaVita

24   or USPI, so not permitted to moving forward.  Does he know

25   others to recommend?

                        Sarah K. Mitchell, RPR, CRR

1   Q.  And finally, let's take a look at the last page.  What is

2   the comment that Ms. Mayhan has input here?

3   A.  Can't go after DaVita people for SCA.

4   Q.  Let's turn to the next individual identified as a

5   coconspirator for today's purposes, Nate Haines.  Who is Mr.

6   Haines?

7   A.  He was a recruiter with Russell Reynolds.

8   Q.  And what role, if any, did Mr. Haines have in the

9   conspiracy?

10  A.  He also received instructions not to recruit from DaVita

11  and followed those instructions.

12  Q.  Did he confirm that he would abide by those instructions?

13  A.  He did.

14  Q.  Let's take a look at *James* log entry 34.  Can you just

15  point to where Mr. Haines in this document confirms that he

16  will not recruit from DaVita?

17  A.  At the end of this message he says we will also not call

18  anyone else from DaVita.

19  Q.  All right.  I want to turn to how the agreement functioned

20  in practice, and I'd like to start with how the agreement

21  impacted the contemplated recruiting of an individual named

22  Joe Clark.  Do you know who Mr. Clark is?

23  A.  He was an executive with SCA.

24  Q.  And was DaVita at some point contemplating Mr. Clark for

25  an open position?

21-CR-00229-RBJ          *James* Hearing          02/24/2022     20

1   A.  They were.

2   Q.  And did DaVita ultimately recruit Mr. Clark?

3   A.  They did not.

4   Q.  Why not?

5   A.  Because he was employed by SCA.

6   Q.  Let's take a look at *James* log entry 19, please.  Let's

7   start with the e-mail at the very bottom of this chain from

8   Noah Waldman.  Who's Mr. Waldman?

9   A.  He was a recruiter with Korn/Ferry.

10  Q.  And who was Korn/Ferry employed by?

11  A.  DaVita.

12  Q.  And who does Mr. Waldman present to SCA?

13  A.  Joe Clark.

14  Q.  Let's turn your attention to Mr. Thiry's e-mail on

15  February 12th, 2012.  What does Mr. Thiry relay there?

16  A.  I believe this e-mail is from February 17th, and he says

17  that Andrew has not gotten back to me yet, but the only

18  outstanding issue was director or VP level which was

19  appropriate given our contemplated business relationships.

20  Q.  Do you have an understanding of who Andrew refers to here?

21  A.  Andrew Hayek.

22  Q.  Can you just explain to us in layman's terms what this

23  e-mail means?

24  A.  This e-mail means that the two companies have come to an

25  agreement apart from one term being at which level employee it

Sarah K. Mitchell, RPR, CRR

1   applies to.

2   Q.  Based on the feedback received from Mr. Thiry, what is

3   Mr. Kogod's response in the next e-mail?

4   A.  That it sounds like we pass on him.

5   Q.  Let's turn to *James* log entry 22.  Who is this e-mail

6   from?

7   A.  Noah Waldman.

8   Q.  Can you remind us who Mr. Waldman is?

9   A.  A recruiter with Korn/Ferry.

10  Q.  Looking at the attachment line of this document, can you

11  tell what Mr. Waldman circulates here?

12  A.  A document called DaVita SVP CDO status report.

13  Q.  And in layman's terms, what's that?

14  A.  A search status report for a chief development officer

15  position.

16  Q.  All right.  Let's take a look at the attachment and look

17  at page 1 just for some context, and then if we could please

18  turn to page 6.  What is the status of Mr. Clark as of the

19  date of this document?

20  A.  Will not pursue per client.

21  Q.  Let's take a look at *James* log entry 24.

22        MS. CLINGAN:  And, Ms. Teklu, if we could please

23  see both pages of this e-mail.  Thank you.

24  Q.  (By MS. CLINGAN) Looking at the top e-mail on this chain,

25  who is this e-mail from?

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ         *James* Hearing         02/24/2022    22

1    A.  Tom Usilton.

2    Q.  And who is Mr. Tom Usilton?

3    A.  He was a former DaVita executive who at this time was

4    employed by Radiology Partners.

5    Q.  And do you have an understanding of what the subject line

6    of this e-mail is?

7    A.  Yes.  BD at HCP refers to business development at

8    HealthCare Partners.

9    Q.  Can you briefly summarize what happens in this e-mail.

10   A.  This e-mail chain begins with Kent Thiry reaching out to

11   Tom Usilton asking if he has any candidates he would recommend

12   for an open position, and Tom Usilton says, The guy you may

13   want may work for Andrew Hayek.  And Kent Thiry responds

14   saying, I won't pursue one of Andrew's senior folks.

15   Q.  And do you have an understanding of why it was the case

16   that Mr. Thiry would not pursue one of Andrew Hayek's folks?

17   A.  Because of the agreement.

18   Q.  Let's take a look at some of the instructions that were

19   provided to recruiters.  Did DaVita and SCA use recruiters to

20   identify candidates for senior level roles?

21   A.  They did.

22   Q.  Did the conspiracy have any impact on how the recruiters

23   identified candidates?

24   A.  It did.

25   Q.  How was that?

21-CR-00229-RBJ        *James* Hearing        02/24/2022    23

1   A.  Candidates that would otherwise be attractive for an open

2   role would not be reached out to because of the agreement.

3   Q.  And let's take a peek at *James* log entry 27.  Agent

4   Timens, what's the subject of this e-mail?

5   A.  Spencer Stuart.

6   Q.  And what is Spencer Stuart?

7   A.  A recruiting firm.

8   Q.  Could you just explain for the Court what happens here.

9   A.  Spencer Stuart has submitted a package to SCA to be

10  considered for a search that the company will be running, and

11  this top message is Andrew Hayek providing feedback on the

12  attachment they provided.

13  Q.  Focusing on the second bullet in Mr. Hayek's e-mail, what

14  is the feedback he provides concerning DaVita?

15  A.  DaVita is off the table given our relationship.

16  Q.  Let's take a look at *James* log entry 31, please.  Agent

17  Timens, who is this communication with?

18  A.  Bridie Fanning and Eric Sigurdson.

19  Q.  And who is Eric Sigurdson with?

20  A.  With Russell Reynolds.

21  Q.  All right.  Let me point you to his September 28th, 2015,

22  e-mail on page 2.  Can you summarize what's happening here,

23  looking at the last paragraph.

24  A.  Did you say DaVita is definitely off limits?  There's a

25  prospect who I'm speaking to about the role but need your

1    guidance.

2    Q.   What is Dr. Fanning's response to Mr. Sigurdson's inquiry?

3    A.   Sorry.   DaVita is definitely off limits.

4    Q.   Let's take a look at *James* log entry 32.   Who is this

5    communication involving?

6    A.   Andrew Hayek and Bridie Fanning.

7    Q.   What's the subject of the e-mail?

8    A.   Companies to recruit from.

9    Q.   What instruction does Mr. Hayek provide here?

10   A.   Bullet point number two says, Putting two companies in

11   italics, USPI and DaVita, we can recruit junior people below

12   director, but our agreement is that we would only speak with

13   senior executives if they have told their boss already that

14   they want to leave and are looking.

15   Q.   So Andrew Hayek instructs here to put two companies in

16   italics.   If we can look at page 4 of the attached document to

17   this e-mail, what company is in italics here?

18   A.   DaVita Healthcare Partners.

19   Q.   Do you have an understanding of what that italicization

20   signifies?

21   A.   That senior employees are off limits.

22   Q.   I'd like to talk a little bit more about how the agreement

23   affected specific candidates in practice, and I'd like to look

24   at how this played out with a candidate named Jordan Thau.   If

25   we can take a look at *James* log entry 33, please.   This e-mail

1   starts out with a communication with Jordan Thau.  Do you

2   understand where Mr. Thau was employed at the time of this

3   e-mail?

4   A.  At DaVita.

5   Q.  And what happens here?

6   A.  Jordan Thau reaches out to Goran Dragolovic because he's

7   interested in an opportunity with SCA.

8   Q.  And how does Mr. Dragolovic respond?

9   A.  He forwards the message chain to Bridie Fanning.

10  Q.  What two options does he present to Dr. Fanning?

11  A.  To tell him about our understanding with DaVita or run him

12  through the paces with Cielo.

13  Q.  At any point does Mr. Dragolovic contemplate considering

14  Mr. Thau as a candidate?

15  A.  No.

16  Q.  Why not?

17  A.  Because he's employed at DaVita.

18  Q.  What is Dr. Fanning's response?

19  A.  To stay out of it and let Russell Reynolds contact him and

20  withdraw him.

21  Q.  Let's take a look at *James* log entry 34.  What does Dr.

22  Fanning do with Mr. Dragolovic's e-mail that we just looked

23  at?

24  A.  She forwards it to Nate Haines.

25  Q.  Can you remind us who Mr. Haines is?

Sarah K. Mitchell, RPR, CRR

1   A.   A recruiter at Russell Reynolds.

2   Q.   What does she instruct Mr. Haines?

3   A.   To not contact anyone at DaVita again.

4   Q.   Does she say under any circumstances?

5   A.   Yes.  We must not under any circumstances be contacting

6   people at DaVita.

7   Q.   And how does Mr. Haines respond?

8   A.   That they will not call anyone else from DaVita.

9            MS. CLINGAN:  Ms. Baskin, if we can close the

10  callout, please.

11  Q.   (By MR. CLINGAN) Okay.  In the top of this e-mail,

12  Mr. Haines' e-mail on October 26th, 2015, at 10:55, Mr. Haines

13  also references Craig McKessar.  Do you have an understanding

14  of who Craig McKessar is?

15  A.   He was also an employee at DaVita.

16  Q.   And do you have an understanding of what happened with

17  Mr. McKessar?

18  A.   He was turned away from the recruiting.

19  Q.   Let's take a look at *James* log entry 159, please.  Is that

20  what's reflected in this communication?

21  A.   Yes.

22  Q.   All right.  Agent Timens, that covers my questions for

23  Count 1.  I'd like to turn now to Count 2, which you

24  previously testified involves an agreement between the

25  defendants and a company called Hazel.  Were DaVita and Hazel

21-CR-00229-RBJ        *James* Hearing        02/24/2022    27

1  competitors for employees?

2  A.  They were.

3  Q.  How do you know that?

4  A.  From documents I've reviewed and through a witness

5  interview.

6  Q.  Could you generally describe the agreement between Hazel

7  and the defendants.

8  A.  In this agreement the two companies agreed that Hazel

9  would not proactively solicit employees of DaVita.

10 Q.  And what was the goal of the conspiracy?

11 A.  To keep employees at DaVita.

12 Q.  Could you give us an overview of how that conspiracy

13 functioned in practice?

14 A.  The chief executive officers of the two companies made the

15 agreement and then circulated information regarding the

16 agreement to their employees and third-party recruiters, and

17 they monitored and enforced it.

18 Q.  Let's walk through who's been identified as a

19 coconspirator for purposes of 801(d)(2)(E) for Count 2.  Let's

20 start with Josh Golomb.  Who is Mr. Golomb?

21 A.  He was the chief executive officer of Hazel.

22 Q.  Agent Timens, did you or other investigators speak to

23 Mr. Golomb?

24 A.  We did not.

25 Q.  So how were you able to determine if a conspiracy existed

21-CR-00229-RBJ          *James* Hearing          02/24/2022    28

1   between Mr. Golomb's company and the defendants?

2   A.  Through the contemporaneous documents, communications at

3   the time of the conspiracy.

4   Q.  And did anyone else corroborate the existence of the

5   conspiracy charged in Count 2?

6   A.  Dennis Kogod was aware of an issue around recruiting

7   between the two companies.

8   Q.  The other individual identified as a coconspirator for

9   purposes of this hearing is Matt Weissert.  Who is

10  Mr. Weissert?

11  A.  He was an executive at Paladina Health.

12  Q.  And do you have an understanding of whether or not the

13  agreement applied to Paladina Health?

14  A.  It did.

15  Q.  What is Paladina's relationship to DaVita?

16  A.  It is part of DaVita.

17  Q.  We're going to look at some communications involving

18  Mr. Weissert in *James* log 62 in just a bit, but first I'd like

19  to start out with how the agreement came to be.  Did you

20  review communications between Mr. Golomb and Mr. Thiry that

21  showed the agreement?

22  A.  Yes.

23  Q.  Let's take a look at *James* log entry 53, please.  This is

24  a series of text messages.  Agent Timens, do you know who

25  these text messages are between?

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    29

1    A.   Kent Thiry and Josh Golomb.

2    Q.   So the text messages on the right-hand side, who are those

3    from?

4    A.   Josh Golomb.

5    Q.   And the text messages on the left-hand side, who are those

6    from?

7    A.   Kent Thiry.

8    Q.   Let's start with the text messages on March 28th, 2017,

9    beginning with, Kent, it's Josh.  Can you just read those text

10   messages.

11   A.   Kent, it's Josh.  I know you talked to Julio.  Wanted to

12   talk to you on the front end, but felt like I had to respect

13   him wanting to talk to you first.  I'm hoping he walked

14   through all context, et cetera.  Would like to talk to you

15   when you have time.  Know you are very busy and sorry for

16   adding any stress to your already busy life.

17   Q.   Let's get a little context here.  Mr. Golomb says, I know

18   you talked to Julio.  Who is Julio?

19   A.   Julio is Julio Quinones.

20   Q.   And who is Mr. Quinones?

21   A.   He was an employees at DaVita who Josh Golomb was in

22   conversation with regarding a position with his company.

23   Q.   Do you have an understanding of his relevance to the

24   agreement?

25   A.   His recruiting to Hazel was what precipitated the

1    agreement.

2    Q.   If you could just read the next text message from

3    Mr. Golomb in the chain starting with, Do want you to know.

4    A.   Do want you to know that I take this stuff crazy seriously

5    and have complete respect for you and have very clear lines of

6    things I would not do and inquiries I have already rebuffed.

7    Think when you hear the context on this specified situation

8    you may still be unhappy with outcome, but will appreciate I

9    am trying to operate in way in line with Village values as

10   someone who is very committed to seeing it always thrive.

11   Q.   Mr. Golomb here refers to, quote, inquiries I have already

12   rebuffed.   Can you explain what that means?

13   A.   That individuals at DaVita have reached out to him about

14   opportunities with Hazel, and he has not considered them.

15   Q.   Mr. Golomb also refers to Village values.   What is the

16   Village?

17   A.   The Village is DaVita.

18   Q.   What are Village values?

19   A.   One of the things that refers to is loyalty to DaVita.

20   Q.   And how does that apply in the context of recruiting?

21   A.   Loyalty to DaVita could mean that you don't want to do

22   anything to hurt DaVita, and taking away a high-level employee

23   could be seen as hurting DaVita.

