IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-0229-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

   1.  DAVITA INC.,

   2.  KENT THIRY,

        Defendants.

_____

**DEFENDANTS' OPPOSITION TO THE UNITED STATES'
MOTION FOR A CURATIVE INSTRUCTION**
_____

      Yesterday morning, the Antitrust Division ("Division") requested a supplemental preliminary instruction, claiming that clarification was needed on issues raised in DaVita's opening; and this morning, at 12:06 a.m., the Division filed a motion for a curative instruction. ECF No. 237.  A supplemental preliminary instruction is neither warranted nor appropriate at this stage of trial.  Not only did DaVita understand its opening to be consistent with the Court's rulings to date, the Division did not object during DaVita's opening, and tellingly, the Division's motion fails to identify any actual misstatement of law.  Instructing the jury in the middle of a trial after testimony by government witnesses would have the effect of improperly commenting on the weight of the evidence, and would gravely prejudice the defendants.

      As the Court has noted, this is a criminal antitrust case of first impression, and the issues presented are complex and novel.  The proper time to address the issue of further jury

instructions is at the charging conference prior to closing argument, after all the evidence in the case is before the Court.

Given the Division's request for a supplemental jury instruction and the colloquy of the parties with the Court yesterday, Defendants file this brief to address the argument advanced by the Division that there was a market "between" each of the alleged pairs of co-conspirators for each Count in the indictment. The Division's construction confuses (a) what a market is, with (b) who the competitors in the market are.

Here, the Court, based on the indictment, has focused attention on "the market for senior executives (Count 1) and other employees (Counts 2 and 3)." ECF No. 132 at 17-18. The Court does not need to further define the market.[1] As discussed below, market definition is a question of fact, not law, and is typically for the jury to decide.

The Division also confuses its burden of proof (that it need not define a market) with the relevance of evidence (namely, evidence that competition for the allegedly allocated employees did not meaningfully cease). Competition by other competitors *for* those employees in the purportedly allocated market not only goes to whether there was the purpose and intent to allocate the market for employees in the first place, but whether those employees were actually allocated to DaVita (or SCA). Once the Court has heard this evidence come in at trial, it can properly instruct the jury on the law.

---

[1] Defendants also recognize that the Court has held that "[t]he government does not need to define the 'market' allegedly allocated to carry its burden of proof." ECF 214 at 6.

## I.     A Curative Instruction Is Unnecessary and Would Be Improper

There is no basis for a curative instruction at this juncture of the trial. The Division does not and cannot point to any actual statement in DaVita's opening—during which the Division did not object—that was a misstatement of the law. To the contrary, DaVita's opening repeatedly referred to the market for DaVita employees,[2] and focused the opening on defendants' lack of intent to allocate that market—wholly consistent with this Court's rulings to date.

The cases cited in the Division's motion do not suggest otherwise. Tellingly, they uniformly hold that no curative instruction was required, and they all relate to alleged misstatements of the law by the *prosecution*. Furthermore, a curative instruction would inevitably be construed by the jury as the Court's own commentary on the weight of the testimony by Mr. Kogod and Ms. Fanning, the government's lead witnesses in this criminal case. It would be highly improper for the Court to suggest its own views as to the evidence introduced thus far.

There will be a full set of instructions issued at the end of the case. At that point, with all of the evidence in, the Court will be in a position to consider the intersecting nature of the instructions on a *per se* offense in this criminal case of first impression, the requisite intent, and the meaning of market allocation and finalize its instructions. Thus, the Court should deny the Division's request for a curative instruction at this juncture in the government's case. Indeed, in these circumstances, providing one would be error.

---

[2] Senior executives of DaVita in Count 1 and DaVita employees in Counts 2 and 3.

