```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 21-cr-00229-RBJ
 3
     UNITED STATES OF AMERICA,
 4
          Plaintiff,
 5
     vs.
 6
     1. DAVITA INC., and
 7   2. KENT THIRY,
 8        Defendants.
     _____
 9

10                      REPORTER'S TRANSCRIPT
                        TRIAL TO JURY – DAY ONE
11   _____

12           Proceedings before the HONORABLE R. BROOKE JACKSON,

13   Senior Judge, United States District Court for the District of

14   Colorado, commencing at 3:08 p.m., on the 4th day of April,

15   2022, in Courtroom A902, United States Courthouse, Denver,

16   Colorado.

17

18

19

20

21

22

23                THERESE LINDBLOM, Official Reporter
                  901 19th Street, Denver, Colorado 80294
24           Proceedings Reported by Mechanical Stenography
                  Transcription Produced via Computer
25
```

**A P P E A R A N C E S**

MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE CLINGAN and ANTHONY WILLIAM MARIANO, Attorneys at Law, U.S. Department of Justice, Antitrust Division, Washington Criminal II Section, 450 5th Street N.W., Washington, DC, 20530, appearing for the Government.

JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103, appearing for Defendant DaVita.

JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP, 1225 17th Street, Suite 2600, Denver, Colorado, 80220, appearing for Defendant DaVita.

THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201, appearing for Defendant Thiry.

JUANITA ROSE BROOKS, Attorney at Law, Fish & Richardson, 12860 El Camino Real, Suite 400, San Diego, California, 92130, appearing for Defendant Thiry.

* * * * *

**P R O C E E D I N G S**

* * * * * *

(Jury selection not herein transcribed.)

(In open court at 3:08 p.m.)

*THE COURT:*  Okay.  Have a seat.

So ladies and gentlemen, the first thing is you just saw something that is important to me in my cases, and that is, out of respect for the job that you're about to do, we stand for you now.  You saw that when I walked into the courtroom after the break this morning or whatever, she would say, "All rise," and people would stand up.  You're the judges now; so every time you walk into this courtroom and every time you

1    leave, we'll all, myself and everybody, stand for you, just to

2    show our respect and our appreciation for what you're doing.

3            Now, the next stage of the case is that the lawyers

4    have a right to make an opening statement.  An opening

5    statement is a little different than the closing arguments that

6    you will hear at the end, because the opening statement should

7    be a shorter, more just-the-facts type of statement; they tell

8    you what they anticipate the evidence will be.  Mind you, they

9    have prepared and prepared.  They have a pretty darn good idea

10   who is going to be their witnesses and what they're likely to

11   say.  Plus, there are a lot of documents; and they know what

12   those documents say.  They can give you a preview in their

13   opening statement; they can let you know what the position of

14   their client is.  They do not have to make an opening

15   statement.  That's an option.

16           Furthermore, they can reserve their opening statement.

17   And I've been informed that the lawyer for Mr. Thiry has

18   elected to postpone the opening statement until the beginning

19   of the defense case.  That is their right; nothing wrong with

20   that.  They can make an opening statement now or later.

21           Here is something that is important:  When the lawyers

22   are making speeches, that is not evidence.  Your decision will

23   be based on the evidence.  Evidence is the sworn testimony of

24   witnesses who have taken an oath, exhibits that are admitted by

25   the Court, any inferences -- reasonable inferences you draw

1    from the other evidence; but not the speeches of the lawyers,

2    not what I'm doing right now, talking to you, that is not

3    evidence.  Hopefully, the speeches of the lawyers will be

4    helpful to you, but your ultimate decision won't be based on

5    that.

6            All right.  Who would like to make an opening

7    statement for the government?

8            MS. LEWIS:  Thank you, Your Honor.  Megan Lewis for

9    the United States.

10           May I proceed, Your Honor?

11           THE COURT:  Yes.  Go ahead.

12                       **OPENING STATEMENT**

13           MS. LEWIS:  Ladies and gentlemen, this is a case about

14   a corporate CEO who wanted control over his employees.  Not

15   just control over how they did their jobs, but control over

16   what job opportunities they got and how they were allowed to

17   leave his company.  That CEO is Kent Thiry, and he was the top

18   executive at a company called DaVita.  He called DaVita the

19   village, and he didn't want employees to leave the village.

20   And when other CEOs dared to recruit his employees, he was

21   outraged.  And instead of competing openly, he cheated.  He got

22   together with three competitor CEOs, and they agreed that they

23   would put employees off limits and take steps to stop them from

24   moving between their companies.

25           Now, what happened here was not business as usual.

1    Kent Thiry crossed a line when he went to competitors to reach

2    those agreements.  As you heard the judge inform you, the

3    defendants are charged here with violating something called the

4    Sherman Act.  It's a federal law that protects competition, the

5    free market.  Competing businesses aren't allowed to

6    conspire -- that is, to agree with each other -- to restrict

7    competition in the way it is charged here.

8         As CEO, Kent Thiry had all the employment opportunity

9    in the world; his employees did not.  And not because they

10   weren't qualified; not because they didn't deserve them; but

11   because he got together with his CEO friends, and they agreed

12   not to compete freely for employees.  That's the crime charged,

13   and that's why we're here.

14        Now, throughout the course of this trial, you're going

15   to hear a lot about DaVita, the corporate defendant in this

16   case.  As you heard this morning, DaVita is a company that

17   provides medical services, primarily, dialysis for kidneys.

18   They provide that to patients across the United States and is

19   headquartered here in Denver.  Kent Thiry was its CEO until

20   June of 2019.

21        But this case is not about the medical services; it's

22   about the people at DaVita who made the company run, the

23   business personnel, the managers, and the senior employees who

24   worked their way up to those positions.  And it's not about

25   whether DaVita was or was not a good place to work.  It's about

1    the employees' right to benefit from open competition for their

2    services, competition that could have given them more

3    opportunities, more choices to change companies, and more

4    chances at a better job.

5         And the competition that you're going to hear about

6    during this trial, it's not the competition for the kidney care

7    services.  It's about the competition for the business people,

8    other companies who wanted to hire DaVita's employees.  And

9    witnesses are going to tell you that DaVita was a place that

10   was known for strong talent.  It's a term you're going to hear

11   witnesses use to refer to people who were really desirable

12   candidates.  It meant that a lot of employees at DaVita were

13   really good at their jobs.  Other companies wanted to hire

14   them.

15        So most people have searched for jobs at some point in

16   their lives, and so you probably have a sense of how it usually

17   works.  But let me highlight two ways that you're going to hear

18   about in this case.

19        So in some instances the companies are searching for

20   people to fill open positions, and they can do that by

21   recruiting people, by approaching them, reaching out, seeing if

22   they are a good fit for an opportunity.  Sometimes DaVita's

23   competitors would call or reach out to DaVita's employees.  And

24   you're going to hear that referred to as solicitation or maybe

25   an active recruitment.  And you're going to hear that this type

1   of opportunity, a solicitation, was particularly important for

2   the more senior folks because a lot of those jobs aren't

3   posted.  A person can't just go online and apply.  Someone has

4   to reach out and tell them about that opportunity.

5        Now, you'll hear that a solicitation is the first step

6   in a recruitment process.  It's not the same thing as a job

7   offer.  But if a person doesn't get that call, they don't go

8   into that pipeline, and they don't get the chance to progress

9   to an offer.

