IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cr-00229-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. DAVITA INC., and
2. KENT THIRY,

    Defendants.

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO JURY - DAY TWO

_____

        Proceedings before the HONORABLE R. BROOKE JACKSON,

Senior Judge, United States District Court for the District of

Colorado, continuing at 9:01 a.m., on the 5th day of April,

2022, in Courtroom A902, United States Courthouse, Denver,

Colorado.

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1          **A P P E A R A N C E S**

2              MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE
  CLINGAN and ANTHONY WILLIAM MARIANO, Attorneys at Law, U.S.
3 Department of Justice, Antitrust Division, Washington Criminal
  II Section, 450 5th Street N.W., Washington, DC, 20530,
4 appearing for the Government.

5              JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius
  LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103,
6 appearing for Defendant DaVita.

7              JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP,
  1225 17th Street, Suite 2600, Denver, Colorado, 80220,
8 appearing for Defendant DaVita.

9              THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn
  LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201,
10 appearing for Defendant Thiry.

11             JUANITA ROSE BROOKS, Attorney at Law, Fish &
  Richardson, 12860 El Camino Real, Suite 400, San Diego,
12 California, 92130, appearing for Defendant Thiry.

13                     *   *   *   *   *

14                  **P R O C E E D I N G S**

15         (In open court at 9:01 a.m.)

16         *THE COURT:*  Good morning.

17         *MS. LEWIS:*  The government does have one preliminary

18 matter to raise, if this is a convenient time.

19         *THE COURT:*  Okay.

20         *MS. LEWIS:*  Megan Lewis for the United States.

21         We would like to request that the Court give a brief

22 preliminary instruction -- supplemental preliminary instruction

23 to the jurors before we begin testimony today.  Yesterday in

24 defense counsel's opening they referenced the fact that a

25 market allocation would require more than the three competitors

1    charged here and suggested that there was a need for a national

2    market consisting of over 400 companies across the

3    United States, which is contrary to what Your Honor ruled in

4    the order clarifying the jury instructions.

5            So we would be asking for a brief instruction because

6    we think it would be confusing and prejudicial for the jurors

7    to have to listen to two weeks of testimony under the

8    misimpression that what we're talking about here is a national

9    market rather than what is the correct market charged in the

10   Indictment, which is the competition between the two

11   competitors in each count.

12           THE COURT:  Wow, that's a preliminary matter to be

13   brought up in the minute or two before the jury walks in?  No,

14   thank you.

15           What's your response?

16           MR. DODDS:  Your Honor, my response is very simple.  I

17   followed Your Honor's preliminary instructions, and I followed

18   the rulings that Your Honor has made in allowing this case to

19   go to trial.  The focus of my opening statement was on the

20   purpose and intent element.  And my argument was that the

21   government has to prove what Your Honor has said, that the

22   purpose and intent -- understood purpose and intent was to

23   allocate the market for these employees.

24           THE COURT:  She said I previously ruled the market was

25   just the limited market of these four companies.

1          MR. DODDS:  I don't think -- I don't think that is

2     what Your Honor has previously ruled.

3          THE COURT:  Someone is going to have to show me.

4          MS. LEWIS:  Your Honor, I have prepared a preliminary

5     instruction that cites your ruling, if I may approach and

6     present that to you.

7          THE COURT:  You can approach.  I'm not going to give

8     the instruction without really taking time to think about it

9     and go back over the many orders we've issued in this case.

10          MS. LEWIS:  Certainly, Your Honor.

11          THE COURT:  Why didn't you object during his argument

12     yesterday, if this is your point?

13          MS. LEWIS:  Yes, Your Honor.  We -- out of respect, we

14     did not want to interrupt the argument.  I would note that

15     defense counsel did not share with us the slides -- the

16     demonstratives that they intended to use in advance, otherwise

17     we would have brought it up pretrial with them.

18          THE COURT:  Well, I'm not going to give any

19     preliminary instruction this morning; but I'm inclined to agree

20     with you.

21          MS. LEWIS:  Thank you, Your Honor.

22          MR. DODDS:  Your Honor, may I be heard on a few

23     points?

24          First of all, in terms of giving them the slides, I

25     followed Your Honor's practice standards --

1      THE COURT:  You didn't have to give them the slides.

2  But I think she's probably right, I don't think she has to show

3  the market, and certainly not the market of all healthcare

4  companies plus investment bankers.

5      MR. DODDS:  But what she does have to do, according to

6  Your Honor's ruling, is prove beyond a reasonable doubt that

7  the defendants entered into an agreement with the purpose of

8  allocating the market for senior executives and other

9  employees.  Now, the market is a thing of fact.  It is what it

10  is.  It's not a construct that the government makes up and

11  limits to these two employees.  It is wherever as a matter of

12  fact these employees could have otherwise gone.

13      And that evidence -- that would be proved during the

14  course of trial, and Your Honor will instruct the jury at the

15  close of the evidence, based on the evidence.  But the market

16  is an actual thing.  It is what it is.  It's not just something

17  they want to confine it to.

18      THE COURT:  Do you know what an *ipse dixit* is?

19      MR. DODDS:  Yes, Your Honor.

20      THE COURT:  You just gave a good example of it.  The

21  market is what I say it is.  But I think that the government

22  can prove a market allocation agreement to allocate a smaller

23  market than the entire market.  And, in fact, that's what the

24  Tenth Circuit -- Tenth Circuit seemed to say in the *Kemp* case.

25  And that seems to be what I've already ruled.

1      MR. DODDS:  Well, then, we're misunderstanding what

2   has been -- what Your Honor has ruled, with apologies.

3      THE COURT:  That happens sometimes.

4      MR. DODDS:  It does, Your Honor.  But here we think

5   it's important because they have alleged conspiracies to not

6   solicit employees.  And Your Honor has said that an agreement

7   not to solicit is not a violation of the Sherman Act, at least

8   not *a per se* violation --

9      THE COURT:  Yes.

10      MR. DODDS:  -- unless it has the purpose and intent to

11   allocate the market.

12      THE COURT:  Yes, I said that.

13      MR. DODDS:  Yes.  And the market for these

14   employees -- it may not be that as a matter of fact the market

15   is all companies across the United States; and I never said

16   that it was.

17      THE COURT:  Well, you pretty much did, Mr. Dodds.  You

18   said that the market has hundreds of companies.  One of your

19   slides listed all of these different companies and the

20   different aspects of healthcare and then went one step further

21   and said, oh, by the way, all of these investment bankers, too.

22   I don't think that's the market that they have to prove.

23      MR. DODDS:  Well, that may or may not be the market

24   that they have to prove; but I think, certainly, to be

25   consistent with the law they have to prove a market that is

1    bigger than one other company when the demand for these

2    employees was greater than that one other company.  And the

3    slide that I showed was an exhibit from in this trial.

4         THE COURT:  You don't seem to be convinced in this

5    document she just handed you.  Finally -- and this comes from

6    something that we already ordered.  Finally, the government

7    need not prove that defendants allocated the entire market for

8    employees.  The Tenth Circuit made this clear when it said that

9    an agreement may be a horizontal market allocation agreement

10   even though the alleged agreement would only affect a small

11   number of potential customers.

12        MR. DODDS:  Uh-huh.

13        THE COURT:  Okay.

14        MR. DODDS:  But, again, Your Honor, the focus of my

15   argument was on the intent and purpose elements that Your Honor

16   has set out.  And I believe that under those intent and purpose

17   elements, putting aside the issue of what the actual market

18   was, they have to prove beyond a reasonable doubt that when

19   these participants reached these agreements, they understood

20   that they were allocating the market for these employees.

21        THE COURT:  Okay.

22        MR. DODDS:  Their understanding of what that market

23   was is relevant to this.  The document that I showed from SCA

24   was SCA's understanding of what the market was.

25        THE COURT:  All right.  We'll start up again.  I'm not

1   going to give a preliminary instruction this morning, but I'm

2   inclined towards your view.

3          MS. LEWIS:  Thank you, Your Honor.

4          THE COURT:  Now, since we don't have a jury, I guess

5   we wait.

6              (Recess at 9:11 a.m.)

7              (In open court at 9:20 a.m.)

8          THE COURT:  I'll prepare my own instruction on the

9   market.  What is your theory of what the market is?

10         MS. LEWIS:  Thank you, Your Honor.  The market is what

11  we charged in the Indictment, which is the market between the

12  two competitor companies in each count for the employees in

13  those counts.  So in Count 1 it would be the senior-level

14  employees between DaVita and SCA is the market that is being

15  suppressed.

16         THE COURT:  All right.  Thank you.

17         MS. LEWIS:  Thank you, Your Honor.

18             (Jury in at 9:21 a.m.)

19         THE COURT:  All right.  Have a seat.

20         Good morning, ladies and gentlemen.

21         How are my favorite jurors this morning?

22         Excellent.  Ready for some evidence?  Let's get some.

23         MS. CLINGAN:  The United States calls Dennis Kogod.

24         THE COURT:  Good morning, sir.

25

1       (**DENNIS KOGOD, GOVERNMENT'S WITNESS, SWORN**)

2                    **DIRECT EXAMINATION**

3    *BY MS. CLINGAN:*

4    *Q.*  Good morning, Mr. Kogod.

5    *A.*  Good morning.

6    *Q.*  Could you please state and spell your name for the record.

7    *A.*  Dennis Kogod.   K-O-G-O-D.

8    *Q.*  Mr. Kogod, what's your current title?

9    *A.*  I'm an independent consultant.

10   *Q.*  What did you do before that?

11   *A.*  I worked in the autism space and a little bit in the renal

12   space and prior to that, DaVita.

13   *Q.*  Tell us about DaVita.  What does DaVita do?

14   *A.*  DaVita is a dialysis company that also developed a lot of

15   ancillary services, all catered towards the unique needs of

16   patients with end-stage renal disease.

17   *Q.*  And during the years that you worked there, where did

18   DaVita have facilities?

19   *A.*  Throughout the United States, approximately 45 or 46

20   states, and approximately twelve countries outside of the U.S.

21   at some point.

22   *Q.*  Did DaVita have employees in all of those states?

23   *A.*  They did.

24   *Q.*  Where was its headquarters?

25   *A.*  Originally in El Segundo, California, when I joined the

Dennis Kogod - Direct

1    company in 2005, and relocated to Denver, Colorado somewhere

2    around 2010, 2011.

3    Q.  You stated that you started at DaVita around 2005.  All

4    told, how many years did you work at DaVita?

5    A.  Including a three-year consulting agreement after I left,

6    approximately 14 years.

7    Q.  Can you just walk us through the titles that you held while

8    you were at DaVita?

9    A.  2005, in September, when I joined DaVita, I joined as a

10   group president, responsible for one of the operating groups.

11   January 2009, I was promoted to chief operating officer.

12   Somewhere in around 2010, 2011, I took on the responsibility of

13   the international department, which was new to DaVita.  In

14   2013, I shifted from DaVita Kidney Care to HealthCare Partners,

15   which was an acquisition that DaVita completed in 2012.  I

16   joined HealthCare Partners, a DaVita subsidiary, if you will,

17   as chief operating officer, continued to have international

18   responsibility.  And somewhere in the 2014 time frame, my title

19   changed to president of HealthCare Partners and CEO of DaVita

20   International, until I left at the end of November 2016.

21   Q.  What about Kent Thiry?  During the years that you worked at

22   DaVita, what was Kent Thiry's title?

23   A.  Kent was the chairman of the board and chief executive

24   officer.

25   Q.  In layman's terms who was in charge of DaVita?

Dennis Kogod - Direct

1    A.   Kent was in charge.

2    Q.   During the 14 some odd years that you worked at DaVita, how

3    many of those years did you report directly to Mr. Thiry?

4    A.   In the early years, I reported to Mr. Thiry 2005 to 2009

5    just on some project work.   And a couple of the departments I

6    oversaw reported directly to him through me.   Directly

7    reporting to Mr. Thiry, January 1, 2009, until I left the

8    company in 2016, and continued to report to Mr. Thiry during my

9    consulting engagement.

10   Q.   During those years when you reported directly to Mr. Thiry,

11   how often in a given week would you have conversations with

12   him?

13   A.   Depending on the week, but I would describe it as frequent

14   conversations, telephone calls, emails, voicemail exchanges,

15   live meetings, particularly when I relocated to Denver.   So

16   frequently would be the best way to describe it.

17   Q.   And during those years, who was Mr. Thiry's right-hand man?

18   A.   I consider myself from '09 until '13 or '14 Mr. Thiry's

19   right-hand man.   And Mr. Rodriguez was also a very significant

20   executive on the team.

21   Q.   Who is Mr. Rodriguez?

22   A.   Javier Rodriguez, who is the current CEO of DaVita.

23   Q.   Mr. Kogod, can you describe the circumstances under which

24   you left DaVita?

25   A.   Yes.   It was somewhere in -- I put it around April of 2016,

Dennis Kogod - Direct

 1   I had just recovered from a hip replacement, the first of many

 2   surgeries.  I flew up to Northern California to meet Mr. Thiry

 3   at the DaVita Rx subsidiary of DaVita, their headquarters.

 4   When we sat down and exchanged just a couple of how are you

 5   doing post-surgery, Mr. Thiry expressed some unhappiness with

 6   the international results in HealthCare Partners.  And from my

 7   perspective, rather than debate that, it just felt like it was

 8   a good time to say, it is time to go.

 9           I felt like after many years of travel, spent the last

10   couple of years spending at least one trip almost on a monthly

11   basis in Saudi Arabia negotiating and administering a big

12   contract -- it's a 45-hour round trip.  Sometimes I'd go just

13   for a meeting and come back, and I had a day job running

14   HealthCare Partners.  So when Mr. Thiry suggested that he was

15   unhappy with the results of those two companies that I was

16   overseeing, or part of, it felt like an appropriate time just

17   to say, we should transition out.

18           We did a couple of weeks after have I think two

19   meetings, one in Washington and perhaps a dinner, where we

20   talked about hitting the reset button, should we try one more

21   time?  I think the conclusion was, no.  And I ultimately left

22   November 30, 2016, was my last day at DaVita.

23   Q.  And did you remain a consultant at DaVita after that time?

24   A.  I did.  On December 1, 2016, I began a three-year

25   consulting agreement, where DaVita purchased approximately 100

Dennis Kogod - Direct

1    hours of my time per month, focused almost exclusively on

2    international.

3    Q.   And do you have any personal animosity toward Mr. Thiry?

4    A.   No.  Quite the contrary.  I have had tremendous regard for

5    Mr. Thiry personally, professionally for many years.  I'm

6    grateful for the opportunities.  Our relationship I think was

7    at its peak in 2009 to 2000 -- early '13.  The relationship did

8    begin to deteriorate or decline over time.  But even after I

9    left and entered my consultant role, engaged in a couple of

10   projects with Mr. Thiry.  And saw him in Germany during an

11   international strategy meeting.

12          So I don't have any bad feelings towards Mr. Thiry.  I

13   regret the relationship ended where it did, but I don't have

14   any regret -- any animosity towards him.

15   Q.   Let's switch gears for a second and talk about hiring at

16   DaVita.  While you were at DaVita, did you have any

17   responsibility for recruiting or hiring employees?

18   A.   Yes.

19   Q.   What was that role?

20   A.   If it was a direct employee of mine, I would lead that

21   process all the way up to the final candidate.  If it was a

22   direct report of mine or somebody else on the executive team, I

23   would play a role.  I would typically interview the candidate

24   and typically sit through what was a case study requirement for

25   executives that they had to undergo as one of the last steps in

Dennis Kogod - Direct

1    hiring.  So directly and indirectly, I touched candidates.

2    Sometimes I would be called in to help recruit a candidate a

3    level or two down.  They may have multiple offers on the table,

4    and sometimes having somebody with a different business card is

5    helpful in the recruiting process.

6    Q.  Did DaVita hire people nationwide?

7    A.  They did.

8    Q.  Would DaVita ever hire someone across state lines?  So

9    would someone ever move from one state to another to work for

10   DaVita?

11   A.  Yes.

12   Q.  Can you just give us a quick summary.  If a company like

13   DaVita is looking to hire an employee to fill an open role, how

14   would DaVita go about finding a particular candidate?

15   A.  May I limit my responses to more of the executive, rather

16   than the front-line clinical people?

17   Q.  Yes.  Testify to what you're familiar with.

18   A.  Thank you.  On the executive level, the first choice was to

19   retain the services of an executive recruiter -- a Spencer

20   Stuart, a Korn Ferry, an executive recruiting firm that did

21   what was called a retained search.  That was the primary way of

22   recruiting executives.  Second would have been word of mouth,

23   somebody knew of somebody who might have been looking, and you

24   could avoid using a recruiter.  But more times than not it was

25   an executive recruiter.

Dennis Kogod – Direct

1    Q.   Okay.  You talked a little bit about the use of executive

2    recruiters.  A lot of us might not have interacted with an

3    executive recruiter.  Could you just briefly explain in your

4    own words how that works?

5    A.   Sure.  Once you decide on the firm you choose -- there were

6    a couple out there that meet the criteria of having kind of a

7    national footprint, you go through the process of identifying

8    what the role is, what the job specifications are, the ideal

9    profile of the person you're looking for, any other

10   requirements that you may have that are part of the job, they

11   then go back and come back to you with almost an initial slate

12   of candidates that they think meet the criteria that you've

13   described to them.  And then their job is to go out and

14   identify candidates and speak to them and do some type of

15   initial check and clearance.  And once they've done that, they

16   continue to pass on names to DaVita and say, the list gets a

17   little bit shorter, but these are candidates we think meet the

18   requirements, and we should start setting you up with

19   interviews.  That's basically what an executive recruiter would

20   do.

21   Q.   So, Mr. Kogod, we have a court reporter this morning that

22   is taking a transcript of what is being said.  And she has very

23   kindly put a little note on the podium here that says, "Speak

24   nice and slow and nobody gets hurt."  So nobody gets hurt this

25   morning, maybe let's slow down just a little bit.

Dennis Kogod - Direct

1   *A.*   Apologies.

2   *Q.*   Did that process of recruiting that you were just

3   describing -- in that process, would you sometimes reach out to

4   candidates who perhaps weren't at that moment looking to leave

5   their current job?

6   *A.*   Yes.   It was a typical practice for recruiting firms or

7   search firms to reach out to people whether they had expressed

8   an interest or not.

9   *Q.*   And why would it be a typical practice to reach out

10   proactively to a potential candidate?

11   *A.*   Not all of the candidates that may have met the requirement

12   might have notified the recruiters that they're looking to

13   leave their current job.   So it became a worthwhile exercise,

14   part of the recruiter's business model, to identify the

15   candidates regardless of where they're working and make cold

16   calls to see if any of them would consider leaving.   Did they

17   have a bad day, and it was a good day for the recruiter to

18   call.   So they tried to cast their net as wide as they could.

19   And, ultimately, that means contacting people whether they had

20   expressed an interest or not.   Cold calling.

21   *Q.*   What was Mr. Thiry's role in recruiting and hiring at

22   DaVita?

23   *A.*   Mr. Thiry was an excellent resource in recruiting.   The

24   same process as I described.   I think he would lead the process

25   for anybody that was being hired that would directly report to

Dennis Kogod - Direct

1    him.  On direct reports of his direct reports, he would likely

2    be part of the final interview process, perhaps the case study,

3    most often.  And Mr. Thiry was utilized by a lot of the other

4    executives because candidates want to talk to the CEO.  They

5    want to understand first-hand the direction of the company, so

6    he was an excellent resource for others in the recruiting

7    process.

8    Q.  You testified that he led the process.  Did he receive

9    regular updates about the recruiting process?

10   A.  If it was a direct reporting role to him, absolutely.  If

11   it were one level down, there would be some communication in

12   terms of how that process is going, what does the pipeline look

13   like, and then arrangements made to have that candidate

14   interview with Mr. Thiry, oftentimes.

15   Q.  Did he issue any directives concerning recruiting

16   practices?

17   A.  There were certain companies that had what was called a

18   hands-off or no-poaching agreement that we were instructed just

19   to stay away from.

20   Q.  Okay.  We're going to talk about those in just a moment.

21        Let me ask, did any companies ever try to recruit from

22   DaVita?

23   A.  Yes.

24   Q.  Do you know if Mr. Thiry had a reaction to that?

25   A.  Yes.  A -- there were some hot buttons that Mr. Thiry had.

Dennis Kogod - Direct

1    I put this in the category of being one, where it became more

2    of an emotional issue, frustration, a little bit of anger.  I

3    think Mr. Thiry took a lot of pride in the executives he hired;

4    and the idea of somebody poaching them just set off a level of

5    an emotional response.  Anger, discussions of retaliation if it

6    was a company that had a no-poaching -- hands-off agreement

7    with DaVita.

8    Q.  Did you ever personally observe instances in which

9    Mr. Thiry reacted to another company trying to recruit a DaVita

10   employee?

11   A.  I can't give you a specific date; but, yes, I was part of

12   those conversations, whether live, telephone call or email,

13   in terms of responses, yes.

14   Q.  Can you just briefly describe the reaction.

15   A.  Again, if it was one of the companies that entered into a

16   no-poach, hands-off, the conversation quickly shifted to what

17   could we do in response to it?  Should we target some of their

18   executives?  Should I call the CEO and remind them?  So, again,

19   angry, frustrated, upset, personal -- more of a personal

20   attack, from my perspective.  And conversations quickly shifted

21   to what -- what is the appropriate response for that?  How do

22   we retaliate?

23   Q.  From those conversations that you observed, would it be

24   fair to say that Mr. Thiry wanted to control whether or not

25   employees left DaVita?

1          *MS. BROOKS:*  Objection, Your Honor.  Leading.

2          *THE COURT:*  Overruled.

3          *THE WITNESS:*  Yes.

4     *BY MS. CLINGAN:*

5     *Q.*  Did Mr. Thiry take steps to make it harder for people to

6     leave?

7     *A.*  Yes.

8     *Q.*  Now, Mr. Kogod, you testified just a moment ago that you

9     learned that DaVita had these no-poach agreements with other

10    companies, how did you learn about those no-poach agreements?

11    *A.*  They were discussed openly, as part of the executive team.

12    I was present during conversations.  I was present -- I was

13    involved -- copied on emails pertaining to it.  It was openly

14    discussed among the executive team who the companies were we

15    had a hands-off agreement with.

16    *Q.*  Who was the point person at DaVita for negotiating and

17    implementing these no-poach agreements?

18    *A.*  The negotiating would be different from case to case.

19    Typically, it was the executive at DaVita that had the closest

20    relationship with the former executive of DaVita that had

21    entered one of the companies.  In most cases, other than,

22    perhaps, Kindred, in terms of enforcing, ultimately, Mr. Thiry

23    was the lead on what steps, if any, took place.  And -- yes,

24    Mr. Thiry.

25    *Q.*  Now, you testified that the no-poach agreements were

Dennis Kogod - Direct

1    discussed openly among the executive committee.  Did you have

2    conversations with Mr. Thiry and the other individuals

3    responsible for the agreements?

4    A.   Yes.

5    Q.   And from those conversations, did you have an understanding

6    of the purpose of those agreements?

7    A.   Yes.

8    Q.   What was the purpose of those agreements?

9    A.   To ensure that these other companies were unable or

10   precluded or prevented from reaching out to, contacting,

11   presenting to any DaVita executive, to make it impossible to

12   hire a DaVita executive.

13   Q.   Now, these no-poach agreements were discussed openly among

14   the executives.  Were all employees at DaVita made aware of the

15   existence of these no-poach agreements?

16   A.   I can't speak for all employees.  I know that people in my

17   lanes would have been communicated, because I didn't want them

18   to go through a process and surface a candidate that was going

19   to end up being rejected.  So it's fair to say, down to the

20   senior vice president level and in my lanes, my area of

21   responsibility, down to the divisional vice presidents, so they

22   didn't start a process that was going to end up burning a lot

23   of time.  So it was communicated beyond the executive team.

24   Q.   All right.  Let's talk about who DaVita had these no-poach

25   agreements with.  Are you familiar with a company called

Dennis Kogod - Direct

1   Surgical Care Affiliates?

2   *A.*   I am.

3   *Q.*   Is that sometimes referred to as SCA?

4   *A.*   Yes.

5   *Q.*   Did DaVita have a no-poach agreement with SCA?

6   *A.*   Yes.

7   *Q.*   What about with a company called Hazel?

8   *A.*   Yes.

9   *Q.*   A company called Radiology Partners?

10  *A.*   Yes.

11  *Q.*   A company called IntegraMed?

12  *A.*   Yes.

13  *Q.*   A company called Kindred?

14  *A.*   Yes.

15  *Q.*   A company called Spectranetics?

16  *A.*   Yes.

17  *Q.*   What was the effect of these no-poach agreements?

18  *A.*   The effect was that there would be no outreach, no

19  recruiting by either company -- DaVita and the company it was

20  in the agreement with.  So the end result was, DaVita employees

21  ultimately didn't go to these companies.  And unless

22  specifically targeted, as we talked about earlier, their

23  employees did not come to DaVita.

24  *Q.*   Who were these no-poach agreements intended to benefit?

25  *A.*   DaVita.

Dennis Kogod - Direct

1    Q.   And at whose expense did these no-poach agreements operate?

2    A.   People wishing to leave DaVita.

3    Q.   All right.  Generally speaking, what types of companies did

4    DaVita have these no-poach agreements with?

5    A.   They were in most cases stand-alone decentralized

6    healthcare services companies, meaning a series of clinics and

7    buildings throughout the country, instead of one big hospital

8    where everybody shows up.  I think the exception to that would

9    probably be Hazel and Spectranetics, but they were healthcare

10   services companies, generally speaking.

11   Q.   How did you refer to these agreements in regular

12   conversation during the period they were enforced?

13   A.   Typically, hands-off agreement.

14   Q.   And what did that hands-off refer to?

15   A.   To recruiting of each other's employees.

16   Q.   Do you know whether or not DaVita took steps to monitor and

17   enforce these agreements?

18   A.   Yes.  It -- from my perspective, people in the organization

19   knew that this was a pretty important topic.  So it was not

20   uncommon for people to elevate when they had heard of somebody

21   being recruited by -- attempted to be recruited by these

22   companies.

23        I'm sorry.  Can you repeat the question?  I got

24   sidetracked.

25   Q.   Sure.  Do you know whether or not DaVita took steps to

1  monitor and enforce these agreements?

2  A.  Yes.  DaVita executives would elevate this.  They didn't

3  want to be the executive that had an employee recruited by one

4  of these companies and not have raised it to the attention of

5  senior team.  So, ultimately, in terms of monitoring,

6  enforcing, Laura Mildenberger, who was the chief people

7  officer, would be somewhat the record keeper.  But the

8  enforcement of it, again, Mr. Thiry was the primary engineer.

9  Q.  Did Mr. Thiry personally monitor compliance with the

10 agreement?

11 A.  Yes.

12 Q.  Did you have a role in monitoring and enforcing the

13 agreements?

14 A.  I had a role in monitoring.  And I would say the

15 enforcement decisions fell to Mr. Thiry, administering some of

16 those.  Yes.

17 Q.  Did Mr. Thiry have a nickname for the village -- for

18 DaVita?  Excuse me.

19 A.  The DaVita village.  Yes.

20 Q.  What was Mr. Thiry's role in the village?

21 A.  His unofficial title was mayor of the DaVita village.

22 Q.  And do you know what the idea was behind the village?

23 A.  It was a good idea.  It was -- rather than thinking of

24 yourself working in a clinic, particularly in a rural area, you

25 were part of a much bigger village.  That the village cared

Dennis Kogod - Direct

1    about you, would do a great deal of things -- personal and

2    professional development, training, try to bring people

3    together.  So the concept initially of the village was a

4    remarkable concept, because so many of the teammates were

5    scattered throughout the country and they only had their small

6    clinics to think of.  So creating this concept of, you're part

7    of something much larger, became important in terms of

8    recruiting and retention.  That really was the concept of the

9    village, that you had a bigger home.

10   Q.  Now, you testified that the concept was a good one.  How

11   did it work in practice?

12   A.  I think for a lot of the front-line people, the nurses and

13   the technicians and the people in the clinics every day, I

14   think the concept of the DaVita village resonated well with

15   them.  I think as you moved further up into the organization,

16   the expectation was that you would be a good role model of the

17   DaVita village.  But I can only speak personally.  I think

18   there is a time where I think the concept of the village just

19   became a little overboard, from my perspective.  A little bit

20   too much Kent-centric and less about the DaVita village.

21   Q.  Can you explain how it became Kent-centric?

22   A.  Kent had a remarkable personality.  Incredibly present.

23   You'd see a lot of that during nationwide, which is a gathering

24   of a lot of DaVita teammates in one location for three or four

25   days.  I mean, he had what I would call a rock star status with

Dennis Kogod - Direct

1    people.  He'd get up at big events, and he'd join the band.

2    And he was very approachable and very personable.  And it felt

3    like over time that the village became a little bit less about

4    the DaVita village and a little -- a lot more about Kent.

5    Q.  Did these agreements have any impact on employees' ability

6    to leave the village?

7    A.  It makes their ability to leave far more difficult.  The

8    agreements transitioned a little bit to where there was a

9    requirement that if a DaVita executive wanted to interview with

10   one of these companies, they had to disclose to their boss that

11   they were looking to leave the village and interview outside of

12   the village.  And that became one of the requirements before

13   the other company could interview them.  There are a lot of

14   people that just don't want to have that conversation.  It's a

15   tough one to have.  There are some that did and may have

16   benefited from it.  But for the most part, once you make the

17   decision to leave, sitting down with your boss and telling that

18   person you're going to leave makes you somewhat vulnerable.  So

19   I think it had a chilling effect with a lot of people.

20   Q.  Were there any ceremonies around the village?

21   A.  Ceremonies?

22   Q.  Uh-huh.

23   A.  There were numerous ceremonies at the clinic level and

24   group level and nationwide level and international.

25   Q.  Can you just describe one of them?

Dennis Kogod - Direct

1   *A.*  At clinic level, a core value ceremony, where teammates are

2   recognized for living or embodying, exemplifying, excelling at

3   one of DaVita's core values, which they took quite seriously.

4   I think DaVita just finished last week their nationwide

5   ceremony, that brings several thousand people together in one

6   location over a three-day period.  And there are things in

7   between.

8   *Q.*  Are there any ceremonies involving a bridge?

9   *A.*  Yes.  There is a ceremony called crossing a bridge, where

10  one literally crosses a wooden bridge.  And at the end -- the

11  concept was that you had gone from being a DaVita teammate to

12  being a DaVita citizen.  And there was in some cases a reading

13  of a proclamation to kind of your direct reports and others,

14  exposing yourself, making yourself vulnerable, and almost

15  committing to the village to be a citizen of the village

16  instead of somebody that was just passing through, who happened

17  to be working there.  There was typically a bridge brought in

18  for every ceremony.  Crossing the bridge was a very big

19  concept -- very important at DaVita.

20  *Q.*  Mr. Kogod, we've been talking about bilateral agreements

21  that DaVita entered into with other companies.  I want to talk

22  about something different for a moment.  I want to talk about

23  nonsolicitation or noncompete clauses that might be included in

24  an individual employee's employment contract.  Are you familiar

25  with those types of nonsolicitation or noncompete contractual

Dennis Kogod - Direct

1   provisions?

2   *A.*   As a layman, yes, I am.

3   *Q.*   Could you just explain your understanding of those

4   provisions.

5   *A.*   Let's start with nonsolicit.   If a contract I have has a

6   nonsolicit, it simply means, if I go to a new company, I won't

7   reach out directly to any DaVita teammates -- using the DaVita

8   example -- to try to recruit them.   If those individuals learn

9   about a job opening because the company I went to ran an ad, we

10  posted it somewhere on a website and they responded to it, that

11  would not be violating.   My nonsolicit means I, Dennis Kogod,

12  will not reach out directly to try to recruit somebody.

13          A noncompete clause is one that says for a period of

14  time -- typically twelve months after an executive leaves --

15  that I will not go to work with a company that is in the same

16  space as DaVita.   In other words I wouldn't go to Fresenius,

17  which is a DaVita competitor.   So that's -- but those are about

18  what I can and can't do.   I'm not -- not about what the company

19  can and can't do.   They're personal agreements.

20  *Q.*   Do you know whether those type of contractual provisions

21  that you were just testifying to, do you know whether or not

22  those are typically limited in time?

23  *A.*   From my personal experience, having signed some, they are

24  typically twelve months from the time you depart.   That is a

25  typical noncompete, nonsolicit period.   And there are also

Dennis Kogod - Direct

1    states where the noncompetes are unenforceable, like

2    California.  But, typically, a year.

3    Q.  And do you know whether or not the employee who enters into

4    those contracts is typically compensated?

5    A.  Sometimes as part of a separate agreement, the signing of a

6    noncompete becomes a reason why a company may extend severance

7    or some time of remuneration because they're anxious to get

8    that noncompete agreement.

9    Q.  How did the no-poach agreement that DaVita entered into

10   with other companies differ from the types of contractual

11   provisions you were just describing?

12   A.  If we go back, they were -- the noncompete and the

13   nonsolicitation were what I couldn't do after I left DaVita.

14   The no-poach agreement meant that DaVita employees were

15   excluded from being able to go to work for one of these

16   companies that had a reciprocal hands-off, and their employees

17   couldn't be hired at DaVita without going through that last

18   step I mentioned a few minutes ago.  So the first set was

19   individual, what I could and could not do.  The second really

20   pertained to the entire company -- both companies -- what they

21   could and could not do.

22   Q.  Okay.  You testified that the no-poach agreement applied

23   generally to the entire companies.  Were the no-poach

24   agreements that DaVita entered into with other companies

25   limited in time?

Dennis Kogod - Direct

1    *A.*   No.   They were -- there was no ending date, to the best of

2    my knowledge.

3    *Q.*   All right.   Let's start by talking about the agreement with

4    SCA.   And I think you testified a moment ago, you're familiar

5    with the SCA company.   What does SCA do?

6    *A.*   Surgical Care Affiliates owns, operates, and manages

7    stand-alone ambulatory surgery centers across the country.   And

8    they may have different levels of ownership; but that's the

9    business they're in, in surgery centers.

10   *Q.*   Focusing on the time period roughly 2012 to 2017, what was

11   DaVita's relationship with SCA?

12   *A.*   There was a very brief discussion at one point whether one

13   of DaVita's subsidiaries, Lifeline, should do any work with

14   Surgical Care Affiliates.   It was a relatively short

15   conversation, and I know that because Lifeline reported up

16   through me.

17             And in 2014, HealthCare Partners, which was a DaVita

18   affiliate or subsidiary, did one joint venture in the

19   Los Angeles area with Surgical Care Affiliates.   There was a

20   brief exchange afterwards about further exploration in other

21   areas, whether HealthCare Partners should be working with --

22   with Surgical Care Affiliates; but to the best of my knowledge

23   they didn't yield any results.   So it -- we would discuss were

24   there opportunities, were there mutual needs in the market?

25   And out of that it yielded one ambulatory surgery center in

Dennis Kogod - Direct

1    HealthCare Partners, not DaVita Kidney Care, in 2014.

2    Q.  What did the no-poach agreement have to do with those

3    business discussions with SCA you were just testifying about?

4    A.  Nothing at all.

5    Q.  Were the transactions that you were just describing, were

6    those anticipated to be limited to a specific city?

7    A.  Yes.

8    Q.  And did the no-poach agreement with SCA apply just to a

9    specific city or did it apply nationwide?

10   A.  Nationwide.

11   Q.  Do you know who Andrew Hayek is?

12   A.  I do.

13   Q.  What was his role?

14   A.  From an SCA perspective, he was chief executive officer.  I

15   don't know if he was chairman of the board.  But he had left

16   DaVita and became the chief executive officer of Surgical Care

17   Affiliates.

18   Q.  You say he had left DaVita.  Do you know roughly when he

19   had left DaVita?

20   A.  Going from memory, I'm going to say somewhere in the 2008

21   time frame; but that is a wild guess.

22   Q.  Do you know what his role had been at DaVita?

23   A.  Andrew was hired as a very high-potential executive.  I

24   think the role he played at DaVita may have been to one of its

25   affiliates, Village Health.  He was given I think a couple of

Dennis Kogod - Direct

1   different assignments, made a member of the executive team.  I

2   think Andrew was recruited as Mr. Thiry started to think about

3   succession planning for himself in the future.  Andrew was a

4   viable candidate.

5   Q.  Before DaVita entered into a no-poach agreement with SCA,

6   do you know if DaVita and SCA competed for employees?

7   A.  I'm sure they did.

8   Q.  How did you learn about the agreement between SCA and

9   DaVita?

10  A.  It was discussed openly when Mr. Thiry -- and I think

11  Mr. Usilton may have been involved with Andrew Thomas, chief

12  development officer, when the agreement was reached.

13          MS. CLINGAN:  All right.  Ms. Cabrera, if we could

14  please take a look at Government Exhibit 32.

15          And we have stipulated to admissibility, so I can

16  formally move this into evidence or we can --

17          THE COURT:  It's admitted.

18          MS. CLINGAN:  Thank you.

19          (Exhibit 32 admitted.)

20  BY MS. CLINGAN:

21  Q.  Mr. Kogod, if we could please start with the first

22  chronological email in this chain, which is from an

23  individual named Noah Waldman on February 13, 2012.

24          Who is Noah Waldman?

25  A.  Noah was a senior partner for Korn Ferry, one of the

Dennis Kogod - Direct

1    international retained search firms that we talked about; and

2    he was leading this particular search on behalf of Korn Ferry

3    for DaVita.

4    Q.   You say Korn Ferry was a search firm.  Is that another name

5    for a recruiting firm?

6    A.   Yes.  I'm sorry.

7    Q.   And in what context would you interact with Mr. Waldman?

8    A.   If I were the direct hiring manager who initiated or

9    agreed, acknowledged, approved the search, I would be

10   coordinating with Mr. Waldman what the profile, the candidate

11   looked like, likely industries they may have come from,

12   everything we talked about before, any unique skill sets,

13   qualifications that would be more attractive.  And then

14   throughout the process, Mr. Waldman would be responsible for

15   communicating back to either myself or whoever the hiring

16   manager was to let him know how he was doing, how the

17   discussions, the search for candidates was going.  So there was

18   ongoing communication with these search partners.

19   Q.   All right.  Let's take a look at your response to

20   Mr. Waldman, which is on the bottom of page 2, at 11:58.

21   A.   Okay.

22   Q.   Can you just read your email to Mr. Waldman.

23   A.   "Noah, the SCA guy, how interested is he?  Was he looking

24   when you contacted him?"