24   Q.   Let's take a look at the last text message on this page

25   from Mr. Golomb beginning with, Did not sleep.   If you could

21-CR-00229-RBJ        *James* Hearing        02/24/2022    31

1  read that message, please.

2  A.  Did not sleep last night knowing how much everything hurt

3  you personally.  In retrospect should have followed my

4  instinct and talked to you directly much earlier and made sure

5  we were aligned on right way to do things instead of operating

6  from what felt like the highest integrity position and what

7  others told me is how they do things versus having Julio

8  message at times he felt was appropriate.  I get that it felt

9  like a blind side and possibly a betrayal and easy to assume

10  worst-case narrative without context.  I have thought through

11  a very specific set of ground rules based on your feedback to

12  commit to.  We can discuss.

13  Q.  Can you explain the meaning of ground rules here?

14  A.  Ground rules refer to terms of the agreement.

15  Q.  Let's take a look at the next page of this set of text

16  messages.  On April 8th, 2017, Mr. Golomb sends a text message

17  that reads, Just sent you an e-mail with thoughts.  Did you

18  locate an e-mail from Mr. Golomb to Kent Thiry?

19  A.  Yes.

20  Q.  And does that contain the ground rules?

21  A.  Yes.

22  Q.  Let's take a look at *James* log entry 54.  What is the date

23  of this e-mail?

24  A.  April 8th, 2017.

25  Q.  Who is it from and who is it to?

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ          *James* Hearing          02/24/2022      32

1    A.  It's from Josh Golomb to Kent Thiry.

2    Q.  If you can please just read the highlighted portion, the

3    first paragraph.

4    A.  I did not actively try to recruit Julio or anyone else at

5    DaVita.  I know this probably sounds like semantics, but it is

6    not.  I have a very full organization chart that I need to

7    fill out, and there are great candidates at DaVita for a

8    number of those roles.  I both have not reached out to anyone

9    about roles and also have told people that have probed me

10   about my hiring plans and expressed interest to work with me

11   that I am not recruiting anyone from DaVita.

12   Q.  Let's take a look at paragraph 3.  If you can please just

13   read the highlighted portion of paragraph 3.

14   A.  I knew that we would talk and there would be complete

15   transparency to how things unfolded, and I tried to operate in

16   a way that felt as right as possible.  Examples: making sure

17   not to offer a title, let alone a better one; making sure he

18   knew comp would be vastly lower than anything he had at

19   DaVita; telling him to take his time and explore every option

20   DaVita was going to put in front of him.  I am a great

21   recruiter, and steps I was taking were exact opposite of what

22   I would do if I was trying to maximize success in getting

23   candidate.

24   Q.  Do you have an understanding of what individual Mr. Golomb

25   is referring to when he says in this e-mail, for example,

21-CR-00229-RBJ      *James* Hearing      02/24/2022    33

1    making sure not to offer any title, let alone a better one?

2    A.  Julio Quinones.

3    Q.  Let's look at the next e-mail chronologically in the

4    series, which is the second e-mail on page 3 from Mr. Golomb

5    to Mr. Thiry on April 13th, 2017, at 11:50 a.m.  If you could

6    please just read the highlighted portion of this e-mail.

7    A.  As I mentioned when he asked for more compensation, I have

8    said no even though I would do in every other situation to

9    close the deal as I want to be able to honestly say that I

10   know he made this decision based on right thing for him and

11   his family and that he suboptimized other areas in order to do

12   it.

13   Q.  And looking at Mr. Thiry's response, which is directly

14   above this e-mail, what is his response?

15   A.  I disagree with what you have done, but our friendship

16   will survive.  Other people at DaVita will not be as

17   understanding, however.

18   Q.  Okay.  If we can turn to the next e-mail chronologically,

19   which is at the top of page 4 from Mr. Golomb to Mr. Thiry on

20   April 16, 2017, if you could just read the highlighted portion

21   of this e-mail.

22   A.  You also have my commitment we discussed that I'm going to

23   make sure everyone on my team knows to steer clear of anyone

24   at DaVita and that I'll come back to you and talk before ever

25   get anywhere near a point that could contemplate someone else.

21-CR-00229-RBJ        *James* Hearing        02/24/2022    34

1   Q.  All right.  Agent Timens, we walked through communications

2   between Mr. Thiry and Mr. Golomb.  Did you also review

3   communications between Mr. Golomb and Mr. Quinones that showed

4   how the agreement affected Mr. Quinones?

5   A.  I did.

6   Q.  Let's take a look at *James* log entry 57.  Who are these

7   text messages between?

8   A.  Josh Golomb and Julio Quinones.

9   Q.  Text messages on the right side, who are those text

10  messages from?

11  A.  Josh Golomb.

12  Q.  And the text messages on the left side, who are they from?

13  A.  Julio Quinones.

14  Q.  Let's turn to page 6 of this document, starting with text

15  messages on March 26th, 2017.  Mr. Golomb asks Mr. Quinones,

16  Did you end up e-mailing Kent?  Do you have an understanding

17  of why Mr. Golomb need to know if Mr. Quinones had ended up

18  e-mailing Kent?

19  A.  Josh Golomb had agreed to let Julio Quinones approach the

20  subject with Kent Thiry first, but Josh Golomb also wanted to

21  reach out to Mr. Thiry after Julio had his chance to speak

22  with him.

23          MS. CLINGAN:  If we could turn to the text

24  messages on April 4th, 2017, which are on page 8.  For

25  those following along in the binder, this is Bates labeled

Sarah K. Mitchell, RPR, CRR

1   in the bottom right corner 439.

2   Q.   (By MS. CLINGAN) If you could just read Mr. Golomb's text

3   message on April 4th, 2017.

4   A.   Hey, if you have a few minutes this morning, I wanted to

5   clarify a couple quick things before I talk to Kent, a couple

6   of data points around what you did already to convey to DaVita

7   that you were looking.

8   Q.   Do you have an understanding of why it was necessary for

9   Mr. Golomb to reiterate the point that Mr. Quinones was

10  already looking?

11  A.   It appears that Mr. Golomb already had the understanding

12  that it was less hurtful to DaVita to recruit someone who was

13  already looking at other opportunities as opposed to only

14  theirs.

15       MS. CLINGAN:   All right.  If we can turn to text

16  messages on April 17th, which are at the bottom of

17  page 12.  For those using the binder, this is Bates

18  labeled in the bottom right 443.

19  Q.   (By MS. CLINGAN) If you could just read the highlighted

20  text message from Mr. Golomb.

21  A.   And let me know if their tactics turn a bit negative.  I

22  don't expect them to do that, but Dennis and other has warned

23  me that they have innuendoed to them before that they would do

24  that if they are unhappy in the past situations.  I'm

25  committing to Kent a bunch of stuff for future I don't need to

21-CR-00229-RBJ      *James* Hearing      02/24/2022      36

1   do but out of respect given how upset he was, but will revisit

2   with him if he takes a different path.

3   Q.  Do you have an understanding of why it was necessary for

4   Mr. Golomb to relay this to Mr. Quinones?

5   A.  So the purpose of the agreement was from Josh Golomb's

6   side to keep Kent Thiry happy, so he is agreeing to things in

7   order to do that.  So if Kent Thiry is not happy, Josh Golomb

8   is saying he doesn't want to commit to those things, or at

9   least will reconsider.

10  Q.  Okay.  Let's turn to page 26.  These are text messages on

11  June 20th, 2017.  If you can just read the highlighted text

12  message from Mr. Golomb to Mr. Quinones on July 20th.

13  A.  Also please let me know if you think of any great folks,

14  nobody currently at DaVita, that would be worth talking to.

15  Guessing we may end up prioritizing SF over sac to have

16  broader pool.  Thanks.

17  Q.  What, if anything, does this tell you about the conspiracy

18  charged in Count 2?

19  A.  This shows that Josh Golomb is still committed to not

20  proactively soliciting DaVita employees.

21  Q.  If we can turn to *James* log entry 58, who is this e-mail

22  from and who is it to?

23  A.  It's from Josh Golomb to Julio Quinones.

24          MS. CLINGAN:  And, Ms. Baskin, if we can call out

25  paragraph 3, please.

                        Sarah K. Mitchell, RPR, CRR

 1   Q.  (By MS. CLINGAN) And, Agent Timens, if you could please

 2   just read -- I think it's the third-to-last sentence in this

 3   paragraph starting with, However, I did realize.

 4   A.   However, I did realize last night that because of weird

 5   context you are being paid less than I would have offered you

 6   had the DaVita thing not been in play.

 7   Q.   I'd like to turn now to text messages with Matt Weissert.

 8   Can you just remind us for context who Mr. Weissert is?

 9   A.   He was an executive with DaVita.

10   Q.   And did he supervise anyone at DaVita?

11   A.   Yes.  He supervised an employee named Arlin Villa-Howells.

12   Q.   And at some point was Mr. Golomb contemplating potentially

13   recruiting Arlin?

14   A.   Yes.

15   Q.   And how did that play out?

16   A.   I believe it started with Arlin providing Josh Golomb a

17   list of potential people that he could recruit, and at the

18   bottom of the list she added herself, and I believe that

19   started the conversations.

20   Q.   All right.  And so let's look at *James* log entry 62.  Who

21   are these text messages between?

22   A.   Josh Golomb and Matthew Weissert.

23   Q.   What does Mr. Golomb say to Mr. Weissert in this text

24   message?

25   A.   Just FYI, I am very slow rolling next conversations with

1   Arlin.  Going forward to talk to her, but likely two to

2   three weeks out to make sure we're not adding stress,

3   particularly with other stuff going on with you guys.

4   Q.  Do you have an understanding of why Mr. Golomb was in his

5   own words slow rolling next conversations with Arlin?

6   A.  To make sure he was coordinating the effort with DaVita.

7   Q.  And let's turn to Mr. Golomb -- or Mr. Weissert's response

8   to Mr. Golomb on the next page.  What does he instruct?

9   A.  Just make sure you clear with KT when you need to.

10  Q.  What, if anything, does that tell you about the

11  conspiracy?

12  A.  It shows that Matthew Weissert had an understanding that

13  Kent Thiry should clear the hiring of the DaVita employee.

14  Q.  Let's turn to at the bottom Bates entry 366, which is a

15  text message from Mr. Weissert at 9:02 p.m.  What does

16  Mr. Weissert request of Mr. Golomb here?

17  A.  To let him know on timing regarding Arlin.

18  Q.  Does Mr. Golomb offer Mr. Weissert any assurances that are

19  consistent with the agreement charged in Count 2?

20  A.  He says, So actually ideal would be to make her an

21  official offer tomorrow, but won't until you give me the

22  thumbs-up.  And my commitments, one, we're not going to offer

23  her more money, want her to only leave if for location, fit;

24  and, two, if she does join, will work with you on best

25  transition plan.

21-CR-00229-RBJ        *James* Hearing        02/24/2022    39

1   Q.  And let's take a look at *James* log entry 56.  Agent

2   Timens, who are these text messages between?

3   A.  Josh Golomb and Zondra Evans.

4   Q.  And is Zondra Evans one of Mr. Golomb's former colleagues

5   at DaVita Rx?

6   A.  That's correct.

7   Q.  What does Mr. Golomb ask of Ms. Evans here?

8   A.  If she knows any former RFPs not at Rx today that she

9   would target.

10  Q.  And if we could look at the first page of this document,

11  if you could just read the last line of the last text message.

12  A.  But nobody at Rx today promised Kent.

13  Q.  In layman's terms, can you explain what that instruction

14  is?

15  A.  He doesn't want her to provide him with anyone's name from

16  DaVita Rx because he promised Kent he wouldn't hire anyone

17  from DaVita.

18  Q.  Just for context, what is Rx?

19  A.  DaVita Rx.

20  Q.  How is that related to DaVita?

21  A.  It's part of DaVita.

22  Q.  And do you have an understanding of whether or not the

23  agreement applied to DaVita Rx?

24  A.  It did.

25  Q.  Okay.  Agent Timens, that concludes my questions for

Sarah K. Mitchell, RPR, CRR

1  Count 2.  Let's turn now to Count 3, which you previously

2  testified is an agreement between the defendants and a company

3  called Radiology Partners.  Were DaVita and Radiology Partners

4  competitors for employees?

5  A.  They were.

6  Q.  How do you know that?

7  A.  I see that in documents that I've reviewed and from

8  witness statements.

9  Q.  Could you generally describe the agreement between

10  Radiology Partners and DaVita.

11  A.  In this agreement the two companies agreed that Radiology

12  Partners wouldn't proactively solicit employees of DaVita.

13  Q.  Could you give us an overview of how the conspiracy

14  functioned in practice.

15  A.  The two chief executive officers at the companies agreed

16  on terms.  They provided that information to their executive

17  teams and recruiters, and they monitored and enforced the

18  agreement.

19  Q.  Let's talk a little bit about the monitoring and

20  enforcing.  How did that work in practice?

21  A.  So we see examples where an employee at DaVita might

22  receive or reach out from a recruiter on behalf of Radiology

23  Partners, and they would forward the message up the chain of

24  command, and it would be addressed with Radiology Partners.

25  Q.  How, if at all, would that advance the conspiracy?

21-CR-00229-RBJ        *James* Hearing        02/24/2022    41

1    A.  It helped keep DaVita employees at DaVita.

2    Q.  And do you have an understanding of the goal of

3    conspiracy?

4    A.  To keep the employees at DaVita from leaving DaVita for

5    Radiology Partners.

6    Q.  Let's talk about who's been identified as a coconspirator

7    for purposes of 801(d)(2)(E) in Count 3.  Let's start with

8    Mr. Kogod.  Can you remind us who Mr. Kogod is?

9    A.  He was the chief operating officer of DaVita.

10   Q.  Did you speak to Mr. Kogod about the agreement charged in

11   Count 3?

12   A.  We did.

13   Q.  What, if anything, did he tell you about the conspiracy

14   charged in Count 3?

15   A.  He recalled the agreement existing and steps that were

16   taken in furtherance of it.

17   Q.  And what did you determine his role in the conspiracy was?

18   A.  We see examples of him raising potential issues of

19   noncompliance up the chain.

20        MS. CLINGAN:  Let's take a look at *James* log

21   entry 135.  Actually, let me start with *James* log entry

22   117.  And, Ms. Baskin, if you can retrieve the *James* log

23   entry for this.

24   Q.  (By MS. CLINGAN) Can you summarize what happens in this

25   communication?

Sarah K. Mitchell, RPR, CRR

1    A.  This e-mail chain begins with Dennis Kogod sending a

2    message that starts with the subject line, Appears they had

3    John Nehra call Guy to help recruit.  So he's raising a

4    potential issue of recruitment of Guy Seay up to Kent Thiry.

5    Q.  And from this e-mail who does Mr. Kogod understand was

6    recruiting Guy Seay?

7    A.  John Nehra ultimately on behalf of Radiology Partners.

8    Q.  And Mr. Kogod reports this to Mr. Thiry, and what action

9    does Mr. Thiry take?