II.  **"The Market" Allegedly Allocated Is the Market for DaVita and SCA's Senior Employees (Count 1) and DaVita's Employees (Counts 2 and 3)**

Defendants have not argued, nor do they intend to argue, that every employee in the various healthcare companies in the United States must be subject to the alleged allocation agreement for the Division to prevail. The Court's decisions have clearly described the markets at issue (*see* ECF No. 132 at 17-18 ("the market for senior executives (Count 1) and other employees (Counts 2 and 3)") based on what is alleged in the indictment. *See* ECF No. 74 (alleging in Count 1 a conspiracy to "allocate senior-level employees by not soliciting each other's senior-level employees" (¶ 10) and in Counts 2 and 3, conspiracies to "allocate employees by [Hazel Health's and Radiology Partners] not soliciting DAVITA's employees" (¶¶ 18, 26)).[3]

The Division now contends that the relevant market is "the market *between the two competitor companies* in each count." Trial Tr. (Rough) at 9:20:21 (April 5, 2022) (emphasis added). In other words, the Division asserts that any reference to *other competitors* for the services of the employees in the allegedly allocated market is somehow irrelevant. The Division's argument conflates *what* is being allocated (e.g., the market for DaVita *employees* in Counts 2 and 3) with *who* is competing in that market (any other *company* that *competes* to hire DaVita employees). The Division's position is inconsistent with the Tenth Circuit's explanation of what a market is:

---

[3] This description is consistent with the market described by the Division in its leniency agreement with Radiology Partners in this matter. *See* Defs' Trial Exhibit B-406 (addressing "an agreement between Applicant and DaVita Inc. *to suppress competition for employees in the healthcare industry*.") (emphasis added).

4

> [A] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered. We also look to the geographic reach of the group of sales or sellers to determine the relevant market. Further, because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the 'relevant market' rests on a determination of available substitutes.

*SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994) ("By defining the relevant market, [] we identify the firms that compete with each other."). And in *Bogan v. Hodgkins*, the Second Circuit held that, as a matter of law, the no-hire agreements were not *per se* unlawful because, *inter alia*, there was "cross-elasticity of demand between the product and its substitutes," as evidenced by the fact that the allegedly allocated employees easily "found other work." 166 F.3d 509, 516 (2d. Cir. 1999). Finally, "[t]he determination of the relevant market is *generally a question of fact*" for the jury to decide. *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 n. 4 (10th Cir. 1984); *see also In re High-Tech Employee Antitrust Litigation*, 856 F.Supp.2d 1103, 1122 (N.D. Cal. 2012) (in case challenging no-poach agreements among competitors in the employment market, the court held that "[t]he existence of a 'relevant market' is typically a factual inquiry for the jury").

### III.    Defendants Will Introduce Evidence and Argue That They Did Not Intend to Allocate These Markets

Defendants will introduce evidence and argue that they did not *intend* to allocate the market for senior executives (Count 1) and other employees (Counts 2 and 3) simply by entering into non-solicitation agreements. The Court's motion to dismiss decision held that not "every non-solicitation agreement or even every no-hire agreement would allocate the market and be subject to per se treatment." ECF No. 132 at 17.

5

In support of this conclusion, the Court cited *Bogan*, in which the Second Circuit held that a no-hire agreement was not *per se* unlawful because it was incapable of allocating the market for employees. The Second Circuit reasoned:

> [Plaintiffs] suggest that the Agreement may be a supplier allocation, but the facts do not bear this interpretation; the Agreement *permits transfers*, and experienced NML agents *do not comprise the entire set of suppliers of their services*. Thus, while the Agreement may constrain General Agents *to some degree*, it *does not allocate the market* for agents to any *meaningful extent*.
>
> […] The Bogans argue that the specialized training and expertise of experienced NML agents creates a submarket distinct from the market for all NML sales agents (both new and experienced) and from the general market for insurance sales agents in New York. But they have introduced no factual evidence regarding the demographics of the New York insurance market. In the end, the problem with the Bogans' proposed submarket is that *other insurance companies compete for the services of experienced NML agents, as is clearly evidenced by the Bogans having found other work after being terminated from NML*.