10        So another way that you might hear about is that an

11   employee might try to switch jobs, reach out on their own to a

12   company.  Now, normally, an employee gets to conduct their job

13   search in private.  They get to choose if or when they tell

14   their current boss.  And that makes sense, that

15   confidentiality, that ability to explore jobs in private is

16   something that is important to a lot of people, because a lot

17   of people want to have an offer in hand before they tell their

18   current boss that they're thinking about leaving.

19        But what you're going to hear about in this trial is

20   that something different happened here.  DaVita's CEO, Kent

21   Thiry, put up roadblocks that were designed to stop calls from

22   coming in to his employees and to keep them from leaving the

23   village.

24        Now, as we talked about this morning, there are ways

25   that employers can restrict what their employees do.  And some

1   of you, it sounds like you're familiar with employment

2   contracts that might have restrictions, like a noncompete, a

3   nondisclosure, even a nonsolicit; but those sometimes come with

4   payment to the employees for agreeing to those restrictions.

5   But at minimum, the employer is signing that contract directly

6   with the employee, so the employee has their eyes wide open

7   what they're signing up for, what they're agreeing to, or what

8   they wouldn't want to agree to.  They have the freedom and the

9   choice to agree to or walk away.

10          This case is not about those types of employment

11   terms, not about those types of employment contracts.  What

12   happened here was fundamentally different.

13          It was not business as usual.  It was not a contract

14   between an employer and an employee.  Instead, Kent Thiry got

15   together with competitor CEOs, and they agreed with each other

16   to restrict competition and control the competition between

17   them for employees.  The employee was not part of those

18   agreements, and the CEOs did not have to compensate the

19   employees for them.  Kent Thiry put employees across his entire

20   company off limits and blocked their opportunities at these

21   other companies without even telling them.

22          So let me talk a little bit about how these

23   conspiracies worked.  So, throughout the trial, you're going to

24   hear that Kent Thiry was intensely focused on keeping employees

25   from leaving DaVita.  He called himself the mayor of the

9

1    village, and he demanded loyalty to the village.  And in this

2    case, it is no coincidence that each of the three competitor

3    CEOs is a former DaVita executive.  Even after they left the

4    village and they became competitors, Kent Thiry still wanted to

5    control them.  He still demanded loyalty instead of

6    competition.

7            And you'll hear that DaVita was a larger company than

8    these competing employers.  You'll hear how Kent Thiry was a

9    well-connected influential person in the business world, and he

10   held out a carrot and a stick to these competitor CEOs.  He

11   would threaten that if they tried to recruit his employees, he

12   would retaliate.  He would threaten to cut them off from his

13   professional networks.  But if the CEO agreed to stay away from

14   DaVita's people, the carrot -- the reward -- was that a world

15   of personal connections and business opportunities opened up.

16   And you will hear that it was better to be Kent Thiry's friend

17   than his foe.

18           So in each of the three conspiracies, you're going to

19   see the same pattern play out.  First, there is competition for

20   employees.  Somebody is recruiting talent from DaVita, and Kent

21   Thiry gets mad.  He goes to his CEO friend to shut it down,

22   they agree to the conspiracy, and they take steps to carry it

23   out.  And in all three conspiracies, the terms were almost the

24   same.  First, don't solicit.  That means that the competitors

25   agreed not to call, not to reach out to DaVita employees.

1    DaVita was off limits.  And, second, even for employees who

2    weren't solicited -- meaning they reached out on their own --

3    you'll see Kent Thiry finding ways to control that process too.

4            One of those ways was getting the competitor CEO to

5    agree that they would not talk to DaVita employees unless the

6    DaVita employee first told their boss they were trying to

7    leave -- the tell-your-boss rule.  So I want to pause for a

8    moment on this tell-your-boss rule, because you're going to

9    hear witnesses describe two reasons for it.  And the first is

10   that it was a way for Kent Thiry to confirm that these

11   competitor CEOs were following the conspiracy, to make sure

12   that they weren't secretly soliciting employees behind his

13   back.  The employee had to go and tell their boss, because Kent

14   Thiry wanted to know if those conversations were happening.

15           And, second, the tell-your-boss rule was another

16   hurdle to keep people from leaving DaVita, because most people

17   would not want to do that.  Because that requirement, it wasn't

18   at the end of the process with an offer in hand, it was at the

19   beginning of the process.  So without any certainty of an

20   offer, without any certainty that they had another job lined up

21   to go to, the employee had to go and tell their boss that they

22   were trying to leave DaVita.  And if they didn't, the other

23   company would stop the process.

24           And you're going to hear how at DaVita, saying that

25   you wanted to leave the village was a very risky career move.

1          Now, were there some employees who did jump over those

2    hurdles?  Yes.  Some left.  Some stayed at DaVita.  But for the

3    people who didn't want to tell their boss, they couldn't move

4    forward.  But more importantly, you'll hear that Kent Thiry

5    knew that would happen; he knew that most of the time people

6    wouldn't want to tell their boss; he knew that it would shut

7    down the possibility that these competitor CEOs could freely

8    pursue his people; and he knew that it would prevent DaVita

9    employees from leaving DaVita go to these competitors.

10          Why?  Because losing employees was bad for business.

11   It was bad for DaVita's reputation, and it was bad for Kent

12   Thiry's reputation.  Kent Thiry found it personally

13   embarrassing.  It wouldn't look good if people left his company

14   to go to his competitors.  And you'll also hear that keeping

15   people from leaving DaVita was a factor in Kent Thiry's own

16   compensation.

17          These conspiracies benefited DaVita, and they

18   benefited Kent Thiry.  But they came at the expense of

19   opportunities for employees, and they suppressed competition.

20          So let me tell you now about the charges in this case.

21   And you'll see on your screens there, there are two

22   defendants -- Kent Thiry and DaVita.  And both Kent Thiry and

23   DaVita are charged as defendants in each count.  And as

24   Judge Jackson informed you, the Indictment charges three

25   separate employee market allocation conspiracies in violation

1    of the Sherman Act.

2           Count 1 of the Indictment charges Kent Thiry and

3    DaVita with entering into a conspiracy with Surgical Care

4    Affiliates -- or SCA -- through its CEO, Andrew Hayek, to

5    allocate the market for senior-level employees between their

6    companies, to keep senior employees at DaVita and senior SCA

7    employees at SCA.

8           And Count 2 of the Indictment charges Kent Thiry and

9    DaVita with entering a conspiracy with Hazel Health, through

10   its CEO, Josh Golomb, to allocate the market for DaVita

11   employees, to keep DaVita employees from being recruited over

12   to Hazel.

13          And Count 3 of the Indictment charges Kent Thiry and

14   DaVita with entering a conspiracy with Radiology Partners -- or

15   RAD Partners -- through its CEO, Rich Whitney, to allocate the

16   market for DaVita employees, to keep DaVita employees from

17   being recruited over to RAD Partners.

18          So let me talk about how we will prove this case.  You

19   will hear from witnesses who participated in these crimes with

20   Kent Thiry.  And you will hear that the government has told

21   many of them that they will not be prosecuted.  These witnesses

22   are cooperating; they're here to tell you what they know, what

23   they saw, what they heard.  And what you'll learn is that even

24   those three are three separate conspiracies, it was the same

25   person behind all of them -- Kent Thiry.

1        But you're not going to have to rely on what the

2   witnesses tell you alone.  You're going to see the text

3   messages and the emails that show these conspiracies being

4   formed and that show them in action.  And I'm not going to walk

5   through all the evidence right now, but let me highlight some

6   of what you'll hear.