25   Q.   Why did you need to ask Noah Waldman if the SCA guy was

Dennis Kogod - Direct

1    looking when you contacted him?

2    A.  I knew at this point that there was a hands-off no-poach

3    agreement, and I was just gathering some facts that I know I

4    would have been asked.  Was he actively recruiting, was he

5    already looking, or did DaVita just reach out to him on those

6    cold calls.  So I want to know if we were in violation of the

7    hands-off agreement.

8    Q.  Had this individual not been actively looking, would you

9    have been able to talk to him, as you understood it under the

10   no-poach agreement?

11   A.  The fact that he made the list from Korn Ferry as a viable

12   candidate, the expectation would have been that he would have

13   been interviewed.  Yes.

14   Q.  Sorry.  Would you have been able to talk to this

15   individual, consistent with the no-poach agreement, if you had

16   learned he wasn't actively looking for a job?

17   A.  No.

18   Q.  Let's take a look at the first page of this document.  Who

19   do you forward this email thread to?

20   A.  To Mr. Rodriguez and Mr. Thiry.

21   Q.  And why did you loop in Mr. Rodriguez and Mr. Thiry?

22   A.  The no-poach agreement was, as we talked about earlier,

23   maintained and enforced at a -- the most senior level; and

24   these were the two senior-most executives in the company, other

25   than myself, in 2012.

Dennis Kogod – Direct

1   Q.  Let's take a look at Mr. Thiry's response at 11:42.  Can

2   you read Mr. Thiry's response?

3   A.  "So an SCA guy, in addition to a Quake guy.  Andrew has not

4   gotten back to me yet, but the only outstanding issue was

5   director or VP level, which was appropriate given our

6   contemplated business relationships.  So I think we have a

7   business relationship conflict, assuming they have stopped on

8   their side."

9   Q.  All right.  Let's start with the "Andrew has not gotten

10  back to me yet."  Who is Andrew?

11  A.  Andrew Hayek, the CEO of SCA.

12  Q.  And can you just explain in your own words what it means

13  when it says "the only outstanding issue was director or VP

14  level"?

15  A.  What was being decided was at what level does the hands-off

16  agreement begin?  Would it be a director level or above that

17  meet the criteria of being hands off, or was it a vice

18  president level or above that meet the criteria.

19  Q.  Okay.  Let's take a look at the "contemplated business

20  relationships."  What were the contemplated business

21  relationships at this point in time?

22  A.  None.  None.

23  Q.  And let's take a look where Mr. Thiry says, "So I think we

24  have a business relationship conflict."  Was there a business

25  relationship conflict with SCA at this time?

Dennis Kogod - Direct

1    A.   No.

2    Q.   Based on your conversations with Mr. Thiry, do you know why

3    this email says there is a business relationship conflict

4    when there wasn't one?

5    A.   DaVita had a -- an unofficial program called smart

6    communication in terms of what you write and what you say.  And

7    when I look at this email, to me, this is simply trying to

8    put it under the guise of, we're doing something that is

9    questionable; but if we call it a business relationship, it

10   legitimizes the need to do it.

11           MS. BROOKS:   Objection, Your Honor.  That is the

12   witness giving an opinion, and I would move to strike.

13           THE COURT:   All right.  Overruled.

14   BY MS. CLINGAN:

15   Q.   Mr. Kogod, were you finished with your testimony?

16   A.   Yes.

17   Q.   Did Mr. Thiry ever provide any instructions to you about

18   how to communicate about the no-poach agreements?

19   A.   There were communications -- again, it falls under the

20   smart communication -- be careful what you write and what you

21   say.  So, yes, we were given guidance on what to write.

22   Q.   Okay.

23   A.   And what not to write.

24   Q.   Let's take a look at your response at 10:08 a.m.  Now, in

25   this email chain, you had been discussing an SCA candidate.

Dennis Kogod - Direct

1    Can you read in your email what the decision is with respect

2    to the SCA candidate?

3    A.   "Yes, SCA and HCP.  Sounds like we pass on him" -- meaning,

4    the SCA.  "Interesting out of the original group Noah teed up,

5    two from Kindred, one SCA, one HealthCare Partners."

6    Q.   Did you ultimately interview the SCA guy?

7    A.   We did not.

8    Q.   What was the reason you passed on him?

9    A.   It would have been violating the no-poach agreement.

10   Q.   Any other reason?

11   A.   No.

12           MS. CLINGAN:  Let's look at Government Exhibit 42,

13   please.

14           And Mr. Kogod --

15           THE COURT:  It's stipulated.  It's admitted.

16           (Exhibit 42 admitted.)

17           MS. CLINGAN:  Thank you, Your Honor.

18           THE COURT:  It has to be admitted before the jurors

19   can look at it.

20           MS. CLINGAN:  My apologies.

21           Let's go to the bottom email, please.

22   BY MS. CLINGAN:

23   Q.   Who is this email from, and who is it to?

24   A.   It's from myself to Mr. Thiry, Mr. Rodriguez.

25   Q.   Can you just read the email.

Dennis Kogod - Direct

1    A.   "Confirm the SCA candidate that may be a group vice

2    president" -- GVP -- "candidate, diversity, has let SCA know he

3    is interviewing and will be leaving to go somewhere, so don't

4    think the hands-off is applicable.  Agree," question mark.

5    Q.   What is the hands-off that you're referring to here?

6    A.   Whether we would as DaVita be able to interview this

7    candidate from the company that had a hands-off agreement with

8    DaVita.

9    Q.   All right.  Let's take a look at Mr. Rodriguez's response

10   at 3:59.  Mr. Rodriguez writes, "Yes, but still good for KT to

11   make the call.  Good relationship building."  Who is KT?

12   A.   Mr. Thiry.

13   Q.   And do you have an understanding of why it was good for

14   Mr. Thiry to make the call?

15   A.   To reinforce that DaVita was living up to their part of the

16   hands-off agreement and also as a reminder that Mr. Thiry --

17   this was high on his radar and there is an expectation that

18   Andrew was doing the same.

19        MS. CLINGAN:  And can we take a look at Mr. Thiry's

20   response.

21   BY MS. CLINGAN:

22   Q.   You can just read Mr. Thiry's response.

23   A.   "Agree we can pursue.  Can I go ahead and tell Andrew that

24   we ran this through the right traps?"

25   Q.   Who is Andrew?

Dennis Kogod - Direct

1   *A.*  Andrew Hayek, the CEO of SCA.

2   *Q.*  And in this email, who is making the decision about

3   whether or not the candidate can be contacted?

4   *A.*  Mr. Thiry.

5          *MS. CLINGAN:*  All right.  Ms. Cabrera, if we could

6   please just show the witness what has been previously marked

7   Government Exhibit 595.

8   *BY MS. CLINGAN:*

9   *Q.*  All right.  Mr. Kogod, can you remind us who Noah Waldman

10  is?

11  *A.*  Noah was the senior client manager for Korn Ferry who was

12  conducting this search on behalf of DaVita.

13  *Q.*  I think you testified earlier the circumstances under which

14  you would interact with Mr. Waldman.  Did you interact with

15  Mr. Waldman routinely concerning recruiting?

16  *A.*  If it was one of my searches that I was leading, yes, we

17  would talk on a frequent basis.

18  *Q.*  And do you know if Mr. Waldman was ever informed about the

19  no-poach agreements?

20  *A.*  He was.

21  *Q.*  Do you know if Mr. Waldman agreed to abide by those

22  no-poach agreements?

23  *A.*  I don't know whether he ever agreed that he wasn't going to

24  contact people, but he knew that he couldn't present or forward

25  those candidates.  So I -- I don't know specifically.  I don't

1    recall.

2    Q.   Okay.

3    A.   But he knew which companies were off limits.  That would be

4    part of the screening process when we were trying to develop

5    the candidate profile.

6           MS. CLINGAN:  Ms. Cabrera, if you could show the

7    witness the first page of the attachment, which has been

8    previously marked as Government Exhibit 596.

9    BY MS. CLINGAN:

10   Q.   Mr. Kogod, are you familiar with this report?

11   A.   Yes.

12   Q.   Do you know who drafted it?

13   A.   Yes.

14   Q.   Was it drafted based on conversations you had with

15   Mr. Waldman?

16   A.   Yes.

17          MS. LEWIS:  Your Honor, at this time the United States

18   moves Government Exhibits 595 and 596 into evidence.

19          MS. BROOKS:  No objection, Your Honor.

20          THE COURT:  Admitted.

21          (Exhibits 595 and 596 admitted.)

22          MS. CLINGAN:  Mr. Kogod -- if we could please publish

23   to the jury.

24          Ms. Cabrera, just so the jury has an opportunity to

25   see it, if we could just take a look at 595, the cover email.

Dennis Kogod - Direct

1          Okay.  Let's go to the attachment, 596, the cover.

2          And let's please go to the second to the last page of

3     the attachment.

4     *BY MS. CLINGAN:*

5     *Q.*  Mr. Kogod, about six individuals down on the page is an

6     individual named Joe Clark.

7          Ms. Cabrera, could we please highlight that.

8          Mr. Kogod, from this document, can you tell where Joe

9     Clark worked as of the time of this document?

10    *A.*  Surgical Care Affiliates.

11    *Q.*  And can you read what his status is in the comments column

12    of this document?

13    *A.*  "Will not pursue, per client."

14    *Q.*  Do you understand why it was determined that he would not

15    be pursued?

16    *A.*  Yes.

17    *Q.*  What was that?

18    *A.*  That it would have been violating the hands-off agreement,

19    so we couldn't reach out or interview him.

20    *Q.*  Any other reason this candidate was not given an interview?

21    *A.*  No.

22    *Q.*  Okay.  Let's take a look at the below individuals, Gregory

23    Miller and Paul Eiseman.  Can you tell where they work?

24    *A.*  Kindred Healthcare.

25    *Q.*  What is the status of those individuals?

Dennis Kogod – Direct

1   A.   "Will not pursue, per client," for both of them.

2   Q.   Do you have an understanding why those candidates would not

3   be pursued?

4   A.   DaVita had a hands-off agreement with Kindred Healthcare.

5   Q.   Any other reasons those individuals were not given an

6   interview?

7   A.   No.

8   Q.   Mr. Kogod, you testified earlier that there at some point

9   came to be a requirement that individuals let their manager at

10  DaVita know if they were looking to leave DaVita.  Were there

11  repercussions at DaVita for looking to leave?

12  A.   There were a couple of cases where the individual did let

13  their supervisors know that they were looking to leave, didn't

14  see a career path, and there were ramifications after

15  disclosing that.

16  Q.   I want to talk about some specific examples in just a

17  second.  But big picture, how might a DaVita employee be hurt

18  if they let their management know that they were considering

19  looking to leave DaVita?

20  A.   I think it's fairly common sense.  There is a possibility

21  it could play to their advantage and have a good conversation.

22  But more times than not, what you're saying is, I'm unhappy;

23  I'm leaving; I've made a decision.  So when you think about

24  future consideration for salary increases, your annual bonus,

25  your performance rating, any stock equity -- which was a big

Dennis Kogod - Direct

1   piece of DaVita's compensation package -- that's what people

2   would remember.  This person was looking to leave; they're

3   unhappy here; they're going to leave anyway, so we shouldn't

4   give them this next big job; we shouldn't give them the right

5   amount of options.  So there was an absolute downside of making

6   that known.  That's why most people do confidential searches;

7   they don't want their boss to know.

8   Q.  You said just a moment ago that there were specific

9   examples.  Can you describe one of those.

10  A.  Jung Lee, and I -- Jung was a longtime DaVita teammate.

11  Started in the compliance department and switched at some point

12  to an operating role.  He expressed an interest in pursuing

13  other opportunities, including outside of the village.  And

14  within a couple of days there were memos written about him from

15  his two superiors, alleging a variety of kind of behavioral

16  leadership issues that were new to me, and I'm sure to others

17  who knew Jung.  So it was a good example of, I followed the

18  rules, and the response was, people are now writing emails

19  and talking about alleged investigation for excessive alcohol

20  use at company functions.  So I think it's a good example of

21  what it can look like if it backfires on you.

22  Q.  All right.  I want to turn now to talk about a no-poach

23  agreement with a different company, a company called Hazel.  Do

24  you know who the head of Hazel is?

25  A.  Josh Golomb.

Dennis Kogod – Direct

1    *Q.*  And where did Josh Golomb work before he worked at Hazel?

2    *A.*  DaVita, and, specifically, DaVita Rx, which was a

3    subsidiary of DaVita.

4    *Q.*  How are you aware of the agreement between DaVita and

5    Hazel?

6    *A.*  The same way on all of these others, when they were reached

7    between executives, the executive team was notified.

8    *Q.*  Now, a moment ago you testified that DaVita contemplated

9    perhaps some business relationships with SCA.  Did DaVita have

10   any business relationships with Hazel?

11   *A.*  None whatsoever.

12   *Q.*  Was the no-poach agreement with Hazel necessary to any type

13   of business transaction that DaVita had with Hazel?

14   *A.*  No.

15   *Q.*  And to your knowledge, did the no-poach agreement between

16   DaVita and Hazel ever end?

17   *A.*  Not to my knowledge.

18        *MS. CLINGAN:*  Okay.  Let's take a look at Government

19   Exhibit 280.

20        And we have stipulated to admissibility of this, Your

21   Honor.

22        *THE COURT:*  Admitted.

23        (Exhibit 280 admitted.)

24   *BY MS. CLINGAN:*

25   *Q.*  Mr. Kogod, if we could start with the first chronological

1  email in this chain, which is at the very bottom from

2  Mr. Thiry.  Who is this email to?

3  *A.*  To Mr. Thiry.

4  *Q.*  Who is this -- the email is from Mr. Thiry.  Who is the

5  email to?

6  *A.*  I'm sorry.  Julio Quinones.

7  *Q.*  Who is Julio Quinones?

8  *A.*  Julio was part of the operating team at DaVita, first as a

9  regional director, I believe, in North Carolina.  He joined my

10 international team somewhere around 2010, and he was a very

11 integral part of the international team based in the U.S.

12 *Q.*  Can you read the subject in the body of the email?

13 *A.*  The subject is, "We will be very hurt if you do not help us

14 through the Saudi negotiation."  And then the body is, "What

15 are your thoughts," question mark.

16 *Q.*  Can you just explain your understanding of this email.

17 *A.*  Yes.  DaVita had entered into a five-year agreement in

18 Saudi Arabia to help privatize their dialysis system and built

19 some clinics as a result of that.  At this point, I had left

20 the company and was now operating as independent consultant

21 focused on international.  And what Mr. Thiry was saying was

22 that Julio was critical to the re-negotiation, since he had

23 been there throughout, and it would be a really tough time if

24 he left.  That was the gist of the message.

25 *Q.*  Can you take a look at the April 14, 2017, email at

1   3:11 p.m. from Mr. Thiry.

2   A.   Yes.   I see it.

3   Q.   Can you read what that says?

4   A.   "Julio is going to be leaving the village.   Still private."

5   Q.   Can you just remind us what the village is.

6   A.   DaVita.

7   Q.   Why is it of note that Julio was going to be leaving the

8   village?

9           MS. BROOKS:   Excuse me.   I'm going to object.   This is

10  after Mr. Kogod had already left DaVita.

11          THE COURT:   Yes.   So?

12          MS. BROOKS:   He has no knowledge -- no personal

13  knowledge, Your Honor.

14          THE COURT:   Foundation, please.

15          MS. CLINGAN:   Your Honor, Mr. Kogod is copied on this

16  email chain.

17          MS. BROOKS:   Then I withdraw my objection, Your Honor.

18  BY MS. CLINGAN:

19  Q.   Mr. Kogod, why was it of note that Julio was going to be

20  leaving the village?

21  A.   He was significant to the renewal, and -- well, he was

22  significant to the renewal.

23  Q.   Was it generally significant if someone left the village?

24  A.   Certain people, like Julio, it was significant.   Others

25  could be less significant, depending on the role they were in.

1   *Q.*  All right.  Let's take a look at the top email from you.

2   And for the sake of expediency, let's just look at the bottom

3   paragraph of your email.  You write, "Yes, I know.  I also

4   know he will be staying through the negotiation.  He's been

5   keeping me up to date on his decision.  Today he asked me for

6   time in Saudi to discuss a good transition.  I'm certain he

7   wants to leave you with good feelings."

8           Why was it necessary for you to reassure Mr. Thiry

9   this way?

10  *A.*  I believe Julio was an outstanding executive.  I was

11  fearful that he was going to get caught up in pressure.  He had

12  never dealt with Mr. Thiry directly; he had always reported to

13  me.  And as a consultant and I think a mentor to Julio, I

14  wanted to make sure that he would go through this process and

15  not be damaged.

16  *Q.*  You said that you wanted to make sure that he was going to

17  be okay with the pressure from Mr. Thiry and not be damaged.

18  Can you explain what you mean by that.

19  *A.*  Again, a bad time.  I was no longer at international.  They

20  had not appointed an international leader.  DaVita had invested

21  a lot of money in Saudi, building these clinics.  And I've

22  always been a buffer for people like Julio.  He's dealt with

23  Mr. Thiry directly, but not on any frequency.  So I just --

24  knowing the track record of Jung Lee, I just didn't want to see

25  Julio get caught and hurt in this process.  It's as simple as

Dennis Kogod - Direct

 1   that.

 2   Q.  Let's take a look at the top email from Mr. Thiry.

 3   Mr. Thiry writes, "Josh is recruiting him.  Can you believe

 4   that?"  Do you know who Josh is?

 5   A.  Josh Golomb, the former DaVita Rx president, who is now

 6   running Hazel Health.

 7   Q.  Why was it noteworthy that Josh was recruiting him?

 8   A.  Because there was a hands-off agreement in place between

 9   Hazel and DaVita.

10        MS. CLINGAN:  Let's take a look at Government

11   Exhibit 281.  And we have a stipulation to admissibility on

12   281.

13        THE COURT:  281 is admitted.

14        (Exhibit 281 admitted.)

15   BY MS. CLINGAN:

16   Q.  For the sake of expediency, Mr. Kogod, this is offshoot of

17   the email thread we were just looking at.  Let's take a look

18   at your top email to Mr. Thiry at 4:54 p.m.  Can you just

19   read what you said here?

20   A.  "I think he got scared about where he fit in.  Josh's

21   opportunity is his backyard.  He has a child that desperately

22   needs him to be home, and he is a big loss for DaVita.

23   Bjorn" -- who is the president of Europe -- "will come to

24   recognize how involved he was in Saudi.  I too will miss him

25   dearly."

Dennis Kogod – Direct

1   *Q.*  Why did you send this email to Mr. Thiry?

2   *A.*  For the same reason.  I felt a certain amount of ownership

3   for Julio, responsible.  I had left; he stayed behind; we had

4   worked very closely together; traveled extensively to every

5   international market; relied on him heavily.  I just didn't

6   want him to get hurt in this process.  This -- I knew of his

7   family situation.  This was a really good opportunity for him.

8   He was spending most of his time abroad, when he needed to be

9   home with his family at this time; so this just lined up so

10  perfectly for him.

11          *MS. CLINGAN:*  Okay.  Ms. Cabrera, if we could please

12  show the witness -- and just the witness -- Government

13  Exhibit 313.

14          Your Honor, we don't have a stipulation to

15  admissibility on 313.  But the identical document is on

16  defendant's exhibit list as their A463, and the parties have

17  stipulated to the admissibility of that.  So unless there is

18  any objection, I would move Government Exhibit 313 into

19  evidence.

20          *MS. BROOKS:*  No objection, Your Honor.

21          *THE COURT:*  313 is admitted.

22          (Exhibit 313 admitted.)

23          *MS. CLINGAN:*  Could we please publish to the jury.

24  Thank you.

25

Dennis Kogod - Direct

1    *BY MS. CLINGAN:*

2    *Q.*  Mr. Kogod, who are these text messages between?

3    *A.*  The 949 number is mine.  There is no other number on here;

4    but based on the conversation, it was a text message between

5    Josh Golomb and myself.

6    *Q.*  And who is sending the text messages on the right-hand

7    side?  Who sends the text message that reads, "Kent just ended

8    our relationship"?

9    *A.*  Mr. Golomb.

10   *Q.*  And the texts on the left-hand side are from?

11   *A.*  Myself.

12   *Q.*  All right.  Do you know what this is about?  Do you know

13   why Mr. Golomb texted, "Kent just ended our relationship"?

14   *A.*  I believe Mr. Quinones, who we had just talked about, had

15   notified DaVita that he was accepting the job as the chief

16   operating officer for Hazel Health, reporting to Mr. Golomb.

17   *Q.*  And can you read your response to Mr. Golomb?

18   *A.*  The first one is, "What?  Looking for an explanation on

19   what happened."  And a couple of hours later, "Don't let him

20   get to you.  Despite him wanting to, he has no and shouldn't

21   have any power over you, that includes making you feel bad."

22           *MS. CLINGAN:*  Let's show the witness Government

23   Exhibit 315.

24           And, Your Honor, I'd like to move this into evidence,

25   as well.  This is for clarity, Defendant's Exhibit --

Dennis Kogod – Direct

1          *THE COURT:*  Any objection to 315?

2          *MS. BROOKS:*  No, Your Honor.

3          *THE COURT:*  It's admitted.

4          (Exhibit 315 admitted.)

5     *BY MS. CLINGAN:*

6     *Q.*  Mr. Kogod, who are these text messages between?

7     *A.*  Between myself and Mr. Golomb.

8     *Q.*  Again, who is sending the text messages that are on the

9     right-hand side?

10    *A.*  Mr. Golomb.

11    *Q.*  Let's just take a look at the bottom half of the text

12    message.  So starting with, "He behaved poorly," can you read

13    that?

14    *A.*  "He behaved poorly during the process, but glad you guys

15    got to a point that makes sense."

16    *Q.*  Who is "he" referring to in this text message?

17    *A.*  He was referring to Mr. Thiry.

18    *Q.*  Let's take a look at Mr. Golomb's text message.  He writes,

19    "Yes, I get that for him, perceived loyalty is huge for him,

20    even if not always reciprocal, although I believe he thinks it

21    always is.  In retrospect I would have called him before got

22    close on Julio and established high-level ground rules so it

23    didn't come as much of a shock."

24          Let's take a look at the first line.  The perceived

25    loyalty, do you have an understanding what that refers to?

1  *A.* Having worked for Mr. Thiry, loyalty was just a must.  It

2  couldn't be a question mark; it couldn't be halfway.  It was a

3  commitment not only to the DaVita village; but in this case, to

4  Mr. Thiry.  It was a core part of relationships that were

5  formed.  Loyalty.

6  *Q.* In the last line, Mr. Golomb refers to "ground rules."  Do

7  you know whether those ground rules were ever established?

8  *A.* I don't know for a fact if they were spelled out with

9  Mr. Golomb, like some of the others that went back and forth in

10 writing.  But for that, he was certainly aware of the no-poach.

11        *MS. CLINGAN:*  And, Ms. Cabrera, let's take a look at

12 Government Exhibit 314, just for the witness, please.

13        Your Honor, I'd like to move 314 into evidence.

14        *MS. BROOKS:*  If we could have a foundation of who

15 these texts are between, Your Honor.

16 *BY MS. CLINGAN:*

17 *Q.* Sure.  Mr. Kogod, do you recognize these text messages?

18 *A.* I do.

19 *Q.* Who are they between?

20 *A.* Between myself and Mr. Golomb.

21        *MS. BROOKS:*  Then no objection, Your Honor.

22        *THE COURT:*  It's admitted.

23        (Exhibit 314 admitted.)

24 *BY MS. CLINGAN:*

25 *Q.* Mr. Kogod, I'm going to give you a second to just read the

Dennis Kogod - Direct

1   email -- read the text messages.

2   *A.*   Okay.

3   *Q.*   Had Mr. Thiry threatened Mr. Golomb here?

4   *A.*   In the second paragraph, he -- he implies that Julio should

5   do some due diligence on Mr. Golomb himself and any issues

6   surrounding, perhaps, his departure.  So it was in a way a

7   threat that might have -- that may have taken Julio out of

8   the -- you know, Julio may have withdrawn his application at

9   that point.

10  *Q.*   Can you tell what Mr. Thiry was seeking with that threat?

11  *A.*   To prevent Julio from going to Hazel Health, I think was

12  the key take-away here.

13  *Q.*   How, if at all, did this relate to the agreement concerning

14  hiring between DaVita and Hazel?

15  *A.*   It was a violation.  Julio felt like he had made it known

16  to people.  I think Josh took that in good faith and -- but it

17  was a violation of the -- the agreement.  Josh was directly

18  recruiting a DaVita executive.

19  *Q.*   All right.  Let's switch gears and talk about an agreement

20  with another company, a company called Radiology Partners.  For

21  expediency, I'm going to refer to it as RAD Partners.

22         Are you familiar with RAD Partners?

23  *A.*   Yes.

24  *Q.*   Do you know who founded it?

25  *A.*   Rich Whitney.

Dennis Kogod – Direct

1   *Q.* Who is Rich Whitney?

2   *A.* Rich was the former off-and-on-again CFO -- chief financial

3   officer -- of DaVita for a very long-standing time.

4   *Q.* Now, ordinarily, would DaVita and Radiology Partners have

5   competed for employees?

6   *A.* Yes.

7   *Q.* You testified earlier that you were aware of a no-poach

8   agreement between DaVita and Radiology Partners.  How are you

9   aware of the agreement?

10  *A.* It was verbally communicated that one had been written, and

11  there were subsequent emails that were very specific as to the

12  rules within that agreement.

13  *Q.* Who at DaVita was responsible for negotiating that

14  agreement with RAD Partners?

15  *A.* Mr. Thiry.

16  *Q.* And who at DaVita monitored and enforced the agreement?

17  *A.* Mr. Thiry.

18  *Q.* Were other employees expected to monitor compliance with

19  the agreement?

20  *A.* They were expected to elevate if there were any infractions

21  of that agreement.  Yes.

22  *Q.* Did DaVita have any type of business relationship with

23  Radiology Partners?

24  *A.* No.

25  *Q.* Have any type of contemplated joint venture?

Dennis Kogod - Direct

1    A.  No.  It was a very different space in healthcare.

2    Q.  Ever talk about doing any type of business with Radiology

3    Partners?

4    A.  Not to my knowledge.

5    Q.  And did the no-poach agreement with RAD Partners to your

6    knowledge ever end -- have an end date?

7    A.  No.

8           MS. CLINGAN:  Let's take a look at Government

9    Exhibit 164.  And we have a stipulation to admissibility on

10   this one.

11          THE COURT:  It's admitted.

12          (Exhibit 164 admitted.)

13          MS. CLINGAN:  I will note, I'm about two-thirds done

14   here.  So if the Court would like a break, I can come to a

15   stopping point or --

16          THE COURT:  Anybody need a break on the jury yet?

17          Not yet.

18          MS. CLINGAN:  All right.  Let's take a look at

19   Government Exhibit 164.  Let's look at the bottom half of this

20   email chain.

21   BY MS. CLINGAN:

22   Q.  Who is on this email chain?

23   A.  Mr. Rodriguez, Mr. Thiry, myself, and a gentleman called

24   Guy Seay, who had been serving as the chief financial officer

25   for Dialysis Operations and International.

Dennis Kogod – Direct

1   Q.  And what's the subject of this email?

2   A.  "Whitney and Gabriel recruiting folks.  What should we do?"

3   Q.  Who are Whitney and Gabriel?

4   A.  Rich Whitney was the former DaVita CFO and current

5   chairman, founder, CEO of RAD Partners.  Anthony Gabriel had

6   served as DaVita's chief information officer for a long period

7   of time and had become RAD Partners' chief operating officer.

8   Q.  And this email starts with an email from Kent Thiry.  Can

9   you just read Mr. Thiry's email.

10  A.  "Me call Rich," question mark.  "Make sure search firms go

11  after theirs," question mark, "both," question mark.

12  Q.  Can you just explain your understanding of that email.

13  A.  I believe he was asking the people that he reached out to

14  whether he should call Rich.  He was throwing out some ideas.

15  Should we make sure the search firms go after theirs, in

16  response to an infraction of the hands-off agreement, or do

17  both.

18  Q.  Okay.  Let's take a look at the response email from Guy

19  Seay.  Remind us who Mr. Seay is.

20  A.  Guy Seay was the chief financial officer for domestic

21  dialysis and the CFO, if you will, for International at this

22  time.

23  Q.  Okay.  Mr. Seay writes, "Not sure of all of the details,

24  but this is who I know of at the new radiology business,

25  Whitney/Gabriel.  Tom Usilton, Phil Reger, IT director LA, Jeff

Dennis Kogod - Direct

 1   Young, corporate finance manager LA.  Had been working with Tom

 2   on HealthCare Partners.  ABQ deal with Misha and Chan.  Earlier

 3   this year, Elements, Whitney/Mahan, hired a recently promoted

 4   manager on the embassy team, Luis Mejia.  I'm familiar with

 5   some of the details and that they paid him 20k higher base and

 6   10k bonus potential.  Expect recruiter targeted him because of

 7   DaVita background."

 8          Why was it necessary for Mr. Seay to compile this list

 9   of individuals?

10   A.  I think he wanted to make sure that Mr. Thiry and

11   Mr. Rodriguez and myself were aware of the people that had

12   already been recruited at Radiology Partners.

13   Q.  Did DaVita track who left the village?

14   A.  DaVita tracked people that left the village, particularly

15   at the executive level.  Sure.

16   Q.  Let's take a look at the response from Mr. Thiry.  He says,

17   "Wondering if we should call Tom also."  Who is Tom?

18   A.  Tom Usilton was the company's chief development officer for

19   many years and had stepped out of the company and rejoined --

20   joined Radiology Partners, I believe, as their chief

21   development officer for a period of time.  I'm not sure of the

22   title at RAD Partners, but he effectively retired from DaVita

23   and went back to work at RAD Partners.

24   Q.  Okay.  So he went to RAD Partners after he had retired from

25   DaVita?

Dennis Kogod - Direct

1    A.   Yes.

2    Q.   The email continues, "Wonder if we should call Tom also

3    and say, if he is going to hire DaVita folks, forget going-away

4    dinner."  What does that mean?

5    A.   There was a -- there was a discussed going-away dinner to

6    recognize and acknowledge Tom's many, many years at DaVita,

7    being a very significant part of the senior team.  It was very

8    important to Tom.  He's a very person -- people person.  And

9    he -- Mr. Thiry was suggesting that one of the messages back to

10   Mr. Usilton was, if you're going to violate the agreement,

11   there is no retirement dinner for you.  That's the message.

12   Q.   How long had Mr. Usilton worked at DaVita?

13   A.   So I joined in 2005.  Tom was part of the Gambro

14   acquisition team, so I'm going to say he had to have been there

15   in very early 2000, maybe before, I don't know, until, again,

16   somewhere at the end of 2013 time frame.  So at least a decade

17   plus, I'm going to guess.

18   Q.   Do you know whether or not the going-away retirement dinner

19   was meaningful leverage to Mr. Usilton?

20   A.   It was very important to Tom.  It was important how people

21   thought about him.  He didn't feel like he got his recognition

22   when he left the village.  It wasn't the best departure.

23   Q.   And why was that?

24   A.   I think Tom was a little upset about his role, where he fit

25   in.  He lived in Georgia, so a little bit of out of sight, out

1    of mind.  And I think, similar to my own experience, just

2    reached a point where it was just time to step out.  I think

3    Tom was at that part.  So --

4    Q.  All right.

5    A.  -- this was important to Tom.

6         MS. CLINGAN:  Let's go to Government Exhibit 174.  We

7    have a stipulation on this, Your Honor.

8         THE COURT:  It's admitted.

9         (Exhibit 174 admitted.)

10   BY MS. CLINGAN:

11   Q.  Mr. Kogod, I'll give you just a second to orient yourself

12   to this email.  Let me know when you're ready.

13   A.  Yes.  I've read it before, so I'm ready.

14   Q.  Who is this email from?

15   A.  It is from the top or -- the main body?

16   Q.  Let's look at the main body.

17   A.  Yeah.  It's from Mr. Whitney at RAD Partners, copied to

18   Mr. Thiry and Mr. Usilton.

19   Q.  Remind us what Mr. Whitney's title was at this point in

20   time?

21   A.  Chairman and chief executive officer of RAD Partners, I

22   believe.

23   Q.  Let's take a look just at the first paragraph of

24   Mr. Whitney's email.  Can you read this?

25   A.  "Kent, good catching up with you the other day.  I have had

Dennis Kogod - Direct

1    a chance to think about our conversation and discuss it with

2    key people at RP.  Where I am coming out is that the

3    requirement of any teammate talking to their boss before

4    pursuing discussions with RP about possible opportunities

5    probably works just fine in many cases, but in other cases,

6    that isn't really reflective of how the person is likely to

7    leave DaVita.  The following is a bullet-point list of ground

8    rules that we would be comfortable with as being fair to both

9    RP and DaVita.  That is not meant to create any kind of legal

10   agreement but instead serve to create clarity around what we

11   hopefully can both agree is a fair way to treat each other out

12   of respect for our long-term relationships while maintaining

13   our ability to meet our responsibilities to our shareholders

14   and other company constituents."

15   Q.  All right.  Let's start with the phrase, "the following is

16   a bullet list of ground rules."  What were those ground rules?

17   A.  Mr. Whitney was defining from his perspective the ground

18   rules that he could commit to in terms of a hands-off, no-poach

19   agreement.

20   Q.  Mr. Whitney continues, "This is not meant to create any

21   kind of legal agreement."  Was it intended to create an

22   agreement?

23   A.  Yes.

24   Q.  And did both parties, DaVita and Radiology Partners, act as

25   though this agreement existed?

Dennis Kogod - Direct

1    *A.*  Yes.

2    *Q.*  Let's take a look at the first ground rule of the

3    agreement, which reads, "We, nor our recruiters, will initiate

4    contact with DaVita teammates about positions at RP."  Does

5    this accurately capture your understanding of one of the ground

6    rules that DaVita and RAD Partners followed?

7    *A.*  Yes.

8    *Q.*  What effect did this have on employees?

9    *A.*  It limits their ability to leave the village and join

10   Radiology Partners.

11   *Q.*  All right.  Let's take a look at paragraph 2B, which reads,

12   "for a DaVita teammate to contact us, we will not pursue

13   possible employment opportunities for them with RP unless they

14   either represent to us that they are actively pursuing other

15   opportunities outside of DaVita -- e.g., that they are

16   interviewing, have other offers, et cetera -- or that they have

17   a specific conversation with their boss, telling him/her, that

18   they are interested in pursuing opportunities outside of

19   DaVita."

20        What effect would this provision have on employees?

21   *A.*  The second part of that bullet point --

22        *MS. BROOKS:*  Objection.  Calls for speculation, Your

23   Honor.

24        *THE COURT:*  Rephrase your question.

25

Dennis Kogod - Direct

1   *BY MS. CLINGAN:*

2   *Q.*  Mr. Kogod, did you have an opportunity to observe how this

3   type of provision affected employees in practice?

4   *A.*  I did.

5   *Q.*  And how did this provision affect employees in practice?

6   *A.*  As answered before, in some small number of cases, it

7   elevated, and the employee walked away with a better position,

8   at least for that time.  But more times than not, it shut down

9   conversations, it had a chilling effect, and it took this

10  opportunity off the table for DaVita employees who didn't want

11  to have it.  Examples of people that did elevate, we talked

12  about Julio, and we talked about Jung Lee.  It had a negative

13  impact on them, and there was some level of retaliation

14  afterwards.

15          *MS. CLINGAN:*  Okay.  Let's take a look at --

16  Ms. Cabrera, if we could please just show the witness this

17  exhibit -- Government Exhibit 257.

18  *BY MS. CLINGAN:*

19  *Q.*  Mr. Kogod, who is Philipp Stephanus?

20  *A.*  Philipp, I believe, is a senior vice president of revenue

21  operations at DaVita.  At least he was when I left.

22  *Q.*  And what was his relationship to Mr. Thiry?

23  *A.*  Their relationship I think spanned well before DaVita.

24  Mr. Stephanus was a partner at Bain Consulting, and Mr. Thiry

25  spent part of his early career at Bain.  I think they had a

Dennis Kogod – Direct

1   working relationship and friends, I would say.

2   Q.  Do you know if Mr. Stephanus was informed of the agreement

3   that existed between Radiology Partners and DaVita?

4   A.  Yes.

5   Q.  How do you know that?

6   A.  He was part of the senior team.  So it -- again, it wasn't

7   a closely held secret.  He was part of the executive leadership

8   team.

9          MS. CLINGAN:  Your Honor, we would move Government

10   Exhibit 257 into evidence.

11          MS. BROOKS:  Your Honor, unfortunately, I can't see it

12   from down here.  But unless Mr. Kogod is on this email

13   string, we would object.

14          MS. CLINGAN:  Certainly.  I can lay some foundation

15   for that.

16   BY MS. CLINGAN:

17   Q.  In the top of this email, the email is sent to the

18   Lambeau LISTSERV.  What is the Lambeau LISTSERV?

19   A.  Lambeau List was a group of executives -- which I was

20   included in Lambeau when I first got to DaVita -- of executives

21   that reported directly to Mr. Thiry or were considered part of

22   the executive team because of their area of responsibility or

23   their potential, which I was copied as part of the Lambeau

24   team.

25          MS. BROOKS:  Then we have no objection, Your Honor.

Dennis Kogod - Direct

1    Thank you.

2           THE COURT:  It's admitted.

3           (Exhibit 257 admitted.)

4    BY MS. CLINGAN:

5    Q.  Mr. Kogod, let's start with the bottom email from an

6    individual named Bill Hughson.  Who is Bill Hughson?

7    A.  Bill was a longtime DaVita teammate in various roles, who

8    left the village somewhere, I'm guessing, around 2008, 2009.

9    And he went on to DeVry University and then ultimately to

10   IntegraMed.

11   Q.  Let's take a look at Mr. Hughson's email to Mr. Thiry.

12   Before I ask you that, I think you testified earlier that

13   DaVita had a no-poach agreement with IntegraMed?

14   A.  Yes.

15   Q.  All right.  Let's take a look at Mr. Hughson's email in

16   the third paragraph.  He writes, "This is absolutely consistent

17   with my behavior in general and with my commitment to you that

18   I will not proactively recruit from DaVita."

19          Does this capture your understanding of the no-poach

20   agreement between DaVita and IntegraMed?