10   A.  He says, Rich, it is feeling to me that you guys should

11   stop talking to Guy.

12   Q.  Who is Rich?

13   A.  Rich Whitney.

14   Q.  Who is Mr. Whitney?

15   A.  He was the chief executive officer of Radiology Partners.

16   Q.  Let's turn to the next individual identified as a

17   coconspirator.  That's Javier Rodriguez.  Can you remind us

18   who Mr. Rodriguez was?

19   A.  He was the chief executive officer of DaVita Kidney Care.

20   Q.  What role, if any, did Mr. Rodriguez play in the

21   conspiracy charged in Count 3?

22   A.  We see examples of him enforcing the agreement.

23   Q.  Can you remind us who Rich Whitney is?

24   A.  Chief executive officer of Radiology Partners.

25   Q.  Is he identified in the superseding indictment?

1  A.  He is.

2  Q.  How is he identified in the superseding indictment?

3  A.  As individual four.

4  Q.  Is Mr. Whitney cooperating with this investigation?

5  A.  He is.

6  Q.  What, if anything, did he tell you about the agreement

7  with DaVita concerning hiring?

8  A.  He recalled the agreement existing and drafting ground

9  rules for the basis of the agreement.

10  Q.  We'll take a look at those ground rules in just a moment.

11  Let's turn next to Anthony Gabriel.  Who is Dr. Gabriel?

12  A.  He was the chief operating officer of Radiology Partners.

13  Q.  What, if anything, did he tell you about the agreement

14  charged in Count 3?

15  A.  He recalled the agreement existing and providing

16  instructions to others on how to comply with the agreement.

17  Q.  Let's talk about Basak Ertan.  Who was Ms. Ertan?

18  A.  She was the chief revenue officer of Radiology Partners.

19  Q.  And what role did you determine Ms. Ertan held in the

20  conspiracy, if any?

21  A.  She provided instructions containing specific steps that

22  employees and recruiters should take when concerning DaVita

23  candidates for positions.

24          MS. CLINGAN:  I want to look at an example of

25  Ms. Ertan's involvement in the conspiracy.  We'll do that

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ          *James* Hearing          02/24/2022      44

1    in connection with Mr. Omrani.  Ms. Baskin, if you could

2    please highlight Mr. Omrani.

3    Q.  (By MS. CLINGAN) Who is Mr. Omrani?

4    A.  He was an executive at DaVita.

5    Q.  Let's take a look at *James* log 87.  Who is this

6    communication from?

7    A.  Rick Omrani.

8    Q.  Who is this communication to?

9    A.  Basak Ertan.

10   Q.  Can you remind us where Mr. Omrani worked at this time?

11   A.  At DaVita.

12   Q.  What does Mr. Omrani ask Ms. Ertan here?

13   A.  He's noticed that a recruiter on behalf of Radiology

14   Partners has been reaching out to his team, and he says he was

15   okay with employees finding and applying for opportunities on

16   their own versus being targeted directly, and he thought that

17   understanding was consistent with Ms. Ertan.

18   Q.  All right.  Does this prompt Ms. Ertan to take any action?

19   And it might help if you take a look at *James* log entry 88.

20   A.  She says they sent out clarification to their recruiting

21   team.

22   Q.  And if you could just read the last line of her e-mail.

23   A.  Sorry about this and appreciate you sharing so we could

24   get it addressed.

25   Q.  Let's turn to the next coconspirator identified for

                    Sarah K. Mitchell, RPR, CRR

1  purposes of this *James* hearing.  That's Tom Usilton.  Who is

2  Mr. Usilton?

3  A.  He was the chief development officer at Radiology

4  Partners.

5  Q.  And what was his role in the conspiracy, if any?

6  A.  We see him helping draft a message to Mr. Thiry regarding

7  Guy Seay, and we also see him keeping Kent Thiry apprised on

8  recruitment efforts at RP.

9  Q.  Why was it necessary for Mr. Usilton to draft talking

10  points to Mr. Thiry about the contemplated recruitment of Guy

11  Seay?

12  A.  In that particular instance they were seeking permission

13  to proactively recruit Guy Seay.  So since it was not within

14  the terms of the agreement, they were very careful about their

15  messaging.

16  Q.  Let's talk about Keegan Scanlon.

17  A.  He was an executive with Radiology Partners.

18  Q.  And what role, if any, did he have in the conspiracy?

19  A.  He provided instructions to others consistent with the

20  agreement.

21          MS. CLINGAN:  If we can take a look at *James* log

22  entry 71.  And, Ms. Baskin, we can just look at the *James*

23  log entry.

24  Q.  (By MS. CLINGAN) Agent Timens, if you can just please read

25  *James* log entry 71.

21-CR-00229-RBJ          *James* Hearing          02/24/2022     46

1   A.   Based on the August 18th, 2021, FBI interview of Keegan

2   Scanlon, the United States anticipates that Scanlon would

3   testify that Scanlon told Holder that he needed to notify his

4   current supervisor before they could move forward.

5   Q.   Who is Holder here?

6   A.   Holder is Elliot Holder.

7   Q.   Who was he?

8   A.   He was an employee at DaVita who Radiology Partners was

9   considering for an open position.

10  Q.   So Mr. Holder was a candidate for an open position, and

11  Mr. Scanlon advised him that he needed to notify his current

12  supervisor?

13  A.   Yes.

14  Q.   Let's talk about Alex Won.  Who is Mr. Won?

15  A.   He was another executive at Radiology Partners.

16  Q.   And what was his role in the conspiracy, if any?

17  A.   He also provided instruction to others consistent with the

18  agreement.

19  Q.   Let's take a look at an example of that.  Let's take a

20  look at *James* log entry 146.  If we can call out the top two

21  e-mails, please.  Who is this communication between?

22  A.   Alex Won and Jeffrey Lombardo with Jeffrey Stout CC'd.

23  Q.   And who was Jeff Lombardo?

24  A.   He was a recruiter with Blue Sky.

25  Q.   And looking at Mr. Won's e-mail, what is Mr. Won's

                    Sarah K. Mitchell, RPR, CRR

1    instruction to the recruiter Mr. Lombardo, if you could just

2    read the e-mail.

3    A.  Yes, Patrick looks promising.  RP's recruiting team will

4    be reaching out to schedule a phone interview.  One thing to

5    note going forward, we would like to avoid recruiting from

6    DaVita as it will be a longer recruiting process due to some

7    existing agreements.

8    Q.  And looking at Mr. Lombardo's response, if you could just

9    read the last paragraph in Mr. Lombardo's response.

10   A.  Noted about DaVita.  Me and my team will refrain from

11   reaching out to current DaVita employees going forward.

12   Q.  What impact at all did that have on the conspiracy?

13   A.  It took away potential opportunities from DaVita employees

14   who didn't receive reach-outs.

15   Q.  Let's talk about Guy Seay.  Who is Mr. Seay?

16   A.  He was an executive at DaVita.

17   Q.  And I think you've testified a little bit about this, but

18   was he someone who Radiology Partners considered recruiting?

19   A.  Yes.

20   Q.  And did he ultimately go to Radiology Partners?

21   A.  He did not.

22   Q.  What was his role in the conspiracy?

23   A.  I believe we see examples of him raising issues of

24   noncompliance, potential issues.

25   Q.  Okay.  I think that covers what we need to cover for

Sarah K. Mitchell, RPR, CRR

1   purposes of identifying the coconspirators.  Let's take a look

2   at some documents that have been determined to be in

3   furtherance of the conspiracy.  If we can start, please, with

4   *James* log entry 98, who is this e-mail from and who is it to?

5   A.  It's from Rich Whitney to Kent Thiry.

6   Q.  And what's the subject of the e-mail?

7   A.  Follow-up to our conversation last week.

8   Q.  What happens in this e-mail?

9   A.  Rich Whitney provides ground rules for the agreement.

10  Q.  And if you could just briefly summarize what are those

11  ground rules as set forth here?

12  A.  That Radiology Partners wouldn't proactively solicit

13  DaVita employees, and for DaVita employees who contacted

14  Radiology Partners, they would encourage them to consider

15  opportunities internal to DaVita, and they would not pursue

16  employment opportunities for them unless they represent that

17  they're looking for other opportunities or they have had a

18  specific conversation with their supervisor.

19  Q.  Do you have an understanding of why it was necessary for

20  Mr. Whitney to set up these ground rules in writing?

21  A.  To make it clear what Radiology Partners was willing to

22  do.

23  Q.  Let's take a look at *James* log entry 100.  If you could

24  just read Mr. Thiry's response to Mr. Whitney's ground rules

25  e-mail.

1   A.  Am not comfortable with this as it is fundamentally

2   asymmetrical to our disadvantage.  How might you propose to

3   deal with this?

4   Q.  And how does Mr. Whitney respond?

5   A.  I don't understand what you mean by asymmetrical.

6   Q.  Agent Timens, based on your investigation, including

7   witnesses you've spoken to who are familiar with the agreement

8   and subsequent documents to this one, do you have an

9   understanding of whether or not there was an agreement as set

10  forth in the ground rules e-mail?

11  A.  There was.

12  Q.  Let's take a look at how that functioned in practice.

13  Let's turn to *James* log entry 105, please.  And if we can

14  start, please, with pages 2 to 3 of this e-mail thread

15  starting with Mr. Whitney's 5:24 p.m. e-mail that's labeled

16  draft.  Could you just summarize what's happening for us in

17  this e-mail.

18  A.  This is the draft of the message I referenced earlier

19  where Radiology Partners is proposing to Kent Thiry that they

20  be allowed to communicate with Guy Seay regarding their chief

21  financial officer position.

22  Q.  Why was it necessary for Radiology Partners to seek Mr.

23  Thiry's permission before having that conversation with

24  Mr. Seay?

25  A.  They had agreed not to proactively solicit DaVita

21-CR-00229-RBJ        *James* Hearing        02/24/2022      50

1   employees, so had they not gotten his permission, this would

2   be a violation of their agreement.

3   Q.  Let's turn to Mr. Usilton's e-mail in the middle of the

4   page at 9:17 p.m.  Mr. Usilton says in his e-mail, I believe

5   he says no even though this would be good for Guy, but the

6   DaVita executive team will hate the optics.  Who is the "he"

7   in I believe he says no?

8   A.  Kent Thiry.

9   Q.  What does that mean?

10  A.  That Tom Usilton believes Mr. Thiry won't allow them to

11  speak with Guy Seay.

12  Q.  Do you have an understanding whether or not consistent

13  with the agreement Radiology Partners would decline to speak

14  with Mr. Seay if Mr. Thiry didn't give them permission?

15  A.  They would not.

16  Q.  Let's take a look at *James* log entry 113.

17          THE COURT:  You said they would not.  They would

18  not what?

19          MS. CLINGAN:  That they would not speak to Guy

20  Seay without Mr. Thiry's permission.

21          THE COURT:  I'm asking her.

22          MS. CLINGAN:  Apologies, Your Honor.

23          THE WITNESS:  I believe they wouldn't proactively

24  solicit Guy Seay without Kent Thiry's permission.

25  Q.  (By MS. CLINGAN) Let's take a look at *James* log entry 113.

21-CR-00229-RBJ        *James* Hearing        02/24/2022    51

1    Looking at Mr. Thiry's January 12th e-mail at 9:04 p.m., what

2    does Mr. Thiry say about Mr. Seay in this e-mail?

3    A.   That Mr. Seay can contact Radiology Partners if he wants

4    to.

5    Q.   And if you could just read the last paragraph of his

6    e-mail.

7    A.   I would prefer that there be no reach-out to him for a

8    couple of weeks as we nail down what his DaVita Healthcare

9    Partners options are.

10   Q.   How, if at all, did this affect the contemplated

11   recruitment of Mr. Seay?

12   A.   It allowed DaVita to get a heads-up on retaining Guy Seay.

13   Q.   Let's take a look at *James* log entry 116.  Looking at

14   Mr. Kogod's e-mail on February 10th, 2014, what information

15   does Mr. Kogod relay about Mr. Seay in this e-mail?

16   A.   That he has spoken to Guy Seay, and after meeting with

17   Rich Whitney, Guy Seay still wants to stay in the Village.

18   Q.   Let's take a look at *James* log entry 119.  Based on this

19   e-mail, do you have an understanding of what happened with the

20   contemplated recruitment of Mr. Seay?

21   A.   They stopped moving forward with him.  I believe Rich

22   Whitney says it's not worth the brain damage.

23   Q.   Let's take a look at *James* log entry 122.  Looking at Mr.

24   Thiry's e-mail on March 26th, 2014, if you could just read the

25   last paragraph of Mr. Thiry's e-mail on March 26th, 2014.

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    52

1   A.  So it seems to me the process worked quite well except for

2   the Nehra part where he was asked to do something

3   inappropriate.  We accept that was a mistake, not a strategy,

4   but it would be good in stuff like this if people were extra

5   careful.

6   Q.  Let's take a look at *James* log entry 115.  And while we're

7   turning to that, who is Cameron Cleeton?

8   A.  Cameron Cleeton was a DaVita employee.

9   Q.  If we can take a look at the bottom e-mail on page 1 from

10  Mr. Whitney, could you just summarize what's happening here?

11  A.  He says he believes that Anthony Gabriel may have told

12  Cameron that we need to back off the idea of him joining RP at

13  the moment because we are starting to overstay our welcome at

14  DaVita.

15  Q.  Let's take a look at *James* log entry 124.  What's the

16  subject of this e-mail?

17  A.  CC communications outline.

18  Q.  Do you have an understanding of who CC refers to?

19  A.  Cameron Cleeton.

20  Q.  Let's look at Mr. -- Dr. Gabriel's e-mail at the very

21  bottom.  There's a series of bullet points here that include

22  CC has begun an active search, we have not made him an offer,

23  we are not recruiting, CC decided to leave.  Do you have an

24  understanding of why it was necessary to compile these bullet

25  points?

1   A.  To make sure they could message this clearly to DaVita

2   that they were following the agreement.

3   Q.  What, if anything, does this tell you about the

4   conspiracy?

5   A.  It shows a good-faith effort to comply with the agreement

6   on Radiology Partners' part.

7   Q.  Okay.  Let's take a look at *James* log entry 126.  Who is

8   this communication between?

9   A.  Kent Thiry and Rich Whitney.

10  Q.  What is Mr. Thiry's ask of Mr. Whitney in this e-mail?

11  A.  To please wait until the next week, the week of the 23rd,

12  to continue conversations with Cameron Cleeton.

13  Q.  Let's take a look at *James* log entry 131.  Let me just

14  ask, with reference to the last e-mail in which Mr. Thiry

15  asked them to put a pause on talking to Mr. Cleeton, how, if

16  at all, did that affect Radiology Partners' ability to recruit

17  Mr. Cleeton?  Did it have any impact?

18  A.  For that temporary period it stopped them from actively

19  recruiting him.