166 F.3d at 515-16 (emphasis added).

Like *Bogan*, the evidence in this case will show that the non-solicitation agreement in Count 1 (for example) "permits transfers" by senior employees; DaVita and SCA "do not comprise the entire set of" companies seeking to purchase their senior employees' services; and the non-solicitation agreement "may constrain [senior employees at DaVita and SCA] to some degree," but "does not allocate the market [for them] to any meaningful extent," as "clearly evidenced" by the fact that these senior executives easily "found other work." *Bogan*, 166 F.3d at 515.

Citing *Bogan* in its ruling on the parties' jury instruction disputes, the Court held that "a horizontal market allocation requires *cessation of 'meaningful competition' in the allocated*

6

*market*." ECF No. 214 at 6-7 (emphasis added).  The jury's decision as to whether there has been a cessation of meaningful competition in the market for senior executives of DaVita and SCA (Count 1) and DaVita employees (Counts 2 and 3) will necessarily require hearing the evidence of the actual competition for those employees.

Finally, the Court's jury instruction order recognized that "the government need not prove that defendants allocated the *entire* market for employees," explaining that the "Tenth Circuit made this clear when it said that an agreement may be a horizontal market allocation agreement even though 'the alleged agreement would only affect a small number of potential customers.'" ECF No. 214 at 8 (*citing United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1277 (10th Cir. 2018)).  In *Kemp*, the fact that the two co-conspirators entered into an agreement that only "affected a small number of estates" (i.e., a subset of all their potential customers) did not mean their agreement was not a market allocation agreement, and defendants have not argued anything to the contrary here.  Nothing in *Kemp* suggests that the defendants were precluded from introducing evidence that they lacked the intent to allocate the market for this "small number of potential customers" because there were other competitors in the market for those potential customers.

*Kemp* is also consistent with *Cooperative Theatres*.  *United States v. Cooperative Theatres*, 845 F.2d 1367 (6th Cir. 1988).  That case involved a "conspiracy … whereby each of the two competing corporations agreed to refrain from competing for customers who were currently being serviced by the other rival corporation," while "the companies remained free to compete for new customers." *Id*. at 1368.  In other words, like *Kemp*, the *Cooperative Theatres* court found market allocation could exist even though the agreement affected only a subset of

7

the conspirators' potential customers.  And like *Kemp*, nothing in *Cooperative Theatres* suggests that defendants were precluded from introducing evidence that they lacked the intent to allocate the market because of the significant competition from other companies for the customers in the allegedly allocated market.

Evidence that many other companies competed in the market for DaVita employees is highly relevant to whether defendants intended for the non-solicitation agreements to cause a "cessation of 'meaningful competition' in the allocated market," ECF 214 at 6, that is, "the market for senior executives (Count 1) and other employees (Counts 2 and 3)." ECF No. 132 at 17-18.  Defendants should be permitted to introduce this evidence.

## CONCLUSION

Accordingly, the Court should deny the Division's request for a supplemental jury instruction.

Dated:  April 6, 2022

JOHN C. DODDS
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-4942
john.dodds@morganlewis.com

Respectfully submitted,

/s/ *John F. Walsh III*
JOHN F. WALSH III
WILMER CUTLER PICKERING HALE & DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80220
(720) 274-3154
john.walsh@wilmerhale.com

J. CLAY EVERETT, JR.
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
(202) 739-5860
clay.everett@morganlewis.com

*Counsel for Defendant DaVita Inc.*

CLIFFORD B. STRICKLIN                    JEFFREY E. STONE

KING & SPALDING
1401 Lawrence Street, Suite 1900
Denver, CO 80202
(720) 535-2327
cstricklin@kslaw.com

JUSTIN P. MURPHY
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8018
jmurphy@mwe.com

DANIEL CAMPBELL
McDermott Will & Emery LLP
444 W Lake St.
Chicago, IL 60606
(312) 984-2064
jstone@mwe.com
dcampbell@mwe.com

*Counsel for Defendant Kent Thiry*

**CERTIFICATE OF SERVICE**

    I certify that on April 6, 2022, I filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification thereof to all registered counsel.

/s/ *John F. Walsh III*
John F. Walsh III