7        You're going to hear from DaVita's own former chief

8   operating officer, its COO, Dennis Kogod.  He worked directly

9   with Kent Thiry for about ten years, and for a while he was

10  Kent Thiry's right-hand man.  He's going to take you inside the

11  walls of the village, and he's going to tell you what he knows

12  about these conspiracies from inside DaVita.  He's going to

13  tell you about Kent Thiry's obsessive focus on not losing

14  employees, and he'll tell you that Kent Thiry took it

15  incredibly personally when a former DaVita executive left

16  DaVita and then started recruiting back out of the village.  It

17  was one of the things that angered Kent Thiry the most.

18       And he'll tell you that the purpose of these

19  agreements with competitor CEOs was not about business deals

20  for DaVita; it was not about promoting competition; it was to

21  make it harder for employees to leave, harder to change

22  companies.  And he will tell you that at DaVita you put your

23  career at risk if you told your boss that you were even

24  thinking about leaving the village.

25       You'll also see or hear evidence from the competitor

1    companies that were run by these three former DaVita

2    executives.  On Count 1, you'll hear from Andrew Hayek, who was

3    the CEO of SCA, the competitor company in Count 1.  Andrew

4    Hayek used to work for DaVita.  And his own story is going to

5    show you the power of a single solicitation call.  Andrew Hayek

6    got his job at SCA through a solicitation.  He got the career

7    opportunity of his life to become a CEO.  And after he took

8    that opportunity and he became CEO of SCA, he started competing

9    with DaVita for employees.  And that made Kent Thiry mad.

10   Andrew Hayek recruited several senior DaVita executives over to

11   SCA.

12         And you're going to hear how Kent Thiry threatened his

13   reputation.  He threatened to retaliate and disrupt SCA's

14   business by targeting SCA employees and recruiting them to

15   DaVita.  Now, that's retaliation, of course, from the company's

16   perspective.  It's also called competition from the employee's

17   perspective.

18         And that competition for employees between SCA and

19   DaVita is what led to the conspiracy.  The two CEOs agreed not

20   to solicit each other's senior-level employees, and they agreed

21   to shut down the recruiting process for people who didn't want

22   to follow the tell-your-boss rule.  And you're going to hear

23   why Andrew Hayek agreed.  He wanted to avoid the business

24   disruption to SCA; but also because Kent Thiry was powerful, he

25   was influential, and Andrew Hayek wanted SCA to be able to do

1     business with DaVita.  He wanted the carrot; not the stick.

2            And you will see that after their agreement, SCA and

3     DaVita did discuss business deals.  But Mr. Hayek will echo

4     what Mr. Kogod from DaVita will tell you.  These two people at

5     SCA and DaVita, who know about these business deals, will both

6     tell you the same thing.  This CEO-to-CEO no-poach agreement

7     was not part of any business transaction; it was not necessary

8     to do any business deals; it was only necessary to keep the

9     peace with Kent Thiry so he didn't pull those opportunities.

10           You're also going to hear from the former chief talent

11    officer of SCA.  Now, she was not a former DaVita executive.

12    And she's going to tell you how important, how meaningful

13    solicitation is as a way for people at the senior levels to get

14    jobs.  And she's going to tell you how companies vigorously

15    compete for that top talent.  And she will tell you that DaVita

16    was one of the top places that she would have looked for that

17    talent if these conspiracies hadn't existed.  She would have

18    tried to recruit candidates from DaVita.

19           And you will hear how she tried to push back, because

20    she thought that these types of agreements limited

21    opportunities and mobility for employees.  But the answer that

22    she got every time was the same:  You can't solicit from

23    DaVita.  You can't go after DaVita candidates.  And so she told

24    SCA's recruiters to make DaVita off limits, and they removed

25    candidates because of the conspiracy.

1          Now, in Count 2, FBI Special Agent Matthew Hamel will

2    show you Kent Thiry's own text messages and emails with the CEO

3    of Hazel Health.  And you will see the same pattern as the

4    other conspiracies.  First, there is competition when Hazel

5    recruits and hires an employee away from DaVita.  And you'll

6    see in those text messages and emails that Kent Thiry goes

7    full buckets about that hiring.  And you will see the CEO of

8    Hazel agree in an email with Kent Thiry that he will "steer

9    clear" of DaVita employees.  And you'll see Hazel's CEO

10   complying with that agreement by telling Kent Thiry that he has

11   passed on DaVita employees.  And when he's trying to recruit

12   for open positions for Hazel, he specifically tells people not

13   to recommend current DaVita employees because he promised Kent

14   Thiry he wouldn't.

15         And on Count 3, you're going to hear from CEO and the

16   co-founder of Radiology Partners, an up-and-coming company in

17   the healthcare space.  Now, both the CEO and the co-founder

18   were both DaVita executives.  And after they founded the

19   company, RAD Partners began recruiting from DaVita; and Kent

20   Thiry let him know he wasn't happy about it.  And you're going

21   to hear both of RAD Partners' founders tell you the same things

22   that you're going to hear from other witnesses, that it was

23   better for business to be on the Kent Thiry's good side than on

24   his bad side.  And they'll tell you that Kent Thiry wanted one

25   thing from RAD Partners in return:  Don't come after DaVita's

1  employees.  That's what Kent Thiry wanted; that's what they

2  agreed to.

3         And you're going to see that RAD Partners drafted

4  ground rules that they would agree to follow.  RAD Partners

5  agreed that they would not initiate contact, meaning that they

6  would not solicit employees for jobs at RAD Partners.  And even

7  for employees who came to them, they agreed that they would

8  promise to require employees to be actively looking elsewhere

9  or tell their boss at DaVita that they were trying to leave

10  before they could be considered.

11        And you're going to see Kent Thiry try to negotiate

12  even stronger ground rules; but, ultimately, he agrees to them.

13  And you're going to know that because you'll see Kent Thiry

14  following up to make sure that they're being followed.  And

15  you'll see how he referred to the conspiracy as "our

16  guidelines."  And you'll hear that RAD Partners passed on the

17  information, the instructions, to its employees and its

18  recruiters, who agreed to stop contacting DaVita candidates

19  because of that.

20        And, finally, you will hear from a former DaVita

21  employee, Elliot Holder.  Mr. Holder was young.  He was

22  starting out his career, and he wanted to advance his career by

23  exploring job opportunities at RAD Partners.  He didn't know

24  that Kent Thiry had already reached a back-room deal with RAD

25  Partners' CEO that would shut down that opportunity for him.

1    RAD Partners wanted to make Mr. Holder an offer, but the

2    conspiracy kicked in.  They told him they couldn't do it unless

3    he told his boss at DaVita that he wanted to leave.  He was

4    supposed to tell his boss without any offer in hand, without

5    any certainty that he had somewhere else to go.

6           And you're going to hear that Mr. Holder describe that

7    confidentiality in his job search was very important to him.

8    He didn't want to risk his job at DaVita.  He didn't want to

9    risk seeming disloyal to the village.  So he thought this

10   requirement was bizarre, it made him uncomfortable, and he

11   withdrew, without an offer.  He stayed put at DaVita without

12   DaVita having to compete with RAD Partners to retain him.

13   That's the conspiracy working.

14          And the evidence will show that Mr. Holder's story is

15   just one of the blocked opportunities for these employees who

16   fell within these conspiracies.

17          Now, ladies and gentlemen, you heard the judge

18   describe the charges in the Indictment as employee market

19   allocation conspiracies.  That is a mouthful even for me, so

20   you're probably not going to hear any of the witnesses use

21   those terms, because they're not going to speak the way a

22   lawyer would.  But you will hear them describe how the purpose

23   of these agreements was to place DaVita off limits, to stop

24   solicitation calls from happening, to keep DaVita employees at

25   DaVita, and to restrict the movement of employees from one

1    competitor to another.