21          MS. BROOKS:  Your Honor, just for the record, we

22   maintain our objection regarding 404(b).

23          THE COURT:  Overruled.

24   BY MS. CLINGAN:

25   Q.  All right.  Now, let's take a look at the top email from

Dennis Kogod – Direct

1   Mr. Stephanus in response to Mr. Hughson's email.  Can you

2   read Mr. Stephanus' email?

3   A.   "This underscores the importance of the rule that you were

4   insisting on with Rich, namely, that they must not engage in

5   any discussion unless the person's supervisor at DaVita has

6   been informed first.  Without that, we'll always hear the

7   excuse that he/she was already talking to others."

8   Q.   Now, Mr. Stephanus here refers to "the rule that you" –– to

9   Mr. Thiry –– "were insisting on with Rich."  What did that

10  refer to?

11  A.   The agreement with Mr. Whitney with RAD Partners.

12  Q.   And the rule here that Mr. Stephanus refers to is that,

13  "RAD Partners must not engage in any discussion unless the

14  person's supervisor at DaVita has been informed first."  Is

15  that your understanding of a rule that Mr. Thiry was insisting

16  on with Rich Whitney?

17  A.   He was.  Mr. Whitney had broadened the definition.  That's

18  what Mr. Stephanus is referring to.  But, yes, this was the

19  ideal agreement, that the DaVita supervisor had to be notified.

20       MS. CLINGAN:  Let's take a look at Government

21  Exhibit 333.  I believe we have a stipulation to admissibility

22  on this one.

23       THE COURT:  Well, I don't know.  Oh, yes, you do.

24  Admitted.

25       (Exhibit 333 admitted.)

Dennis Kogod – Direct

1    *BY MS. CLINGAN:*

2    *Q.*   Mr. Kogod, I'll give you just a second.

3    *A.*   Got it.

4    *Q.*   This is an offshoot of the email we were just looking at.

5    Who does Mr. Thiry forward Mr. Whitney's ground rules email

6    to?

7    *A.*   To Kim Rivera, the Lambeau group and Laura Mildenberger.

8    *Q.*   Let's take a look at Mr. Rodriguez's response.  Can you

9    read Mr. Rodriguez's response.

10   *A.*   "While very rational and hard to debate, leaves a lot of

11   room for gaming.  As Rich clearly states, the trust and track

12   record will be critical.  By the way, I had the same

13   conversation with Rob.  He ended up in the same spot."

14   *Q.*   All right.  Let's take a look at the response from

15   Mr. Thiry.  If you could just read that.

16   *A.*   Sure.  "I am not clear.  He ended where we wanted him or is

17   in the spot Rich is proposing.  I don't know that we should

18   agree to Rich's proposal, not without getting to recruit at

19   least one of their folks.  Hayek and Drake are in the better

20   spot.  Let's do conversations live from this point.  Too many

21   nuances for shorthand."

22   *Q.*   All right.  Let's break this email down a little bit.  He

23   writes, "Hayek and Drake are in a better spot."  Who is Hayek?

24   *A.*   Andrew Hayek with Surgical Care Affiliates.

25   *Q.*   Who is Drake?

Dennis Kogod - Direct

1   A.   Scott Drake, the CEO of Spectranetics.

2   Q.   Did DaVita have a no-poach agreement with Spectranetics?

3   A.   Yes.

4   Q.   What is your understanding of the term, "Hayek and Drake

5   are in a better spot"?

6   A.   That they weren't insisting on the provision that the

7   employee could simply say, We're looking elsewhere, that they

8   had not challenged the rule that you had to talk to your direct

9   supervisor.

10   Q.   All right.  Mr. Thiry goes on, "Let's do all conversations

11   live from this point."  What does it mean to go live?

12   A.   To have a live conversation or phone conversation.  No

13   more emails, no more voicemails on the subject.

14   Q.   Did you and others obey that directive?

15   A.   Yes.

16   Q.   So what effect would that have on the existence of further

17   written communications on this issue?

18   A.   They would cease to exist.

19   Q.   Do you know if Mr. Thiry and Mr. Whitney ultimately did

20   reach an agreement on the ground rules?

21   A.   I don't know.

22   Q.   Do you know if they ultimately reached a no-poach

23   agreement?

24   A.   Yes.

25   Q.   At some point did you learn that Radiology Partners was

Dennis Kogod - Direct

 1   considering speaking to a DaVita employee named Guy Seay?

 2   *A.*  I did.

 3   *Q.*  What do you recall about that?

 4   *A.*  A number of things.  There was some confusion about

 5   Radiology Partners talking directly to Guy, who was an

 6   important teammate at DaVita.  Number two, somehow one of the

 7   DaVita board members got pulled into the conversation.  That's

 8   the most memorable takeaway.

 9           MS. CLINGAN:  All right.  Let's take a look at some

10   documents about Mr. Seay.  Let's look at Government

11   Exhibit 284.

12           THE COURT:  It's admitted.

13           (Exhibit 284 admitted.)

14   BY MS. CLINGAN:

15   *Q.*  Mr. Kogod, who is on this email chain?

16   *A.*  The email chain up top is Mr. Whitney, Mr. Thiry, myself,

17   Mr. Rodriguez, Mike Staffieri, and that is it.

18   *Q.*  All right, Mr. Thiry writes to Mr. Whitney at 9:04 p.m. in

19   the bottom email, "I brought up your job with Guy.  So he can

20   contact you if he wants to.  I put no qualifiers on my giving

21   him that information.  I told him you were very interested in

22   him and reached out to me."  And then on the very bottom he

23   writes, "I would prefer that there be no reach-out to him for a

24   couple of weeks as we nail down what his DaVita HealthCare

25   Partners options are.  Once again, he is free to call you at

Dennis Kogod - Direct

1    any time.  I did not ask for any restraint on that front."

2         Let me ask, as the no-poach agreement applied to

3    Mr. Seay, did the agreement give Mr. Thiry veto power over

4    talking to Mr. Seay?

5    A.   Yes.

6    Q.   And did Mr. Whitney agree to abide by that term?

7    A.   I believe he did agree in a follow-up email to avoid

8    talking to him for a couple of weeks, as Mr. Thiry requested.

9    Q.   All right.  Let's just take a look at that top email.  Is

10   that the follow-up email that you were just describing, where

11   Mr. Whitney says, "We won't contact him for a couple of weeks

12   as you have asked"?

13   A.   Yes.

14   Q.   Did you have a view of whether or not that was good for

15   Mr. Seay's career?

16   A.   No.  Mr. Seay had served me for a number of years as my

17   chief financial officer in Kidney Care.  At this point I had

18   already transitioned over to HealthCare Partners.  The new

19   chief operating officer, Mr. Staffieri and his team, felt like

20   Mr. Seay wasn't the right match to continue in that role.  So

21   for all intents and purposes, Guy was a man without a home.

22   And the opportunity at RAD Partners was, A, in his backyard; B,

23   he had worked for Mr. Whitney for years, more than a decade,

24   since Mr. Whitney was the company CFO and Guy was in the

25   finance department.  So it was a comfortable fit.  So I don't

Dennis Kogod – Direct

1    think this was in Guy's best interests.  I think he would have

2    been a good partner for RAD Partners.

3    *Q.*  To be clear, did you testify that DaVita was eliminating

4    Mr. Seay's CFO role?

5    *A.*  The role wasn't being eliminated.  Mr. Staffieri and I

6    think Mr. Maughan, the senior vice president reporting to

7    Mr. Staffieri, had made it clear to the organization and to Guy

8    that they had a different profile in mind for what their needs

9    were as the new administration in DaVita Kidney Care, so his --

10   his job may not have been eliminated, but he was not going to

11   be the gentleman or person in that role going forward.

12   *Q.*  Do you know whether or not Mr. Seay wanted to remain in the

13   CFO role?

14   *A.*  Mr. Seay wanted to remain in the CFO role, where he had

15   spent his whole career, in finance.

16   *Q.*  Do you know the title of the role that Mr. Whitney was

17   proposing to offer to Mr. Seay?

18   *A.*  CFO.

19           *MS. CLINGAN:*  Let's look at Government Exhibit 202.

20   And we have a stipulation as to admissibility, Your Honor.

21           *THE COURT:*  Admitted.

22           (Exhibit 202 admitted.)

23   *BY MS. CLINGAN:*

24   *Q.*  All right.  Mr. Kogod, if we could start with the first

25   email in this chain, which is your email on February 28,

Dennis Kogod – Direct

1    2014, on the second page.

2    *A.*   Yes.

3    *Q.*   Can you read the subject of your email.

4    *A.*   "Appears that they had John Nehra."

5    *Q.*   And the first line?

6    *A.*   "Call Guy to help recruit to NEA."

7    *Q.*   Who is John Nehra, and what is NEA?

8    *A.*   John Nehra was both a DaVita board member for a very long

9    time; and at this time, I think he headed up NEA, National

10   Enterprise Associates, somewhat of a private equity firm that

11   has a very large portfolio of healthcare companies, that John

12   was the senior healthcare executive.

13   *Q.*   Why were you letting Mr. Thiry know that John Nehra had

14   spoken to Guy Seay?

15   *A.*   For a couple of reasons.  Number one, it involved a board

16   member, and I -- Mr. Thiry regarded that as an important

17   relationship, so I just thought I had an obligation to let him

18   know that a board member was involved in something.

19            Second, I had an -- I remember these conversations.  I

20   felt a tremendous amount of loyalty to Guy.  He served me both

21   domestically and internationally; and I relied on him quite

22   heavily.  I get he may not have been the right person for the

23   next job, but he was for me.  And I want to make sure that he

24   didn't get put aside and that a good home was found.  And,

25   third, it is just part of the DNA of elevating.  You didn't

Dennis Kogod - Direct

1    want to be that executive that something happened on your watch

2    and you had not made the right notifications.

3    Q.  All right.  Let's take a look at Mr. Thiry's email on

4    March 2, 2014, at 4:36.  Mr. Thiry writes, "Rich, it is feeling

5    to me you guys should stop talking to Guy.  Agree?  I don't

6    know how anyone got the idea that Nehra should be called in as

7    a RAD advocate.  How did that happen?"

8          Do you know whether or not Mr. Thiry was upset that

9    someone had spoken to Guy Seay?

10   A.  Yes.

11   Q.  Do you have a view of whether or not it would have been

12   good for Mr. Seay's career to have a conversation with Mr.

13   Nehra about the RAD Partners opportunity?

14   A.  Yes, I believe it would have.

15   Q.  It would have been?

16   A.  Helpful.

17   Q.  To?

18   A.  To -- I believe NEA was an early investor in Radiology

19   Partners, and maybe Mr. Nehra.  I think John understood what

20   the needs of the CFO were at RAD Partners.  So I think having a

21   conversation with Guy, a healthy one about that role, I think

22   Mr. Nehra could have been a great reference -- not that Guy

23   needed it with Mr. Whitney.  So I think the conversation could

24   have been productive.

25   Q.  Would that opportunity, the CFO opportunity, have been a

1    good one for Mr. Seay?

2    A.   I believe it would have been a great opportunity for Guy,

3    for a number of reasons.

4    Q.   All right.  Let's take a look at Mr. Whitney's email,

5    March 2, 2014, bottom of the first page.  Mr. Whitney writes,

6    in pertinent part, "As for stopping talking with him, if that

7    is what you want, that is what we will do."

8         Do you know if Mr. Seay ultimately went to Radiology

9    Partners?

10   A.   He did not.

11   Q.   Let's take a look at Mr. Thiry's email in response.  So

12   Mr. Thiry's email comes March 26, 2014, which is a couple of

13   weeks after the previous email in the chain.  Thiry writes,

14   "Sorry.  Just opened.  I responded to your original idea by

15   saying I would raise it with Guy."  He continues, "After he

16   spoke to a bunch of folks, he told us clearly he wanted to stay

17   with the village.  Then and only then did I ask that you stop

18   talking to him."  To your knowledge, was that true?

19   A.   I think Guy had some strong -- very strong feelings.  He

20   had been there when it was Total Renal Care, when Kent came in

21   and the company was barely afloat.  So I think in a perfect

22   world, Guy wanted a home.  If he couldn't have a home at a role

23   at his level, Radiology Partners was a wonderful alternative

24   option for him.  He ultimately stayed at the village --

25   HealthCare Partners for a while.

Dennis Kogod - Direct

1   *Q.*  Was it unusual for Mr. Thiry to reach out directly when he

2   saw others recruiting DaVita teammates?

3   *A.*  In this case, no.  This relationship between he and

4   Mr. Whitney goes back probably decades, so it was not unusual

5   at all for him to be this involved.

6   *Q.*  All right.  Let's talk about another DaVita employee, an

7   individual named Cameron Cleeton.  Are you familiar with

8   Mr. Cleeton?

9   *A.*  I am.

10  *Q.*  Tell us about Mr. Cleeton.

11  *A.*  Somewhere in earlier 2010, 2011, Mr. Cleeton was a domestic

12  teammate at DaVita.  I can't recall what role he was in.  He

13  expressed an interest in international experience.  It was the

14  same time the company was thinking about an international

15  expansion.  So he was the first U.S.-based teammate that got

16  moved to Singapore, I believe was his first entry point.  And

17  stayed with International for a number of years doing business

18  development.

19  *Q.*  So to be clear, Mr. Cleeton moved to Singapore for DaVita?

20  *A.*  Yes.

21          *MS. CLINGAN:*  All right.  Let's take a look at

22  Government Exhibit 212.  And we have a stipulation to

23  admissibility on this one.

24          *THE COURT:*  It's admitted.

25          (Exhibit 212 admitted.)

1    *BY MS. CLINGAN:*

2    *Q.*  Mr. Kogod, at some point did you learn that Radiology

3    Partners was interested in talking to Cameron Cleeton?

4    *A.*  I did.

5    *Q.*  All right.  Let's take a look at the bottom email, from

6    Mr. Thiry in Government Exhibit 212.

7           Mr. Thiry begins, "I'm thinking of disinviting Tom."

8    Remind us who Tom is?

9    *A.*  Tom Usilton.

10   *Q.*  And what does he propose about Mr. Usilton?

11   *A.*  That he is thinking about disinviting him to I think it was

12   a Green Bay Packers game, where Mr. Thiry had invited a group

13   of executives to come to Wisconsin for the weekend and go to a

14   Packers game.

15   *Q.*  So a different event than the retirement party Mr. Usilton

16   was previously disinvited from?

17   *A.*  Yes.

18   *Q.*  Mr. Thiry continues, "There is nothing unethical about how

19   that happened, but it is hard to have that kind of hardship

20   inflicted on us right now."  Let me just ask would Cameron

21   Cleeton's departure have inflicted a real hardship on DaVita?

22   *A.*  No.  To the best of my knowledge, he wasn't being

23   considered for the chief development officer role at DaVita

24   U.S.A., which is what he wanted to be considered for.  He was

25   either in a relationship or had just gotten married and could

123

1   no longer do the travel back and forth from Asia.  They were

2   starting -- a young family emerging.  So Cameron was at this

3   point I think in a role of just ambiguous, in terms of what he

4   was doing.  He wasn't going to get the big job.  So his

5   departure, while sentimental, yes -- a lot of history -- but he

6   wasn't in a role that was going to stop DaVita from anything

7   important.

8   Q.  Did you observe whether or not Mr. Thiry was angry about

9   Mr. Cleeton being recruited?

10  A.  Yes, he was.

11  Q.  Do you have an understanding of why Mr. Thiry was angry,

12  given your testimony that Cameron Cleeton's departure wasn't

13  going to hurt DaVita?

14  A.  I do.  To me, this is less about companies violating it; it

15  is about former executives who leave DaVita, recruiting DaVita

16  teammates.  They know where the talent is; they've got

17  relationships.  As I look at all of these, these are not

18  companies that DaVita was competing with.  It was more an issue

19  of an executive that had been mentored by Mr. Thiry, invested

20  in by DaVita, they leave to go to another company, oftentimes

21  with Mr. Thiry's recommendation and reference.  And I -- I

22  believe, as I witnessed this, being close for many years, that

23  this was more of a personal insult of, How dare you?  You're

24  recruiting one of my people.  It was less about the company.

25  They weren't competitors.  There were no trade secrets that

Dennis Kogod - Direct

1    were going to change hands.  It -- just at the core, this was

2    just a very personal issue, like, I invested in you, I helped

3    create the role you're in, I gave you the opportunity, and the

4    response to that is you're going to recruit some of my talent

5    away from me.

6            So I think from what I witnessed, that -- that is the

7    real issue, it's less about the companies.

8    Q.  Now, you testified that Radiology Partners and DaVita

9    didn't compete with each other for the services that they

10   provided in the marketplace.  Did they compete for employees?

11   A.  Yes, they would have.

12   Q.  You say they would have?

13   A.  Yes.

14   Q.  But for what?

15   A.  But for the hands-off agreement.

16   Q.  All right.  Let's take a look at your response to

17   Mr. Thiry.  What do you say here?

18   A.  I say that -- I questioned, "Did Cameron accept?"  And, "I

19   agree with your thinking."

20   Q.  Why do you say, "I agree with your thinking"?

21   A.  You know, I wish I had a really good explanation other

22   than, I was just being a good soldier.  There is no other good

23   explanation.

24   Q.  What do you mean by "being a good soldier"?

25   A.  Not disagreeing.  Acknowledging, you're right.  I think

Dennis Kogod - Direct

1    this was more political than it was anything else.

2            THE COURT:  Are you close?

3            MS. CLINGAN:  I am.  We can take a break, or I can

4    power through.

5            THE COURT:  Let's take a break right here.

6            How long would you like for a break today, folks?

7    15 minutes?  You got it.  11:08.

8            (Recess at 10:53 a.m.)

9            (In open court at 11:08 a.m.)

10   BY MS. CLINGAN:

11   Q.  Mr. Kogod, I want to clarify one thing.  You testified

12   earlier the no-poach agreement was openly discussed among the

13   executive team.  Roughly, how many people was that?

14   A.  I characterize the Lambeau team, it's ten, twelve people.

15   Q.  Okay.  During the time that you worked at DaVita, how many

16   employees did DaVita have?

17   A.  I think there were times that it probably reached 35, 40,

18   45,000, worldwide.  I don't have the exact number.  A lot.

19           MS. CLINGAN:  All right.  Let's continue with Cameron

20   Cleeton.

21           And if we could please take a look at Government

22   Exhibit 217.  I believe we now have a stipulation on Government

23   Exhibit 217.

24           THE COURT:  Admitted.

25           (Exhibit 217 admitted.)

Dennis Kogod – Direct

1   *BY MS. CLINGAN:*

2   *Q.*  Let's take a look at this bottom email from Josh Golomb.

3   What was Josh Golomb's role at this point in time, at the time

4   of this email?

5   *A.*  Josh was the president of Paladina Health.  I don't know if

6   he still had his DaVita Rx responsibilities, but Paladina.

7   *Q.*  And what was Paladina's relationship to DaVita?

8   *A.*  Paladina was a DaVita subsidiary, designed to provide

9   on-site concierge primary care to large employers.

10  *Q.*  And you mentioned Rx.  What was that?

11  *A.*  DaVita RX was a specialty pharmacy that Josh had been the

12  president of for many years.

13  *Q.*  How did it relate to DaVita?

14  *A.*  They were both owned by DaVita.

15  *Q.*  And did the no-poach agreement between DaVita and Radiology

16  Partners also apply to Paladina and Rx?

17  *A.*  All of its subsidiaries.  Yes.

18  *Q.*  All right.  Where did Cameron Cleeton work at the time of

19  this email?

20  *A.*  I believe Radiology Partners.

21  *Q.*  Can you just explain what Mr. Golomb was proposing here?

22  *A.*  Cameron was a huge fan.  He was thinking outside the box if

23  there were any opportunities that would bring him back to

24  DaVita.

25  *Q.*  Okay.  Let's take a look at your response to Mr. Golomb.

1    Can you just read your response to Mr. Golomb?

2    A.  "Talked briefly to Kent.  Thinks it violates our hands-off

3    with them."

4    Q.  What did you mean by "hands-off with them"?

5    A.  The hands-off agreement with Radiology Partners, that if

6    somebody had reached out to Cameron to talk about this job at

7    Paladina, it would be a violation of the reciprocal hands-off.

8    Q.  So was Mr. Cleeton ever offered that opportunity at

9    Paladina?

10   A.  Not to my knowledge, no.

11   Q.  Why not?

12   A.  Because it violated the hands-off agreement, and it

13   precluded us from doing that.

14   Q.  Okay.  Now, Mr. Kogod, you testified at the outset of your

15   testimony that DaVita also had a no-poach agreement with a

16   company called IntegraMed.  Can you remind us who Bill Hughson

17   is?

18   A.  Bill Hughson worked at DaVita for a long time.  I think he

19   started in compliance, then he was instrumental, I believe, in

20   building DaVita Rx.  He then shifted over in the 2008 time

21   period to operations, and then exited the company.  So a former

22   DaVita senior executive.

23   Q.  Are you familiar with IntegraMed as a company?

24   A.  I am.

25   Q.  Do you know whether or not IntegraMed would be an

Dennis Kogod – Direct

1    attractive employee for DaVita employees?

2        *MS. BROOKS:*  Your Honor, again, I apologize for

3    interrupting.  I just wanted to maintain our 404(b) objection

4    for the record.

5        *THE COURT:*  Okay.  I ruled on it already.  Just belt

6    and suspenders, you can do that.

7        *MS. BROOKS:*  Okay.  Your Honor, thank you.

8    *BY MS. CLINGAN:*

9    *Q.*  Did DaVita have any business relationships with IntegraMed?

10   *A.*  No.

11   *Q.*  And did the no-poach agreement with IntegraMed ever end, to

12   your knowledge?

13   *A.*  No.

14       *MS. CLINGAN:*  Let's take a look at -- we can just put

15   it up for the witness.  This is Government Exhibit 152.

16       Your Honor, we would move Government Exhibit 152 into

17   evidence.

18       *MS. BROOKS:*  Again, since I can't see it all the way

19   down there, if they could just lay a foundation that Mr. Kogod

20   is on this.

21   *BY MS. CLINGAN:*

22   *Q.*  Sure.  Mr. Kogod, let me direct you to the second email

23   in the cc line.  Whose email is that?

24   *A.*  It is from Mr. Thiry to Bill Hughson, copying several

25   DaVita people -- all DaVita people.

Dennis Kogod – Direct

1   Q.   Looking at the cc line at the top email, about --

2   A.   Okay.  I'm sorry.  One more time, please.

3   Q.   Mr. Kogod, do you see your email address on the email?

4   A.   I do.

5   Q.   Did you receive this email?

6   A.   I did.

7        MS. CLINGAN:   United States moves Government

8   Exhibit 152 into evidence.

9        MS. BROOKS:   No objection, Your Honor.

10        THE COURT:   Admitted.

11        (Exhibit 152 admitted.)

12   BY MS. CLINGAN:

13   Q.   Let's take a look at the bottom email, Mr. Kogod.  Who is

14   it from, and who is it to?

15   A.   It is Mr. Thiry to Mr. Hughson, with a group of DaVita

16   folks copied.

17   Q.   What is the subject of the email?

18   A.   Setting up a call between Mr. Thiry and Bill Hughson

19   regarding possible recruiting of DaVita teammates by

20   Mr. Hughson.

21        MS. CLINGAN:   All right.  Let's take a look at

22   Government Exhibit 336.

23   BY MS. CLINGAN:

24   Q.   Let's take a look at the date of this email.  What's the

25   date?

Dennis Kogod - Direct

1    *A.*   November 2, 2013.

2    *Q.*   And who is the email from?

3    *A.*   It is from Mr. Thiry.

4    *Q.*   And can you just read the body of the email, please.

5    *A.*   Yes.   "I'm going to tell Hughson if he does not withdraw

6    Dawe offer, major competitive response.   I am livid.   He used

7    me as a reference.   He used me as a counselor on the decision,

8    et cetera."

9    *Q.*   Who is Dawe?

10   *A.*   Lisa Dawe was a regional vice president at DaVita Kidney

11   Care.

12   *Q.*   What is Mr. Thiry demanding here?

13   *A.*   That Mr. Hughson withdraw an offer that he made to Lisa

14   Dawe to join IntegraMed.

15   *Q.*   Mr. Thiry's email concludes, "Major competitive

16   response"?

17   *A.*   Yes.

18   *Q.*   What did that mean?

19   *A.*   Retaliation, targeting executives with IntegraMed, focusing

20   some searches on their executive team, potentially making

21   offers even if there is not a position for them.   That was the

22   competitive response.

23         *MS. CLINGAN:*   Your Honor, we have a stipulation on

24   336, just for the record.   We'd like to admit it.

25         *THE COURT:*   I already admitted 336.

1          *MS. CLINGAN:*  Let's take a look at Government

2     Exhibit 279.

3     *BY MS. CLINGAN:*

4     *Q.*  Okay.  For reference, the last email that we looked at

5     you testified was November 2, 2013.  What's the date of this

6     email at the very --

7          *THE COURT:*  279 is admitted.  It's admitted.

8          (Exhibit 279 admitted.)

9          *THE WITNESS:*  November 3, 2013.

10    *BY MS. CLINGAN:*

11    *Q.*  And who is the email from?

12    *A.*  It is from Mr. Hughson to Mr. Thiry.

13    *Q.*  And could you just read the first bullet.

14    *A.*  "I realize and appreciate that you're upset even though

15    both in the case of Susan Wright and Lisa Dawe, you admit that

16    they were in the process of being counseled out of DaVita.  And

17    that was evident to both of them, just as it was evident to me

18    I was being not so subtly counseled out back in 2009.  But in

19    general, I don't really like being threatened."

20    *Q.*  Mr. Hughson refers to Susan Wright and Lisa Dawe and writes

21    that they were in the process of being counseled out of DaVita.

22    To your knowledge, is that inaccurate?

23    *A.*  I don't know Susan Wright well enough to opine on it, but

24    Lisa Dawe was not being counseled out.  She may have been

25    underperforming but certainly not a conscious effort to counsel

Dennis Kogod - Direct

1   her out.

2   *Q.* All right.  Mr. Hughson continues, "In general, I really

3   don't like being threatened."  Do you understand what that

4   means?

5   *A.* I wasn't on the conversation; but given the tone and other

6   conversations, I -- I suspect that there was reference to

7   hiring their folks, targeting their folks, doing searches that

8   included their folks.  But, again, I wasn't on the

9   conversation; but I can infer from this.

10  *Q.* All right.  In the third bullet Mr. Hughson writes, "As

11  someone who myself believes I suffered retribution because of

12  perceived disloyalty, I understand the risk that I'd be asking

13  people to accept."  Can you explain what he meant by "the risk

14  I'd be asking people to accept"?

15  *A.* I believe he was referring to talking or having a

16  conversation with that person's boss, their direct hire --

17  direct supervisor, that they were looking to leave the company

18  and that they were talking to IntegraMed, in this case.  So

19  disclosure.

20  *Q.* And why is that a risk?

21  *A.* For the reasons we talked about.  While in some cases it

22  may work out to the person's benefit, there is the very real

23  possibility that it has an adverse effect and potentially

24  damages the person's career going forward if they stay at

25  DaVita.

1    Q.  And can you just read the bottom bullet of Mr. Hughson's

2    email.

3    A.  "That being said, I can absolutely commit to you that I

4    will not proactively recruit anyone from DaVita.  I agree with

5    you that it is an appropriate respect to pay out of both

6    friendship and appreciation for all that you have done for me."

7    Q.  Okay.  Mr. Hughson's commitment not to proactively recruit

8    from DaVita, does that accurately capture your understanding of

9    the no-poach agreement that existed between DaVita and

10   IntegraMed?

11   A.  Yes.

12         MS. CLINGAN:  Let's look at Government Exhibit 257.

13   And if we could please just show the email to the witness.

14         THE COURT:  257?

15         MS. CLINGAN:  257.  I believe 257 is already in

16   evidence.

17         THE COURT:  257 is in evidence.

18         MS. CLINGAN:  We can show it to the jury.  Sorry.

19   Being careful.

20   BY MS. CLINGAN:

21   Q.  Let's take a look at the bottom email from Mr. Hughson.

22   What's the date of this email?

23   A.  November 5, 2015.

24   Q.  You said 2015?

25   A.  I'm sorry.  2013.  Sorry.

Dennis Kogod - Direct

1   *Q.*   Where in time does this fall relative to the email from

2   Mr. Thiry where he said, "I am livid"?

3   *A.*   Within two or three days after that email exchange.

4   *Q.*   Okay.  Let's take a look at the last paragraph of this

5   email.  Mr. Hughson again writes, "This is absolutely

6   consistent with my behavior in general and with my commitment

7   to you that I will not proactively recruit from DaVita."  Does

8   it accurately capture your understanding of the no-poach

9   agreement between DaVita and IntegraMed?

10  *A.*   Yes, although there are more components to it.  There is

11  disclosure.  So I think Bill gets a little cute with his words

12  on proactively, as to leave the door open unintentionally.  But

13  that is a big part of the no-poach agreement.

14  *Q.*   Can you explain in your own words, what were the terms of

15  the no-poach agreement between DaVita and IntegraMed?

16  *A.*   I think it goes well beyond, we won't recruit.  It is, we

17  will not hire.  There is a difference between attempting to

18  recruit and talking to people, as opposed to extending an offer

19  to hire.  So in a perfect world, the hands-off would be, thou

20  shalt not hire.  And because you can't hire, you shouldn't talk

21  to people either unless they have met the threshold of talking

22  with their boss first.  So I think it's a little bit deeper

23  than what Bill has characterized here.

24  *Q.*   And do you have an understanding of the purpose of that

25  no-poach agreement?

Dennis Kogod – Direct

1  *A.*  To make it more difficult for people to leave the village

2  and make it impossible for them to go to a company that has a

3  former DaVitan as their leader, who they may have an attraction

4  to want to work for.

5  *Q.*  All right.  Mr. Kogod, you testified at the outset of your

6  testimony that there was also a no-poach agreement with a

7  company called Kindred.  What did Kindred do?

8  *A.*  Kindred is in the business of -- they own and operate acute

9  care hospitals, skilled nursing facilities, nursing facilities,

10  and I think other places of care.  But probably best to say

11  they're a hospital company.

12  *Q.*  Do you have a view of whether or not Kindred would have

13  been an attractive employer for DaVita employees?

14  *A.*  Yes.

15  *Q.*  Who was Paul Diaz?

16  *A.*  Paul Diaz was the CEO of Kindred, as well as a DaVita board

17  member.

18       *MS. CLINGAN:*  Let's take a look at Government

19  Exhibit 312, which is in evidence.

20  *BY MS. CLINGAN:*

21  *Q.*  And, Mr. Kogod, let's look at your email at 6:49 p.m.

22       *COURTROOM DEPUTY:*  I don't have 312.  I have --

23       *THE COURT:*  312 has not been admitted.

24       *MS. CLINGAN:*  We move 312 into evidence.

25       *MS. BROOKS:*  No objection, Your Honor.

1          *THE COURT:*  Admitted.

2          (Exhibit 312 admitted.)

3     *BY MS. CLINGAN:*

4     *Q.*  Mr. Kogod, who is this email from?

5     *A.*  It is from me.

6     *Q.*  And who is it to?

7     *A.*  To Mark Yowe.

8     *Q.*  Who is Mr. Yowe?

9     *A.*  Mark Yowe was a senior client partner with one of the

10    search firms that DaVita was using to conduct a search.

11    *Q.*  And what search firm was that?

12    *A.*  I believe it was Spencer Stuart.  But can we go back to the

13    main body?  I'm sorry.  Sometimes Spencer Stuart –– Spencer

14    Stuart.  Thank you.

15    *Q.*  What is the instruction you give to Mr. Yowe concerning

16    Kindred?

17    *A.*  I give him two.  One, to avoid recruiting from Kindred

18    because of the relationship with Mr. Diaz and DaVita.  And a

19    second set of instructions to aggressively target two division

20    presidents of Surgical Care Affiliates, which would have been

21    in response to a perceived violation of the hands-off.

22    *Q.*  All right.  Let's be clear.  What's the date of this

23    email?

24    *A.*  September 20, 2011.

25    *Q.*  Okay.  Why did you give Mr. Yowe the instruction to please

Dennis Kogod - Direct

1   avoid Kindred?

2   A.  Because of a hands-off agreement between the two

3   organizations.

4          MS. CLINGAN:  All right.  Let's take a look at

5   Government Exhibit 596.

6   BY MS. CLINGAN:

7   Q.  Mr. Kogod, we looked at this document just a moment ago.

8          Ms. Cabrera, if you could just highlight Gregory

9   Miller and Paul Eiseman.  The whole row.

10         Thank you.

11         What was the instruction with respect to these two

12  candidates from Kindred?

13  A.  "Will not pursue, per client."

14  Q.  What was the sole reason that those individuals were not

15  given an opportunity at DaVita?

16  A.  The hands-off agreement between DaVita and Kindred.

17  Q.  Okay.  Finally, you testified that there was a no-poach

18  agreement with another company called Spectranetics.  What does

19  Spectranetics do?

20  A.  They are -- I don't know them as well -- more on the

21  diagnostic side, having to do with cardiovascular, arterial.  A

22  very different, more -- I put them more on the device side than

23  I would the service side of healthcare.

24  Q.  Do you have a view of whether or not Spectranetics could

25  have been an attractive employer for DaVita employees?

1    *A.*  It could have been.  Yes.

2    *Q.*  And how are you aware of the no-poach agreement between

3    DaVita and Spectranetics?

4    *A.*  The same way as the others.  Once they were reached, it was

5    communicated.

6    *Q.*  Mr. Kogod, who is Scott Drake?

7    *A.*  Scott Drake was the CEO of Spectranetics and a former

8    DaVita employee.

9    *Q.*  And what was Mr. Drake's role in the no-poach agreement

10   between Spectranetics and DaVita?

11   *A.*  He was the decision maker on behalf of Spectranetics, so he

12   negotiated it with Mr. Thiry.

13   *Q.*  And do you know if he agreed not to poach DaVita employees?

14   *A.*  He did.

15        *MS. CLINGAN:*  All right.  If you could just please

16   show the witness, Ms. Cabrera, Government Exhibit 255.

17   *BY MS. CLINGAN:*

18   *Q.*  Were you copied on communications from Mr. Drake concerning

19   the no-poach agreement?

20   *A.*  Let me -- one second.  No.  The initial one was to

21   Mr. Thiry, and then Mr. Thiry copied me on the next one.

22   *Q.*  Okay.  So you received the chain in which --

23   *A.*  Yes.

24        *MS. CLINGAN:*  Okay.  Your Honor, we move Government

25   Exhibit 255 into evidence.

1          *MS. BROOKS:*  No objection, Your Honor.

2          *THE COURT:*  Admitted.

3          (Exhibit 255 admitted.)

4   *BY MS. CLINGAN:*

5   *Q.*  Let's look at the bottom email from Mr. Drake.  Who is it

6   to?

7   *A.*  It is to Mr. Thiry.

8   *Q.*  Can you just read what it says?

9   *A.*  "I hope you are well.  A quick note to let you know our

10  system/agreement is working.  An open position we are

11  recruiting for yielded a DaVita teammate.  Our HR and senior

12  leader of the department saw the resumé and stopped the process

13  with the individual.  Thought you'd want to know."

14  *Q.*  All right.  Mr. Drake refers to "our system agreement."  Do

15  you know what that is a reference to?

16  *A.*  The hands-off agreement between the companies.

17  *Q.*  All right.  Mr. Kogod, what's your status in this

18  investigation?

19  *A.*  I was subpoenaed to testify.

20  *Q.*  Do you know whether or not you're going to be prosecuted as

21  part of this investigation?

22  *A.*  I am not.

23  *Q.*  Do you know why?

24  *A.*  I do not.

25  *Q.*  At the time that you worked at DaVita, did you think that

Dennis Kogod - Direct

1    the no-poach agreements were wrong?

2    A.  Can you clarify from a legal or --

3    Q.  Not from a legal perspective.  I don't want you to testify

4    on the legal perspective.

5    A.  I thought the no-poach -- I understood it is important to

6    preserve talent, because I was the beneficiary of that.  I

7    thought the restrictions on notification of one's boss was too

8    much to ask for, but I was certainly the recipient of the

9    no-poach agreements.  That meant some of my teammates that

10   worked for me worked harder, so that's my -- that's my

11   recollection.

12   Q.  And did you observe the impact that these no-poach

13   agreements had on employees?

14   A.  The ones that were visible.  I don't know how many just

15   left quietly because they ended up choosing other employers.

16   But I certainly understood and witnessed the impact on

17   employees.  Yes.

18   Q.  What was that impact?

19   A.  For some, like Jung Lee and Guy Seay, trying to leave the

20   village, Cameron, Julio, it was tough.  It was a very tough

21   spot to be in.  And, again, in the spirit of full balance,

22   there were probably others that as their cases got elevated,

23   everyone wrapped their arms around them, and they leveraged

24   that position.  But far more times than not, I found it to have

25   a very negative impact.

Dennis Kogod – Cross

1          *MS. CLINGAN:*  Thank you, Mr. Kogod.

2          *THE COURT:*  Cross-examination.

3          *MS. BROOKS:*  Thank you, Your Honor.

4                          **CROSS-EXAMINATION**

5    *BY MS. BROOKS:*

6    *Q.*  Mr. Kogod, you started your examination by saying under

7    oath that you have no personal animosity toward Kent Thiry.

8    Did you not say that, sir?

9    *A.*  I did.

10   *Q.*  In fact, you said that when Mr. Thiry expressed some

11   unhappiness regarding your performance, you thought that it was

12   a good time to say, It's time to go.  Did you say that to us

13   earlier?

14   *A.*  I did.

15   *Q.*  That's not true, is it, Mr. Kogod?

16   *A.*  I believe that is a good recollection and summary of the

17   meeting we had in Northern California.

18   *Q.*  Mr. Kogod, isn't it true that you hold Kent Thiry

19   personally responsible for losing your position at DaVita in

20   2016?

21   *A.*  No.

22   *Q.*  All right.  Let's go back and see how you came to be here.

23   You started at DaVita in 2005.  I think you already told us

24   that; is that right?

25   *A.*  Correct.

Dennis Kogod - Cross

1    *Q.*  Now, the way that you came to be at DaVita is that you were

2    at a company called Gambro; correct?

3    *A.*  Yes, ma'am.

4    *Q.*  And DaVita, according to you, were intent on having --

5    after -- I'm sorry.  Let me back up.  DaVita acquired Gambro;

6    is that right?

7    *A.*  Correct.