20  Q.  Okay.  Let's take a look at *James* log entry 131, and let's

21  look at Mr. Thiry's e-mail on the bottom of the page.  If you

22  could just read the first line of Mr. Thiry's e-mail.

23  A.  I'm thinking of disinviting Tom.  They just recruited

24  Cameron Cleeton away.

25  Q.  Do you have an understanding of what this means?

21-CR-00229-RBJ       *James* Hearing        02/24/2022    54

1   A.  That he's considering disinviting Tom Usilton from a

2   social event because Radiology Partners has recruited Cameron

3   Cleeton.

4   Q.  How, if at all, did that relate or further the conspiracy?

5   A.  This is one of a few examples we see across the

6   conspiracies where one potential ramification of violating

7   these agreements was exclusion from social circles or events.

8   Q.  I'd like to wrap up by discussing a candidate named Elliot

9   Holder, who I think you testified earlier was an employee of

10  DaVita.  If we can turn to *James* log entry 138, let's start on

11  page 3 with an e-mail from Belinda Reynaga on August 28th,

12  2016.  Briefly, what's happening here?

13  A.  Elliot Holder has reached out to Belinda Reynaga about

14  interest in Radiology Partners.

15  Q.  And he says -- or the top of this e-mail says, Candidate

16  has asked we keep this confidential.  Do you have an

17  understanding why that was?

18  A.  Elliot Holder didn't want his employer DaVita to know he

19  was looking at outside opportunities.

20  Q.  All right.  Let's take a look at *James* log entry 139, and

21  let's take a look at Basak Ertan's e-mail at the bottom, the

22  second paragraph.  Who does the second paragraph relate to?

23  A.  Elliot Holder.

24  Q.  And what does Ms. Ertan ask or seek clarification about

25  concerning Mr. Holder?  Looking at the last line.

21-CR-00229-RBJ        *James* Hearing        02/24/2022        55

1   A.  She says, My understanding, though, is that he has not

2   told DaVita he is looking.  Do we have to let DaVita know?

3   Q.  All right.  And what is Mr. Whitney's instruction to

4   Ms. Ertan?

5   A.  That he really feels he should give Kent a heads-up.

6   Q.  Let's take a look at *James* log entry 142.  Who is this

7   e-mail from?

8   A.  It's from Alex Won.

9   Q.  What's the subject?

10  A.  Elliot Holder, feedback from Derek Lee.

11  Q.  Looking at the portion of this e-mail that's headed

12  recommended next steps, what are the specific recommended next

13  steps for Mr. Holder?

14  A.  Alex to confirm with Elliot and his interest in the senior

15  business analyst role.  Alex to coordinate second round phone

16  interview with Jacob.  If Jacob agrees, outline next steps for

17  Elliot letting his management know that he is looking for

18  other opportunities and Radiology Partners is one of the

19  prospects.

20  Q.  Did Mr. Scanlon ultimately inform Mr. Holder he could not

21  proceed in the process until he let his management know?

22  A.  He did.

23  Q.  Is that reflected in *James* log entry 143?

24  A.  Yes.

25  Q.  All right.  Let's take a look at *James* log entry 145.

Sarah K. Mitchell, RPR, CRR

1   Turning to the second page, the e-mail from Elliot Holder,

2   what does Mr. Holder do here?

3   A.  He withdraws himself from further consideration.

4   Q.  Do you have an understanding of why he did that?

5   A.  Because he didn't want to let his supervisors at DaVita

6   know.

7   Q.  Do you have an understanding of the purpose of the

8   provision that required employees to let their supervisor know

9   they were leaving before they could move on in the interview

10  process?

11  A.  It seemed like it was to make it less likely that they

12  continue looking at Radiology Partners as an opportunity.

13  Q.  Did that succeed with respect to Mr. Holder?

14  A.  It did.

15  Q.  Let's take a look at Ms. Reynaga's response at the bottom

16  of page 1.  What does Ms. Reynaga say?

17  A.  I had a feeling this would happen once I heard he would

18  need to discuss with current employer.

19  Q.  Okay.  Agent Timens, you testified at the outset that you

20  were aware of other conspiracies that defendants entered into,

21  one of them being with a company called IntegraMed.  What was

22  the nature of that agreement?

23  A.  In this agreement the two companies DaVita and IntegraMed

24  agreed that IntegraMed wouldn't proactively solicit DaVita

25  employees.

21-CR-00229-RBJ        *James* Hearing        02/24/2022    57

1   Q.  Let's take a look at who's been identified as a

2   coconspirator for purposes of that conspiracy.  Let's start

3   with Bill Hughson.  Who's Mr. Hughson?

4   A.  He was the chief executive officer of IntegraMed.

5   Q.  And who is Phillip Stephanus?

6   A.  An executive at DaVita.

7   Q.  Let's turn to *James* log entry 154.  Let's look at the

8   bottom e-mail.  Who is it from?

9   A.  Bill Hughson.

10  Q.  If you could please just read the last sentence -- or the

11  first sentence of the last paragraph starting with, This is

12  absolutely.

13  A.  This is absolutely consistent with my behavior in general

14  and with my commitment to you that I will not proactively

15  recruit from DaVita.

16  Q.  And let's look at Mr. Stephanus's response, if you could

17  just read that.

18  A.  This underscores the importance of the rule that you are

19  insisting on with Rich, namely that they must not engage in

20  discussion unless the person's supervisor at DaVita has been

21  informed first.  Without that we'll always hear the excuse

22  that he/she was already talking to others.

23  Q.  And Ms. Stephanus references, quote, the rules you were

24  insisting on with Rich.  Do you understand who Rich refers to

25  here?

21-CR-00229-RBJ        *James* Hearing        02/24/2022     58

1   A.   Yes.

2   Q.   Who is that?

3   A.   Rich Whitney.

4   Q.   Let's turn to *James* log entry 155.  Let's look at

5   Mr. Hughson's e-mail on April 8th, 2014.  If you could just

6   read the second and third paragraph of Mr. Hughson's e-mail.

7   A.   It's been over four months since this communication.  I

8   wanted to let you know that even though I never heard back

9   from you, we have adhered to the commitment I made to you.  We

10  have not proactively communicated with anyone at DaVita about

11  opportunities at IntegraMed, and when people reach out to us,

12  we tell them that they need to speak to their boss at DaVita

13  about their interest in leaving before we can speak to them.

14  Q.   Continue, please.

15  A.   This isn't because we're not hiring.  I've actually hired

16  about 15 people in the past four months.  It's because I've

17  made this commitment to you.

18  Q.   Excellent.  I think you also testified at the outset of

19  this hearing you identified a conspiracy with a company called

20  Spectranetics.  What was the nature of that agreement?

21  A.   In that agreement the two companies agreed that

22  Spectranetics wouldn't proactively solicit employees at

23  DaVita.

24  Q.   And Scott Drake has been identified as a coconspirator for

25  purposes of this hearing.  Who is Mr. Drake?

21-CR-00229-RBJ       *James* Hearing       02/24/2022    59

1   A.  He was the chief executive officer of Spectranetics.

2   Q.  Besides documents that you've reviewed, has anyone

3   corroborated the existence of this agreement?

4   A.  Dennis Kogod was aware of an agreement between the two

5   executives.

6   Q.  Let's take a look at *James* log entry 157.  If you could

7   just read Mr. Drake's e-mail on April 11th, 2013.

8   A.  I hope you are well.  A quick note to let you know our

9   system agreement is working.  An open position we are

10  recruiting for yielded a DaVita teammate.  Our HR and senior

11  leader of the department saw their resume and stopped the

12  process with the individual.  Thought you would like to know.

13  Q.  And if we can turn to *James* log entry 158, how does Mr.

14  Thiry respond to Mr. Drake's e-mail that we just reviewed?

15  A.  He forwards it to Kim Rivera, Laura Mildenberger, Dennis

16  Kogod, and Javier Rodriguez.

17  Q.  And who is Laura Mildenberger?

18  A.  She was the head of HR at DaVita.

19          MS. CLINGAN:  Your Honor, we've made it through

20  the bulk of my direct testimony.  My great hope, without

21  causing too much consternation for the poor court

22  reporter, I think I may have about 5 or 10 minutes left to

23  do a brief redirect if necessary.

24          THE COURT:  No.  You've used your time.

25          MS. CLINGAN:  Okay.  Thank you, Your Honor.

                        Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    60

 1              THE COURT:  We'll take a fairly short break here,

 2    and then we are into DaVita's time.  Ten minutes.

 3              THE COURTROOM DEPUTY:  All rise.  Court is in

 4    recess.

 5         (Break was taken from 10:23 a.m. to 10:36 a.m.)

 6              THE COURT:  Mr. Walsh.

 7              MR. WALSH:  Thank you, Your Honor.

 8              I want to confirm that we are, in fact, connected

 9    to the system.  Thank you.

10                          CROSS-EXAMINATION

11    BY MR. WALSH:

12    Q.  Agent Timens, I'm John Walsh.  I'm representing DaVita

13    today.  Nice to meet you.

14    A.  Nice to meet you too, sir.

15    Q.  When did this investigation begin?

16    A.  At least as early as 2019.

17    Q.  So approximately three years?

18    A.  I think that's fair.

19    Q.  And over the course of those three years, how many

20    different witness interviews have taken place in connection

21    with the investigation?

22    A.  I'm not sure the exact number, but I do know that there

23    are over 100 serials in the interview portion of the

24    investigative file.

25    Q.  By serials you mean entries?

                        Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    61

1   A.   Individual files within that section, yes.

2   Q.   And you -- what was the date that you actually got

3   involved in the case?

4   A.   I don't know the exact date.  I would estimate around

5   December of 2021.

6   Q.   Of 2021.  And of all the witness 302s, the witness

7   interview memorandum that are prepared by the FBI,

8   approximately how many did you write?

9   A.   Approximately five.

10  Q.   And the first one of those was in January of 2022; is that

11  correct?

12  A.   That sounds correct.

13  Q.   And the most recent one was sometime this month in

14  February?

15  A.   Yes, sir.

16  Q.   The primary case agent on this case is Special Agent Matt

17  Hamel?

18  A.   That's correct.

19  Q.   Do you know how many interviews Special Agent Hamel has

20  conducted in this case?

21  A.   I don't, but I would think he has been involved in the

22  majority of them.

23  Q.   If I were to tell you that the defense has received 120

24  interview memorandum where he is listed as the FBI agent, does

25  that sound about right?

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    62

1    A.   That sounds like the ballpark.

2    Q.   Okay.  And is Agent Hamel present here today?

3    A.   He is.

4    Q.   Now, I'd like to turn for a moment to your preparation for

5    this hearing.  When did you learn that you were going to be

6    the testifying agent at today's hearing?

7    A.   I believe sometime in January.

8    Q.   Okay.  And did you begin to prepare for the hearing at

9    that time?

10   A.   I did.

11   Q.   Could you describe what you did to prepare for the

12   hearing?

13   A.   I have read all of the 302s in the file at least once.

14   There are numerous.  So I've read the reports.  I have had

15   many discussions with Special Agent Hamel regarding his

16   investigation, and I've also spoken with the prosecution team.

17   Q.   And have you had an opportunity to read the grand jury

18   transcripts in this case?

19   A.   I have not.

20   Q.   Does that include grand juror witness testimony you have

21   not had a chance to review?

22   A.   I have not.

23   Q.   So, for example, Agent Hamel has testified in front of the

24   grand jury, I'll represent to you.  Have you had a chance to

25   review the transcripts of his testimony?

                         Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ         *James* Hearing         02/24/2022    63

1   A.  I have not reviewed them.

2   Q.  Similarly, Andrew Hayek has testified in front of the

3   grand jury.  You haven't had a chance to review that?

4   A.  I haven't read the transcript, no.

5   Q.  Okay.  All right.  Is there any other preparation that you

6   did for this hearing today?

7   A.  I've reviewed all of the documents in the *James* log, of

8   course, and other pieces of evidence that have been collected

9   in the investigation.

10  Q.  All right.  Let's turn to the specific conspiracies that

11  are alleged in the superseding indictment.  If I understood

12  your testimony correctly this morning, you testified that the

13  conspiracies in each of the three counts were the

14  non-solicitation agreements alleged in the superseding

15  indictment; is that correct?

16  A.  That's correct.

17  Q.  And you did not, if I understood your testimony correctly,

18  offer any testimony regarding evidence as to the purpose or

19  intent of those non-solicitation agreements?

20  A.  I believe I was asked questions regarding the goals of the

21  agreements.

22  Q.  All right.  And let's start with Count 1.  What was the

23  goal of Count 1, as you have testified?

24  A.  To have employees at DaVita and at SCA stay with their

25  current employer.

                        Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    64

1    Q.  Now, the non-solicitation agreement alleged in Count 1

2    between DaVita and SCA does not, in fact, prevent either

3    company from hiring employees from each other; is that

4    correct?

5    A.  That's correct.

6    Q.  It also doesn't prevent them from competing for each

7    other's employees; is that correct?

8    A.  It prevents aspects of competition.

9    Q.  The agreement is limited, I take it from your testimony,

10   to not affirmatively or actively soliciting each other's

11   senior level employees, correct?

12   A.  Correct.

13   Q.  Now, the indictment does not allege that this count --

14   that the alleged conspiracy in Count 1 is a no-hire agreement;

15   is that fair?

16   A.  That's fair.

17   Q.  And your review of the evidence shows that it is not a

18   no-hire agreement, correct?

19   A.  Correct.

20   Q.  And your review of the evidence also showed that the

21   companies actually did compete for each other's employees

22   during the period of the alleged conspiracy?

23   A.  Yes.

24   Q.  Could you describe some of the ways they did that?

25   A.  I can't think of a particular example, but relating to the

21-CR-00229-RBJ        *James* Hearing        02/24/2022        65

1    agreement, if an employee reached out on their own to one of

2    the companies, that could initiate circumstances where it was

3    okay to hire them.

4    Q.  So even as alleged in Count 1, if an employee reached out

5    to -- a DaVita employee reached out to SCA, for example, SCA

6    could consider that candidate for employment under some

7    circumstances, correct?

8    A.  I think that's fair.

9    Q.  And in other words, if they let their supervisor know that

10   they were thinking of leaving?

11   A.  The agreement for Count 1 was done I believe primarily

12   verbally.  We don't have a specific ground rules e-mail like

13   we do in Counts 2 and 3, so I can't say in particular if that

14   was a part of that agreement, but it seems consistent with

15   what we see.

16   Q.  And, in fact, executives, senior level employees moved

17   from DaVita to SCA during the period of the alleged conspiracy

18   in Count 1, didn't they?

19   A.  Yes.

20   Q.  And executives from SCA moved to DaVita -- senior level

21   employees moved to DaVita during the period of the alleged

22   conspiracy in Count 1?