2            And you'll see examples of people who were taken off

3    recruitment lists, never contacted because of them, and people

4    like Mr. Holder, who lost a good job opportunity because of

5    them.

6            You'll also see evidence that the agreements didn't

7    work perfectly all the time.  Some people got recruited, some

8    people switched companies, and people tried to get around these

9    restrictions.  But that's not the issue.  CEOs don't get to

10   agree with each other when they will and will not compete for

11   employees.  And we will prove to you beyond a reasonable doubt

12   that these three conspiracies with DaVita's competing employers

13   existed and that Kent Thiry and DaVita knowingly and

14   intentionally entered them to allocate the market for employees

15   as charged in the Indictment.

16           And you'll see that Kent Thiry knew exactly what he

17   was doing.  You'll see him make the same demands again and

18   again, from competitor after competitor, even beyond the three

19   that are charged here.  And you'll see that Kent Thiry knew he

20   was restricting competition, because you will see Kent Thiry's

21   own words, where he says that there are free markets, and there

22   are relationships.  Instead of competition in the free market,

23   he conspired with his CEO friends to allocate the market for

24   employees.

25           And at the conclusion of all the evidence, we will ask

1    that you return a verdict against Kent Thiry and DaVita as

2    guilty on all counts.

3            Thank you.

4            *THE COURT:*  Okay.  Thank you.

5            Mr. Walsh.  No?

6                          **OPENING STATEMENT**

7            *MR. DODDS:*  Thank you, Your Honor.

8            May it please the Court, counsel for the Division,

9    members of the jury.

10           It's been a little while since we were all first

11   introduced.  My name is Jack Dodds.  And along with my

12   colleague, John Walsh, it's my privilege to represent DaVita

13   against these charges.

14           I'd like to try to get to the heart of this case by

15   cutting through the things we don't dispute.  First of all, we

16   don't dispute what Ms. Lewis said about the employees that are

17   involved in this case, what it is all about.  It is not about

18   the rank and file; it was not about the dialysis technicians;

19   it was about the executives, managers, senior business people.

20   And that's important, for reasons we'll get to.

21           Now, we don't dispute that Kent Thiry didn't like it

22   when Andrew Hayek and Josh Golomb and Rich Whitney -- who he

23   had mentored and promoted at DaVita and helped to become CEOs

24   in their own right and whom he considered friends -- turned

25   around and targeted DaVita as a source for executives for their

1    new companies.  He really didn't like it when he felt like they

2    were doing it behind his back.  He thought it was disloyal; he

3    thought it took unfair advantage of their inside knowledge and

4    their inside access at DaVita.  As you will hear, this is about

5    people who knew each other, and he thought that gave them an

6    unfair advantage.  And in no small measure, it wounded his ego.

7    And he let them know how he felt.

8         For their part, Hayek, Golomb, and Whitney were his

9    friends.  And their relationship with him was important to

10   them.  It was important to them personally.  They had history;

11   they were friends; and that mattered to them, as it mattered to

12   him.

13        It was important to them professionally.  They were

14   trying to grow and build and expand their companies and by

15   doing so, create more jobs.  And their relationship with Kent

16   Thiry and with DaVita helped them do that.  So they wanted to

17   find a way to diffuse his reaction and maintain that

18   relationship, while maintaining their ability to continue to

19   compete for these senior-level employees, including from

20   DaVita.  What they were looking for was a way to compete

21   without hard feelings.  And they came up with a way to do that.

22   They came up with ground rules that they agreed on, that met

23   those goals.

24        And you'll hear those ground rules described in

25   various ways during the course of this trial by various people.

1    But we don't dispute that they had two components.  First, that

2    they would not actively solicit DaVita executives.  Not that

3    they wouldn't recruit them, and certainly not that they

4    wouldn't hire them, but that they just would not use that first

5    call, active solicitation, as a tool to do that.

6           And, second, when they were in discussions about

7    recruiting with these DaVita executives and employees -- which

8    they frequently were because of their network at DaVita -- they

9    knew each other -- when they were in those discussions, DaVita

10   would get a heads-up so that it had an opportunity to compete

11   to try to keep those people.  And you will see that that is

12   uniformly what it did.

13          Now, we don't dispute any of that, we don't dispute

14   that these agreements existed, and we don't dispute that they

15   affected specific employees in specific ways, mostly positive.

16   Because in virtually every instance when DaVita learned that an

17   employee was thinking about going to one of these other three

18   companies, because of this agreement, it did exactly what the

19   Sherman Act would want it to do:  It competed to try to keep

20   them by offering raises, promotions, better jobs.  Some chose

21   to stay; more, you'll hear, chose to leave, to go to these

22   three companies.

23          But if there was an employee who didn't want to give

24   notice, we don't dispute that that employee's opportunity to go

25   to one of these three companies would be affected in a

1   market -- because remember, the charge here is conspiracy to

2   allocate the market -- in a market that especially for these

3   senior kinds of employees included hundreds of companies.

4         Now, this may bother you.  It may bother you a lot.

5   You may think that it should be the employee's right to decide

6   whether they tell their boss that they're looking for another

7   job.  It may be something you might think you wouldn't be

8   comfortable doing.  You may just not like the whole thing.  And

9   you may very well not like Kent Thiry, and you may see reason

10  in the evidence to feel that way.  But what you won't see

11  anywhere in the evidence is the only thing that could make any

12  of this a crime:  A market allocation agreement.  A conspiracy

13  and agreement to allocate the market for these employees and

14  prevent meaningful competition for these employees in the

15  market.

16        And that, ladies and gentlemen, brings us to the heart

17  of this case.  It brings us to what this dispute is really

18  about and what your decision point when you deliberate after

19  hearing all the evidence will be:  Whether the Division --

20  whether these prosecutors have proved beyond a reasonable doubt

21  that when Thiry, Hayek, Golomb, and Whitney reached these

22  agreements, set these ground rules, their purpose and their

23  intent was to allocate the market for these employees -- the

24  market -- and to eliminate meaningful competition for their

25  services in the market.

1          Now, as Ms. Lewis said, the prosecutors will call

2   Andrew Hayek and Rich Whitney to testify.  And we'll hear what

3   they have to say about what their purpose and intent was nine,

4   ten, eleven, twelve years ago, when these things happened; but

5   you'll also hear the path that they took to get to that witness

6   stand.  You will hear that on that path, they were called to

7   meeting after meeting with these prosecutors and that at those

8   meetings, the stakes were very high.  Their lives could go in

9   two directions.  One direction would take them over here,

10  sitting with us, as defendants in this case.  The other

11  direction could take them to that witness stand, and when

12  they're done testifying, take them out the door to freedom and

13  the rest of their lives.

14          And you'll hear how under that pressure, they went

15  back and reflected on what they thought nine, ten, eleven,

16  twelve years ago, and realized that what they thought then was

17  something that never entered their mind then.  You'll hear how

18  their understanding of what they were really trying to do

19  evolved as they were trying to take the path to there and there

20  and avoid the path to here.

21          And you'll have to decide whether what they say from

22  that witness stand is really what they thought, what they

23  intended, what their purpose was then.  Because that is what

24  this case is about, what was their purpose then?  And hindsight

25  doesn't matter.  All that matters is their intent, their

1  purpose, what they thought then.

2  As you heard from Ms. Lewis, these prosecutors will

3  also call Dennis Kogod.  I expect he'll be their first witness.