8    *Q.*  And DaVita, according to you, was intent on having one of

9    the senior team from Gambro stay; is that right?

10   *A.*  That was my understanding.  Yes.

11   *Q.*  And they chose you?

12   *A.*  Yes.

13   *Q.*  Now, at that time you felt like the odd man out; did you

14   not?

15   *A.*  I was certainly new to the organization.

16   *Q.*  I'm sorry, sir.  So did you feel like the odd man out?

17   *A.*  That's a reasonable characterization.  Sure.

18   *Q.*  And one of the reasons that you felt like the odd man out

19   is that you looked at the current executives of DaVita and most

20   of them had advanced degrees; would that be fair?

21   *A.*  Yes.

22   *Q.*  And according to you, they also, some of them, had Ivy

23   League educations, which you did not?

24   *A.*  Correct.

25   *Q.*  But despite all of that, in 2009, Mr. Thiry appointed you

1  as chief operating officer; did he not?

2  A.  He did.

3  Q.  And there you were, now working for a Fortune 400 company

4  that had an incredible reputation; correct, sir?

5  A.  Yes.

6  Q.  And in your words, doing good stuff clinically; right?

7  A.  Yes.

8  Q.  Improving healthcare; correct?

9  A.  I believe so.

10  Q.  And, in fact, you saw your promotion to COO as an

11  acknowledgment and a reward for all of your years of -- your

12  years of hard work; correct?

13  A.  Yes.

14  Q.  And during that time, once you got promoted to COO, your

15  salary went up; right?

16  A.  It did.

17  Q.  Your bonuses went up; correct?

18  A.  Correct.

19  Q.  And your stock options went up; did they not?

20  A.  They did.

21  Q.  You began making a lot of money; isn't that true, sir?

22  A.  It is.

23  Q.  You had a good run at DaVita; right?

24  A.  I did.

25  Q.  But that good run came to a screeching halt in 2016; did it

1    not?

2    A.   I don't consider it a screeching halt.

3    Q.   Well, sir, do you not blame Mr. Thiry for trying to put the

4    blame on you for what happened with HealthCare Partners?

5    A.   I think there was an element of blame for HealthCare

6    Partners and International at the time.   Yes.

7    Q.   So that would explain why you told, in fact, the agents --

8    or the Division, I should say -- on March 20 of this year, that

9    when HealthCare Partners did not perform to the level at which

10   Mr. Thiry expected, according to you, it was easier for

11   Mr. Thiry to point the finger of blame at someone else.   And in

12   this case, it was you.   Is that why you told the agents that,

13   sir?

14   A.   I don't recall the exact conversation, so I'll rely on your

15   notes.

16   Q.   Would you like -- I can put it up on your screen.   Would

17   you like to see the 302 from your interview of March 20, 2022?

18   A.   Sure.

19        MS. CLINGAN:   Objection, Your Honor.   This is improper

20   impeachment.

21        MS. BROOKS:   I believe he said he didn't recall, so

22   I'm refreshing his recollection.

23        THE COURT:   To refresh his recollection, yes, she can

24   do that.

25

Dennis Kogod - Cross

1   *BY MS. BROOKS:*

2   *Q.*  So if you would, let's look specifically on page 1.  Let me

3   get the right one here.

4           Looking at the second to the last full paragraph, that

5   begins with, "After 2013" -- there we go.  It's blown up.

6   *A.*  Yes, I see it.

7   *Q.*  Does that refresh your recollection, sir --

8   *A.*  It would --

9   *Q.*  Let me finish.

10  *A.*  I've not seen this document, and it represents somebody's

11  characterization of the conversation.  It's not a transcript,

12  but I don't disagree with it.

13  *Q.*  I need to ask the question first, and then you get to

14  answer.  Okay?

15  *A.*  Sure.  Sorry.

16  *Q.*  So looking at this now, sir, does this refresh your

17  recollection of whether or not you told the Division that when

18  HealthCare Partners did not perform to the level at which

19  Mr. Thiry expected, according to you, it was easier for

20  Mr. Thiry to point the finger of blame at someone else.  And in

21  this case, that was you?

22  *A.*  And I -- I'm not trying to be argumentative.  I agree

23  with -- I don't remember the exact conversation and how it got

24  reduced to a paragraph.  But I don't disagree with the

25  fundamentals, that during that conversation, when we met in

Dennis Kogod - Cross

1   April or May, the source of the conversation was the

2   performance of International and HealthCare Partners.  I don't

3   dispute that.

4   Q.  Okay.  I think we're kind of crossing paths here.

5        Do you believe, sir, that when HealthCare Partners did

6   not perform to the level at which Mr. Thiry expected, is it

7   your belief, sir, that it was easier for Mr. Thiry to point the

8   finger of blame at someone else?  In this case, you.  And if

9   you don't, just say, I don't.

10  A.  At the time, I probably took that into consideration.  Yes.

11  Q.  And then in addition, to that, sir, not only do you feel

12  like he pointed the finger of blame at you for HealthCare

13  Partners; but since leaving DaVita, isn't it true, sir, that

14  you believe that you had a difficult time finding employment in

15  the same industry, which you attribute to Mr. Thiry?

16  A.  I don't agree with that.  If you have a note that says

17  otherwise, I'd love to see it.  I -- it's a small industry.

18  There are very few companies that rise to the level of DaVita.

19  Q.  Okay.

20  A.  There is --

21  Q.  So let me try my question again --

22  A.  Sure.

23  Q.  -- so it's clear.  Do you agree or disagree, sir, that you,

24  Mr. Kogod, have had a difficult time finding employment in the

25  same industry after leaving DaVita; and you attribute that

Dennis Kogod - Cross

1   difficulty to Mr. Thiry?

2   A.   I don't agree with that.  No.

3   Q.   Can you explain why you said that, then, to the Division on

4   October 20 -- 23, 2020?

5             MS. CLINGAN:  Objection, Your Honor.

6             THE COURT:  Objection is sustained.  Let me explain

7   something to the jury because you are not.

8             When she refers to a 302 -- maybe you heard her say

9   that -- that's a form.  Typically, an FBI agent -- because the

10  FBI agents are the ones that do the investigation for the

11  government in cases like this.  Typically, an FBI agent will

12  interview people -- lots of people -- and then they write a

13  memo that is the FBI agent's version of what happened.  But it

14  is not a transcript of what the person told the FBI agent.  It

15  is simply a memo of the FBI agent's impression of what was

16  said.  That's the document she's talking about here.

17            Onward.

18            MS. BROOKS:  Thank you, Your Honor.

19  BY MS. BROOKS:

20  Q.   Let me rephrase my question, Mr. Kogod.  Did you tell the

21  Division on October 23, 2020 -- and specifically, attorneys

22  Megan Lewis, William Vigen, and FBI Agent Charles Butcher --

23  did you tell them that you had had a difficult time finding

24  employment in the same industry after leaving DaVita, which you

25  attribute to Mr. Thiry?

148

Dennis Kogod - Cross

1   *A.*  Ma'am, with all due respect, you're asking me about a

2   conversation in 2020.  I don't recall that exact conversation.

3   *Q.*  So you don't recall whether you told them that?

4   *A.*  I don't recall.

5        *MS. BROOKS:*  Your Honor, may I refresh recollection,

6   then?

7        *THE COURT:*  I think you just did.

8        *MS. BROOKS:*  Okay.

9   *BY MS. BROOKS:*

10  *Q.*  So even -- I'll let it go.  Thank you very much, Mr. Kogod.

11  Let's move on to another topic.  Let's talk about your leaving

12  DaVita.

13       Today I believe you told us that you had a

14  conversation with Mr. Thiry, I think it was in, what, April of

15  2016?  He expressed some dissatisfaction; and you decided that

16  this was, perhaps, a good time for you to go.  Is that a fair

17  characterization of what you told us?

18  *A.*  There is more to it; but, yes.

19  *Q.*  Okay.  Now, previously, had you told the Division -- again,

20  in October of 2020 -- that in April of 2016, you had had

21  surgery, you flew to see Mr. Thiry, and you resigned from

22  DaVita?

23  *A.*  I don't recall saying I resigned from DaVita.  I don't

24  recall -- that did not happen at that meeting.

25  *Q.*  Okay.  So you're saying you did not say that?

Dennis Kogod - Cross

1  *A.*  No.  We talked about the process, whether we would try to

2  negotiate a separation ourself or through somebody else.  But I

3  did not resign that day.  No.

4  *Q.*  I'm sorry.  I'm asking you, did you in October of 2020 tell

5  the Division that you had had surgery, then you went to see

6  Mr. Thiry, and you resigned from DaVita in April of 2016?

7  *A.*  I do not remember saying that.

8  *Q.*  Okay.  Now, in the version that you did give today -- let

9  me back up.  Did you -- have you previously told the Division

10  that when you met with Mr. Thiry in April of 2016 in Northern

11  California, that you were surprised that Mr. Thiry was unhappy

12  with the performance of the groups that you were leading?  Did

13  you tell the Division that?

14  *A.*  Again, I don't recall; but I'm happy to look at the memo of

15  somebody's characterization.

16  *Q.*  Okay.  Then let's put on your screen again, March 6, 2020,

17  this time at page 2 -- I'm sorry, March 6, 2022.  It's a typo

18  on my part.

19            *THE COURT:*  All right.  Give him a chance to read it.

20            *MS. BROOKS:*  I will, Your Honor.

21            *THE COURT:*  And then ask him if that refreshed his

22  memory.

23            *MS. BROOKS:*  Thank you.  Sorry I'm going too fast.  I

24  broke the rule.

25            *THE COURT:*  I imagine it's clear enough to the

Dennis Kogod – Cross

1   Division.  You keep talking about the Division.  Why don't you

2   tell us what the Division is so we all know.

3         MS. BROOKS:  Thank you, Your Honor.

4   BY MS. BROOKS:

5   Q.  So let me set the stage here, Mr. Kogod.  Did you have an

6   interview on March 6, 2022, with Ms. Megan Lewis and Mr. --

7   Trial Attorney Anthony Mariano, and Trial Attorney Sarah

8   Clingan and FBI Agent Laura Timmons?  That's March 6, 2022.

9   A.  I defer to you for the accuracy of the names; but, yes, I

10  had a meeting.

11        THE COURT:  Okay.  And the Division, which was my

12  point, is the Antitrust Division of the United States

13  Department of Justice.  And these people over here are

14  associated with the Division.  It's a little bit like "the

15  Rule."

16        MS. CLINGAN:  Your Honor, I respectfully have to

17  object here.  There is a characterization that somehow

18  Mr. Kogod's testimony is different than what is reflected in

19  this writeup.  There is no discrepancy, so I'm just not sure

20  what the point is.

21        THE COURT:  She's asking him to read this and refresh

22  his memory.  That's what is going on.

23        MS. CLINGAN:  Fair enough.

24        MS. BROOKS:  Would the Court prefer if I say the

25  Antitrust Division for clarity?

151

Dennis Kogod – Cross

1          THE COURT:  No.  The Division is fine.  I just want to

2    make sure that all of us understand what you're talking about.

3          MS. BROOKS:  Thank you, Your Honor.

4          THE COURT:  Sometimes you talk in lingo that may not

5    be common outside your little circle.

6          MS. BROOKS:  Thank you, Your Honor.  I'll be careful.

7    Thank you.

8    BY MS. BROOKS:

9    Q.  So, Mr. Kogod, I think my question to you was, did you tell

10   Ms. Lewis, Mr. Mariano, Ms. Clingan, and FBI Agent Laura

11   Timmons on March 6, 2022, that when you met with Mr. Thiry in

12   April of 2016, he expressed dissatisfaction with the

13   performance of HealthCare Partners and DaVita International and

14   that you were surprised that Mr. Thiry was unhappy with the

15   performance of the groups that you were leading?

16   A.  I don't recall the exact words; but directionally, that

17   would have been the message, surprise.

18   Q.  But in fact, sir, you weren't surprised, because you saw

19   this coming as early as February 24 of 2016; did you not?

20   A.  You'll have to -- I don't recall what happened on that day,

21   so --

22         MS. BROOKS:  Your Honor, I have a binder of prior

23   testimony for impeachment purposes.  May I approach the witness

24   and give the binder to him and to opposing counsel?  And we

25   have one for Your Honor, if you'd like.

Dennis Kogod – Cross

1          THE COURT:  No, I don't want one.  Are you talking

2     about a deposition?

3          MS. BROOKS:  No, Your Honor.  It's prior testimony in

4     an actual court under oath.

5          THE COURT:  All right.

6     BY MS. BROOKS:

7     Q.  Mr. Kogod, if you would like to turn to tab 2 in that

8     binder.  Let me know when you're there, sir.

9     A.  I've got tab 2.

10    Q.  And specifically go to page 161.

11    A.  Okay.

12    Q.  And looking at line 4, okay --

13    A.  I'm looking at 01061.

14    Q.  Page 161 of the transcript.

15    A.  I'm sorry.  Looking at the wrong number.  Okay.

16    Q.  And so let's go back, sir.  Isn't it true that as early as

17    February 24, 2016, you had some various concerns about your

18    ongoing ability at DaVita to stay in your current capacity?

19    A.  Okay.

20    Q.  Is that true, sir?

21    A.  Well, that's what I said at the time; so I must have

22    believed it at the time.

23    Q.  Okay.  Because this testimony was under oath in a

24    courtroom; right?

25    A.  I understand.  I'm having a hard time going back to 2014.

Dennis Kogod - Cross

1    But if that's what I said, then it probably characterized what

2    I thought at the time.

3    Q.   And, actually, it's 2016, Mr. Kogod.

4    A.   '16.  I'm sorry.

5    Q.   All right.  And your serious concerns as of February 24,

6    2016, about your ongoing employment was based on some

7    conversations you had already had with Kent Thiry; correct?

8    A.   According to this document, that's correct.

9    Q.   And it was based on some emails that Mr. Thiry had sent

10   you over the last couple of weeks laying the foundation for

11   compensation conversations; correct?

12   A.   That's what I said.  Yes.

13   Q.   And in those emails, he documented his disappointment in

14   HealthCare Partners; correct?

15   A.   Again, without seeing the email -- but that's what I said

16   at the time.

17   Q.   Do you have any reason to believe that you weren't telling

18   the truth under oath at this point, sir?

19   A.   No.  I just don't know what the emails were that you're

20   referring to, but --

21   Q.   And, in addition, you -- your serious concerns were also

22   based on those emails documenting Mr. Thiry's disappointment

23   on the international portfolio; correct?

24   A.   I said it at the time, so, yes.

25   Q.   And that those were all great leading indicators of how

Dennis Kogod - Cross

 1    your CEO was valuating your performance?

 2    *A.*  According to the emails, yes.  That's correct.

 3    *Q.*  So rather than go with what various versions you told us

 4    about how you came to leave DaVita, let's look at what happened

 5    at the time.  The emails.

 6           *MS. CLINGAN:*  Your Honor, I'm going to object.

 7           *THE COURT:*  Sustained.

 8    *BY MS. BROOKS:*

 9    *Q.*  Let's go if we could, and put it up on your screen, Defense

10    Exhibit B534.

11           And let's start at the second page so you can see.  It

12    starts with an email from Kent Thiry to you.  And then if we

13    look at the next -- the way we know it's to you is if we look

14    at the next email, it's an email back from you to Mr. Thiry.

15           *MS. CLINGAN:*  I apologize.  Is this in evidence?

16           *MS. BROOKS:*  No.  I'm trying to lay the foundation to

17    get it in.

18           *THE COURT:*  It's not in evidence, and the jury can't

19    see it.

20           *MS. CLINGAN:*  Okay.  Thank you.

21    *BY MS. BROOKS:*

22    *Q.*  The next email is a response back to you from Mr. Thiry

23    back to you; correct?

24    *A.*  I'm sorry.  You're moving quickly.  Which one are you on --

25    yes, it's mine.

Dennis Kogod – Cross

1   Q.  Okay.  Then an email -- a response from Mr. Thiry back to

2   you; correct?

3   A.  I'm sorry?  There is a lot of activity on my screen.

4           THE COURT:  Do you want this in evidence?

5           MS. BROOKS:  I do, Your Honor.  I move B534 into

6   evidence, please.

7           MS. CLINGAN:  I need one minute to take a look at it.

8           No objection.

9           THE COURT:  It's admitted.

10          (Exhibit B534 admitted.)

11  BY MS. BROOKS:

12  Q.  Okay.  Mr. Kogod, then, with this in evidence, let's start

13  with the first email from Mr. Thiry to you dated March 25,

14  2016.  Do you see that, sir?

15  A.  I do.

16  Q.  And this was an email written contemporaneously -- in other

17  words, not now, but back on March 25, 2016; right?

18  A.  Yes.

19  Q.  Mr. Thiry says in this email to you, "Thanks for booking

20  the time to discuss your/my work situation.  I have been

21  waiting for in-person time, but that was not working out.  And

22  as you pointed out, I have not been able to mask some of my

23  frustration."  Do you see that, sir?

24  A.  I do.

25  Q.  And that frustration was Mr. Thiry's frustration with your

Dennis Kogod - Cross

1   performance at DaVita; correct?

2   A.  According to the email.  Yes.

3   Q.  And he says to you, "I look forward to getting together in

4   person and sorting this out very much."  Correct?

5   A.  That's what it says.  Yes.

6   Q.  And, in fact, he says after that, "The equally important

7   objective for me is to maintain our friendship for the rest of

8   our lives."  Is that right, sir?

9   A.  That's what it says.  Yes.

10  Q.  Let's see what you said back to Mr. Thiry.

11          On March 25, 2016, at 11:04 a.m., you write back to

12  Mr. Thiry, and you say, "Thanks for the message.  I will be

13  curious to hear if your preference for sorting it out is to hit

14  the restart button or wind down."  Is that correct, sir?

15  A.  It is.

16  Q.  And then the next thing you say is, "But I too appreciate

17  greatly the chance to tell you what was on my mind, feeling

18  strongly you were feeling the same."  Do you see that?

19  A.  I do.

20  Q.  And you went on to say, "As I mentioned yesterday, should

21  we decide to hit the reset, I would be committed for the next

22  few years leading International in more of a team approach and

23  would be excited to do that."  Is that right?

24  A.  It is what it says.  Yes.

25  Q.  So this doesn't fit with what you told the jury earlier,

Dennis Kogod - Cross

1   that at that meeting with Mr. Thiry, you decided it would be a

2   good time for you to go?

3   A.  I think what I said is, we had that meeting, and then we

4   had two subsequent follow-up conversations about hitting the

5   restart.  So when I left that meeting, I was resigned to the

6   fact that separating at this point was a reasonable outcome.  I

7   didn't have -- I was okay with that.

8          We did have, as I said earlier, a meeting I think in

9   Washington, and maybe a dinner, and emails going back and

10  forth about hitting the restart.  And it was a possibility.  In

11  the end, it wasn't the right decision, so I -- that's my -- I'm

12  just -- I'm not -- that's it, period.

13  Q.  Were you telling the truth to Mr. Thiry when you said that

14  you would be committed for the next few years to lead

15  International in a more team approach and that you would be

16  excited to do that?  Were you telling him the truth when you

17  said that on March 25, 2016?

18  A.  As I explored my options, I had never had the opportunity

19  to just do International.  It was always an extra job, being

20  COO of DaVita Kidney Care and COO of HealthCare Partners.  So,

21  yes, if the outcome was a pure international role, where that's

22  all I did -- which I ended up doing in a consulting role --

23  that would have been a reasonable outcome of this meeting; but

24  it wasn't meant to be.

25  Q.  So is your answer yes, when I say -- I asked, were you

Dennis Kogod – Cross

1   telling the truth to Mr. Thiry when you said you'd be committed

2   to leading International for the next few years and you would

3   be excited to do that, were you telling him the truth?

4   *A.*   At that moment, I was probably thinking it would be a good

5   possibility.  So, yes, I'm sure I meant what I said.

6   *Q.*   Let's -- let's see what Mr. Thiry responded to you on

7   March 25, 2016, at 11:50 a.m.  Mr. Thiry said to you, "I am

8   squarely on the fence."  Right?

9   *A.*   Yes.

10  *Q.*   "Until our phone call, I was leaning toward winding it

11  down."  Correct?

12  *A.*   That's what it says.  Yes.

13  *Q.*   "But the call was a bit of a catharsis.  It is not clear to

14  me if it is a good fit.  It is not clear to me it is not."

15  That's what Mr. Thiry told you, correct, sir?

16  *A.*   Correct.

17  *Q.*   But he also told you that he was at least glad that you

18  were communicating again; right?

19  *A.*   I think it says, "we are communicating," not me.

20  *Q.*   I'm sorry.  I thought it said, "I am glad we are

21  communicating again."

22  *A.*   Yes.  You said "me."

23  *Q.*   I apologize.  I meant to say "we," he was glad we, meaning

24  the two of you, are communicating again; right?

25  *A.*   Yes.

Dennis Kogod - Cross

1    *Q.*   Okay.  Now, let's move to the next exhibit, B535.  And

2    we'll put it up on your screen.

3              Your Honor, I would represent to the -- to

4    government's screen.  Your Honor, I would represent that this

5    is, again, an email chain between Kent Thiry, Dennis Kogod,

6    with a cc to Javier Rodriguez and Joe Mello in the April 2016

7    time frame.

8              *THE COURT:*  Did you say B535?

9              *MS. BROOKS:*  Yes, I'm sorry.  B, as in boy, 535.  I

10   would move it into evidence, Your Honor.

11             *THE COURT:*  Any objection?

12             *MS. CLINGAN:*  I don't see the relevance.

13             *THE COURT:*  Okay.  If that's the objection, overruled.

14   Admitted.

15             (Exhibit B535 admitted.)

16             *MS. BROOKS:*  So now we can put it on the screen for

17   everyone.

18   *BY MS. BROOKS:*

19   *Q.*   So let's look at Mr. Thiry's email to you, dated

20   April 10, 2016, at 12:29 p.m., Mr. Thiry saying to you, "JR has

21   been my partner in thinking about this for a while, and he is

22   fully up to date."  Do you see that, sir?

23   *A.*   I do.

24   *Q.*   Now, JR, is that Javier Rodriguez?

25   *A.*   Yes, it is.

Dennis Kogod – Cross

1    Q.  I think you told us earlier that at one point in time,

2    Mr. Thiry had two right-hand men, you and Mr. Rodriguez;

3    correct?

4    A.  After Mr. Mello had retired.  Yes.

5    Q.  And Mr. Rodriguez is now the new CEO -- or the CEO of

6    DaVita after Mr. Thiry retired; correct?

7    A.  Correct.

8    Q.  And you find yourself at this point unemployed?

9    A.  I find myself where I want to be right now.

10   Q.  And that is without a firm position?

11   A.  Consulting assignments, which has been just fine.

12   Q.  Okay.  Mr. Thiry goes on and says, "DK" -- so is that --

13   does Mr. Thiry have a habit of referring to people by their

14   initials?

15   A.  Yes.

16   Q.  He refers to himself, in fact, by KT?

17   A.  He does.

18   Q.  "DK, my objective remains to either, number one, give it

19   another try for X months, after a thorough PDR type

20   discussion."  Now, let me stop right there.  What does "PDR"

21   stand for?

22   A.  Professional development review.

23   Q.  Had you ever had to undergo a professional development

24   review before this time period, sir?

25   A.  I believe it was standard at DaVita to undergo one each

Dennis Kogod - Cross

1   year.  So, yes, I had some PDRs.

2   *Q.*  Okay.  And Mr. Thiry wanted you to undergo another PDR-type

3   discussion; correct?

4   *A.*  I think that's what he's implying.  Yes.

5   *Q.*  And, again, he wanted to try to separate out his

6   appreciation for the substantial contributions over the last

7   few years -- I assume by you -- from his assessment of what

8   needs to change going forward.  Right, Mr. Kogod?

9   *A.*  Correct.

10  *Q.*  Or, number two, that you separate -- meaning, you separate

11  from DaVita -- in a mutually constructive way, hopefully

12  maintaining both professional and personal relationships.

13  *A.*  Is that -- yes.  That's what is on the screen.

14  *Q.*  Okay.  Now let's go to B -- B, as in boy -- 537.  This is

15  now an email chain between you and Mr. Thiry, dated April 18,

16  2006 [sic].

17          And, Your Honor, we would move B537 into evidence.

18          *MS. CLINGAN:*  No objection.

19          *THE COURT:*  It's admitted.

20          (Exhibit B537 admitted.)

21  *BY MS. BROOKS:*

22  *Q.*  So if we go to your email -- there is a rather lengthy

23  email from you to Mr. Thiry, starting at the bottom of the

24  first page, Sunday, April 17, 2016, at 8:23 p.m.  And the

25  subject is, "Proposal."  Do you see that, Mr. Kogod?

1    A.   I do.

2    Q.   And in the first paragraph of your proposal -- so now we're

3    already April 17 -- you say to Mr. Thiry, "I'd like to thank

4    you for the time and courtesy you extended this past Tuesday

5    night in D.C."  So let me stop there.  Do you recall -- we

6    already talked about a meeting you had with Mr. Thiry in

7    California; but apparently you also had a meeting later in time

8    with Mr. Thiry in Washington, D.C.  Is that right?

9    A.   I think I brought that up, that we had two subsequent

10   meetings.  And this is the first one.  Yes.

11   Q.   Okay.  Thank you.  You say, "I thought it was an honest and

12   productive conversation, and I hope you felt the same."

13   Correct?

14   A.   Correct.

15   Q.   You said, "Before I outline my proposal, I'd like to make

16   and in some cases reiterate some important points and

17   considerations relevant to our conversation going forward."  Is

18   that right?

19   A.   That's correct.

20   Q.   Now --

21          THE COURT:  Before you launch deeply into this

22   document, it's noon.

23          MS. BROOKS:  Perfect.  Thank you, Your Honor.

24          THE COURT:  How much time would you like for lunch

25   today, gentlemen and ladies?

Dennis Kogod - Cross

1           JUROR:  An hour is good.

2           THE COURT:  Okay.  We'll reconvene right around

3    1 o'clock, then.

4               (Jury out at 12:01 p.m.)

5               (In open court at 1:34 p.m.)

6           THE COURT:  Go ahead.

7           MS. BROOKS:  Thank you.

8    BY MS. BROOKS:

9    Q.  Mr. Kogod, when we broke for lunch we were talking about

10   Exhibit B, as in boy, 537.

11              And if we could put that back up on the screen.

12              Now I'd like to go to what in that exhibit -- it's a

13   very long one.  Let's go to the third -- I'm sorry, the second

14   page.  And down at the bottom, where it says, "Based on our

15   meetings," now, this is the email from you to Mr. Thiry.  And

16   it is dated April 17, 2016.  This says, "Based on our meetings

17   on April 8 and April 12" -- I'm sorry, I've gone too far.

18   Let's back up -- sorry.  We will pull up the whole page.  I

19   wanted to go back to the top, No. 1.  "I am both" -- there we

20   go.

21              Okay.  This is where we left off.  I got ahead of

22   myself.  It's --

23           THE COURT:  Apparently the jury is not able to see it.

24           MS. BROOKS:  I apologize.  I think it's in evidence,

25   Your Honor.

1          *THE COURT:*  It is.

2          *COURTROOM DEPUTY:*  That was not my mistake at all.

3          *THE COURT:*  You know, I've lived with Julie for a lot

4    of years, and she's just always full of surprises.

5    *BY MS. BROOKS:*

6    Q.  Let me back up again, Mr. Kogod, now that the jury can see

7    what you're seeing and what the rest of us are seeing.  So this

8    is in evidence.  It's B, as in boy, 537.  It's an email chain

9    between you and Mr. Thiry, dated April 17, 2016.  Do you see

10   that, sir?

11   A.  I see four bullet points and a paragraph above it on my

12   screen.

13   Q.  Do you want me to go page by page?

14   A.  No.  We can go to the points you want to go to.

15   Q.  So you confirm this is an email chain -- it's already in

16   evidence.  You confirm this is an email chain between you and

17   Mr. Thiry about you staying or not staying at DaVita; correct?

18   A.  Yes.

19   Q.  All right.  What you say to Mr. Thiry on April 17, 2016,

20   is, "Number one" -- "number one point, I am both interested and

21   excited about having the chance to actually lead International

22   on a full-time basis."  Correct?

23   A.  Yes.

24   Q.  "And, number two, this will only work if you feel the

25   same."  Correct?

1    A.   Yes.

2    Q.   And it turned out, Mr. Thiry did not feel the same;

3    correct?

4    A.   I disagree with that; but, okay.

5    Q.   Well, did --

6    A.   I don't recall ever seeing a communication or being in one

7    where Mr. Thiry said, I want you to leave the company.  So I

8    maintain, at the end of the day, I was proposing some options

9    and was open to them and equally open to, it was time to go.

10   Q.   And the bottom line was that, whether it was Mr. Thiry

11   telling you it was time to go or you finally deciding it was

12   time to go, you went; correct?

13   A.   I went.

14   Q.   And the job that you considered the job of a lifetime at

15   that point came to an end, did it not?

16   A.   I had a wonderful time at DaVita, and it came to an end.

17   Yes.

18   Q.   A job where in its heyday, you were making, if you include

19   salary, bonus, and stock options, almost $10 million -- is

20   it --

21        MS. CLINGAN:   Objection.  Defense counsel themselves

22   had sought *in limine* conversations about compensation, I'm not

23   sure why that's coming in.

24        THE COURT:   I'll overrule the objection but it might

25   be opening some doors.

1          *MS. BROOKS:*  Understood, Your Honor.

2     *BY MS. BROOKS:*

3     Q.  Let me ask again, Mr. Kogod.  A job where in its heyday if

4     you consider your salary plus your bonus plus your stock

5     options, you were making almost $10 million a year; correct?

6     A.  I don't have the data in front of me, but I'll rely on your

7     figures.

8     Q.  And to this day, you blame Mr. Thiry for you no longer

9     having that job.  Correct, sir?

10    A.  No, I don't.

11    Q.  Now, let's move to some of the other things you told the

12    jury today.  You talked about a gentleman by the name of Jung

13    Lee; is that right?

14    A.  Jung Lee; correct.

15    Q.  Am I pronouncing that correct?

16    A.  It's Jung.

17    Q.  Jung Lee.  And you had previously also brought up Mr. Lee

18    when you were interviewed by the Division; is that right?  If

19    you know?

20    A.  I believe so.  Yes.

21    Q.  And you described that once Mr. Lee let it be known that he

22    wanted to leave DaVita, he was, quote, toast, unquote.  Does

23    that sound like something you'd say?

24    A.  That's reasonable.

25    Q.  And that's what you're telling the ladies and gentlemen of

Dennis Kogod - Cross

1   the jury happened; right?

2   A.   I believe when Jung made it clear that he wanted to leave,

3   there was an effort to assassinate his character.  Yes.

4   Q.   Well, let's see what actually happened by looking at the

5   documents.  Let's start with A023 -- Defendants' Exhibit A023.

6   We're going to show it to you on your screen.

7        I would represent, Your Honor, that this is an email

8   chain that includes Mr. Kogod and a gentleman by the name of

9   Joe Mello, another gentleman by the name of Jim Rechtin, and

10  the subject is, "Met with Jung Lee today," dated April 27,

11  2015.  And I would move it into evidence.

12        THE COURT:  I think it's May 27.

13        MS. BROOKS:  I'm sorry.  Did I misspeak, Your Honor?

14        THE COURT:  You said April.

15        MS. BROOKS:  I had April on my mind from the previous

16  subject.

17  BY MS. BROOKS:

18  Q.   Let's try it again for the record, Mr. Kogod.  May 27,

19  2015; is that right?

20  A.   Yes, it is.

21  Q.   Now, if we look at the beginning, we're going to see an

22  email from -- let me set out who these people are.  At the top

23  of the page -- let's go to the very first page at the top.

24  This first email says Joe Mello.  And at that point in time,

25  in May of 2015, Mr. Mello was COO -- chief operating officer --

Dennis Kogod – Cross

1   at HealthCare Partners; is that right?

2   A.   I believe so.  Yes.

3   Q.   And at this point in time, you were CEO of HealthCare

4   Partners International; is that right?

5   A.   I was.  My title was president of HealthCare Partners and

6   CEO of DaVita International.

7   Q.   Jim -- how do you pronounce that name, Rechtin?

8   A.   Rechtin.

9   Q.   -- was senior vice president of strategy -- no -- one more

10  time -- strategy at DaVita; right?

11  A.   It -- may have been about the time he was appointed market

12  president of -- but it was either strategy or HealthCare

13  Partners market president of California.  I'm not sure which.

14  Q.   And the subject of the email or this email string is

15  "Met with Jung Lee today."  Do you see that?

16  A.   I do.

17  Q.   Now, in this email you tell Mr. Mello and Mr. Rechtin

18  that Mr. Lee is going to leave -- let me get -- it in my --

19  "Mr. Lee is going to leave DaVita if we don't find him

20  something."

21  A.   Yes, I see that.

22  Q.   So if I'm understanding this email, you're telling other

23  executives at DaVita that Mr. Lee is thinking of going if

24  DaVita doesn't find him something to do at DaVita; right?

25  A.   I think I'm communicating that he is at risk for leaving

Dennis Kogod - Cross

1    the company.  Yes.

2    *Q.*  And, in fact, the next sentence says, "He was going to let

3    Staffieri and Maughan know that he is talking to us and also to

4    tell them he is actively looking outside."  Is that correct?

5    *A.*  Yes.

6    *Q.*  And Mike Staffieri at this point was chief operating

7    officer of DaVita Kidney Care; correct?

8    *A.*  Yes.

9    *Q.*  And David Maughan was a senior vice president at DaVita?

10   *A.*  Correct.

11   *Q.*  So am I correct, sir, that this email chain shows that

12   Mr. Lee was open, with you and a number of other executives at

13   DaVita, about the fact he was looking for other opportunities?

14   *A.*  I don't remember saying he wasn't open to disclosing that.

15   I was commenting on what happened afterwards, not this portion.

16   *Q.*  So you would agree that Mr. Lee was open with you and a

17   number of other executives at DaVita about the fact he was

18   looking for other opportunities?

19   *A.*  Yes.

20   *Q.*  And in response to your email, Mr. Mello and Mr. Rechtin

21   began talking about some other possibilities.  And then you

22   say, "He can't live in Nevada, so Nevada's probably not a good

23   option."  Do you see that, sir?

24   *A.*  I do.

25   *Q.*  And is that because -- I think you mentioned this to us --

170

Dennis Kogod – Cross

1    Mr. Lee had a child that was in Southern California, and he

2    needed to be with that child?

3    A.   No.   We're talking about Mr. Quinones --

4    Q.   The situation with Mr. Lee, why was Nevada not an option

5    for him?

6    A.   I don't know why relocation wasn't good for him and his

7    family.   I don't remember the details.

8    Q.   Okay.   But somehow back then, you did know that, according

9    to you, Mr. Lee can't live in Nevada, so Nevada probably is not

10   a good option; right?

11   A.   I remember talking to him about the Nevada opening.

12   Q.   But it quickly came off the table because he wasn't able to

13   relocate for family reasons.   In fact, that very next sentence

14   says, "However, he is interested in the Riverside region that

15   Jim proposed as part of the Southern California

16   reorganization."   Is that right?

17   A.   Correct.

18   Q.   And, "He'd like a shot" -- he, meaning, Mr. Lee?

19   A.   Yes.

20   Q.   "He'd like a shot like Chris Mayne SVP of ops."   What do

21   you mean by that?

22   A.   Mr. Mayne transitioned over from DaVita Kidney Care to

23   HealthCare Partners and became a senior vice president of

24   operations.   I think that was a goal that he had, to be like

25   Chris.

Dennis Kogod – Cross

1   Q.  On the next page you say, "Jim, I'd like to have Jung talk

2   to you about the Riverside region."  Right?

3   A.  Right.

4   Q.  And in response, Mr. Mello says, "I set up Friday when I'm

5   in the office.  Should I call him."  Correct?

6   A.  Sorry.  It -- it just changed pages so --

7   Q.  It's May 27 at 2:00 p.m.

8   A.  Yes.

9   Q.  There we go.

10  A.  Yes.

11  Q.  "I have set up a time on Friday when I am in the office.

12  Should I call him?"  Correct?

13  A.  Got it.  Said that it was, yes.

14  Q.  Okay.  And you respond, telling Mr. Mello in part, "Perhaps

15  tell Mike if we don't take him, DaVita loses him."  Right?

16  A.  That's what I wrote.  Yes.

17  Q.  Now, who is the "we" in that sentence you're talking about,

18  "if we don't take him, DaVita loses him"?

19  A.  I believe I would have been referring to HealthCare

20  Partners, the opening in Riverside.

21  Q.  Now, you weren't, Mr. Kogod, trying to prevent Mr. Lee from

22  leaving DaVita, were you?

23  A.  I was trying to provide another option for him to stay.

24  Yes.

25  Q.  That's just a good business practice, isn't it?

Dennis Kogod - Cross

1    *A.* In this case, Jung was worth saving, from my perspective.

2    Yes.

3    *Q.* And one of the ways to save an employee if they're looking

4    to leave is to try to offer them something better where they

5    currently are; right?

6    *A.* In this case, that's correct.

7    *Q.* And then you get a response back from Mr. Rechtin, who

8    says, "Happy to talk to him" --

9    *A.* I don't see that.

10          *MS. BROOKS:* I'm sorry. I need to go another

11   exhibit now, A22.

12          I'll represent this is a continuation of that email

13   chain, so I would move A022 into evidence.

14          *MS. CLINGAN:* No objection.

15          *THE COURT:* It's admitted.

16          (Exhibit A022 admitted.)

17   *BY MS. BROOKS:*

18   *Q.* And Mr. Rechtin replies back, "Happy to talk to him. Might

19   include Scott if you don't object. He knows some of the

20   Riverside details better than me." Right?

21   *A.* I see that. Yes.

22   *Q.* This is all going on in May of 2015. And it all about

23   trying to find a better fit for Mr. Lee at DaVita; correct?

24   *A.* Correct.

25          *MS. BROOKS:* Then if we go to A799 -- 779. Again,

1   this is a continuation of the email chain, so I would move

2   A779 into evidence.

3         *MS. CLINGAN:*  No objection.

4         *THE COURT:*  It's admitted.

5         (Exhibit A779 admitted.)

6   *BY MS. BROOKS:*

7   *Q.*  So we now have -- it starts by -- we go to the first of

8   that chain, and now we have Mr. Lee responding.  And he's

9   responding to you; right?

10  *A.*  Yes.