23   A.  I can't think of an example off the top of my head, but I

24   believe it's possible.

25   Q.  Have you seen in the investigatory file that an executive

21-CR-00229-RBJ        *James* Hearing        02/24/2022     66

1   at SCA named Jeff Musser moved to DaVita during the conspiracy

2   period?

3   A.   It sounds familiar, but I'd have to review the documents.

4   Q.   And another executive at SCA Kate Lope also left to go to

5   DaVita, correct?

6   A.   Can you repeat that name?

7   Q.   I believe it's Kate Lope.

8   A.   That name doesn't sound familiar to me.

9   Q.   All right.  So what evidence, Agent, with respect to

10  Count 1 shows that the purpose of the agreement was to

11  allocate the market for senior level employees between SCA and

12  DaVita?

13  A.   Can you repeat the question?

14  Q.   What evidence in the investigation shows that the purpose

15  of the alleged agreement, the non-solicitation agreement in

16  Count 1, was to allocate the market for employees of DaVita

17  and SCA?

18  A.   I believe examples where we see the agreements being

19  applied to candidates shows evidence to that effect

20  indirectly.

21  Q.   And so when we talk about allocating a market, do you have

22  a sense of what market we're talking about here from your

23  review of the investigatory file?

24          MS. CLINGAN:  Objection, Your Honor.  I'm going

25  to object to this line of questioning because it's simply

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    67

1   not relevant.  There is no requirement under Section 1 in

2   a per se case that we define the market.  That's very

3   clear.  That's the very point of the per se rule.

4         THE COURT:  Overruled.

5   Q.  (By MR. WALSH) You may answer.

6   A.  I'm sorry.  Can you repeat the question?

7   Q.  What market was being allocated between as alleged in

8   Count 1?

9   A.  The market of senior level employees at DaVita and SCA.

10  Q.  All right.  And how would you describe that market?

11  A.  Can you be more specific?

12  Q.  All right.  So if I understand your testimony correctly,

13  Agent, what you're saying is the market that is being

14  allocated in your opinion is for the senior level executives

15  at those two companies?

16  A.  That's correct.

17  Q.  All right.  All right.  Let's turn briefly to Count 2.

18  Before I do that, let me ask you this question.  Has any

19  witness in the investigation of the materials that you have

20  reviewed ever stated that the purpose of the alleged agreement

21  in Count 1 was to allocate the senior level employees of SCA

22  and DaVita?

23  A.  No.  But can I add a little more color to that?

24  Q.  Why don't you go ahead and do that, yes.

25  A.  No.  But in my experience it's not necessarily common for

1    regular people to use such language.  So, for example, when I

2    was assigned to a previous squad I worked an insider trading

3    case, and no one involved in that conspiracy used the term

4    material nonpublic information, but that didn't mean they

5    didn't have access to such information.

6    Q.  Let me put the question a different way, Agent.  You

7    testified earlier that the goal was to keep employees at

8    DaVita and SCA; is that correct?

9    A.  Yes.

10   Q.  Did any witness say that in the course of the

11   investigation?

12   A.  I would have to review the numerous 302s to be sure.  I

13   can't think of a particular instance off the top of my head,

14   but I believe it's possible.

15   Q.  Do you know whether any of the witnesses were actually

16   asked if the goal was to keep senior level employees at SCA

17   and DaVita in Count 1?

18   A.  The 302s don't document the questions that were asked, so

19   I can't gain that information necessarily from the reports.

20   Q.  Now, this is an antitrust investigation, correct?

21   A.  Yes, sir.

22   Q.  And the issue here is allocation of markets, correct?

23   A.  Correct.

24   Q.  Did any of the witnesses get asked in the course of the

25   investigation whether the purpose or intent of the

21-CR-00229-RBJ        *James* Hearing        02/24/2022    69

1    non-solicitation agreement alleged in Count 1 was to allocate

2    the market between the two -- for senior level executives

3    between the two companies?

4    A.  I don't know.

5    Q.  Okay.  Let's turn to Count 2.  Count 2 alleges that there

6    was an agreement that Hazel Health would not solicit DaVita

7    employees; is that correct?

8    A.  That's correct.

9    Q.  And let me ask you the same questions -- or similar

10   questions as I just did in Count 1.  Did any witness -- based

11   on your review of the investigation, did any witness ever

12   state that the purpose or intent of that non-solicitation

13   agreement was to allocate DaVita employees?

14   A.  They did not.

15   Q.  Did any witness ever say that the purpose or intent of

16   that non-solicitation agreement was to -- excuse me -- I'll

17   rephrase that question -- that the goal of that agreement was

18   to keep DaVita employees at DaVita?

19   A.  Specific with a witness statement in an interview?

20   Q.  Yes.  Yes.

21   A.  No.

22   Q.  Anywhere else?

23   A.  I believe you can infer that from some of Josh Golomb's

24   writing.

25   Q.  Now, in -- I just want to be clear that we understand

1   Count 2.  It's a one-way agreement, correct?  In other words,

2   even under the Government's theory in Count 2, DaVita can

3   still solicit from Hazel Health?

4   A.  Correct.

5   Q.  Now, a couple of additional questions on this.  As alleged

6   in Count 2, the non-solicitation agreement did not preclude

7   other forms of competition for DaVita employees by Hazel

8   Health, correct?

9   A.  What do you mean by other forms of --

10  Q.  Any other form of competition.

11  A.  I don't know.

12  Q.  For example, it also didn't prohibit Hazel Health from

13  hiring DaVita employees, did it?

14  A.  Correct.

15          THE COURT:  John, would you stop for just a

16  second.

17      (Pause in the proceedings.)

18          THE COURT:  Thank you.  Onward.

19  Q.  (By MR. WALSH) So my question was this was not a no-hire

20  agreement?

21  A.  That's correct.

22  Q.  And it was possible for Hazel even under the alleged

23  agreement to hire DaVita executives, correct?

24  A.  It was possible, yes.

25  Q.  So in that -- to that degree, it did not, in fact, have

1   the effect of keeping DaVita employees at DaVita?

2   A.  If there was an instance --

3         MS. CLINGAN:  I'm sorry.  I'm going to object to

4   the relevance of that question as well because this is

5   going into effects, and, again, the very purpose of the

6   Section 1 per se claim is that we don't have to go into

7   the competitive effects because the criminality comes from

8   the agreement itself.

9         THE COURT:  Okay.  The objection is overruled for

10   today's purpose.

11         MR. WALSH:  And, Your Honor, I would just

12   emphasize for the Court that I'm asking these questions

13   with respect to purpose and intent, which is an element

14   here, as I believe the Court's found.

15         THE COURT:  Well, it's an element in the ultimate

16   issue in the case per our ruling on your motion to

17   dismiss.  To what extent it is an element for *James*

18   purposes may be a different issue.

19         MR. WALSH:  Thank you.

20   Q.  (By MR. WALSH) And, in fact, just as in Count 1 between

21   DaVita and SCA, employees moved back and forth between Hazel

22   and DaVita during the alleged period of the conspiracy?

23   A.  I don't know about back and forth, but Hazel did hire at

24   least two employees that I'm aware of from DaVita.

25   Q.  And, in fact, there were four executives, higher level

21-CR-00229-RBJ       *James* Hearing       02/24/2022    72

1   employees who moved from DaVita over to Hazel Health; is that

2   correct?

3   A.  I'm not certain of the number.

4   Q.  Do you know -- if I were to represent to you that of

5   Hazel's 150 employees, 25 had come from DaVita in all, do you

6   know one way or another from the investigatory file if that's

7   the case?

8   A.  I don't.

9   Q.  But that would be one-sixth of all of Hazel's employees if

10  that were the case, correct?

11  A.  25 out of 150?

12  Q.  Correct.

13  A.  Yes, sir.

14  Q.  Your accounting skills came to bear immediately.  Let me

15  ask you a question.  Was there any investigation actually done

16  to determine whether the market for DaVita employees was

17  allocated between DaVita and Hazel Health?

18  A.  Yes.  I believe that the investigative team has looked at

19  employee lists from the two companies and, yeah, reviewed that

20  material.

21  Q.  And that review would have shown employees moving from

22  DaVita to Hazel, correct?

23  A.  Again, I'm aware of two in particular, yes.

24          MS. WALSH:  All right.  So did any -- excuse me

25  just a moment, Your Honor.

                        Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ          *James* Hearing          02/24/2022      73

1   Q.  (By MR. WALSH) Thank you, Agent.  I'm going to move to

2   Count 3 briefly.  In Count 3 the allegation is that there was

3   a non-solicitation agreement under which Radiology Partners

4   would not solicit employees at DaVita, correct?

5   A.  Yes, sir.

6   Q.  Again, that was a one-way agreement; is that correct?

7   A.  Yes, sir.

8   Q.  In other words, DaVita even as alleged in the indictment

9   could still solicit Radiology Partners' employees?

10  A.  I have reviewed an e-mail communication where it appears

11  that they might have perceived that they couldn't, but my

12  understanding of the agreement from the interviews of multiple

13  executives from Radiology Partners was that they viewed it as

14  one-way.

15  Q.  Similarly, this was not a no-hire agreement, correct?

16  A.  Correct.

17  Q.  In other words, it was possible for Radiology Partners to

18  hire employees in DaVita?

19  A.  Correct.

20  Q.  Even under the alleged agreement?

21  A.  Correct.

22  Q.  And, for example, other forms of competition for employees

23  were perfectly permissible, correct?

24  A.  It's hard for me to say without an example of what you

25  mean by that.

 1   Q.  Well, if an employee -- as we've been discussing, if an

 2   employee of DaVita reached out to Radiology Partners,

 3   Radiology Partners could consider that candidate?

 4   A.  I guess in that example I wouldn't consider it competing

 5   if it's the DaVita employee who's doing the reaching out.

 6   They're the one taking the action.

 7   Q.  All right.  So you would limit the idea of competition to

 8   solicitation?

 9   A.  I don't believe that's true.  I just think in that example

10   the initial reach-out is being done by the employee.

11   Q.  In connection with Count 3 and based on your review of the

12   investigatory file, has any witness ever stated that the

13   purpose or intent of that non-solicitation agreement as

14   alleged in Count 3 was to allocate the market for employees

15   between the two companies?

16   A.  No one has used that language.

17   Q.  And if I understood your prior answer, you don't know

18   whether that question was ever asked during the course of the

19   investigation of any of the witnesses?

20   A.  I don't know whether that particular language was used in

21   a question.  That's correct.

22   Q.  And has any witness ever stated that the goal of that

23   alleged non-solicitation agreement was to keep DaVita

24   employees at DaVita?

25   A.  I think it's possible they did, but I'm not sure without

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ          *James* Hearing          02/24/2022     75

1   reviewing the records.

2   Q.  All right.  And, again, in fact, Radiology Partners and

3   DaVita did compete for each other's employees during this

4   time, correct?

5   A.  Yes.

6   Q.  And in the end some 12 executives left DaVita to join

7   Radiology Partners during the alleged period of the

8   conspiracy; is that correct?

9   A.  I don't know of the exact number, but some did.

10  Q.  And that included Cameron Cleeton who you testified about

11  earlier?

12  A.  That's correct.

13  Q.  And Keegan Scanlon?

14  A.  That's correct.

15  Q.  And a number of others?

16  A.  There are others, yes.

17         MR. WALSH:  All right.  I'm going to move to some

18  specific questions related to Count 1, and then

19  Mr. Melsheimer will ask you about Counts 2 and 3.  First

20  of all, could we show Defense Exhibit -- or Exhibit 202,

21  which is just the superseding indictment in this case,

22  which is Docket Number 74.  And if we could go to Count 1

23  and go to the second page, and if we could highlight

24  paragraph 9 at the bottom.

25  Q.  (By MR. WALSH) The allegation -- do you see that, Agent?

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022     76

1    A.  Yes.

2    Q.  And you're familiar with this superceding indictment,

3    correct?

4    A.  Yes.

5    Q.  So the alleged period of the conspiracy is at least as

6    early as February of 2012 and continuing until at least as

7    late as July 2017, correct?

8    A.  Yes.

9    Q.  Why February 2012?  Do you know what triggered that date?

10   A.  I'm not aware of a particular incident or instance that

11   triggered that particular date.  I'm aware that from the

12   documents it becomes clear around that time that there's an

13   agreement.

14   Q.  If we could now turn to *James* log entry number 56 and put

15   that up on the screen.  And looking at the Bates page ending

16   23 -- I'm sorry.  I misread it.  I'm looking for *James* log

17   entry 19.  All right.  So if we could highlight the

18   February 17th paragraph.  I believe you testified about this

19   earlier, Agent?

20   A.  Yes, sir.

21   Q.  So this is February 17th, 2012, from Kent Thiry -- is it

22   to Dennis Kogod?

23   A.  Yes, I believe Dennis Kogod and potentially Javier

24   Rodriguez.

25   Q.  So in this e-mail Kent Thiry responds, Andrew has not

                      Sarah K. Mitchell, RPR, CRR

1    gotten back to me yet, but the only outstanding issue is

2    director or vice -- or VP level which was appropriate given

3    our contemplated business relationships.  Do you see that?

4    A.  Yes, sir.

5    Q.  So Andrew refers to Andrew Hayek?

6    A.  Yes, sir.

7    Q.  So as of this time, this e-mail suggests that there was

8    not an actual final agreement; is that correct?

9    A.  Well, the continuation of that is he says, So I think we

10   have a conflict.  So it appears that there is an agreement,

11   but a particular term of it hasn't been decided.

12   Q.  In fact, it's a business relationship conflict, correct?

13   A.  That's what it says, yes.

14   Q.  And Mr. Thiry is referring to the business relationships

15   between SCA and DaVita, correct?

16   A.  I believe he's referring to the agreement that's alleged

17   in the superseding indictment.

18   Q.  But what this says is business relationships, correct?

19   A.  Yes, sir.

20   Q.  All right.  Do you know whether there were other business

21   dealings that were under discussion at the time?

22   A.  I don't know about under discussion, but I'm not aware of

23   any special relationship between the two companies that would

24   have precluded solicitation during this time.

25   Q.  All right.  Do you have evidence specifically that you can

1  point to that an agreement began between SCA and DaVita prior

2  to February of 2012?

3  A.   Prior to February 2012?

4  Q.   Correct.

5  A.   Well, I believe in one of Dennis Kogod's interviews he

6  recalled Andrew Hayek and Mr. Thiry agreeing or at least

7  Mr. Hayek being admonished not to hire -- or solicit DaVita

8  employees when he left the company.

9  Q.   Just to follow up on Exhibit 19, which is up on the screen

10 right now, just one follow-up question.  What does business

11 relationship conflict mean based on your review of the

12 investigation?

13 A.   So another statement Mr. Kogod made in one of his

14 interviews was that it was common for Mr. Thiry to use

15 language like this to disguise something that he may not want

16 to put in writing, and I believe Mr. Kogod referred to this

17 type of language as smart communication.