4  And when you see Dennis Kogod, you will see a man who

5  definitely has an agenda; but you'll also see that that agenda

6  has not the first thing to do with the truth.  You'll see a man

7  that left DaVita unhappy because his performance deteriorated

8  and he would not be accountable for it.  You'll see a man who

9  has a history of being deceitful and untruthful under oath, and

10  you'll see a man who cannot be trusted to tell you the truth

11  here.

12  And it will be your duty to evaluate all the testimony

13  you hear against all of the evidence and decide whether, based

14  on all the evidence, the prosecutors have proved beyond a

15  reasonable doubt that when Thiry, Hayek, Golomb, and Whitney

16  struck these agreements, they did it with the shared understood

17  purpose and intent to allocate the market for these employees.

18  And, ladies and gentlemen, when you see all the

19  evidence -- I'm going to start pushing buttons now, so things

20  could get dangerous -- when you see the evidence, you will see

21  some simple truths that will tell you that this had nothing to

22  do with allocating the market.

23  If you wanted to allocate the market, you would

24  involve more than three companies in the market.  But you will

25  see that DaVita, as big as it is, SCA, Hazel, and Radiology

1   Partners are just a fraction of the market for these employees.

2   There are hundreds of companies from which they could hire and

3   hundreds of companies to which these executives, these

4   managers, could go.

5           Even the market for just DaVita employees extends well

6   beyond these three companies.  During this alleged conspiracy,

7   while Kent Thiry was supposedly trying to keep all of the

8   employees -- the senior employees at DaVita, 500 senior-level

9   DaVita employees went to over 300 other healthcare companies.

10   During that same period, DaVita hired over 500 senior-level

11   employees from over 400 other healthcare companies.  Those are

12   simple, irrefutable truths.

13          You'll also see that these agreements did not prohibit

14   hiring.  If you wanted to allocate the market, you would at

15   least agree not just not to solicit, but not even to hire.

16   These agreements did not involve that.  They did not prohibit

17   hiring from each other or from the hundreds of companies that

18   were in this market.  And, in fact, you will see from the

19   evidence that they did continue hiring from each other and from

20   the hundreds of companies in the rest of the market.

21          If you wanted to allocate the market, you would agree

22   to stop competing.  But you will see that that's not what they

23   agreed to do either.  They agreed to ground rules about the way

24   they would compete, but they never agreed to stop competing.

25   And, in fact, they did not stop competing with each other or

1    with the hundreds of other companies in the market.

2           And, in fact, when DaVita learned -- as I said before,

3    when DaVita learned, because of these agreements, that people

4    were thinking about leaving to go to one of these other

5    companies, it did exactly what the law would want it to do.  It

6    competed to try to keep them by offering raises, promotions,

7    different jobs, better jobs.  How can we make you happy and

8    keep you here?  Some chose to leave; some chose to stay.

9           And you will see, ladies and gentlemen, objective,

10   hard data that will show you what your common sense and these

11   simple truths will tell you, that these agreements simply not

12   to proactively solicit could not allocate the market for these

13   employees; it did not allocate the market for these employees;

14   and nobody thought it could or even thought about trying to do

15   it back then, when all of this happened.

16          Now, let's talk about -- I told you it would get

17   dangerous.  I'm pushing buttons.  Let's talk about each of the

18   counts in turn.  The first count relates to SCA, Surgical Care

19   Affiliates.  This is Andrew Hayek's company.

20          And as we all know, ladies and gentlemen, if you want

21   to know the truth, if you want to know the real story, context

22   matters.  Right?  The whole story matters.  So here is the

23   context here:  When Andrew Hayek left DaVita to take over as

24   CEO of Radiology Partners, he was taking over a struggling

25   company.  And he was hired to turn -- I'm sorry -- SCA.  I said

1    Radiology Partners.  Sometimes I get them confused -- he was

2    hired to turn SCA around.  And over the course of the next four

3    years, from the time he left DaVita in 2008 until about 2012,

4    when the prosecutors say this conspiracy was hatched, he did

5    that.

6          Now, you will hear from the evidence that while he was

7    taking this struggling company and trying to turn it around, he

8    recruited freely from DaVita.  He built a large part of his

9    executive team with DaVita executives, while running a

10   struggling company, apparently completely unafraid of Kent

11   Thiry or this supposed behemoth, DaVita.

12         Now, the government alleges after doing that for four

13   years without apparent fear, somehow in 2012, all of a sudden,

14   as his company got stronger, he was more afraid and then gave

15   in to Kent Thiry's demands that he stop recruiting senior

16   executives.

17         Well, something happened in 2012.  What was it?  What

18   made Andrew Hayek come to this agreement with Kent Thiry?  Why

19   did he make this decision?  Well, like most decisions in life,

20   being there wasn't a reason.  There were reasons.  And you'll

21   hear from Andrew Hayek, I expect, that he had reasons.  But

22   none of those reasons had anything whatsoever to do with

23   allocating the market.

24         First, by this time, as I said, he had built his

25   company and his executive team with a good many DaVita hires.

1    And by that point in time, he wasn't particularly interested in

2    hiring anymore, because he was not trying to create little

3    DaVita.  He was trying to build his company with its own

4    culture.

5            You'll hear that he definitely wanted to diffuse Kent

6    Thiry's reaction to his hiring and avoid the disruption that

7    came with it, and you'll hear why he wanted to avoid that

8    disruption.  Not so that he could keep employees in place or

9    allocate markets, but because he wanted a positive relationship

10   with Kent Thiry and DaVita, because that positive relationship

11   would position him to do exactly what the antitrust laws would

12   have him do:  Continue to grow SCA, build it, expand it, and

13   thereby create even more jobs, because Andrew Hayek's strategy

14   for turning SCA around, for growing the company, revolved

15   around collaborating with other healthcare companies.

16           And in DaVita, Andrew Hayek saw two enormous

17   opportunities.  DaVita had a business called Lifeline Vascular

18   Care.  Lifeline was a system of outpatient clinics where

19   physicians would perform procedures on patients who are getting

20   dialysis or other infusion therapies, installing ports and

21   other vascular access devices.  Well, SCA's outpatient surgery

22   centers were in the same business; and Andrew Hayek saw an

23   opportunity to join forces with Lifeline, to grow both of them,

24   to expand, to grow, to create more jobs.

25           Later in 2012, DaVita bought a physician group called

1    HealthCare Partners.  And this acquisition was so important

2    that DaVita, Inc., changed its name to DaVita HealthCare

3    Partners.  And it called this physician group the DaVita

4    Medical Group.  And in this business, Andrew Hayek saw an even

5    bigger opportunity, to have a collaboration between the

6    physicians in DaVita HealthCare Partners and the outpatient

7    surgery centers in SCA and grow his business, have it expand,

8    have it create more jobs.

9          So in thinking about what to do about the fact that

10   Kent Thiry didn't like the fact that he was recruiting DaVita

11   executives, what did Andrew Hayek understand about the market?

12   Because, again, that's the accusation.  He understood that the

13   market for executives -- which is what this count is about --

14   is huge.  And how do we know that?  Because SCA had a list of

15   the companies that were part of this market.  This is the

16   market in which if you were looking to hire executives you

17   would look.  And it's the market in which if you were an

18   executive and you were looking for another job, you would look.

19   And it didn't just include DaVita, by any stretch of the

20   imagination.