11  *Q.*  He says, "Hi, Dennis.  Wanted to thank you for the open,

12  direct dialogue.  It is greatly appreciated."  Correct?

13  *A.*  Correct.

14  *Q.*  He says, "I had a discussion with the family, Tanya, Lucas,

15  Sasha, last night about LV" -- is that Las Vegas?

16  *A.*  It is.

17  *Q.*  "I was proud to be able to start by letting them know that

18  the company I work for wants to make sure my kids don't miss

19  their daddy."  Right?

20  *A.*  I think he's referencing my conversation with him, but

21  that's what he wrote.

22  *Q.*  And that was because you and other executives at DaVita

23  were trying to find a better fit for Mr. Lee so he'd stay at

24  DaVita and not leave to go to SCA; correct?

25  *A.*  That's correct.

Dennis Kogod - Cross

1    Q.  And that's just good business practice, isn't it,

2    Mr. Kogod?

3    A.  In this case, this was a good business practice.

4    Q.  And Mr. Lee went onto say, "I'm very excited about the

5    opportunity to grow HCP's LV market.  If you are okay with it,

6    I'd like to go through the interview process for the LV

7    opportunity."  Is that right?

8    A.  He did.  Yes.

9    Q.  So at this point it looks like he is possibly considering

10   the Las Vegas opportunity within DaVita; fair?

11   A.  It was an option, it looks like.  Yes.

12   Q.  Then he goes on, "At the same time, it would be great if I

13   could connect with Jim Rechtin about the Riverside activity.

14   Based on my kidney care knowledge of the Riverside area, I

15   believe I could be helpful in the start-up phase of that

16   market, even while driving the business in Las Vegas, if that

17   is an option for me."  Correct?

18   A.  Correct.

19   Q.  So, again, this is back and forth amongst the executives at

20   DaVita, now including Mr. Lee himself, about various options

21   that would be available to him if he stayed at DaVita; correct?

22   A.  Correct.

23   Q.  Las Vegas was one possible option; right?

24   A.  Correct.

25   Q.  Riverside was another possible option; right?

Dennis Kogod - Cross

1    A.   Perhaps a better one; but, yes.

2    Q.   Well, that was certainly up to Mr. Lee to decide?

3    A.   Well, I think we had some input in terms of which was the

4    better role for Jung; but they were both on the table.

5    Q.   And in that same email string, I believe the next email

6    in the string, May 28, 2015, at 3:15 p.m., it should say "I

7    plan" -- there we go.

8         This is Mr. Lee again.  "I plan to let Maughan know

9    next week" -- M-A-U-G-H-A-N, not mom -- "know next week.  Will

10   then call Mike.  Thanks on Riverside.  I will wait to hear from

11   Rechtin."  Correct?

12   A.   Correct.

13   Q.   Then a few days later, Scott Doniger responds to you.

14   Mr. Doniger worked for Mr. Rechtin at DaVita; correct?

15   A.   Correct.

16   Q.   He apparently, according to him, had spoken with Mr. Lee

17   about a job in the Inland Empire.  Do you see that?

18   A.   I do.

19   Q.   What is that Inland Empire being referred to here?

20   A.   It's a part of Southern California.  I don't know the

21   specific cities, but somewhere in the LA, area out to the

22   desert.  I don't know the exact geography.

23   Q.   Possibility of Las Vegas opportunity for Mr. Lee.

24   Riverside --

25   A.   I think Riverside and Empire are one and the same.

Dennis Kogod - Cross

1   *Q.*   Okay.  It goes on to say that, "I think he left" --

2   meaning, Mr. Lee -- "left pretty excited about the opportunity

3   in the market and the potential to build something from the

4   ground up."  Is that right?

5   *A.*   It is.

6   *Q.*   Now, none of that could have happened if Mr. Lee had left

7   to go to SCA; correct?

8   *A.*   That's correct.

9           *MS. BROOKS:*   Now let's go to A-775.  And this is an

10  email string between you and Mr. Lee dated June 10, 2015.

11          And, Your Honor, we would move A-775 into evidence.

12          *MS. CLINGAN:*   No objection.

13          *THE COURT:*   Admitted.

14          (Exhibit A775 admitted.)

15  *BY MS. BROOKS:*

16  *Q.*   Mr. Lee says to you, "Hi, Dennis."  And he says, "My

17  discussion with mike last week about looking" -- on to -- I'm

18  sorry.  Let's back up.

19          "Not sure if you received my text from last week re my

20  discussion with Mike last week about looking for external and

21  internal opportunities."  Do you see that?

22  *A.*   I do.

23  *Q.*   If we look further down, he says -- so he talked to Mike

24  about internal and external opportunities, and Mike -- is that

25  Mike Staffieri?

Dennis Kogod - Cross

1    *A.*  Yes.

2    *Q.*  He's at DaVita; right?

3    *A.*  Yes.

4    *Q.*  And in addition to that, Mr. Lee says, "And I've talked

5    with Rechtin and Doniger about the Inland Empire opportunities

6    in pretty good detail.  Appears to be a great opportunity to

7    build a medical group/IPA and processes surrounding it.  I'd

8    like to talk with you more about it."  Correct?

9    *A.*  Correct.

10    *Q.*  So, again, if Lee had gone to SCA, this opportunity that he

11    thought looked like a great opportunity wouldn't have been

12    available to him; right?

13    *A.*  This was a good process so far.

14    *Q.*  Then if we go to A784 -- actually, you just said something

15    that just cued me.  You said, "This was a good process so far."

16    Are you telling us that somewhere along the way, this process

17    went bad?

18    *A.*  I felt that some of the letters, particularly the ones

19    where Mr. Stephanus is raising concerns that had not been

20    talked about openly before, in response to Jung looking around,

21    is where the process went sideways.

22    *Q.*  Well, all these emails we just looked at that are in

23    evidence -- these are all dated in May of 2015; isn't that

24    right?

25    *A.*  Correct.

Dennis Kogod - Cross

1   Q.  And you said that it was -- if I'm getting your words

2   right, it was after that that there was this complaint about

3   excessive alcohol use on the part of Mr. Lee.  Is that what you

4   told us about earlier today?

5   A.  You'd have to put the email up to refresh the date, but

6   that's my understanding, sequentially, that the email from

7   Mike Staffieri about his performance and his areas of weakness

8   and the allegation of an internal investigation were presented

9   during this process as Jung was looking around.

10  Q.  All right.  I am going to show you an email.

11  A.  Thank you.

12       MS. BROOKS:  Your Honor, this is not on our exhibit

13  list because it's surprise impeachment based on what the

14  witness just said.  May I mark it as an exhibit and pass out

15  copies?

16       THE COURT:  Well, yes, of course, you can.

17       MS. BROOKS:  Thank you.

18       THE COURT:  What are you marking it as?

19       MS. BROOKS:  Your Honor, this will be marked as B538.

20  BY MS. BROOKS:

21  Q.  Now, please tell the ladies and gentlemen of the jury

22  whether or not before you testified today about these -- the

23  alcohol complaints coming after this whole email exchange we

24  were just talking about, were you aware that on April 21, there

25  had been an anonymous complaint sent to a few executive leaders

Dennis Kogod – Cross

1   about Mr. Lee's excessive drinking at a DaVita function?

2          *MS. CLINGAN:*  Your Honor, I object.  One, it wasn't on

3   their exhibit list.  Two, Mr. Kogod is not on the

4   communication.

5          *THE COURT:*  Okay.

6          *MS. BROOKS:*  Your Honor, I just asked him if he was

7   aware.

8          *THE COURT:*  Correct.  You can answer the question.

9   *BY MS. BROOKS:*

10  *Q.*  Mr. Kogod, were you aware that prior to this whole email

11  exchange that we just went over, on April 21, there had been an

12  anonymous complaint sent to a few DaVita executives --

13         *MS. CLINGAN:*  Objection, Your Honor.  She is

14  testifying to facts not in testify.

15         *THE COURT:*  She's asking if he's aware.  Overruled.

16  *BY MS. BROOKS:*

17  *Q.*  Were you aware, Mr. Kogod, that on April 21, there had been

18  an anonymous complaint sent to a few executive leaders at

19  DaVita about Mr. Lee's overconsumption of alcohol at a recent

20  Surf and Sun division meeting?

21  *A.*  No.

22  *Q.*  So you didn't know about this when you told the ladies and

23  gentlemen of the jury that you thought the alcohol complaint

24  was a ruse that --

25         *MS. CLINGAN:*  Objection.  Again, counsel is testifying

1   to facts that are not in evidence.

2           THE COURT:  Well, she's cross-examining.

3           MS. CLINGAN:  Yes.  But her questions are

4   presupposing --

5           THE COURT:  Overruled.  Overruled.

6   BY MS. BROOKS:

7   Q.  So you didn't know about this anonymous complaint having

8   been made on April 21 about Mr. Lee's drinking when you told

9   the ladies and gentlemen of the jury that the drinking

10  complaint was a ruse to punish Mr. Lee for wanting to leave

11  DaVita?

12  A.  I did not.  No.

13  Q.  Thank you, Mr. Kogod.

14          Now let's turn to what you said about Mr. Quinones.  I

15  believe you said that Mr. Quinones -- did you tell us that he

16  did or did not leave to go from DaVita to Hazel Healthcare?

17  A.  I wasn't aware of what decision he made after DaVita.  So I

18  didn't answer that question, nor was I asked.

19  Q.  Did you ever tell the agents that Mr. Quinones didn't go to

20  Hazel because of this supposed non-poach agreement between

21  Hazel and DaVita?

22  A.  You'd have to show me the document.  But I was under the

23  belief that Julio went to a behavioral health company from

24  DaVita and did not take Hazel.  But I didn't state that as a

25  fact.  It was what I thought.

1  *Q.*  Okay.  You thought he didn't go to Hazel; right?

2  *A.*  Yes.

3  *Q.*  Do you now know that, in fact, he did go to Hazel?

4  *A.*  I did not know that.

5  *Q.*  So even as of today when you testified, you still don't

6  know that Julio Quinones went from DaVita to Hazel?

7  *A.*  No.

8  *Q.*  I'm going to show you again now some letters,

9  contemporaneous with Mr. Quinones telling DaVita that he wanted

10  to go to Hazel.

11        I'm going to show you A015.  A015 is an email from

12  Mr. Quinones dated March 28, 2017, to Kent Thiry.  Subject:

13  "Life update."  And then in brackets, "Apologies for the

14  technical difficulties," forward slash, "late send," brackets.

15        Are you familiar with this email where

16  Mr. Quinones --

17        *THE COURT:*  Just ask him if he's familiar with the

18  email.

19        *MS. BROOKS:*  Yes.  I'm sorry.

20  BY MS. BROOKS:

21  *Q.*  Are you familiar with this email between Mr. Quinones and

22  Mr. Thiry regarding his desire to leave DaVita?

23  *A.*  I am not.

24  *Q.*  You are not.  Are you aware that Mr. Quinones told

25  Mr. Thiry that he would strongly prefer not to move his family

Dennis Kogod - Cross

1    or overburden them with travel?

2    A.   I had heard that from Julio several times.  Yes.

3    Q.   So you had -- did say you had that conversation with him?

4    A.   Not as it relates to this memo; but, in general, he did

5    share the burden -- the problems that excessive travel was

6    causing.  Yes.

7    Q.   Because at this point in time -- and we're talking now

8    about 2017 or so -- Mr. Quinones had been traveling extensively

9    internationally for six or seven years; right?

10   A.   Approximately.  Yes.

11   Q.   And he told you that -- and you were an executive at DaVita

12   up until the 2016.  He told you during that time that he would

13   rather not do that anymore; right?

14   A.   He told me it was -- it was a burden on his family, and it

15   he had an issue with his son.  But I think this came to a head

16   when I left and he was very unclear about his future.  Travel

17   was just a symptom of not knowing what his future would look

18   like.

19   Q.   And he told you when you were still at DaVita as an

20   executive at DaVita, that he would like an opportunity to have

21   a different position that wouldn't require him to travel

22   internationally; correct?

23   A.   I don't remember that specific conversation.  So if you

24   have something to that effect, please show me.  I -- Julio -- I

25   never questioned Julio wanting to get out of international up

1   until the time I left.

2   Q.  I'm sorry.  You said you never questioned --

3   A.  I never thought Julio was at risk for stepping out of

4   international because of the travel at that point.  I didn't

5   think that was a big issue until he was unclear what his role

6   would be at DaVita going forward.

7   Q.  Well, at some point, didn't Mr. Quinones tell you -- I

8   think it was after you left DaVita, that he was considering

9   going to Hazel?

10  A.  Yes.  But you said as a DaVita -- I had left the company

11  when the conversation about Hazel took place.

12  Q.  Okay.  My apologies.  Let's get time straight, then.  So

13  you left the company and now Mr. Quinones -- you were still

14  acting as a consultant at that point?

15  A.  Yes, I was.

16  Q.  Okay.  And Mr. Quinones tells you that he has this

17  opportunity to go with Hazel Healthcare and Josh Golomb; right?

18  A.  Correct.

19  Q.  The company that supposedly has this no-hire agreement

20  between DaVita and Hazel Healthcare; right?

21  A.  Correct.

22  Q.  So according to you, Mr. Quinones had an opportunity to go

23  to Hazel Healthcare, a company that allegedly had a no-hire

24  agreement with DaVita?

25  A.  Correct.

Dennis Kogod – Cross

1   Q.  And according to you, sir, you didn't think he ended up at

2   Hazel Healthcare; right?

3   A.  I wasn't clear where he ended up at that time.

4   Q.  If I represented to you, sir, that Mr. Quinones did go to

5   Hazel Healthcare, would you have any reason to disagree with

6   that representation?

7   A.  If you say it is that way, I take your word for it.

8   Q.  And he went there despite what you're calling a no-hire

9   agreement between DaVita and Hazel Healthcare?

10  A.  If that's what he said, yes.

11  Q.  Do you know, sir -- and I'm just asking if you know.  Do

12  you know whether or not Mr. Quinones was interviewed by the

13  Division on March 22, 2021?

14  A.  By the Division?

15  Q.  Yes.  By -- let's see.  Specifically Agent Hamel.

16  A.  I don't know any of the specifics.  Julio had called me

17  once and asked if I had been contacted; but we just agreed

18  there would be no discussion about it.  So I don't know when or

19  if he was interviewed.  I just assumed.

20  Q.  And the Division did not share with you their interview

21  notes of Mr. Quinones?

22  A.  No.

23  Q.  Thank you.  Okay.  Now, let's go to what you talked about,

24  Guy Seay at Radiology Partners -- vis-a-vis Radiology Partners.

25  Do you remember that?  Mr. Seay?

Dennis Kogod - Cross

1   A.   Yes.

2   Q.   Again, you told us -- and I don't remember how you

3   characterized the alleged agreement between DaVita and

4   Radiology Partners.  Was that, according to you, a no-hire?

5   A.   According to me and the documentation by Mr. Whitney

6   outlining the agreement, yes.

7   Q.   Well, are you aware, sir, that we're going to hopefully

8   hear from Mr. Whitney in this case?

9   A.   I wasn't aware.

10  Q.   And did the Division share with you any of the interviews

11  that they've had with Mr. Whitney?

12          MS. CLINGAN:  Objection.

13          THE COURT:  Sustained.

14  BY MS. BROOKS:

15  Q.   So you don't know one way or the other if we're going to

16  hear from Rich Whitney; is that right?

17  A.   I have not inquired about anyone testifying other than

18  myself.  So I don't know, and I haven't asked.

19  Q.   Would you agree, sir, that Rich Whitney might be a better

20  person to tell us why Guy Seay ended up not going to Radiology

21  Partners?

22  A.   I think it would be a good source of information.

23  Q.   Thank you.  You talked about Tom Usilton.  And you said

24  that -- oh, you know what?  I'm not quite done.  Because you

25  were shown an exhibit regarding Mr. Seay, GX202.  That was in

1    evidence.

2            You were shown parts of that exhibit, but let's go to

3    page 3.  There is an email from Dennis Kogod to Kent Thiry and

4    Javier Rodriguez, February 28, 2014.  Now, you were shown parts

5    of it.  You were shown the, "Call Guy to help recruit to NEA."

6    Do you remember that earlier today?

7    A.  I do, yes.

8    Q.  Okay.  And then I think you were shown this one, "John was

9    under the impression Guy had already made decision to leave

10   DaVita."  Do you remember being shown that?

11   A.  Yes.

12   Q.  But you weren't shown this next sentence.  What does this

13   next sentence say?

14           MS. CLINGAN:  Objection.  He was shown the very next

15   sentence.  She's testifying to things that didn't occur.

16           THE COURT:  Just ask him a question about it, not

17   whether he was shown it or not.

18           MS. BROOKS:  Thank you, Your Honor.

19   BY MS. BROOKS:

20   Q.  What does this next sentence say?

21   A.  "Guy told John he was hoping to stay at DaVita and talking

22   about an HCP and international role."

23   Q.  So at least according to this email, Mr. Seay was hoping

24   to stay at DaVita; correct?

25   A.  Based on my conversation with him at the time, yes.

Dennis Kogod - Cross

1    *Q.*  And not go to Radiology Partners; correct?

2    *A.*  It was a good option if he couldn't find a job within

3    HealthCare Partners, an expanded international role.

4    *Q.*  Let's go now to the email from Mr. Thiry on March 26,

5    2014, where it says, "Sorry.  Just opened."  Okay?

6            The first sentence, "I responded to your original idea

7    by saying I would raise it with Guy so he could think about

8    what was best for him."  And this is actually an email from

9    Kent Thiry to Rich Whitney; is that right?

10   *A.*  I don't see who it is to.  The screen is covered.

11   *Q.*  Okay.  Let's see if we can go up one --

12   *A.*  Okay.

13   *Q.*  -- and see if Rich Whitney responds.

14   *A.*  Yes.

15           *MS. BROOKS:*  Let's do the whole thing.  There we go.

16   *BY MS. BROOKS:*

17   *Q.*  So Mr. Thiry says to Mr. Whitney, "I responded to your

18   original idea by saying I would raise it with Guy so he could

19   think about what was best for him."  Correct?

20   *A.*  Yes.

21   *Q.*  So in this case, I think you told us, Mr. Thiry, according

22   to the emails, asked Mr. Whitney, give me a couple of weeks

23   to talk to Guy Seay before you talk to him so we can see if we

24   can offer him a better deal at DaVita; right?

25   *A.*  I believe that was -- that was what we covered this

Dennis Kogod - Cross

1   morning, yes.

2   Q.   Now, Mr. Seay was a fairly senior executive; correct?

3   A.   Yes.

4   Q.   And would you agree with me, sir, in your experience at

5   DaVita, that DaVita puts a lot of time and money into

6   recruiting senior executives; correct?

7   A.   Yes, they do.

8   Q.   DaVita puts a lot of time and money into training senior

9   executives; do they not?

10  A.   They do.

11  Q.   And DaVita puts a lot of time and money into doing things

12  that will help retain those senior executives; correct?

13  A.   They do.

14  Q.   And do you agree, Mr. Kogod, that's just good business

15  practice?

16  A.   The steps you outlined are good business practice.  Yes.

17  Q.   And Mr. Thiry says to Mr. Whitney, "I responded to your

18  original idea" -- about Guy Seay -- "by saying I would raise it

19  with Guy so he could think about what was best for him,"

20  meaning Guy Seay; correct?

21        What did Mr. Thiry say to Mr. Whitney in that very

22  next line?

23  A.   Would you like me to read it?

24  Q.   Yes, please.

25  A.   "I did that.  I also told him we were totally supportive of

189

Dennis Kogod - Cross

1    him talking directly to you" -- "talking to you directly."

2    Sorry.

3    Q.  On March 26, 2014, Mr. Thiry said to Mr. Whitney that Guy

4    Seay had been told that DaVita was very supportive of Mr. Seay

5    talking to Mr. Whitney at Radiology Partners, is that right,

6    according to this email?

7    A.  So far that's correct.  Yes.

8    Q.  And Guy Seay ended up staying at DaVita; correct?

9    A.  He moved over to HealthCare Partners with me.  Yes.

10   Q.  Okay.  So sometimes a division that a person is in -- a

11   senior executive is in -- may not be the right fit.  And if

12   DaVita wants to hang on to them, they may give them an

13   opportunity in another division; right?

14   A.  That's possible.  Yes.

15   Q.  And, again, that's just good practice, isn't it?

16   A.  If it works like that, it's good business.

17   Q.  Now let's go to Mr. Usilton.  You told us about Tom

18   Usilton.  He was originally at DaVita, and then he went to

19   Radiology Partners.  Is that right?

20   A.  I believe after he retired from DaVita, that's where he

21   ended up.  Yes.

22   Q.  So he was a senior executive at DaVita?

23   A.  Yes.

24   Q.  And he was allowed to go to Radiology Partners; correct?

25   A.  After he had retired from DaVita, yes, he ended up at

Dennis Kogod - Cross

1    Radiology Partners.

2    Q.   And you say that he left -- you thought he -- he had -- let

3    me get it right.  He had a bad departure from DaVita; is that

4    right?

5    A.   I think my -- my feelings that at the end, the relationship

6    between Tom and Mr. Thiry had -- was not as good as it was

7    prior, and Tom didn't leave in the greatest fashion.  There

8    was -- there was some -- a cloud that hung over that departure.

9    Q.   What was the last time you talked to Mr. Usilton?

10   A.   I haven't talked to him since -- I don't even remember.

11   Certainly before I left DaVita.

12   Q.   Are you aware, sir, that just last year Mr. Usilton was at

13   the wedding of Mr. Thiry's son?

14   A.   I would have no way of knowing that.  No.

15   Q.   Now let's talk about Spectranetics and Scott Drake.  Okay?

16   A.   Okay.

17   Q.   Now, I looked in the Indictment -- I don't know -- have you

18   had a chance to see the Indictment in this case?

19   A.   I have not.

20   Q.   So you're not aware of which companies are alleged to have

21   conspired with each other, as far as violating the Sherman Act?

22   A.   I've been informed, but I have not read the Indictment

23   myself.

24   Q.   And you've been informed that it's Count 1, Surgical Care

25   Affiliates, SCA; is that your understanding?

Dennis Kogod – Cross

1  A.  I have not gone through the counts.  I've just been asked

2  if I'm aware of these companies.  I've not gone through the

3  counts.

4  Q.  So you don't know one way or another if Spectranetics is

5  one of the alleged co-conspirators; is that right?

6  A.  All I know is I was asked about the companies by name, and

7  I don't know about the counts or beyond that.  I have not taken

8  the time to spend on that.

9  Q.  And did you tell the jury earlier today that Mr. Priest and

10  Spectranetics entered into -- I can't -- sometimes you said

11  no --

12  A.  Mr. Drake.

13  Q.  I'm sorry.  Mr. Drake.  Mr. Drake and Spectranetics entered

14  into some sort of an agreement with DaVita?

15  A.  Yes.

16  Q.  What are you basing that understanding on?

17  A.  Conversations with Scott, emails that directly referenced

18  the system that was put into place.  I was a part of Scott's

19  departure from DaVita and part of the ongoing conversations.

20  Q.  So did Mr. Drake ever tell you -- let me clear this up.

21        When Mr. Drake left, he had a contractual

22  nonsolicitation restriction in his contract; did he not?

23  A.  I'm not aware of what his agreement said, so I'll take your

24  word on that.

25  Q.  Did he ever tell you that after his nonsolicitation

Dennis Kogod - Cross

1    restriction ended, he began soliciting DaVita executives?  Did

2    you know that or not?

3    A.  I did not.

4    Q.  Did he tell you he had no push-back or issue from Mr. Thiry

5    or others at DaVita as it related to recruitment?

6    A.  I didn't have that conversation with him.  No.

7    Q.  Did he tell you that he successfully recruited --

8           MS. CLINGAN:  Objection.  I have no idea what defense

9    counsel is referring to.

10          THE COURT:  It sounds like you're testifying here.

11          MS. BROOKS:  Your Honor, I am -- I am referring

12   directly to a 302 that was written by Agent Hamel.

13          MS. CLINGAN:  This is completely improper for her to

14   be reading testimony -- what she alleges is testimony from a

15   302.

16          THE COURT:  Is this a 302 with this witness?

17          MS. BROOKS:  No.  This is a 302 from Scott Drake.

18          THE COURT:  Then forget about it.

19   BY MS. BROOKS:

20   Q.  Let me ask you this:  Do you know whether or not

21   Spectranetics successfully recruited from DaVita Paul Gardon,

22   who became the general counsel at Spectranetics?

23   A.  I don't know of that.  No.

24   Q.  Do you know whether or not Spectranetics successfully

25   recruited Robert McCormack, who became the deputy general

Dennis Kogod - Cross

1    counsel --

2             *MS. CLINGAN:*  I'm going to renew my objection.

3             *THE COURT:*  Overruled.

4             *THE WITNESS:*  I don't know.  I wasn't aware.

5             *MS. BROOKS:*  May I proceed, Your Honor?

6             *THE COURT:*  Yes, absolutely.

7             *MS. BROOKS:*  Thank you.

8    *BY MS. BROOKS:*

9    *Q.*  Mr. Kogod, let's go back for one moment.  I forgot one

10   document relating to Mr. Quinones, and then we'll go on to our

11   next topic.

12            I'm going to put on your screen Government

13   Exhibit 151.  And I believe this is a series -- you can tell

14   me, sir, is this a series of texts between you and

15   Mr. Quinones?

16            *THE COURT:*  151 is admitted.

17            (Exhibit 151 admitted.)

18            *MS. BROOKS:*  Oh, it is admitted?  Thank you.

19            *THE COURT:*  No, just now.

20            *MS. BROOKS:*  Thank you very much, Your Honor.

21   *BY MS. BROOKS:*

22   *Q.*  So now --

23            *THE COURT:*  It's stipulated so it's admitted.

24            *MS. BROOKS:*  Thank you, Your Honor.

25            *MS. CLINGAN:*  I'm sorry.  If we could check our notes

Dennis Kogod - Cross

1    and make sure --

2              THE WITNESS:  Ma'am, I don't recognize this phone

3    number or anything that identified -- do you?  I don't

4    recall --

5    BY MS. BROOKS:

6    Q.  I'm sorry.  I misspoke, sir.  This is actually the text --

7    you were shown some texts between you and Mr. Quinones.  Do you

8    recall that?

9    A.  I was -- no.  I looked at a text between me and Mr. Golomb.

10   Q.  Ah, okay.  So this is a text between Mr. Golomb and

11   Mr. Quinones.  Are you with me?

12   A.  Okay.  I don't know who is who.  Do you want to tell me,

13   and I'll read it?

14   Q.  I think we'll be able to tell once we look at the texts

15   themselves.

16             MS. CLINGAN:  Your Honor, I'm going to object.

17             THE COURT:  You stipulated to its admission.

18             MS. CLINGAN:  Sure.  But this witness has never seen

19   this document before.  It's not his text message.

20             THE COURT:  It's in evidence.  I don't know what she's

21   going to ask him.  If he hasn't seen it, he'll tell her.  I

22   think he already told her.

23   BY MS. BROOKS:

24   Q.  So let's go, sir -- since you looked at some emails with

25   Mr. Golomb, let's go to -- I'm not sure which one to identify

1    it by -- the bottom one.   439.

2    A.  Okay.

3         MS. BROOKS:  So -- actually, let's go up all the way,

4    where it says, "Hey, if you have a few minutes this morning."

5    There we go.

6         THE WITNESS:  Okay.

7    BY MS. BROOKS:

8    Q.  It says, "Hey, if you have a few minutes this morning, I

9    wanted to clarify a couple of quick things before I talk to

10   Kent, a couple of data points around what you did already to

11   convey to DaVita that you were looking."

12        So would it be fair to say, based on this, the right

13   side appears to be from Mr. Golomb, if Mr. Quinones is the one

14   that is looking to go?

15   A.  Could you ask that question again, please?

16        MS. BROOKS:  Let me just -- let's scroll down.

17        THE WITNESS:  Can you please one more time identify

18   one more time, the right side of the screen is --

19   BY MS. BROOKS:

20   Q.  Right side is Mr. Golomb.

21   A.  Okay.

22   Q.  Left side is Mr. Quinones.  Are you with me?

23   A.  I am.

24   Q.  Okay.  Great.  Mr. Quinones says to Mr. Golomb about his

25   meeting, "It went well.  I like Ray.  They have a healthy team,

Dennis Kogod - Cross

1  and there are some aspects to the role that are attractive, but

2  don't think it changes my ultimate choice.  Let's talk later

3  today."  Do you see that, sir?

4  *A.*  I do.

5  *Q.*  And then Mr. Golomb responds, "Cool.  Any data from him on

6  the DVA" -- is that DaVita?

7  *A.*  Yes.

8  *Q.*  -- "DVA point of view.  Still haven't seen anything that

9  makes it seem like they are planning to intervene."  Do you see

10  that, sir?

11  *A.*  I do.

12  *Q.*  So at least according to this text from Mr. Golomb, it

13  appears that DaVita isn't going to do any kind of an

14  intervention to try to stop Mr. Quinones from going to Hazel?

15  *A.*  I'm looking at the same data you are.  If that's what I'm

16  supposed to draw from that, okay.

17  *Q.*  Would it be fair to say, Mr. Kogod, that if we really want

18  to know what something means, we should ask the person who

19  wrote it?

20       *THE COURT:*  That's pretty much what the objection was.

21       *MS. BROOKS:*  Understood, Your Honor.  But earlier

22  today Mr. Golomb interpreted -- Mr. Kogod interpreted a lot for

23  us, so I don't know if he can interpret this one or not.  I was

24  just checking.

25       *THE COURT:*  I just sustained her objection.  Let's

197

Dennis Kogod – Cross

1    move on to something he knows about.

2             *MS. BROOKS:*  Let's go if we could to what Mr. Quinones

3    said.  And I'm going to ask if it's consistent with what

4    Quinones said to Mr. Kogod.

5             Mr. Quinones --

6             *MS. CLINGAN:*  Your Honor, I think we've seen enough of

7    this document.

8             *THE COURT:*  I do too.

9             *MS. BROOKS:*  Okay.  We'll move on.

10   *BY MS. BROOKS:*

11   *Q.*  You talked about a Bill Hughson; do you recall that?

12   *A.*  I do.

13   *Q.*  And you were shown Exhibit 279.  Do you remember that, sir?

14   *A.*  Yes, I do.

15   *Q.*  And in that exhibit -- and, unfortunately, I didn't write

16   which page number it is -- there is some language about

17   retaliation -- retribution -- I'm sorry -- and perceived

18   disloyalty --

19             Let's see if we can find it.  We'll scroll up.

20             It might be on a later page.

21             *THE WITNESS:*  There it is.

22   *BY MS. BROOKS:*

23   *Q.*  There it is.  Thank you.  This is from Mr. Hughson to

24   Mr. Thiry, and it says --

25             Let's do the whole paragraph, please.

Dennis Kogod - Cross

1          "In all honesty, it doesn't really seem right to give

2     you a blanket guarantee that I'll never talk to anyone who

3     reaches out to me regarding opportunities unless they speak

4     with you or Dennis first."  Is the Dennis you, sir?

5     *A.*  It probably was.  Yes.

6     *Q.*  And so here Mr. Hughson is saying, that doesn't seem fair

7     to me; right?

8     *A.*  That's what he's saying.

9     *Q.*  Says, "it seems to me that a more refined case-by-case

10    assessment may be needed."  Correct?

11    *A.*  That's what it says.  Correct.

12    *Q.*  Then he says, "As someone who myself believes I suffered

13    retribution because of perceived 'disloyalty,' I understand the

14    risks that I'd be asking people to accept."  Do you see that,

15    sir?

16    *A.*  I do.

17    *Q.*  Now, you weren't trying to imply that Mr. Hughson suffered

18    retribution from Mr. Thiry, were you?

19    *A.*  Can you refresh my memory what I said to -- I'm not sure I

20    said exactly what you just stated.  So can you please --

21    *Q.*  I'm asking you, were you trying to imply to the ladies and

22    gentlemen of the jury when you were shown this just this

23    morning, that Mr. Hughson was referring to Mr. Thiry when he

24    talked about he, Mr. Hughson, having suffered retribution

25    because of perceived disloyalty and the risks that he would be

Dennis Kogod - Cross

1   asking other people to accept?

2   *A.*   I would have to be refreshed on what I said this morning.

3   I apologize.  But what is the question, other than -- did I say

4   that this morning?

5   *Q.*   I'm asking you, sir -- you do recall seeing this document;

6   is that right?

7   *A.*   I do.  Yes.

8   *Q.*   And specifically being shown this paragraph; correct?

9   *A.*   Yes.

10  *Q.*   And when you discussed this paragraph --

11  *A.*   Yes.

12  *Q.*   -- were you trying to leave the jurors with the impression

13  that the retribution and disloyalty and risks Mr. Hughson was

14  talking about were coming from Mr. Thiry?

15  *A.*   I think I was suggesting that they could come from anyone

16  in the company once you made it known that you were thinking of

17  leaving.  I don't think I specifically said Mr. Thiry was going

18  to cause retribution.  I think it was more of a culture.  And I

19  don't think I specifically in that case said Mr. Thiry.

20  *Q.*   Because the very next sentence says -- Mr. Hughson says to

21  Mr. Thiry, "I know you would never do that."  Right?

22  *A.*   That's what he said.

23  *Q.*   He says, "But, unfortunately, I don't believe the same is

24  true of others."  Correct?

25  *A.*   That's what Bill said.

Dennis Kogod - Cross

1    *Q.*  And the other he was referring to, Mr. Kogod, was you?

2    *A.*  Okay.

3    *Q.*  Would you agree?

4    *A.*  I don't -- you're asking me to agree to something that Bill

5    wrote.  I can -- I'm happy to comment on that relationship, but

6    I can't -- I can't agree with that statement.  I don't know

7    what Bill was thinking at the time.

8    *Q.*  Well, you know that Mr. Hughson had told Mr. Thiry when

9    both you and Mr. Hughson were working together that you had

10   lied about him?

11   *A.*  I don't remember the circumstances in 2008, but Bill and I

12   did not have a good relationship for the short time that he

13   reported to me.

14   *Q.*  And did you, in fact, lie to Mr. Thiry about something that

15   Mr. Hughson allegedly did, and it caused Mr. Hughson to lose

16   his entire bonus for that year?

17   *A.*  I honestly don't remember the circumstances.  I -- we could

18   sit here for as long as you want, and I don't remember what

19   happened in 2008.

20   *Q.*  Well, this is dated 2013, sir.

21   *A.*  But Bill left DaVita in 2008.  So you're asking me to

22   comment on something that was 14 years ago, and I couldn't tell

23   you sitting here.  I could characterize, Bill and I did not

24   have a good working relationship; but beyond that, I don't even

25   remember what the issue was.

Dennis Kogod - Cross

1    Q.  Just a couple more points, Mr. Kogod, and then we are done.

2    A.  Yes, ma'am.

3    Q.  You mentioned recruiters.

4    A.  Yes.

5    Q.  And I think you showed us a list where recruiters were told

6    that they couldn't recruit from DaVita, if I'm remembering that

7    correctly.  Does that sound right?

8    A.  No.  I think the list we looked at was candidates that they

9    were teeing up for a role.  Is that the list you're referring

10   to.

11   Q.  Okay.  Please refresh my memory, because I'm having trouble

12   remembering what you said this morning.

13   A.  These were the candidate reports initially submitted by the

14   recruiting firm that they thought would meet the qualifications

15   that were specified and running that list by on first pass.

16   Q.  And you're familiar, are you not, sir, with the fact that

17   if a recruiter is hired by, let's say, Kindred -- okay -- and

18   they're also hired by DaVita to go out and find candidates for

19   the companies, isn't it common practice that that recruiter

20   can't go and get candidates from Kindred and send them over to

21   DaVita and vice versa?

22   A.  I honestly don't know what is in a recruiter's agreement

23   and what stipulations they agree to when they do a search.  I'm

24   sorry.

25   Q.  Well, as an executive, do you think it would be

Dennis Kogod - Cross

1   unreasonable to ask your recruiter not to take from one client

2   to give to another?

3   A.  If memory serves me, the three people we looked at today,

4   the instructions not to talk to them were DaVita's

5   instructions, not the recruiter saying that they couldn't

6   contact those people.  So I can't speak to what was in the

7   agreement between Korn Ferry and Spencer Stuart.  Sorry.

8   Q.  So you can't speak to what kind of agreements the

9   recruiters had; correct?

10  A.  No.  I'm happy to look at one, but I can't off the top of

11  my head.

12  Q.  Okay.  I missed one point about Mr. Lee, Jung Lee?

13  A.  Sure.

14  Q.  Isn't it true, sir, that he ended up staying at DaVita and

15  became a senior vice president of HealthCare Partners in

16  Southern California?

17  A.  It is true that I brought him over to HealthCare Partners,

18  as I did with Mr. Seay.  Yes.

19  Q.  And as far as you know, he's still there today?

20  A.  I've lost track of him since they were sold to Optum.  I

21  don't know.

22  Q.  Now, you talked briefly with counsel about a

23  non-prosecution agreement that you have.  Do you remember that?

24  A.  I remember being asked, yes.

25  Q.  And I'm not sure if it's in evidence.  It's B, as in boy,

Dennis Kogod - Cross

1    477.  Is this a letter to you from Brian Young, director of

2    criminal litigation?

3    A.  It is a letter to me, in care of my attorney, yes.

4    Q.  And is this, in fact, your non-prosecution agreement, sir?

5    A.  I believe it is.

6          MS. BROOKS:  Your Honor, we would move B477 into

7    evidence.

8          MS. CLINGAN:  No objection.

9          THE COURT:  It's admitted.

10   BY MS. BROOKS:

11   Q.  And, Mr. Kogod, I take it this is a very valuable letter to

12   you?

13   A.  I think I'm going to get into conversations that I had with

14   my attorney, so I don't know how appropriate it is to talk too

15   much about this.

16   Q.  I --

17   A.  On advice of counsel, he thought it was important.  I'll

18   just leave it at that.

19   Q.  Okay.  And I don't want to get into either what your

20   attorney said to you.

21   A.  Thank you.

22         MS. BROOKS:  With that, if I can just have one moment,

23   Your Honor.

24         I have been told by my colleagues I have no further

25   questions, Your Honor.

Dennis Kogod – Redirect

1        THE COURT:  How about the DaVita representatives?

2        MR. DODDS:  Nothing from us, Your Honor.  Thank you.

3        THE COURT:  Redirect.

4                    **REDIRECT EXAMINATION**

5   BY MS. CLINGAN:

6   Q.  Mr. Kogod, you reviewed some communications with defense

7   counsel from late May, early June about Jung Lee.  Do you

8   remember those?