18 Q.   So the phrase business relationship was code for

19 something.  Is that your testimony?

20 A.   That was what Mr. Kogod suggested.

21 Q.   All right.  Let's go to entry 12 on the Government's *James*

22 log, Exhibit 12, and if we can blow that up so we can see.

23 All right.  I don't believe you testified about this e-mail

24 this morning.

25 A.   Correct.

21-CR-00229-RBJ        *James* Hearing        02/24/2022    79

1   Q.  So I want to be sure that I understand what this is.  This

2   is an e-mail from Michael Rucker at SCA to Mr. Rodriguez at

3   DaVita, correct?

4   A.  Correct.

5   Q.  In July of 2011, correct?

6   A.  Correct.

7   Q.  And so this is prior to the February 2012 date specified

8   in the superseding indictment, correct?

9   A.  It is.

10  Q.  All right.  So what Mr. Rucker is saying here -- he's

11  passing along a message that he received from an internal SCA

12  recruitment coordinator.  Do you see that?

13  A.  Yes.

14  Q.  And she or he is in turn passing along a statement from a

15  person Sue here at DaVita, correct?

16  A.  Correct.

17  Q.  All right.  So if I understood this correctly, Sue said to

18  the SCA internal recruitment coordinator something.  The

19  internal SCA recruitment coordinator then said something to

20  Michael Rucker at SCA, and then Michael Rucker is passing this

21  comment along to Mr. Rodriguez; is that correct?

22  A.  Can I take a moment to review the document?

23  Q.  Yes.

24  A.  Okay.  Can you repeat the question?

25  Q.  Well, I'm -- am I right this looks like it would be on the

21-CR-00229-RBJ        *James* Hearing        02/24/2022    80

1    telephone?

2    A.  I think that's fair.

3    Q.  Okay.  So we've got a multiple -- a series of

4    communications being passed along ultimately to someone at

5    DaVita?

6    A.  Yes, sir.

7    Q.  Can you tell me how the statement by the person whose

8    identity has been anonymized here, Sue, how her statement is

9    in furtherance of the conspiracy?

10   A.  Can you point me to the statement by Sue that you're

11   referring to?

12   Q.  I think there's a quote here, When I contacted Sue this

13   morning -- do you see that sentence?

14   A.  Yes, sir.

15   Q.  That's the statement I'm focused on.

16   A.  I don't believe Sue was a member of the conspiracy.

17   Q.  How about the internal recruitment coordinator at SCA?

18   A.  I think in general recruiters would have been part of the

19   conspiracy.

20   Q.  Do you have specific evidence that this particular

21   recruitment coordinator was part of any conspiracy?

22   A.  I don't.

23          MS. CLINGAN:  Your Honor, I'm sorry.  I'm just

24   going to have to object here.  Our *James* log entry is for

25   Mr. Rodriguez's statements, and so to the effect of we've

21-CR-00229-RBJ       *James* Hearing       02/24/2022   81

1   been continuing to steer recruiting efforts away from

2   DaVita teammates, I'm not sure the relevance of the

3   individuals who are referenced in his internal e-mail,

4   what their participation in the conspiracy might be here.

5           THE COURT:  Well, the fact that you're not sure

6   of the relevance doesn't make it an objectionable

7   question.

8           MS. CLINGAN:  Fair point, Your Honor, but I don't

9   think that the questions that were asked relate to the

10  elements of 801(d)(2) for purposes of this document.

11          THE COURT:  Okay.  I don't know if they do or

12  not, but your objection is overruled at this point.

13          MR. WALSH:  All right.  If we could zoom out on

14  this exhibit briefly.  I apologize.  Could we now go to

15  entry number 13 on the *James* log, and if we could just

16  zoom out so that the agent can see the whole e-mail.

17  Q.  (By MR. WALSH) This is, I'll represent to you, Exhibit 13

18  on the *James* log.  At the top there's an e-mail from Michael

19  Rucker again to Mr. Rodriguez at DaVita.  Do you see that?

20  A.  I do.

21  Q.  All right.  At the bottom there there's a paragraph that

22  says, Important to note.  Do you see that?

23  A.  Yes.

24          MR. WALSH:  Can we blow that up?

25  Q.  (By MR. WALSH) This says, In fact, we turned away six or

21-CR-00229-RBJ          *James* Hearing          02/24/2022    82

1    more inquiries from qualified DaVita teammates over the last

2    six months.  Do you see that?

3    A.   Yes.

4    Q.   Has the investigation identified who these people from

5    DaVita making inquiries allegedly were?

6    A.   I'm not personally aware of their identities.

7    Q.   Has Mr. Rucker confirmed or not confirmed whether or not

8    this is actually a factual statement?  He's been interviewed,

9    correct?

10   A.   Correct.  I would have to review his interview reports.

11   Q.   Okay.  So as you sit here today you don't know whether

12   that statement is true?

13   A.   Which statement?

14   Q.   The last sentence, In fact, we have turned away.

15   A.   I can't be sure.

16   Q.   And, by the way, this e-mail is dated September 28th,

17   2011, correct?

18   A.   Correct.

19   Q.   Again, prior to the February of 2012 date?

20   A.   Correct.

21   Q.   All right.

22        MR. WALSH:  Your Honor, give me one moment.  Just

23   coordinating on time, Your Honor.

24   Q.   (By MR. WALSH) All right.  Let's turn to just a couple of

25   other things.  I believe you testified earlier about a

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022        83

1    recruiter named Carrie Mayhan; is that correct?

2    A.  That's correct.

3    Q.  She was at Spencer Stuart?

4    A.  That's correct.

5    Q.  If we can take a look at entry number 48 on the

6    Government's *James* log, which is our Exhibit 227.  By the way,

7    the original document in the *James* log is something like 170

8    pages long, or even more?

9    A.  That sounds accurate.

10   Q.  All right.  And if we could take a look now at the

11   specific comment -- asked for her thoughts -- yes.  I believe

12   you testified about this earlier this morning, correct?

13   A.  Correct.

14   Q.  All right.  So this is a statement posted to what?  What

15   is this -- this is a database at the recruiter?

16   A.  Yes.

17   Q.  Who is Carrie Mayhan speaking to when she posts this?

18   A.  I don't believe she's speaking in particular to anyone.

19   It's just that this comment will be present for anyone who

20   reviews this source, Alexandra Helfan.

21   Q.  And in this notation she says, Told her we couldn't go

22   directly into DaVita.  Do you see that?

23   A.  I do.

24   Q.  Does this indicate in any way why?

25   A.  No, it doesn't.

21-CR-00229-RBJ        *James* Hearing        02/24/2022    84

1   Q.   Okay.  And, in fact, the other couple of entries in this

2   same exhibit in the Government's *James* log by Carrie Mayhan

3   also don't give a reason why they could not recruit directly

4   into DaVita?

5   A.   That sounds correct.

6   Q.   Have you interviewed Ms. Mayhan -- or has the

7   investigation interviewed Ms. Mayhan?

8   A.   I'm not certain.  I have not personally.

9   Q.   So do you know whether Ms. Mayhan herself knew about an

10  agreement as alleged in the indictment?

11  A.   She was aware of the instructions she was given.  I don't

12  know about an agreement.

13          MR. WALSH:  All right.  In the interest of time,

14  I'm going to turn it over to Mr. Melsheimer now.  Thank

15  you, Your Honor.

16          MR. MELSHEIMER:  May it please the Court, Your

17  Honor.

18          THE COURT:  Sir.

19                    CROSS-EXAMINATION

20  BY MR. MELSHEIMER:

21  Q.   Agent Timens, good morning.

22  A.   Good morning.

23  Q.   Been at it a while?

24  A.   I have.

25  Q.   So His Honor asked you one question in your examination.

1   Do you remember that question?

2   A.  It was regarding Guy Seay.

3   Q.  Yes.  He asked you to respond to what RP -- what Radiology

4   Partners would do if Mr. Thiry had said that Radiology

5   Partners couldn't contact Guy Seay.  Do you remember that

6   question?

7   A.  I do.

8   Q.  And do you remember what your answer was?

9   A.  I believe they wouldn't.

10  Q.  Right.  Now, you know that answer is wrong, right?

11  A.  I don't know that.

12  Q.  Well, you only sat in about five interviews in this entire

13  investigation, right?

14  A.  I've sat in on more than that, but a small number compared

15  to the total.

16  Q.  A relatively small --

17  A.  Yes, sir.

18  Q.  I'm not fussing at you about that.  You're new to the

19  case.  But you sat in on the interview with Mr. Usilton,

20  didn't you, ma'am?

21  A.  Yes.

22  Q.  And you know that Mr. Usilton was asked the same question

23  the judge asked about what Radiology Partners would have done

24  if Mr. Thiry had declined to allow them to reach out to

25  Mr. Seay, do you remember that?

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ      *James* Hearing      02/24/2022   86

1          THE COURT:  Sir, that wasn't really the purpose

2    of my question.

3          MR. MELSHEIMER:  I'm sorry, Your Honor.

4          THE COURT:  My question was given the way the

5    question was phrased, it was ambiguous as to what her

6    answer referred to.

7          MR. MELSHEIMER:  I see, Your Honor.

8          THE COURT:  I was just trying to clear up the

9    record.

10         MR. MELSHEIMER:  Thank you, Your Honor.

11   Q.  (By MR. MELSHEIMER) But with respect to your answer -- and

12   I apologize for getting the Court's question wrong.  But with

13   respect to your answer, you know that Mr. Usilton told you and

14   the other agents that they would have gone and reached out to

15   Mr. Seay anyway, correct?

16   A.  That is what Mr. Usilton said.

17   Q.  Okay.  And Mr. Usilton -- just so we're all on the same

18   page, Mr. Usilton was part of Radiology Partners, correct?

19   A.  He was.

20   Q.  Okay.

21   A.  He was not the ultimate decision-maker, but he was, yes.

22   Q.  And, in fact, with respect to Mr. Seay, we know that

23   Radiology Partners did, in fact, talk to him, right?

24   A.  After receiving permission, yes.

25   Q.  They had multiple conversations with him, correct?

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022      87

1    A.  I don't know the number.

2    Q.  Well, you know they talked to him at least one time about

3    his job, right?

4    A.  Yes, sir.

5    Q.  And he thought about it and eventually elected to stay at

6    DaVita, correct?

7    A.  That's correct.

8    Q.  He had been a longtime and valuable DaVita employee; is

9    that correct?

10   A.  He had been a longtime employee.  I'm not aware of his

11   performance.

12   Q.  And you know that Mr. Thiry talked to him about the idea

13   of either staying at DaVita or going to Radiology Partners.

14   Is that reflected in your interviews?

15   A.  Yes.

16   Q.  Okay.  Now, let's go to Count 2.  That's the Hazel count,

17   right?

18   A.  Yes, sir.

19   Q.  And the individual number three in the indictment there,

20   we know now that's Josh Golomb, right?

21   A.  Yes, sir.

22   Q.  And that conspiracy -- I think Mr. Walsh pointed this out

23   -- that alleged conspiracy does not deal with senior level

24   employees, but is alleged to deal with all employees, correct?

25   A.  Correct.

1  Q.  Now, it's a one-sided agreement, right?

2  A.  Correct.

3  Q.  In other words, Hazel committed that it would -- Hazel

4  committed that it would not solicit DaVita's employees, but

5  DaVita, according to your investigation, didn't make any such

6  commitment to Hazel, correct?

7  A.  Correct.

8  Q.  Okay.  Let's talk about how the agreement, the alleged

9  agreement was supposed to work.  The Government alleges that

10 it began at least as early as April 2017?

11 A.  That's correct.

12 Q.  And continued through April 2019, right?

13 A.  I believe that's right.

14 Q.  And it was formed in about April 2017; is that correct?

15 A.  That sounds right.

16 Q.  Okay.  So now I think you said on your direct examination,

17 and correct me if I'm wrong about this, that it started in

18 relation to the hiring of Mr. Quinones from DaVita to Hazel,

19 correct?

20 A.  The actual hiring didn't happen for months later, but the

21 beginning of the recruitment process.

22 Q.  Now, Mr. Quinones was a senior level DaVita employee

23 before he was hired by Hazel, right?

24 A.  Yes.

25 Q.  He was solicited by Hazel, right?

21-CR-00229-RBJ          *James* Hearing          02/24/2022     89

1    A.  I don't know that.

2    Q.  Well, does your investigation not reveal that Mr. Golomb

3    reached out to Mr. Quinones for a possible job opportunity?

4    A.  I can't be certain who reached out to who first.  There

5    are other forms of communication besides these text messages.

6    Q.  Now, the Government interviewed Mr. Quinones, right?

7    A.  Yes, sir.

8    Q.  And he said he told your investigation that he had decided

9    on his own to tell Mr. Thiry that he was thinking about

10   leaving the company, right?

11   A.  I'd have to review the report to be certain.

12   Q.  Okay.  Well, let's take a look.  If we might pull up on

13   the screen the Quinones 302, which is Exhibit 253 at page 3,

14   the top paragraph.  Do you see where it says, When Quinones

15   thought the offer from Hazel was serious, he decided to and

16   did tell Mr. Thiry on the call he was thinking about leaving

17   DaVita?  He goes on to say that he was thinking about joining

18   a startup run by Mr. Golomb, right?

19   A.  That's what this says, yes.

20   Q.  You know that DaVita's response to this was to compete to

21   try to retain him at DaVita, right?

22   A.  Yes.

23   Q.  DaVita offered Mr. Quinones substantially more money,

24   right?

25   A.  I don't know that.

                        Sarah K. Mitchell, RPR, CRR

1   Q.   A promotion?

2   A.   I'm also not aware of that.

3   Q.   Let's take a look at Exhibit 205.  Do you know what a

4   proffer letter is, Special Agent Timens?

5   A.   Yes.

6        MS. CLINGAN:  Objection, Your Honor.  I'm going

7   to object to the use of the proffer letter.  This is in no

8   way evidence.  This is summaries of advocacy presentations

9   that were made by counsel.  This is not even witness

10  statements.

11       THE COURT:  What's your point here, sir?

12       MR. MELSHEIMER:  Well, Your Honor, I'm just --

13  I'm trying to illustrate that the Government was informed

14  by the lawyers for Hazel that Mr. Quinones was offered a

15  raise and a promotion to stay at DaVita.  She said she

16  didn't know, and I was just checking to check her

17  recollection on that if reading this would either refresh

18  her recollection or tell her that that happened.

19       THE COURT:  Well, if all you're doing is

20  refreshing her recollection, that's fine, but you don't

21  need to put it up on my screen then.

22       MR. MELSHEIMER:  Thank you, Your Honor.  Is there

23  a way just to show her screen, Your Honor?

24       THE COURT:  I don't know.  Put it up, and I won't

25  look at it.