21          It included over 400 companies, surgical services

22   companies, large for-profit hospitals, more large nonprofit

23   hospitals, for-profit ancillary services businesses, large

24   physician groups, more large physician groups, health insurance

25   and managed care companies, health consulting and brokerage

1    companies, healthcare technology companies, more healthcare

2    technology companies, healthcare population health companies,

3    other types of healthcare companies.  Even businesses that

4    aren't healthcare companies, because we're talking about

5    finding executives here, hiring executives.  And you can be an

6    executive in a healthcare company if you have no prior

7    experience in a healthcare company, and you can be an executive

8    who goes from a healthcare company to some other company that

9    isn't one.  So that was part of this market.  Private equity

10   and venture capital companies and orthopedic device

11   manufacturers.  That was the market from which SCA could

12   recruit talent, and Andrew Hayek knew that.

13          So wanting to have this relationship with Kent Thiry

14   so that he could have these collaborations around Lifeline and

15   DaVita HealthCare Partners, he had a choice to make.  He could

16   insist on the right to continue soliciting senior executives

17   even though he had no need to do it and no interest in doing

18   it, or he could give Kent Thiry the proverbial sleeves off the

19   vest.  He could give him a concession that was something he

20   didn't intend to do anyway, something he didn't need anyway,

21   and focus on the opportunity to have DaVita be one of the

22   companies with which SCA collaborated to grow and to create

23   more jobs.  And that's what he decided to do.

24          And you will see in the documents and other evidence

25   in this case that SCA's approach to recruiting from DaVita

1    during this supposed conspiracy was all about business

2    collaboration and had nothing to do with market allocation,

3    which is the heart of this case.  And you will see it in

4    various documents in the case, and I'm going to give you one

5    example.

6         This is an email that the government -- that the

7    prosecutors cite in their Indictment that brings us all here.

8    This is an email from a woman named Bridie Fanning, who

9    Ms. Lewis referred to -- she was the chief personnel officer

10   she mentioned at SCA -- to a man named Andy Kay.  Andy Kay was

11   a DaVita executive who reached out to SCA to inquire about the

12   possibility of opportunities there.  And Bridie Fanning sent

13   back this email.  And in something that I think you will see

14   throughout this case, in the Indictment, the government takes a

15   snippet, a snapshot, from that email.  And it's the snapshot,

16   the snippet, that is highlighted there, where she writes back

17   and says that he cannot be considered for employment at SCA

18   unless he's been given explicit permission by his employer that

19   he can be considered for employment with SCA.  And it does say

20   that.

21        But this case isn't about whether that agreement

22   existed.  That's a misstatement of the actual agreement, and

23   you'll hear that.  But that's not important for present

24   purposes, because what this case is really all about is, why

25   did this agreement exist?

1            And the document tells you why.  Bridie Fanning says

2     why.  Because DaVita are priority strategic partners, and we

3     have a policy that we don't recruit from our clients and

4     strategic partners.  Hopefully, you will understand that these

5     key partnerships are of the utmost importance to us.

6            There is the snapshot, and there is the whole picture.

7     The snapshot tells you what they agreed to; the whole picture

8     tells you what really goes to the heart of this case -- why did

9     they agree to it?  What was their purpose?  What was their

10    intent?

11           And because context matters, let's take it one step

12    further.  The government's Indictment cites two -- two --

13    emails between Kent Thiry and Andrew Hayek that have anything

14    to do with recruiting after this supposed conspiracy is

15    hatched.  And I'm showing them on the screen here.  One is an

16    email from October of 2014, and the other is an email from the

17    summer of 2016.  And you'll get to see these documents more

18    close up during the trial, so we don't have to dwell too much

19    on them now.

20           But in the first email, Kent Thiry tells Andrew

21    Hayek that he does not proactively recruit from SCA.  And in

22    the second email, Andrew Hayek sends along an outreach -- a

23    solicitation that came from a DaVita recruiter to an SCA

24    employee, passes it along to Kent Thiry, and Kent Thiry says,

25    I'll check it out.  Those two communications by email between

1    Kent Thiry and Andrew Hayek during this entire alleged
2    conspiracy.
3          But what else was happening?  Hundreds -- hundreds of
4    communications between DaVita and SCA in pursuit of these
5    collaborations that I told you about, in pursuit of the
6    collaboration with Lifeline and the collaboration with DaVita
7    HealthCare Partners.  Hundreds of discussions about that,
8    trying to bring to fruition the vision that Andrew Hayek and
9    Kent Thiry had that led them to decide to these recruiting
10   ground rules.
11         Now, you will see from the evidence that there were
12   dozens -- technical difficulties here -- that there were dozens
13   of executives from SCA and DaVita that were involved in these
14   negotiations, in these collaboration efforts, in these business
15   dealings.  And remember that the allegation here is that they
16   agreed not to solicit each other's senior executives.
17         Now, it will be for you to decide whether it's just
18   good sense when you're trying to accomplish what those hundreds
19   of emails say they were trying to accomplish that you agree to
20   some ground rules about the way you'll recruit the people who
21   are involved in trying to accomplish that, because it is senior
22   executives that we are talking about.
23         And you will hear during the course of the testimony
24   that all of these discussions resulted in only a few
25   transactions, and that is true.  We don't dispute that.  That

1   happens in business sometimes.  Businesses invest in trying to

2   make things happen that don't happen all the time.  But those

3   discussions weren't for naught.  They didn't amount to nothing.

4   Because in 2017, right at the time where the prosecutors say

5   the conspiracy ended, after SCA was purchased by a company

6   called Optum, it then purchased DaVita HealthCare Partners --

7   the vision came to pass in a different way -- for over

8   $4 billion, right at the time when the prosecutors say the

9   conspiracy ended.

10          So that brings us to the simple truths that when you

11  see the evidence will tell you that your verdict on Count 1

12  should be not guilty.

13          SCA could and did recruit executives from hundreds of

14  companies.  DaVita could and did recruit executives from

15  hundreds of companies.  SCA and DaVita could, even under this

16  agreement, and did continue to recruit executives from each

17  other.  And most importantly, SCA's approach to recruiting from

18  DaVita was driven by business collaboration, not market

19  allocation.

20          So let's talk about Count 2.  This is the count that

21  relates to Josh Golomb and Hazel Health.  Now, this accusation,

22  this allegation, is a little bit different.  The allegation

23  here is that Kent Thiry and Josh Golomb -- DaVita and Hazel --

24  conspired to allocate the market for all of DaVita's

25  employees -- thousands of them -- simply by little Hazel

1    Health -- which had about 150 employees, 25 of which were

2    former DaVitans, by the way -- simply by little Hazel Health

3    agreeing not to solicit employees from DaVita.  That they

4    allocated the market for DaVita employees simply by doing that.

5            And, again, context matters.  If you want to know the

6    truth, you need to know the whole story.

7            Well, not only had Kent Thiry mentored and promoted

8    Josh Golomb at DaVita, he helped him get his job as CEO of

9    Hazel Health.  Josh Golomb reached out and asked Kent Thiry to

10   give him a good recommendation with the company that owned

11   Hazel Health, and Kent Thiry did that.  And shortly after that,

12   Josh Golomb got the job.  Well, shortly after that, within a

13   month, in fact, a DaVita executive named Julio Quinones told

14   Kent Thiry that Josh Golomb was trying to recruit him.  And he

15   was angry about it.  He had just helped this guy get his job,

16   and the next thing he knew he was turning around and trying to

17   recruit his executives without even the courtesy of letting him

18   know.