9   A.  Yes.

10  Q.  And in those communications in late May, early June, there

11  were some discussions about keeping Jung Lee; is that correct?

12  A.  Yes.

13        MS. CLINGAN:  Could we please take a look at

14  Government Exhibit 321.  I think we've got a stipulation on

15  this.

16        THE COURT:  It's admitted.

17        (Exhibit 321 admitted.)

18        MS. CLINGAN:  Let's take a look -- Ms. Cabrera, if we

19  could get the first and the second page of this document on the

20  screen.

21  BY MS. CLINGAN:

22  Q.  Mr. Kogod, I'm going to be focusing on the email from

23  Mike Staffieri on June 11, 2015, at the bottom of the page.

24  A.  Okay.

25  Q.  So roughly in time, that's, by my math, 15 days after the

Dennis Kogod - Redirect

1  communications where DaVita was contemplating potentially

2  keeping Mr. Lee?

3  A.   Yes.

4  Q.   Okay.  Let's take a look at the first couple bullet points

5  on the -- under what Jung needs to work on, top of the second

6  page.

7  A.   Okay.

8  Q.   Can you just summarize what is being raised here?

9  A.   There was a question about the scope and breadth of his

10  leadership skills and alleging that he had an opportunity to

11  step in and step up, as referenced by other people, and that he

12  did not do that.  He ran his division well, but didn't take

13  advantage of that opportunity.  And that he hasn't demonstrated

14  an ability to be a strong team and a peer, I guess, among his

15  colleagues at the divisional vice president level.  Questioning

16  just communication and judgment on hiring the right people.

17  And they're commenting on his emotional intelligence,

18  summarizing it by poor feedback around boarding of new

19  teammates, and, I guess, prior poor professional development

20  reviews.

21  Q.   Mr. Kogod, how closely did you work with Mr. Lee?

22  A.   I worked with Mr. Lee quite a bit when I first joined

23  DaVita.  He was in a compliance role.  And there was a

24  transition between compliance officers, so I got to know Jung

25  quite well.  We both worked in the Los Angeles office over the

Dennis Kogod – Redirect

1    years.  And then I got to know Jung again as he transitioned

2    into operations.  So I'd say a decade plus long of

3    collaborating and getting to know him.

4    Q.  Were these concerns about Mr. Lee ever raised before Lee

5    made it known that he was considering leaving DaVita?

6    A.  I had never heard anyone say anything other than good

7    things about Jung, so I was surprised to see them.

8    Q.  What were Mr. Lee's reviews prior to him being -- letting

9    others know he was contemplating leaving DaVita?

10   A.  I didn't do his reviews, so I'd have a hard time speaking

11   to whoever his boss was at the time.

12   Q.  Do you know if Jung Lee was designated a high-performing

13   individual?

14   A.  I believe Jung had been on the hyper or high-performing,

15   high-potential list.

16   Q.  Is that the best designation that DaVita can give an

17   employee?

18   A.  That is about the top rating that you could get within

19   DaVita.  Yes.

20   Q.  Let's look at a couple of bullet points just below this

21   one.  Can you summarize these concerns?

22   A.  Mr. Staffieri is calling out the investigation again.  I

23   don't remember the results of it, but he's calling it out

24   again.  And then he's indicating that Jung, out of a peer group

25   of Chris Mayne and Kenny Gardner, is the only one that never

Dennis Kogod - Redirect

1   expressed interest in a group vice president role within one of

2   the operating groups.  And I think he's saying that despite a

3   professional development review by Mr. Maughan in 2015 -- well,

4   that -- that Jung was doing well.  Things were going well

5   during that PDR -- based on that PDR.

6   Q.  Were the concerns that are raised in the first bullet of

7   this paragraph ever circulated among the executives of DaVita

8   or shared broadly until Mr. Lee made it known that he was

9   contemplating leaving?

10  A.  To the best of my knowledge, they were not shared broadly

11  until afterwards, the initial investigation.

12  Q.  All right.  Let's talk about Julio Quinones.  Mr. Kogod, I

13  think you testified you don't know whether or not Mr. Quinones

14  ultimately went to Hazel?

15  A.  I do not.

16  Q.  But are you aware of whether or not Mr. Thiry tried to get

17  his offer from Hazel pulled?

18  A.  I am aware of that.  Yes.

19  Q.  And how are you aware of that?

20  A.  Through the communication with Josh Golomb and Julio, one

21  of them specifically said that Mr. Thiry was trying to get the

22  offer withdrawn.

23  Q.  I want to talk just briefly about good business.

24  Mr. Kogod, defense counsel asked you if it would be good

25  business to offer DaVita employees other opportunities within

1    DaVita.  Do you remember that?

2    *A.*  I do.

3    *Q.*  And I think you said, if things had worked that way, it

4    would have been good business.

5    *A.*  Yes.

6    *Q.*  Is that the way the no-poach agreements worked in practice?

7    *A.*  No, I don't believe they do.  I think that they drive

8    people to make other choices because they don't want to have

9    that uncomfortable conversation.  And I think, again, there are

10   exceptions to that, where it worked to the employee's benefit,

11   at least at that time.  But overall, I think it is -- it is a

12   very large hoop to ask somebody to step into.

13   *Q.*  Now, as you just testified, certainly, there are

14   exceptions.  And I think on cross-examination you walked

15   through a handful of exceptions.  Can you just remind us how

16   many employees worked at DaVita?

17   *A.*  At that time, somewhere in excess of 30,000; but I'm

18   probably understating it by 10,000, 15,000.

19   *Q.*  So in practice, do the no-poach agreements result in more

20   opportunities or less opportunities for DaVita employees?

21   *A.*  They were less opportunities for the employees.

22             *MS. CLINGAN:*  Nothing further, Your Honor.

23             *THE COURT:*  All right.  Thank you.

24             Ladies and gentlemen of the jury, do you have any

25   questions?  Yes.

1          (Hearing commenced at the bench.)

2          THE COURT:  The procedure is, I put a number on it, I

3     show it to you, and you tell me if you object.

4          Question 1.

5          MS. CLINGAN:  No objection.

6          MS. BROOKS:  I can't read.  I've --

7          I'm sorry.  Yeah, that's great.

8          (Hearing continued in open court.)

9          THE COURT:  All right.  Mr. Kogod, the question from

10    the jurors:  What does the Lambeau List Serve -- what does the

11    Lambeau List Serve refer to?  What is Lambeau?

12         THE WITNESS:  I believe it's Lambeau Field.  Mr. Thiry

13    is quite a Packers fan, so it was not uncommon to name email,

14    voicemail, small working groups under different names just to

15    keep them -- so Lambeau was a group of senior executives,

16    direct reports to Mr. Thiry.  There may have been some *ad hoc*

17    members.  But Lambeau Field was just an arbitrary name and

18    reference to, I guess, where the Packers play.

19         THE COURT:  It could be, for example, the traitorous

20    Aaron Rogers --

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Okay.  Who was on the list?

23         THE WITNESS:  I can't -- it was fluid.  People could

24    be moved off and on the list.  Myself; Javier Rodriguez; when

25    Joe Mello was at the company; Lauren Mildenberger, the chief

 1   people services officer; the chief legal counsel at the time; I

 2   believe for a while, Mark Gildea, one of the senior vice

 3   presidents; Philipp Stephanus, who was revenue.  But I -- I'm

 4   sure I'm leaving off one or two names.

 5            THE COURT:  That's okay.

 6            THE WITNESS:  And the finance officer.

 7            THE COURT:  A dozen people, plus or minus.

 8            THE WITNESS:  Yes, sir.

 9            THE COURT:  All right.  Any other questions from the

10   jury?

11            Follow up questions from government counsel?

12            MS. CLINGAN:  No.  May the witness be excused?

13            THE COURT:  Ms. Brooks, any follow-up?

14            MS. BROOKS:  No.  Thank you very much, Your Honor.

15            THE COURT:  Sir, you are excused and free to go.

16            THE WITNESS:  Thank you all very much.

17            THE COURT:  Or welcome to stay and watch if you want

18   to.  No one ever takes me up on that.

19            Would anyone like a break before we go to the next

20   witness?

21            JURY:  Yes.

22            THE COURT:  How long would you like?

23            Fifteen.  Let's do it.

24            (Recess at 2:24 p.m.)

25            (In open court at 2:42 p.m.)

1          *THE COURT:*  Next witness.

2          *MS. LEWIS:*  Your Honor, the United States of America

3     calls Dr. Bridget Fanning.

4               (**BRIDGET FANNING, GOVERNMENT'S WITNESS, SWORN**)

5          *THE COURT:*  All right.  Have a seat.

6                          **DIRECT EXAMINATION**

7     *BY MS. LEWIS:*

8     *Q.*  Good afternoon, Dr. Fanning.  Could you please state and

9     spell your name for the record, please.

10    *A.*  Bridget Fanning.  Bridget, B-R-I-D-G-E-T; Fanning,

11    F-A-N-N-I-N-G.

12    *Q.*  Do you go by a nickname?

13    *A.*  Bridie.  Yes, I'm known as Bridie.

14    *Q.*  Dr. Fanning, could you please tell the jury a little bit

15    about your background -- your professional background.

16    *A.*  I've been in human resources for over 30 years, worked for

17    lots of major international companies, and lived and worked in

18    multiple countries.

19    *Q.*  And what type of educational background do you have?

20    *A.*  I have a doctorate and three master's degrees.

21    *Q.*  And could you provide in a little bit more detail what

22    those are in.

23    *A.*  Sure.  Human resource management, management studies,

24    corporate education, talent management.

25    *Q.*  And what is your doctorate degree in?

Bridget Fanning - Direct

1   A.   Corporate education.

2   Q.   Did it take a while to get?

3   A.   Yeah.  Yes.

4   Q.   Worked hard for that one, didn't you?

5   A.   Sure did.

6   Q.   And could you tell the jurors a little bit about your

7   business structure, the way that you structure your business in

8   the past and now.

9   A.   Sure.  So I had an LLC.  I was self-employed, and I worked

10  for multiple clients, and I sent invoices every month to a

11  variety of clients for my time.

12  Q.   And what was the name of your LLC?

13  A.   Bridget Fanning, LLC.

14  Q.   And has the government told you that you will not be

15  prosecuted in this case?

16  A.   Yes.

17  Q.   And are you familiar with a company called Surgical Care

18  Affiliates?

19  A.   Yes.

20  Q.   How are you familiar with that company?

21  A.   I worked on assignment with Surgical Care Affiliates from

22  July -- sorry -- September 2014 to July 2016.

23  Q.   And were you employed directly or through your LLC?

24  A.   Through my LLC.

25  Q.   And was that work part time or full time?

Bridget Fanning – Direct

1   *A.*  Part time.

2   *Q.*  And despite being part time, what was your role -- what was

3   your title at Surgical Care Affiliates?

4   *A.*  I was the chief talent officer.

5   *Q.*  Can you just describe a little bit about what a chief

6   talent officer is.

7   *A.*  Sure.  So I was responsible for all the operations of the

8   human resources function, all the recruitment, hiring,

9   onboarding, compensation, benefits, and employees.

10  *Q.*  And as the chief talent officer, did you have hiring and

11  firing authority?

12  *A.*  No.

13  *Q.*  What type of activity within the recruiting space fell

14  within your authority?

15  *A.*  Mainly executive recruitment, so mainly VP and above.  I

16  did get involved in director-level recruitment, but not so

17  much.  And I was also responsible for some of the processes and

18  things of the more junior roles.

19  *Q.*  And how did you come to work for SCA?

20  *A.*  I was recruited by a headhunter, approached me, saying they

21  had a role.  And I was interested, but I had other clients and

22  other businesses and agreed with Andrew that I could work part

23  time.

24  *Q.*  And when you're referring to Andrew, who are you referring

25  to?

214

Bridget Fanning - Direct

1   *A.*   The CEO of Surgical Care Affiliates, Andrew Hayek.

2   *Q.*   And who hired you into SCA?

3   *A.*   Andrew.

4   *Q.*   And tell us a little bit about what SCA's recruiting

5   function looked like at the time that you joined?

6   *A.*   SCA was growing rapidly; and they were struggling to

7   recruit VP candidates, in particular, those responsible for

8   business development.   They had recruited maybe one or two in

9   the prior twelve months, and they had multiple vacancies.   And

10   they were struggling to be able to do that hiring.

11   *Q.*   And what were you brought on to do?

12   *A.*   Really, talent management, to help Andrew create a Goldman

13   McKinsey of Surgical Care Affiliates.

14   *Q.*   And -- can you just describe, when you sort of refer to

15   Goldman McKinsey, what does that mean to a layperson?

16   *A.*   McKinsey is premier global consultancy.   It's where lots of

17   consultants want to go and work.   It's like a top employer.

18   Goldman Sachs is considered like a prestige brand within

19   financial services.   And they're talent machines, in terms of

20   recruiting people, training them up.   Lots of CEOs come from

21   those two companies.

22   *Q.*   And you testified that Andrew Hayek wanted to create that

23   type of talent culture; did I hear that correctly?

24   *A.*   Yes.   That's right.

25   *Q.*   And in terms of the number of positions at the time that

Bridget Fanning - Direct

1    you joined SCA, was SCA looking to increase the number of

2    positions it was recruiting for?

3    *A.*  Yes.  They had, I don't know, half a dozen or more VP

4    vacancies.  Most had been open for over a year.

5    *Q.*  And you mentioned earlier that you were primarily focused

6    on recruiting for some of the VP and above positions.  Can you

7    give a little more explanation of what that means.

8    *A.*  It means engaging the executive recruiters to do the

9    searches, working with them on assignments, specifications,

10   target companies where you can find candidates, interviewing

11   those candidates, working with the recruitment firms, all the

12   way through to doing the offering letters.

13   *Q.*  And in terms of the roles themselves, when you refer to VP

14   and above, what types of roles are there above a VP at a

15   company like SCA?

16   *A.*  Well, I helped Andrew recruit the chief financial officer.

17   But the VP roles in the main -- I mean, there were all sorts,

18   from finance and a number other functions.  But the main

19   vacancies were in business development.  These were the

20   revenue-generating and sales roles for SCA.

21   *Q.*  And so fair to say, there were more than one role for these

22   types of positions?

23   *A.*  Yes.  I mean, at any given time there must have been six,

24   eight of them.

25   *Q.*  I believe you used the word "talent" previously.  Could you

Bridget Fanning – Direct

1   just describe what that word means to you.

2   *A.*   Yes.   It means people that are highly skilled in high

3   demand in the marketplace.   There is a lot of competition for

4   these people, and they are likely to have multiple options and

5   possibly even multiple offers.

6   *Q.*   And how valuable are senior-level employees to a company?

7   *A.*   Very valuable.

8   *Q.*   Could you explain why they're valuable to a company?

9   *A.*   Well, particularly in the business development type roles,

10  they're very hard to hire for.   As I said, SCA had many of them

11  open for more than a year.   They're hard to find, and then

12  finding somebody who has the right skill set with the right

13  culture, fit, that's going to be successful in your environment

14  is difficult.   And they build relationships from a sales

15  perspective; and when they leave, they bring all of their

16  institutional knowledge and sales relationships with them.   And

17  then you have a challenge backfilling them.   And very often

18  those executives that backfill may not be successful.

19  *Q.*   And so in your experience, what does it mean for a company

20  to lose a senior-level employee?

21  *A.*   It is a real challenge.   That business is going to take a

22  hit.   They will have business disruption.   And depending on how

23  talent rich the organization is will depend on how big that gap

24  is.   But they bring relationships and things with them.

25  *Q.*   And so roughly how much recruiting work have you done over

Bridget Fanning – Direct

1  the course of your career?

2  A.  Oh, my goodness.  I've hired thousands of people over the

3  years.

4  Q.  And you described a moment ago kind of the steps in a

5  recruitment process.  What are those first steps in that

6  recruitment process for this level of position?

7  A.  The first step is to identify the recruitment firm.  And

8  then with that firm, they'll put a proposal together.  If you

9  engage that firm, usually as part of that proposal, there will

10  be a list of target companies where they can find candidates.

11  They'll have their off-limits in the proposal and so on.  And

12  then you go through -- you go through -- they'll prepare a

13  short list; they'll interview candidates that they identify

14  through networking and through that target list; and they

15  provide you a short list of three to five candidates for the

16  role, if you're fortunate to get that.

17  Q.  And where in that process does the act of soliciting a

18  candidate fall?

19  A.  Very early on, at the beginning.  Once you agreed on the

20  research list, the target company list, and possible candidates

21  or referrals, people that could network and refer you to other

22  candidates -- once you agree, that is early in the process.

23  Q.  And could you just explain a little bit about what

24  soliciting means in this context of recruiting?

25  A.  Yeah.  It means an executive recruiter reaching out to

Bridget Fanning – Direct

1   somebody and saying, I have a great opportunity for you that

2   I'd like you to consider, I'd like to talk to you about it or

3   other people that you could recommend for this opportunity.

4   And, basically, they're trying to sell them on the opportunity.

5   Most of these people are not actively looking for a job -- in

6   fact, they might not want to be seen to be looking for a job --

7   so it's the recruiter's responsibility to sell them on the

8   opportunity and get their interest.

9   Q.  And how important or not is solicitation for recruiting

10  these senior-level positions?

11  A.  Most executives will join through some form of referral

12  from somebody they know or through an executive recruiter.  So

13  if they ever want to move, it's very important.

14  Q.  Is that a meaningful opportunity, a meaningful way that

15  companies will get people?

16  A.  For sure.  I mean, I can't put a percentage on it; but 80,

17  90 percent, something like that, will be filled in this way.

18  Q.  And roughly how many people does a recruiter reach out to

19  or solicit for any particular open role?

20  A.  Oh, my goodness.  It really depends on the role.  If I pick

21  an example like those BD roles, you could be talking to 20, 30,

22  50 people to put a short list of five together.  You're easily

23  talking to maybe a couple of hundred.

24  Q.  And so safe to say that it's -- a lot more people are

25  getting solicited than just the one person for that job

Bridget Fanning - Direct

1   opening?

2   *A.*  Of course, yes.  A lot more.  I wish it were as easy as

3   that.

4   *Q.*  And are solicitations valuable to candidates, even if they

5   don't end up in a job offer?

6   *A.*  Yes.

7   *Q.*  And how do you know that?

8   *A.*  I've been in a position as a candidate myself.  I spend a

9   lot of time talking to candidates, and I've been on the

10  receiving end of when this happens with candidates as an HR

11  leader.  But, yes, it's very valuable.

12  *Q.*  Can you explain the ways in which it is valuable.

13  *A.*  Well, firstly, you want to know you're in demand on the

14  marketplace.  You may also find out what your compensation

15  value is in the marketplace.  And depending on your

16  relationship with your employer, if you intend to stay, you

17  might go and say, Hey, I'm in demand; I'm not interested; I'm

18  really loyal to you; I'm not going anywhere; but I learned the

19  market for this kind of job is X; and it's time you gave me a

20  pay rise, et cetera.  I mean, I've seen those kind of things

21  leveraged a lot.

22  *Q.*  And in that circumstance, does the employee have the choice

23  of whether they want to raise that with their current employer?

24  *A.*  Yes.

25  *Q.*  And so turning to SCA's use of search firms that you spoke

Bridget Fanning – Direct

1    about a moment ago, did SCA use search firms for those senior

2    positions?

3    *A.* Yes.  We used a number of search firms.

4    *Q.* Okay.  Could you just list the ones that you can remember

5    that SCA used?

6    *A.* Well, when I first joined, we were using CT Partners and

7    Caldwell.  And when I started taking responsibility of

8    recruiting and we really weren't being successful with CT

9    Partners and Caldwell, I also engaged Spencer Stuart, Russell

10   Reynolds, Heidrick & Struggles, Cielo Executive Search.

11   *Q.* And who at SCA was the primary point of contact for

12   interfacing with those firms?

13   *A.* I was.

14   *Q.* And what guidance did you give those firms, just at a high

15   level, on where to look for candidates?

16   *A.* Well, very often they would have their own target list of

17   firms that they would recommend they could find candidates.

18   But at SCA, we put together a very comprehensive list of

19   healthcare companies that they could recruit from, and I gave

20   all of those recruiters that list.

21   *Q.* And describe for us just in general, what level of talent

22   did SCA have?

23   *A.* SCA had very high-caliber people.  Andrew was trying to

24   make them the McKinsey Goldman of healthcare, and I would say

25   he succeeded in many ways.  They went to good schools, they

Bridget Fanning - Direct

1   were hard working, very career oriented, long hours, great

2   relationship skills.  Really, it was a very impressive group of

3   people, VP and above.

4   Q.  And how did that level of talent compare to other companies

5   in the industry?

6   A.  There really wasn't many companies like it at all.  It was

7   really quite unique.

8   Q.  And what are the companies that come to your mind that had

9   the same level of talent at SCA?

10  A.  Well, you really had to look at related industry.  There

11  was none in the direct industry.  So if you looked at maybe

12  health insurers, maybe a couple of the health insurers.

13  Certainly, the consulting firms.  We targeted a lot of the

14  consulting firms to recruit talent.  I mean, it was a limited

15  pool.

16  Q.  And were -- were you familiar with a company called DaVita?

17  A.  Yes.

18  Q.  And if you were starting on a blank slate, where would

19  DaVita have fallen in that realm of companies with comparable

20  talent?

21  A.  It would have been a priority company.

22  Q.  And, again, if you were starting on a blank slate, would

23  you have looked at DaVita to recruit?

24  A.  Yes.  Absolutely.

25  Q.  Would it have been in your top ten companies?

Bridget Fanning - Direct

1   A.  Yes.

2   Q.  Maybe even the top three?

3   A.  Yes.

4   Q.  And why was DaVita such a perfect place to look for talent?

5   A.  Because Andrew Hayek and Michael Rucker, the number one and

6   number two executives at DaVita -- sorry -- SCA joined from

7   DaVita.  And DaVita also had a very high-caliber, high-energy

8   group of talent.  And an example, Andrew/Michael.  And

9   Andrew/Michael brought those talent practices and culture

10  practices with them from DaVita to SCA and set up very -- a

11  very similar mindset from the leadership perspective.

12  Q.  How does that similarity factor into whether a candidate

13  will be a good fit?

14  A.  A lot of executives, especially in these BD roles, are not

15  successful.  The failure rate is very much there.  And you're

16  trying to avoid risk.  Recruiting is all about maximizing the

17  odds of someone being successful.  So the more you can recruit

18  somebody from a similar culture or a similar environment and

19  pull them in, where the standards are similar, the targets are

20  similar, the demands are similar, you're maximizing your odds

21  all the time that this person is going to be successful.  And

22  even more so, if you know that person through a referral.

23  That's why referrals are so important.

24  Q.  Did you, in fact, go after DaVita candidates for SCA?

25  A.  No.

Bridget Fanning – Direct

1   *Q.*  Why not?

2   *A.*  Because Andrew Hayek had an agreement with Kent Thiry not

3   to recruit executives.

4   *Q.*  How did you learn about that agreement?

5   *A.*  Not long after I started with SCA, Andrew and I were having

6   a meeting and a conversation about recruiting.  And I brought

7   up CT Partners and DaVita, because it was off limits to CT

8   Partners.  And Andrew explained to me that he had an agreement

9   with Kent Thiry, so we couldn't recruit from DaVita anyway.

10  *Q.*  And what kind of terms have you heard used to describe that

11  agreement?

12  *A.*  No-poach agreement is probably the most common term.

13  *Q.*  Did you express anything to Mr. Hayek about that agreement?

14  *A.*  I did.

15  *Q.*  What did you tell him?

16  *A.*  I told him I didn't like those agreements.  They're

17  actually not uncommon.  But I told him I didn't like those

18  agreements because, one, they make my job much harder; and

19  secondly, they limited the opportunities of people.

20  *Q.*  What effect did they also have on mobility of employees

21  between those companies?

22  *A.*  It meant that you wouldn't see executives moving from SCA

23  to DaVita or from DaVita to SCA.

24  *Q.*  And who else at SCA knew about the agreement between Kent

25  Thiry and Andrew Hayek?

Bridget Fanning – Direct

1    *A.* Well, most of Andrew's direct reports.  We discussed it,

2    and I remember clearly discussing it at a meeting with them.  I

3    mean, that was probably the main audience.  Each of the

4    regional managers who worked for Michael Rucker would have been

5    aware of that.

6    *Q.* And did those people need to know about the existence of

7    that agreement?

8    *A.* Yes.

9    *Q.* And did all people who were covered by the agreement know

10   about the agreement?

11   *A.* No.

12          *MS. LEWIS:*  Ms. Baskin, if we could pull up Government

13   Exhibit 67-3, please.

14          Your Honor, this should be a stipulated exhibit.

15          *THE WITNESS:*  Sorry.  My eyesight isn't the best.

16          *THE COURT:*  67-3?

17          *MS. LEWIS:*  Yes, Your Honor.

18          *THE COURT:*  It's admitted.

19          (Exhibit 67-3 admitted.)

20          *MS. LEWIS:*  Thank you.

21          With the Court's indulgence, could we provide a hard

22   copy binder for the witness just for ease of visibility?

23          *THE COURT:*  If she wants, sure.

24          *THE WITNESS:*  I can see this okay.

25          *MS. LEWIS:*  Okay.  Great.

Bridget Fanning – Direct

1   *BY MS. LEWIS:*

2   *Q.*   I'm showing you an email that is from Andrew Hayek, dated

3   October 16 of 2015.   First of all, just to confirm, is this

4   the email address that you used to correspond while you were

5   employed at SCA?

6   *A.*   Yes.

7   *Q.*   Okay.   And do you recognize this document?

8   *A.*   Yes, I do.

9   *Q.*   And could you just give a little bit of explanation as to

10  the context of what is happening in this document.

11  *A.*   Yes.   I had worked with recruiters, my executive assistant

12  to put a comprehensive list together -- as comprehensive as

13  possible -- of all the healthcare companies where we could

14  possibly find talent from.   And I had sent that list to Andrew

15  for him to review and edit.

16  *Q.*   And directing you to bullet two of the email, could you

17  please read Mr. Hayek's statement out loud.

18  *A.*   "Putting two companies in italics, USPI and DaVita, we can

19  recruit junior people, below director.   But our agreement is

20  that we would only speak with senior executives if they have

21  told their boss already that they may want to leave and are

22  looking."

23  *Q.*   And I think you may have added a "may" in there.   "They

24  want to leave and are looking."

25  *A.*   Yes.   Sorry.   "That they want to leave and are looking."

Bridget Fanning – Direct

1   Q.  And with regard to DaVita, did you have an understanding as

2   to who Mr. Hayek was referring to when he said "our agreement"?

3   A.  Yes.

4   Q.  And who was that?

5   A.  Kent Thiry, the CEO of DaVita.

6   Q.  And with regard to this requirement that people had to

7   notify their bosses, roughly when did you learn about that

8   aspect of the agreement?

9   A.  Well, I really learned it from this email here.  This was

10  the first time it registered with me.  I had seen it before

11  with Michael Rucker, I think when we tried to hire somebody --

12  sorry -- recruit somebody as a candidate.  But this was the

13  first time I saw it officially and thought, oh, right, okay.

14  That's part of the agreement.  Because up to that point I

15  thought it was a standard no-poach agreement.

16  Q.  And what is your understanding of what that requirement is

17  really asking the employee to do?

18  A.  Well, if they've told their boss already that they want to

19  leave, then they would have had to have resigned.

20  Q.  So in your opinion, is that the equivalent of a

21  resignation?

22  A.  Pretty much so, yes.  I mean, there is not many companies

23  where you'd go to them and say, Hey, I'm looking for another

24  job.  Let me hang around for six months or so while I find

25  something.  Normally for an executive, you want them to be

Bridget Fanning – Direct

1   loyal.  You need to know that they are thinking of you 24 by 7

2   and working for you.  You don't want them off looking for other

3   jobs or doing other things.

4   *Q.*  And what has been your experience with candidates wanting

5   to tell their boss that they're looking to leave without having

6   another job lined up?

7   *A.*  I mean, generally people don't.  They might play a game to

8   get more money.  Hey, I've had some calls.  I'm interested, but

9   I'm loyal.  I really want to stay, but I could get more comp

10  somewhere else.  I've seen that kind of game.  But generally

11  people aren't going to go to their boss and say they're leaving

12  and they're looking for something else.

13  *Q.*  And so when you refer to this sort of game that people

14  play, does that only work if you have a solicitation?

15  *A.*  I'm sure some people make it up.  I mean, I've been on the

16  receiving end so many times as an HR leader.  But really

17  knowing what your value is worth -- yeah, you'd really need the

18  solicitations.

19  *Q.*  And so let me ask you, what is the difference, then,

20  between somebody having the freedom to go to their boss with a

21  solicitation versus what this agreement was intended to do with

22  the forced notification?

23  *A.*  Well, this, the stakes are really high.  Right?  You don't

24  know how your employer is going to respond.  I mean, they could

25  respond, No, no, don't go.  Let us pay you more money.  But if

Bridget Fanning - Direct

1    you're going up to them and saying, I am leaving, the odds are,

2    your employer is going to say, Okay.  How quickly can you go?

3    *Q.*  And this provision, did it take the choice away from the

4    employee?

5    *A.*  Yes, I believe so.

6    *Q.*  And just focusing in on the timing of that provision, when

7    does that provision kick in, the forced notification of the

8    boss?

9    *A.*  Well, I just know that we -- we were not able to talk to

10   anybody, even consider them, interview them, or talk to them

11   about an opportunity without them having to have gone and

12   informed their boss and got permission, if you'd like, that

13   they were going to be considered.

14   *Q.*  And so was that at the beginning of the recruiting process

15   or the end of the recruiting process?

16   *A.*  Right at the beginning.

17   *Q.*  Does a candidate have an offer in hand at the point this

18   provision kicked in?

19   *A.*  No.

20   *Q.*  And focusing on the no-poach agreements between DaVita and

21   SCA, what effect did that have for candidates that didn't want

22   to tell their bosses?

23   *A.*  It meant that they couldn't be considered for opportunities

24   at SCA.

25   *Q.*  And what is your understanding of the effect that that had

Bridget Fanning – Direct

1    on people trying to move between DaVita and SCA?

2    *A.*  I don't think there was a lot of movement of executives

3    from SCA to DaVita, and vice versa, in the time period I was

4    working there.

5    *Q.*  And why not?

6    *A.*  Because of the no-poach agreement between the CEO of DaVita

7    and SCA.

8    *Q.*  Would you have expected movement in the absence of that

9    no-poach agreement?

10   *A.*  Yes, I would.

11   *Q.*  And why do you say that?

12   *A.*  A lot of the culture practices and talent practices from

13   DaVita were at SCA.  Andrew/Michael brought them with them.  So

14   culturally, the demands, the targets, the expectations were

15   very similar.  And both Andrew Hayek and Michael Rucker both

16   came from DaVita to SCA and were wildly successful at SCA.

17   *Q.*  And at DaVita, roughly how many positions, if you know,

18   were there for directors and VPs and above?

19   *A.*  I don't know, but it had to be -- I mean it had to be 100,

20   200, 300.  I mean, I have no idea; but it was a lot.  DaVita

21   was a huge company and is a huge company.  SCA is quite small,

22   by comparison.

23   *Q.*  And were all of those people off limits for recruiting for

24   SCA?

25   *A.*  Yes.

Bridget Fanning - Direct

1    Q.  And did you have any conversations with Andrew Hayek about

2    the purpose of the no-poach agreement?

3    A.  Yes.

4    Q.  And when did you discuss that agreement with him?

5    A.  Oh, we had multiple conversations over the time I was

6    there.  There was one we had in a leadership team meeting.

7    There was several I had with him just the two of us in

8    meetings.

9    Q.  And how did the agreement come up in this leadership team

10   meeting?

11   A.  We were discussing the target company list that I had put

12   together, and I had needed more help to do it.  I mean, I

13   needed all of Andrew's direct reports and executives to weigh

14   in and help us identify all of these companies.  And we were

15   reviewing that list.

16   Q.  And did anybody make any comments with regard to DaVita?

17   A.  Somebody questioned why DaVita was on the list, and we

18   discussed it.

19   Q.  And what was discussed?

20   A.  It was discussed why DaVita was on the list.  Andrew

21   explained that this was really important to Kent, and he wanted

22   to be a friend -- this was that important to Kent that you were

23   either friend or foe.  And he didn't want to be a foe with

24   Kent.  It was much more important to be a friend.  And it just

25   wasn't worth upsetting Kent over.  It was too important.

Bridget Fanning - Direct

1   *Q.* And you mentioned a moment ago I think that DaVita was on

2   the list.  Was this a question of whether DaVita should be on

3   the list?  If you just wanted to clarify.

4   *A.* Yeah.  I mean, we were going through the whole list,

5   questioning what was on, adding companies.  And someone was

6   basically saying, Look, DaVita is a great company to recruit

7   from.  Do we really need to have DaVita as -- marked as off

8   limits?  Which it was on the document that I had circulated.

9   *Q.* And the comment that you just described, the friend or foe

10  comment that was in response to why DaVita was taken off the

11  list?

12  *A.* Yes.  Sorry.  Can you clarify?

13  *Q.* Sure.  What was the comment, Kent Thiry is either your

14  friend or your foe, in response to?

15  *A.* Oh, Andrew was explaining why DaVita was on the list and

16  why it was important to leave it on the list.

17  *Q.* And, again, when you say "on the list," meaning --

18  *A.* Off limits.

19  *Q.* -- on the off-limits list?

20  *A.* Yeah.  It was off limits.

21  *Q.* Okay.  And did he express any other reasons for this

22  agreement?

23  *A.* No.

24  *Q.* Okay.  And I'd like to refer you back on the screen to

25  Government Exhibit 673, which we were just reviewing a few

Bridget Fanning – Direct

1    moments ago.

2          Ms. Baskin, if you could pull that up.  Thank you.

3          Did the email, 67-3, did that have an attachment to

4    it?

5    A.  Yes.  It had Andrew's edits to the attachment.

6          MS. LEWIS:  Okay.  Showing you what has been marked as

7    Government Exhibit 70-1 --

8          Your Honor, I believe that is stipulated.  We would

9    move to admit.

10          THE COURT:  Admitted.

11          (Exhibit 70-1 admitted.)

12   BY MS. LEWIS:

13   Q.  And is this attachment, 70-1, is that the attachment to the

14   previous email?

15   A.  Yes.

16   Q.  And are you familiar with this document?

17   A.  Yes.

18   Q.  Could you just describe what it is?

19   A.  It's various sectors within the healthcare industry and a

20   list of companies that we could possibly ever remotely recruit

21   from for talent.

22   Q.  Is it safe to say this was much broader than sort of the

23   realistic number of companies that you could recruit from?

24   A.  Yes.  It was a very comprehensive list.

25   Q.  And as you testified earlier, in your opinion, if the

Bridget Fanning – Direct

1   agreement had not existed, where did DaVita fall in that list

2   of many, many companies?

3   A.  With regards to --

4   Q.  A place to look for talent?

5   A.  I mean, it would have been a very, very important source of

6   talent.

7   Q.  And looking back at the first bullet on 67-3, the

8   email -- do you see the first bullet where Mr. Hayek writes,

9   "Putting a line through and making the text red for current

10  partners/customers that we should not recruit from"?  Now, were

11  there companies that SCA independently decided not to recruit

12  from?

13  A.  Yes.  There were current partners and customers where --

14  some of them may have been contractual.  I don't know.  But,

15  generally, we did a lot of work with hospital systems.  It's

16  not good to go and recruit executives within that hospital

17  system if they're a direct client or you have formed some kind

18  of partnership with them.  So those companies had a line

19  through.

20  Q.  And is it your understanding that SCA made those decisions

21  on its own?

22  A.  Yes.

23  Q.  Okay.  And in this email, did Mr. Hayek indicate that

24  DaVita was off limits because they were a current business

25  partner or because of an agreement?

Bridget Fanning - Direct

1   *A.*   No.  It was because of the agreement.  It was our

2   agreement.

3   *Q.*   And how is he indicating that on the chart?

4   *A.*   He's put DaVita in italics.

5   *Q.*   And directing you to page 4 of the chart.

6   *A.*   Yes.

7   *Q.*   Do you see DaVita listed there?

8   *A.*   Yes.  It's in italics.  In red and italics.

9   *Q.*   What did that notation mean?

10  *A.*   It meant that there was an agreement that we would only

11  speak with senior executives if they have told their boss

12  already that they want to leave and are looking.

13  *Q.*   And that meant that you could not solicit them; is that

14  correct?

15  *A.*   Correct.

16  *Q.*   And just for clarity, it refers to DaVita HealthCare

17  Partners.  What is it your understanding that is referring to?

18  *A.*   DaVita.

19  *Q.*   So stepping away from this document.  Did Mr. Hayek ever

20  refer to DaVita as a partner?

21  *A.*   Yes.

22  *Q.*   And can you just describe the context in which that came

23  up?

24  *A.*   Yes.  It was much later on in my time with SCA.  I think a

25  candidate had reached out to me directly to be considered for a

Bridget Fanning - Direct

1   role, and it had come up around that time.  And Andrew and I

2   had a conversation about it.  And he said they were strategic

3   partners, and we didn't recruit from strategic partners.

4   Q.  Did you feel that was the reason you were being told not to

5   solicit from DaVita?

6   A.  Well, we have already had an agreement between Andrew and

7   Kent Thiry not to recruit, so I -- I mean -- I just thought

8   this was, you know, something else.  I mean, he already had the

9   agreement not to recruit.

10  Q.  So to your knowledge, the strategic partnership, whatever

11  it was, was not the reason that he wasn't recruiting from SCA?

12  A.  No.  It felt like an excuse.  The reason was the agreement

13  that was already in place.

14  Q.  And did you have full visibility into what was going on in

15  the business side?

16  A.  No.

17  Q.  Okay.  Now, was there any business reason that you had to

18  have a supervisor notification provision in order to have a

19  candidate considered?

20  A.  I had never seen that before.  It was the first time in my

21  career I had seen that.

22  Q.  And do you have experience looking at transactional

23  documents?

24  A.  Significant.  Yes.

25  Q.  And have you sometimes seen provisions in contractual

Bridget Fanning - Direct

1   documents that pertain to nonsolicitation?

2   A.   Yeah, sure.   It's quite common for people under a

3   nondisclosure agreement to have some kind of contractual

4   obligation about talent in that agreement.