21-CR-00229-RBJ        *James* Hearing        02/24/2022    91

1          MR. MELSHEIMER:  Thank you.

2          MS. CLINGAN:  Your Honor, just to lay a bit of

3    foundation here, I think he hasn't asked the witness if

4    her recollection would be refreshed by such a document.

5          THE COURT:  The procedure is you can show her

6    anything in the world including a recording of Elvis

7    Presley singing Blue Hawaii, and if that helps refresh her

8    recollection, then she listens to the recording, says

9    she's done it.  He says, Is your recollection refreshed?

10   She says it is.  What's your answer?  She gives it.

11   That's how it works.  And, by the way, Elvis Presley would

12   lighten up the hearing.

13         MR. MELSHEIMER:  Do you have the recording of

14   Mr. Presley, Brett?

15   Q.  (By MR. MELSHEIMER) Let me just ask -- in the interest of

16   time, Special Agent Timens, let me just say this.  You don't

17   know whether or not Mr. Quinones was offered a raise and a

18   promotion to stay at DaVita?

19   A.  I don't.

20   Q.  Okay.  You do know, though, that he told the Government

21   that he wanted to inform Mr. Thiry as a matter of professional

22   courtesy.  Do you recall that?

23   A.  Yes.

24   Q.  That it was not some requirement that was implemented by

25   Mr. Thiry or his employer, but that he simply wanted to do

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022      92

1    that based on his relationship with Mr. Thiry and the company.

2    Does that sound about right?

3    A.   In the context of this situation, I believe it was either

4    Josh Golomb was going to reach out to Mr. Thiry -- well, he

5    was but for Mr. Quinones wanting to make the first contact.

6    Q.   But, in fact, you know -- as I understand you, you know

7    that Mr. Quinones made the first contact --

8    A.   Yes, sir.

9    Q.   -- with Mr. Thiry, correct?  Now, there were other

10   employees who left Hazel to go -- excuse me -- who left DaVita

11   to go to Hazel that were aware of no such agreement to either

12   notify or talk to Mr. Thiry or anything like that, right?

13   A.   I'm not sure.

14   Q.   Well, do you remember a woman named Jeannie Chen?

15   A.   I'm familiar with the name, but not the particulars of

16   that instance.

17   Q.   And she's a former DaVita employee who left to go to

18   Hazel, right?

19   A.   I'd have to review the documents to be sure.

20   Q.   Okay.  Were you aware that Ms. Chen was involved in hiring

21   people from DaVita when she worked at Hazel?

22   A.   No.

23   Q.   Were you aware that she had been involved in hiring Arlin

24   Villa-Howells?

25   A.   It appears from the records I've reviewed that Josh Golomb

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing          02/24/2022      93

1    seemed to be the primary contact with Ms. Howells.

2    Q.  But do you remember Ms. Chen telling your investigation at

3    all in the course of your review of all these documents that

4    she was not told to stay away from or avoid people at DaVita

5    in hiring?

6    A.  I'd have to review the document you're referring to.  I'm

7    sorry.

8    Q.  Now, you mentioned to the Court that you had not -- the

9    Government had not spoken to Mr. Golomb, correct?

10   A.  Correct.

11   Q.  Were you aware, though, that Mr. Golomb's attorneys made a

12   proffer to the Government about what Mr. Golomb would say?

13   A.  I'm aware that his attorneys gave an advocacy presentation

14   to the attorneys for the Government.

15   Q.  Were you aware in that presentation that those attorneys

16   proffered that Mr. Golomb would say that there was no

17   agreement between Mr. Thiry and Mr. Golomb?

18   A.  Myself nor anyone else from the FBI was present for that

19   discussion, so I don't know the particulars of what they said.

20   In general I believe they said something to that effect.

21   Q.  Did you have an opportunity to review the proffer letter

22   that the Government produced to the defense in this case that

23   laid all this out?

24   A.  I have not.

25   Q.  I understand you weren't there.  Did you hear with respect

Sarah K. Mitchell, RPR, CRR

1   to that proffer that Mr. Golomb would state that anything he

2   did with respect to hiring at DaVita was a one-sided

3   unilateral commitment he made, and it was not the result of

4   any agreement with Mr. Thiry?

5   A.  I don't know if they said that or not.

6   Q.  Was that available to you to review for preparation for

7   this hearing today?

8            MS. CLINGAN:  Objection, Your Honor.  I'm going

9   to renew my objection here.  Even under the liberal

10  construction of what's relevant for purposes of a *James*

11  hearing under 104, this simply is not evidence.

12           MR. MELSHEIMER:  I'll move on, Your Honor.

13  Q.  (By MR. MELSHEIMER) Now, with respect to Count 2 --

14           THE COURT:  I guess you won that one.

15           MS. CLINGAN:  It was about time.

16  Q.  (By MR. MELSHEIMER) The only declarants the Government

17  lists with respect to Count 2 are Mr. Golomb, Mr. Thiry, and

18  Mr. Weissert, right?

19  A.  Yes, sir.

20  Q.  Okay.  Now, with respect to Mr. Weissert, let's take a

21  look at *James* log entry 62.  Now, he's the only declarant in

22  Count 2 that's not named Thiry or Golomb, right?

23  A.  Correct.

24  Q.  Now, he works for Hazel, doesn't he?

25  A.  I think that's right, yes.

21-CR-00229-RBJ       *James* Hearing       02/24/2022    95

1    Q.  And the Government interviewed him on or about March 4th,

2    2021; is that correct?

3    A.  I'm aware he was interviewed.  The exact date I'm not sure

4    of.

5    Q.  You testified on your direct examination he was an

6    employee of Paladina which was a wholly-owned subsidiary of

7    DaVita?

8    A.  The organization structure, the specifics might escape me

9    a bit, but, yes, it was part of DaVita.

10   Q.  Well, let me ask you this.  When did Mr. Weissert become a

11   member of the conspiracy to allocate employees in Count 2?

12           MS. CLINGAN:  So, Your Honor, I'm going to object

13   to this line of questioning as well.  The Tenth Circuit

14   has been very clear that for purposes of a *James* hearing

15   we don't have to identify when a particular declarant

16   became a member of the conspiracy so long as we can

17   determine that the individual was a member of the

18   conspiracy at the time the declaration is sought to be

19   admitted, and that determination can be made with

20   reference to the documents themselves.

21           THE COURT:  Okay.  But why isn't he allowed, if

22   he's curious, to find out when she became a member?

23           MS. CLINGAN:  Your Honor is correct.  I suppose

24   defense counsel can use his time however he chooses, but

25   it's not relevant for purposes of 801(d)(2).

21-CR-00229-RBJ        *James* Hearing        02/24/2022    96

1           THE COURT:  Well, maybe so, but he's entitled to

2     ask his questions.  If he's interested in knowing when he

3     became part of it, he can ask.  Whether or not that's a

4     necessary fact is a different issue.

5     Q.  (By MR. MELSHEIMER) Special Agent Timens, do you have any

6     idea when Mr. Weissert became a member of the conspiracy

7     alleged in Count 2?

8     A.  I'm not sure of when exactly he became a member.

9     Q.  Let's take a look at *James* log entry 62.  Can we pull that

10    up?

11           MR. MELSHEIMER:  Your Honor, rather than pull up

12    the underlying text, I actually think it's easier to read

13    on this log.  So if you could pull up log 62, and

14    highlight that, if you would.

15    Q.  (By MR. MELSHEIMER) Now, this is -- this is alleged to be

16    a statement in the course and furtherance of an alleged

17    conspiracy, and this is Mr. Golomb telling Mr. Weissert, I'm

18    slow rolling the next conversation with Arlin.  That's

19    this Arlin Villa-Howells that was at DaVita and eventually

20    went to work at Hazel, right?

21    A.  Yes, sir.

22    Q.  And then Mr. Weissert's response is, Just make sure you

23    clear it with KT when you need to, right?

24    A.  Yes.

25    Q.  Now, Mr. Weissert told the Government what that meant when

21-CR-00229-RBJ        *James* Hearing        02/24/2022    97

1   they interviewed him, right?

2   A.  I'd have to look at the report.

3   Q.  Well, let's look at Exhibit 206, the Weissert 302, at

4   page 2, the second-to-last paragraph, if we can pull that up.

5   He's asked specifically about that entry, isn't he, ma'am?

6   A.  Yes.

7   Q.  And he says clear with KT meant Golomb had to ensure that

8   Hazel was not violating any non-solicitation agreements,

9   right?

10  A.  Yes.

11  Q.  Now, you know that non-solicitation agreements can

12  sometimes be part of normal employment contracts, right?

13  A.  Correct.

14  Q.  When you worked at Pricewaterhouse, did you have a

15  non-solicitation after you left?

16  A.  I wasn't senior enough for that to apply.

17  Q.  But you know of those kinds of agreements, right?

18  A.  Yes, sir.

19  Q.  And you know that some of the executives at DaVita had

20  such non-solicitation agreements, right?

21  A.  Yes.

22  Q.  And those non-solicitation agreements would prevent them

23  from individually participating in solicitation for six months

24  or 12 months or however long the actual agreement was, fair?

25  A.  Yes.

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    98

1   Q.  And this is what Mr. Weissert's referring to here is to

2   make sure that there wasn't any non-solicitation agreements by

3   anyone at Hazel like Mr. Golomb involved in the recruitment of

4   Arlin, correct?

5   A.  I'm not sure that's how I would interpret this.  It

6   doesn't say Josh Golomb's non-solicitation agreement, but

7   Hazel in general, and Hazel had a non-solicitation agreement

8   with DaVita at this time that's alleged in the superseding

9   indictment.

10  Q.  Well, let's go down to the rest of that 302, ma'am.  The

11  line that begins, Weissert did not talk to Golomb.

12          MR. MELSHEIMER:  If you could highlight, sir, I

13  think it's on the next page -- or the next paragraph.

14  Q.  (By MR. MELSHEIMER) He says, Weissert did not talk to

15  Golomb about his NSA.  Now, you understand that to be

16  non-solicit agreement, right?

17  A.  Yes, sir.

18  Q.  And did not know that Golomb was constricted by his own

19  NSA.  Do you see that?

20  A.  Yes.

21  Q.  And you understand, don't you, that that is referring to

22  Mr. Golomb's agreement with the company not to solicit

23  employees, not some alleged conspiracy as in Count 2, right?

24  A.  This is particularly referring to Mr. Golomb, yes.

25  Q.  And then there's an additional log entry that I want to

21-CR-00229-RBJ      *James* Hearing      02/24/2022    99

1   look at, if we can go back to the log, log entry 62.  This is

2   Mr. Golomb saying, Actually, so ideal would be to make her an

3   official offer tomorrow, but won't give -- but won't until you

4   give me the thumbs-up.  Do you see that?

5   A.  Yes, sir.

6   Q.  Now, the thumbs-up Mr. Weissert told the Government in the

7   302 was not a reference to any illegal agreement, right?

8   A.  To be sure I'd have to look back at the report.

9   Q.  Let's look at the Weissert 302, which is Exhibit 206, on

10  the top of page 3.

11  A.  Thank you.

12  Q.  And apparently in this interview the Government was doing

13  the same thing you and I are doing right now, right?  Weissert

14  was shown a text message he received from Golomb, right?

15  A.  Yes.

16  Q.  And they asked him apparently, or he said give me the

17  thumbs-up meant everything was agreed upon regarding timing,

18  right?

19  A.  That's what this says, yes.

20  Q.  It wasn't a thumbs-up in compliance with some alleged

21  conspiracy.  It was Mr. Weissert's concern that the timing of

22  Ms. Villa-Howells' exit from DaVita or Paladina to Hazel would

23  be not disruptive to her current employer, right?

24  A.  That's what this is saying, yes.

25  Q.  Now, you were asked about what corroboration you had about

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    100

1    the alleged conspiracy in Count 2, and, again, I want to make

2    sure -- if I got this wrong, speak up, but I think you said

3    that your corroboration was a statement from Mr. Kogod, right?

4    A.   Primarily the documents that we've been reviewing today,

5    but, yes, Mr. Kogod was aware of an issue.

6    Q.   Outside the documents, which I think you and I have just

7    established can be subject to multiple interpretations, right?

8    A.   Some of them can.

9    Q.   I mean, it's important that you know what someone means by

10   thumbs-up or timing to really understand whether it's

11   something benign or something more sinister, right?

12   A.   I don't know if I'd make that distinction because I'm not

13   sure it's appropriate for the current supervisor to be so

14   involved in the process, but...

15   Q.   You don't think it's appropriate for the supervisor to be

16   involved in the exit of one of their employees if they're

17   trying to make sure that the timing is not disruptive to the

18   company?  Doesn't that seem like a fair inquiry?

19   A.   In my experience my previous employers have never been

20   involved with my transitions.

21   Q.   To go back to your Kogod example, I think you said that he

22   -- a corroboration of the alleged conspiracy in Count 2 was

23   that he said -- or you said he was aware of an issue regarding

24   recruiting.  Do you remember that?

25   A.   Yes.

21-CR-00229-RBJ        *James* Hearing        02/24/2022    101

1   Q.  You didn't say that he was aware of an agreement to

2   allocate employees, right?

3   A.  Right.

4   Q.  And you didn't participate in Mr. Kogod's interview and in

5   his 302s, fair?

6   A.  Correct.

7   Q.  And you can be aware of issues regarding recruiting

8   without being part of an illegal conspiracy, right?

9   A.  Correct.  But what he was specifically referring to was

10  Julio Quinones' recruitment from DaVita, and I'd have to

11  review the document to be sure of the exact context, but I

12  believe he was saying that Mr. Thiry wasn't allowing Josh

13  Golomb to hire Mr. Quinones.

14  Q.  Just to be clear, Mr. Quinones went to work for Hazel,

15  right?

16  A.  He did.

17  Q.  And we've already established you don't know, but you

18  don't dispute that he was offered a raise and a promotion to

19  stay, right?  You don't dispute that?

20  A.  I don't know whether that's true or not.

21  Q.  Well, we know he left?

22  A.  Yes.

23  Q.  Now, let's talk a little bit about -- I want to -- a term

24  that you used repeatedly in describing the alleged

25  conspiracies is proactive solicitation.  Do you recall that?

Sarah K. Mitchell, RPR, CRR

1    A.  Yes.

2    Q.  And you're distinguishing that from just regular

3    solicitation, right?

4    A.  I guess it is redundant.

5    Q.  Well, but you used it several times, and I thought it had

6    -- I thought it had some importance to you, but proactive

7    recruiting means to you and this investigation that one

8    company would make the first outreach to the individual,

9    right?  That's proactive recruiting, isn't it?

10   A.  Yes.

11   Q.  Now, of course, when the person wants to come interview,

12   and they do interview, and there's conversations about the job

13   and the details and how great it is and all that, that's

14   solicitation too, right?

15   A.  I would think that's more just in general the recruiting

16   process.  I would interpret soliciting as making that first

17   contact.