19           And Golomb knew that Kent Thiry would be angry, so

20   they had a series of communications, including a series of

21   texts.  And you'll see them, and you'll see how emotional they

22   are and how personal they are.  And you'll see this text where

23   Josh Golomb says to Kent Thiry, "I didn't sleep much last night

24   knowing how much everything hurt you personally.  I get that it

25   felt like a blindside and possibly a betrayal and easy to

1   assume worst-case narrative without context.  I have thought

2   through a very specific set of ground rules based on your

3   feedback to commit to."  Those ground rules are what these

4   prosecutors say was a conspiracy to allocate the market for all

5   DaVita employees.

6        Now, if that were true, if those ground rules were an

7   effort to allocate the market, you would think that they would

8   bring Josh Golomb in here to get on the witness stand, take the

9   oath, and tell you so.  But you didn't hear Ms. Lewis say they

10  were going to do that because they're not going to do that.

11  Instead, what they're going to do is ask you to rely on

12  Agent Hamel's rendition of, reading of, these text messages.

13  But even when you see the text messages and when you see the

14  entirety of the evidence -- not the snapshots, but the whole

15  picture -- you will see that there is no evidence of any intent

16  to allocate the market.

17       In fact, when Kent Thiry and DaVita learned that Josh

18  Golomb was recruiting him, what did they do?  Did they say, No,

19  no.  He's allocated to us.  You can't have him?  No.  They

20  competed to try to keep him, by offering him a promotion and a

21  better position.  And how do we know that?  From these same

22  text messages.

23       This is a text message from Julio Quinones to Josh

24  Golomb, telling him the very same thing.  "He is trying to

25  convince me of the DaVita path" -- he, Kent Thiry -- "and

1    unprompted said he would like to get me an offer later next

2    week, but no indication of any other type of intervention."  No

3    "You can't go."  No "You're allocated.  How can we get you to

4    stay?  Here is more money.  Here is a better job."  And Julio

5    Quinones, for reasons of his own, decided to go to Hazel.

6            Not only is there no evidence that those ground rules

7    had anything to do with trying to allocate the market; in fact,

8    Josh Golomb continued to recruit from DaVita.  And you'll see

9    various examples of this.

10           This is an example that relates to a woman named

11   Arlene Villa Howells, who was a DaVita manager, who Josh Golomb

12   worked and recruited despite this supposed conspiracy.  And as

13   with Julio Quinones, what did DaVita do?  It competed to try to

14   keep her.  How do we know?  Because Arlene Villa Howells said

15   so in a text to Josh Golomb, which is on the screen before you

16   now.  "They're trying to sell me pretty hard over here."  And

17   they tried to sell her pretty hard in exactly the way the

18   Sherman Act would want them to do, by offering her a raise and

19   a promotion.  And like Julio Quinones, she chose to go to Hazel

20   Health.

21           That brings us to the simple truths related to this

22   count, Count 2, that after you hear all the evidence will tell

23   you that your verdict should be not guilty.  There is no

24   evidence that the market for DaVita employees, thousands of

25   them, could remotely be allocated simply by Hazel with its 150

1    employees agreeing not to solicit.  There is no evidence that

2    Golomb or anybody else remotely thought that would be possible

3    or that is what he was trying to do.  In fact, there is no

4    evidence that he was trying to do anything but repair his

5    relationship with Kent Thiry.  And the prosecution won't call

6    Golomb to say otherwise.

7          And, in fact, Hazel continued to recruit from DaVita.

8    And when it did, and DaVita learned about it, because of these

9    ground rules, it did exactly what the law would want it to do.

10   It competed to try to keep them.

11         Now, finally, Count 3.  This is the count that relates

12   to Radiology Partners and Rich Whitney.  And the allegation

13   here is similar to the allegation in Count 2 related to Hazel

14   Health.  The allegation here is that DaVita and Radiology

15   Partners -- Kent Thiry and Rich Whitney -- conspired to

16   allocate the market for DaVita employees simply by Radiology

17   Partners agreeing not to solicit them.  And, once again,

18   context matters.  And here is the context; here is the full

19   picture.

20         Kent Thiry and Rich Whitney were friends.  Thiry was a

21   mentor to Whitney.  And, in fact, Whitney credited Thiry for

22   preparing him to be the CEO of Radiology Partners.  And, in

23   fact, there were friendships interlocking between the two

24   companies.  Many of the executives at Radiology Partners came

25   from DaVita and still had friends at DaVita.  These were all

1    friends who knew each other.  And they were more than just

2    friends; they were business partners.  Because Kent Thiry and a

3    group of other DaVita executives invested their own money in

4    Radiology Partners in an investment group that Rich Whitney and

5    Radiology Partners called the friends and family investors.

6    And Kent Thiry supported Rich Whitney and Radiology Partners in

7    its business endeavors.  He did have influence in the industry;

8    he did have influence in the business community; and he used

9    that influence at Rich Whitney's request to help him, by

10   connecting him with influential people, by helping him find

11   members for his board of directors, and by doing other things.

12   That's the context in which Rich Whitney agreed to these ground

13   rules that Ms. Lewis told you about.

14            Now, those ground rules were contained in this

15   document.  And you'll see the entirety of this document during

16   the trial.  This is the document that the prosecutors allege is

17   where the conspiracy was hatched.  It's an email from Whitney

18   to Kent Thiry in November of 2013, copying Tom Usilton, another

19   former DaVita executive.  And this email set forth the ground

20   rules that Ms. Lewis described to you, what they agreed to.

21   But the heart of this case is not what they agreed to.  We

22   admit they agreed to it.  The heart of the case is why they

23   agreed to it, and the document tells you.  Rich Whitney told

24   Kent Thiry why he was proposing these things.

25            "The following is a bullet point list of ground rules

1    that we" -- Radiology Partners -- "would be comfortable with as

2    being fair to both Radiology Partners and DaVita.  This is not

3    meant to create any kind of legal agreement but, instead, serve

4    to create clarity around what we hopefully can both agree

5    is" -- and this is the important part -- "a fair way to treat

6    each other out of respect for our long-term relationships while

7    maintaining our ability to meet our responsibilities to our

8    shareholders and other company constituents."  How can we

9    remain friends and business associates and compete without hard

10   feelings?

11       And then Whitney lays out the ground rules, what they

12   agreed to, and then again says why he's proposed them.  "This

13   is what I'm thinking is a fair way to go about our business

14   with a respect for the valued relationships that exist between

15   you" -- Kent Thiry -- "and many other DaVita people on one hand

16   and me and several other Radiology Partners people on the

17   other."

18       When he made the proposal, Rich Whitney told you what

19   his purpose and intent was.  And his purpose and intent could

20   have nothing to do with allocating the market and did have

21   nothing to do with allocating the market.  And, in fact, you

22   will see the same thing in other documents you see during the

23   course of this case where Radiology Partners is recruiting

24   people from DaVita, which it continued to do without stopping.

25   And I'll show you a few examples of those.

 1          This is an email from 2014, during the thick of this

 2    supposed conspiracy, where Radiology Partners was recruiting a

 3    DaVita executive named Guy Seay.  And because of this

 4    agreement, DaVita knew that Radiology Partners was trying to

 5    recruit Guy Seay.  And Radiology Partners pitched him hard to

 6    leave, and DaVita pitched him hard to stay, and he decided to

 7    stay.  But Rich Whitney in this email to Kent Thiry says why

 8    they agreed to handle the recruitment of Guy Seay that way.

 9    "Hopefully your team has had the opportunity to consider and

10    discuss with him his available paths at DaVita so that everyone

11    can make an informed decision and feel very good about it one

12    way or the other."  How can we recruit between friends but

13    continue to compete?  Which they did.