5   Q.   And how is -- that contractual obligation in a written

6   document, how is that different than the agreement between

7   Mr. Hayek and Mr. Thiry?

8   A.   Well, firstly, a lot of the people that are part of that

9   agreement get to see it, because they're signing the

10   nondisclosure agreement themselves it's time-bound.   It's

11   usually for a period of time of over -- after the transaction

12   or during the transaction, six, twelve months, something like

13   that.   So it's time-bound.   It's usually restricted to those

14   individuals or the business division that is party to that

15   specific transaction or deal.   In some cases, I've even seen

16   named individuals.   But both sides sign that agreement that

17   they won't take each other's talent that they're learning about

18   directly as part of that transaction.

19   Q.   And this no-poach agreement, was that time-bound in any

20   way?

21   A.   No, not that I'm aware of.   It was an agreement.   It was

22   open-ended.

23   Q.   And was that no-poach agreement limited to any specific

24   business division?

25   A.   No.

Bridget Fanning - Direct

1  Q.  And was that no-poach agreement limited to specifically

2  named individuals?

3  A.  No.

4  Q.  And did you ever hear that the reason for that agreement

5  was to protect confidential information from a deal

6  transaction?

7  A.  No.

8  Q.  And did Mr. Hayek ever convey anything to you about Kent

9  Thiry's reaction about recruiting?

10  A.  Other than it was very important to him.

11  Q.  And how comfortable were you with that agreement between

12  Andrew Hayek and Kent Thiry?

13  A.  I was uncomfortable with it.  I never liked it.

14  Q.  And were there any instances where you did not want to

15  disclose the existence of that agreement to a candidate?

16  A.  Yes.

17  Q.  Why didn't you want to disclose it?

18  A.  I was embarrassed by it.

19  Q.  Why were you embarrassed?

20  A.  You've got -- usually these no-poach agreements, if

21  somebody applies or wants to be considered, they get

22  considered.  It doesn't bar them from that.  This one barred

23  them from that, even when they really wanted to be considered

24  by the company and look for an opportunity there.  And it was

25  hard to tell an individual that really wants to be considered

Bridget Fanning - Direct

1   for an opportunity at SCA, no, you can't be, because of an

2   agreement.

3           So, no, I mean, I never felt comfortable about it.

4   Q.  Were there instances where you used a little more generic

5   language to describe it?

6   A.  Sure.

7   Q.  And I believe you testified earlier that Mr. Hayek gave you

8   feedback of making DaVita off limits because of the agreement

9   with Mr. Thiry; is that correct?

10  A.  Yes.  Multiple times.

11  Q.  And did you incorporate that instruction into recruiting

12  materials for SCA?

13  A.  Yes.

14          MS. LEWIS:  I'd like to show you what has been marked

15  as Government Exhibit 108 and 109.  And I'd move to admit

16  pursuant to stipulation.

17          THE COURT:  Admitted.

18          (Exhibits 108 and 109 admitted.)

19  BY MS. LEWIS:

20  Q.  So directing your attention first to the email on the

21  left of your screen there, Government Exhibit 108.  It says it

22  is from an individual called Sandra -- I'm going to butcher

23  this name -- Mieczkowska?

24  A.  Yes.

25  Q.  Did I get it even remotely close?

Bridget Fanning - Direct

1    *A.*  Close enough.

2    *Q.*  Okay.  And who is -- I will call her Sandra -- who is

3    Sandra?

4    *A.*  She was my executive assistant at SCA.

5    *Q.*  Okay.  And what is it -- directing your attention to the

6    line called "attachments," what is attached to this document?

7    What are you sending her?

8    *A.*  Well, this is the list we were working on together.  So I

9    specifically asked Sandra to get on the internet and look for

10   companies in this sector and look for companies in that sector

11   and help me put the list together.  I mean, we were digging

12   for -- we wanted to make it as comprehensive as possible.

13   *Q.*  So this is another version of the target list that we

14   looked at earlier?

15   *A.*  Yeah.  This is Sandra's research from the internet.

16   *Q.*  Okay.  And directing your attention to the attachment,

17   which is Government Exhibit 109.

18         Ms. Baskin, if you could pull that one to the

19   forefront.

20         And is this incorporating the same strike-through and

21   italics feedback that you received from Mr. Hayek?

22   *A.*  Yes.  It's the same version -- I can't tell you exactly the

23   same version, but it's certainly one that has been marked by

24   Andrew.

25   *Q.*  There were a couple different iterations of this; is that

Bridget Fanning - Direct

1    fair?

2    A.   We had a lot.

3    Q.   And directing your attention to page 4 of that attachment.

4    A.   Yes.

5    Q.   And is DaVita listed on this attachment again?

6    A.   Yes.  It's in italics, and there is a key at the bottom.

7    Q.   And what does the key indicate with regard to italics?

8    A.   Italics, off limits.

9    Q.   And did you --

10           Ms. Baskin, you can take down the document, please.

11           And you testified earlier that SCA used a number of

12   external recruiters; is that right?

13   A.   Yes.

14   Q.   Did you have conversations with them about SCA's

15   off-limits?

16   A.   Yes.

17   Q.   And what did you instruct them with regard to DaVita?

18   A.   That it was off limits to SCA.

19   Q.   And how closely did the recruiters follow your instructions

20   with regard to DaVita?

21   A.   Not very often.

22   Q.   Why not?

23   A.   DaVita was a talent-rich organization, and it was tough to

24   keep DaVita off limits.  And, you know, it was also broad.  And

25   usually there is a geographic or a business division, or maybe

Bridget Fanning – Direct

1    if you got a candidate that is really interested, maybe there

2    is some wiggle room.  So they want to recruit talent as much as

3    I did.

4    *Q.*  Is it fair to say that the recruiters wanted to go after

5    DaVita?

6    *A.*  Yes.

7    *Q.*  And what did you do when you became aware of instances

8    where they had contacted DaVita individuals?

9    *A.*  Sometimes I contacted Andrew and said, Are you sure?  Can

10   we really maybe consider them?  Sometimes I think I would have

11   told them it was off limits.  But there were many times I went

12   to Andrew and said, you know, Can we?  Can we try?

13   *Q.*  And what was the answer you got?

14   *A.*  It -- well, it was mainly in emails; but, no.

15         *MS. LEWIS:*  I'd like to show you what has been marked

16   as Government Exhibit 51, which I'd move to admit as

17   stipulated.

18         *THE COURT:*  Admitted.

19         (Exhibit 51 admitted.)

20   *BY MS. LEWIS:*

21   *Q.*  So do you recognize this document as an email on the bottom

22   chain between you and an individual named Mark Yowe at Spencer

23   Stuart --

24   *A.*  Yes, I do.

25   *Q.*  -- dated May 26 of 2015?

Bridget Fanning - Direct

1    A.   Yes, I do.

2    Q.   Who is Mark Yowe?

3    A.   He's an executive recruiter at Spencer Stuart.

4    Q.   What is Spencer Stuart?

5    A.   Spencer Stuart is a prestige global executive search firm.

6    Q.   Could you explain the context of what Mark Yowe is asking

7    you or suggesting to you in this email?

8    A.   He really wants to do business with us.  He wants to handle

9    the executive search for us.

10   Q.   He's pitching to SCA; is that fair to say?

11   A.   Yes.  Attached was his proposal.

12   Q.   Okay.  And just looking at the email and the chain above

13   this one --

14           If we could pull that one up.

15           And who are you forwarding this email and this

16   proposal to?

17   A.   Andrew.  Andrew Hayek.

18   Q.   And you indicate you're inclined to bring Mark Yowe in to

19   meet you and I from Spencer Stuart.  So what are you just at a

20   high level asking Andrew Hayek?

21   A.   Yes.  So I had actually approached several firms, and I was

22   looking at awarding the proposal to Spencer Stuart.  And it was

23   a very important assignment.  I think this was for Joe's

24   replacement, which is the most senior development person who

25   worked for Andrew in the company, who was looking to retire.

Bridget Fanning - Direct

1   So I was looking to bring Mark in to meet both Andrew and I.

2   Q.  When you say "Joe," who is Joe?

3   A.  I --

4   Q.  Do you remember the last name?

5   A.  I don't.  But he was the chief development officer for

6   Surgical Care Affiliates, which was the role responsible for a

7   lot of the sales, revenue, business development, with regards

8   to new deals, new acquisitions, and so on.

9   Q.  And so that's a senior-level position; is that fair?

10  A.  Yes.  He was kind of -- as well as Michael.  Michael was

11  Andrew's number two for operating the company.  Joe was really

12  Andrew's fourth partner.  So it was kind of Andrew's number two

13  on that side, the business development side.

14        MS. LEWIS:  Okay.  And then looking at what is marked

15  as Government Exhibit 52.  I would also move to admit per

16  stipulation.

17        THE COURT:  Admitted.

18        (Exhibit 52 admitted.)

19  BY MS. LEWIS:

20  Q.  And Dr. Fanning, do you recognize this document as the

21  attachment to the email we were just looking at?

22  A.  Yes, I do.

23  Q.  And at a high level, what is this document?

24  A.  It is the proposal from Spencer Stuart to -- for us to

25  engage them, what the terms of business are.  It will have a

244

Bridget Fanning – Direct

1   target list, what their off-limits are, et cetera, et cetera,

2   in here.

3   Q.  And is this the proposal that you forwarded to Andrew

4   Hayek?

5   A.  Yes.

6   Q.  Okay.  Directing you to page 7 of the attachment.  Could

7   you just read aloud the title of that slide.

8   A.  "Target candidate pools."

9   Q.  Okay.  And then looking at the listing on the left-hand

10  side of the page, do you see DaVita listed there?

11  A.  Yes.

12  Q.  And what does that mean?  What is Spencer Stuart

13  identifying about DaVita?

14  A.  That DaVita is one of the companies that they would

15  consider candidates that were qualified for this role to be at.

16  Q.  So they would like to target DaVita?

17  A.  Yes.

18      MS. LEWIS:  And showing you what has been marked as

19  Government Exhibit 53-1.  I would also move to admit pursuant

20  to stipulation on this.

21      THE COURT:  It's admitted.

22      (Exhibit 53-1 admitted.)

23  BY MS. LEWIS:

24  Q.  And this is an email chain between you and Andrew Hayek

25  dated June 1 of 2015; is that right?

Bridget Fanning - Direct

1  A.  Yes.

2  Q.  And what is Mr. Hayek responding to you on in this email

3  chain?

4  A.  He is giving me feedback on Mark Yowe's proposal from

5  Spencer Stuart.

6  Q.  And he is specifically giving you feedback on page 7; is

7  that right?

8  A.  Yes.  The target list of companies.

9  Q.  And then directing you to the second bullet down, could you

10  just read what that says.

11  A.  "DaVita is off the table, given our relationship."

12  Q.  And what did you understand "our relationship" to mean?

13  A.  The agreement between Kent Thiry and Andrew Hayek.

14  Q.  And did SCA later retain Spencer Stuart for recruiting

15  work?

16  A.  Yes, we did.

17      MS. LEWIS:  I would now like to show you what has been

18  marked as Government Exhibit 101, which I would also offer as

19  stipulated.

20      THE COURT:  Admitted.

21      (Exhibit 101 admitted.)

22  BY MS. LEWIS:

23  Q.  And directing --

24      We'll give Ms. Baskin a moment to pull it up on the

25  screen.

Bridget Fanning – Direct

1      And may I also at this time move Government

2  Exhibit 102.  It is stipulated, as well, the attachment.

3          THE COURT:  Okay.  That's admitted too.

4          (Exhibit 102 admitted.)

5          MS. LEWIS:  Thank you.

6  BY MS. LEWIS:

7  Q.  So directing your attention to first the bottom email

8  chain on the left-hand side of your screen, that says Andrew

9  Hayek, dated Friday, October 16 of 2015.  Is this the same

10  email that we reviewed a few moments ago?

11 A.  Yes, it is.

12 Q.  Okay.  And this is the one where he's telling you about the

13 agreement between SCA and DaVita not to recruit?

14 A.  Yes.

15 Q.  And looking at the next email up in that chain from you

16 to an individual named John Schultz.  Who is John Schultz?

17 A.  He's the executive recruiter that replaced Mark Yowe from

18 Spencer Stuart.

19 Q.  What do you tell Mr. Schultz in this email?

20 A.  "This is an FYI note that USPI and DaVita are off limits to

21 SCA.  Just wanted to be sure you had it."

22 Q.  And what did you intend for Spencer Stuart to do with

23 regard to DaVita?

24 A.  Not solicit candidates from DaVita.

25          MS. LEWIS:  And showing you what has been marked as

Bridget Fanning – Direct

1   Government Exhibit 344.  I would also offer as stipulated, Your

2   Honor.

3             I believe that one may not be noted in the chart, but

4   I believe Mr. Melsheimer indicated they have no objection.

5             *MR. MELSHEIMER:*  No objection, Your Honor.

6             *THE COURT:*  All right.  It's admitted.

7             (Exhibit 344 admitted.)

8   *BY MS. LEWIS:*

9   *Q.*  And directing you to the bottom portion of that chain,

10  this email is dated February 3 of 2016 at 5:03 p.m.  Do you

11  see that email down there?

12  *A.*  Yes.

13  *Q.*  Okay.  And what are you telling Mr. Schultz again?

14  *A.*  "I just want to be sure you know that DaVita and USPI are

15  off limits to SCA."

16  *Q.*  And how did he respond?

17  *A.*  "Thanks, Bridie.  I'm aware.  Is there a specific" -- "is

18  there a specific prospect you have in mind here, or are you

19  just reminding me?"

20  *Q.*  And how did you respond to him?

21  *A.*  I can't read it here; but if I remember, I said it was a

22  friendly reminder -- just a friendly reminder.

23  *Q.*  And, again, why did you have to remind him yet again not to

24  recruit from DaVita?

25  *A.*  This happened all the time.  There was probably some

Bridget Fanning - Direct

1    incident -- there was something where we had reached out to a

2    candidate at DaVita.  And I was, again, concerned from an

3    Andrew perspective.  I mean, I didn't want to get into trouble.

4    Just reminding you they really are off limits.  And I was

5    constantly reminding recruiters of that.

6    Q.  So how important was this no-poach agreement to SCA?

7    A.  I understood it to be very important to Andrew.

8    Q.  And what was your understanding of why it was so important

9    to Andrew?

10   A.  Because of the agreement that he had with Kent Thiry.

11        MS. LEWIS:  And showing you what has been marked as

12   Government Exhibit 60-1, which is -- I would offer as

13   stipulated.

14        THE COURT:  It's admitted.

15        (Exhibit 60-1 admitted.)

16   BY MS. LEWIS:

17   Q.  Did SCA also retain a company called Cielo for recruiting?

18   A.  Yes.  Cielo Executive Search.  It was a search arm of

19   Cielo, separate to the processing arm.

20   Q.  And who was your primary point of contact at Cielo?

21   A.  Kristen Vosmaer.

22   Q.  And do you recognize this email thread as one between you

23   and Mr. Vosmaer?

24   A.  Yes, I do.

25   Q.  So directing you to the bottom email in the chain from

Bridget Fanning - Direct

1    Mr. Vosmaer.

2              If we could just blow that up on the screen.  Just the

3    bottom portion, Ms. Baskin, with further candidates.  Thank

4    you.

5              And directing your attention -- well, let me ask:  At

6    a high level, what is happening here in this email?  What is

7    Mr. Vosmaer proposing to you?

8    A.  He is sharing with me the candidate pipeline for doing this

9    role.  It was frequent for recruiters to do this.  They have to

10   show me they're doing their homework, because I'm sitting there

11   waiting for a short list.  So this is his pipeline of

12   candidates that they're talking to, possible prospects.

13   Q.  And directing your attention to the entry regarding Rick

14   Adams, VP of finance at DaVita.  Could you just indicate what

15   Mr. Vosmaer tells you there below.

16   A.  "Karen conducting initial screen.  Appears to be actively

17   looking, but we are cautious due to hands-off."

18   Q.  And then how did you respond to Mr. Vosmaer about

19   Mr. Adams?  Directing you to the next email in the chain.

20   A.  I believe I asked him whether -- yeah -- did he post for

21   the role?  So what I was trying to find out is whether Cielo

22   had approached Rick or whether this candidate had come to us

23   and said, I really want to work with SCA.

24   Q.  So were you trying to comply with the no-poach agreement

25   here?

Bridget Fanning - Direct

1   A.   Yes.

2   Q.   And you said to him, "You know we have a restriction on

3   recruiting from DaVita?"  Correct?

4   A.   Yes.

5   Q.   How did he respond to this?

6   A.   "I believe he was a referral.  Will confirm."  What that

7   means is, somebody referred Rick as a possible candidate.  So

8   they had proactively reached out to Rick, which meant that he

9   hadn't applied for the role.

10  Q.   And what did that mean with regard to the no-poach

11  agreement?

12  A.   That we have an off-limits with DaVita, is how I responded.

13  To be honest, whether he had applied or whether he had -- we

14  actively proactively tried to recruit him, the answer was the

15  same.  But sometimes if somebody really wants to be considered,

16  then I would maybe escalate it to Andrew and see if there was

17  any way we could consider them.  But in this case, we had

18  approached him; so it was, like, definitely off limits.

19  Q.   What did your response indicate about what you were telling

20  Mr. Vosmaer to do with regard to continuing to pursue this

21  candidate?

22  A.   "We have an off-limits with DaVita," and I was telling him

23  not to consider the candidate further.

24       MS. LEWIS:   I'd like to show you Government

25  Exhibit 104 and its attachment, 105, and move to admit both as

Bridget Fanning – Direct

1    stipulated.

2            *THE COURT:* All right.  Admitted and admitted.

3            (Exhibits 104 and 105 admitted.)

4    *BY MS. LEWIS:*

5    *Q.* And, again, looking at the email on the left of your

6    screen, at the bottom first, from Andrew Hayek to you with

7    regard to "Companies to recruit from."  Is this, again, the

8    same email that we've looked at earlier today?

9    *A.* Yes, it is.

10   *Q.* And why are you sharing that with Mr. Vosmaer?

11   *A.* I suspect that there has been a reach-out to a candidate at

12   DaVita, and it's come up again.  And I wanted Kristen to be

13   really sure that he is not trying to recruit people from

14   DaVita.

15   *Q.* And then directing you to your email to him, where you

16   say, "I really want to be sure you see this.  Can you align the

17   compliance RSM with this list and Andrew's edits?"  What are

18   you referring to with regard to "compliance RSM"?

19   *A.* That's one of the -- probably one of the VP vacancies.

20   Could be a director, but it's certainly one of the two.  "RSM"

21   is regional sales manager.

22   *Q.* Is that a senior-level position?

23   *A.* Yes, it is.  Yes.

24   *Q.* And what are you instructing Mr. Vosmaer to do with regard

25   to DaVita candidates for that open position at SCA?

Bridget Fanning - Direct

 1   A.  I'm trying to make sure that he's not proactively reaching

 2   out to DaVita executives.

 3   Q.  And showing you -- well, let me ask you, you testified

 4   earlier that you also informed the recruiter Russell Reynolds

 5   about the off-limits with DaVita; is that right?

 6   A.  Yes, I did.

 7        MS. LEWIS:  And showing you Government Exhibit 49,

 8   which I also offer as stipulated, along with its attachments,

 9   48-1 and 47-1.  I'll move to admit as stipulated.

10        THE COURT:  All right.  Admitted.

11        (Exhibits 47-1, 48-1, and 49 admitted.)

12   BY MS. LEWIS:

13   Q.  So starting with Exhibit 49, did you receive an email dated

14   May 18 of 2015 from a recruiter from the company Russell

15   Reynolds?

16   A.  Yes, I did.

17   Q.  And at a very high level, what does this email relate to?

18   A.  It is the executive recruiter Russell Reynolds sharing with

19   me the pipeline of candidates that they're talking to and

20   updating me overall on the search -- the status of the search.

21   Q.  And it references RVP searches.  What is that?

22   A.  These are the business development roles, the key roles,

23   the relationship-setting roles, the regional vice president

24   roles.

25   Q.  And are those senior-level positions, as well?

Bridget Fanning - Direct

1   *A.*   Yes.  Yes.

2   *Q.*   And what is Russell Reynolds transmitting to you, generally

3   speaking, in these attachments that they're sending?

4   *A.*   They're trying to show me that they've contacted

5   candidates, and they're qualified candidates, and these are

6   people that they're actively having conversations with to be

7   considered for the role.

8        *MS. LEWIS:*   I'd like to look at Government

9   Exhibit 48-1.

10        Ms. Baskin, if you could pull that up.

11   *BY MS. LEWIS:*

12   *Q.*   Directing you to the title of this slide or this

13   presentation, what is this indicating?

14   *A.*   This is a list that Russell Reynolds had put together of

15   representative target companies for the regional vice

16   president.

17   *Q.*   And directing your attention to the left-hand side of that,

18   do you see DaVita listed in that list?

19   *A.*   Yes.

20   *Q.*   And what does it note in the brackets next to DaVita?

21   *A.*   "DaVita alumni only."

22   *Q.*   And why alumni only?

23   *A.*   Because of the agreement between Kent Thiry and Andrew

24   Hayek.

25   *Q.*   And what, if anything, does the reference to "alumni only"

1    indicate to you about whether DaVita experience generally was a

2    valuable feature in a candidate?

3    A.  We were interested in people with DaVita experience if they

4    had been successful at DaVita but no longer working at DaVita.

5    So they had moved on, taken another job somewhere else, but

6    they had DaVita in their background.

7    Q.  So does Russell Reynolds want to recruit from DaVita?

8    A.  Yes.

9    Q.  And why can't they?

10   A.  Because of the agreement between Andrew Hayek and Kent

11   Thiry.

12   Q.  And, then, looking at Government Exhibit 47-1, one of the

13   other attachments.  At a very high level, what is this

14   document?

15   A.  This is the status update for the RFP role.  I would get --

16   often get official documents where they told me -- they were

17   showing me their homework, that they were doing their job.

18        MS. LEWIS:  And let's look at page 11 of that

19   attachment, Ms. Baskin.

20        And if we could just blow up the line there.

21   BY MS. LEWIS:

22   Q.  So the title of this chart says "former prospects."  What

23   is this showing you?

24   A.  These were people that used to be considered for the role,

25   but they're now no longer being considered for one reason or

1   another.  So they're former possible candidates.

2   *Q.*  And what is the chart indicating about Liz Rodriguez of

3   DaVita HealthCare Partners?

4   *A.*  "DaVita is off limits due to client relationship."

5   *Q.*  And what was your understanding of what "client

6   relationship" meant?

7   *A.*  It was referring to the agreement.

8        *MS. LEWIS:*  I'd like to -- I'd like to show you what

9   has been marked as Government Exhibit 65, which I would also

10  offer as stipulated.

11       *THE COURT:*  All right.  It's admitted.

12       (Exhibit 65 admitted.)

13  *BY MS. LEWIS:*

14  *Q.*  Dr. Fanning, do you recognize this -- I know it's a little

15  hard to read there -- but do you recognize this as an email

16  chain between you and an individual named Eric Sigurdson in or

17  about September of 2015?

18  *A.*  Yes, I do.

19  *Q.*  Who is Eric Sigurdson?

20  *A.*  He's an executive recruiter with Russell Reynolds, managing

21  a chief information officer search for us.

22  *Q.*  And directing you to the top of page 2, and directing you

23  further to the bottom of the paragraph from Mr. Sigurdson, what

24  does he ask you about DaVita?

25  *A.*  "Did you say that DaVita is definitely off limits?  There

1    is a prospect who I'm speaking to about the role but needed

2    your guidance."

3    Q.  And, again, what role is this that's being discussed?

4    A.  This is the chief information officer.

5    Q.  Is that also a senior-level position?

6    A.  Yes.  It -- it reported to the CFO, the chief financial

7    officer.

8    Q.  Okay.  And then directing you to page 1 of this email, at

9    the bottom, how did you respond to his question about DaVita?

10   A.  "Sorry.  DaVita is definitely off limits.  I know.  I know.

11   But for sure it is, and thank you for checking.  It's always

12   worth a try."

13   Q.  So why did you say, "I know, I know"?

14   A.  Because it was a talent-rich organization with candidates

15   that could have been good prospects for SCA.  And so it was

16   just difficult not to be recruiting from DaVita.

17   Q.  And to your knowledge, did he pursue candidates for DaVita

18   for this job opportunity?

19   A.  Not that I was aware of.

20        MS. LEWIS:  And showing you Government Exhibit 98,

21   which I would offer as stipulated.

22        THE COURT:  Admitted.

23        (Exhibit 98 admitted.)

24   BY MS. LEWIS:

25   Q.  And, Dr. Fanning, do you recognize this email chain as

1    one between you and an individual named Goran Dragolovic, dated

2    about October of 2015?

3    A.   Yes, I do.

4    Q.   Did I get that pronunciation vaguely correct?

5    A.   Yeah.  Close enough.

6    Q.   All right.  And then directing you to the bottom of the

7    email on the first page -- so on the left of your screen

8    there.

9    A.   Yes.

10   Q.   It looks like it is an email from an individual named

11   *jordanthau@davita.com*.  Who did you understand Jordan Thau to

12   be?

13   A.   He is a possible candidate, prospect, for a role that we

14   were recruiting for via Russell Reynolds.

15   Q.   And who is Mr. Thau working for at this time?

16   A.   Lifeline Vascular Access, a division of DaVita HealthCare

17   Partners.

18   Q.   And he indicates in his email, "An outside recruiter,

19   Margaret from Russell Reynolds Associates, contacted me.  I do

20   have interest and assume it's preferable to communicate

21   direct."  Is this an instance where a recruiter has reached out

22   in violation of the agreement?

23   A.   Yes.

24        *MS. LEWIS:*  Okay.  Then if we could pull up the next

25   email in the chain on the screen.

Bridget Fanning - Direct

1    *BY MS. LEWIS:*

2    *Q.*   So Mr. Dragolovic forwards this email to you.  And he

3    indicates to you that he works for DaVita.  And could you just

4    read aloud what he says about what he's thinking?

5    *A.*   "He works with DaVita, and I'm thinking to let him know" --

6    he says "now," but he means know -- "that we have an

7    understanding with DaVita to not poach their team."

8    *Q.*   And how did you respond to Mr. Dragolovic?

9          If we could pull the next email up.

10   *A.*   I'm basically letting Goran know not to get involved.

11   Let's let Russell Reynolds contact him and withdraw him and

12   manage it, and then you can reach out to him.  Meanwhile, I've

13   contacted Russell Reynolds to tell them again DaVita is off

14   limits, and this one must have slipped through.

15   *Q.*   And did you, in fact, contact Russell Reynolds to let them

16   know they shouldn't be contacting DaVita employees?

17   *A.*   Yes, I did.

18         *MS. LEWIS:*   And showing you what has been marked as

19   Government Exhibit 100, I would offer as stipulated.

20         *THE COURT:*   Admitted.

21         (Exhibit 100 admitted.)

22   *BY MS. LEWIS:*

23   *Q.*   So do you recognize this document as a continuation of the

24   email chain with Russell Reynolds we were just reviewing?

25         If I can direct you, I'll direct you to the second

Bridget Fanning - Direct

1  page there, where you can see the email that says,

2  "Bridie" --

3  A.  Yes, I've got it.  Yeah.  I took Goran's email to me, and

4  forwarded it, along with Jordan Thau's email, to Nate Haines,

5  who is the executive recruiter at Russell Reynolds.

6  Q.  Okay.  So looking at the next email up in the chain from

7  you to an individual name Nate Haines.  Who is Nate Haines?

8  A.  An executive recruiter with Russell Reynolds, who was

9  handling the searches.

10  Q.  And who is Clare Metcalf on the cc line?

11  A.  Clare is kind of his boss, but she's the executive

12  recruiter I worked with on the chief financial officer search.

13  Q.  And what do you tell Mr. Haines in this email, if you

14  could read that out loud?

15  A.  "Nate, this is a no-go.  We must not under any

16  circumstances be contacting people at DaVita.  They are

17  partners of ours, and we have a commitment not to contact each

18  other's people.  Can you clarify what happened here and that we

19  won't contact anyone at DaVita again?"

20  Q.  And you use the word "partners" in this email.  Why are

21  you using the word "partners"?

22  A.  "Partners" is a very ambiguous term.  I mean, it's very

23  commonly used.  We use it all the time for all sorts of things.

24  And it's a lot more diplomatic to say "partnership" or

25  "partner" than -- or "relationship" than to say it's an

1  agreement between Kent Thiry and Andrew Hayek.

2  Q.  So were you in fact referring to any business deals?

3  A.  Not that -- no.  No, I wasn't.

4  Q.  Okay.  And then looking at Mr. Haines' response there, in

5  the line up.  He says, "I will contact the candidate and let

6  him know.  When we speak, I will tell him that this was my

7  mistake and I wasn't aware of the business relationship between

8  SCA and DaVita.  We will also not call anyone else from

9  DaVita."

10        So what is your understanding of why Mr. Haines used

11  the phrase "business relationship"?

12  A.  Well, he's --

13        MR. MELSHEIMER:  Excuse me, Your Honor.  I'm going to

14  object as calling for speculation, what someone else intended.

15        THE COURT:  Sustained.

16  BY MS. LEWIS:

17  Q.  Dr. Fanning, did you have an understanding of what

18  Mr. Haines meant by "business relationship"?

19        MR. MELSHEIMER:  Same objection, Your Honor.

20        THE COURT:  Sustained.

21  BY MS. LEWIS:

22  Q.  Dr. Fanning, had you ever told Mr. Haines of any specific

23  business relationship that this no-poach agreement related to?

24  A.  No.

25  Q.  Thank you.  And directing you to page 1 of this document,

1  Mr. Haines' follow-up email.  So he says in the bottom there,

2  "Mr. McKessar, who is mentioned below, was also contacted.  I

3  will turn him off too."  Who did you understand Mr. McKessar to

4  be?

5  A.  He was another prospect that Russell Reynolds had reached

6  out to who was working at DaVita.

7  Q.  And then in Mr. Haines' email there at 10:01 p.m., what

8  does he indicate that he did with regard to both Jordan Thau

9  and Craig McKessar?

10 A.  "We've spoken with and turned off in a very tactful way

11 both Jordan Thau and Craig McKessar from DaVita."

12       MS. LEWIS:  And, then, just to look at the last

13 email in this chain.  If we could pull that up, Ms. Baskin.

14 BY MS. LEWIS:

15 Q.  You indicate to Goran, "If you want to reach out to this

16 chap now you can.  RR have closed the loop."  What are you

17 referring to in this email?

18 A.  I'm letting Goran know that Russell Reynolds have told

19 Jordan Thau that he is not a candidate for the role.  They

20 can't consider him.  It's now safe for Goran to reach out to

21 him and have a conversation without getting mixed up in the

22 whole thing.

23 Q.  And were you intending to indicate that Mr. Dragolovic

24 could reach out to him for a job opportunity?

25 A.  No.  No.  Just -- I mean, this was somebody who knew him.

Bridget Fanning - Direct

 1  They had a relationship.  That he could nicely chat to him and

 2  do whatever it was they needed to do to sustain that

 3  relationship.

 4          MS. LEWIS:  And I'm showing you what has been marked

 5  now as Government Exhibit 278, which I would also offer as

 6  stipulated.

 7          THE COURT:  Admitted.

 8          (Exhibit 278 admitted.)

 9  BY MS. LEWIS:

10  Q.  And directing you to the bottom email in the chain, dated

11  October 26, 2015, at 10:30 p.m.

12          Ms. Baskin, if you could zoom on that one, please.

13  A.  Yes.

14  Q.  And who is this email between?

15  A.  This is Craig McKessar after Nate had told him he couldn't

16  consider him further, reaching back out to Nate Haines at

17  Russell Reynolds.

18  Q.  And what does Mr. McKessar express about his desire to

19  pursue the opportunity with SCA?

20  A.  He really wants to be considered for the opportunity.  He

21  heard what Nate had to say, but he's appealing that decision

22  and that discussion and if there is any way he can be

23  considered for an opportunity at SCA.

24  Q.  And he indicates he wants to reopen the opportunity for

25  SCA, and he provides some further details.  What did you

Bridget Fanning - Direct

1   understand about these details that he's providing?

2   A.  Well, he's obviously trying to -- I mean, usually these

3   agreements are restricted to geography or a business unit or a

4   circumstance.  So he's trying to say, I work for Lifeline, it's

5   totally separate from DaVita, I'm not in the main business, I'm

6   not involved in the day-to-day operations of HealthCare

7   Partners or DaVita, I don't have any confidential proprietary

8   information that's going to impact me going to SCA.  And I knew

9   about this opportunity from a friend, not just from Russell

10  Reynolds; so you're not going to get into trouble, because I

11  already knew about the opportunity from another way.  And,

12  quite frankly, I'm pursuing other career opportunities.  I want

13  to leave; but, oh boy, this is really important that you keep

14  this highly confidential.  And he doesn't want, obviously,

15  DaVita to know that he's actively looking; but he's appealing

16  to be considered for the role.

17  Q.  And then looking at Mr. Haines' response -- I'm sorry --

18  forward to you of that email.

19          Ms. Baskin, could you blow that up for us, please.

20          And Mr. Haines indicates to you that he wanted to pass

21  along the information below, and does this change our

22  situation?  I don't believe so.  What did you understand him to

23  be referring to with regard to "our situation"?

24  A.  The agreement with Andrew Hayek and Kent Thiry.

25  Q.  And then he indicates further, "We met by phone.  And he is

1  very excited about, A, the SCA opportunity.  Based on our

2  initial discussion, he was someone I was excited about but just

3  getting to know."

4       What is remarkable about this exchange with these two

5  individuals?

6  A.  Well, they're both really pushing on me pretty hard to be

7  considered for this role.

8  Q.  So Mr. Haines wants to consider this candidate, as well?

9  A.  He says, "He has significant sales experience.  I was

10  excited about it.  He was able to discuss specific examples,"

11  which was very important to me, because it -- people are less

12  likely to be untruthful when they're telling specific examples.

13  "He's got a great track record," and he attached his resumé

14  again.

15  Q.  And how did you respond to Mr. Haines?  If we could just

16  look at the top email there.

17  A.  "If he can get his leader's permission" -- "this leader's

18  permission" -- like, if he goes to his boss -- "to pursue SCA,

19  then fine.  Otherwise, no.  DaVita is a no-go for us."

20  Q.  And I think you described earlier.  Did you see any

21  practical difference between a notification and permission?

22  A.  No.

23       MS. LEWIS:  So showing you what has been marked as

24  Government Exhibit 106 and 107, which I would move to admit as

25  stipulated.

Bridget Fanning – Direct

1        *THE COURT:* All right.  They're admitted.

2            (Exhibits 106 and 107 admitted.)

3   *BY MS. LEWIS:*

4   *Q.* And, again, Dr. Fanning, just to, again, look back at the

5   same email from October 16, 2015, from Andrew Hayek,

6   indicating what the agreement with DaVita is, did you pass

7   this email and this list again on to Nate Haines and Clare

8   Metcalf at Russell Reynolds?

9   *A.* Yes.

10  *Q.* And why are you forwarding it in December?

11  *A.* Something must have happened to have triggered it.  I can't

12  recall exactly what it was, but something triggered the idea to

13  go out to all the recruiters again and say, look, you really

14  shouldn't be recruiting from DaVita.

15  *Q.* And so you're continuing to try to comply with this

16  no-poach agreement?

17  *A.* Yes.

18            *MS. LEWIS:* Showing you what is marked for

19  identification as Government Exhibit 345.

20            Your Honor, this is one not on the list but I believe

21  Mr. Melsheimer has now stipulated.

22            *MR. MELSHEIMER:* Agreed, Your Honor.

23            *THE COURT:* Admitted.

24            (Exhibit 345 admitted.)

25

Bridget Fanning – Direct

1   *BY MS. LEWIS:*

2   *Q.* So directing you to the bottom -- first of all, do you

3   recognize this email as an email chain between you and

4   Mr. Haines dated January of 2016?

5   *A.* Yes.

6   *Q.* And directing you to the bottom portion of this first

7   page here.  What is he asking -- what is Mr. Haines asking you

8   with regard to DaVita for development positions?

9   *A.* "Is San Francisco an option?"  "Be an easy flight."  "Is

10  DaVita off limits for these geographies or just Southern

11  California?"  "If DaVita isn't off limits, someone was referred

12  to us that we'd like to contact."

13          What he's trying to do, this thing with DaVita, is

14  there a geographic restriction?  Because so often there is a

15  business restriction -- business division restriction or

16  geographic restriction or something.  So he's trying to say,

17  look, the last time you told me it was off limits, it was for

18  this kind of job.  But this one is in a different geography, so

19  can we recruit if it's in this geography?

20  *Q.* Was there any geographical limitation on the no-poach

21  agreement with DaVita?

22  *A.* No.

23  *Q.* So directing you to the next email up in the chain, he

24  asks you another question.  "If DaVita is off limits, is it the

25  entire company or just certain divisions?"  And what did you

Bridget Fanning - Direct

1   understand him, again, to be asking with that question?

2   A.  Well, he's trying to find out what the restrictions might

3   be on this no-poach agreement.  So he's -- he's really asking,

4   Is it really the entire company, or is it just certain

5   divisions?

6   Q.  And in your experience, was it unusual to have an entire

7   company off limits?

8   A.  Yes.

9   Q.  And how do you respond to Mr. Haines?

10  A.  "Nope.  Completely off limits unless they have left or

11  talked to their boss and get permission."

12  Q.  And, again, is that referring back to the no-poach

13  agreement between Andrew Hayek and Kent Thiry?

14  A.  Yes.

15          MS. LEWIS:  And showing you what has been marked as

16  Government Exhibit 82-1, which I would offer as stipulated.

17          THE COURT:  Admitted.

18          (Exhibit 82-1 admitted.)

19  BY MS. LEWIS:

20  Q.  Did you later remind Mr. Haines and Ms. Metcalf again of

21  the no-poach agreement with DaVita?

22  A.  Yes, I did.

23  Q.  And just looking at the email, what did you indicate to

24  them in that February 3 of 2016 email?

25  A.  "I just want to be sure you know that DaVita and USPI are

Bridget Fanning - Direct

1   off limits to SCA."

2   Q.  And how does Mr. Haines respond?

3   A.  "I knew about DaVita but not USPI."

4   Q.  And at this point in time, to your knowledge, is there any

5   change in the reason why DaVita is off limits?