18   Q.  But you know that when people -- in your own experience

19   and based on this investigation, you know that when people

20   moved from DaVita to SCA or DaVita to Hazel or DaVita to

21   Radiology Partners there was often a lot of back and forth in

22   interviews with those companies about how great the job was

23   and how you're really going to like it here, right?

24   A.  There were multiple back and forths, yes.

25   Q.  And those companies, Radiology Partners and Hazel and SCA,

21-CR-00229-RBJ      *James* Hearing       02/24/2022    103

1   they were selling the idea of a job to these employees, right?

2   A.  Well, particularly with Julio Quinones I wouldn't view

3   Josh Golomb's communications as selling necessarily.

4   Q.  Well, with respect to all the employees that have moved,

5   and I think you've established you don't know how many, but

6   it's more than we can count on two hands, right?

7   A.  Across all three?

8   Q.  Yes.

9   A.  Yes.

10  Q.  Okay.  And you know that those people -- you've seen in

11  the interview logs and other documentation that there was

12  competition going on between, hey, come work here, this is a

13  great place to work, we'll pay you more money, we'll give you

14  a better location, things like that.  That's just a common

15  sense way of recruiting, right?

16  A.  I can't think of a particular example where I see those

17  statements being made, but that is a common sense method of

18  recruiting.

19  Q.  Well, do you know from your knowledge of the investigation

20  that one of the reasons Mr. Quinones wanted to leave DaVita

21  was because he wanted to get away from all the travel he was

22  having to do on the international side, and he wanted a job

23  where he didn't have to do as much travel, fair?

24  A.  Yes, sir.

25  Q.  And that's a fair thing for companies to compete on, isn't

21-CR-00229-RBJ          *James* Hearing          02/24/2022    104

1    it?  Hey, you come here, you don't have to do as much travel,

2    fair?

3    A.  Yes, sir.

4    Q.  I want to talk about some specific other documents.

5    Ms. Ertan, Basak Ertan, remember her?

6    A.  Yes, sir.

7    Q.  So I've got 21 entries on the *James* log related to Count 3

8    -- so I've moved on to Count 3 -- with Basak listed as a

9    declarant, right?  I'm just going to read them for the record.

10   67 to 70, 72 to 75, 77, 88, 90, 104, 120 to 121, 123, 128, and

11   129.  Now, she was a DaVita employee who left DaVita to go to

12   work for Radiology Partners, right?

13   A.  Correct.

14   Q.  And the Government in log entry 104 is seeking to admit a

15   statement by Ms. Ertan in November of 2013, right?  Just take

16   a look, if we can pull up log 104.  She says, I have a short

17   call with KT tomorrow.  Any messages I can help reenforce with

18   him or any topics to avoid based on how your discussions with

19   him are going?  And then Mr. Whitney -- right?

20   A.  Yes, sir.

21   Q.  Says, Just that we weren't the reason you were exploring

22   other opportunities.  You felt it was time, right?

23   A.  That's right.

24   Q.  Now, she was still at DaVita thinking about going to work

25   for Radiology Partners, right?

Sarah K. Mitchell, RPR, CRR

1    A.  That's right.

2    Q.  And the statements referenced in the log reference to a

3    call that Ms. Ertan was going to have with Mr. Thiry, right?

4    A.  Yes.

5    Q.  And it was a call about her leaving the company, right?

6    A.  I can infer that, yes.

7    Q.  It certainly doesn't strike you as unusual that someone

8    who worked for a company for a long time and had a

9    relationship with the CEO might want to talk to them about

10   their exit and why they're leaving, right?

11   A.  That does not seem odd.

12   Q.  You're not suggesting that Ms. Ertan was a member of some

13   illegal conspiracy at this time, right?

14   A.  I can't judge that by this statement alone.

15   Q.  Well, and were you aware that Ms. Ertan told the

16   Government in her 302 interview that she was not aware of any

17   agreement between Mr. Whitney and Radiology Partners and

18   DaVita?

19   A.  She did.

20   Q.  Now, she was involved -- Ms. Ertan, after she left DaVita,

21   she was involved in the recruitment of DaVita employees for

22   Radiology Partners, right?

23   A.  Yes.

24   Q.  And the Government is seeking to admit a number of log

25   entries -- I'm just going to read them for the record -- 67 to

1   70, 72 to 75, 77, 123, 128, and 129, and I just want to take a

2   couple of minutes.  So Ms. Ertan was one of these people that

3   had a contractual non-solicitation with DaVita following her

4   departure, right?

5   A.  Yes.

6   Q.  She told the FBI that one of the reasons she was cautious

7   about recruiting people from DaVita was because she was still

8   within her 12-month non-solicitation window, right?

9   A.  Yes.

10  Q.  The discussions that she had with Mr. Scanlon, who you

11  talked about on your direct examination, that took place

12  during the time period where she believed she was still under

13  a non-solicitation with her former employer, right?

14  A.  I'm not sure of that.

15  Q.  Well, let's take a look at the -- what she told the FBI in

16  her 302.  This is Exhibit 65, page 6.  Can you read this with

17  me, ma'am?  Ertan was cautious because she was still within

18  her non-solicitation window with DVA as she was roughly four

19  months out from her time at DVA, and she had a 12-month

20  restriction.  Did I read that right?

21  A.  Yes, sir.

22  Q.  So, in fact, whatever she's communicating with Mr. Ertan

23  (sic) is not the result of some alleged agreement between

24  DaVita and Radiology Partners, but, in fact, it's because she

25  was worried about her own non-solicitation, fair?

Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    107

1   A.  Can you repeat the question?

2   Q.  Her hesitancy and her actions in being involved with

3   Mr. Scanlon in terms of possibly recruiting him were informed

4   by -- not by some knowledge she had of an agreement between

5   Radiology Partners and Kent Thiry and DaVita, but because of

6   her own non-solicitation, right?

7   A.  That's correct.

8   Q.  Mr. Scanlon --

9           THE COURT:  Your time is about up.  Finish up in

10  a minute, please.

11          MR. MELSHEIMER:  Thank you, Your Honor.

12          THE COURT:  Two minutes actually.  Two minutes.

13          MR. MELSHEIMER:  I do get two minutes, did you

14  say?  Okay.  Thank you, Your Honor.  I'm going to give

15  30 seconds back.

16  Q.  (By MR. MELSHEIMER) Scanlon ultimately left DaVita to go

17  work with Radiology Partners, right?

18  A.  Yes, sir.

19  Q.  Okay.  Now, with respect to Count 3, just real quick, I

20  didn't hear you mention the roles in the conspiracy of the

21  following people.  See if I've got this right.  Ms. Reynaga,

22  Ms. Hendricks, Mr. or Ms. Desai, Mr. Lombardo or

23  Mr. Stephanus.  I saw e-mails, but I didn't hear you testify

24  about what their roles were, right?

25  A.  That sounds about right.

                        Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ       *James* Hearing       02/24/2022   108

1   Q.  And I'm not fussing at you.  I know you had a lot to do,

2   but I wanted to make sure I didn't miss that.  And with

3   respect to --

4           MR. MELSHEIMER:  You know, the last question

5   should be a good one, Your Honor, so I'm going to try to

6   make it good.

7   Q.  (By MR. MELSHEIMER) So with respect to Count 3, are you

8   aware that Radiology Partners' lawyers have told -- strike

9   that.  Were you aware that Mr. Whitney has described the

10  agreement, the alleged relationship that he had with Mr. Thiry

11  as something that he wasn't sure Mr. Thiry ever agreed to?

12  A.  That doesn't sound correct to me, but if you have a

13  document that can refresh my memory.

14          MR. MELSHEIMER:  Well, I'm out of time.

15          THE COURT:  All right.  Thank you.

16          MR. MELSHEIMER:  Thank you.

17          THE COURT:  Now, I need to make a confession

18  here.  I told you all that you had reserved half a day

19  next Thursday.  You probably realized when I said that

20  that I was wrong.  I took that from my docket that was

21  prepared for me for next Thursday, but Mary corrected me

22  during the break and said that's not true.  She had made a

23  mistake, and you had reserved a whole day.  I didn't

24  really want to tell you that, to be honest.  But that

25  being said, you can use the whole day of Thursday of my

1    life to hammer at me, and if you want to use part of that

2    time with respect to the *James* issues, of course you can.

3          But in the meantime, I think it might be helpful

4    to the DaVita side to think about the following.  If you

5    assume that the Court will be satisfied that for purposes

6    of Rule 801(d)(2)(E) the Government has made a

7    preponderance of the evidence showing of the existence of

8    a conspiracy, which is the first of the three elements,

9    through the combination of the testimony of Agent Timens,

10   the admissions in the documents by DaVita which are

11   otherwise admissible, and by the alleged coconspirator

12   statements themselves, if you assume that the Court will

13   make that finding, then does DaVita wish to identify

14   specific documents within the 161 *James* entries, or

15   whatever the total number is, that they want to call out

16   for particular objection?  At this point you objected to

17   each and every, and I suspect that that isn't going to

18   fly, so I just say that advisedly.  Is there anything else

19   that I can do for you in the last four minutes we have

20   this morning?

21          MS. CLINGAN:  Your Honor, if I may just inquire

22   so that we can streamline events for next week.  Among the

23   motions that are set to be heard next week, does Your

24   Honor wish to hear argumentation on the jury instructions,

25   or would you like to reserve that for a later date?

 1            THE COURT:  There isn't any later time.  Go ahead

 2    and have a seat and let me talk with you about jury

 3    instructions.  I'll give you a brief talk that I give in

 4    every case that usually doesn't apply to criminal cases.

 5    It's more in the civil realm that typically the parties

 6    are disputing forms of instructions.  Either way, you

 7    should want the instructions to be correct.  I mean, you

 8    are disputing and disputing zealously, and that's what

 9    litigation is all about.  That's your obligation to your

10    client.

11            But when it comes to the instructions, that is

12    where if you are able to convince me to give an

13    instruction that turns out to be erroneous, then all of

14    this work that you're putting in including the trial will

15    be for naught because from the perspective of the

16    appellate judges, they're typically not going to be

17    looking to see whether the evidence supports the verdict.

18    That takes too much work, and it generally isn't done.

19    But it's fairly common for them to look at the

20    instructions, and if there's instructional error, that's a

21    very easy way to reverse a verdict .  So bear that in

22    mind.  This is not the place where you should be trying to

23    convince the Court to give the best possible favorable

24    instruction if it's wrong, and I really mean that.

25            What I try to do in every case is to review your

 1   proposed instructions, make comments on them in track

 2   changes, and e-mail them back to you with my comments

 3   before the conference.  I'll try to do that, but, first of

 4   all, I am so swamped with stuff, honestly, that to find

 5   time will be hard.  I'll be working on the weekend anyway

 6   regardless of your instructions.  But, secondly, when you

 7   submitted the instructions you indicated you wanted to

 8   submit briefs on the instructions.  My gracious, folks.

 9   How many briefs do you want me to read?  You have 19, I

10   think by my count, motions pending.  19.

11           So you submit what you feel you have to to make

12   your record, but chances are what I do is go through, and

13   I look at the proposed instructions, and I look at your

14   version, and I look at their version, and maybe I'll make

15   a comment.  Maybe I'll just do some baseball arbitration.

16   Maybe I will look at a case or two if you cite one in the

17   margin, but that's about all.  Otherwise, we'll just have

18   to wait until trial time to get instructions done.  It's

19   to everyone's benefit, mine and yours and the jury's, to

20   have the instructions put together before the trial

21   starts.  If that occurs, I am perfectly willing to

22   instruct the jury preliminarily before your opening

23   statements.  Otherwise, we'll spend some nights together

24   during the course of the trial, and it's exhausting enough

25   for you folks without that.

                        Sarah K. Mitchell, RPR, CRR

1        Is there anything else?

2        MR. WALSH:  Your Honor, if the Court would like

3    to focus on particular motions that we should be prepared

4    to argue next week, we're all ears to that.  I don't know

5    if the Court's prepared right now --

6        THE COURT:  I'm not.  I haven't even looked

7    except at the fact of how many there are.

8        MR. WALSH:  And perhaps the parties can confer to

9    prioritize a little to make it easier.

10       MS. CLINGAN:  I think that's a great idea,

11   Mr. Walsh.

12       THE COURT:  You can do that.  I've got to believe

13   that there are some motions that are not really disputed.

14   For example, it was brought to my attention that one of

15   the witnesses for, I assume the Government, has certain

16   family issues that he would like to have an in limine

17   ruling to exclude.  From what I was told about it, it

18   sounds like one that would not be disputed.  It would be

19   helpful to me to know which ones you not only dispute, but

20   which ones you really care about, right, so I can home in

21   on those.  Anything else?

22       MS. CLINGAN:  Unless the Court wants to hear some

23   Elvis, we can let the Court go on about its day.

24       MR. WALSH:  Nothing further.

25       MR. MELSHEIMER:  Nothing further.

                        Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ      *James* Hearing      02/24/2022   113

1           THE COURT:  Finally, just for the sake of my

2      planning, are you folks talking about a disposition or is

3      that water over the dam at this point?  And don't tell me

4      anything else but whether you're talking.

5           MR. WALSH:  Not at this point, Your Honor.

6           THE COURT:  Are you convinced that you do want to

7      go to trial on March 28th?  And put aside your posturing

8      and just give me an honest answer.

9           MS. CLINGAN:  The honest answer from the United

10     States is yes.

11          MR. WALSH:  Your Honor, we're prepared to go

12     forward on that date as well.

13          THE COURT:  All right.  Take care.  Stay healthy,

14     stay safe.

15          THE COURTROOM DEPUTY:  All rise.  Court is in

16     recess.

17          THE COURT:  By the way, are you also convinced

18     that it will take the full three weeks?

19          MS. CLINGAN:  I think my expectation is about

20     two, perhaps two and a half.

21          THE COURT:  Well, two to two and a half.  I'm

22     asking what can I do with the week of April 11th, or are

23     you going to use some of it?

24          MS. CLINGAN:  Let me propose this, Your Honor.

25     Why don't we confer with defense counsel, and we can come

                    Sarah K. Mitchell, RPR, CRR

21-CR-00229-RBJ        *James* Hearing        02/24/2022    114

1   back to the Court next week with a more precise answer, if

2   that works for Your Honor.

3          MR. WALSH:  That would make sense, Your Honor,

4   from the defense's perspective.

5          THE COURT:  All right.  Thank you.

6       (The proceedings were concluded at 12:03 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sarah K. Mitchell, RPR, CRR

1                        <u>REPORTER'S CERTIFICATE</u>

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 26th day of February, 2022.

11

12

13

14         <u>        /s/ Sarah K. Mitchell        </u>

15                    SARAH K. MITCHELL
                    Official Court Reporter
16            Registered Professional Reporter
                 Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                   Sarah K. Mitchell, RPR, CRR