14          Similarly, this is an email that relates to a DaVita

15    executive named Keegan Scanlon, who Radiology Partners also

16    recruited during the thick of this supposed conspiracy.  And

17    this is an email from a woman named Basak Ertan, another former

18    DaVita executive who moved to Radiology Partners during the

19    course of this supposed conspiracy.  And she reached out to

20    Keegan Scanlon's boss at DaVita and let him know that they were

21    interested in Keegan Scanlon and said why.  "I wanted to make

22    sure DaVita was aware and also that you had time to speak with

23    Keegan about his career opportunities with DaVita so Keegan can

24    make an informed and comprehensive decision."  And Radiology

25    Partners competed to get him, DaVita competed to keep him, and

1    Keegan Scanlon decided to go to Radiology Partners.

2         That brings us, ladies and gentlemen, to the simple

3    truths that when you hear all the evidence and see all the

4    documents will tell you that your verdict on Count 3 should be

5    not guilty.  There is no evidence that the market for DaVita

6    employees could be allocated, the competition in that market

7    could be eliminated, simply by Radiology Partners agreeing not

8    to solicit DaVita's employees.

9         And there is no evidence that Radiology Partners was

10   trying to do anything but preserve important personal and

11   professional relationships, to find a fair way to treat each

12   other while they compete so that everyone can make an informed

13   decision and feel very good about it one way or another, to

14   find a fair way to go about their business out of respect for

15   their valued relationship.  How do we compete without hard

16   feelings?

17        And Radiology Partners, of course, did continue to

18   recruit.  In fact, during this supposed conspiracy to block

19   DaVita employees from going to Radiology Partners, 30 DaVita

20   employees left DaVita for Radiology Partners.  Thirty DaVita

21   employees left DaVita for Radiology Partners.  And DaVita

22   competed to try to keep them, and it lost the competition, the

23   competition that the Sherman Act is supposed to foster.

24        Ladies and gentlemen, whatever these agreements, these

25   understandings were, however you hear them articulated, they

1   were not the only thing that could make them a crime.  They

2   were not agreements that when they were made had the shared

3   understood purpose and intent of allocating the market -- the

4   market -- for these employees.  These agreements could not do

5   that, they did not do that, and no one was trying to do that.

6   That is the heart of this case.

7           And after you've heard all of the evidence, we'll come

8   back to you; and based on that evidence, we'll ask you to find

9   us not guilty.

10          I know it's been a long day, and I talked for a while.

11  Thank you very much for your attention.

12          *THE COURT:*  All right.  Thank you.

13          You're reserving on your opening?

14          *MR. MELSHEIMER:*  Yes, Your Honor.

15          *THE COURT:*  Now, government, would you like to start a

16  witness?  I'll give you ten minutes worth and recess at 4:30,

17  or you do want to wait until the morning?

18          *MS. CLINGAN:*  I think if we're just going to do ten

19  minutes' worth, let's let everybody get out of rush hour

20  traffic.

21          *THE COURT:*  You got it.

22          Ladies and gentlemen, thank you for your service

23  today.  We'll look forward to seeing you tomorrow at 9 o'clock.

24  Have a nice evening.  Enjoy the basketball game, if you're into

25  that.  Just don't think about or read about DaVita.  Good

```
 1   night.

 2              (Jury out at 4:19 p.m.)

 3              THE COURT:  All right.  The jury has been excused.

 4   Does anyone on either side have anything they want to put on

 5   the record this evening before we recess?

 6              Government?

 7              MS. LEWIS:  Nothing for tonight, Your Honor.

 8              MR. WALSH:  Nor from DaVita, Your Honor.

 9              MR. MELSHEIMER:  Your Honor, we'd like to invoke the

10   rule after the opening statements are concluded.

11              THE COURT:  Have the what?

12              MR. MELSHEIMER:  Invoke the rule.

13              THE COURT:  What rule?

14              MR. MELSHEIMER:  Rule for witnesses to be excluded

15   from the courtroom.

16              THE COURT:  Sequestration?

17              MR. MELSHEIMER:  The rule of sequestration.  Yes, Your

18   Honor.

19              THE COURT:  I just got to love the way you Texans

20   talk.

21              MR. MELSHEIMER:  In Texas, we just call it "the rule."

22              MR. DODDS:  They can't believe outside of Texas

23   everyone doesn't know that's the rule.

24              THE COURT:  Okay.

25              MS. LEWIS:  Your Honor, if I may on the request for
```

1   sequestration of witness, we would appreciate defendants

2   providing clarity on who that exactly is, because their witness

3   list has a catchall category that requests an agent or

4   participant for each of the government and attorney witness

5   proffer sessions.  It's not clear to us who they're actually

6   trying to exclude.

7              THE COURT:  Well, I'll clarify it for them.

8              First, in case there is anyone here who doesn't

9   understand "the rule," it simply means that if you are going to

10   be a witness, you have to stay outside the courtroom until it's

11   your turn to testify, and you may not be briefed by anybody --

12   lawyers or otherwise -- about what has already occurred.  We

13   want the witnesses to be fresh and untainted by anything that

14   has occurred so far.  Once a witness has testified, then he or

15   she is welcome to stay and watch if they wish.

16             Second, each party has a right to have one client

17   representative.  That means that the government can have, for

18   example, an FBI agent or somebody else that you want; DaVita

19   can have a client representative; Mr. Thiry can have a

20   representative.  That's it.  Everybody else is excluded until

21   they testify.

22             MS. LEWIS:  Your Honor --

23             THE COURT:  Is that clear enough?

24             MS. LEWIS:  Your Honor, respectfully, I believe we

25   need further clarity.  Because, again, with regard to what

1    they've listed on their list, potentially participants in the

2    government's attorney proffer session, that would include our

3    trial paralegals.  And I'm assuming they are not intending to

4    exclude the government's trial paralegals from this courtroom.

5              MR. WALSH:  We are not.

6              THE COURT:  They're not talking about the lawyers or

7    paralegals.

8              MS. LEWIS:  I appreciate that clarification from

9    Mr. Walsh.

10             THE COURT:  We're talking about witnesses.

11             MS. LEWIS:  Thank you, Your Honor.

12             MR. MELSHEIMER:  At the risk of -- one more question,

13   Your Honor.  My understanding is that the rule of

14   sequestration, as everyone refers to it, is designed to exclude

15   expert witnesses.  So I wanted to make sure that our expert

16   would be excluded from that under the Court's practices.  If

17   not, we need to tell him.

18             THE COURT:  Expert witnesses may sit in and observe if

19   it's important to their testimony to hear other witnesses.

20             MR. MELSHEIMER:  Thank you, Your Honor.

21             THE COURT:  Fact witnesses, no.

22             MR. MELSHEIMER:  Thank you, Your Honor.

23             THE COURT:  Anything else?

24             MR. WALSH:  No, Your Honor.

25             MS. LEWIS:  No, Your Honor.

1      THE COURT:  Have a very nice evening.  I'm glad we

2   finally got started.  We'll see you tomorrow at 9 o'clock.

3      (Recess at 4:24 p.m.)

4                        **I N D E X**

5   **Item**                                                      **Page**

6

   Opening Statement By Ms. Lewis                              5
7   Opening Statement By Mr. Dodds                             21

8

9

10                    REPORTER'S CERTIFICATE

11      I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
12
       Dated at Denver, Colorado, this 25th day of April,
13   2022.

14

15                        _Therese Lindblom_
                    _____
16                    Therese Lindblom,CSR,RMR,CRR

17

18

19

20

21

22

23

24

25