6   A.  No.

7            MS. LEWIS:  And I'd like to show you what has been

8   marked as Government Exhibit 81, which I would also offer as

9   stipulated.

10           THE COURT:  It's admitted.

11           (Exhibit 81 admitted.)

12  BY MS. LEWIS:

13  Q.  Do you recognize this email chain as one between you and

14  Mr. Hayek dated April 23 and April 26 of 2016, forwarding an

15  email from an individual named Andrew Kay?

16  A.  Yes, I do.

17  Q.  So what is your understanding of who Mr. Kay is and who he

18  works for?

19  A.  He is somebody that has reached out to me directly on

20  LinkedIn to say he is a senior group director of operations

21  with DaVita Kidney Care in Dallas.  He explains his job to me

22  and what his role is and wants to send me his resumé.  And he

23  wants to be considered for opportunities at Surgical Care

24  Affiliates.

25  Q.  And then directing you to the next email -- well, first

Bridget Fanning - Direct

1   of all, let me ask you on this, is this a solicitation or not a

2   solicitation?

3   A.   No.  This is somebody who has reached out to me directly.

4   I didn't solicit him.

5   Q.   And you forward this email to Andrew Hayek.

6        If we could just look at that on the screen there.

7   Thank you.

8        You say to him, "Andrew, I think I probably know the

9   answer, but I thought I'd ask."  Can you just read the

10  remainder of that paragraph.

11  A.   "This possible candidate has reached out to me and is a

12  senior group director of operations with DaVita.  Is it a

13  no-go?  I can, of course, diplomatically explain that DaVita is

14  a partner and we don't recruit from partners without explicit

15  permission, but I thought I'd at least ask since he's not at

16  the VP level."

17  Q.   And do you want to consider Mr. Kay?

18  A.   Yes.

19  Q.   And why did you use the phrase that you could

20  "diplomatically explain that DaVita is a partner"?

21  A.   Andrew and I had had a conversation around this time.  I

22  can't tell you exactly when, but it was around this time, that

23  DaVita was a strategic partner.  And Andrew had expressly said

24  to me, DaVita is a strategic partner.  And as you know, we do

25  not recruit from clients and strategic partners.  These were

Bridget Fanning – Direct

1    actually words that Andrew had given to me in that meeting.

2    And I'm still going back to Andrew -- I felt uncomfortable

3    telling this candidate that I can't consider you.  Right?  I'm

4    a consultant at SCA.  So I want Andrew to tell me, No, you

5    really can't consider this person.  That's why I forwarded it

6    to Andrew.

7    Q.  And how does Mr. Hayek respond to your email?

8    A.  "I think the same rules apply."  I -- he had proactively

9    come to us, we hadn't solicited him, so that's why he's saying

10   that.  "Would give him the message that we would only engage if

11   he has already shared this with his supervisor that he wants to

12   explore outside opportunities and speak with SCA.  We're in a

13   very sensitive stage right now with DaVita."

14   Q.  So just parsing that out a little bit, what did you

15   understand him to be referring to with "the same rules apply"?

16   A.  It's the same rules of the agreement that he had all the

17   time with Kent Thiry.

18   Q.  And why do you think he was referring to the no-poach

19   agreement and not a partnership?

20       MR. MELSHEIMER:  Objection, Your Honor.  Calls for

21   speculation as to why.

22       THE COURT:  Overruled.

23   BY MS. LEWIS:

24   Q.  Dr. Fanning, you can answer why you believe he was

25   referring to a no-poach agreement and not a partnership?

Bridget Fanning – Direct

1   *A.*  Because the no-poach agreement was there before there was

2   any kind of relationship, partnership, strategic discussions

3   happening.  The agreement was long-standing.

4        *MS. LEWIS:*  And I'm showing you what has been marked

5   as Government Exhibit 83, that I would like to move as

6   stipulated.

7        *THE COURT:*  Okay.  It's admitted.

8        (Exhibit 83 admitted.)

9   *BY MS. LEWIS:*

10  *Q.*  And do you recognize this email chain as one between you

11  and Andrew Kay, following up on the prior outreach that Mr. Kay

12  had to you?

13  *A.*  Yes, I do.

14  *Q.*  Okay.  And directing you to your response there in the

15  middle to Mr. Kay.

16  *A.*  Yes.

17  *Q.*  We'll look at some of the specific language in a moment;

18  but in summary, what are you telling him in this email?

19  *A.*  I'm telling him that we can't consider him.

20  *Q.*  And then in the first sentence you say, "Dear Andrew,

21  firstly, thank you for proactively reaching out and sharing

22  your experience and background with us."  Why do you use the

23  term "proactively reaching out" in this email?

24  *A.*  I don't want to get into trouble again for breaking the

25  agreement.  So I'm making it clear, he reached out to me.  I

Bridget Fanning – Direct

1  didn't reach out to him.

2  *Q.* And then you go on to say, "DaVita are priority strategic

3  partners for us, and we have a company policy that we don't

4  recruit from our clients and strategic partners unless

5  candidates have been given explicit permission by their

6  employers that they can be considered for employment by us.

7  Sorry we are unable to consider you at this time."

8          So let's unpack that a little bit.  What are you

9  referring to when you are talking about this priority strategic

10  partnership and company policy?

11  *A.* I'm talking about the agreement between Kent Thiry and

12  Andrew Hayek.

13  *Q.* And as a human resources executive, how common is it you

14  use a term like "strategic partner"?

15  *A.* Very.  I mean, all of our HR professionals are called

16  strategic partners.  That's their job title, HR strategic

17  partners.  Everything is a strategic partnership.

18  *Q.* And was the no-poach agreement because of a partnership or

19  because of the promise made to Kent Thiry?

20  *A.* The promise was made to Kent Thiry.  But Andrew and I had

21  just recently had a conversation around this time, where Andrew

22  said, DaVita is now a strategic partner.  It was new

23  information.  It was recent.  I was quoting Andrew's words from

24  that meeting I had with him.

25  *Q.* And I think you testified earlier that you viewed that

Bridget Fanning - Direct

1    almost as an excuse; is that right?

2    A.  Yeah.  Because the agreement was long-standing.

3    Q.  And did SCA have other strategic partners that it worked

4    with?

5    A.  Yeah.  Mainly clients.  I mean, it's -- clients is a lot

6    more straightforward, you know, when you're doing business with

7    a client.  Strategic partner, I mean, anyone can be a strategic

8    partner.  You can just be having a conversation.

9    Q.  And were you able to recruit from other strategic partners

10   at SCA?

11   A.  I can't recall too many others that we couldn't recruit

12   from that weren't clients.  On the target company list, we did

13   call them customers/partners, but they were all customers of

14   some kind in the main.  But, no, I'm not aware -- I mean, there

15   could have been other strategic partners, but none come to mind

16   that I can think of.

17   Q.  So, for example, was Fresenius a strategic partner of some

18   sort?

19   A.  Well, we hired David from Fresenius.  So I believe at some

20   point Fresenius did become a strategic partner, but not for the

21   nearly two years I was working at SCA.  Because I remember very

22   clearly interviewing David and comparing the stock price of the

23   two companies and all sorts of things with him, and he was at

24   Fresenius.

25   Q.  So did the fact that somebody was a strategic partner mean

Bridget Fanning – Direct

1    that you could not recruit from them?

2    A.  I don't believe so.  I think it depended on the nature of

3    the deal and the nature of the partnership.

4    Q.  So not in all instances; is that right?

5    A.  Correct.

6    Q.  And here, the reason for the no-poach agreement, what was

7    that because of?

8    A.  That was the agreement between Andrew Hayek and Kent Thiry.

9    Q.  And you also refer in this email to a company policy.

10   Again, why are you using these words like "strategic

11   partnership" and "company policy" with Andrew Kay?

12   A.  I am dressing this up.  I'm not proud of this email.  I'm

13   dressing this up to make it more official and formal than I

14   believed it was.  And as an HR professional, I often have to

15   share information or direction I'm given to relay to employees

16   or candidates.  It's not uncommon for a CEO to create a company

17   policy.  But in this case, I'm kind of calling that agreement a

18   company policy, because I feel better about saying that than an

19   agreement.

20   Q.  And does -- at this time of this email that we're looking

21   at, does Mr. Kay have any sort of offer from SCA at this point

22   in time?

23   A.  No.

24   Q.  And could you even begin a conversation with him?

25   A.  No.

Bridget Fanning - Direct

1   *Q.* And what did this agreement do to the recruitment process

2   for Mr. Kay?

3   *A.* We never considered him.  I'm not sure I even got his

4   resumé.

5              *MS. LEWIS:*  And we can take the document down,

6   Ms. Baskin.

7   *BY MS. LEWIS:*

8   *Q.* And in your experience, Dr. Fanning, are these agreements

9   beneficial to employers?

10  *A.* Yes.

11  *Q.* How so?

12  *A.* It voids the business disruption that comes with an

13  executive leaving.  It keeps executives at their current

14  firm -- well, I mean, they can probably go somewhere else,

15  but --

16  *Q.* And based on your experience at SCA, what did you

17  understand the purpose of the agreement to be with respect to

18  keeping SCA and DaVita senior-level employees at their

19  respective companies?

20  *A.* It was ensuring, really, that SCA executives did not leave

21  SCA and go to DaVita and that DaVita executives didn't leave

22  DaVita and go to SCA.

23  *Q.* And which organization benefited more from this agreement,

24  SCA or DaVita?

25  *A.* I believe DaVita did.

Bridget Fanning – Direct

1   *Q.*  And why do you say that?

2   *A.*  Because it was a much, much bigger company, with a lot more

3   talented individuals than SCA had.  SCA -- I mean, we had high

4   recruitment demands because they hadn't recruited for such a

5   long time, because they didn't have the process and somebody

6   like me helping them.  So they had all of these vacancies that

7   hadn't been filled for a long time.  I don't know how many

8   people director level and above that DaVita had.  Like I said,

9   it could have been hundreds.  They had a lot more vacancies.

10  *Q.*  And, now, are these agreements -- these no-poach

11  agreements -- are they beneficial to employees or are they

12  harmful to employees?

13  *A.*  I think they're harmful to employees.

14  *Q.*  How so?

15  *A.*  Because it restricts their opportunities.

16  *Q.*  What does it do to their mobility?

17  *A.*  Can you explain?  Sorry.

18  *Q.*  How did the no-poach agreement between SCA and DaVita

19  affect the mobility of employers moving between -- I'm sorry --

20  employees moving between SCA and DaVita?

21  *A.*  It meant that you didn't see executives moving from SCA to

22  DaVita and from DaVita moving to SCA.

23  *Q.*  And, now, are you familiar with ways that companies can

24  retain their own employees?

25  *A.*  Yes.

Bridget Fanning - Direct

1   Q.  How do companies retain employees?

2   A.  Well, firstly, they should make it a really great place to

3   work, that people don't want to leave and look after their

4   people and have great cultures and good bosses.  But other than

5   that, they have noncompete agreements.  I've used them lots and

6   lots of times.

7   Q.  And so how is -- a noncompete agreement between an employer

8   and an employee, how is that different from the no-poach

9   agreement here?

10  A.  A noncompete agreement is usually handed to the employee,

11  it's fully transparent, they read it, they sign for it, and

12  they usually are given compensation in exchange for their

13  signature for that noncompete.  And it's clear what companies

14  or kind of companies they're restricted from going to work for.

15  Q.  And how does that compare to the no-poach agreement here?

16  A.  Well, most employees probably wouldn't have known of its

17  existence, unless they were looking for a job at DaVita.  I

18  mean, I don't know SCA people that tried to work for DaVita

19  that were -- that's not known to me.  I just know the DaVita

20  executives that tried to come to SCA.

21  Q.  And did any of the employees that were affected by this

22  agreement -- to your knowledge, did any of them receive

23  compensation for this no-poach agreement?

24  A.  No.

25  Q.  And what was the SCA-DaVita agreement intended to achieve

Bridget Fanning - Cross

 1 | with respect to competition for employees?

 2 | A.  I don't understand.  Sorry.  You'd have to explain.

 3 | Q.  Did the SCA and DaVita agreement, the no-poach agreement,

 4 | did it have an effect on competition for employees between SCA

 5 | and DaVita?

 6 | A.  Well, it meant that DaVita wasn't competing with SCA for

 7 | executives that were already working at DaVita, and SCA wasn't

 8 | competing with DaVita for executives that were already at

 9 | DaVita.  Did I get that right?  I mean, basically, it kept SCA

10 | executives at SCA from going to DaVita and DaVita executives at

11 | DaVita from going to SCA.

12 | Q.  And that's your understanding of the effect that it had on

13 | competition?

14 | A.  Yes.  So they weren't competing with the same executives

15 | between them.

16 |          MS. LEWIS:  Thank you, Dr. Fanning.

17 |          THE COURT:  You want to start your cross-examination?

18 |          MR. MELSHEIMER:  Your Honor, I'd be happy to.  I have

19 | nine minutes?

20 |          THE COURT:  Something like that.

21 |                       **CROSS-EXAMINATION**

22 | BY MR. MELSHEIMER:

23 | Q.  Dr. Fanning, good afternoon.

24 | A.  Hi.

25 | Q.  We have spoken on the phone a couple of times, haven't we?

Bridget Fanning - Cross

1   *A.*   Yes.

2   *Q.*   The last time we spoke, you were headed to the Elton John

3   concert; right?

4   *A.*   It was great.

5   *Q.*   How did that work out?

6   *A.*   It was good.

7   *Q.*   Okay.  So I want to start by making sure we understand the

8   events you were personally involved in and what events you were

9   not personally involved in.  Are you with me?

10  *A.*   Yeah.  Sure.

11  *Q.*   Okay.  So you did not start working for SCA until about

12  September 2014; is that correct?

13  *A.*   Correct.

14  *Q.*   And you told the ladies and gentlemen of the jury that

15  whatever agreement was made between Mr. Hayek and -- and DaVita

16  and Mr. Thiry was already in place when you started; right?

17  *A.*   Yes.

18  *Q.*   So because you weren't working at SCA back in 2012, you

19  don't have any personal knowledge of what was going on with the

20  SCA business back at that time; that's fair, right?

21  *A.*   That is true.

22  *Q.*   You never spoke to Mr. Thiry about this agreement; right?

23  *A.*   No.

24  *Q.*   You never emailed him about it or talked to him on the

25  phone; right?

Bridget Fanning - Cross

1   A.   No.

2   Q.   You've never met him, actually; is that right?

3   A.   Correct.

4   Q.   Okay.  Now, once you did start working for SCA in

5   September 2014, your role was to lead the human resources group

6   of SCA; is that right?

7   A.   Yes, that's right.

8   Q.   And, in fact, your role at SCA for the two years you were

9   there stayed pretty consistent; do I have that right?

10  A.   No.  It evolved and changed over the time I was there.

11  Q.   Well, do you recall telling the FBI that your role at SCA

12  stayed fairly consistent over her time at the company?

13  A.   No.  I mean, broadly, I was still responsible for HR when I

14  joined; and I was broadly responsible for HR when I left.  But

15  the responsibilities broadened over the time I was there.  So,

16  for example, when I first joined, I wasn't directly responsible

17  for VP level and above recruiting.  Michael Rucker was.  But

18  after my first two months, it transitioned to me.  So the role

19  did evolve; but I would say, tweaks and extensions --

20  Q.   Okay.  Fair enough.

21  A.   -- versus a fundamental switch.

22  Q.   Let me make sure I've got this right.  Fundamentally, you

23  were involved with HR during the entire time you were at SCA?

24  A.   Yes.

25  Q.   Thank you.  Now I think you said this on your direct

Bridget Fanning - Cross

1  examination, you didn't -- your role at SCA did not include the

2  ultimate decision on whether to hire or fire someone; right?

3  A.  Yes.

4  Q.  You personally made no decisions about who would be hired;

5  is that fair?

6  A.  Correct.

7  Q.  In fact, as I understand it, you yourself were not actually

8  an SCA employee; is that correct?

9  A.  Correct.

10  Q.  Technically, you were hired as an independent contractor;

11  right?

12  A.  Yes.

13  Q.  You were a consultant while you worked at SCA, as opposed

14  to an employee; fair?

15  A.  Yes.

16  Q.  You continued -- while you were consulting for SCA, you

17  continued to consult for other companies; is that fair?

18  A.  Yes.  That's right.

19  Q.  And part of the reason you wanted to do that -- and it

20  makes sense to me -- is that you wanted to make sure that you

21  didn't put all of your eggs in the SCA basket; is that fair?

22  A.  There were lots of reasons I decided to do that; but that

23  would be one, yes.

24  Q.  Now, while you were at SCA, you were not personally

25  involved in discussions with other healthcare companies that

Bridget Fanning - Cross

1   might lead to business transactions between SCA and these other

2   companies; correct?

3   *A.*   In the main, no.

4   *Q.*   But you know, don't you, that those discussions took place?

5   That is to say, discussions between SCA and other healthcare

6   companies about possibly doing business together; true?

7   *A.*   Yes.

8   *Q.*   So let's talk about that for just a minute, because I want

9   to make sure I understand the business of SCA.  Are you with

10  me?

11  *A.*   Sure.

12  *Q.*   Okay.  So the business of SCA was actually to partner with

13  a lot of other healthcare companies; right?

14  *A.*   Mainly orthopedic surgeons; but they had a few deals with

15  hospital health systems, as well.

16  *Q.*   Let's talk about the orthopedic surgeons first.  So SCA was

17  in the business, as I understand it, of creating these what

18  they call ambulatory or outpatient surgery centers; is that

19  right?

20  *A.*   Correct.

21  *Q.*   That's where you -- instead of going to a hospital and

22  spending all of that money at the hospital, you actually go to

23  a center, maybe you have a surgery on your hip or your ankle or

24  something like that; right?

25  *A.*   Yes.  I used one.

1  *Q.*  How did it work out?

2  *A.*  Well, my brother got both his knees replaced, and it worked

3  out really well for him.

4  *Q.*  Great for him.  And it ends up being more convenient for

5  the patients; right?

6  *A.*  Yes.

7  *Q.*  And it can be -- it can be more efficient -- meaning, less

8  expensive -- for everybody; right?

9  *A.*  For sure.  And a share of the savings that are made between

10  the cost of the hospital system and the surgeon, the profits

11  are shared between the surgeon and SCA.  Yes.

12  *Q.*  And part of the job that Mr. Hayek had, broadly, was to go

13  out and find other healthcare opportunities for SCA to partner

14  with; right?

15  *A.*  Yes.

16  *Q.*  And to be fair, that was his job; but that was not your

17  job.  Right?

18  *A.*  Correct.

19         *MR. MELSHEIMER:*  Your Honor, I'm about to move to

20  another area.  This would be a convenient time for a break.

21         *THE COURT:*  Thank you, Mr. Melsheimer, this is a very

22  good time to stop for the day.

23         So, ladies and gentlemen, thank you for being here all

24  day, listening, taking notes.  But I have to ask you to come

25  back at 9 o'clock in the morning.  See you then.

 1          (Jury out at 4:29 p.m.)

 2          THE COURT:  The jury has been excused.  I have a thing

 3    or two to talk about.  But before I do, do you?

 4          MS. LEWIS:  No, Your Honor.

 5          May Dr. Fanning step down?

 6          THE COURT:  Yes.  Yes.  I'm sorry.

 7          THE WITNESS:  Can I actually go?

 8          THE COURT:  Well, you can go or you can stay.  We're

 9    not going to be here very long, but I need to talk to these

10    lawyers for a minute or two.

11          Anything for you to put on the record tonight,

12    Government?

13          MS. LEWIS:  No, Your Honor.

14          THE COURT:  Defendants?

15          MR. MELSHEIMER:  No, Your Honor.

16          THE COURT:  All right.  I have two things to ask

17    about, and they both had to do with Mr. Dodds' opening

18    statement.

19          One is just more a matter of curiosity than anything

20    else.

21          MR. DODDS:  Yes, sir.

22          THE COURT:  As I interpreted your statement -- but I

23    might have misunderstood what you were trying to communicate --

24    you were saying, in effect, well, absolutely, we had the

25    agreement they're talking about.  We're not going to dispute

1   that.  But it was a legal agreement.

2          *MR. DODDS:*  That's correct, Your Honor.

3          *THE COURT:*  And yet the young woman representing

4   Mr. Thiry kept calling it "that alleged agreement."  Now, are

5   you two taking different paths?

6          *MR. DODDS:*  We're not, Your Honor.

7          *THE COURT:*  Is it the alleged agreement that she turns

8   up her nose on; or is it, you bet we had that agreement, and it

9   was perfectly fine?

10         *MR. DODDS:*  I'll let Ms. Brooks speak for herself; but

11  we are not taking different paths, as far as I'm concerned,

12  Your Honor.  No.

13         *THE COURT:*  Okay.

14         *MS. BROOKS:*  Your Honor, with the Court's permission.

15  When I'm talking about the alleged agreement, I was talking

16  about the agreement the government alleges, which is the

17  agreement to allocate the market.  I wasn't talking about the

18  actual agreement that the parties had entered into.

19         *THE COURT:*  Well, you might want to think about how

20  you're coming across to the people that are going to decide

21  your fate at some point.

22         All right.  More importantly -- you can hammer out

23  your semantics between you.  This whole business, Mr. Dodds,

24  about the market of all employees, I don't buy it for a minute.

25  And, to me, it doesn't even make sense.

1          For example, if the government had to prove that the

2     government -- that the agreement had closed off opportunities

3     for this long, long, long list of other companies, you might as

4     well go ahead and have a no-poach agreement.  It might as well

5     be iron clad; right?  Because it wouldn't matter.  Or put

6     another way, if your theory is correct, there really isn't any

7     such thing, is there, of allocating an employee market?  With

8     all of these different companies out there, you couldn't ever

9     allocate an employee market; could you?

10         MR. DODDS:  It depends -- it would depend, Your Honor,

11    on how you tried to do it.  Our position here is that you

12    cannot allocate a market for employees by simply two companies

13    in that market agreeing not to solicit each other's employees

14    or --

15         THE COURT:  Yeah.  I don't agree with you.  There is a

16    case that all of you talk about in your briefs -- I just am

17    using some of the facts for a hypothetical here -- but there is

18    a case having to do with allocation of the market for

19    theaters -- for selling movies to theaters.

20         MR. DODDS:  Uh-huh.

21         THE COURT:  All right.  So suppose you have in a

22    community 20 theaters.  And your conspirators agree that number

23    one is servicing ten, and number two is servicing the other

24    ten, and you won't solicit each other's.  That's illegal.

25         MR. DODDS:  In that instance, Your Honor, you would

 1   be -- you would have allocated all of the theaters or all of

 2   the customers in that market.  In this instance --

 3        *THE COURT:*  Well, what's the difference?  I'm talking

 4   about a market of 20 in a mid-sized town.

 5        *MR. DODDS:*  Uh-huh.

 6        *THE COURT:*  You're talking about a market of tens of

 7   thousands, maybe, hundreds, at least, of companies.  Why can't

 8   you have a market that consists of two companies and their

 9   employees, where they're limiting the opportunities to have a

10   job with the other company?

11        *MR. DODDS:*  Well, I'd like to make two points, Your

12   Honor.  I'll answer Your Honor's question, and then I have

13   another point, because I think there was another element that

14   Your Honor has articulated to the offense that I also think is

15   important here.

16        Why can't you have a market that consists of two

17   companies?  It is simply because that is not the market for the

18   employees that are at issue here, as the documents that we saw

19   today show.  Even --

20        *THE COURT:*  We talked about that yesterday.  You're

21   saying that isn't the market because it isn't the market.

22        *MR. DODDS:*  Because --

23        *THE COURT:*  If somebody like Mr. -- what was his

24   name -- if his goal is to get a job at Surgical Care

25   Associates --

1          MR. DODDS:  Surgical Care Affiliates.  Yes, Your

2     Honor.

3          THE COURT:  Affiliate.  If that's what he wants, he

4     wants that job, and that's closed to him, that market is

5     closed.  Sure, he can go try to get a job with the Indiana

6     State University Hospital.

7          MR. DODDS:  Uh-huh.

8          THE COURT:  But for whatever reason, he wants a job

9     with SCA.  SCA wants to recruit him, SCA wants to recruit

10    anybody at DaVita, because they're talented and experienced and

11    good executives, but that market is closed.  And if the intent

12    was to allocate that market, you lose.  Right?

13         MR. DODDS:  If that -- if that is how the market is

14    defined, then we might, or we might have to switch theories.

15    But I don't think it would be proper and appropriate for that

16    to be how the market is defined.

17         THE COURT:  Have a seat, Mr. Melsheimer.

18         MR. DODDS:  The other --

19         THE COURT:  You're interesting, and I like listening

20    to you, but it's not your turn.

21         MR. MELSHEIMER:  I'll wait, Your Honor.

22         MR. DODDS:  The other point, Your Honor, that I wanted

23    to make that goes to the other element, which was really the

24    thrust of my opening statement -- at least the thrust I was

25    attempting to make -- is that Your Honor has said -- correctly,

         1    we think -- that in order for these nonsolicitation agreements

         2    to be *per se* violations of the Sherman Act, the government has

         3    to prove beyond a reasonable doubt that when they were made,

         4    the makers -- Mr. Thiry and the others -- understood that they

         5    were allocating the market.  That naturally --

         6              THE COURT:  Actually, better than that.  That they

         7    intended to allocate the market.

         8              MR. DODDS:  Yes, that they intended to allocate the

         9    market.  But that obviously brings up the factual question in

        10    the case of what they understood the market to be.  Otherwise,

        11    that -- that element is meaningless.

        12              THE COURT:  That actually brings up -- I think what

        13    the market is is a legal question.  Whether he intended to

        14    allocate that market is your fact question for the jury, I

        15    think.

        16              MR. DODDS:  But I -- I'm sorry, Your Honor.  I don't

        17    understand how if it -- if there is an intent element here, an

        18    understanding of the market that was not actually that person's

        19    understanding can properly be imposed on them.  The question is

        20    what they understood back then; and, naturally, their

        21    understanding of the market is critical to that.

        22              THE COURT:  So -- okay.  You two sides don't have even

        23    a remotely similar idea as to what is critical; you're leaving

        24    it to this court to decide that.

        25              So setting aside the question -- and it's a big

1   question -- as to whether it makes any sense to do another

2   preliminary instruction, because the Government sat there

3   during your speech -- to use the vernacular -- fat, dumb, and

4   happy and didn't say boo.  And to come up with a preliminary

5   instruction now in the middle of the case is something that I

6   would have to think about.

7          But something like this would be what I would be

8   potentially thinking about:  The government need not prove that

9   defendants allocated an entire market to carry its burden of

10  proof.  To prove an agreement to allocate the market for

11  employees exists, the government must show, one, an agreement

12  between -- and I think you could say competitors for employees,

13  you could say companies competing for employees, you could say

14  actual or potential competitors for employees.  I don't care

15  too much about that -- let's just say an agreement between

16  competitors for employees.  Two, to allocate employees -- or

17  you could say to allocate employment opportunities.  Three, in

18  order to minimize competition.

19         Now, if I instructed that way, that would be precisely

20  along the lines of the *Kemp* case in the Tenth Circuit.  What's

21  wrong with that?

22     *MR. DODDS:*  Well, a couple of things, Your Honor.

23  First, as an overarching matter before I forget, obviously,

24  this is a very, very important issue.  And we disagree with the

25  government's position, and I think we would disagree with Your

1    Honor's instruction here.  And we'd like -- we have prepared a

2    short submission that we'd like to be able to make to Your

3    Honor on this point.

4         THE COURT:  Well, you can make the submission.  But

5    I'm thinking out loud.  That's how I sometimes can decide

6    something.  This is what I think.

7         MR. DODDS:  So here is, Your Honor, the answer to that

8    question:  When Your Honor submitted to our -- sent to us very

9    helpfully the preliminary instructions you were considering --

10   and I actually don't remember whether -- you gave us two

11   things.  One was about the preliminary instructions and the

12   other was about the final jury instructions.  And one of the

13   questions was, what do we call this case?  Do we call it an

14   employee -- a conspiracy to allocate employees or a conspiracy

15   to allocate the market?  And I believe what Your Honor said was

16   a conspiracy to allocate the market.  This seems to have

17   retreated from that.

18        THE COURT:  Actually, I said a horizontal market

19   allocation agreement.  And you antitrust gurus didn't like the

20   word "horizontal," even though that's exactly what it is; and

21   so I dropped it off in the final version, to accommodate you.

22        MR. DODDS:  I do think there was some other language,

23   Your Honor, that I'm thinking of.  I can't cite it exactly

24   right here, but I do think --

25        THE COURT:  I --

1          MR. DODDS:  I am not an antitrust guru, by the way.

2          THE COURT:  Well, you're a very clever litigator; and

3     you made an impressive speech.  But in doing so, you might have

4     committed yourself to a position that isn't going to work.

5     That's what I'm trying to tell you, Mr. Dodds.

6          MR. DODDS:  I hear very clearly what you're saying,

7     Your Honor.

8          THE COURT:  All right.

9          MR. DODDS:  Obviously, we disagree.

10          THE COURT:  Mr. Melsheimer, your turn now.

11          MR. MELSHEIMER:  Thank you, Your Honor.  I'm a great

12     guest in this court, and I want it to stay that way.

13          I think as Your Honor is thinking out loud about this,

14     I urge you to think about this:  You told us in your lengthy

15     and scholarly order denying the motion to dismiss in the last

16     couple of pages -- remember, there was the whole debate about,

17     well, the case is over, because it's an agreement, and that's

18     the crime, and we're done.  And you said, no, that's not right.

19     And you said you disagreed with the government's position on

20     this.  And you said we were going to be allowed to prove that

21     we lacked the intended purpose to allocate the market.

22          THE COURT:  Correct.

23          MR. MELSHEIMER:  Now, I think there is a factual --

24     we're having a trial here.  Right?  So there is a factual

25     dispute about this.  I think they're entitled to say what they

| | |
|---|---|
| 1 | want to say.  I'll note that with this witness, Dr. Fanning, |
| 2 | they brought in all of this evidence about all of these other |
| 3 | companies, all of these other things that were being hired |
| 4 | from.  So that's not just unobjected to; that's what they |
| 5 | brought into evidence.  So I think we're entitled to -- |
| 6 | THE COURT:  Sleight of hand, Mr. Melsheimer.  They |
| 7 | brought the other companies in for a totally different purpose. |
| 8 | MR. MELSHEIMER:  Well, Your Honor, that may be.  But |
| 9 | the jury is entitled to see it for a different purpose, Your |
| 10 | Honor; and that's the purpose that we're arguing, which is to |
| 11 | say that these -- this company and this gentleman -- Packer |
| 12 | fan, though he may be -- did not have the intent and purpose to |
| 13 | allocate the market for a lot of different reasons.  One of |
| 14 | which was, is that the market was far larger for these |
| 15 | employees to go to, as we've seen in the evidence already. |
| 16 | So all I'm asking, Your Honor, is as you continue to |
| 17 | think about this, is that we have -- we have prepared an entire |
| 18 | defense based on the last two pages of the Court's order -- |
| 19 | which I think were dead-on correct. |
| 20 | THE COURT:  Mr. Melsheimer, I understand that.  And |
| 21 | I've been and will be very liberal in terms of letting you put |
| 22 | in your evidence, that the government believes shouldn't come |
| 23 | in in a *per se* case, that Mr. Thiry had purposes other than |
| 24 | allocating the market.  You've announced that his purposes were |
| 25 | to improve your ability to compete, to improve the lot of the |

1     employees, to do this, to do that.  I haven't shut you down on

2     that, because I gave you a lifeline.  And that was, they have

3     to prove beyond a reasonable doubt the intent to allocate the

4     market.  That is not an abdication of the Court's role to

5     determine what the market is that we're talking about.

6         *MR. MELSHEIMER:*  I agree with that, Your Honor.  But

7     can I make two more comments without taxing the Court's

8     patience?

9         *THE COURT:*  All right.

10        *MR. MELSHEIMER:*  That remains to be seen.

11        *THE COURT:*  No, no, you won't tax my patience.

12        *MR. MELSHEIMER:*  So one point, Your Honor, is it's

13     totally inappropriate, in my judgment, in the middle of a trial

14     to give an additional instruction.  To me, that would be an

15     improper comment on the weight of the evidence.  And you can

16     avoid that because you're going to be able to instruct the jury

17     at the end of the case anyway.

18        *THE COURT:*  I'm potentially agreeing with you on that.

19        *MR. MELSHEIMER:*  On the preliminary.  Okay.

20        So with respect to this, Judge, all I'm saying is that

21     two things can be true.  Parties can be arguing different

22     things.  They can be arguing, the market should be this; and we

23     can be arguing, we didn't see it that way, and that's why we

24     don't -- that's why we lacked the intended purpose to allocate

25     it.  And I think an instruction that says somehow even

1   indirectly we're wrong about that, I think would be taking away

2   from the jury the province of deciding -- because all we're

3   really trying to figure out is what really happened here?

4           *THE COURT:*  Okay.

5           *MR. MELSHEIMER:*  I would urge the Court to read our

6   submission on this issue and continue to think about it.

7           *THE COURT:*  Okay.

8           Now, Ms. Lewis, do you want to respond to these very

9   persuasive gentlemen?

10          *MS. LEWIS:*  Your Honor, I think Your Honor understands

11  the issues.  I think Your Honor has clearly indicated your view

12  of what it means to be a horizontal competitor in a market.

13  Your Honor has agreed, the Indictment charges what the

14  Indictment charges, which is these markets in between these two

15  competitors in each of the three counts.  So I believe Your

16  Honor --

17          *THE COURT:*  So you're saying that there are three

18  markets.

19          *MS. LEWIS:*  The market that is charged in each count

20  of the Indictment.  The competitors are the --

21          *THE COURT:*  There three counts, and you're saying

22  there is three markets?

23          *MS. LEWIS:*  Relevant to each count, yes, Your Honor.

24          *THE COURT:*  One market for each count.

25          *MS. LEWIS:*  Correct.

1          THE COURT:  And the market is the employees of DaVita

2    and the conspirator identified in that count.

3          MS. LEWIS:  Correct, Your Honor.

4          THE COURT:  Well, I think I agree with you.  But,

5    look, folks, I have a very strong desire to help this jury

6    steer through your disputes and reach a decision.  The problem

7    is, you get up there in your speech, Mr. Dodds -- and it was

8    really a very nice speech, by the way.

9          MR. DODDS:  Thank you.

10          THE COURT:  You both gave very nice opening

11    statements.

12          MR. DODDS:  I didn't expect it to get me in this kind

13    of trouble.

14          THE COURT:  Well, you made a nice speech.  Ms. Lewis

15    made one of these I-hate-to-have-to-follow-that, and you did

16    it.  But in the process, you told the jury something that in my

17    view isn't right.  And they're over there, I think, potentially

18    thinking, how can there be an allocation of the market when

19    there are hundreds of companies that these people can go to?

20    They got shut out of one.  Okay.  Too bad for them.  And that

21    isn't, I think, what the law is.

22          Anyway, you want to submit something, you said.  Fine.

23    Think about it overnight.  You too.  But I'm going to have my

24    ears prick up if somebody starts talking about the Dodds

25    market, because that is where I'll perk up and say, well, the

1    Jackson market might be something a little different.

2           MR. MELSHEIMER:   Your Honor, I would also note -- my

3    ears pricked up when you called the lawyer examining the

4    witness a young lady.   I just don't know if we were referring

5    to the same person.

6           THE COURT:   Did he just insult you?

7           MS. BROOKS:   The record reflects, Your Honor, it

8    happens oh, three or four times a day.

9           THE COURT:   Is that a Texas thing, to be rude to your

10   co-counsel?

11          MR. MELSHEIMER:   It's kind of part of the schtick,

12   Your Honor.   But thank you, in any event.

13          THE COURT:   All right.   Have a nice evening.

14          MS. LEWIS:   Thank you, Your Honor.

15          MR. WALSH:   Thank you, Your Honor.

16          (Recess at 4:49 p.m.)

17                            **I N D E X**

18   **Item**                                                   **Page**

19

20      DENNIS KOGOD
             Direct Examination By Ms. Clingan            59
             Cross-examination By Ms. Brooks             143
21          Redirect Examination By Ms. Clingan          206
        BRIDGET FANNING
22           Direct Examination By Ms. Lewis             213
             Cross-examination By Mr. Melsheimer         280

23

24

25

GOVERNMENT'S EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 32 | | 81 | | | |
| 42 | | 86 | | | |
| 47-1 | | 254 | | | |
| 48-1 | | 254 | | | |
| 49 | | 254 | | | |
| 51 | | 243 | | | |
| 52 | | 245 | | | |
| 53-1 | | 246 | | | |
| 60-1 | | 250 | | | |
| 65 | | 257 | | | |
| 67-3 | | 226 | | | |
| 70-1 | | 234 | | | |
| 81 | | 270 | | | |
| 82-1 | | 269 | | | |
| 83 | | 273 | | | |
| 98 | | 258 | | | |
| 100 | | 260 | | | |
| 101 | | 247 | | | |
| 102 | | 248 | | | |
| 104 and 105 | | 253 | | | |
| 106 and 107 | | 267 | | | |
| 108 and 109 | | 240 | | | |
| 151 | | 195 | | | |
| 152 | | 131 | | | |
| 164 | | 104 | | | |
| 174 | | 108 | | | |
| 202 | | 119 | | | |
| 212 | | 123 | | | |
| 217 | | 127 | | | |
| 255 | | 141 | | | |
| 257 | | 113 | | | |
| 278 | | 264 | | | |
| 279 | | 133 | | | |
| 280 | | 93 | | | |
| 281 | | 97 | | | |
| 284 | | 117 | | | |
| 312 | | 138 | | | |
| 313 | | 98 | | | |
| 314 | | 101 | | | |
| 315 | | 100 | | | |
| 321 | | 206 | | | |
| 333 | | 114 | | | |
| 344 | | 249 | | | |
| 345 | | 267 | | | |
| 595 and 596 | | 89 | | | |

1                        DEFENDANTS' EXHIBITS

2    Exhibit       Offered   Received  Refused  Reserved  Withdrawn

3    A022                      174
     A775                      178
4    A779                      175
     B534                      157
5    B535                      161
     B537                      163

6

7                       REPORTER'S CERTIFICATE

8            I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
9
             Dated at Denver, Colorado, this 12th day of April,
10   2022.

11

12                              _Therese Lindblom_

13                              _____
                                Therese Lindblom,CSR,RMR,CRR
14

15

16

17

18

19

20

21

22

23

24

25