1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

Civil Action No. 21-cr-00229-RBJ
3

UNITED STATES OF AMERICA,
4

      Plaintiff,
5

vs.
6

1. DAVITA INC., and
7  2. KENT THIRY,

8       Defendants.
_____
9

10                    **REPORTER'S TRANSCRIPT**
              TRIAL TO JURY – DAY SIX
11
_____
12

13         Proceedings before the HONORABLE R. BROOKE JACKSON,

14  Senior Judge, United States District Court for the District of

15  Colorado, continuing at 8:32 a.m., on the 11th day of April,

16  2022, in Courtroom A902, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24              THERESE LINDBLOM, Official Reporter
              901 19th Street, Denver, Colorado 80294
25      Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1

**A P P E A R A N C E S**

2          MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE
CLINGAN and ANTHONY WILLIAM MARIANO, Attorneys at Law, U.S.
3   Department of Justice, Antitrust Division, Washington Criminal
II Section, 450 5th Street N.W., Washington, DC, 20530,
4   appearing for the Government.

5          JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius
LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103,
6   appearing for Defendant DaVita.

7          JOHN CLAYTON EVERETT, JR., Attorney at Law, Morgan
Lewis & Bockius LLP, 1111 Pennsylvania Avenue NW, Washington,
8   DC, 20004, appearing for Defendant DaVita.

9          JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP,
1225 17th Street, Suite 2600, Denver, Colorado, 80220,
10  appearing for Defendant DaVita.

11         THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn
LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201,
12  appearing for Defendant Thiry.

13         JUANITA ROSE BROOKS, Attorney at Law, Fish &
Richardson, 12860 El Camino Real, Suite 400, San Diego,
14  California, 92130, appearing for Defendant Thiry.

15                          *  *  *  *  *

16                     **P R O C E E D I N G S**

17         (In open court at 8:32 a.m.)

18         THE COURT:  Good morning.  How do you wish to proceed?

19         MR. VIGEN:  Your Honor, we talked to defense counsel,

20  and we believe it makes sense to go right to cross-examination

21  of the expert as part of the *Daubert* hearing.

22         THE COURT:  All right.

23         Good morning.

24         MR. VIGEN:  Before I begin, I just for the record,

25  want to give a thanks to Terri Lindblom for her great work last

1    week and working over the weekend to get us some transcripts.

2    We appreciate that, Terri.

3                  (**PIERRE CREMIEUX, DEFENDANTS' WITNESS, SWORN**)

4                              **CROSS-EXAMINATION**

5    *BY MR. VIGEN:*

6    *Q.*   Good morning, Dr. Cremieux.

7    *A.*   Good morning.

8    *Q.*   My name is William Vigen.  I'd like to discuss today your

9    opinions that you filed in your expert report in this matter in

10   Sections 5 and 6.  And just briefly, that's where you compared

11   DaVita turnover and compensation data against turnover and

12   compensation data from industry benchmarks that you selected.

13   Is that generally accurate?

14   *A.*   Yes.  I compared the movement in the turnover and

15   compensation for DaVita with the movement in compensation -- in

16   turnover and compensation for a benchmark, which was the

17   healthcare industry.

18   *Q.*   Okay.  And that type of analysis -- sorry.  That type of

19   analysis is called a difference-in-difference approach by

20   economists; correct?

21   *A.*   That's right.

22   *Q.*   Okay.  For a valid difference-in-difference analysis, it's

23   important that you're comparing apples to apples; would you

24   agree with me on that?

25   *A.*   It's not a technical term; but generally speaking, I

Pierre Cremieux – Cross

1   understand the spirit.

2   Q.  Yeah.  So the one apple is the DaVita data, and the other

3   apple is supposed to be your benchmark data.  Is that right?

4   A.  Not quite.  One apple, if you will, is the change in DaVita

5   compensation; and the other one is the change in the benchmark.

6   Q.  And if you're not comparing apples to apples, essentially,

7   you haven't done a valid analysis; would you agree with that?

8   A.  Again, it's very vague.  Apples to apples, I don't know

9   what that means.  But generally speaking, if you didn't do it

10  right, then it's wrong.

11  Q.  Okay.  So let's talk about how you're supposed to do it

12  right.  The assumption is, if you're comparing or using an

13  appropriate benchmark -- what I'm referring to is apples to

14  apples, but an appropriate benchmark -- that the various

15  economic factors and variables that could affect the turnover

16  and compensation data are essentially impacting the DaVita data

17  and the benchmark data you selected in relatively similar ways

18  overall.  Is that the idea?

19  A.  That's fair.  Yeah.

20  Q.  Okay.  So one variable that could impact turnover or

21  compensation is how fast the economy was growing; right?

22  A.  Yes.  That's a good example.

23  Q.  Another variable could be overall inflation; would you

24  agree?

25  A.  Yes.  That's right, too.

Pierre Cremieux - Cross

1    Q.   One other could be wage growth?

2    A.   Could be, sorry?

3    Q.   Wage growth.

4    A.   I don't think that's quite right.  It depends on which wage

5    growth you're looking at.  Right?  If you're looking at

6    compensation, for example, which I am, then since what I'm

7    looking at is whether there is a difference between the two in

8    the rate at which they grow, that's actually the variable I'll

9    be interested in, as opposed to one that I would control for,

10   for example.

11   Q.   Okay.  So another variable could be job satisfaction?

12   A.   Okay.  So now we have to -- you mean specifically in this

13   application; right?

14   Q.   Yes, sir.

15   A.   No.  I don't think that's right either, because I'm not

16   trying to make a statement about the general economy on one

17   hand and DaVita on the other.  The statement I'm making is

18   different from that, and it's important for that point.  The

19   statement I'm making is that, as I look at the change in the

20   rate of growth or shrinkage of compensation or turnover, I want

21   to make sure that I anchor it to something so that what I'm

22   looking at is real, if you will.  And what I'm anchoring it is

23   the change at the benchmark.  And so if turnover is higher,

24   say, at -- or if -- sorry -- if job satisfaction is higher at,

25   say, DaVita relative to the benchmark, that's okay.  Because

Pierre Cremieux – Cross

1     since what I'm interested in is the change, unless there is

2     something which would lead somehow the economy to have a change

3     in job satisfaction, which is not reflected at DaVita because

4     somehow it's insulated from the economy -- which I don't

5     believe it is -- then my comparison is going to be valid.

6           In other words, if you have my charts in mind, the

7     point I'm making is that I think it was -- you know, there was

8     a chart with 13 percent versus 9 percent.  That difference is

9     not one that I'm particularly interested in, but it's the one

10    you're referring to.  What I'm interested is how the change

11    compares between the two groups.

12    Q.  Okay.  So I'd like to draw out a little bit of what you

13    just said.  So you said if the change in job satisfaction is

14    different over time, then your analysis is not valid.

15          If the change in job satisfaction at DaVita changes

16    over time relative to the national benchmark, your analysis is

17    not valid?

18    A.  What I'm saying that if there was a significant -- if there

19    was a reason --

20    Q.  Sir --

21    A.  Sorry.

22    Q.  My question is --

23          THE COURT:  Are you under the impression you're

24    communicating with the Court, or are you just having a nice

25    discussion with one economist to another?  Because I don't know

Pierre Cremieux – Cross

1   what you're talking about.

2           *MR. VIGEN:*  Okay.  Let me back up.

3   *BY MR. VIGEN:*

4   *Q.*  You agree, Dr. Cremieux, that, essentially, various

5   variables can impact and cause turnover and compensation data

6   to change; correct?

7   *A.*  Yes.

8   *Q.*  Okay.  And we talked about some variables that you

9   acknowledged could impact that change.  You at least

10  acknowledged overall inflation or the economy growing; right?

11  *A.*  In the case of compensation, inflation would matter.  I

12  think in the case of job turnover, you took the example of job

13  satisfaction, so that may matter.

14  *Q.*  Okay.  So one of the variables that might matter is job

15  satisfaction at DaVita?

16  *A.*  We're now back on the job turnover; right?

17  *Q.*  I'm just asking if job satisfaction as an economic variable

18  could impact turnover and compensation numbers at DaVita.

19  *A.*  It's possible.

20  *Q.*  Okay.  The assumption is, using a difference-in-difference

21  approach, that job satisfaction at DaVita relative to the

22  benchmarks you chose is roughly the same, that they're

23  impacting those numbers in relatively the same way?

24  *A.*  No, it's not.

25  *Q.*  Okay.  Can you explain why not?

Pierre Cremieux - Cross

1   *A.*  Because in that analysis, what I'm doing is I'm looking at

2   the trend, the growth, if you will, or reduction in

3   compensation for DaVita.  And all I'm doing with the benchmark

4   is I want to make sure that if I observe a growth in

5   compensation at DaVita, I know how to interpret it, given

6   that -- if, for example, in the benchmark, the growth was twice

7   as fast, it means that, really, DaVita is lagging.  If the

8   growth is half as fast, it means DaVita is going faster.  So

9   what I'm doing here is really just using the benchmark to help

10  interpret the DaVita data.  Not making any statements about

11  whether the fact that I observed a 13 percent growth in

12  compensation at DaVita and a 9 percent growth in compensation

13  for the benchmark means anything.  Doesn't make any difference.

14  *Q.*  Okay.  What I would like to focus on is how to do a proper

15  difference-in-difference analysis, not what you did.

16  *A.*  Okay.

17  *Q.*  Okay.  So let's just back up to the first principles.

18  *A.*  Okay.

19        *THE COURT:*  So what you're saying is you don't want to

20  focus on what he did; you want to focus on some analysis of

21  yours?

22        *MR. VIGEN:*  No.  I'm focusing on the method that he

23  chose to use, which is the difference-in-difference method.

24        *THE COURT:*  Let's see if I can even understand what

25  we're talking about.

Pierre Cremieux - Cross

1          Sir, in section 5, as I read it -- and probably

2     putting it more simply than you do -- you're looking at

3     DaVita's turnover rate for, during, and after the conspiracy

4     periods, and you're looking at a national -- you call it a

5     benchmark -- average turnover rate for senior executives; yes?

6          THE WITNESS:  That's exactly right.  Yes.

7          THE COURT:  And you're comparing DaVita's turnover

8     rate to the benchmark during this period of time; yes?

9          THE WITNESS:  I'm comparing the two changes.  So they

10    go up, both at different rates, and I'm just looking at the

11    changes of the two.

12         THE COURT:  You say that during the period starting

13    before our conspiracy periods and continuing all the way

14    through and even after the conspiracy periods, the national

15    turnover rate for executives was 8 to 9 percent.

16         THE WITNESS:  That's right.

17         THE COURT:  And you said that during that same period,

18    DaVita's rate of turnover started at 4 percent and grew up to 7

19    to 8 percent.

20         THE WITNESS:  I don't remember the numbers off the top

21    of my head; but, yes, I make statements about --

22         THE COURT:  I think those are the numbers, because I

23    just read them over the weekend.

24         And then you say, thus, DaVita's rate of turnover

25    increased relative to the benchmark.  And you say that wouldn't

Pierre Cremieux - Cross

1    happen, in your opinion, if there was a labor market allocation

2    agreement in place.

3            THE WITNESS:  That's exactly right.  Yes.

4            THE COURT:  That's section 5.

5            Section 6, you're, in theory, comparing DaVita's

6    salaries during, before, and after the conspiracy period to the

7    national average; yes?

8            THE WITNESS:  Yes.

9            THE COURT:  And you say DaVita's median annualized

10   salaries for senior-level executives exceeded the national

11   benchmark by 50 percent before the conspiracy period.  In other

12   words, you worked at DaVita, you got paid better than the

13   national average.

14           THE WITNESS:  That's right.

15           THE COURT:  During the conspiracy period, it wasn't

16   50 percent anymore; it was 52 percent higher.

17           THE WITNESS:  That's right.

18           THE COURT:  After the conspiracy period, you say it

19   was now only 45 percent higher.  So you say the highest DaVita

20   average salary compared to the benchmark occurred during the

21   conspiracy period.  And then from that, you concluded if there

22   was an allocation agreement in effect, that shouldn't have

23   happened.

24           THE WITNESS:  Correct.  I would expect the opposite.

25   Yes.

1          THE COURT:  That's what section 5 and 6 are about.

2          THE WITNESS:  That's right.

3          THE COURT:  Okay.  Now, what's your problem with it,

4    that he's so full of beans that his opinion can't even be

5    heard?

6    BY MR. VIGEN:

7    Q.  So, Dr. Cremieux, can you please explain to the Court what

8    the parallel trends assumption or the common trends assumption

9    is with respect to the difference-in-difference approach.

10   A.  So the assumption here is that there is validity in looking

11   at how the DaVita compensation increased and comparing it with

12   the change in compensation in a sector which DaVita used as its

13   benchmark for its compensation in its own document, which is

14   the outpatient healthcare sector.  So I'm not doing anything

15   here that is unusual, that's methodologically problematic or

16   inconsistent with very much the way in which DaVita itself was

17   thinking about what benchmark it should use when it's thinking

18   about its own employees and how to compensate them.

19        MR. VIGEN:  Could we please show the witness

20   Government Exhibit 588.  And if we can go to page 3.

21   BY MR. VIGEN:

22   Q.  Sir, I was trying to get you to explain in laymen's terms

23   for the Court the parallel trends assumption; but I'd like to

24   read you this explanation of it.

25        "The parallel trend assumption is the most critical of

Pierre Cremieux – Cross

1   the above four assumptions to ensure internal validity of

2   difference-in-difference models" --

3           THE COURT:  What are you reading from?

4           MR. VIGEN:  This is an article explaining the

5   difference-in-difference analysis on the Columbia University

6   website.  I'm trying to see if the witness agrees with this to

7   try to get this in simpler terms.

8           THE COURT:  An article on the Columbia University

9   website?

10          MR. VIGEN:  Describing the difference-in-difference

11  approach, and I'd like the witness to see if he agrees with

12  this.

13          THE COURT:  How long is the article?

14          MR. VIGEN:  Four pages.

15          THE COURT:  Do you want to take the time to read it,

16  or are you familiar with it already?

17          THE WITNESS:  I'd love to have it in front of me just

18  so I know what the context of it is.

19          MR. VIGEN:  Okay.

20          THE COURT:  Okay.  Show it to him.

21          You go ahead and read it, and tell us when you're

22  done.

23          MR. VIGEN:  Your Honor, I wanted to -- I want to show

24  the witness Government Exhibit 590, please.

25          THE COURT:  590?

1          *MR. VIGEN:*  Yes, sir.

2          *THE COURT:*  What's 590?

3    *BY MR. VIGEN:*

4    *Q.*  Sir, this is a textbook that you cited in your expert

5    opinion; correct?

6    *A.*  Yes.

7    *Q.*  Okay.  Could we please go to -- you specifically cited

8    Chapter 5 on differences-in-differences; correct?

9    *A.*  Yes.  I believe that's right.

10          *MR. VIGEN:*  Could we go to the opening paragraph,

11   please.

12   *BY MR. VIGEN:*

13   *Q.*  Do you see where it says, "This chapter considers a

14   variation on the control theme:  Strategies that use data with

15   a time or cohort dimension to control for unobserved but fixed

16   omitted variables.  These strategies punt on comparisons and

17   levels while requiring the counterfactual trend behavior of

18   treatment and control groups to be the same."

19          Do you see that?

20   *A.*  I apologize.  Can I read it from the beginning, just

21   because I think you started reading and --

22          *THE COURT:*  Absolutely, you can.

23          *THE WITNESS:*  Okay.  Just give me one second.  I'm

24   sorry.

25          Okay.  Thank you.

Pierre Cremieux – Cross

1    *BY MR. VIGEN:*

2    *Q.*  Do you agree that the strategies punt on comparisons and

3    levels while requiring the counterfactual trend behavior of

4    treatment and control groups to be the same?

5    *A.*  Yes, I do.

6    *Q.*  Okay.  And the treatment group is the DaVita data; is that

7    right?

8    *A.*  That's right.

9    *Q.*  And the control group is your benchmark data; correct?

10   *A.*  That's correct.

11   *Q.*  Okay.  And this is saying that the counterfactual trend

12   behavior of both groups needs to be the same; right?

13   *A.*  That's what this says.  Yes.

14   *Q.*  And you agree with that?

15   *A.*  Well, it depends what you applied for.  But, yes, I agree

16   generally with the statement.  There is nothing wrong with the

17   statement.

18   *Q.*  Okay.  I'd like to show what you have done to show that or

19   what you have not done to show that.  If we could go to your

20   expert report, Government Exhibit 510.  Specifically,

21   Exhibit 3.

22          So the counterfactual trend behavior being the same,

23   you need to show that it's the same before the conspiracy

24   period; you would agree with that?

25   *A.*  That's not quite right.

Pierre Cremieux - Cross

1    Q.   Okay.  What do you disagree about that?

2    A.   What I disagree about is that what happens within the

3    pre-conspiracy period is not particularly important.  What's

4    important is that as I compare the levels before and during the

5    conspiracy period at DaVita, I have an anchor that I can use to

6    see how that evolution fits within what we see in the more

7    general economy, in the comparators that DaVita uses for its

8    compensation.

9         So that's what I'm doing.  I'm literally simply taking

10   a benchmark and -- which is -- which includes DaVita -- the

11   benchmark is the sector of the outpatient healthcare sector --

12   and I'm saying, well, it moved by 12 percent, DaVita moved up

13   by 15 percent, so DaVita moved up faster than the benchmark.

14   That's really beginning and end of the statement I'm making.  I

15   made up the numbers; those are not the exact numbers in my

16   report; but, fundamentally, what I'm doing is that.

17   Q.   Sir, where did you show that the trend behavior of the

18   DaVita data and the benchmark data was the same prior to the

19   conspiracy?

20   A.   I didn't.

21   Q.   And that is a necessary requirement -- if we go back to

22   Government Exhibit 590 -- for this to be a valid

23   difference-in-difference approach; correct?

24   A.   No, that's not right.  You're not reading -- you're

25   understand -- I think you're not understanding that document

Pierre Cremieux - Cross

1    correctly.

2    Q.   Okay.

3    A.   That's not what it says.

4    Q.   When this document says that, "These strategies punt on

5    comparisons and levels, while requiring the counterfactual

6    trend behavior of treatment and control groups to be the same,"

7    what is that saying you're supposed to show to show a valid

8    difference-in-difference approach?

9    A.   What that says is that since I'm comparing two periods for

10   DaVita and I'm comparing two periods for the benchmark, the

11   movement between the two absent the allegations should

12   expect -- should be expected to be similar.  And since the

13   benchmark is in fact the benchmark that DaVita uses to

14   determine its compensation, that seems like quite a reasonable

15   assumption to me.

16   Q.   Okay.  But you need to actually show that those trends in

17   the before period are moving in similar fashion; that's what

18   you just said.

19   A.   No, that's not what I just said.  I'm sorry.  You're not

20   understanding.  You're making the mistake of conflating what

21   happens before -- in the before period with the difference in

22   the trend before and after.  So you cannot just look at one

23   period.  Because, again, if you look at my report, you'll see

24   that the -- in the before period -- in fact, you put it up on

25   the chart earlier.  If you go to the chart with the percentage

935

Pierre Cremieux - Cross

1   change, you'll see that I have something like a 3.6, I think.

2   Q.   3.9.

3   A.   3.9 percent change difference.   That number in and of

4   itself is not particularly interesting.   What is interesting is

5   how it compares with the number after.

6   Q.   Right.   If you go back to 590, you're saying, what is

7   interesting is how it compares?

8   A.   You mean 510; right?

9   Q.   No.   590.

10  A.   Okay.

11  Q.   The counterfactual in your analysis is the before period;

12  would you agree with that?

13  A.   No, I don't.   That's I think the source of the error.   The

14  counterfactual here is not the before period.   The

15  counterfactual is the growth rate before and after for the

16  benchmark.   I'm not making any statements about the before

17  period being the counterfactual.   It's -- methodologically,

18  what I'm doing is different from what I think what you have in

19  your head as my method.

20  Q.   The trend behavior between what you're studying, DaVita's

21  data and the benchmark, absent an alleged conspiracy, they need

22  to be moving in a relatively similar trend.   That's what the

23  word -- that's what the whole purpose of this trend analogy is;

24  right?

25  A.   I agree with that.   Yes.

Pierre Cremieux - Cross

1   *Q.*   Okay.  Where in your report did you show that the DaVita

2   data and the benchmark data moved over time in a similar trend?

3   *A.*   I don't.  That's the whole point.  Is I'm showing that if

4   you look at the benchmark -- which, again, is used by DaVita in

5   its own determination of compensation -- and I compare it with

6   the trend for DaVita itself, I observe a difference.  I'm not

7   sure what more you'd expect me to do.

8   *Q.*   When we were talking about all of these variables before

9   that impact both the benchmark and DaVita --

10  *A.*   Uh-huh.

11  *Q.*   -- the whole assumption of a difference-in-difference

12  approach is that those variables taken together, you don't need

13  to separately analyze, because they are all moving in the same

14  trend absent what you're studying here, the alleged conspiracy;

15  right?

16  *A.*   Over the entire period?

17  *Q.*   Correct.

18  *A.*   Yes.  Not in the pre-period, as you've been saying.

19  *Q.*   Well, but it's important also in the pre-period, would you

20  agree, to show a parallel trend?

21  *A.*   Not necessarily.  What's important is to show that for the

22  two periods you're looking at, the benchmark is appropriate.

23  And, again, this benchmark, I'm not making it up.  I'm taking

24  it from what DaVita uses as its own benchmark when it tries to

25  figure out how much to compensate its employees.

1          *MR. VIGEN:*  Could we show you Government Exhibit 589,

2     please.

3     *BY MR. VIGEN:*

4     *Q.*  This is another document you cited in your report, the

5     "Proving Antitrust Damages."

6     *A.*  Uh-huh.

7     *Q.*  If we can start in the middle paragraph, starting with

8     "further."

9               "Further, the benchmark and affected markets should be

10    characterized by sufficiently comparable economic conditions,

11    at least after controlling for observable factors, such that

12    prices in those markets would have been identical had there

13    been no anticompetitive behavior."  Do I read that right?

14    *A.*  I'm sorry.  You're going -- at least for me, you're going

15    too fast.  What are you reading from?

16              *THE COURT:*  I can't cure him of that.  I tried.

17    *BY MR. VIGEN:*

18    *Q.*  Middle way through the first paragraph on the screen there.

19    "Further, the benchmark" --

20    *A.*  Yes.

21    *Q.*  Can you read it --

22    *A.*  Give me one second to read from the beginning, and then

23    I'll be happy to focus on what you'd like me to focus on.

24              *MR. VIGEN:*  Could we highlight that "A" please.

25              *THE WITNESS:*  Okay.  I see this.

Pierre Cremieux – Cross

1    *BY MR. VIGEN:*

2    *Q.*   And then if we can go down to the next paragraph, where it

3    says, "Under the assumption that the differences would have

4    been stable, controlling for observable factors but for the

5    alleged anticompetitive conduct, the difference-in-differences

6    provides an alternative approach to estimating damages."

7    *A.*   Yeah, I see that.

8    *Q.*   Okay.  And this is generally saying what we have been

9    discussing before, that the DaVita data and the benchmark data

10   should be moving in relatively stable, similar trends for this

11   to be a valid analysis.  Would you agree with that?

12   *A.*   Absent the allegations.

13   *Q.*   Absent the allegations.

14   *A.*   There we have --

15   *Q.*   So let's go back to your Exhibit 3 in Government

16   Exhibit 510.  So absent the allegations, we see that in your

17   before period; correct?

18   *A.*   That's right.

19   *Q.*   Okay.  But you have not shown across those three years that

20   it is a stable trend, have you?

21   *A.*   Again, I haven't.  But you're not understanding, I think,

22   the point of the previous article.  That's not what the article

23   is saying.  What the article is saying is that over the entire

24   period -- so in this case, 2009 through 2017 or 2019 -- would

25   you expect, absent the allegation, for the trends to be roughly

Pierre Cremieux – Cross

1    the same for the entire period?

2    Q.  But, sir, you just acknowledged in the before period, when

3    there is no allegation, that in and of itself that before

4    period should be stable, as compared to the DaVita data and the

5    benchmark data.

6    A.  I'm sorry.  Should be stable, as compared to the DaVita

7    data and the benchmark data?  I don't know --

8    Q.  The trend should be stable to have a valid

9    difference-in-difference approach?

10   A.  Which trend?

11   Q.  The trend in the difference-in-difference between the

12   DaVita compensation data and the benchmark compensation data.

13   A.  I'm sorry.  I mean, I'm really not understanding.  There is

14   no such thing as a trend in the before period in the

15   difference-in-difference.  The difference-in-difference

16   analysis is all about using both the before period and the

17   after period -- that's the first difference -- and using the

18   benchmark versus DaVita.  That's the second difference in

19   difference-in-difference.  So you can't have a

20   difference-in-difference in one of the two periods.  It doesn't

21   make sense.  You can have a difference, which is 3.9 percent.

22   Q.  Sir, before I got to the ultimate question that would show

23   why this is problematic, what you've done, you acknowledge that

24   in the before period, the trend between the DaVita data and the

25   benchmark data should be similar.  You acknowledged that right

Pierre Cremieux – Cross

1   before I got into the follow-up questions; right?

2   A.  I have not looked at that.  That's correct.

3   Q.  You haven't looked at it.  Okay.  We have.

4   A.  Doesn't matter, but that's correct.

5   Q.  We have.  I'd like to show you what we did with your data.

6          THE COURT:  Well, you don't show him anything until

7   you show it to your opposing counsel first.

8          Show it to the Court, too, if you wouldn't mind.

9          MR. VIGEN:  Julie, can we have the Elmo?

10          THE COURT:  This is something you created, Mr. Vigen?

11          MR. VIGEN:  From his data.

12          THE COURT:  Right.

13          MR. VIGEN:  Correct.

14          THE COURT:  You don't have an expert; it's you?

15          MR. VIGEN:  Well, this is what I'm representing; and I

16   want to see if he did this.  It's a demonstrative.

17          MR. MELSHEIMER:  Your Honor, I guess -- I appreciate

18   the lovely burnt orange and the University of Texas homage in

19   this, but I don't understand how he's going to cross-examine --

20   I don't understand how he's going to cross-examine Dr. Cremieux

21   on something that he did without any basis for how it's done or

22   what was done or anything like that.

23          THE COURT:  Well, during this so-called *Daubert*

24   hearing, I'll let him do that.  But when it comes to the actual

25   trial in front of the jury, unfortunately for -- maybe

Pierre Cremieux - Cross

1   fortunately -- for the government, Mr. Vigen can't take the

2   stand.

3        MR. MELSHEIMER:   Thank you.

4   BY MR. VIGEN:

5   Q.   Okay.   So on your Exhibit 3, you showed an average of the

6   2009 to 2011 years; is that right?

7   A.   Can you show me Exhibit 3 again?

8        That's -- that seems -- I mean, again, I don't know

9   how you generated those numbers; I don't know where they come

10  from; I don't know if they're right; so I'm just going to take

11  your word for it for now.   So the 3.9 percentage points is the

12  average over that period.   It's the average elevation in

13  job-to-job turnover for the senior-level employees in that

14  period.   Yes.

15       MR. VIGEN:   If we go back to the demonstrative on the

16  Elmo, please.

17  BY MR. VIGEN:

18  Q.   This is the type of analysis you did not show; right?   You

19  did not show the trend in the before period; correct?

20  A.   That's right.   It's not relevant to my analysis.

21  Q.   Okay.

22  A.   That's why I'm doing the difference-in-difference.

23  Q.   The difference-in-difference analysis, as we discussed,

24  requires that your control group, your benchmark, and the

25  DaVita data have a similar trend outside of the effective

Pierre Cremieux - Cross

1    conspiracy without the conspiracy in place.

2    A.   Again, the answer to that is no.

3    Q.   Why do you say that?

4    A.   Because what -- that's why it's a difference-in-difference.

5    If it was just a difference, where I was interested in what is

6    happening in those three years between DaVita and the

7    benchmark, then, yes, I'd be focusing on that.  But the whole

8    point of a difference-in-difference is to be able to use the

9    change in what is happening on the DaVita side and comparing

10   with the change that's happening on the benchmark side.  And so

11   in this case, if you were to -- you know, if you were to draw a

12   line -- I would call it a regression line, but you can just

13   call it a line.  You know, just a line from beginning to end --

14   if you were to do that, you would get something like this.

15   Right?  And so what I'm doing is, I'm saying, well, here is

16   what is going on in the pre-period, and here is what is going

17   on in the post-period.

18   Q.   What is causing that change?  What variable?

19   A.   The change in the job turnover over time.

20   Q.   No.  What variable is causing the effect on the change in

21   job variable turnover over time?

22   A.   So what is -- the only thing that is changing at that point

23   between the two is the beginning of the allegation.  And so if

24   the allegation had led to a diminished competition, what we

25   would see is we would see a diminished level of turnover, which

Pierre Cremieux - Cross

1   is --

2   Q.  Sir --

3   A.  -- not what we see.  What we see instead is a movement in

4   the opposite direction.

5   Q.  Sir, is it your opinion that the alleged allocation

6   agreement caused DaVita's compensation to go up?

7   A.  No, it's not.

8   Q.  Okay.

9   A.  My opinion --

10  Q.  Sir, then what caused DaVita's compensation to go up?

11  A.  There is natural variation in compensation over time.

12  Inflation could be one of them.

13  Q.  You --

14  A.  And, in fact, that's why you observed that on the benchmark

15  side, you also see an increase in compensation.

16  Q.  Right.  So what caused the difference?  What caused DaVita

17  to go up as compared to the national benchmark?

18  A.  That there may have been some differences -- some noise, if

19  you will, in the way in which compensation was set at DaVita

20  versus that big benchmark which they used to set compensation.

21  Q.  Could it have been job satisfaction at DaVita getting worse

22  over time as compared to the national benchmark?  You don't

23  know, do you --

24  A.  I have no reason to believe that's true.  But --

25  Q.  But you didn't study why that is?  There is some variable

Pierre Cremieux – Cross

1   that is causing DaVita compensation to go up relative to the

2   benchmark that you have not studied; is that correct?

3   *A.*  So I think that -- I mean, the answer is, of course, there

4   are many, many variables that exist out there that I haven't

5   studied.  A, I don't have data on them; B, it's not relevant to

6   my analysis.  But the point I am making is much simpler than

7   the point you're trying to make, which I think is trying to

8   complicate or -- I don't know exactly what.

9          But what I'm doing is very simple.  There is a

10  benchmark used by DaVita to set the compensation of its

11  employees.  That benchmark is healthcare employees.  Why?

12  Because if it doesn't use that benchmark -- if it doesn't check

13  what it compensates -- what its compensation is with the rest

14  of the employees it's competing with, it's going to lose

15  people; and so that's what it uses as its benchmark.  So that's

16  what I did, as well.  I said, if that's what DaVita does, if

17  that's what they do in their normal course of business, then

18  that means that they consider that that benchmark -- the data

19  from the Bureau of Labor Statistics, published by the

20  government -- is the correct benchmark to see what is happening

21  to their compensation, then you can do the same thing for their

22  turnover.

23         So all I did is, I said, well, if, in fact, there is

24  an allocation of labor, I would expect compensation to drop,

25  and I would expect turnover to drop.  Did it?  And my answer,

Pierre Cremieux - Cross

1    what I find from the data, is, no, it didn't drop.

2            Now, you're right that it rose by 2 percent.  That's

3    not what I'm interested in.  What I'm interested in is, do we

4    see a significant drop relative to a benchmark that would be

5    consistent with my expectation given the allegation of an

6    allocation of labor.  I don't see that.

7    Q.  Let me just try to get some very specific questions.  If

8    you can keep your answers to my very specific yes-or-no

9    questions.

10           THE COURT:  You've got six minutes left in your

11   period.

12           MR. VIGEN:  Understand.

13   BY MR. VIGEN:

14   Q.  Would you agree with me that your data shows -- if we can

15   go back to Exhibit 3 -- that your data shows that there is some

16   variable that is causing DaVita's compensation to increase that

17   you have not examined?

18   A.  Relative to the benchmark, in absolute terms?  In absolute

19   terms, there are many things that are going on.  I agree with

20   you.

21   Q.  And one of them could be, but you don't know because you

22   haven't studied it, one or more variables that is affecting the

23   DaVita data differently from the benchmark data; correct?

24   A.  That's why I do a difference-in-difference.

25   Q.  And you don't know how that variable might have changed

Pierre Cremieux - Cross

1    over time, do you, because you didn't study it?

2    A.  I'm -- I don't even know what variable we're talking about

3    so --

4    Q.  Well, you acknowledge there is one or more, and you don't

5    know, because you didn't study it.  And what I'm asking is, you

6    also don't know whether that change in how that variable

7    impacted over time changed over time, do you?

8    A.  I'm sorry.  Can you -- when you interrupted me, I kind of

9    lost track of what you were asking.  Can you just start with

10   the beginning of the question.

11   Q.  You have acknowledged that there is at least one or more

12   variables that is affecting the DaVita compensation differently

13   from the national benchmark data; right?

14   A.  I have not.  You've -- I think you've made that statement.

15   I've said that there are obviously variables that affect

16   benchmark data.  That benchmark data is the data that is being

17   used by DaVita to set its own compensation, and so the

18   variables that affect the benchmark data are likely to also be

19   variables that affect the DaVita data.

20   Q.  And what you show is that some variable, one or more, is

21   actually affecting DaVita differently than the national

22   benchmark; correct?  Because you show an increase.

23   A.  I'm finding that relative to the national benchmark, the

24   compensation at DaVita went up faster --

25   Q.  And my question --

Pierre Cremieux - Cross

1   *A.*  -- during the allegation period.  Yes.

2   *Q.*  My question is, the cause of that is one or more variables

3   that you did not study?

4   *A.*  The cause of that is the -- the set of determinants of

5   compensation at DaVita during that period, which are likely to

6   be very similar to the ones before that period, which is why

7   I'm using the difference-in-difference.  That's the whole

8   point.

9   *Q.*  You didn't study those different factors?

10  *A.*  That's right.  That's why I'm doing a

11  difference-in-difference --

12  *Q.*  And you --

13  *A.*  -- otherwise I wouldn't need to.

14  *Q.*  And you said "likely" was going to be the same before the

15  alleged conspiracy; is that what you just said?

16  *A.*  That's right.  I have no evidence that there is any

17  significant change in trend that would -- which is, again, what

18  I'm looking for -- would result in that 3.9 percentage point

19  going down, as opposed to up.

20  *Q.*  You have no evidence one way or the other, because you

21  didn't study it?

22  *A.*  Well, I have a difference-in-difference analysis that is

23  telling me that relative to the benchmark that is used by the

24  company to set its compensation, these changes occurred.  Now,

25  you're telling me there could be some variable out there that

Pierre Cremieux - Cross

1   explains this, which you're not identifying, which, you know,

2   despite the graphs -- I mean, I'm not --

3   Q.   Sir --

4   A.   -- I don't have any evidence --

5   Q.   I think we've established today that I'm --

6   A.   -- sorry -- that any of this exists.

7   Q.   I'm not the expert.  You are.  Your data shows some

8   variable that is causing the DaVita data to change more than

9   the benchmark data.  That's what your data shows, sir.

10  A.   My analysis -- sorry.

11  Q.   Is that what your data shows?

12  A.   My analysis -- my data shows that during the period of the

13  three conspiracy periods, the compensation at DaVita increased

14  faster -- or at least did not decrease -- relative to the

15  increase I observed for the benchmark.

16  Q.   And you don't know what is causing that faster increase to

17  occur, do you?

18  A.   I don't.  It doesn't matter.  The whole point of the

19  difference-in-difference is that that won't matter.  It will be

20  taken into account by the difference-in-difference.  Otherwise,

21  I wouldn't need a benchmark.

22  Q.   What if the --

23  A.   I'm sorry.  Let me finish.  I think this is going to be

24  helpful.

25          If I did not have a benchmark and I only studied

1    DaVita and looked at what happened early and what happened --

2    sorry -- what happened during the prior period and what

3    happened during the conspiracy period, right, I could compare

4    those two, identify the data you -- the variables you refer

5    to -- I would have to, to understand why the change is

6    happening -- and then I would have done a difference analysis.

7    But the whole point in doing a difference-in-difference is so I

8    don't have to do that.  Why?  Because I don't have access to

9    those data.  I don't know all of the things that may be going

10   on at DaVita.

11        But the beauty with the difference-in-difference is, I

12   don't need to know.  All I need to do is find a benchmark that

13   is appropriate -- for example, one that is used by the company

14   to set its own compensation -- and using that benchmark,

15   looking at how DaVita evolves, the compensation or the

16   turnover, relative to the benchmark.

17        *MR. VIGEN:*  Your Honor, it looks like I'm out of time.

18   Appreciate it.

19        *THE COURT:*  All right.  So he can be excused, or he

20   can stay and watch, or what do you want him to do?

21        *MR. MELSHEIMER:*  Your Honor, we have no questions.  He

22   can be excused.  I think he may sit in in the morning session,

23   if that's all right with the Court.

24        *THE COURT:*  Sure.  That's fine.  Experts can do that.

25        *MR. MELSHEIMER:*  Thank you, Your Honor.

950

1          *THE COURT:*  All right.  Get yourselves set up, and

2     we'll be ready to go with the jury.

3          Thank you, sir.

4          *MR. MELSHEIMER:*  Are we going to start at 9:30, Your

5     Honor, or right away?

6          *THE COURT:*  When did we say the jury is coming back?

7          *COURTROOM DEPUTY:*  You told them 9:30, Your Honor.

8          *THE COURT:*  Do the lawyers, then, want to make any

9     argument about any of the sections of the expert report before

10    9:30?

11         *MR. MELSHEIMER:*  We don't, Your Honor.

12         *MR. VIGEN:*  We would like to, Your Honor.

13         *THE COURT:*  All right.

14         Leave five minutes to switch gears so -- you've got

15    ten minutes to make your argument.

16         Which sections of his report do you want me to

17    exclude?

18         *MR. VIGEN:*  Your Honor, we would like to exclude

19    sections 5 and 6 as not reliable.  I think the witness

20    acknowledged on the stand that there were variables that

21    affected the data in different ways that he was not accounting

22    for.

23         *THE COURT:*  I don't think you even listened to the

24    witness's testimony on the stand.

25         *MR. VIGEN:*  Your Honor, we also believe that section 7

```
 1   is not relevant.  That's where he opines -- that's where he

 2   opines that the scope of employment options is broad, with

 3   DaVita competing with hundreds of other organizations and that

 4   the market allocation agreement could not reasonably be

 5   expected to restrict labor competition and suppress

 6   competition.

 7        We would point to the brief that Your Honor is well

 8   aware of --

 9        THE COURT:  I'm inclined to agree with you on section

10   7.

11        MR. VIGEN:  Thank you, sir.

12        Section 8 we also believe is not relevant.  That

13   opines that that --

14        THE COURT:  I'm inclined to agree with you on section

15   8.

16        MR. VIGEN:  Thank you, Your Honor.

17        THE COURT:  So you don't have a problem with sections

18   1, 2, 3, and 4?

19        MR. VIGEN:  1, 2, and 3 are just background.  And then

20   4, we are dropping that issue.

21        THE COURT:  All right.  Your turn.

22        If you don't care that much about 7 and 8, you don't

23   have to say anything.

24        MR. EVERETT:  I would like to say something, Your

25   Honor.  This is Clay Everett for DaVita.
```

1          So if we could talk first about section 7.  And in

2     that section, Dr. Cremieux is analyzing the extent of

3     competition for the employees that were allegedly allocated.

4     And the argument that the government has made that that is

5     irrelevant is based on the argument that the -- that the

6     government or a plaintiff in a private *per se* case doesn't need

7     to show that the -- there was a power to affect competition.

8     It doesn't need to show, in fact, that there were effects --

9     anticompetitive effects from the alleged *per se* violation.

10          THE COURT:  I don't see the issue with 7 the way

11    you're trying to describe it.  7, to me, is "Dodds on the law."

12    And I've already disagreed with "Dodds on the law," as you

13    know.

14          MR. EVERETT:  I am aware of that, Your Honor.

15          So I think if properly understood, what section 7 is

16    addressing is whether, in fact, there is evidence that would

17    support the proposition that there was a purpose of allocating

18    the underlying markets.  Even if those markets are just

19    between --

20          THE COURT:  No. 8 you're talking about now?

21          MR. EVERETT:  So I believe --

22          THE COURT:  8 is where the expert is trying to opine

23    on what DaVita intended.

24          MR. EVERETT:  So No. 8, Your Honor, as I understand

25    it, is addressing the unilateral interests of SCA and an

1    explanation or purpose that is economically rational for their

2    behavior based on how they approached recruiting with regard to

3    other strategic partners.

4         THE COURT:  I understand that.  And you can make that

5    argument and the jury understands it completely well without

6    any need for expert gloss on it.

7         MR. EVERETT:  Okay.  Well, one expert gloss that our

8    expert is prepared to make is that he has actually looked at

9    hiring patterns with the other strategic partners by SCA and

10   analyzed that in reference to and in relation to the hiring

11   patterns with regard to SCA from DaVita.  And there is evidence

12   that I believe from the analysis of the data our expert can

13   proffer to the jury that would be helpful to the jury, if

14   that's the underlying issue.

15        THE COURT:  Helpful to the jury in deciding what

16   DaVita intended?  I don't think so.

17        MR. EVERETT:  Well, it's helpful to understanding what

18   the underlying purpose of the recruiting behavior was and

19   whether it was to allocate markets or whether it was, in fact,

20   further strategic partners between SCA and DaVita.

21        THE COURT:  Look, let me make it really simple:  Your

22   theory is, SCA and DaVita wanted to get along with each other

23   because they thought they might be doing other kinds of deals.

24   And so to avoid ruffling each other's feathers, they were

25   willing to say, we'll keep our mitts off your people, and you

1    keep your mitts off ours.  It's just that simple, isn't it?

2         MR. EVERETT:  Well, I think it goes beyond that.

3    Because I believe the evidence will show -- and the expert's

4    analysis actually goes to this point -- that with regard to

5    other strategic partners, the exact same or in fact more

6    restrictive recruiting occurred.  And the analysis that our

7    expert has done will show that in fact is the case, that other

8    entities that SCA identified as strategic partners, its

9    recruiting behavior with regard to those, is consistent,

10   frankly, with testimony that you've heard from Mr. Hayek and

11   others -- or that the jury has heard from Mr. Hayek and

12   others --

13        THE COURT:  Okay.  Thank you.

14        Mr. Vigen, what is your response to him on No. 8?

15        MR. VIGEN:  Your Honor, what -- what SCA did with

16   respect to other entities is absolutely irrelevant with respect

17   to the intent of the acknowledged agreement and what that was

18   intended to do with respect to SCA and DaVita employees.  I

19   just think --

20        THE COURT:  Well, you say it's absolutely irrelevant.

21   Why?

22        MR. VIGEN:  Because it doesn't go toward what the

23   parties were actually intending when they entered into that

24   specific agreement.  As the witnesses have acknowledged that

25   they did -- with respect to the other business partners, that

1   was done for a totally separate reason.  And with respect to

2   DaVita, it was because of an agreement.

3        So an expert opining that it's within SCA's

4   independent economic interest to do that with their other

5   business partners tells you nothing about intent with respect

6   to DaVita.

7        THE COURT:  Okay.  Anything else, Mr. Clayton -- no --

8   Mr. Everett.

9        MR. EVERETT:  Yes, Your Honor.  Mr. Everett.

10        So if you're not inclined to hear any more argument on

11   section 7, then I don't believe I have anything further to say.

12        THE COURT:  You've got three minutes.  You can use it

13   on section 7.

14        MR. EVERETT:  So --

15        THE COURT:  I think all of you are under the probably

16   false impression that the economist testimony is going to

17   determine how the case comes out.

18        MR. EVERETT:  I understand your perspective, Your

19   Honor.

20        So with regard to section 7 we do believe it is

21   relevant to the underlying purpose, whether there was an

22   economic incentive to enter into agreements to allocate

23   markets.  And the opinion that our expert has, from looking at

24   the evidence about the competitive conditions for the employees

25   that were allegedly allocated, is that there would be no

1    economic incentive to enter into a market allocation agreement,

2    because the companies could not control the movement of the

3    employees through agreements between them.

4         I think it's worth noting, and it is relevant to

5    various issues, that the Department of Justice in this case has

6    put into issue how they have described the underlying purpose

7    of the agreement.  So Ms. Lewis in her opening on numerous

8    occasions indicated that the underlying purpose of the

9    agreements was to keep DaVita's employees at DaVita.  And I can

10   give you cites to the transcript for that, if --

11        THE COURT:  To keep DaVita's employees from going to

12   SCA --

13        MR. EVERETT:  That's not --

14        THE COURT:  -- from going to Hazel, from going to

15   Radiology Partners.

16        MR. EVERETT:  Your Honor, that's not what she said.

17   She said --

18        THE COURT:  I don't know.  What she said in her

19   opening, what Mr. Dodds said in his opening, what one of you is

20   going to say in the defense opening for Mr. Thiry, none of that

21   is evidence.

22        MR. EVERETT:  I understand.  There are also various

23   occasions in the cross-examination and examination of witnesses

24   where the same characterization has been made -- it is in

25   evidence -- that the underlying purpose -- they elicited

1     testimony of the agreements -- was to keep DaVita employees at

2     DaVita.  And in the case of Count 1, also to keep SCA senior

3     employees at SCA.

4          *THE COURT:*  What do you think the purpose was?

5          *MR. EVERETT:*  So the --

6          *THE COURT:*  That's your defense.  Your defense is

7     purpose, purpose, purpose.  That's what you've been screaming

8     about since I denied the motion to dismiss.  What do you think

9     the purpose is?  Not that you have to prove it.  They have to

10    prove their case; you don't have to prove anything.

11         *MR. EVERETT:*  Yeah.

12         *THE COURT:*  But I'm just asking, what do you think the

13    purpose was?

14         *MR. EVERETT:*  So I believe the underlying purpose, if

15    you were to look at the evidence that has come in, was to

16    maintain relationships between the underlying individuals, to

17    address --

18         *THE COURT:*  There is your argument right there.

19         *MR. EVERETT:*  I understand.  But we should be able to

20    introduce evidence.  The question is relevance; it's not

21    ultimately what the argument will be --

22         *THE COURT:*  You can bring in evidence.  You don't have

23    to, but you can.  But I don't think the economist's speculation

24    on what your intent was is that evidence.  The ones who know

25    what your intent was are sitting right there at your table.

958

 1   Now, you don't have to call them; they don't have to do that.

 2   But -- Mr. Thiry is the one who knows what the intent was.

 3          *MR. EVERETT:*  But, Your Honor, what our expert can

 4   speak to are what the underlying economic incentives are.  This

 5   is an economic crime, where for market allocation, the economic

 6   incentive should drive, if that was the underlying purpose.

 7   And what the expert can speak to is what the economic

 8   incentives are, given the underlying competitive conditions

 9   here.

10          *THE COURT:*  All right.  Thank you, Mr. Everett.

11          *MR. EVERETT:*  Thank you, Your Honor.

12          *THE COURT:*  All right.  I'll tell you what I think

13   about the various sections, but not right now, because right

14   now we're going to get the jury and start the trial again.

15          (Jury in at 9:38 a.m.)

16          *THE COURT:*  Good morning, ladies and gentlemen.  How

17   are the best jurors in the United States this morning?

18          You're The Masters guy.  You watched the tournament.

19          *JUROR:*  I did.

20          *THE COURT:*  It was fun.

21          So I have a grandson -- I have three of them -- but

22   the oldest one just turned 15, is quite a good golfer.  And he

23   just competed in a tournament.  He lives in California.

24   Two-day tournament.  Apparently, it was very windy; and he

25   didn't shoot as well as he would like.  He's a five handicap,

Jeffrey Lombardo - Direct

1    so he expects to be right around par, which he wasn't.  And he

2    said, Papa, I had two four-putt holes.  And I can say, Look at

3    the guy who just won The Masters.  He had four putts on the

4    last hole.  It can happen to anybody.

5              All right.  Let's go.

6              *MR. MARIANO:*  The United States calls Jeffrey

7    Lombardo.

8              (**JEFFREY LOMBARDO, GOVERNMENT'S WITNESS, SWORN**)

9              *COURTROOM DEPUTY:*  Thank you.  Have a seat.

10                      **DIRECT EXAMINATION**

11   *BY MR. MARIANO:*

12   *Q.*  Good morning.

13   *A.*  Good morning.

14   *Q.*  Could you please state and spell your name for the record.

15   *A.*  Jeff Lombardo.  J-E-F-F, L-O-M-B-A-R-D-O.

16   *Q.*  Where do you work, Mr. Lombardo?

17   *A.*  BlueSky Professional Services Group.

18   *Q.*  What is BlueSky?

19   *A.*  It's a recruiting and executive search placement firm.

20   *Q.*  What's your position at BlueSky?

21   *A.*  I'm currently a partner there.

22   *Q.*  How long have you worked there?

23   *A.*  Thirteen years.

24   *Q.*  And what are your responsibilities?

25   *A.*  In addition to running the company, I have client

Jeffrey Lombardo - Direct

1   responsibilities, where I help -- help our clients with

2   placement of candidates either as BlueSky consultants or for

3   permanent positions with their organization.

4   Q.  You might want to move the microphone a little bit closer

5   to you to make sure it picks up your answers.

6   A.  All right.

7   Q.  Let me ask you how a typical recruitment process works.

8   When a client retains BlueSky to hire for a particular

9   position, what type of information does the client typically

10  provide you?

11  A.  Most common is the job description that explains what

12  they're looking for.  And, then, hopefully in addition to that,

13  we'll have a phone call with them to learn more of the nuances

14  and details of what they're looking for.

15  Q.  So once BlueSky has that information, what does BlueSky do?

16  A.  We'll use resources to try to find candidates.  We have our

17  own database.  Most commonly we use LinkedIn -- I think most

18  people are familiar with that -- where we'll try to filter on

19  requisites for the role.  So it could be, you know, geography,

20  it could be certain keywords, it could be at times academic

21  backgrounds, degrees.  Those are the types of things we'd do.

22  Q.  You mentioned LinkedIn.  Do you proactively reach out to

23  candidates?

24  A.  Yes.

25  Q.  Is it just through LinkedIn; or are there other ways that

Jeffrey Lombardo - Direct

1   you do, as well?

2   A.  We have our database but -- and there are other sources,

3   but I would say the bulk of our proactive sourcing and

4   searching comes from LinkedIn.

5   Q.  So why do you proactively reach out to potential

6   candidates?

7   A.  I feel good candidates aren't typically looking or

8   available.  If you're unemployed, that's usually a flag right

9   there.  We've posted a lot of our roles on our website to see

10  if people passively come to us.  In the 13 years, I don't think

11  we've ever had success with that; and so I'd rather go out and

12  find them myself.

13  Q.  Are you aware of any ways in which proactively reaching out

14  to a candidate is beneficial to that candidate?

15  A.  I'd like to think that I'm providing a lot of benefit to my

16  candidates if they do choose to move forward, whether it's a

17  better company, a step up in management, compensation.  I like

18  to build relationships with candidates.  And with that, if they

19  do decide to move forward, I like to think it has benefited

20  them in terms of, you know, a better place than where they

21  were.

22  Q.  Are you familiar with a company called Radiology Partners?

23  A.  Yes, I am.

24  Q.  What is Radiology Partners?

25  A.  A national radiology practice that provides services to

Jeffrey Lombardo - Direct

1   imaging centers, radiology practices, patients, et cetera.

2   Q.  And does BlueSky have a relationship with Radiology

3   Partners?

4   A.  We have.  Yes.

5   Q.  What's the nature of that relationship?

6   A.  They've been a client of ours since 2016.  We've provided

7   them with BlueSky consultants and have also placed a handful of

8   people to be permanent employees with them.

9   Q.  So BlueSky does recruiting work for RAD Partners?

10  A.  Yes, we do.

11  Q.  Approximately how many searches have you worked on for RAD

12  Partners?

13  A.  Thirty plus.  It doesn't mean we've placed all 30, but

14  we've worked on probably 30 plus.

15  Q.  Who have your main points of contact been at Radiology

16  Partners?

17  A.  Our first point of contact was Basak Ertan, who put us in

18  touch with others.  There has been a handful, but the primary

19  ones were Keegan Scanlon, Shital Desai, and then Alex Won, and

20  then their HR team.  I would say Alex Won I worked with the

21  most.

22  Q.  Are you familiar with a company called DaVita?

23  A.  I am familiar with them.  Yes.

24  Q.  And does BlueSky have a relationship with DaVita?

25  A.  BlueSky does have a relationship with DaVita.

963

Jeffrey Lombardo - Direct

1    *Q.*  What's the nature of that relationship?

2    *A.*  Initially, I think it was in 2012, 2013, the owner and

3    founder of BlueSky, my company, who is a former partner from

4    Accenture, knew Accenture consultants who went to DaVita to

5    help them.  And in the beginning, in 2012, '13, we provided

6    them a handful of BlueSky consultants.  Since that time, we at

7    some point had a contract with them in 2013; but our first

8    personal placement with them wasn't until 2020.

9    *Q.*  Have you personally worked on any DaVita searches?

10   *A.*  No, I've not.

11   *Q.*  So let's return, then, to RAD Partners.  What type of

12   information would RAD Partners typically provide you for their

13   searches?

14   *A.*  Either the HR team or at times Alex Won would reach out to

15   me directly.  I had a good relationship with Alex.  We had a

16   good communication line.  I placed a handful of people with

17   him, and so he would send me an email and say, hey, look, I've

18   got a need for more people.  Let's get on the phone and talk.

19   We were always supposed to do that through HR.  But they would

20   reach out, they would provide me a job description, or he would

21   give me a phone call and say, this is what I need, more people

22   like this, or, you know, this type of skill set at this level

23   or this geography.

24   *Q.*  Would RAD Partners ever provide feedback when you would

25   present a potential candidate?

Jeffrey Lombardo - Direct

1    *A.*  Yes.

2    *Q.*  Did you ever receive instructions from RAD Partners about

3    recruiting employees from DaVita?

4    *A.*  Yes, I did.

5    *Q.*  And, generally, what were those instructions?

6    *A.*  Not to source candidates from DaVita -- current employees

7    at DaVita.

8    *Q.*  Were you told why you couldn't source candidates currently

9    at DaVita?

10   *A.*  No.

11          *MR. MARIANO:*  Let's take a look at Government

12   Exhibit 228.

13          I'll move for admission pursuant to stipulation.

14          *THE COURT:*  All right.  Admitted.

15          (Exhibit 228 admitted.)

16   *BY MR. MARIANO:*

17   *Q.*  Mr. Lombardo, is this an email thread ending October 12,

18   2016, between you and Alex Won?

19   *A.*  Yes, it is.

20   *Q.*  You mentioned that individual earlier.  Who is Alex Won?

21   *A.*  Alex Won, when I first met him, I think he was contracting

22   with Radiology Partners.  He soon became a permanent employee

23   of Radiology Partners.  He was the hiring manager that did work

24   in the revenue cycle team.

25   *Q.*  So let me direct your attention to the second email from

Jeffrey Lombardo - Direct

1   the top here, the email from Alex Won.  Can you read the

2   second paragraph of that to the jury.

3   A.  "One thing to note, going forward, we would like to avoid

4   recruiting from DaVita, as it will be a longer recruiting

5   process due to some existing agreements."

6   Q.  Is this the instruction that you received that you were

7   referring to a few minutes ago?

8   A.  Yes.

9   Q.  So let's take a look at your response.  Can you read the

10  last paragraph of your reply.

11  A.  "Noted about DaVita.  Me and my team will refrain from

12  reaching out to current DaVita employees going forward."

13  Q.  And who did you send that to?

14  A.  I sent that to Alex Won; and I cc'd the owner, founder of

15  my company, Jeff Stout.

16  Q.  The owner of your company, Jeffrey Stout, why did you copy

17  him?

18  A.  Just to keep him in the know.  Just so he was informed

19  of -- I mean, at times it can be specific to candidates or

20  searches.  I think this was early on in our relationship with

21  Radiology Partners, and just so he was informed.

22  Q.  So you write, "Me and my team will refrain from reaching

23  out to current DaVita employees going forward."  Did you, in

24  fact, refrain from reaching out to current DaVita employees for

25  Radiology Partners searches?

Jeffrey Lombardo - Direct

1   A.   Yes.

2   Q.   And did you share that direction with anyone else at

3   BlueSky?

4   A.   Everyone else at BlueSky.

5   Q.   Why?

6   A.   It makes no sense for me to speak to DaVita candidates if

7   we can't present them.  I've got better things to do with my

8   time.

9   Q.   Did you ever ask Mr. Won or anyone else at RAD Partners

10  around this time why you weren't allowed to recruit from

11  DaVita?

12  A.   I did not.

13  Q.   Alex Won mentions "some existing agreements."  Do you see

14  that?

15  A.   Yes.

16  Q.   Did you ever ask what "some existing agreements" referred

17  to?

18  A.   I did not.

19  Q.   In your experience as a recruiter, have other clients asked

20  you not to recruit from particular companies?

21  A.   Yes.

22  Q.   And in your experience, under what circumstances does that

23  happen?

24  A.   In my experience, as we work with a handful of large,

25  prestigious consulting firms, those consulting firms at times

Jeffrey Lombardo - Direct

1    will not want to source candidates from one of their clients.

2    They don't want to come in to help out and then end up taking

3    half of their team.  And so in those examples, a consulting

4    firm will say, please don't source from candidate X.  We're

5    currently working with them, and we want to respect our

6    relationship with them.

7    Q.  Based on your knowledge, was either DaVita or Radiology

8    Partners a consulting firm?

9    A.  No.

10   Q.  And based on your knowledge, was DaVita or Radiology

11   Partners a client of the other?

12   A.  No, not to my knowledge.

13   Q.  You also mentioned that BlueSky had a relationship with

14   DaVita.  In your understanding, was this instruction not to

15   recruit from DaVita at all related to BlueSky's relationship

16   with DaVita?

17   A.  Not at all.

18   Q.  So let me ask you a few questions about the candidate that

19   triggered this response from Mr. Won.  That's Patrick Ayers;

20   right?

21   A.  Yes.

22   Q.  We're looking at Mr. Ayers' background here.  What was

23   Mr. Ayers' salary at that time with DaVita?

24   A.  67,000.

25   Q.  And his position?

Jeffrey Lombardo - Direct

1  *A.*  Senior publicly reported data analyst.

2  *Q.*  In your experience, was this a lower-level position or a

3  senior-level position?

4  *A.*  Lower-level position for us.

5  *Q.*  And more broadly, when you would conduct searches for RAD

6  Partners, was that only for senior-level positions; or did you

7  also do searches for lower-level or mid-tier positions?

8  *A.*  It would span -- I don't know if we want to use titles --

9  but anywhere from 70 to 200K plus.  So this would be on the

10  lower end if you just used the metric of compensation.

11  *Q.*  So going back to this instruction not to recruit current

12  candidates from DaVita, did this make it harder to conduct

13  searches for RAD Partners positions?

14  *A.*  Yes, because we -- you know, it limited us in terms of who

15  we could reach out to.

16  *Q.*  And if you hadn't received this instruction from RAD

17  Partners, how if at all would your approach to recruiting for

18  RAD Partners positions have differed?

19  *A.*  We would have considered candidates from DaVita.

20  *Q.*  Were candidates from DaVita attractive candidates for RAD

21  Partners?

22  *A.*  Yes.

23  *Q.*  Why?

24  *A.*  DaVita was a reputable firm; they're known for training

25  their employees; they're in the same geography; they had the

Jeffrey Lombardo - Cross

1    same type of groups.  A lot of our roles were in the revenue

2    cycle space, and that's exactly what they did.  So they would

3    be a decent -- a great source of candidates.

4    Q.  So you said DaVita would have been a great source for

5    candidates.  But after receiving this instruction, did you ever

6    reach out to candidates at DaVita for RAD Partners positions?

7    A.  No.

8    Q.  And prior to June 2019, did the instruction that you

9    received from RAD Partners regarding DaVita ever change?

10   A.  Not to my knowledge.

11          MR. MARIANO:  Thank you, Mr. Lombardo.  Nothing

12   further.

13          THE COURT:  Cross.

14          MR. WALSH:  Thank you, Your Honor.

15                     **CROSS-EXAMINATION**

16   BY MR. WALSH:

17   Q.  Mr. Lombardo, my name is John Walsh; and I represent

18   DaVita.  How are you today?

19   A.  I'm good.  Thanks.  Nice to meet you.

20   Q.  You and I exchanged emails about ten days ago about

21   possibly talking before your testimony here when you came to

22   Denver.  Do you recall that?

23   A.  Yes.

24   Q.  And you expressed a willingness to do that?

25   A.  Yes.

Jeffrey Lombardo - Cross

1    *Q.* But we never actually were able to connect?

2    *A.* Right.

3    *Q.* So this is the first time we've had an opportunity to talk?

4    *A.* Yes.

5    *Q.* So I want to ask a couple of questions following up on

6    Mr. Mariano's questions about this email in 2016.

7            If we could have Exhibit 228 put back up on the

8    screen.  And if you could blow up the second email that

9    starts "Jeff."  There we go.

10           All right.  This is the email in which Mr. Won says,

11   "We would like to avoid recruiting from DaVita."  Correct?

12   *A.* Yes.

13   *Q.* So he didn't tell you that Radiology Partners was barred

14   from recruiting from DaVita, did he?

15   *A.* Well, I don't know what the difference in saying that would

16   be.  I mean, I guess everybody can interpret it differently.  I

17   took it as we shouldn't recruit from DaVita anymore.

18   *Q.* I guess my question is a little bit different,

19   Mr. Lombardo.  He says, "We would like to avoid recruiting from

20   DaVita, as it will be a longer recruiting process."  Correct?

21   *A.* Yes.  That's -- "we would like to avoid recruiting from

22   DaVita as it will be a longer recruiting process," is what

23   this email says.  Yes.

24   *Q.* All right.  And there is nothing in this email that says,

25   we need to check with an employee to see if they've talked to

Jeffrey Lombardo - Cross

 1   their boss about being interested about leaving; correct?

 2   A.   There is nothing in this email that says that; correct.

 3   Q.   And there is also nothing in this email that says, well,

 4   confirm with the candidate first if they're actively looking

 5   already for outside opportunities.

 6   A.   That's correct.  There is nothing in this email that says

 7   that.

 8   Q.   All right.  He just says it's a longer process.

 9   A.   In this email it says, "It will be a longer recruiting

10   process due to some existing agreements."

11   Q.   And so I think you testified a moment ago that you did not

12   follow up with Mr. Won to ask what the nature of those

13   agreements were.

14   A.   I did not ask about the nature of the agreements, no.

15   Q.   And part of the reason you didn't do that is instructions

16   from your clients to avoid recruiting from particular companies

17   are actually pretty common?

18   A.   I wouldn't -- not for us, it's not common; but it happens,

19   as I said, with our consulting firms.  I don't think I've -- I

20   don't know if I've had it with another -- I use the term

21   industry firm, which is non-consulting firm.  I don't know if

22   I've had that with another, so I wouldn't say common.

23   Q.   Well, isn't it --

24   A.   For me -- for our group.

25   Q.   So I guess my question is, it's fairly typical, is it

Jeffrey Lombardo - Cross

1    not -- you've characterized it as typical that clients will

2    tell you, we'd like to avoid recruiting from particular

3    companies?

4    *A.*  No, I -- I said it is -- it at times happens with our

5    consulting clients.  I would not say it's typical.  I actually

6    just said the opposite of that.  With in-house firms, or

7    industry firms -- this is the only example that I can think of

8    where we were asked not to go after another firm.  Consulting

9    firms are a bit different for us --

10   *Q.*  Well --

11   *A.*  -- so I can't say if it's typical or not.  But in my

12   experience, I haven't had it.

13   *Q.*  Well, let me ask you this question, Mr. Lombardo:  Isn't it

14   typical or common for clients to actually give you a list of

15   off-limit companies for recruiting purposes?

16   *A.*  No.  Only the consulting firms that I've worked with.

17   *Q.*  Isn't it true that Radiology Partners gave you such a list,

18   as well?

19   *A.*  No.

20          *MR. WALSH:*  Give me just one moment.

21          *THE WITNESS:*  Okay.

22          *MR. WALSH:*  Your Honor, may I approach the witness to

23   refresh recollection with a document?

24          *THE COURT:*  Sure.

25          *MR. MARIANO:*  Your Honor, the witness said he did not

Jeffrey Lombardo - Cross

1    remember.  He said he did not receive such a list.

2            *MR. WALSH:*  I'll ask the question, Your Honor.

3            *THE COURT:*  All right.

4    *BY MR. WALSH:*

5    Q.  Mr. Lombardo, have you -- do you recall that Radiology

6    Partners actually included in its contract with BlueSky a

7    requirement that BlueSky stay away from companies it identified

8    as off limits on a list?

9    A.  I do not remember.

10   Q.  All right.

11           *THE COURT:*  Yes, you may.

12           *MR. WALSH:*  Thank you, Your Honor.

13   *BY MR. WALSH:*

14   Q.  Mr. Lombardo, if you would take a moment to review this

15   document.

16   A.  Okay.

17   Q.  This is an email and an attached -- this is an email

18   attaching an executed agreement between Radiology Partners and

19   BlueSky; correct?

20   A.  Give me a moment.  I'm -- it appears to be, but give me a

21   moment.

22   Q.  Sure.

23   A.  Can you repeat the question?

24   Q.  My question is that Radiology Partners itself had a

25   requirement in its contract that BlueSky would comply with its

Jeffrey Lombardo - Cross

1    request not to contact companies it designated as off limits.

2    A.  Where is that in here?  I don't see that.

3    Q.  All right.  Let me show you a different document.

4         If we could have F10.

5         Do you recognize that document, Mr. Lombardo?

6    A.  It looks familiar.  I mean, do I remember this document

7    from six years ago?  I -- sort of.  Not really.

8    Q.  Well, this is a professional search agreement dated October

9    of 2016.

10   A.  Yeah.

11   Q.  Between --

12   A.  The overall format looks very familiar.

13   Q.  And it's between Radiology Partners and BlueSky

14   Professional Group?

15   A.  Yes.

16   Q.  And in this -- this was the contract or a contract signed

17   by Jeff Stout?

18   A.  Yes.

19   Q.  Your boss?

20   A.  We're partners now, but maybe at the time he was the owner

21   of my company.

22   Q.  He was the owner of the company.  Would you take a look at

23   paragraph 8 of this provision.  Take a look at 8E.  Does that

24   refresh your recollection -- take your time.  Does that refresh

25   your recollection that Radiology Partners provided that

Jeffrey Lombardo - Cross

1   off-limit companies could not be contacted by BlueSky?

2           MR. MARIANO:  Your Honor, that was not the question.

3   The question was whether he was provided with a list of

4   companies.

5           THE COURT:  Well, he changed the question.  Have a

6   seat, sir.

7           THE WITNESS:  I see that it's written here.

8           Yeah, I see that it's written here, but we were never

9   provided a list.

10  BY MR. WALSH:

11  Q.  Is this document in front of you sort of a standard

12  professional search agreement contract for BlueSky?

13  A.  Elements of it seem to be, yes.  I mean, even as I look at,

14  you know, the following things -- you know, "When conducting

15  cold calls to source potential candidates, BlueSky shall not

16  identify Radiology Partners' name without first establishing

17  the potential candidate's interest in the position."  I mean,

18  that -- these don't look familiar, in that I don't think we've

19  used things like this.  And I don't know if this is specific to

20  the contract we had with RAD Partners, because I identify the

21  client in my first email.  So I -- I don't know if this is --

22  Well, with recent contracts I've done, I'm certain that I don't

23  have this language in there.  I do not recall if in 2016 this

24  was standard for all of our agreements.

25          So to answer your question, the overall format of this

Jeffrey Lombardo - Cross

1   looks pretty consistent.  I don't know if this is something --

2   sometimes our clients will say, we want to use our contract --

3   BlueSky, we have our own contract that we typically send.

4   We're typically trying to be pretty easy with our clients.  And

5   so sometimes they say, We have our own contract.  So we'll look

6   at them and say, sure, we'll use yours.  I don't know if this

7   is a Radiology Partners contract -- like, you know, the

8   origination is from Radiology Partners or was from BlueSky.  An

9   assumption -- to be very clear, I'm not certain.  I would

10  imagine that some of this was from Radiology Partners, because

11  I don't think I would -- I would not want to include some of

12  this.

13         Now, the section that you're asking about, 8E, I would

14  not have an issue with that.  If a client gave that to me, I

15  would want to know who the clients were that I wasn't allowed

16  to reach out to.

17  Q.  And clients do ask you to put certain companies off limits,

18  don't they?

19  A.  In my experience, my clients have been specifically

20  consulting firms.

21  Q.  In this instance, the contract reflects that Radiology

22  Partners included that provision?

23  A.  In this instance, if this is the right contract, if it says

24  there is off-limits companies, I never -- I never -- well, I'm

25  almost positive I never received a list of those companies.

Jeffrey Lombardo - Cross

1   Q.  Isn't it common, though, Mr. Lombardo, for clients to give

2   you instructions on companies to affirmatively target and

3   companies not to target?

4   A.  I would not say it's common.  When we have those intake

5   calls with clients, sometimes we'll say, Are there clients you

6   think we should go after?  Again, you know, you've seen people

7   in the market that have the right skills that, you know,

8   they've got a good training program.  So I like asking that

9   question, you know, are there firms that you'd like us to

10  target as we go after?  Again, outside of the consulting

11  firms -- and I do ask that question to my consulting clients,

12  are there clients we should not go after, or target?  But we

13  typically don't have that issue with non-consulting clients.

14  Q.  So let me ask you another question.  At the time that you

15  got the request from Mr. Won in October of 2016 regarding

16  reaching out to DaVita, you didn't follow up with Mr. Won;

17  correct?

18  A.  That is -- well, about -- no, I didn't follow up and say

19  why, or, tell me more.

20  Q.  And that's because, in general, if a client asks BlueSky to

21  do something like avoid a particular company in its searches,

22  BlueSky will follow that direction without asking a bunch of

23  follow-up; correct?

24  A.  I made the assumption -- I knew that a lot of leadership

25  from DaVita had moved to Radiology Partners.  I had made an

Jeffrey Lombardo - Cross

1   assumption because their leadership team had left, they wanted

2   to be respectful; but I didn't follow up or ask.  And I haven't

3   been in the situation before of, why don't you want to go after

4   that client?  But I made the assumption because I knew that

5   Basak Ertan and I think her husband both had previously worked

6   there, that it was -- I just made assumptions.

7   Q.  So, Mr. Lombardo, isn't it true that you told the FBI in an

8   interview that if a client asked BlueSky to do something like

9   avoid a particular company in its searches, BlueSky will follow

10  that direction without asking much follow-up?

11  A.  I imagine some -- so can I just answer the question to you

12  now so I'm not going off memory, to give you -- if a client --

13  yeah.  I would say that if a client asked me to avoid another

14  client, I would follow that instruction; and there is a very

15  high likelihood that I would not ask why.

16  Q.  And you also told the FBI that those sorts of instructions

17  were common; haven't you?

18  A.  Common as it relates to my consulting clients, if that's --

19  I don't know -- I mean, the -- I mean, I don't remember -- for

20  me, it is common for my consulting clients.

21  Q.  So when the FBI contacted you about this particular

22  email, you were surprised; would that be a fair statement?

23  A.  Yes.

24  Q.  And you were a little confused about why they would be

25  inquiring about this email; correct?

Jeffrey Lombardo - Cross

1   A.   Yes.  I mean, I'm surprised to see -- you know, my contract

2   is here; and I'm surprised to see that they had an email I sent

3   in 2016.  It was all a surprise.

4   Q.   And you were surprised that there was anything that -- you

5   were surprised that they focused on this instruction from

6   Radiology Partners to you; isn't that correct?

7   A.   I don't know that I was surprised.  I mean, it was

8   interesting to learn.  I was more surprised -- again, who is

9   expecting a call from the FBI?  Who is ready to see an email

10  that you sent to somebody else six years ago?  That was -- it's

11  like the movies.

12  Q.   Did you even remember this email when the FBI gave it to

13  you?

14  A.   No.  I mean, not really.  I mean, I remember the candidate

15  vaguely.  I know that I presented him.  I was very aware that,

16  you know, for years, we weren't -- you know, we did not source

17  from DaVita.  But if you were to say to -- if you were to ask

18  me before I was reached out to by the FBI, you know, pinpoint

19  the time when you were told you can't -- you're not supposed to

20  source from DaVita, I would not have remembered this email.

21  I wouldn't have known if it was a conversation, an email, or

22  something along those lines.

23  Q.   So let me be a little bit more specific.  So when this

24  written instruction came to you, nothing about it struck you as

25  improper; is that fair?

Jeffrey Lombardo - Cross

1          MR. MARIANO:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3          THE WITNESS:  Can you repeat the question?

4    BY MR. WALSH:

5    Q.  When you received the email, nothing about it struck you

6    as improper?

7    A.  Well, I don't know -- I wasn't familiar with the rules that

8    I have come to learn in the last couple of weeks or months.

9    So, yeah, when I received the email, I was, Okay, I can't

10   reach out to them.

11   Q.  So you didn't at the time think it was improper, just to be

12   clear?

13   A.  At the time -- at the time, again, I had made the

14   assumption it was, like, out of a respect, because leadership

15   from DaVita had moved to Radiology Partners.  That was my

16   assumption.

17   Q.  My question is whether you thought it was improper.

18   A.  I didn't think about it that way.

19   Q.  So you didn't think it was improper?

20   A.  I don't know if that's how I would phrase it.  I didn't --

21   I mean, I don't know -- I don't know what I thought six years

22   ago.  It -- I don't know -- it made -- I understood it to be --

23   again, I made the assumption that this was because of the

24   leadership had moved over.  I did not give it more thought.

25   You're asking me if I thought a certain way.  That didn't come

981

Jeffrey Lombardo - Cross

1    into my mindset, so I can't answer that.

2    *Q.*    I --

3    *A.*    I don't recall if I thought it was improper or not.

4    *Q.*    So when you -- in part, you mentioned that you made the

5    assumption that it was because Radiology Partners executives

6    had come from DaVita, and they wanted to preserve the

7    relationship.    Correct?

8    *A.*    Something along those lines.

9    *Q.*    And that didn't strike you as improper either, did it?

10   *A.*    I guess I'm having reservations with the word "improper."

11   It made sense to me.

12   *Q.*    So would it be fair to say, Mr. Lombardo, that when you got

13   contacted by the FBI about this case, it made you nervous; is

14   that fair?

15   *A.*    No.    I didn't feel nervous about it.

16   *Q.*    All right.

17   *A.*    I mean -- I didn't -- I -- my first reaction, is this a

18   scam or something?    You know, I get a phone call from the FBI

19   and a voicemail, and I was, like, should I call this person

20   back or not?

21   *Q.*    You were hoping it was a scam?

22   *A.*    I don't know.

23   *Q.*    So I guess my question to you is, you were confused enough

24   about the fact that this was the subject of an FBI interview

25   that you asked --

Jeffrey Lombardo - Cross

1          MR. MARIANO:  Objection, Your Honor.  Relevance.

2     Asked and answered.

3          THE COURT:  Overruled.

4     BY MR. WALSH:

5     Q.   -- you asked the FBI and the attorneys for the Department

6     of Justice's Antitrust Division for advice on how to handle

7     clients who put certain companies off limits for recruiters?

8          MR. MARIANO:  Your Honor, I'll renew my objection for

9     relevance.

10         THE COURT:  Overruled.

11         THE WITNESS:  Can you repeat the question?

12    BY MR. WALSH:

13    Q.   You were confused enough about the fact that you were being

14    interviewed by the FBI about this email in October of 2016

15    that you asked the FBI agent and the attorneys for the

16    Antitrust Division just a month ago or so for advice on how to

17    handle clients who asked you to put certain companies off

18    limits for recruiting?

19    A.   I wouldn't say I was confused.  I would say -- I would say

20    that I don't have in-depth knowledge of this.  And it was

21    interesting to me, as we continue to work with clients in the

22    future, that I want to either educate or be aware of what is

23    the right way to do things.

24    Q.   So --

25    A.   As you previously had said, was it improper that they asked

Jeffrey Lombardo - Cross

 1    that?  I didn't -- I didn't give it any thought.  I would want

 2    to know what's improper and not improper in the future.  I'd

 3    like to be educated.  So I didn't -- I wouldn't say "confused."

 4    I did not have education on this subject.

 5    Q.  And so you asked the FBI and the Department attorneys for

 6    help -- to explain that to you?

 7    A.  I wouldn't say help.  I just said, you know, what -- and

 8    maybe I shouldn't have asked them.  Maybe I should have gone

 9    and done my own research, but I was on the phone, and it was

10    easy and convenient.  I was being educated.  I mean, this is a

11    new topic for me, in terms of what is improper and not

12    improper; so I was looking for a little education.  There

13    wasn't a lot of thought behind it.

14    Q.  Okay.  The bottom line is, you don't understand if there is

15    some kind of problem with this kind of instruction from a

16    client?

17    A.  I'm beginning to learn.  I mean, I have been learning in

18    the last weeks, months.  I'm learning more, but I'm not an

19    expert in this, no.

20    Q.  And you're learning it from the government; is that fair?

21    A.  No.  I asked them a question, and they were very clear that

22    they can't give me any sort of counselor advice.  They were

23    very direct and clear that they're not meant to be sources of

24    information or to provide anything, and that if I needed to

25    learn more, I could go learn more.

984

Jeffrey Lombardo - Cross

1    *Q.* But you did -- they did tell you that under certain

2    circumstances, an off-limits request could be appropriate?

3    *A.* I don't -- I don't recall their answer outside of, we can't

4    really -- you know, we're not meant to be a source of

5    information for you.

6    *Q.* Okay. I'm going to switch gears for a second. And thank

7    you for bearing with me as we walked through that.

8    *A.* Sure.

9    *Q.* Now, let's go back to the October 12, 2016, email. Now,

10   in fact, Radiology Partners did talk to Patrick Ayers about

11   possibly coming to Radiology Partners; isn't that true? The

12   candidate, Patrick Ayers.

13   *A.* Yes, I believe so.

14   *Q.* So this is 2016. And, effectively, Radiology Partners is

15   soliciting through you Mr. Ayers at DaVita; correct?

16   *A.* I presented the -- I just want to make sure that our

17   diction is the same. I presented the candidate, they expressed

18   interest, and I think -- I believe they moved forward to screen

19   the candidate.

20   *Q.* All right. And, in fact, they got back to you and told you

21   that he wasn't the right fit for the job; correct?

22   *A.* I think in the end, that is what happened.

23   *Q.* In other words, they didn't tell you, Gosh, we can't

24   consider him, turn him off right now, because he's at DaVita?

25   *A.* I don't think that was ever -- I don't think that was

Jeffrey Lombardo - Cross

 1    ever -- I don't remember perfectly, but I don't think that was

 2    the email thread that I had or what they said about it.

 3              MR. WALSH:  All right.  If we could have Exhibit B497

 4    placed before the witness.  That's been stipulated as authentic

 5    but not yet admissible.

 6    BY MR. WALSH:

 7    Q.  So taking a look at this email, do you -- do you

 8    recognize -- this is an email from Mr. Won to you and Jeff

 9    Stout about Patrick Ayers later the same day on October 12,

10    2016?

11    A.  I recognize it.

12    Q.  And that's what it is?

13    A.  Yeah.

14              MR. WALSH:  I'd move the admission of Exhibit B497.

15              MR. MARIANO:  No objection.

16              THE COURT:  Admitted.

17              (Exhibit B497 admitted.)

18              MR. WALSH:  If we could show the jury that document.

19    BY MR. WALSH:

20    Q.  So Mr. Won actually followed up after that prior email

21    and asked you, "Could you please let Patrick know that we will

22    be reaching out?"

23    A.  That's what this states.  Yes.

24    Q.  Okay.  And, in fact, they did reach out; correct?

25    A.  I believe so.  Yes.

Jeffrey Lombardo - Cross

1        MR. WALSH: Let's take a look at Exhibit B498, also

2    stipulated as authentic, Your Honor, but not yet admissible.

3    So just for the witness.

4    BY MR. WALSH:

5    Q.  And this is an email, Mr. Lombardo, from Sarah Hendricks at

6    Radiology Partners to Alex Won, copied to you, on October 21,

7    2016; correct?

8    A.  It appears, yes.  Correct.

9        MR. WALSH:  I would move the admission of B498.

10        MR. MARIANO:  No objection.

11        THE COURT:  It's admitted.

12        (Exhibit B498 admitted.)

13    BY MR. WALSH:

14    Q.  Mr. Lombardo, Sarah Hendricks is saying to you, "Hi, Jeff.

15    The team decided Patrick is not the right fit for this role."

16    Correct?

17    A.  That's what it says.  Yes.

18    Q.  So Mr. Ayers wasn't turned off, so to speak, from Radiology

19    Partners because of the fact that he was at DaVita; is that

20    fair?

21    A.  Based on this email, that would be -- that would be fair.

22    Q.  Okay.  Now, I want to be clear, other than Mr. Won, has

23    anyone at Radiology Partners ever reached out to you about

24    limitations on recruiting from DaVita?

25    A.  I don't know.  I don't remember.

Jeffrey Lombardo - Cross

1    *Q.*  For example -- do you know a man by the name of Dr. Anthony

2    Gabriel?

3    *A.*  I don't think so.

4    *Q.*  Okay.  So you've never spoken to him, to your knowledge?

5    *A.*  I don't think so.  No.

6    *Q.*  How about a man named Rich Whitney?

7    *A.*  I don't think so.

8    *Q.*  Have you ever spoken to anyone at DaVita about Radiology

9    Partners' instruction from Mr. Won?

10   *A.*  I have not.  No.

11   *Q.*  All right.  Now, even after receiving this email from

12   Mr. Won, you, in fact, continue reaching out to DaVita

13   teammates in the course of your work, don't you?

14   *A.*  I don't think so.

15   *Q.*  I'm asking more generally, not just on behalf of Radiology

16   Partners.  You reach out to DaVita teammates as part of your

17   recruiting job; correct?

18         *MR. MARIANO:*  Objection.  Relevance.

19         *THE COURT:*  Overruled.

20         *THE WITNESS:*  Did I reach out to other DaVita people

21   not for Radiology Partners?  Is that what your --

22   *BY MR. WALSH:*

23   *Q.*  Correct.

24   *A.*  Is that the question?  I don't remember.

25   *Q.*  So earlier you said that DaVita was an attractive target

Jeffrey Lombardo - Cross

1   for candidates; correct?

2   A.   Yes.

3   Q.   And that's because DaVita is a quality organization;

4   correct?

5   A.   Yeah.  Can I -- I think I get where you're going.  I can

6   try to answer --

7   Q.   Well, let me just be specific with you.

8   A.   Okay.

9   Q.   They have a good training program; correct?

10  A.   Yes.

11  Q.   And you want to build relationships with people at DaVita

12  for potential search projects; correct?

13  A.   So they're attractive as -- so it's not a simple yes-or-no.

14  For other clients, they would have no interest in DaVita

15  candidates.  And I have -- I have -- I'm kind of pigeonholed in

16  my vision based on who my clients are.

17          The fact that DaVita had a revenue cycle team, billing

18  team, that's very similar for Radiology Partners.  But for,

19  like, a consulting firm, DaVita would be of absolutely no

20  interest.  Because if I'm not working with, like, their

21  healthcare department -- if it's their financial services

22  banking group, DaVita is not going to be much of interest.

23  Q.   So --

24  A.   My other clients, I would -- it would be rare to reach out

25  to DaVita for my -- the other clients that I have.

Jeffrey Lombardo - Cross

1   Q.  So is Radiology Partners the only healthcare client you've
2   got?
3   A.  We have few healthcare clients.
4   Q.  For those clients, DaVita would have a pool of potential
5   candidates; fair?
6   A.  Yes.
7   Q.  And you would reach out to DaVita candidates just generally
8   to sort of create a pool of candidates; is that fair?
9   A.  Yes.
10  Q.  All right.  Now, Radiology Partners hires more than one
11  executive recruiting firm at a time; is that your
12  understanding?
13  A.  I believe so.  Yes.
14  Q.  And that's pretty common among corporations that are
15  searching for candidates?
16  A.  Yes.  Better for us if it's just us; but, yes, we have
17  competition.
18  Q.  And so are you aware of Radiology Partners -- one way or
19  another if Radiology Partners had other executive search firms,
20  as well?
21  A.  I don't know with certainty that they had other clients.  I
22  don't know the answer to that.  I would assume they did, but I
23  don't know the answer to that.
24  Q.  So earlier you said that BlueSky did approximately --
25  something like 30 plus searches for Radiology Partners from

Jeffrey Lombardo - Cross

1    2016 to the present; is that true?

2    A.  We're -- yes, roughly.  I mean, it probably is more than

3    that.  We're not doing much -- we haven't done much work with

4    them in the last two to three years.

5    Q.  So from 2016 to 2019, do you have -- I believe you -- is it

6    true that you placed nine candidates for Radiology Partners?

7    A.  I would have thought we placed nine to ten people.  I think

8    we had five consultants through those years, and I think we

9    placed ten.

10   Q.  So over that three-year period, maybe three candidates a

11   year?

12   A.  That's a good average.

13   Q.  Okay.

14   A.  How did you get nine?  How did you know that?

15   Q.  A little birdie told me.

16   A.  Okay.

17   Q.  Isn't that what you told the FBI, Mr. Lombardo?

18   A.  Oh, probably.  Nine or ten, yeah.  I think so.

19   Q.  All right.  Now, companies don't just recruit through

20   outside recruiting firms; correct?

21   A.  No.  Most of them do their own internal recruiting.

22   Q.  And they also post job opportunities on websites and other

23   online mechanisms; correct?

24   A.  Yes.

25   Q.  And on LinkedIn?

Jeffrey Lombardo - Cross

1    A.   Yes.  Firms do that.

2    Q.   Which is one of your main avenues to potentially find

3    candidates; correct?

4    A.   Not -- well, we use LinkedIn.  We use it in a different way

5    than a firm would post a role for their own things.  But, yes,

6    that is a source for both companies and for recruiting firms

7    like mine.

8    Q.   And companies actually often go to like business schools to

9    try to recruit candidates who are graduating from business

10   school, as well; is that fair?

11   A.   Certain companies, yes, go to business schools.

12   Q.   And to particular healthcare conferences in the healthcare

13   industry, that's a way that companies recruit?

14   A.   Probably, but I -- I couldn't speak to that.

15   Q.   And, in fact, a company like Radiology Partners may post

16   hundreds of job opportunities on its career center website

17   page?

18   A.   Probably.  Yes.

19   Q.   Okay.  So BlueSky was just one mechanism by which Radiology

20   Partners was identifying candidates to recruit; is that fair?

21   A.   Potentially.

22   Q.   I want to switch gears again.  Are you familiar with

23   something known as a nonsolicitation agreement in the context

24   of your work?

25   A.   I don't know the details of it; but high level, yes.

Jeffrey Lombardo - Cross

1    *Q.*  And isn't it common for executive recruiting firms like

2    BlueSky to enter into a nonsolicitation agreement with its

3    clients like Radiology Partners?

4    *A.*  It has not been common for BlueSky.

5    *Q.*  And, however, BlueSky has done it, hasn't it?

6    *A.*  Not to my knowledge.  But I mean, you have a contract here

7    that has language that I was not familiar with; so I don't want

8    to say no and then be shown something that I didn't remember.

9    So I don't think we have, but you've got some more answers than

10   I do today.

11          MR. WALSH:  Okay.  So if we could have Exhibit B495

12   placed on the screen for Mr. Lombardo.

13          This has been stipulated authentic but not yet

14   admitted.

15   *BY MR. WALSH:*

16   *Q.*  So, Mr. Lombardo, this is an email from Rebecca McKenzie to

17   Basak Ertan at Radiology Partners, among other people, and

18   you --

19   *A.*  Uh-huh.

20   *Q.*  -- with executed copies of the agreements attached.  Do you

21   see that?

22   *A.*  Yes.

23          MR. WALSH:  I would move admission of Exhibit B495,

24   Your Honor.

25          MR. MARIANO:  No objection.

Jeffrey Lombardo - Cross

1                THE COURT:  It's admitted.

2                (Exhibit B495 admitted.)

3                MR. WALSH:  Thank you, Your Honor.

4                Let's take a look at Exhibit B496.

5                Again, this has been stipulated as authentic, Your

6       Honor; but it has not been admitted yet.

7       BY MR. WALSH:

8       Q.  Mr. Lombardo, does this appear to be the contract attached

9       to the prior email that came to you?

10               Take a moment to review it.

11      A.  It appears to be.  Yes.

12               MR. WALSH:  All right.  And, Your Honor, I would move

13      the admission of B496.

14               MR. MARIANO:  No objection.

15               THE COURT:  It's admitted.

16               (Exhibit B496 admitted.)

17      BY MR. WALSH:

18      Q.  So, Mr. Lombardo, this is the project delivery agreement

19      between BlueSky and Radiology Partners; correct?

20      A.  It appears to be.  Yes.

21      Q.  Okay.  And it's dated, again, October of 2016.  In this

22      case, the 27th.  Do you see that?

23      A.  Yes.

24               MR. WALSH:  Okay.  So let's take a look -- if we could

25      go down to Section 5(a) of this, and if we could blow that up.

Jeffrey Lombardo - Cross

1   BY MR. WALSH:

2   Q.   So this is a provision for nonsolicitation of employees;

3   correct?

4   A.   Give me a moment.

5   Q.   Sure.   Take your time.

6   A.   I'm -- so this document started with project delivery.

7   Project delivery in our business is when we provide a

8   consultant to the client.   Unfortunately, I'm not able to --

9   I'm not certain in my response.

10          So we find a BlueSky consultant that would go and work

11   with Radiology Partners as a contractor to us.   So as an

12   example, we find a project manager to help them with initiative

13   for six months, and they're a BlueSky consultant for six

14   months.   I don't know if -- interpreting this offhand, if this

15   is -- you know, so at times, clients will say, you can't -- you

16   can't hire our consultant.   I don't think that's what this is

17   saying.

18   Q.   So let me ask you a couple questions, Mr. Lombardo, so that

19   we can -- so that we can discuss what it does say.   What this

20   says is that BlueSky will not directly or indirectly solicit

21   any employee of the client, Radiology Partners, for the

22   duration of this agreement and for twelve months following.

23   A.   Okay.

24   Q.   And what that means is that BlueSky agreed it was not going

25   to reach out and solicit employees at Radiology Partners --

Jeffrey Lombardo - Cross

1    A.  Right.

2    Q.  -- during that time.  So this is an agreement between

3    BlueSky on the one hand and Radiology Partners on the other;

4    correct?

5    A.  Yes.

6    Q.  It is not an agreement by BlueSky with employees of

7    Radiology Partners?

8    A.  Okay.  I get where you're going.  No.  It's an agreement

9    with our client.

10   Q.  Okay.

11   A.  So this kind of comes back to the whole consulting examples

12   I was using before.

13   Q.  Well, let me ask you a couple of questions.  That's not an

14   agreement with individual employees of Radiology Partners;

15   correct?

16   A.  Correct.  That's --

17   Q.  And, in fact, employees of Radiology Partners presumably

18   don't even know that this provision is included; correct?

19   A.  Correct.

20   Q.  All right.  And Radiology Partners employees are not

21   compensated by virtue of the fact that BlueSky has agreed not

22   to solicit them?

23   A.  I don't know the answer to that, but --

24   Q.  There is nothing in this contract that compensates

25   employees?

996

Jeffrey Lombardo - Cross

1   *A.*   That compensates Radiology employees?

2   *Q.*   Yes.

3   *A.*   No.  No.

4   *Q.*   So in some sense, the opportunities of employees of

5   Radiology Partners are being limited by the fact that BlueSky

6   has agreed not to solicit them; isn't that true?

7   *A.*   Being limited to work with the company that they're already

8   at.  Like, we're not going to hire them to work at their own

9   firm as a BlueSky consultant.

10  *Q.*   This provision doesn't say that it's limited in that sense,

11  does it --

12  *A.*   No.

13  *Q.*   -- Mr. Lombardo?

14  *A.*   Can you rephrase it so I make sure I answer this correctly?

15  *Q.*   The question I think is, doesn't this limit the opportunity

16  of Radiology Partners employees who will not be solicited by

17  you?

18  *A.*   Yes.

19  *Q.*   Okay.  Now, are you familiar also with the concept of

20  nonsolicitation agreements in the context of executive or

21  employee contracts?

22  *A.*   Say that again, please.

23  *Q.*   Are you familiar with nonsolicitation agreements or clauses

24  in employment contracts?

25  *A.*   As familiar as I am with this.  So, I mean, to a degree.

Jeffrey Lombardo - Cross

1   Q.   They exist; is that fair?

2   A.   Sure.

3   Q.   And what those clauses provide is that if an employee

4   leaves a company, they won't solicit other employees back at

5   their former company for some period, twelve months?

6   A.   I have heard of that.

7   Q.   In fact, it's fairly common; isn't it?

8   A.   I don't know.

9   Q.   So when you place candidates, do you get involved in the

10  actual contracting once you place them?  Are you involved in

11  that part of the process?

12  A.   Do we help with negotiating?

13  Q.   Yes.

14  A.   Yes.

15  Q.   And so do those clauses come up in the course of those

16  negotiations?

17  A.   I'm trying to think of examples of that happening.  At this

18  moment, not that I can think of.

19  Q.   Okay.  So let me make sure I understand this, Mr. Lombardo.

20  You're an executive recruiter?

21  A.   Yes.

22  Q.   Your job is placing candidates at companies?

23  A.   Uh-huh.

24  Q.   And you assist with the negotiations for placing those

25  candidates?

Jeffrey Lombardo - Cross

1    *A.*  At times, yes.

2    *Q.*  And you're not familiar of any example of a nonsolicitation

3    agreement being part of an employment contract for one of those

4    candidates?

5    *A.*  No.  I mean, I'm familiar with it, just -- it -- I mean,

6    with one of our clients, you know, they'll ask, do you have any

7    nonsolicitation or anything like -- along those lines that

8    would -- that would refrain from us being able to hire you?

9    But more often than not, it's typically not something that is

10   an issue for us.

11   *Q.*  I guess my question is the flip side.  Do your candidates

12   end up signing agreements that include nonsolicitation clauses?

13   *A.*  Oh.  I'm not typically part of that.  I don't see those

14   documents.  That's -- I mean, once we present a candidate and

15   then place a candidate, then -- I mean, the client typically

16   does a lot of it.  I might help a candidate in terms of

17   negotiating their salary; but in terms of background checks, in

18   terms of those types of things, I don't have visibility.  I'm

19   not part of that.

20   *Q.*  But it's your understanding that it's a common provision;

21   is that fair?

22   *A.*  I don't know if I'd say "common."  It's my understanding

23   that it happens.

24   *Q.*  Okay.  How about noncompete clauses?

25   *A.*  Again, it happens; but I don't -- I don't -- I don't get to

Jeffrey Lombardo - Cross

1   see those.  I'm not part of the signing of those.  It's not

2   part of -- I don't have visibility to that.

3   Q.  So, Mr. Lombardo, I'm asking you generally, based on your

4   knowledge of placing candidates for companies for a living,

5   that noncompete clauses in employment contracts are common, are

6   they not?

7   A.  I'm not one to say that they're -- they exist.

8   Q.  Okay.  They're not unusual; fair?

9   A.  They exist.  Common, unusual, I don't know what the metrics

10  would be for that.

11  Q.  Okay.

12       MR. WALSH:  Your Honor, if I could have one moment.

13  BY MR. WALSH:

14  Q.  Were you aware, Mr. Lombardo, that employees at Radiology

15  Partners who had come from DaVita had nonsolicitation

16  agreements in their DaVita contracts?

17       MR. MARIANO:  Objection.  Lacks personal knowledge.

18       MR. WALSH:  That wasn't my question, Your Honor.

19       THE COURT:  That wasn't his question.

20       THE WITNESS:  Thank you.  I don't know.

21  BY MR. WALSH:

22  Q.  Is it -- so you don't know whether or not nonsolicitation

23  agreements for former DaVita people at Radiology Partners might

24  limit the ability to recruit from DaVita directly?

25  A.  I don't know.

Jeffrey Lombardo - Redirect

1           MR. WALSH:  Okay.  I have nothing further, Your Honor.

2           THE COURT:  Redirect.

3           MR. MARIANO:  Yes, Your Honor.

4                        **REDIRECT EXAMINATION**

5    BY MR. MARIANO:

6    Q.  Mr. Lombardo, I'd like to clear up some confusion.

7           Can we pull back up Defense Exhibit B496, section

8    5(a).

9           Defense counsel was asking you about this provision;

10   right?

11   A.  Yes.

12   Q.  And in your understanding, was this at all related to any

13   specific project that BlueSky was working on?

14   A.  I don't remember if it was to a specific project.

15   Q.  I think you called out before the project delivery

16   agreement title; right?

17   A.  Yes.

18   Q.  Can you explain what that meant, what this contract was

19   about?

20   A.  Project delivery is when BlueSky provides a client with a

21   consultant, versus the other title would be something along the

22   lines of executive search, where we're presenting a candidate

23   to be a full-time employee.  So this is -- this is two lines of

24   business for us, in terms of providing a consultant versus

25   providing a permanent employee.

Jeffrey Lombardo – Recross

1    *Q.*  And this clause is limited to twelve months; right?

2    *A.*  That's what it says.

3    *Q.*  So, then, let's talk about the agreement that -- the

4    direction that you received from Alex Won.  Was that related to

5    any specific project that BlueSky was working on, or was it

6    broader?

7    *A.*  Alex is -- that conversation with Alex is when we were

8    presenting permanent employees, not BlueSky consultants.

9    *Q.*  Was it at all time limited, as this contract is?

10        *MR. MELSHEIMER:*  Your Honor, objection to the leading.

11        *THE COURT:*  Sustained.

12   *BY MR. MARIANO:*

13   *Q.*  Mr. Lombardo, was the direction that you received from Alex

14   Won time limited, or did it continue in perpetuity?

15   *A.*  He didn't -- they didn't put an end date to it.

16        *MR. MARIANO:*  Thank you, Mr. Lombardo.

17        Nothing further.

18        *MR. WALSH:*  Your Honor, may I ask one follow-up

19   question?

20        *THE COURT:*  Yes.

21                    **RECROSS-EXAMINATION**

22   *BY MR. WALSH:*

23   *Q.*  Mr. Lombardo, the hard copy agreement in front of you that

24   I showed you to refresh your recollection -- do you have that

25   in front of you?

Jeffrey Lombardo - Recross

1    *A.*  Yeah, I've got it.

2    *Q.*  That's a professional search agreement; correct?

3    *A.*  This one, yes.  Yes.

4    *Q.*  And it also -- does that -- take a look at it, and look at

5    page 6.  Take a look at the top of the page.

6    *A.*  Yes, I see that.

7    *Q.*  Does that refresh your recollection that your professional

8    search agreements also contain a nonsolicitation clause?

9    *A.*  I mean, I wouldn't have remembered it; but it says that

10   here.  Yes.

11         *MR. WALSH:*  Thank you.

12         Oh, Your Honor, I would offer that exhibit.  We would

13   mark it as B539.

14         *MR. MARIANO:*  No objection.

15         *THE COURT:*  I'll admit it if you'll admit that that

16   wasn't one question.

17         (Exhibit B539 admitted.)

18         *MR. WALSH:*  I don't want to count, Your Honor.  Thank

19   you.  I'll admit it.

20         *THE COURT:*  All right.  B539 --

21         *MR. WALSH:*  Yes.

22         *THE COURT:*  -- is admitted.

23         (Exhibit B539 admitted.)

24         *THE COURT:*  Ladies and gentlemen of the jury, do you

25   have any questions for the witness?

1    Yes.

2         (Hearing commenced at the bench.)

3         *THE COURT:*  Question 30.

4         *MR. WALSH:*  No objection to 30.

5         *MR. MARIANO:*  No objection.

6         *MR. MELSHEIMER:*  We have no objection.  Looks fine.

7         *THE COURT:*  To either one?

8         *MR. WALSH:*  Either one.

9         *MR. MELSHEIMER:*  They're good questions, actually.

10        *THE COURT:*  All right.  Thank you.

11        (Hearing continued in open court.)

12        *THE COURT:*  Sir, the jurors have a couple questions

13   for you.

14        Question:  In your experience, does BlueSky ever find

15   people they want to hire because they are -- because they

16   learned they are skilled or a good fit through their work for a

17   company placing candidates?

18        *THE WITNESS:*  Can you repeat that?

19        *THE COURT:*  Yeah.  In your experience, does BlueSky

20   ever find people they want to hire say because --

21        *THE WITNESS:*  "They," being that we -- that BlueSky

22   wants to hire?

23        *THE COURT:*  I think so.

24        *THE WITNESS:*  Okay.

25        *THE COURT:*  Do you ever hire -- find people that you

1   want to hire through your work for a company placing

2   candidates?  You're going out, doing an assignment for a

3   company, and you see somebody that looks pretty good to you, do

4   you ever hire those people yourself?

5            *THE WITNESS:*  Okay.  So if that is the question -- and

6   I just want to clarify it just to make sure.  So client X has

7   asked me to find them a certain type of position; and as I'm

8   speaking to candidates, I say, gee, they would be great for me.

9   In thinking of all of the -- well, that could potentially

10  happen.  I don't think any of our hires have ever happened that

11  way.

12           But just to paint a picture of how we operate and how

13  I work, when I speak with a candidate, I say, I've reached out

14  to you about this opportunity; but I'd like to learn more about

15  your background, as we work with many clients in many different

16  industries across the country.  And maybe this role that I

17  reached out to you isn't a fit; but I'm looking to build a

18  relationship and have a good sense of what I can reach out to

19  you about in the future if this isn't the right fit.  That

20  could be for BlueSky.  I mean, we're recruiting; and we don't

21  typically work on recruiting roles for our clients.  We're

22  typically working on transformational type roles.

23           So could that happen?  Sure.  I mean, I'm in the

24  business of networking and meeting people.  I talk to thousands

25  of people all the time.  So could that happen?  Yes.  And it

1    could happen -- yeah, it could potentially happen.  I don't

2    believe it has happened with any of our hires.

3         THE COURT:  Question:  If an employee of a BlueSky

4    client reached out to BlueSky about an employment opportunity,

5    would BlueSky consider them?

6         THE WITNESS:  Yes, we would.  We've placed a lot of

7    people.  And after three or four years, they could say, hey,

8    look this isn't working out anymore, or I want something new or

9    it's different.  In terms of the nonsolicitation that was in

10   that contract that said twelve months -- I've been doing this

11   for 13 years; we've been in existence for 16 years.  I could

12   place somebody -- they could even be a hiring manager that we

13   work for; but eventually, five, six, seven years, they want to

14   leave and do something new, we're here to help and assist them.

15   They could be a client -- I mean, Alex Won, for example, could

16   reach out to me tomorrow and say, I want to leave.  Can you

17   help me out?  And I'm happy to speak with him.

18        THE COURT:  Question:  Approximately how many

19   candidates do you need to solicit in order to fill one

20   position?

21        THE WITNESS:  That's a magic number -- well, there is

22   no magic number, but that's a metric that we try to keep track

23   of.  It really ranges depending on who the client is, what the

24   role is, et cetera.  These aren't clients of ours, but I'll use

25   them as examples.

1006

```
 1              There is companies like Apple or Google that people

 2    are dying to work for.  There are other companies that you've

 3    never heard of.  You know, so if I send you a message and said

 4    I have an opportunity -- and, again, not a client, but an

 5    example -- I've got an opportunity to be a project manager at

 6    Apple versus I've got an opportunity to work with, you know,

 7    Bob's Technology, are you going to respond to Bob's Technology

 8    or maybe Apple.  I mean, Apple just has a great brand

 9    reputation.  So it can really range on a variety of things, in

10    terms of brand name, location, is it remote, how much travel,

11    what's the compensation going to be?  So there is a lot of

12    factors that go into how many -- how many people it would take.

13              THE COURT:  Is there any average number, or is that

14    just --

15              THE WITNESS:  That would be -- in the industry, I

16    don't think anybody could say that.  And the other part of it

17    too is, how good of a job are we doing sourcing the right

18    candidate?  But you don't necessarily know.  I mean, if you

19    look at LinkedIn and you find a candidate that has all of the

20    skills and the background that you're looking for, they could

21    be the right fit.  But I don't know -- I mean, if one of you as

22    an individual says -- you know, if I see your LinkedIn profile

23    and it's like you're a great fit, but you're not interested in

24    taking your career in that direction or continuing in that

25    direction, you really want to switch to go into sales as
```

1    opposed to technology implementation or healthcare, I won't

2    know that until I speak to you and learning what your career

3    interests are most important.

4         So there is no average number in terms of number of

5    people that you have to speak to to place.  You hope that it's

6    small, because you don't want to have to talk to hundreds of

7    people.  That's part of the reason why we have our profession,

8    is that -- you know, two things.  I mean, one of the questions

9    that was asked me is proactive, being passive.  A lot of

10   passive come to good companies; and they have to sort through

11   hundreds of thousands of people, if it's a good firm.  That's

12   why they use us.  They know that I've talked to the person; and

13   I'm going to provide them with somebody that is qualified, not

14   just somebody that applied and might look good.  Maybe their

15   communication is very poor.

16        So, yeah -- you know, being proactive in terms of

17   finding people and then being able to present good candidates

18   is where we add the value to our clients.

19             THE COURT:  Any other questions, folks?

20             (No response.)

21             Mr. Mariano.

22             MR. MARIANO:  Nothing from the United States.

23             THE COURT:  Mr. Walsh.

24             MR. WALSH:  Nothing from the defense either, Your

25   Honor.

1           *THE COURT:*  Mr. Melsheimer.

2           *MR. MELSHEIMER:*  Thank you, Your Honor.  No questions.

3           *THE COURT:*  All right.  Thank you, sir.  You're

4   excused and free to go.

5           *THE WITNESS:*  Thanks.

6           *THE COURT:*  Terri, would you like a break before we go

7   to the next witness?

8           How about you folks?

9           *JUROR:*  Take ten.

10          *THE COURT:*  Take ten?  All right.  Let's do it.

11          (Jury out at 10:51 a.m.)

12          *MR. MELSHEIMER:*  Can I raise one matter with the

13  Court, as we're obviously anticipating the Court's rulings with

14  respect to what Dr. Cremieux can say, not say.  But as you're

15  thinking about those, I would just ask you to consider this

16  from our perspective:  It is in evidence that one of the

17  factors for Mr. Thiry's compensation -- and I think the

18  government mentioned this in their opening, and we're going to

19  hear about it in the closing -- is the retention of employees.

20  So it's really important to us that we be able to show through

21  Dr. Cremieux that, in fact, there were many, many, many

22  different people targeting and possible destinations for DaVita

23  employees, not just these three companies.

24          And so it would be irrational in some sense for him to

25  have focused on this in terms of how much money he might make.

1   Because if you don't let us do that, then we don't have a way

2   of rebutting something I think is going to be the government's

3   big point.  And you might say, well, that's your fault,

4   Mr. Melsheimer.  You better come up with another idea.  I would

5   ask the Court to consider that in telling us what Dr. Cremieux

6   can and cannot say.

7           THE COURT:  Do you think it hasn't already been said

8   and isn't it obvious that companies all over the United States

9   could recruit and vice versa?  That's clear and understood.

10  You don't need an expert to tell us that.

11          MR. MELSHEIMER:  Understood, Your Honor.  But, again,

12  I think that -- again, on this side of the table, we're just

13  trying to make sure we have all of the arrows in our quiver in

14  a criminal case to respond to the allegations by the

15  government; and this is one of them.  And we'd ask you at least

16  to consider it.

17          THE COURT:  See you in ten minutes.

18          MR. MELSHEIMER:  Thank you, Your Honor.

19          (Recess at 10:53 a.m.)

20          (In open court at 11:07 a.m.)

21          THE COURT:  All right.  Next witness.

22          MR. VIGEN:  Your Honor, William Vigen for the

23  United States.  Call Special Agent Matthew Hamel.

24

25

Matthew Hamel - Direct

1          (**MATTHEW HAMEL, GOVERNMENT'S WITNESS, SWORN**)

2                          **DIRECT EXAMINATION**

3     *BY MR. VIGEN:*

4     *Q.*  Can you please state and spell your full name.

5     *A.*  It's Matthew Hamel.  M-A-T-T-H-E-W, H-A-M-E-L.

6     *Q.*  And Agent Hamel, can you please give us a quick background

7     on your education.

8     *A.*  I have an undergraduate and master's degree in accounting.

9     *Q.*  Where are you employed?

10    *A.*  I'm a special agent with the Federal Bureau of

11    Investigation.

12    *Q.*  Can you please give us a brief background on your time with

13    the FBI?

14    *A.*  Sure.  I joined the FBI in August of 2012, so just under

15    ten years ago.  My first office of assignment was Minneapolis,

16    where I worked mostly counterterrorism investigations related

17    to Al-Shabaab and ISIS.  I moved to Washington, D.C., in 2017.

18    And since 2019 I've been on the team I'm on currently.

19    *Q.*  Are you assigned to a particular unit now within the FBI?

20    *A.*  Yes, sir.

21    *Q.*  Okay.  And what was your role in the investigation -- in

22    this investigation?

23    *A.*  For this investigation, as of April, May, 2019, I was the

24    primary case agent.

25    *Q.*  Can you please give us a sense of the general description

Matthew Hamel – Direct

1  of the sorts of investigative steps that you undertook as part

2  of this investigation?

3  *A.*  Sure.  We did a lot of interviews and collected a lot of

4  documents, that includes text messages, emails, PowerPoint

5  presentations, contracts, things like that.

6  *Q.*  And you mentioned a lot of interviews.  Approximately how

7  many interviews did the FBI as a whole conduct?

8  *A.*  As a whole, over 100.  I don't know the exact number as I

9  sit here today.

10 *Q.*  Okay.  And does that mean you interviewed over 100

11 witnesses?

12 *A.*  No, it does not.  Witnesses, some we interviewed more than

13 once; so there would be multiple interview reports for a single

14 witness.

15 *Q.*  Of those interviews, approximately how many did you

16 personally participate in?

17 *A.*  This would be ballpark, but I'd say 75 to 80 percent of the

18 total number of interviews.

19 *Q.*  Agent Hamel, I'd now like to talk about certain documents

20 your investigation revealed with respect to Count 2, the

21 charged conspiracy between Mr. Thiry and DaVita and Hazel

22 Health between April 2017 and June 2019.

23         Before we start on that, though, one question.  Based

24 on your investigation, when did Mr. Thiry step down as CEO of

25 DaVita?

Matthew Hamel – Direct

1   *A.*  As I understand it, June of 2019.

2          *MR. VIGEN:*  If we can please show Government

3   Exhibit 338 and move it as stipulated.

4          *THE COURT:*  It's admitted.

5          (Exhibit 338 admitted.)

6          *MR. VIGEN:*  If we can go to the very bottom email,

7   please, an email between Mr. Thiry and Mr. Golomb, dated

8   February 23, 2015.

9   *BY MR. VIGEN:*

10  *Q.*  At this time in 2015, where did Mr. Golomb work?

11  *A.*  Mr. Golomb at this point worked for Hazel Health -- excuse

12  me.  He was the president of DaVita Rx and Paladina Health.

13  Still within DaVita at this point.

14  *Q.*  In 2015, Mr. Golomb is an employee of DaVita; is that

15  correct?

16  *A.*  That's correct.

17  *Q.*  And if you could read to the jury, please, Mr. Thiry's

18  statement to Mr. Golomb.

19  *A.*  "Please let me know if you are talking to anyone about

20  joining Paladina or Rx from any other part of company."

21  *Q.*  And is Paladina a subsidiary of DaVita at this time?

22  *A.*  Yes, I believe so.

23  *Q.*  Is DaVita Rx a subsidiary of DaVita at this time?

24  *A.*  Yes, yes.

25         *MR. VIGEN:*  If we could look at Mr. Golomb's response,

Matthew Hamel - Direct

1    please.

2    *BY MR. VIGEN:*

3    *Q.*  If you could read his first two sentences.

4    *A.*  "Will do.  Below is a message I sent to Palmer a few weeks

5    ago."

6    *Q.*  What is Palmer?

7    *A.*  As I understand it, Palmer is kind of an email list -- an

8    email grouping within DaVita, similar to the Lambeau Serve.

9          MR. VIGEN:  Let's look at that email now.  If we can

10   blow up the -- right there.  Thank you.

11   *BY MR. VIGEN:*

12   *Q.*  If you could just read his introductory sentence to Palmer.

13   *A.*  "As we grow across the country, it will end up creating

14   three types of roles that kidney care teammates may be most

15   likely to express interest in."

16   *Q.*  And are kidney care teammates DaVita employees?

17   *A.*  Yes.

18   *Q.*  All right.  Just very briefly, what are those three roles

19   he's mentioning there?

20   *A.*  Field ops managers, market leaders, and care coordinators.

21          MR. VIGEN:  Okay.  We can go down to the next

22   paragraph, which is the proposal.

23   *BY MR. VIGEN:*

24   *Q.*  If you can read his introductory sentence to that proposal.

25   *A.*  "I want to make sure me/my team follow a very thoughtful

Matthew Hamel - Direct

1    set of guidelines as we staff for these roles.  Here is what

2    I'd propose."

3    *Q.*  And if you can read the first paragraph, please.

4    *A.*  "One, clear agreement that Paladina teammates never

5    directly target a specific leader in kidney care.  If there is

6    someone that one of us knows and thinks would be a great fit,

7    we should talk to their manager first to decide if right thing

8    to do for the teammate/village to explore.  If the existing

9    manager is in any way uncomfortable with conversation, we do

10   not have it."

11          MR. VIGEN:  Okay.  If we can now go to the first page

12   with Mr. Thiry's response to Mr. Golomb's suggestion.

13   *BY MR. VIGEN:*

14   *Q.*  Can you read that -- those first few sentences, please.

15   *A.*  "I don't think this is the right system.  We need a people

16   services organization to help on this.  I fear we are doomed if

17   we continue with current process.  It will not work to tell

18   people to talk to their bosses.  Too many won't."

19   *Q.*  Okay.  Approximately when did Mr. Golomb leave DaVita?

20   *A.*  Approximately 2017.

21   *Q.*  Where did Mr. Golomb go next?

22   *A.*  He became the chief executive officer at Hazel Health.

23   *Q.*  Approximately when did Mr. Golomb join Hazel Health as its

24   CEO?

25   *A.*  It was in the early part of 2017.  I think February, if I'm

Matthew Hamel – Direct

1    not mistaken.

2    *Q.* Did your investigation uncover text messages between

3    Mr. Thiry and Mr. Golomb?

4    *A.* Yes, it did.

5    *Q.* Okay. And were those text messages produced as individual

6    messages?

7    *A.* Yes.

8            *MR. VIGEN:* If we can go to Government Exhibit 113,

9    please, which is stipulated.

10           *THE COURT:* All right. It's admitted.

11           (Exhibit 113 admitted.)

12   *BY MR. VIGEN:*

13   *Q.* Is this an example of what you were describing?

14   *A.* Yes, it is.

15   *Q.* What information is contained in this document?

16   *A.* The document has about what you'd expect from a text

17   message. It's the sender, the receiver, the date and time

18   stamp, and then the content of the message.

19   *Q.* Okay. Were these produced for each individual message?

20   *A.* Yes. One individual item was produced for an individual

21   message.

22   *Q.* Okay. So what is the -- the date of this text message,

23   it's from Josh Golomb to Mr. Thiry dated March 28, 2017?

24   *A.* That's correct.

25   *Q.* Okay. This is after Mr. Golomb had become CEO at Hazel?

Matthew Hamel - Direct

1    *A.*   Yes.

2    *Q.*   All right.  And if you could please read Mr. Golomb's text

3    message to Mr. Thiry.

4    *A.*   "Kent, it's Josh.  I know you talked to Julio" --

5    *Q.*   Stop you right there.  Who is Julio?

6    *A.*   Julio is a reference to Julio Quinones, who was a DaVita

7    executive that was eventually hired by Hazel Health.

8    *Q.*   You can continue, please.

9    *A.*   "Wanted to talk to you on the front end but felt like I had

10   to respect him wanting to talk to you first.  I'm hoping he

11   walked through all context, etc.  Would like to talk to you

12   when you have time.  Know you are very busy and sorry for

13   adding any stress to your already busy life."

14   *Q.*   And are there additional text messages in this string?

15   *A.*   Yes.

16   *Q.*   And have you helped create an exhibit that pieces together

17   these text messages between Mr. Golomb and Mr. Thiry?

18   *A.*   Yes, I have.

19        *MR. VIGEN:*  Your Honor, at this time for efficiency

20   sake, I plan to only show Government Exhibit 324.  If we can

21   just show that to the witness.  It is stipulated.

22        But, then, Your Honor, I think for completeness sake,

23   we will also need to move in the referenced underlying text

24   message.  So for the record, those are Government

25   Exhibit 113 --

Matthew Hamel – Direct

1          THE COURT:  Just a second.  324 is admitted.

2          (Exhibit 324 admitted.)

3          Now, you say 113?  It's already admitted.  What else?

4          MR. VIGEN:  114.

5          THE COURT:  Yes, admitted.

6          MR. VIGEN:  115.

7          THE COURT:  Admitted.

8          MR. VIGEN:  116.

9          THE COURT:  Admitted.

10          Tell me all the way to the end.

11          MR. VIGEN:  All the way through 121.

12          THE COURT:  Yes.  Admitted.

13          MR. VIGEN:  We will skip 122, and then 123 through

14    128.

15          THE COURT:  Okay.

16          (Exhibits 114-121 and 123-128 admitted.)

17          MR. VIGEN:  Thank you.

18    BY MR. VIGEN:

19    Q.  Agent Hamel, can you please explain to the jury how this

20    exhibit was put together and what it shows.

21    A.  Sure.  So we previously looked at one of those exhibits

22    that has just an individual text message on it.  All we've done

23    is extract the items that you see here, the date, the time, the

24    exhibit number, and then the content.  And on the right side of

25    the screen you'll see Mr. Golomb's text message showing up in

Matthew Hamel – Direct

1    the blue bubbles and on the left side, Mr. Thiry's text message

2    showing up in the gray bubbles.

3    Q.   Okay.  So you had just read and we just had seen the

4    individual text message at Government Exhibit 113; is that

5    right?

6    A.   That's correct.

7    Q.   Okay.  So then Mr. Thiry responds, "It is not a good time

8    to talk right now."  If you can read Mr. Golomb's reply,

9    please.

10   A.   "No problem, Kent."

11          The next day he goes on to say, Do you want to know --

12   "Do want you to know that I take this stuff crazy seriously and

13   have complete respect for you and have very clear lines of

14   things I would not do and inquiries I have already rebuffed.

15   Think when you hear the context on this specified situation,

16   you may still be unhappy with outcome, but will appreciate I am

17   trying to operate in way in line with village values, as

18   someone who still is very committed in seeing it always

19   thrive."

20          MR. VIGEN:  And go to the next page, please.

21   BY MR. VIGEN:

22   Q.   Then the next day, Mr. Thiry texts Mr. Golomb, "I would not

23   consider this outcome to be set yet.  Very serious conversation

24   required."

25          If you can read Mr. Golomb's response, please.

Matthew Hamel – Direct

1    A.  "Yes.  I meant outcome in terms of what you heard outcome,

2    not end outcome.  May well be better outcome for village and

3    him.  Just let me know what right next steps are."

4    Q.  And then Mr. Thiry texts back, "I am at a board meeting.

5    Will try to call tomorrow."

6              Did your investigation uncover text message between

7    Mr. Golomb and Mr. Quinones --

8    A.  Yes.

9    Q.  -- Mr. Julio Quinones?

10   A.  Yes, we did.

11   Q.  And, again, were those also produced as single-page text

12   messages?

13   A.  Yes.

14   Q.  Have you helped create a similar exhibit that pieces

15   together text messages between Mr. Thiry -- I'm sorry --

16   Mr. Golomb and Mr. Quinones?

17   A.  Yes, I have.

18             MR. VIGEN:  Okay.  If we can show the witness, please,

19   Government Exhibit 325.

20             So, Your Honor, at this point I'd move Government

21   Exhibit 325 --

22             THE COURT:  It's admitted.

23             MR. VIGEN:  -- 293, 294, 295, and 296.

24             THE COURT:  All right.  They're in.

25             (Exhibits 325 and 293-296 admitted.)

Matthew Hamel - Direct

1   *BY MR. VIGEN:*

2   *Q.*  So Mr. Quinones texts to Josh Golomb, "FYI, just talked to

3   Kent.  On a call now but will reach out soon."

4          Next message, "I did, FYI, say that I did not have an

5   offer yet."

6          If you can read Mr. Golomb's reply, please.

7   *A.*  This is the next day following those messages.  "Hey, if

8   you have a few minutes this morning, I wanted to clarify a

9   couple quick things before I talk to Kent, a couple of data

10  points around what you did already to convey to DaVita that you

11  were looking."

12         The next message, "Call got pushed to 4:30, FYI."

13  *Q.*  Did your investigation reveal whether Mr. Thiry and

14  Mr. Golomb spoke on April 4, 2017, following this text message?

15  *A.*  Yes.

16  *Q.*  Okay.  If we can go back to Government Exhibit 324, which

17  was just admitted as the text exchange between Mr. Thiry and

18  Mr. Golomb.  What is the date of this text message from

19  Mr. Golomb?

20  *A.*  This is April 5, 2017.

21  *Q.*  If you can please read Mr. Golomb's text message to

22  Mr. Thiry.

23  *A.*  "Did not sleep much last night knowing how much everything

24  hurt you personally.  In retrospect, should have followed my

25  instinct and talked to you directly much earlier and made sure

Matthew Hamel - Direct

1    we were aligned on right way to do things instead of operating

2    from what felt like the highest integrity position and what

3    others told me is how they do things versus having Julio

4    message at time he felt was appropriate.  I get that it felt

5    like a blindside and possibly a betrayal and easy to assume

6    worst-case narrative without context.  I have thought through a

7    very specific set of ground rules based on your feedback to

8    commit to.  We can discuss when you have time."

9    Q.  Did your investigation reveal whether Mr. Thiry and

10   Mr. Golomb planned to speak after this text message?

11   A.  Yes, they did plan to speak.

12          MR. VIGEN:  Okay.  If we can go to Government

13   Exhibit 326, which is stipulated.

14          And I would move that and Government Exhibit 297,

15   please.

16          THE COURT:  All right.  Admitted.

17          (Exhibits 297 and 326 admitted.)

18   BY MR. VIGEN:

19   Q.  Is this the next day?

20   A.  Yes.  This is April 6.

21   Q.  All right.  What does Mr. Golomb text Mr. Quinones?

22   A.  "Is time set with Kent?  He was going" -- typo -- "to call

23   me tonight but I think it was to follow up on what he said he

24   wanted for our future agreements."

25   Q.  Okay.  This is April 6?

Matthew Hamel – Direct

 1   A.  Yes, sir.

 2          MR. VIGEN:  Okay.  If we can please go to Government

 3   Exhibit 129.

 4          And I would move in as stipulated.

 5          THE COURT:  Okay.  Admitted.

 6          (Exhibit 129 admitted.)

 7   BY MR. VIGEN:

 8   Q.  Okay.  What is the subject of this email, Agent Hamel?

 9   A.  "Julio recap."

10   Q.  And, again, who does Julio refer?

11   A.  Julio Quinones.

12   Q.  Okay.  And the bottom email that is shown there from Mike

13   Staffieri on April 6 to Mr. Thiry, Javier Rodriguez, and Julie

14   Allen -- who is Julie Allen?

15   A.  As I understand it, Ms. Allen was Mr. Thiry's personal

16   assistant in some capacity.

17   Q.  Okay.  Then what does Mike Staffieri email to Julie?

18   A.  It says, "Julie, can you make sure Kent sees this ASAP?"

19   Q.  And what does he say to Mr. Thiry?

20   A.  "Kent, it appears that Josh continues to pursue Julio.  I

21   think it is worth you placing a call at this point."

22   Q.  And then how does Mr. Thiry respond?

23   A.  "Hope you got my VM.  Disappointing."

24          MR. VIGEN:  If we can go to tab 7 -- sorry --

25   Government Exhibit 286.

Matthew Hamel – Direct

1              If we can put these up side by side --

2              THE COURT:  It's admitted.

3              (Exhibit 286 admitted.)

4              MR. VIGEN:  Thank you, Your Honor.

5              -- with 129.

6    BY MR. VIGEN:

7    Q.  Okay.  Following this, do you see it's the same thread,

8    starting from Mike Staffieri's email?

9    A.  Yes, I do.

10   Q.  How does Julie Allen respond?

11   A.  Initially her response is, "Will do."  And then she follows

12   up later -- a few hours later, saying, "FYI, Kent said he'll

13   make the call."

14   Q.  What is the date of this email?

15   A.  April 7, 2017.

16             MR. VIGEN:  If we now can go back to Government

17   Exhibit 324, the text exchange between Mr. Thiry and

18   Mr. Golomb.

19   BY MR. VIGEN:

20   Q.  And on April 7, Mr. Thiry texts to Mr. Golomb, "Could you

21   write me a note and walk me through, how do you think about

22   asking someone for a reference and then recruiting away someone

23   with whom they are working regularly a few weeks later?"  How

24   does Mr. Golomb respond?

25   A.  Initially he says, "Coaching baseball tonight but will send

1024

Matthew Hamel – Direct

1  a note this evening or tomorrow a.m."  Then goes on to say,

2  "Any further follow up from KT or other random text messages?"

3  Then he says, "Just sent you an email with thoughts, but to

4  your Kent Thiry domain address."

5  Q.  And Mr. Thiry responds, "Thanks.  Am in Asia.  Will do best

6  to respond."

7         Did your investigation reveal the email that Josh

8  Golomb said he sent to Mr. Thiry at his Kent Thiry domain

9  address?

10 A.  Yes, it did.

11 Q.  How did you obtain this email?

12 A.  Via subpoena to Mr. Thiry.

13       MR. VIGEN:  Show you Government Exhibit 146, please.

14       And I would move it as stipulated.

15       THE COURT:  Admitted.

16       (Exhibit 146 admitted.)

17 BY MR. VIGEN:

18 Q.  This is the email that you were referring to?

19 A.  Yes, sir.

20 Q.  So this is the email from Josh Golomb to Kent Thiry's

21 domain address on April 8, 2017?

22 A.  That's correct.

23 Q.  If you can please read the first paragraph and then the

24 first bulleted paragraph.

25 A.  "Kent, I received your text.  Some thoughts below.  Sorry

Matthew Hamel – Direct

1  for length and I know redundant with some of our conversation.

2          "One, I did not actively try to recruit Julio or

3  anyone else at DaVita.  I know this probably sounds like

4  semantics, but it is not.  I have a very full organization

5  chart that I need to fill out, and there are great candidates

6  at DaVita for a number of those roles.  I both have not reached

7  out to anyone about roles and also have told people that have

8  probed me about my hiring plans and expressed interest to work

9  with me that I'm not recruiting anyone from DaVita."

10          MR. VIGEN:  Please now go on to the third bulleted

11  paragraph.

12  BY MR. VIGEN:

13  Q.  Agent Hamel, if you can read that through the -- through

14  the end of, "this is the exact opposite of what I would do if I

15  was trying to maximize success in getting candidate."

16  A.  Would you like me to start at the top?

17  Q.  Yeah.  Start at the top through the --

18  A.  "Three, in retrospect, the first thing I should have done

19  was called you and gotten aligned on how to think about things

20  the moment the conversation shifted from me networking with

21  Julio to him expressing interest in learning more about what we

22  were doing.  I totally own that and realize that this huge

23  blunder likely makes this feel far worse for you and everyone

24  there.  I did tell Julio from get-go that I would never get to

25  an offer until I talked to you.  I should have just done that

Matthew Hamel - Direct

1  myself and sooner.  I knew that we would talk and there would

2  be complete transparency to how things unfolded, and I tried to

3  operate in a way that felt as right as possible.

4       "Examples, making sure to not offer a title, let alone

5  a better one.  Making sure he knew comp would be vastly lower

6  than anything he had at DaVita.  Telling him to take his time

7  and explore every option DaVita was going to put in front of

8  him.  I am a great recruiter, and steps I was taking were exact

9  opposite of what I would do if I was trying to maximize success

10  in getting candidate."

11       MR. VIGEN:  And then further down -- I think we might

12  need to scroll down the blowup a little bit.

13  BY MR. VIGEN:

14  Q.  But if you could start reading at the part that says, "This

15  is part of why I don't feel."  Right there.

16  A.  I see it.  "This is part of why I don't feel it is right

17  thing to rescind offer.  The only reason he would choose this

18  is if it really was the best thing for his family, and it seems

19  wrong to me that he would not have the right to make that

20  decision for himself.  If Julio lived in Denver, was in a

21  current role that was key to village, he wanted job for money

22  or promise of a promotion, I would actually consider rescinding

23  offer.  Well, actually, I never would have made one."

24  Q.  Did your investigation reveal whether Mr. Golomb continued

25  to discuss with Mr. Quinones about Mr. Golomb's interactions

Matthew Hamel – Direct

1    with Mr. Thiry on this subject?

2    *A.*  Yes, he did.

3              *MR. VIGEN:*  Go to Government Exhibit 327, which I

4    would move as stipulated.

5              *THE COURT:*  It's admitted.

6              (Exhibit 327 admitted.)

7              *MR. VIGEN:*  Including the text messages at 298 through

8    310.

9              *THE COURT:*  Okay.  Admitted.

10             (Exhibits 298-310 admitted.)

11   *BY MR. VIGEN:*

12   *Q.*  If you can read -- this is, essentially, April 8, as well?

13   *A.*  Yes, it is.

14   *Q.*  All right.  If you can read Mr. Golomb's text, and I can

15   read Mr. Quinones' texts.

16   *A.*  Sure.  "Any follow-up from KT?"

17   *Q.*  "Nothing from KT.  Ray made a surprise call to make an

18   official offer.  Economics were basically in line with my

19   current comp."

20   *A.*  "Cool.  He asked for me to explain what J did in writing,

21   so I did."

22   *Q.*  "What J did?  Not sure I follow."

23   *A.*  "I, not J.  Sorry.  Odd text about wanting to better read

24   and understand my position."

25   *Q.*  "Very interesting.  Do you think he has another motive?"

Matthew Hamel - Direct

 1   A.   "What 'we' you thinking.  Legal" --

 2              MR. WALSH:  Object.

 3              MS. BROOKS:  Apparently we're both going to object,

 4   Your Honor.  It's very unclear for the record.

 5              THE COURT:  Objection is sustained.  That made no

 6   sense at all.

 7              MR. VIGEN:  Sure.

 8         So let's back up you to the prior page, please.

 9   BY MR. VIGEN:

10   Q.   So I think the objection is to clarify who is saying what

11   here.  So, Agent Hamel, if we can just start over.

12   A.   Sure.

13   Q.   What does Mr. Golomb tell Mr. Quinones?

14   A.   From the top he begins saying -- asking, "Any follow-up

15   from KT?"

16   Q.   Mr. Quinones says, "Nothing from KT.  Ray made a surprise

17   call to make an official offer.  Economics were basically in

18   line with my current comp."

19         And then what does Mr. Golomb reply?

20              THE COURT:  Wait a minute.  Who is Ray?

21   BY MR. VIGEN:

22   Q.   Agent Hamel, who is Ray, if you know?

23   A.   Ray I believe was an executive at DaVita.  I don't know his

24   exact title.

25   Q.   And then -- sorry.  Mr. Golomb responds to Mr. Quinones

Matthew Hamel – Direct

1    how, Agent Hamel?

2    *A.*   He writes, "Cool.   He asked for me to explain what J did in

3    write, so I did."

4    *Q.*   And then Mr. Quinones said, "What J did?   Not sure I

5    follow."

6          How does Mr. Golomb respond?

7    *A.*   He says, "I, not J.   Sorry.   Odd text about wanting to

8    better read and understand my position."

9    *Q.*   And then Mr. Quinones responds, "Very interesting," on

10   April 8.   And then the following text message on the next page,

11   also on April 8, Mr. Golomb texts, "Do you think he has another

12   motive?"

13          And how does Mr. Golomb reply on April 8?

14          *MS. BROOKS:*   Objection.   Misstates the record.   I

15   think Mr. Vigen just said that Mr. Golomb responded, "Do you

16   think he has another motive?"   We're getting -- could I just

17   ask perhaps --

18          *THE COURT:*   Yes.   It wasn't Quinones -- it wasn't

19   Golomb.   It's Quinones, if you're following the same pattern.

20          *MR. VIGEN:*   I apologize.   That's a misstatement, then.

21   BY MR. VIGEN:

22   *Q.*   Yeah.   Mr. Quinones responds -- or follows up, "Do you

23   think he has another motive?"

24          And then how does Mr. Golomb respond?

25   *A.*   Mr. Golomb writes, "What" -- I think is a typo for

Matthew Hamel - Direct

1    "were" -- "what we you thinking?  Legal.  I thought for a
2    second so was thoughtful about message.  No legal issues for
3    me, though."
4    Q.  And then Mr. Quinones tells Mr. Golomb also on April 8,
5    "That was my first reaction, but I couldn't think of any legal
6    implications, so not sure.  Just seems strange for him."
7           And then can you please read the next two text
8    messages from Mr. Golomb on April 8.
9    A.  "He said it was because he was in Asia and wanted to
10   reflect.  Trust me, I have thought through everything they
11   could throw at me, and I would be in better position if ever
12   there really was escalation.  My sense is that he goes full
13   buckets with everyone first time this happens so that we all
14   accept a position none of us would ever normally agree to.  For
15   example, Riopelle has a complete hands-off policy."
16   Q.  And, then, just for completeness, Mr. Quinones responds --
17   I'm sorry.  If you could read Mr. Golomb's text message to
18   Mr. Quinones.
19   A.  "Sorry this ended up being high drama.  DaVita is absolute
20   wonderful place, and I love it, but leaving is so much drama
21   unless they want you to, and then whole different story."
22   Q.  Agent Hamel, did your investigation reveal whether
23   Mr. Golomb followed back up with Mr. Thiry after this exchange
24   with Mr. Quinones?
25   A.  Yes, he did.

Matthew Hamel – Direct

1          MR. VIGEN:  Okay.  If we can go back to Exhibit 146,

2    please.

3    BY MR. VIGEN:

4    Q.   So the text messages we were just looking at were from

5    April 8.  Does this show an email from Mr. Golomb to

6    Mr. Thiry's personal domain address dated April 13?

7    A.   Just to clarify, I think some of the messages -- at least

8    one of the messages was on April 9.  But, yes, April 8 and 9.

9    Q.   Thank you.

10   A.   And, yes, this email is April 13.

11   Q.   If you could read Mr. Golomb's email to Mr. Thiry on

12   April 13 and also the subject, please.

13   A.   The subject is "Julio."  And Mr. Golomb writes, "Kent,

14   following up.  I know you are crazy busy but wanted to make

15   sure you had gotten my email and also talk about next steps.

16   My understanding is that Julio is trying to get time with you,

17   hopefully Friday, to talk more and share where his head is.  I

18   want to make sure you know that my communication to him has

19   been that I am not going to hard close or pressure him to make

20   a decision, that I am 100 percent supportive if he decides that

21   staying at DaVita is right option for him.  And that honestly,

22   unless he is absolutely certain this is the right thing for him

23   and has family on a personal side, he should stay at DaVita.

24        "As I mentioned, when he asked for more compensation,

25   I have said no, even though I would do in every other situation

1   to close the deal, as I want to be able to honestly say that I

2   know he made this decision based on right thing for him and his

3   family and that he suboptimized other areas in order to do it."

4   Q.  If you can go to the following email in this exchange

5   from Mr. Thiry and read what Mr. Thiry writes to Mr. Golomb on

6   April 16, 2017, please.

7   A.  Mr. Thiry wrote, "I disagree with what you have done, but

8   our friendship will survive.  Other people at DaVita will not

9   be as understanding, however."

10  Q.  And then if we can go up to Mr. Golomb's email back to

11  Mr. Thiry.  And if you can read the middle two paragraphs,

12  please.

13  A.  "If he decides to join, I'll tell Julio to play down where

14  he is going and not to mention me as he talks about his

15  departure more broadly, to minimize any additional

16  embarrassment for you.  We are keeping the business low profile

17  and off the radar for another three to six months at least."

18  Q.  And if you can read, then, the next paragraph, please.

19  Thank you.

20  A.  "You also have my commitment we discussed that I am going

21  to make sure everyone on my team knows to steer clear of anyone

22  at DaVita and that I'll come back to you and talk before we

23  ever get anywhere near a point that could contemplate someone

24  else."

25  Q.  Did your investigation reveal whether Mr. Golomb sent

Matthew Hamel – Direct

1    another text message to Mr. Quinones following this email to

2    Mr. Thiry?

3    A.  Yes.

4         MR. VIGEN:  If we could go to Government Exhibit 328,

5    please.

6         I would move this and Government Exhibit 311 as

7    stipulated.

8         THE COURT:  Admitted.

9         (Exhibits 311 and 328 admitted.)

10   BY MR. VIGEN:

11   Q.  If you can please read -- the date of this text message is

12   April 17, 2017?

13   A.  Yes, sir.

14   Q.  Is that the day after the email we just looked at?

15   A.  I believe so.

16   Q.  If you could read Mr. Golomb's text message to

17   Mr. Quinones, please.

18   A.  "Let me know if their tactics turn a bit negative.  I don't

19   expect them to do that, but Dennis and other has warned me that

20   they have innuendoed to them before that they would do that if

21   they are unhappy in past situations."

22   Q.  If I could stop you right there, Agent Hamel.  What was

23   your -- based on your investigation, who does Dennis refer to

24   in that message?

25   A.  That would be Dennis Kogod.

Matthew Hamel – Direct

1    *Q.*  Continue.  Thank you.

2    *A.*  "I'm committing to Kent a bunch of stuff for future I don't

3    need to do but out of respect given how upset he was" -- dot,

4    dot, dot -- "but will revisit with him if he takes a different

5    path."

6          *MR. VIGEN:*  Okay.  If we can go now and show the

7    witness Government Exhibit 133, please.

8          And I would move this as stipulated.

9          *THE COURT:*  All right.  Admitted.

10         (Exhibit 133 admitted.)

11   *BY MR. VIGEN:*

12   *Q.*  And this is an email from Mr. Golomb to Mr. Quinones, Agent

13   Hamel; is that correct?

14   *A.*  That's correct.

15   *Q.*  Dated July 8, 2017?

16   *A.*  Yes.

17   *Q.*  And approximately how long after these initial

18   conversations with Mr. Quinones about a role at Hazel is this

19   email being sent?

20   *A.*  About three months later.

21         *MR. VIGEN:*  If we can go down to Bullet No. 3, "cash

22   comp."

23   *BY MR. VIGEN:*

24   *Q.*  If you can please read the first sentence that Mr. Golomb

25   writes to Mr. Quinones in that paragraph, please.

Matthew Hamel - Direct

1   *A.*  Sure.  He writes, "No. 3, cash comp.  You know it was

2   important to me to feel like we could tell honesty that comp

3   was a hit to come here."

4   *Q.*  If you can go down and read the third to the last sentence,

5   "however."

6   *A.*  "However, I did realize last night that because of weird

7   context, you are being paid less than I would have offered you

8   had the DaVita thing not been in play."

9   *Q.*  Agent Hamel, if I can now show you another text exchange

10  between Mr. Quinones and Mr. Golomb, Government Exhibit 329.

11          I would move 329 and 134 in as stipulated.

12          *THE COURT:*  Admitted and admitted.

13          (Exhibits 134 and 329 admitted.)

14  *BY MR. VIGEN:*

15  *Q.*  Agent Hamel, is this a text message that followed the

16  email we just saw?

17  *A.*  Yes, it is.

18  *Q.*  And what does Mr. Golomb text to Mr. Quinones in July of

19  2017?

20  *A.*  He writes, "Also please let me know if you think of any

21  great folks, nobody currently at DaVita, that would be worth

22  talking to.  Guessing we may end up prioritizing SF over Sac to

23  have broader pool.  Thanks."

24  *Q.*  What does "SF" refer to?

25  *A.*  San Francisco, which is where Hazel Health was

Matthew Hamel – Direct

1    headquartered.

2    Q.   And what about "Sac"?

3    A.   Sacramento, which is where Julio Quinones lived.

4          MR. VIGEN:   If I can now show you Government

5    Exhibit 136 and move that in as stipulated.

6          THE COURT:   All right.   Admitted.

7          (Exhibit 136 admitted.)

8          MR. VIGEN:   The first email in this chain, if we can

9    please blow that whole thing up.   We can start with that.

10   That's great.

11   BY MR. VIGEN:

12   Q.   This is an email from Mr. Golomb to Mr. Thiry dated

13   February 22, 2018, with a subject, "Checking in."

14   A.   Yes, sir.   It is.

15   Q.   Timeline-wise, about how many months is this after the

16   original text in April 2017 and phone calls in April 2017?

17   A.   Ten months.

18   Q.   If we can look now at what Mr. Golomb emails to Mr. Thiry

19   in February 2018.   If you can please read the first two

20   paragraphs.

21   A.   "I wanted to check in, in general, but also wanted to flag

22   one thing.   I took our conversations last year to heart around

23   how it felt to you/DaVita when Julio left.   Our relationship

24   matters far more to me than any potential addition to our team.

25   Although there have been four people that have reached out over

Matthew Hamel - Direct

1    the past year to probe about opportunities, I have not pursued

2    those conversations, always being clear that it was about not

3    having a clear need, which was accurate to some extent.  All

4    were director/VP types.  And my sense anyway for most of them

5    is that it was far more about fear of change coming and not

6    that they were really unhappy/planning to leave DaVita."

7    Q.  And then if you can please read the first two sentences of

8    the next paragraph.

9    A.  "However, there was another person that reached out a

10   couple of weeks ago.  She is a manager that I have known since

11   2007 or so that reached out for career advice and to be a

12   reference for an opportunity outside DaVita that she was in the

13   mix for."

14   Q.  And if you can go to the next paragraph and read the first

15   two sentences, please.

16   A.  "We do happen to have openings in her area, and they could

17   be a good fit.  However, I told her that given my relationship

18   with the village, I would only discuss with her if she told her

19   manager explicitly that she would like to talk to me about a

20   role and that I would talk to you about it before I would

21   discuss with her.  I framed it in a positive way about me

22   making sure I'm doing the right thing as someone who cares

23   about the village and an investor in the village, as well."

24   Q.  Agent Hamel, based on your investigation, who was

25   Mr. Golomb talking about with respect to the DaVita employee

Matthew Hamel – Direct

1  that he's referencing with Mr. Thiry in this email?

2  A.  I believe that's Arlene Villa-Howells.

3       MR. VIGEN:  At this point, if I could show the witness

4  only Government Exhibit 331.  And --

5       THE COURT:  It's admitted -- well, wait a minute.

6  It's not stipulated.

7       MR. VIGEN:  Yes, Your Honor.  So --

8  BY MR. VIGEN:

9  Q.  Agent Hamel, this a text exchange between Mr. Golomb and a

10 Matt Weissert.

11 A.  Yes, it is.

12 Q.  Where did Mr. Weissert work at the time of these text

13 messages?

14 A.  At this point I believe Mr. Weissert was still with DaVita.

15 Q.  And what was Mr. Weissert's relationship to Ms. Arlene

16 Villa-Howells?

17 A.  He was in Ms. Villa-Howells' chain of management.

18 Q.  Was he a superior?

19 A.  I believe her direct supervisor.

20      MR. VIGEN:  At this time, Your Honor, I move

21 Government Exhibit 331 and the underlying text messages.

22      MR. WALSH:  Your Honor, we would object based on the

23 Court's ruling on the James hearing.

24      MR. VIGEN:  So, Your Honor, on the James hearing -- I

25 may need to get into the details about what Your Honor ruled,

Matthew Hamel - Direct

```
 1    and I don't want to step out of line in front of the jury.
 2            THE COURT:  I told you gentlemen earlier that the
 3    order on the James hearing talked about dozens of
 4    communications.  I don't have them memorized.  But I expect you
 5    guys to honor that order.  And if you disagree about what the
 6    order said, then I guess I better see you up here at the bench.
 7    I'm surprised that you would have such a disagreement.
 8            MR. VIGEN:  Thank you.
 9            MR. WALSH:  I actually don't believe --
10            THE COURT:  All statements by Matthew Weissert were
11    excluded by the Court.
12            MR. VIGEN:  Yes, Your Honor.  But with respect to
13    Mr. Golomb and then Mr. Weissert's statements we believe come
14    in as effect on the listener.
15            MR. WALSH:  We object, Your Honor.
16            THE COURT:  Let me look at them, then.
17            Objection is sustained.
18            MR. VIGEN:  Can we show Government Exhibit 137,
19    please.
20    BY MR. VIGEN:
21    Q.  Is this a single text message from Mr. Golomb to
22    Mr. Weissert, Agent Hamel?
23            MR. WALSH:  Same objection, Your Honor.
24            THE COURT:  Objection is sustained.
25
```

Matthew Hamel - Direct

1   *BY MR. VIGEN:*

2   Q.  Agent Hamel, can we please now go to Government

3   Exhibit 330.

4         Your Honor, at this point I would move 330 in as

5   stipulated, along with 130, 131, 132.

6         *THE COURT:*  330 is admitted.

7         (Exhibit 330 admitted.)

8         *THE COURT:*  You said 131 --

9         *MR. VIGEN:*  130, 131, and 132.

10        *THE COURT:*  All right.  Those are admitted.

11        (Exhibits 130-132 admitted.)

12  *BY MR. VIGEN:*

13  Q.  Agent Hamel, who is this text message exchange between?

14  A.  It's between Josh Golomb and a woman named Zondra Evans,

15  who was a DaVita employee.

16  Q.  And if you can please read Mr. Golomb's text message to

17  Ms. Evans on April 20, 2017.

18  A.  "Hey, do you know any former RFPs not at Rx today that you

19  would target if we wanted amazing customer service folks or

20  people that were in customer service that left?"

21  Q.  And then Evans responds back, "Yep.  Let me get a list

22  together.  When you need it by?"

23        And how does Mr. Golomb respond to Ms. Evans on

24  April 20, 2017?

25  A.  "Whenever you have time.  I've been thinking of our

Matthew Hamel - Direct

1    customer service dilemma, finding great people here, and

2    contemplating actually just hiring two to three people that I

3    trusted in Texas that could do a great job remotely, but nobody

4    at Rx today.  Promised Kent."

5    Q.  Agent Hamel, before we move on to the other counts, I'd

6    like to now transition to discuss some other documents.

7            First, would like to discuss IntegraMed and William

8    Hughson.  Who is William Hughson?

9    A.  Mr. Hughson was an executive at DaVita who left to join

10   DeVry and then eventually became the chief executive officer at

11   IntegraMed Fertility.

12           MR. VIGEN:  If we can show Government Exhibit 336,

13   which is in evidence.

14   BY MR. VIGEN:

15   Q.  And this is an email dated November 2, 2013, from

16   Mr. Thiry.  And he states, "I am going to tell Hughson if he

17   does not withdraw Dawe offer, major competitive response.  I am

18   livid.  He used me as a reference, he used me as a counselor on

19   the decision, etc."

20           So this email is November 2, 2013.  I would like to

21   show you Government Exhibit 256.

22           MR. WALSH:  Your Honor, was there a question related

23   to that exhibit?

24           THE COURT:  I didn't -- I don't think the witness

25   heard one, and I didn't either.

Matthew Hamel - Direct

1  *BY MR. VIGEN:*

2  *Q.*  In relation to Government Exhibit 336 on November 2, 2013,

3  how does that relate in time to Government Exhibit 256,

4  Agent Hamel?

5  *A.*  It is just before Exhibit 256.

6          *MR. VIGEN:*  If we can put 336 up to the left of 256,

7  please.

8          And then if we can also put -- take down 336 and put

9  Government Exhibit 256 to the left and show Government

10  Exhibit 279, which is in evidence, next to it.

11          I apologize, is -- if I can move Government

12  Exhibit 256, please, which was subject of the *James* order.

13          *THE COURT:*  Just out of curiosity, what were you doing

14  with those two that you put up side by side and then took them

15  down again?  What were we supposed to know about that?

16          *MR. VIGEN:*  Just establishing that the first email

17  at 336 was the day before these two emails, 256 and 279.

18          *THE COURT:*  All right.  256, is there an objection to

19  it?

20          *MR. WALSH:*  No objection.

21          *THE COURT:*  256 is admitted.

22          (Exhibit 256 admitted.)

23          *THE COURT:*  And 279?

24          *MR. VIGEN:*  Is already in evidence, I believe.

25          *THE COURT:*  Correct.

Matthew Hamel – Direct

1    *BY MR. VIGEN:*

2    *Q.*   Now, Agent Hamel, did Mr. Kogod testify to 279?

3    *A.*   Yes, I believe he did.

4    *Q.*   And 256 that was just admitted, is this Mr. -- is this the

5    response --

6    *A.*   Yes.  If you look at the bottom of 279 and the bottom of

7    256, it's the same kind of start to the email chain, and then

8    different threads off of that beginning email.

9    *Q.*   Okay.  So in the interest of time, why don't we just read

10   Mr. Hughson's response that has not already been -- the jury

11   has not already seen.  If you can read starting with, "As I

12   said."

13   *A.*   "As I said, I will never pursue people who work at DaVita.

14   That's a commitment, and I will honor it.  If they're looking,

15   however, it doesn't seem unreasonable for me to be willing to

16   speak with them.  Regardless, you're always welcome to recruit

17   people who work at my company whether they're looking or not.

18   They aren't mine.  They just happen to be working with me right

19   now.  If any of them ever feel that a job at DaVita or anywhere

20   else, for that matter, would be better for them either

21   personally or professionally, I'd never want to inhibit that

22   opportunity for them.  I want them to freely choose to work

23   with me each day with full knowledge of the alternatives

24   available to them.

25           "I know we've had this conversation before, and I

Matthew Hamel - Direct

1    believe that I've been very consistent in my philosophy."

2              *MR. VIGEN:*  Mr. Hughson sends this email to

3    Mr. Thiry on November 3, 2013.

4              If I can now show Government Exhibit 258.

5              And I would move this in under the *James* order.

6              *MR. WALSH:*  No objection, Your Honor.

7              *THE COURT:*  258 is admitted.

8              (Exhibit 258 admitted.)

9    *BY MR. VIGEN:*

10   *Q.*  Agent Hamel, the prior email that we saw was

11   November 2013.  And if we can go down to the bottom, first

12   email, this is an email the next month, December 3, 2013, from

13   Mr. Hughson to Mr. Thiry.

14             And if you could please read the first -- the first

15   two paragraphs.

16   *A.*  "While I'd rather discuss live, given our schedules, that

17   may not be so easy to do.  I've spent a tremendous amount of

18   time thinking about our conversations.  While philosophically I

19   just don't agree with the perspective you have on this issue, I

20   have come to the conclusion that our friendship and the respect

21   I owe you for your help with my career are higher consideration

22   than my philosophical viewpoint.  Part of this self-reflection

23   is that my personality tends to be philosophically rigid and

24   that I need to work on being more open minded and holistic in

25   my thinking about what is right and how to set priorities."

Matthew Hamel – Direct

1   Q.  If you can read the next paragraph, as well, please.

2   A.  "Therefore, I will respect your proposed process with

3   regard to people who come to me looking for opportunities at

4   IntegraMed Fertility and have already given that feedback to a

5   couple people who have reached out to me in the past few

6   months."

7   Q.  Okay.  So this is December 2013.  If we can go to the next

8   email in the chain, which is a follow-up from Mr. Hughson to

9   Mr. Thiry dated some months later in April of 2014; is that

10  right?

11  A.  That's correct.

12  Q.  If you could read Mr. Hughson's email, starting with,

13  "It's been over four months."

14  A.  "It's been over four months since this communication.  I

15  wanted to let you know that even though I never heard back from

16  you, we have adhered to the commitment I made to you.  We have

17  not proactively communicated with anyone at DaVita about

18  opportunities at IntegraMed.  And when people reach out to us,

19  we tell them that they need to speak with their boss at DaVita

20  about their interest in leaving before we can speak with them."

21  Q.  If you can continue on to the last paragraph, please.

22  A.  "This isn't because we're not hiring.  I've actually hired

23  about 15 people in the past four months.  It's because I've

24  made this commitment to you."

25  Q.  And then how does Mr. Thiry respond?

Matthew Hamel - Direct

1   A.   "Dear Bill, I never saw the earlier message, so I'm glad

2   you checked in.  I am deeply appreciative of your

3   consideration.  I hope you are well."

4   Q.   Agent Hamel, who is Steve Priest?

5   A.   Steve Priest was an executive at DaVita.  I believe he was

6   the chief wisdom officer.  And he left DaVita and started his

7   own healthcare company called Spero Health.

8        MR. VIGEN:  If I can show Government Exhibit 283,

9   please.

10       And I would move for this admission as -- under

11   801(d)(2)(A).

12       MR. WALSH:  Your Honor, if you can give us just one

13   moment.

14       Your Honor, we do object.  It may be necessary to

15   approach.

16       THE COURT:  All right.

17       (Hearing commenced at the bench.)

18       MR. WALSH:  Your Honor, I don't believe this document

19   was placed on the Government's *James* log and therefore was not

20   considered at that time.  And we don't think there is an

21   alternative basis for it to be --

22       MR. VIGEN:  It is Mr. Thiry's own statement --

23       THE COURT:  Well, first of all, was it or was it not

24   on the *James* log?

25       MR. VIGEN:  It was not on the *James* log.

Matthew Hamel - Direct

1           THE COURT:  Okay.  So what's your argument?

2           MR. VIGEN:  So it's Mr. Thiry's own statement, so

3   801(d)(2)(A), party admission statement.  I have the outline,

4   but --

5           And then with respect to the other gentleman, that's

6   just not hearsay and is coming in not for the truth but the

7   effect it has on the listener.

8           MR. WALSH:  Your Honor, I would argue that that is

9   absolutely coming in for the truth; and that's the purpose of

10  the government attempting to admit the document.

11          THE COURT:  I agree with Mr. Walsh.  Objection

12  sustained.

13          (Hearing continued in open court.)

14          THE COURT:  All right.  The objection to that exhibit

15  is sustained.

16          Mr. Vigen, would this be a good time to break; or

17  would you like to break a little later than this?

18          MR. VIGEN:  This would be a great time, Your Honor.

19  Thank you.

20          THE COURT:  How much time for lunch today, folks?  One

21  hour, is that enough for everybody?  1 o'clock?  Okay.

22          (Jury out at 12:00 p.m.)

23          THE COURT:  All right.  1 o'clock.

24          (Recess at 12:00 p.m.)

25          (In open court at 12:59 p.m.)

Matthew Hamel - Direct

1          THE COURT:  Is this your last witness?

2          MR. VIGEN:  No, Your Honor.  Two more.

3          THE COURT:  Who?

4          MR. VIGEN:  Skip Thurman and Elliot Holder.

5          THE COURT:  With respect to Mr. Thurman, the defendant

6    has filed an objection over the weekend.  They said a lot of

7    things in the objection, but the basic points are these:

8    Number one, that you agreed that he would not be called until

9    rebuttal.

10          Number two, that they tried to find out what it was

11   that had come up during the government's case so far or the

12   defendants' cross-examination that Thurman would rebut and that

13   came as a surprise to the government.  And in the exchange of

14   emails between Walsh and Clingan, she refused to identify it.

15          Number three, he was disclosed late -- i.e.,  the day

16   before the trial was to begin.

17          And, number four, other than describing things that

18   Thiry said in the so-called strange meeting, most of what he

19   has to say is speculation, hearsay, and sour grapes.

20          What is your response?

21          MS. CLINGAN:  The United States' response is reflected

22   in the hopefully succinct filing that we made last night.  So

23   I'll take you to those arguments in turn.

24          The first argument was that the United States' notice

25   of Mr. Thurman was late.  It was not.  Mr. Thurman was noticed

Matthew Hamel – Direct

1    consistent with the parties' agreement as to when we would

2    notice our witnesses.  That was on the docket at ECF No. 215,

3    March 25, 2022.  Defense counsel have had ample opportunity to

4    prepare for Mr. Thurman's anticipated testimony.  Indeed, they

5    have more defense lawyers than we have witnesses.

6         The next argument is that there is a concern that this

7    witness will testify as to unnoticed 404(b) material.  I think

8    we've been unequivocal about that, that we don't intend to

9    elicit any unnoticed 404(b) material.  I'm candidly baffled as

10   to why there is any confusion about that.

11        The next concern that defense counsel raised is that

12   Mr. Thurman's testimony could be prejudicial under Rule 403.

13   As we said very clearly in our filing, we don't anticipate that

14   any of his testimony is going to come anywhere near the line of

15   403.

16        And, then, finally, defense counsel raised a concern

17   that they haven't received notice as to the topics Mr. Thurman

18   is going to testify about.  I think that should be very, very

19   clear, both from the 302s and the notes of his interviews,

20   which are very brief, and which were produced to defense

21   counsel well before trial commenced and from our filing last

22   night, which identifies the very brief topics to which we

23   anticipate Mr. Thurman will testify.

24        *THE COURT:*  Thank you.

25        The Court order is that you may not call Mr. Thurman

Matthew Hamel - Direct

1   during your case in chief.  You said you wouldn't; you reneged

2   on your agreement; that's not acceptable to this court, period.

3            MS. CLINGAN:  If I may briefly respond.

4            THE COURT:  No.  That's my ruling.

5            Onward.

6            (Jury in at 1:04 p.m.)

7            THE COURT:  Okay.  Onward.

8   BY MR. VIGEN:

9   Q.  Good afternoon, Agent Hamel.

10  A.  Good afternoon.

11           MR. VIGEN:  Your Honor, may I proceed?

12           THE COURT:  Yes.

13  BY MR. VIGEN:

14  Q.  Agent Hamel, before we left, if you could just remind the

15  jury who Steve Priest and Spero Health is.

16  A.  Sure.  Steve Priest was the chief wisdom officer for a time

17  at DaVita.  Then he left and started his own healthcare company

18  called Spero Health, based in Nashville.

19           MR. VIGEN:  If I could please show the witness

20  Government Exhibit 452.

21  BY MR. VIGEN:

22  Q.  Agent Hamel, is this a single email from Mr. Thiry to

23  Mr. Priest, dated July 13, 2017?

24  A.  Yes, it is.

25           MR. VIGEN:  Your Honor, at this point I would move

Matthew Hamel - Direct

1  this under -- as notice 404(b) and a party admission.

2         MR. WALSH:  Your Honor, the Court found -- well, we

3  would object on the basis of the *James* hearing order.

4         THE COURT:  What you do mean?

5         MR. WALSH:  That this was -- that with respect to this

6  particular company, Spectranetics -- this is Spero -- Spero --

7  I'm sorry -- the same argument as previously, on the *James*

8  hearing.

9         THE COURT:  That it wasn't on the *James* list?

10         MR. WALSH:  Correct, Your Honor.

11         MR. VIGEN:  If I may respond?

12         The *James* list only dealt with statements under

13  801(d)(2)(E).  And because this is a statement under

14  801(d)(2)(A) as a party admission, that it was not required to

15  be listed on the *James* log.

16         MR. WALSH:  Your Honor, I don't believe that there is

17  any independent corroboration of the conspiracy on this, as the

18  Court found.

19         THE COURT:  The objection is overruled.  Go ahead.

20         MR. VIGEN:  Thank you.

21  BY MR. VIGEN:

22  *Q.*  Agent Hamel --

23         THE COURT:  452?

24         MR. VIGEN:  Yes, Your Honor.

25         THE COURT:  Admitted.

Matthew Hamel – Direct

1        (Exhibit 452 admitted.)

2   *BY MR. VIGEN:*

3   *Q.*  Agent Hamel, do you see the email from Mr. Thiry to

4   Mr. Priest?

5   *A.*  Yes, I do.

6   *Q.*  If you could read just the first sentence of the second

7   paragraph.

8   *A.*  Sure.  Mr. Thiry wrote, "We agreed that you would call JR

9   or Mike S of functional equivalent if DMG if someone wants to

10  talk to you guys."

11  *Q.*  Based on your investigation, who is JR?

12  *A.*  JR is a reference to Javier Rodriguez.

13  *Q.*  Who is Mike S?

14  *A.*  That would be Mike Staffieri.

15  *Q.*  And notes "functional equivalent if DMG."  What is your

16  understanding of DMG, based on your investigation?

17  *A.*  DMG is a reference to DaVita Medical Group, which sometimes

18  is referred to as HealthCare Partners.  It was a business unit

19  within DaVita overall.

20  *Q.*  Then if you could please keep reading the remainder of

21  that email through "happens before the notice," please.

22  *A.*  Sure.  "They should not care since they will have told you

23  they have already told their bosses they are looking.  Of

24  course, this needs to happen right up front, or it turns into

25  one of those farcical situations where there has been a bunch

Matthew Hamel – Direct

 1   of talk about the role, comp, etc, and so the substantive

 2   recruiting happens before the notice."

 3            MR. VIGEN:  If we can please show the witness

 4   Government Exhibit 621.

 5            And, Your Honor, I do have a supplement to the exhibit

 6   list.  This was a previously noted exhibit at 265, I believe;

 7   but we added two pages, given Your Honor's ruling.  This is --

 8   BY MR. VIGEN:

 9   Q.  Agent Hamel, is this the proxy statement from DaVita from

10   2015?

11   A.  It's definitely a proxy statement.  I don't see a date on

12   this page.

13            Yes, 2015.

14            MR. VIGEN:  And if we can go to pages --

15            THE COURT:  Just a minute.  Is there an objection to

16   this?

17            MR. WALSH:  One moment, Your Honor.

18            No objection, Your Honor.

19            THE COURT:  621 is admitted.

20            (Exhibit 621 admitted.)

21            MR. VIGEN:  Your Honor, I do have the updated exhibit

22   list, if you'd like a piece of paper for that.  Otherwise, we

23   can do that later.

24            THE COURT:  Updated what?

25            MR. VIGEN:  Exhibit list, just for your records.

Matthew Hamel – Direct

1          *THE COURT:*  No.  That's all right.

2          *MR. VIGEN:*  Thank you, Your Honor.

3          If we could please go to page 49 of this proxy

4    statement, please.

5    *BY MR. VIGEN:*

6    *Q.*  Agent Hamel, does this show Mr. Thiry's compensation for

7    the year 2012 through 2014?

8    *A.*  Yes, it does.

9    *Q.*  Where does it show that, if you can indicate on the

10   monitor?

11   *A.*  On the farthest right-hand column of this table that has

12   been kind of highlighted here.  Total compensation is indicated

13   there, and then each row is the year in question.

14          *MR. VIGEN:*  If we can use that same document and go to

15   page 43, please.

16   *BY MR. VIGEN:*

17   *Q.*  Agent Hamel, does this relate to the company-wide factors

18   taken into consideration by the compensation committee in

19   determining compensation at DaVita?

20   *A.*  Yes.  Those listed bullets are the factors.

21   *Q.*  And does this include -- could you read that -- expand and

22   read that bullet, please.  One of the factors that is taken

23   into account.

24   *A.*  Sure.  "Management performance in attracting and retaining

25   high-performing employees throughout our organization and

Matthew Hamel – Direct

1    succession planning."

2              MR. VIGEN:  Please show the witness next Government

3    Exhibit 624.

4              And if we can go please to the next page.

5    BY MR. VIGEN:

6    Q.  Agent Hamel, this is an excerpt from DaVita's proxy

7    statement from 2018.

8    A.  Yes, it is.

9              MR. VIGEN:  At this time we would move GX624 into

10   evidence.

11             MR. WALSH:  Your Honor, we object to this exhibit

12   because it was not covered by the cross-examination the Court

13   found opened the door.

14             THE COURT:  All right.  Overruled.

15             (Exhibit 624 admitted.)

16             MR. VIGEN:  If we can show page 57, please.

17   BY MR. VIGEN:

18   Q.  Agent Hamel, does this show the same factor -- one of the

19   factors taken into account for compensation as management

20   performance in attracting and retaining high-performing

21   employees throughout our organization?

22   A.  Yes.  It's the same.

23             MR. VIGEN:  And if we can show, please, page 64.

24   BY MR. VIGEN:

25   Q.  Does this show Mr. Thiry's compensation from DaVita for the

Matthew Hamel – Direct

1  years 2015 through 2017?

2  A.  Yes, it does.  Again, in the farthest right-hand column.

3       MR. VIGEN:  If we can please show the witness

4  Government Exhibit 626.

5  BY MR. VIGEN:

6  Q.  And, Agent Hamel, is this an excerpt from DaVita's 2020

7  proxy statement filed with the SEC?

8  A.  Yes, it is.

9       MR. VIGEN:  Can we go to page 28, please -- sorry --

10  88.  And if you can please show Mr. Thiry's entry for that

11  table --

12       THE COURT:  It's not in evidence.

13       MR. VIGEN:  Apologies.  Move this into evidence at

14  this point, Your Honor.

15       MR. WALSH:  Your Honor, I would make the same

16  objection as last time.  We understand the Court's ruling,

17  however.

18       THE COURT:  Mr. Vigen, what are you trying to prove

19  here?  That Mr. Thiry made a lot of money?  You don't need

20  three of these to tell us that.  We know that.  Is there some

21  other reason you're putting this into evidence?

22       MR. VIGEN:  Yes.  I can show the same management

23  compensation --

24       THE COURT:  If there is another reason, I'll accept

25  your word for it; but if it's just to show that he made a lot

1    of money, no, we don't need.  It's cumulative.

2             All right.  It's admitted based on your representation

3    that there is some other reason for it.

4             (Exhibit 626 admitted.)

5    *BY MR. VIGEN:*

6    *Q.*  Agent Hamel, can we please go to page 81.  Does this also

7    show that one of the compensation factors taken into account by

8    DaVita was management performance in attracting and retaining

9    high-performing employees throughout the organization?

10   *A.*  Yes, it does.

11            *MR. VIGEN:*  Okay.  You can take that down.  Thank you.

12   *BY MR. VIGEN:*

13   *Q.*  Agent Hamel, I'd like to now talk about documents your

14   investigation has revealed with respect to Count 1, the charged

15   conspiracy between the defendants and SCA between February 2012

16   and July 2017.

17            Please show Government Exhibit 2.

18            Agent Hamel, is this an email between Mr. Thiry and

19   Jonathan Coslet at TPG?

20   *A.*  Yes, it is.

21   *Q.*  Generally, who are they discussing in this email?

22   *A.*  They're discussing generally Andrew Hayek.

23            *MR. VIGEN:*  Your Honor, at this time I would move for

24   the admission of Government Exhibit 2.

25            *MS. BROOKS:*  We object, Your Honor.  This is dated

Matthew Hamel – Direct

1    March 31, 2008, well before the alleged agreement took place.

2    It's more prejudicial than probative.

3         MR. VIGEN:  Your Honor, I believe it goes to the

4    intrinsic nature and to explain the relationship, exactly how

5    Mr. Hayek testified, between him and Mr. Thiry and what led to

6    the agreement.

7         THE COURT:  All right.  Objection sustained.

8         MR. VIGEN:  Please show Government Exhibit 37 --

9    sorry -- Government Exhibit 20.  I apologize.  And can we put

10   up side by side Government Exhibit 21, please.

11   BY MR. VIGEN:

12   Q.  Agent Hamel, is this an email from Mr. Usilton at DaVita to

13   Mr. Thiry dated March 6, 2011?  And is it attaching a DaVita

14   memorandum addressed to Mr. Thiry from Mr. Usilton?

15   A.  Yes, it is.

16        MR. VIGEN:  Your Honor, at this point I'd move for

17   admission of Government Exhibits 20 and 21.

18        Actually, I believe this is stipulated.  Apologies.

19        THE COURT:  20 and 21 are admitted.

20        (Exhibits 20 and 21 admitted.)

21   BY MR. VIGEN:

22   Q.  Agent Hamel, directing you to the memorandum from

23   Mr. Usilton to Mr. Thiry dated March 4, 2021.  Can we please

24   look on the second page there under the "other" category.  And

25   what is the second entry?

Matthew Hamel – Direct

1    *A.*  The second entry reads, "Hayek, keep recruiting."

2    *Q.*  And what is your understanding as to who Hayek refers to,

3    based on your investigation?

4    *A.*  That would be Andrew Hayek, the chief executive officer at

5    Surgical Care Affiliates.

6         *MR. VIGEN:*  If we can please show Government

7    Exhibit 46, which is in evidence.

8    *BY MR. VIGEN:*

9    *Q.*  Mr. Thiry on October 20, 2014, writes to Mr. Hayek,

10   "Someone called me to suggest they reach out to your senior biz

11   dev guy for our corresponding spot.  I explained I do not do

12   proactive recruiting into your ranks."

13        Did your investigation reveal an email Mr. Thiry sent

14   two days before he told Mr. Hayek, "I do not do proactive

15   recruiting into your ranks"?

16   *A.*  Yes, it did.

17        *MR. VIGEN:*  If we can please show Government

18   Exhibit 251.

19        And at this point I'd move it in as stipulated.

20        *THE COURT:*  Admitted.

21        (Exhibit 251 admitted.)

22   *BY MR. VIGEN:*

23   *Q.*  So the top email, Agent Hamel, is the one that you were

24   referring to as two days before the document we just saw

25   previously?

Matthew Hamel – Direct

1  *A.*   That's correct.   October 18 versus October 20 on the

2  previous email.

3          *MR. VIGEN:*   Ruth, if we could please put up Government

4  Exhibit 46 side by side.

5  *BY MR. VIGEN:*

6  *Q.*   Looking at 251, if we can look at the first email in the

7  chain from Mr. Thiry.   And if you can please read what

8  Mr. Thiry writes to Mr. Usilton.

9  *A.*   Sure.   He wrote, "Pretty fascinating job.   I'm doing it

10  now, interviewing.   Know anyone who is really

11  sophisticated/seasoned or incredibly bright and talented.   This

12  is a cool job.   Hospitals, payers, doctor groups, all want to

13  talk to us."

14  *Q.*   Okay.

15  *A.*   "We have a search going.   I postponed seeing finalists but

16  will meet them soon."

17  *Q.*   What is the subject of Mr. Thiry's email?

18  *A.*   It's "BD at HCP."

19  *Q.*   What is your understanding of what "BD" refers to?

20  *A.*   "BD" is shorthand for business development.   It's a type of

21  role within the company.

22  *Q.*   And what about "HCP"?

23  *A.*   That's a reference to HealthCare Partners, the same

24  business unit that I was talking about just a moment ago.

25  *Q.*   So if we can go up to Mr. Usilton's email to Mr. Thiry on

Matthew Hamel – Direct

1    October 13, 2014, what does Mr. Usilton tell Mr. Thiry in

2    response to his request about looking for candidates for the

3    business development role?

4    A.   "I'm going to call Julie and find ten minutes for us to

5    nail down your specs and skill set demand.  The guy you want

6    may work for Andrew Hayek and used to work for me.  But until

7    we talk, I'm not sure."

8    Q.   And, then, what is Mr. Thiry's response on October 18, two

9    days before he writes Mr. Hayek in Government Exhibit 46?

10   A.   He wrote, "I won't pursue one of Andrew's senior folks."

11   Q.   Does this email reference the Arcadia deal at all?

12   A.   No, it does not.

13        MR. VIGEN:  And please now go to Government

14   Exhibit 101, which is in evidence.

15   BY MR. VIGEN:

16   Q.   So this is the email that Dr. Fanning forwards to Spencer

17   Stuart including the instructions from Andrew Hayek.  My

18   question is, does your investigation reveal whether this email

19   was forwarded within Spencer Stuart?

20   A.   Yes, it was.

21        MR. VIGEN:  If we can go to Government Exhibit 103,

22   please.

23        And I would move this in as stipulated.

24        THE COURT:  Okay.  103 is admitted.

25        (Exhibit 103 admitted.)

Matthew Hamel – Direct

1    *BY MR. VIGEN:*

2    *Q.*  Does this show that John Schultz at Spencer Stuart forwards

3    Dr. Fanning's instructions internally at Spencer Stuart?

4    *A.*  Yes.  Mr. Schultz sends it to a woman named Deborah

5    Seltzer.

6    *Q.*  And this is December 13, 2015?

7    *A.*  Yes, sir.

8            *MR. VIGEN:*  If we can show Government Exhibit 528,

9    please.

10           And I would move this in as stipulated.

11           *THE COURT:*  All right.  Admitted.

12           (Exhibit 528 admitted.)

13   *BY MR. VIGEN:*

14   *Q.*  Agent Hamel, what is this document that we are seeing here?

15   *A.*  This is an excerpt -- I'm not sure how many pages we

16   have -- but from Spencer Stuart's internal recruiting database.

17   It's a place where they collect information about potential

18   candidates, sources of information, references, things of that

19   nature, and make comments next to those people as they have

20   conversations about a role that they're working on.  Something

21   they can refer back to later.

22   *Q.*  And what role does -- this internal Spencer Stuart database

23   tracking candidates, what role is this for?  Can you tell from

24   the document?

25   *A.*  Yes.  Along the top in the small writing you'll see

Matthew Hamel - Direct

1    Surgical Care Affiliates, Inc., and in parentheses, group vice

2    president of development.

3            THE COURT:  Excuse me, Mr. Vigen.  You said 528 was

4    stipulated.  I don't see 528 on my list at all.  If it's

5    stipulated, fine.  It's not on the list.

6            COURTROOM DEPUTY:  Your Honor, I think it's on page

7    30.

8            THE COURT:  Page 30?  Ah, so there it is in the middle

9    of the 300 series.

10           MR. VIGEN:  Yes.

11           THE COURT:  When we get to the 500 series, it goes

12   527, 530.

13           MR. VIGEN:  Yes, Your Honor.  Consistent with your

14   practice standards -- we were actually trying to help you out.

15   Consistent with your practice standards, we were trying to list

16   the cross-examination documents separately so as to reveal the

17   true length of our exhibit list.

18           THE COURT:  Okay.  Well, it's admitted.

19   BY MR. VIGEN:

20   Q.  Agent Hamel, what are the general dates for these entries

21   in the Spencer Stuart database for the SCA group vice president

22   of development search?

23   A.  The page we're looking at right now is June of 2016.  And

24   you can see that next to the little lines that say "posted by"

25   and then a date.

Matthew Hamel - Direct

1    *Q.*  I'd like to direct you to the entry for Alexandra Helfin

2    (ph).  What is the date of this entry?

3    *A.*  June 16, 2016.

4    *Q.*  And what is posted into this database for this candidate?

5    *A.*  It reads, "Asked for her thoughts.  Told her we can't go

6    directly into DaVita but if anyone like herself who has left,

7    that would be ideal.  She has recommendation of one person who

8    is leaving, so she'll contact her and see where she stands in

9    departure."

10        *MR. VIGEN:*  If we can please go to the next page.  And

11    let's look at the entry for Sean Taylor.

12    *BY MR. VIGEN:*

13    *Q.*  And Agent Hamel, what is the date of this entry?

14    *A.*  March 1, 2016.

15    *Q.*  Does this entry include an email that Mr. Taylor sent to

16    Spencer Stuart about this position?

17    *A.*  Yes, it does.

18    *Q.*  What does Mr. Taylor write?

19    *A.*  He writes, "Carrie, the experience and expectations for the

20    GVP role are aligned with my career path.  I have over ten

21    years' experience in complex and strategic business development

22    with high-dollar-volume deals in various leadership/management

23    roles.  I have over 16 years of healthcare business development

24    and leadership experience.  If it makes sense, I could send you

25    my resumé, Sean."

Matthew Hamel – Direct

1   Q.  And does the database indicate what Spencer Stuart wrote

2   back to Mr. Taylor?

3   A.  Yes.  At the top there you'll see it says, "Sent note back

4   stating client cannot recruit from DaVita or USPI, so not

5   permitted to move him forward."

6   Q.  And did your investigation determine whether Sean Taylor

7   was a DaVita employee at this time?

8   A.  Yes.

9   Q.  And was he?

10  A.  Yes, he was.

11          MR. VIGEN:  If we could go to the next entry for Paul

12  Lamendola, please.

13          If we could also please get the entry -- the second

14  entry for Mr. Lamendola in the middle of the page blown up, as

15  well.

16  BY MR. VIGEN:

17  Q.  Agent Hamel, what are the dates of these entries for

18  Mr. Lamendola?

19  A.  They're both on the same day, February 17, 2016.

20  Q.  And for the bottom entry, what does Spencer Stuart note

21  about where Mr. Lamendola works?

22  A.  There is a note there that says, "He oversees corporate

23  development functions for DaVita HealthCare Partners on the

24  East Coast."

25  Q.  And what does the top entry indicate in terms of -- what

Matthew Hamel – Direct

1  does the top entry indicate next to Paul Lamendola?

2  A.  They wrote, "Can't go after DaVita people for SCA."

3        MR. VIGEN:  And, finally, if we can look at the entry

4  for Marcus Hathaway, please.

5        And please blow up both entries.  There we go.

6  BY MR. VIGEN:

7  Q.  The bottom entry, what information does this reveal about

8  Mr. Hathaway?

9  A.  It writes that "He's in LA.  He has an early career in

10  banking, financial services.  He's been at DaVita since 2011,

11  and he's a potential diversity candidate."

12  Q.  And what does the entry state for Mr. Hathaway, on the top?

13  A.  It reads the same as the one for Mr. Lamendola, which is,

14  "Can't go after DaVita people for SCA."

15        MR. VIGEN:  Could we please look at Government

16  Exhibit 86-2, which is in evidence.

17  BY MR. VIGEN:

18  Q.  Agent Hamel, this is an email from Mr. Hayek to Mr. Thiry,

19  notifying him of the LinkedIn outreach from a DaVita corporate

20  recruiter to one of our six group leaders.  And then on

21  July 10, Mr. Thiry writes to Mr. Hayek, "Just opened this.

22  Will check it out."

23        Sir, my question is, did your investigation reveal an

24  internal email at DaVita as to what Mr. Thiry did with this

25  document?

Matthew Hamel - Direct

1    *A.*  Yes, it did.

2            *MR. VIGEN:*  If we can go to Government Exhibit 85,

3    please.

4            And I would offer this as stipulated.

5            *THE COURT:*  Admitted.

6            (Exhibit 85 admitted.)

7            *MR. VIGEN:*  If you could please put these two up side

8    by side, 86-2 and 85.

9    *BY MR. VIGEN:*

10   *Q.*  Agent Hamel, on Government Exhibit 85, is this Mr. Thiry

11   forwarding Mr. Hayek's email to Javier Rodriguez at DaVita?

12   *A.*  Yes, it is.

13   *Q.*  And what does he tell -- instruct him to do?

14   *A.*  He instructs Mr. Rodriguez to put this topic on their next

15   agenda.

16   *Q.*  Thank you.

17           You can take that down now.  Thank you.

18           Agent Hamel, last, I would like to transition and talk

19   about documents your investigation revealed with respect to

20   Count 3, the charged conspiracy between defendants and RAD

21   Partners between November 2013 and June 2019.

22           If we can please start with Government Exhibit 238.

23           I would offer this as stipulated, Your Honor.

24           *THE COURT:*  Okay.  Admitted.

25           (Exhibit 238 admitted.)

Matthew Hamel - Direct

1    *BY MR. VIGEN:*

2    *Q.*  The bottom email, Agent Hamel, what is the subject?

3    *A.*  The subject line is, "Go forward ask, soliciting

4    candidates."

5    *Q.*  And this is an email from Alex Won at RAD Partners to

6    others at RAD Partners?

7    *A.*  Yes, it is.

8    *Q.*  Okay.  If you could please read Mr. Won's email for the

9    jury.

10   *A.*  Sure.  "Hello, Rebecca, Maria.  A former colleague of mine

11   reached out from DaVita with concerns regarding our

12   solicitation of candidates.  Ask, could we please make sure we

13   are not proactively reaching out to teammates currently

14   employed by DaVita?  We should only engage DaVita teammates if

15   they applied or reached out to us first."

16          *MR. VIGEN:*  All right.  If we can please look at

17   Government Exhibit 247 and 248, and put those side by side.

18          And, Your Honor, I'd offer these as stipulated.

19          *THE COURT:*  Admitted.

20          (Exhibits 247 and 248 admitted.)

21   *BY MR. VIGEN:*

22   *Q.*  Agent Hamel, is this an internal email at RAD Partners

23   attaching a resumé for Elliot Holder?

24   *A.*  Yes, it is.

25   *Q.*  And what is the ask in -- that's sort of starred or

1   highlighted within the email?

2   A.  It says, "Candidate has asked that we keep this

3   confidential."

4   Q.  And does this indicate whether he was solicited by RAD

5   Partners or whether he reached out on his own?

6   A.  This indicates that Mr. Holder reached out to Ms. Reynaga

7   through LinkedIn with interest about Radiology Partners.

8   Q.  Okay.  At this time was -- does the resumé indicate that

9   Mr. Holder worked at DaVita?

10  A.  Yes, it does.

11  Q.  We'll go to Government Exhibit -- actually, let me just

12  pause one moment.  If we can get the date of this email for

13  the jury, because we're going to be going through a few in date

14  order here.

15  A.  August 28, 2016.

16  Q.  Okay.  I'd like to show you Government Exhibit 219, which

17  is a few -- week or so later on September 8, 2016.

18          And, Your Honor, I'd offer this as stipulated.

19          THE COURT:  Admitted.

20          (Exhibit 219 admitted.)

21  BY MR. VIGEN:

22  Q.  Agent Hamel, does this email reference RAD Partners'

23  consideration of Elliot Holder for a role?

24  A.  Yes, it does.  He's listed there in the subject line.

25  Q.  If you could actually highlight and read the whole subject

Matthew Hamel - Direct

1  line for the jury, please.

2  A.  Sure.  The subject line reads, "Elliot Holder,

3  clarification for DaVita rules of engagement."

4  Q.  And then Mr. Scanlon has written this email to his team;

5  is that right?

6  A.  He's written the email.  I don't believe Ms. Reynaga was

7  actually on his team.  She was an internal recruiting employee

8  within Radiology Partners; but, in substance, yes.

9  Q.  Could you please read for the jury the questions that

10  Mr. Scanlon has.

11  A.  Sure.  "Question one, Did Elliot reach out to RP, or did RP

12  initiate the conversation with him in any way?  Two, Is

13  Elliot's boss aware he is looking?"  Parentheses, "I don't

14  think so.  Three, is Elliot looking anywhere else besides RP?

15  And, four, does Elliot have any other offers outside RP?"

16  Q.  I can now show you an email six days later, Government

17  Exhibit 223.

18         And offer this as stipulated.

19         THE COURT:  It's admitted.

20         (Exhibit 223 admitted.)

21  BY MR. VIGEN:

22  Q.  Does this email, Agent Hamel, also concern Radiology

23  Partners' consideration of Elliot Holder?

24  A.  Yes, it does.  He's, again, listed in the subject line of

25  the email.

Matthew Hamel – Direct

1    *Q.*  If you could just read the first sentence, starting,

2    "Overall, thumbs up."

3    *A.*  Sure.  "Overall, thumbs up for hiring Elliot in a senior BA

4    capacity."

5    *Q.*  Okay.  And then what are the recommended next steps for

6    Mr. Holder?

7    *A.*  "Recommended next steps, Alex to confirm with Elliot in his

8    interested in the senior BA role.  Alex to coordinate second

9    round phone interview with Jacob.  If Jacob agrees, outline

10   next steps for Elliot, letting his management know that he is

11   looking for other opportunities, and RP is one of the

12   prospects."

13   *Q.*  And the date of this email is September 14, 2016?

14   *A.*  Yes, sir.

15   *Q.*  Okay.  I can show you the next and last email in time --

16   the last email for my purposes today -- Government

17   Exhibit 227.

18            And I would offer this as stipulated.

19            *THE COURT:*  Okay.  It's admitted.

20            (Exhibit 227 admitted.)

21   *BY MR. VIGEN:*

22   *Q.*  If we can go to the very bottom email.  This is from

23   Mr. Holder on October 2, 2016, to Keegan Scanlon?

24   *A.*  Yes, it is.

25   *Q.*  And this is maybe two to three weeks since the prior

Matthew Hamel – Direct

1    email we saw, outlining next steps?

2    A.   Yeah, something like that.

3    Q.   Okay.   And what does Mr. Holder write to Mr. Scanlon?

4    A.   "Dear Keegan, thank you so much for your consideration as

5    well as your help and guidance throughout the interview process

6    these last couple of weeks.   Unfortunately, at this time I must

7    withdraw myself from further consideration in this process.

8    Various circumstances in my professional life have changed,

9    causing me to align with a different path.   I hope to stay in

10   touch and wish you all the best with your future endeavors.

11   Sincerely, Elliot Holder."

12   Q.   Okay.   If we could look at Ms. Reynaga's email back,

13   internal to RAD Partners on October 23, 2016, please.   And if

14   you could read that email to the jury.

15   A.   Sure.   "I can call him.   I had a feeling this would happen

16   once I heard he would need to discuss with current employer,"

17   sad face emoji.

18   Q.   And then the next email is from Mr. Scanlon two days

19   later, on October 5.   If you can please read Mr. Scanlon's

20   email.

21   A.   "Can you give him a call and see what happened?   You can

22   indicate to him we wanted to extend an offer to him and see if

23   he is still interested."

24           MR. VIGEN:   No further questions.   Thank you.

25           THE COURT:   Cross.

Matthew Hamel - Cross

1    MR. WALSH:  Thank you, Your Honor.

2                     **CROSS-EXAMINATION**

3    BY MR. WALSH:

4    Q.  Good morning, Agent Hamel.

5    A.  Good afternoon, Mr. Walsh.

6    Q.  I believe -- I'm going to have a few questions for you, and

7    I believe Ms. Brooks may have some follow-up after I'm done.

8    A.  Sounds good.

9    Q.  Now, I want to turn quickly before I get into a little bit

10   of background with you about the investigation, just because

11   it's fresh in everyone's mind, if we could have Exhibit --

12   Government Exhibit 251 pulled up on the --

13           Do you have that email in front of you?

14   A.  251, you said?

15   Q.  Yes.

16   A.  Yes, sir.  I do.

17   Q.  And this is the email in which Kent Thiry says, "I won't

18   pursue one of Andrew's senior folks," on October 18, 2014; is

19   that correct?

20   A.  Yes, sir.

21   Q.  And did your investigation reveal that the Arcadia deal

22   that has been discussed in the course of the testimony here

23   closed about ten days after that email?

24   A.  I can't recall the exact date that the Arcadia deal closed.

25   Q.  It was in October 2014, wasn't it, though?

Matthew Hamel - Cross

1    *A.*   I know it was 2014.  I'm not sure of the exact day.

2    *Q.*   All right.  Let's take that down.

3              You've been the case agent in this case since the

4    inception of the investigation; is that true?

5    *A.*   No, sir.

6    *Q.*   Would -- how long after the investigation began did you

7    become the case agent?

8    *A.*   I don't recall the exact date it was opened, but in the

9    neighborhood of six months after the opening of the case.

10   *Q.*   And that was in the early part of 2019; is that fair?

11   *A.*   I took over in April or May of 2019.

12   *Q.*   And so the investigation was underway for about three

13   years, in that vicinity?

14   *A.*   Yes.  That's fair.

15   *Q.*   And it's looked into the conduct of quite a few companies

16   over the course of that time; is that a fair statement?

17   *A.*   Yeah.  I'd say that's fair.

18   *Q.*   For example, SCA, Radiology Partners, some of the companies

19   that you've testified about even this morning?

20   *A.*   Yes, sir.

21              *MR. WALSH:*  So I believe -- I want to --

22              Your Honor, if I could ask government counsel one

23   quick question?

24              (Brief off-the-record discussion between counsel.)

25

Matthew Hamel - Cross

1  *BY MR. WALSH:*

2  *Q.*   I want to ask you a question about the course of that

3  investigation.  Did you in the process learn that DaVita would

4  buy and sell different subsidiaries?  We've talked about

5  HealthCare Partners, for example, DaVita Medical Group.

6  *A.*   Did I learn that they did those transactions?

7  *Q.*   Yes.

8  *A.*   Yes, I did.

9  *Q.*   Did your investigation reveal that in 2018, DaVita actually

10  sold the DaVita Medical Group to Optum?

11  *A.*   I'm aware that they sold it.  I don't know the exact date.

12  But, yes, I'm aware that they sold it.

13  *Q.*   And that was a billion-dollar transaction, or thereabouts?

14  *A.*   I don't know.

15  *Q.*   All right.  Let's come back to the investigation.

16        You testified that you did a lot of witness interviews

17  in this case -- or the investigating agents did.

18  *A.*   I would say yes to both of those questions.

19  *Q.*   And would it be fair to say that witness interviews are a

20  critical part of an investigation like this one?

21  *A.*   Yes.  I think that's fair.

22  *Q.*   And you received training as an FBI agent about how to do

23  that effectively?

24  *A.*   Yes, we did.

25  *Q.*   And part of that training is the importance of making sure

Matthew Hamel - Cross

1   that you make an accurate record of what the witness told you

2   in the course of the investigation?

3   *A.*   Yes.

4   *Q.*   Now, the FBI doesn't, except in some limited circumstances,

5   record interviews; is that true?

6   *A.*   Yes.  I would say our default position is not to record

7   interviews.

8   *Q.*   And there is an FBI policy on that; correct?

9   *A.*   Yes.

10  *Q.*   And so -- but you do take notes in the course of each

11  interview?

12  *A.*   That's correct.

13  *Q.*   And from those notes, you prepare a memo, in essence, that

14  we've heard about, which is a 302; is that correct?

15  *A.*   That's correct.

16  *Q.*   And 302 just refers to the -- in classic federal government

17  form, the number of the form; is that correct?

18  *A.*   The longhand version is FD302; and I don't know what FD

19  stands for, frankly.

20  *Q.*   Basically, it's the interview memo that you prepare?

21  *A.*   That's correct.

22  *Q.*   And it's particularly important, of course, that you be

23  accurate both in your notes and in the interview memo you

24  prepare; is that fair?

25  *A.*   Yes.  I'd say it's important for us to do our very best to

Matthew Hamel - Cross

1  be accurate.

2  *Q.*  And that's especially the case when there is not a

3  recording of what actually was said in the course of the

4  interview?

5  *A.*  I think I would say that's important regardless of

6  recording or not recording.

7  *Q.*  All right.  Now, the 302s reflect a summary of what the

8  witness has said in the course of the interview, but it

9  doesn't -- they don't include the questions that were asked of

10  the witness; is that fair?

11  *A.*  Yes, that's fair.

12  *Q.*  All right.  So I believe you said that there were north of

13  100 interviews in total done in this investigation over those

14  three years?

15  *A.*  Yes, I think that's right.

16  *Q.*  But it wasn't 100 different people.  A smaller number of

17  people; is that fair?

18  *A.*  It's a smaller number of people.  I don't know off the top

19  of my head the total number of people; but, yes.

20  *Q.*  If --

21  *A.*  Smaller than the total number of reports.

22  *Q.*  If I said it was 75 different people, would that be in the

23  ballpark of what you would expect?

24  *A.*  That's probably about right.

25  *Q.*  And of that number, 65 or so, in that vicinity, are

Matthew Hamel - Cross

1   interviews that you yourself either conducted or were present

2   for?

3   *A.*  Are you comparing the 65 to the 75 people?

4   *Q.*  Yes.

5   *A.*  Okay.  Yeah, that's probably fair.

6   *Q.*  And the -- but the government, in fact, interviewed some

7   people many times in the course of the investigation?

8   *A.*  Yes, we did.

9   *Q.*  All right.  And, in fact, there are something like 150

10  separate 302s in the case?

11  *A.*  I don't know the total number.  One other -- one other

12  piece of context is that a 302 is definitely used to record our

13  interviews, but it also can be used for other things.  So when

14  you say there is 150 302s, they may not all be tied to

15  interviews.

16  *Q.*  Let me be a little more specific in my question.  There are

17  150 witness interview 302s.

18  *A.*  Okay.  I don't know the total number, but that sounds

19  close.

20  *Q.*  So I want to ask you now about some specific witnesses that

21  we -- or individuals that we may have seen in the documents

22  that you were talking about this morning and that were

23  potential -- were interviewed in the course of the

24  investigation.

25          There was an email from John Schultz -- or with John

Matthew Hamel - Cross

1    Schultz at Spencer Stuart.  In fact, there were three

2    documents -- exhibits that you testified about this morning --

3    or today; is that correct?

4    A.  Yes, that sounds right.  I know of Mr. Schultz.  Yes.

5    Q.  And, in fact, you interviewed him twice?

6    A.  Yes.  I'm -- I don't recall if it was twice, but I have

7    definitely interviewed Mr. Schultz.

8    Q.  But he's not going to be testifying in the government's

9    case in chief, I take it?

10   A.  Not that I understand.

11   Q.  Similarly, Tom Usilton appears in multiple emails this

12   morning, probably in total, something like seven?

13   A.  Yes, that's fair.

14   Q.  And he was -- you interviewed him, as well; is that fair?

15   A.  Yes, I did.

16   Q.  But, again, he's not going to be testifying in this trial?

17   A.  Not as I understand it.

18   Q.  Now, Julio Quinones, we talked -- you testified about text

19   exchanges between him and Josh Golomb; correct?

20   A.  Yes, I did.

21   Q.  And something like a total of 20 plus text messages, more

22   or less?

23   A.  Yeah.  More or less.

24   Q.  And you've interviewed Mr. Quinones?

25   A.  I have.

Matthew Hamel - Cross

1    *Q.*  But, again, he's not going to be testifying here?

2    *A.*  Not as I understand it.

3    *Q.*  William Hughson, another person who appears on a number of

4    the emails here today, also interviewed in the course of the

5    investigation, is that true?

6    *A.*  Yes, it is.

7    *Q.*  And he also will not be testifying in the government's

8    case?

9    *A.*  Yes.  Not as I understand.

10   *Q.*  Keegan Scanlon, also interviewed; correct?

11   *A.*  Correct.

12   *Q.*  Also will not be testifying in the government's case?

13   *A.*  Not as far as I know.

14   *Q.*  All right.  Scott Drake, also interviewed; correct?

15   *A.*  Yes, Scott Drake was interviewed.

16   *Q.*  He also will not be testifying?

17   *A.*  As far as I know, that's correct.

18   *Q.*  Okay.  In fact, there aren't going to be any people from a

19   number of the companies that you've -- that we've seen

20   documents on in the course of your testimony today; is that

21   fair?  No actual witnesses from those companies?

22   *A.*  Yes.  There are a few companies that we've seen on

23   documents where there won't be a person from those companies

24   testifying --

25   *Q.*  So --

Matthew Hamel - Cross

1   *A.*   -- as far as I know.

2   *Q.*   For example, there will be no witness from Hazel Health

3   testifying in the government's case?

4   *A.*   No.  No witness from Hazel Health, as far as I know.

5   *Q.*   So the only witness in the government's case about Hazel

6   Health emails and texts that you presented today is you?

7   *A.*   The only witness about the text messages is me; but we did

8   hear from Mr. Kogod, who spoke somewhat to Mr. Golomb and

9   Mr. Thiry.

10   *Q.*   Okay.  Similarly, we've heard about a company called

11   Spectranetics; is that fair?

12   *A.*   Yes.

13   *Q.*   No one from Spectranetics will be testifying in the

14   government's case in chief?

15   *A.*   No.  That's -- as far as I know, that's correct.

16   *Q.*   A company called IntegraMed, no one from IntegraMed will be

17   testifying?

18   *A.*   Again, yeah, as far as I know, that's true.

19   *Q.*   Okay.  We've also heard a little bit of a company called

20   USPI.  Do you recall that information in the course of the

21   trial?

22   *A.*   Learning about USPI.  Yes, I do.

23   *Q.*   Yeah.  And there will be no witness from USPI testifying in

24   this -- in the government's case?

25   *A.*   No.  As far as I know, no USPI witness.

Matthew Hamel - Cross

1  *Q.*  I want to shift gears now, if it's all right, to some of

2  the people that you've testified -- specific individuals you've

3  testified either at DaVita or one of the other companies who --

4  well, let me just ask.  This morning, for the first time the

5  name of a woman named Arlene Villa-Howells came up; do you

6  recall that?

7  *A.*  Yes, sir.

8  *Q.*  Did you ever interview Arlene Villa-Howells?

9  *A.*  No, I don't believe I did.

10       MR. WALSH:  All right.  If we could have Exhibit A459

11  pulled up.

12       I believe that is stipulated to be admissible, Your

13  Honor.

14       MR. VIGEN:  No objection.

15       THE COURT:  Admitted.

16       (Exhibit A459 admitted.)

17       MR. WALSH:  Thank you, Your Honor.

18  *BY MR. WALSH:*

19  *Q.*  Agent Hamel, do you recognize this document?  Now, it's

20  actually a multiple-page document; but let's just look at the

21  first page.  Do you recognize it?

22  *A.*  I recognize the format.  I've looked at many text messages.

23  I don't know who these are between as I sit here, at the

24  moment.

25  *Q.*  Is this a series of text messages -- just to see if it

Matthew Hamel - Cross

1   refreshes your recollection -- between Arlene Villa-Howells and

2   Josh Golomb?  Feel free to --

3   A.  I'm confident this is from Josh Golomb because this is the

4   same format we saw in some other of the other messages we got

5   from him.  I don't know based on what I'm seeing on this

6   page whether it's Ms. Villa-Howells or not.

7   Q.  Why don't you take a look at that.  We can advance through

8   that, see if that refreshes your recollection at all.

9         Your Honor, I may have a hard copy that I can show the

10  witness just to make it a little easier for him to review.

11  A.  Yes, this does seem to be -- yeah, this is Arlene.  On one

12  of the pages she sends Mr. Golomb her email address.

13  Q.  Thank you, Agent Hamel.

14        I'd also -- if we could take that exhibit down and put

15  up Government Exhibit 536.

16        Your Honor, this is not yet in evidence.  We've

17  stipulated to authenticity previously; but we'll stipulate to

18  admissibility, as well.  I would offer 536.

19        THE COURT:  Any objection?

20        MR. VIGEN:  No objection.

21        THE COURT:  It's admitted.

22        (Exhibit 536 admitted.)

23  BY MR. WALSH:

24  Q.  And do you recognize this document?

25  A.  I don't.

Matthew Hamel - Cross

1    Q.   Okay.  Is it -- does it appear to be an internal email at

2    Hazel Health between Josh Golomb and Rob Darzynkiewicz --

3    A.   Without trying to pronounce that last name, yes, it appears

4    to be internal to what was called Hippo MD, which became Hazel

5    Health.  It's just a name change in the company.

6    Q.   All right.  Let me shift gears again and ask you about a

7    few other witnesses.  We've heard quite a bit about Jung Lee in

8    the course of the trial; would you agree with me?

9    A.   A bit.  Yes.

10   Q.   And did you ever interview Mr. Lee or anyone else in the

11   investigation interview Mr. Lee?

12   A.   I did not; and no one else, from what I'm aware.

13   Q.   All right.  So from the point of view of the investigation,

14   you did not determine whether or not he considered himself, for

15   example, a victim in this case?

16   A.   We did not -- no.  I think that's fair.  We don't know if

17   he considered himself a victim.

18   Q.   And, in fact, your investigation revealed that he did go to

19   his supervisor and reveal that he was interested in seeking

20   outside opportunities from DaVita; correct?

21   A.   Correct.

22   Q.   And the investigation also revealed that he ended up

23   getting a promotion and an increase in pay after that?

24   A.   I don't recall that specifically, but --

25   Q.   Okay.  How about Craig McKessar?  I believe Ms. Fanning

Matthew Hamel - Cross

1    testified about Mr. McKessar.  Was that -- did you ever

2    interview, or did the investigation ever interview Craig

3    McKessar?

4    A.   That would be the same answer.  I did not and no one else

5    from my understanding interviewed Mr. McKessar.

6    Q.   How about Jordan Thau?  I believe Ms. Fanning --

7    Dr. Fanning testified about a man named Jordan Thau as a

8    potential recruit to SCA.  Was he interviewed in the course of

9    the investigation?

10   A.   Not that I'm aware of.

11   Q.   Okay.  So both for Mr. McKessar and for Mr. Thau, no one

12   from the investigation ever determined whether they considered

13   themselves victims in any sense in this case?

14   A.   I think that's fair.

15   Q.   Similarly, we heard about Christian Ellison, another

16   potential recruit from SCA to DaVita; do you recall that?

17   A.   We did hear about Mr. Ellison, yes; but to be fair, I don't

18   think he ever -- we don't know if he ever responded to the

19   LinkedIn reach-out.  We just know that he passed it up his

20   chain of command and said, DaVita through the recruiters is

21   reaching out to me about this role.  I understand that we had a

22   gentlemen's agreement or hands-off or something to that effect.

23   Q.   Okay.  But you didn't interview Mr. Ellison?

24   A.   Not that I'm aware of.

25   Q.   Similarly, we heard quite a bit about a man named Guy Seay;

Matthew Hamel - Cross

1   do you recall that?

2   A.   Yes, I do.

3   Q.   And Mr. Seay was not interviewed in the investigation

4   either?

5   A.   No, he was not.

6   Q.   Cindy Pivik, a DaVita executive who did go to Radiology

7   Partners; correct?

8   A.   I don't know that for sure.

9   Q.   All right.  Did you interview Cindy Pivik?

10  A.   Not that I'm aware of.  I personally did not.

11  Q.   All right.  How about -- how about Alex Won, who we've

12  heard about in the course of the testimony this morning a

13  couple of times.  Was Alex Won ever interviewed?

14  A.   I personally did not interview him.  I'm not aware of

15  anyone else doing so.

16  Q.   Okay.  Now, finally, there were a couple of additional

17  people mentioned in passing just a few minutes ago in one of

18  the exhibits.  A man by the name of Sean Taylor; do you recall

19  that mention?

20  A.   Yes.

21  Q.   Any interview of Mr. Taylor?

22  A.   Not that I can recall.

23  Q.   Marcus Hathaway.  Interview of Mr. Mark Hathaway, did that

24  happen?

25  A.   I don't believe so.  I believe I tried to interview

Matthew Hamel - Cross

1    Mr. Hathaway.

2    *Q.*   Okay.  And then Paul Lamendola.

3    *A.*   I believe we tried to interview Mr. Lamendola, but I don't

4    believe we did.

5    *Q.*   Okay.  All right.

6            So prior to your testimony, a total of seven witnesses

7    have testified in the government's case; is that accurate?

8    *A.*   I think that's the right number.  Yes.

9    *Q.*   All but one of those witnesses -- Mr. Lombardo, who

10   testified earlier today -- had received some form of promise

11   from the government that they would not be prosecuted as part

12   of this case?

13   *A.*   I think that's correct.  Yes.

14   *Q.*   Okay.  So I'm going to just very quickly touch on each of

15   those.

16           So the government's first witness, Mr. Dennis Kogod,

17   do you recall received what is known as a declination letter

18   from the government.  Do you recall that?

19   *A.*   Mr. Kogod.  Yes.

20   *Q.*   In which --

21           If we could pull up Defense Exhibit B477, which has

22   been admitted, Your Honor.

23           If we could blow up the first sentence there.

24           And so Mr. Kogod received this representation from the

25   antitrust division on March 11, 2022?

Matthew Hamel - Cross

1    A.  Yes, that's the date.

2              MR. WALSH:  All right.  We can take that down.

3    BY MR. WALSH:

4    Q.  Ms. -- rather, Dr. Fanning, the government's second

5    witness, also received a declination letter; correct?

6    A.  Correct.

7              MR. WALSH:  If we could look at Defense Exhibit B474.

8              Also admitted, Your Honor.

9              And if we could blow up the first letter -- the first

10   sentence there.

11   BY MR. WALSH:

12   Q.  Similarly, she was promised that the antitrust division

13   would not bring criminal charges against her; correct?

14   A.  Specific to what we've discussed in court today, yes.

15   Q.  In the case?

16   A.  Correct.

17   Q.  All right.  And the date of that letter is February 25,

18   2022?

19   A.  Yes, it is.

20   Q.  Okay.  Now, we talked just a little while ago about the

21   witnesses that were not interviewed.  Ms. Fanning was

22   interviewed approximately 19 times.  Does that ring a bell, or

23   does that seem like the ballpark of how many times?

24   A.  Seems a little high; but, generally speaking, ballpark.

25   Q.  All right.  And, in fact, when the Indictment in this case

Matthew Hamel - Cross

1  first came down in July of 2021, you texted Dr. Fanning,

2  sharing the press release on the Indictment; is that fair?

3  A.  Yes, it is.

4  Q.  All right.  The government's third witness, Mr. Rucker,

5  also received a declination letter; is that correct?

6  A.  I think that's correct.

7       MR. WALSH:  Why don't we take a look at Government

8  Exhibit 341.

9       This has not been admitted; but it has been stipulated

10  as admissible, Your Honor.

11       THE COURT:  All right.  It's admitted.

12       (Exhibit 341 admitted.)

13  BY MR. WALSH:

14  Q.  Similarly --

15       If we could blow up that first sentence.

16       He received this representation from the antitrust

17  division; correct?

18  A.  Correct.

19       MR. WALSH:  All right.  Let's take that down, if it's

20  all right.

21  BY MR. WALSH:

22  Q.  And, now, one witness received an individual cooperation

23  and non-prosecution agreement from the government in the course

24  of the investigation; correct?

25  A.  Yes.

Matthew Hamel - Cross

1   *Q.*  That was Mr. Hayek?

2   *A.*  Yes, sir.

3   *Q.*  In fact, he received two different versions of that

4   cooperation agreement; correct?

5   *A.*  Yes, as I understand it.

6           MR. WALSH:  All right.  Let's take a look at

7   Government Exhibit-- excuse me -- Defense Exhibit A001, which

8   has been admitted, Your Honor.

9   *BY MR. WALSH:*

10  *Q.*  And this is dated November 27, 2019; correct?

11  *A.*  Yes, sir.

12  *Q.*  Now, this is the second of the two letters; is that fair?

13  *A.*  I don't remember what date each of the two letters was.

14  I'm not sure.

15  *Q.*  Well, this is a letter that expands the scope of the

16  non-prosecution protection to Mr. Hayek from just DaVita to

17  other potential nonsolicitation agreements; is that true?

18  *A.*  It seems to be the case.  Yes.

19  *Q.*  Okay.  Now, I want to talk for just a couple of minutes

20  about what this letter means, just based on your experience as

21  an FBI agent in the course of this investigation.

22          Under this agreement, if Mr. Hayek cooperates fully,

23  truthfully, and in a continuing way, the government won't bring

24  criminal charges against him; is that fair?

25  *A.*  I think, generally speaking, that's my understanding of it.

Matthew Hamel - Cross

1  *Q.* And that includes testifying on behalf of the government,

2  as he did here in this trial?

3  *A.* Yeah.  Testifying specifically truthfully.

4  *Q.* Also providing documents and other materials in response to

5  requests from the government?

6  *A.* I think -- yeah, that's actually there, 1A, producing

7  documents.

8  *Q.* By the way, Mr. Hayek has ultimately been interviewed about

9  eight times.  Does that ring a bell?

10  *A.* That seems close.

11  *Q.* All right.  Now --

12  *A.* If I can clarify one thing.

13  *Q.* Yeah, please.

14  *A.* You're talking about interviews.  And sometimes it's like a

15  sit-down interview with people, we're asking a lot of

16  questions.  Other times, we might have a quick phone call; and

17  it will be written up in the same way.  It will be a 302.  So

18  eight might count all of those different communications.

19  *Q.* All right.  And the -- so the -- just to be very specific

20  about how this works, the -- he is required under the agreement

21  to cooperate fully and truthfully and in a continuing way with

22  the government in its investigation and any prosecutions;

23  correct?

24  *A.* Yes, as I understand it.

25  *Q.* And there are a variety of ways that he's required to do

Matthew Hamel - Cross

1   that.  We've touched on a couple.

2   A.  Yes.

3   Q.  Now, if he fails to do that, his protection under this

4   non-prosecution agreement can be revoked; is that fair?

5   A.  If he fails to cooperate and testify truthfully and all of

6   the other things, yes.

7   Q.  Okay.

8   A.  I don't know the process of doing that; but as I understand

9   it, yes, that's possible.

10  Q.  And the decision as to whether he's cooperated fully is by

11  the antitrust division of the Department of Justice; correct?

12  A.  Generally, I think that's true.  But the details of how

13  that works, I don't know.

14  Q.  All right.  So -- but without this non-prosecution

15  agreement, he would be potentially -- he would face the

16  possibility of a couple of felony charges, I take it?

17  A.  Possibly.

18       MR. WALSH:  All right.  We can take that down.

19  BY MR. WALSH:

20  Q.  I do -- I do also want to talk about a special case here.

21  There were two witnesses who testified who were employees of

22  Radiology Partners, Mr. Whitney and Dr. Gabriel.  Do you recall

23  their testimony?

24  A.  Yes, I do.

25  Q.  Now, they don't have individual non-prosecution agreements,

Matthew Hamel - Cross

1    do they?

2    A.   I don't believe so.  I think they're covered under the

3    Radiology Partners leniency application.

4    Q.   Okay.  And so their company, Radiology Partners, negotiated

5    a different type of leniency -- to use the word you just

6    mentioned -- than the individuals did; is that fair?

7    A.   I don't know how much negotiation went into it.  I'm not a

8    part of that process.  But I think, generally speaking, that's

9    fair.  That --

10   Q.   And Radiology Partners received something that is known as

11   a conditional leniency letter; is that true?

12   A.   I -- I think so; but, again, I'm not part of that process.

13          MR. WALSH:  So why don't we take a look at Government

14   Exhibit 340.

15          Your Honor, this has been admitted.

16   BY MR. WALSH:

17   Q.   So this is a letter to counsel for Radiology Partners on

18   behalf of the antitrust division; correct?

19   A.   Yes, that's what it looks like.

20   Q.   Okay.  And I want to highlight the sentence in the middle

21   that says, "this agreement is conditional and depends upon

22   applicant, one, establishing that it is eligible for leniency

23   and cooperating in the antitrust division's investigation as

24   required."  Correct?

25   A.   Yes.  I see that here.

Matthew Hamel - Cross

1  Q.  Okay.  So this is conditional, in the sense that it is not

2  a -- it's not a final agreement from the government to

3  Radiology Partners; is that your understanding?

4  A.  From what I'm reading here, it's conditional based on these

5  two listed points.

6  Q.  All right.  What's the date of this letter?

7  A.  That's interesting.

8  Q.  We may have to go to the end to see what the signature date

9  is.

10  A.  December of 2021, over a few days.

11  Q.  Okay.  Very good.  This letter is granted under the

12  antitrust division's corporate leniency program; is it not?

13  A.  That's how I understand it.  Yes.

14  Q.  It requires the company to cooperate fully, much like

15  Mr. Hayek was required to cooperate fully in his agreement?

16  A.  Again, I'm not really sure of the details of the leniency

17  program; but I think generally speaking, that's a fair way to

18  put it.

19  Q.  Now, under this agreement, there is the possibility that

20  covered employees of the company would also receive,

21  essentially, immunity from prosecution; correct?

22  A.  I think so.

23  Q.  And, in fact, you discussed that with Mr. Whitney, at

24  least, and Dr. Gabriel, as well?

25  A.  Yes.  I think we heard from both of them about that.

Matthew Hamel - Cross

1      MR. WALSH:  All right.  Could we take a look at page 2

2  of this -- I believe it's page 2 -- it's a little bit further

3  along.  It is page 4.

4          So if we could highlight that first full paragraph.

5  BY MR. WALSH:

6  Q.  All right.  So this is a provision that provides that

7  covered employees who also provide truthful, continuing,

8  complete cooperation with the division shall not be prosecuted

9  criminally by the antitrust division, et cetera; is that fair?

10 A.  I think with some stipulation, because it does talk about

11 the person's period of employment at the company in question.

12 Q.  Yes.

13 A.  But, generally speaking, I think that's fair.

14 Q.  All right.  And this is also conditional under this

15 conditional leader -- letter; is that fair?

16 A.  I would assume so.  Yes.

17 Q.  And in the event that a covered employee fails to cooperate

18 fully, the agreement is void; true?

19 A.  I don't know if one employee not cooperating would void the

20 entirety of the agreement or if it would change how that person

21 is viewed.  I don't know.

22 Q.  That's a good distinction.  I'm glad you raised it.  The

23 protection for that employee would be void, is that fair?

24 A.  That's how I read this; but, again, I don't know.

25      MR. WALSH:  All right.  Well, let's turn to the next

Matthew Hamel - Cross

 1   page, page 5.  And if we could go in that large paragraph

 2   there -- the very large paragraph, the -- and if we could go

 3   down a little bit further, to where it says, "The antitrust

 4   division also reserves the right to revoke" -- there we go.

 5          And here it's very clear, "In the event" -- I'm going

 6   to go up a little bit higher for highlighting.

 7   BY MR. WALSH:

 8   Q.  "In the event a covered employee fails to comply fully with

 9   his or her obligations under this agreement, as it pertains to

10   that individual, the agreement shall be void."  Do you see

11   that?

12   A.  I see that.

13   Q.  It says "Any conditional leniency, immunity, or

14   non-prosecution may be revoked by the antitrust division."

15   A.  To that individual.  Yes, I see that.

16   Q.  Correct.  And so this letter makes clear that it is the

17   antitrust division that makes that decision; correct?

18   A.  It seems that way in, actually, the next sentence, but --

19   Q.  Why don't we highlight the next sentence.

20   A.  -- again, I don't know the details of how that works.

21   Q.  All right.  And if that were to happen, if the antitrust

22   division actually revoked the conditional non-prosecution

23   agreement as to an individual under this agreement, that

24   individual wouldn't even be able to challenge that decision in

25   court until he or she was prosecuted?

Matthew Hamel - Cross

1    *A.* I have no idea.

2         *MR. WALSH:* Why don't we scan down to the bottom of

3    this paragraph, starting where it says "judicial review."  It's

4    the very last sentence there.  All right.

5    *BY MR. WALSH:*

6    *Q.* So same question.  In other words, if the antitrust

7    division decided to revoke the protection to an individual,

8    that individual could not seek a court's review of the decision

9    until they were prosecuted?

10   *A.* I would say that there is a little bit of distinction

11   there.  It's not "prosecuted"; it's "charged."  So that means

12   that they might have been indicted or they have been charged in

13   some other way, but it doesn't mean that they've gone through

14   the full set of prosecutorial steps like coming to a trial or

15   anything like that.

16   *Q.* All right.  In other words, the judicial review would be

17   available once the person had been charged but would not --

18   rather than all the way through trial and a determination as to

19   guilt or innocence?

20   *A.* I know I'm a broken record.  I don't know the details, but

21   that's how I'm reading this.

22   *Q.* In other words, the antitrust division can make a decision

23   as to prosecution; fair?

24   *A.* Yes.  I think that's fair.

25   *Q.* But they ultimately, obviously, don't make a determination

Matthew Hamel - Cross

1  as to whether a particular person is innocent or guilty of an

2  offense?

3  *A.*  Generally speaking, no.

4  *Q.*  In fact, the twelve people seated here are the ones who

5  have that responsibility and that authority; correct?

6  *A.*  Yes.  As I understand it, that's true.

7  *Q.*  All right.  I want to ask you a question about the

8  conditional leniency program more generally.  Isn't it the case

9  that the antitrust division only grants conditional leniency to

10 one corporation in each conspiracy investigation that it's

11 conducting?  That's a rule of the program.

12        *MR. VIGEN:*  Your Honor, objection.  Based on personal

13 knowledge and also relevance.

14        *THE COURT:*  Overruled.  You can answer if you know.

15        *THE WITNESS:*  I don't know.

16        *MR. WALSH:*  So why don't we take a look at a

17 document -- excuse me -- This is Exhibit-- Defense B531, Your

18 Honor.  It is not in evidence, so it should only be shown to

19 Agent Hamel.

20 *BY MR. WALSH:*

21 *Q.*  Agent Hamel, is -- is this -- do you recognize this

22 document entitled "Frequently Asked Questions About the

23 Antitrust Division's Leniency Program and Model Leniency

24 Letters"?

25 *A.*  I do not.

Matthew Hamel - Cross

1    Q.  All right.  Have you ever reviewed any documents about the

2    leniency program itself?

3    A.  Documents about the program?

4    Q.  Yeah.  The policy?

5    A.  No.

6    Q.  You've never seen that.

7    A.  I take that back.  I think I have seen a broad-strokes

8    presentation at one point, but that's about all I can remember.

9    Q.  Why don't we start with that broad-strokes presentation,

10   then.  Did that broad-stroke presentation make the point that

11   the antitrust division only grants one conditional leniency

12   letter to a company in any particular investigative conspiracy?

13   A.  I don't recall.

14   Q.  Do you recall whether there is any discussion of the fact

15   that the Division -- well, if there is any discussion of the

16   Division representing two companies, that they are in a race to

17   be the first company in the door to seek corporate leniency

18   under the program?

19   A.  I'm not sure I follow your question.

20   Q.  Given that the antitrust division -- well, let me rephrase

21   this, given your answers.

22          You're not aware of the antitrust division telling

23   prospective applicants for corporate leniency under this

24   program that they're in a race to be the first in the door?

25   A.  No.  I'm not aware of that.

1100

Matthew Hamel - Cross

1    *Q.*   Okay.  So just a couple of final questions for you, then

2    I'm going to turn it over to Ms. Brooks.

3            So if I understand the way the corporate leniency

4    agreement operated with respect to Mr. Whitney and Dr. Gabriel,

5    who testified here last week, when they were testifying, their

6    leniency -- their immunity was conditional; correct?

7    *A.*   Yes.  It appears to be that way, based on what we looked

8    at.

9    *Q.*   Not final, in other words?

10   *A.*   Correct.

11   *Q.*   And when they were testifying, they knew that if their

12   testimony was not perceived to be fully cooperative and

13   truthful by the Division, that their leniency could be revoked?

14   *A.*   I think that's generally fair.  Yeah.  They have to

15   testify, and they have to do so fully and truthfully.

16   *Q.*   And the people who decide that are the people seated here

17   at my -- at the table to my left?

18   *A.*   I'm not sure about that.

19   *Q.*   The Antitrust Division, in any event?

20   *A.*   I think, yes, generally speaking, the Antitrust Division

21   would be making that determination.

22           MR. WALSH:  Your Honor, just one moment.

23   *BY MR. WALSH:*

24   *Q.*   One last question for you.

25           I think I can do it in a single question, Your Honor.

Matthew Hamel - Cross

1            There was Mr. Priest whose name came up in documents

2    this morning.  But he wasn't interviewed either, was he?

3    *A.*  Mr. Priest?

4    *Q.*  He was interviewed.  I'm sorry.

5    *A.*  He was interviewed.  Yes.

6    *Q.*  Okay.  Second question and last question.

7            My apologies, Your Honor.

8            He's not going to be a witness in the government's

9    case in chief either, is he?

10   *A.*  As far as I know, he's not.

11           *MR. WALSH:*  Your Honor, I have no further questions at

12   this point in time.

13           *THE COURT:*  All right.  Ms. Brooks, your turn.

14           *MS. BROOKS:*  Thank you.

**CROSS-EXAMINATION**

15

16   *BY MS. BROOKS:*

17   *Q.*  Good afternoon, Agent Hamel.

18   *A.*  Good afternoon, Ms. Brooks.

19   *Q.*  Nice to meet you properly.

20   *A.*  You, as well.

21   *Q.*  You know who I am, since I've been running around here for

22   a week and a half.

23   *A.*  I've seen you a few times, ma'am.

24   *Q.*  And may I just say, I am glad we are not conducting this

25   questioning side by side, standing up.

Matthew Hamel - Cross

1        Now, let's go back over some of the things that you

2   talked about during your direct examination.  But first, I

3   would like for the sake of the jury to -- for them to get to

4   know a little bit more about what a case agent is versus, you

5   know, simply a special agent who is working on a case.  Could

6   you describe for the jury what your role is as the case agent.

7   A.  Sure.  I think the easiest way to explain it is a project

8   manager.  So we have an allegation coming in, we might open a

9   case, and the case agent is going to be the person coordinating

10  anyone else that is going to be working on the case.  That can

11  be other agents who are helping with interviews, it could be

12  analysts that are going through information that exists out --

13  whether we collect it or it's somewhere else, forensic

14  accountants things like that.  So I think broad strokes, a case

15  agent -- the primary case agent is a project manager.

16  Q.  And in this case, once you took over, you became the

17  primary case agent; is that right?

18  A.  Yes, ma'am.

19  Q.  So there are various investigative tools that your -- as

20  part of your resources.  One is that you yourself can go and

21  conduct interviews; is that right?

22  A.  Yes, ma'am.

23  Q.  And some of those interviews, are they also done in the

24  presence of one or more of the prosecutors from the Division?

25  A.  Yes, they can be.

Matthew Hamel - Cross

1    Q.  And also is it your responsibility then -- or another

2    agent's, depending on who is there at the interview, to take

3    notes of what the witness is saying?

4    A.  Yes.  That's fair.

5    Q.  And you talked briefly about those notes then get turned

6    into a 302; is that right?

7    A.  Yes.  I use the notes that are taken whether they're mine

8    or another agent that is present as kind of guideposts for my

9    memory, as I'm writing up my recollection of what was

10   discussed.  So, yes, we use the notes.

11   Q.  And it's very important, you just said, as a guidepost, for

12   example, for your memory.  For example, you might talk to a

13   witness and not be asked to testify about what that witness

14   said until two years later; is that right?

15   A.  Yes.  That's right.

16   Q.  So it would be very important to you to make sure that the

17   302 accurately reflects the -- to what you believe important

18   facts that the witness talked to you about; is that fair?

19   A.  Yes.  I think, generally speaking, I do my very best to

20   make sure the 302 reflects accurately what was discussed.

21   Q.  And if another agent writes the 302, you might rely on that

22   agent's 302 to conduct further investigation; is that right?

23   A.  Yes, ma'am.

24   Q.  So you would hope that that agent also had good training at

25   Quantico and followed their -- the teaching of how to

Matthew Hamel - Cross

1    accurately reflect what a witness has said in a 302; correct?

2    A.   Yes.  I would trust my fellow agents to do that correctly.

3    Q.   Now, because of COVID, were a lot of these interviews

4    conducted via WebEx?

5    A.   WebEx, other video teleconference, yes, they were.

6    Q.   So there would have been the ability without too much

7    trouble to simply hit the record button and record the entire

8    interview; would that be fair?

9    A.   I don't know that I've ever recorded in WebEx or any of the

10   other video conference, so I'm not sure how much trouble that

11   would be.  I don't know.

12   Q.   Okay.  You don't know whether there is, like, just a little

13   button that says "record," and then a light blinks and says,

14   this is being recorded?

15   A.   I don't know that.

16   Q.   Okay.  But is it fair to say in this case, none of those

17   interviews were recorded?

18   A.   Yes.  I think that's true.

19   Q.   And while we can rely on the 302s to hopefully accurately

20   reflect what the witness said, without any kind of recording,

21   we don't know what the questioner said; is that fair?

22   A.   Yes.  I think that's true.

23   Q.   And we don't know the content of the question; correct?

24   A.   Yes, ma'am.

25   Q.   Or how it was asked; is that right?

Matthew Hamel - Cross

1    A.  Yes, ma'am.

2    Q.  Or even the tone that was used; is that right?

3    A.  That's correct.

4    Q.  But if it had been recorded, we'd be able to play it right

5    here in this courtroom so we could all relive that interview

6    together; is that fair?

7    A.  I suppose that's --

8          MR. VIGEN:  Objection, Your Honor, in terms of the

9    statement of the law.

10          THE COURT:  Overruled.

11   BY MS. BROOKS:

12   Q.  I'll ask it again because I'm not sure if the court

13   reporter got your answer down.  So if it would have been

14   recorded, we could all listen together to how the interview

15   was; is that right?

16   A.  I would assume so.  Yes.

17   Q.  All right.  Now, let's talk about -- we'll stay on the

18   interview topic.  You started by telling us about Count 2, that

19   is, Josh Golomb and Hazel Healthcare and Mr. Thiry and DaVita;

20   correct?

21   A.  Yes, ma'am.

22   Q.  Now, of all of the people that were interviewed in this

23   case, am I correct that Josh Golomb was never interviewed?

24   A.  Yes.  Josh Golomb was never interviewed.

25   Q.  So I'd like to back up for a moment and talk about one

Matthew Hamel - Cross

1  other investigative tool that you have.  Are you familiar with
2  what are called attorney proffers?
3  A.  Generally speaking, yes, I am.
4  Q.  And that is where an attorney for a person or a company
5  comes in and makes a proffer to the prosecutors for the
6  Division as to what their company or an individual might say
7  if, in fact, they were interviewed?
8  A.  That is correct.  I'd say that is my general understanding
9  of it.
10       THE COURT:  Terri, do you need a break?
11       I wanted to make sure she's okay.
12       MS. BROOKS:  Understood, Your Honor.  Very important.
13  No record without you.
14  BY MS. BROOKS:
15  Q.  Let me back up.  Of all of the witnesses that were
16  interviewed in this case, Josh Golomb wasn't; is that right?
17  A.  Josh Golomb was not interviewed.  That's right.
18  Q.  Now, as the case agent -- let's go back to the attorney
19  proffers -- you yourself are not present when an attorney comes
20  and makes a proffer to the prosecutors from the Division; is
21  that right?
22  A.  Yeah, I'd say that's fair.  Generally speaking, when a
23  witness of any sort retains counsel, I'll put their counsel in
24  touch with members of the prosecution team that I work with;
25  and then I let them hash out how, if, when an interview might

Matthew Hamel - Cross

1    take place.

2    Q.  But, certainly, as the case agent or project manager, you

3    would go -- before you would go out and conduct further

4    evaluation, you would want to familiarize yourself with what

5    attorneys for individuals or companies had proffered to the

6    Division; is that fair?

7    A.  Potentially, depending on what it is I'm going out to do.

8    Q.  And so you are aware, are you not --

9            MR. VIGEN:  Objection, Your Honor, on the use of the

10   proffer statements, consistent with your prior ruling.

11           THE COURT:  Overruled.

12   BY MS. BROOKS:

13   Q.  You are aware, are you not, that Mr. Golomb's attorney, a

14   Mr. Carlucci, did make a proffer to the Division?

15   A.  I am aware that Mr. Golomb's attorney spoke to members of

16   the Antitrust Division and gave an advocacy presentation on

17   behalf of his client.

18   Q.  And, again, you familiarized yourself with that proffer; is

19   that right?

20   A.  I haven't seen the memo, or whatever form it takes.  No.

21   Q.  You have not read the proffer that Mr. Carlucci made to the

22   Division; correct?

23   A.  Correct.

24   Q.  But you did not interview Mr. Golomb; is that right?

25           THE COURT:  He already said that.

Matthew Hamel - Cross

1      MS. BROOKS:  That's right.  Your Honor, I'm sorry.
2  With that, I can break right now, Your Honor, or go to another
3  subject.
4           THE COURT:  How are you doing over there, folks?
5           JUROR:  How long are we going to have to go?  I'm
6  trying to figure out, if we break now, we'll have two and a
7  half hours --
8           THE COURT:  You've been very calculating over there.
9           MS. BROOKS:  Your Honor, how about I go for another
10 15 minutes, would that work?
11          THE COURT:  Is that okay with everybody else?
12          MS. BROOKS:  Great.  I'll go for another 15.
13 BY MS. BROOKS:
14 Q.  So you -- I don't want to repeat myself about Mr. Golomb.
15 You did interview other employees at Hazel, though; is that
16 fair?
17 A.  Yes, we did.
18 Q.  For example, we've talked a lot about Julio Quinones;
19 correct?
20 A.  Correct.  We talked about Mr. Quinones.
21 Q.  And you yourself interviewed Mr. Quinones; did you not?
22 A.  Yes.
23 Q.  You, along with an Agent Butcher; is that right?
24 A.  I don't recall who was in the interview, but I know I was.
25 Q.  Okay.  And if at any time you want to look at the 302 that

Matthew Hamel - Cross

1   you wrote, just let us know, and we can put it up on the

2   screen.

3         So on March 22, 2021, you and Agent Butcher

4   interviewed Julio Quinones.  Does that sound about right

5   timewise?

6   A.  I'm not clear on the dates on when we sat down with him,

7   but I do know I've spoken with Mr. Quinones.

8   Q.  And you gave him a pretty standard warning, which is that

9   he needed to know that if he lied to you, that in and of itself

10  is a felony; is that correct?

11  A.  I give that in interviews; that's true.  I don't recall

12  specifically Mr. Quinones' interview.

13  Q.  All right.  Well, then, let's go ahead and pull up, just

14  for you --

15  A.  Sure.

16  Q.  -- your March 22, 2021, 302 of Mr. Quinones.

17        And let's blow up under writer's note -- sorry --

18  there we go.

19        Writer's note, does this refresh your recollection,

20  Agent Hamel, that the interview explained to Mr. Quinones and

21  his counsel that lying to a federal agent is a crime?

22  A.  Yes, it does.

23  Q.  In fact, you explained that at the outset of the interview;

24  is that right?

25  A.  That is what it says here.

1110

Matthew Hamel - Cross

1   *Q.*  And as part of your investigation, did you learn that

2   Mr. Quinones before being recruited by Josh Golomb to Hazel

3   Health had worked at DaVita?

4   *A.*  Yes, we did.

5   *Q.*  And at the time that he was recruited by Mr. Golomb to

6   leave DaVita to join Hazel, he had been with DaVita for over

7   ten years.  Does that sound right?

8   *A.*  I don't remember the exact amount of years; but that

9   sounds, generally speaking, correct.

10  *Q.*  Okay.  And if at any time -- we can keep pulling these up

11  if you'd like to look at the 302 to refresh your recollection.

12          Let's pull up the paragraph right underneath the

13  writer's note.  There we go.

14          And so at the time that he was recruited by

15  Mr. Golomb, he had been at DaVita for over ten years.  Does

16  that sound about right?

17  *A.*  Pretty close.  It looks like he joined full-time in July of

18  '07 and I think was recruited by Mr. Golomb in April of '17.

19  So, yes.

20  *Q.*  And, in fact, you said he joined full-time.  He actually

21  worked his way up from being an intern to being vice president

22  of DaVita's international division; is that right?

23  *A.*  Yes, ma'am.

24  *Q.*  Now, by the time Mr. Quinones started thinking about

25  leaving DaVita, he had been traveling extensively

Matthew Hamel - Cross

1    internationally for about six or seven years; is that right?

2    *A.*  I think that's generally accurate.  Yes.

3    *Q.*  At that point in time, in 2017, the international division

4    of DaVita had just hired a new president and was planning on

5    moving the international division headquarters overseas; is

6    that right?

7    *A.*  Yes.  That's correct.

8    *Q.*  And Mr. Quinones' wife did not want to move the family

9    overseas, correct?

10    *A.*  That's --

11    *Q.*  At least according to Mr. Quinones?

12    *A.*  At least according to Mr. Quinones.

13    *Q.*  Okay.  And so that's when Mr. Quinones decided to look for

14    a new opportunity; is that fair?

15    *A.*  Yes, I think that's generally fair.

16    *Q.*  And around that same time, Josh Golomb reached out to

17    Mr. Quinones and asked -- this wasn't a recruiting effort --

18    asked if he, Mr. Quinones, knew anyone in Sacramento who would

19    be a good fit for Mr. Golomb's new company; is that right?

20    *A.*  I don't recall the exact specifics of how that played out.

21    *Q.*  Okay.  Let's find that.

22        Let's go to the second page, two paragraphs -- the one

23    that starts, "At the end of his time with DaVita" and the next

24    paragraph.  There we go.

25        So take your time, sir, and let me know if reading

Matthew Hamel - Cross

1    this refreshes your recollection.  And I'll ask this again.

2    A.  Sure.

3         Okay.  I've read it.

4    Q.  Okay.  So --

5    A.  Is it possible -- maybe, sorry to interrupt --

6    Q.  Sure.

7    A.  Is it possible to zoom out, so I can see the paragraphs --

8    Q.  Whatever you want, sir.  We can look at multiple pages.  I

9    can see if there is a hard copy for you; and if not, we can

10   probably get one at the break.

11   A.  No.  I'm okay.

12   Q.  Okay.  Great.  So around the same time that Mr. Quinones

13   was thinking he had had enough of international travel and now

14   international headquarters was going to move overseas, around

15   this same time is when Josh Golomb reached out to Mr. Quinones

16   and asked if he knew anyone in Sacramento who would be a good

17   fit for Mr. Golomb's new company; is that right?

18        MR. VIGEN:  Objection, Your Honor.  Hearsay.

19        THE COURT:  Overruled.

20        THE WITNESS:  I think, generally speaking, that's

21   accurate.

22   BY MS. BROOKS:

23   Q.  At least according to Mr. Quinones.  Whether it's true or

24   not -- he and Mr. Golomb had some phone calls and an in-person

25   meeting; is that correct?

Matthew Hamel - Cross

1    *A.*  I don't recall.

2    *Q.*  Okay.  Well, let's go to Mr. Quinones -- what you learned

3    about Mr. Quinones informing Mr. Thiry.

4          So let's go to pages 3 and 4.  And let me find the

5    specific -- if we go down to the bottom of page 3 and then also

6    the top of page 4.

7          Did you learn in the course of your investigation that

8    Mr. Quinones informed Mr. Thiry that he was planning to leave

9    DaVita?

10   *A.*  Yes, we did.

11   *Q.*  And that Mr. -- at least according to Mr. Quinones, he felt

12   that notifying Mr. Thiry about his plan to leave was the proper

13   way to handle things; right?

14          *MR. VIGEN:*  Objection, Your Honor.  Hearsay.

15          *THE COURT:*  Overruled.

16   *BY MS. BROOKS:*

17   *Q.*  Is that right, sir?

18   *A.*  Can you repeat the question?

19   *Q.*  Sure.  At least according to Mr. Quinones, he felt that

20   notifying Mr. Thiry about he, Mr. Quinones' plan to leave

21   DaVita was the proper way to handle things; is that right?

22   *A.*  I think, generally speaking, yes; he felt like it was his

23   decision to go and talk to Mr. Thiry and let him know that he

24   wanted to leave.

25   *Q.*  And at least according to Mr. Quinones, all of this felt

Matthew Hamel - Cross

1    like normal protocol because he was leaving to work for someone

2    that used to work for his current employer; is that right?

3           It's the very last line there, where it says, "All of

4    this felt" -- there you go.

5    A.   Yes.  I think that's mostly accurate.

6    Q.   Okay.  I want to make sure I get absolutely accurate.  So

7    according to Mr. Quinones, this felt like normal protocol to

8    him because he was leaving to work for someone that used to

9    work for his current employer; is that right?

10   A.   Yes.

11   Q.   And that is accurate; right?  Josh Golomb used to be at

12   DaVita and now was CEO of Hazel Healthcare; correct?

13   A.   As of the time period Mr. Quinones was thinking about going

14   over, yes.  That's true.

15   Q.   And then in addition to what you learned --

16          Oh, let's go to page 6, and the second to the last

17   paragraph.

18          Now, during your investigation, you also learned that

19   Mr. Quinones never received any direction within DaVita to

20   inform his -- his supervisor prior to leaving the company;

21   correct?

22   A.   Correct.  He did not receive internal-to-DaVita direction

23   to inform his supervisor.

24   Q.   And, in fact, Mr. Quinones made the decision -- at least

25   according to Mr. Quinones, Mr. Quinones made the decision to

1115

Matthew Hamel - Cross

1    inform Mr. Thiry because he thought doing so was a matter of

2    professional courtesy; correct?

3         MR. VIGEN:  Your Honor, objection.  Hearsay and

4    inconsistent with your ruling on motion 141.

5         THE COURT:  Try again.  You're mumbling.

6         MR. VIGEN:  Apologies, Your Honor.

7         Hearsay and also inconsistent with Your Honor's ruling

8    on our motion filed in the docket at 141 concerning the use of

9    302.

10        THE COURT:  Overruled.

11   BY MS. BROOKS:

12   Q.  Do you have my question in mind?

13   A.  I do not.

14   Q.  Okay.  So at least according to Mr. Quinones, he made the

15   decision to inform Mr. Thiry because he thought doing so was a

16   matter of professional courtesy; is that right?

17   A.  Yes, ma'am.

18   Q.  And that it was not going -- according to Mr. Quinones, it

19   was not a requirement implemented by his employer; correct?

20   A.  Not that he knew of.  No.

21   Q.  Once he informed his employer, a bidding war began for

22   Mr. Quinones; is that fair?

23   A.  I don't think that's fair.

24        MS. BROOKS:  Okay.  Well, let's look at some

25   documents, then.

Matthew Hamel - Cross

1    If we could pull up A015. This is an email from Julio

2    Quinones, dated March 28, 2017, to Kent Thiry.

3    Your Honor, we would move A015 into evidence.

4    *MR. VIGEN:* No objection.

5    *THE COURT:* It's admitted.

6    (Exhibit A015 admitted.)

7    *MS. BROOKS:* Let's look -- you know, we can show

8    everybody. Let's look at the first paragraph, then.

9    *BY MS. BROOKS:*

10   *Q.* It says, "Kent, as you are aware, when I think about

11   transitioning, I am looking to find a role that I can be

12   fulfilled by/learn a lot from but also strongly prefer not to

13   move my family or overburden them with my travel."

14   So let me stop there and ask you whether or not this

15   contemporaneous email from Mr. Quinones to Mr. Thiry is

16   consistent with what Mr. Quinones told you when you interviewed

17   him.

18   *A.* I think it's consistent. Yes.

19   *Q.* And then he goes on to say, "My running assumption has been

20   that I will stay with DaVita. However, to be prudent, I also

21   took steps to see what lies outside the village in Northern

22   California."

23   And, again, is that what the email says?

24   *A.* Yes. That's what the email says.

25   *Q.* And is that consistent with what Mr. -- this

Matthew Hamel - Cross

1    contemporaneous email, is that consistent with what

2    Mr. Quinones told you in your interview?

3    A.  Yes, I think it's consistent.

4    Q.  "During this process I recently stumbled across an

5    interesting role with a start-up based in my area" --

6    parentheses -- "Sacramento" -- closed parentheses.

7          So is it your understanding that the start-up he's

8    talking about is Hazel?

9    A.  Probably.  Hazel wasn't actually based in Sacramento, so

10   there is a chance it's something else.  But most likely.

11   Q.  Let's go to the second paragraph.  "There is not a formal

12   offer on the table yet, but I expect one to be.  My wife and I

13   have discussed this scenario and would likely plan to accept.

14   I am not sure of the protocol for these types of things, but it

15   felt right to make you aware and send a message before there

16   was finality."

17          Do you see that?

18   A.  Yes, I see that.

19   Q.  And, again, is that consistent with what Mr. Quinones told

20   you when you interviewed him?

21   A.  I'm not sure that we asked Mr. Quinones why he chose the

22   time period he did choose to talk to Mr. Thiry.  So I don't

23   think it's inconsistent, but I don't know that we asked that

24   question.

25   Q.  And Mr. Quinones went on to say, "I want to be clear, this

Matthew Hamel - Cross

1    is not" -- and that's in all caps -- "meant to create any sort

2    of leverage.  In fact, I would likely take a comp reduction for

3    the role."

4            Do you see that?

5    A.  Yes, I do.

6    Q.  And did you, in fact, tell us earlier how Mr. Quinones did

7    end up taking a comp reduction at his role -- for his role at

8    Hazel?

9    A.  I don't know that I said that earlier.

10   Q.  Oh, okay.  I thought you did.  My -- I apologize.  There is

11   a lot of facts that have been flying around.

12           Let's go to the very last sentence.

13           Mr. Quinones says to Mr. Thiry, "I am very thankful

14   for your support as our internal leadership has transitioned,

15   and I'm ready to discuss on our call tomorrow or at any other

16   time that works for you."

17           Do you see that?

18   A.  Yes, I see that.

19   Q.  Okay.  So that's on April 28, 2017 --

20   A.  No, ma'am.

21   Q.  I did it wrong?

22   A.  March 28.

23   Q.  March -- good.  Because the next one is April 1, so that

24   would have really messed up the timeline.

25           Let me try again.  That's on March 28, 2017?

Matthew Hamel - Cross

1   A.  Yes, ma'am.

2   Q.  Now let's look at A018.  And this is an email dated

3   April 1, 2017, with the subject line, "Julio recap."  And it's

4   from Mike Staffieri to Javier Rodriguez and Allison Farish.  Do

5   you see that?

6   A.  It's actually to Mr. Thiry; but, yes, I see what you're

7   saying.

8   Q.  I'm sorry.  I'm having trouble with the fine print today.

9   Let me slow down.

10          This is from Mike Staffieri; is that right?

11  A.  Yes, ma'am.

12  Q.  To Mr. Thiry; correct?

13  A.  Yes, ma'am.

14  Q.  With a cc to Javier Rodriguez and Allison Farish; is that

15  right?

16  A.  Yes, ma'am.

17  Q.  And all of these people have a DaVita address.  So it looks

18  like it's internal, this communication; is that correct?

19  A.  This one email within the chain that we're looking at,

20  yes, that's accurate.

21          MS. BROOKS:  Your Honor, I would move A018 into

22  evidence.

23          MR. VIGEN:  No objection.

24          THE COURT:  Admitted.

25          (Exhibit A018 admitted.)

Matthew Hamel - Cross

*BY MS. BROOKS:*

1
2    Q.   Let's go down to the bottom -- how the email chain starts

3    with a Ray Follett -- okay.  So we have Ray Follett, Thursday,

4    March 30.  So that is two days after Mr. Quinones emailed to

5    Mr. Thiry.

6            And in this email, Mr. Follett says, "I had a great

7    meeting with Julio yesterday afternoon.  I learned a few

8    things, and I am comfortable around where we are at and feel

9    like if we want him to take ST, DVP role, he would do it."

10           Now, let me stop there.  Is it your understanding that

11   ST, if you know, stands for Sierra Terrific, as a division of

12   DaVita?

13   A.   I do not know that.

14   Q.   How about this, DVP, division vice president; does that

15   sound right?

16   A.   That sounds right.

17   Q.   Okay.  Good.  So some kind -- whatever the name of the

18   division is, we'll say, ST, that it looks like at least

19   internally, it's being considered to offer Mr. Quinones the

20   division vice president role; is that right?

21   A.   I'd say  that's, yeah, generally correct.

22   Q.   And we go down to the last line here.  It says, "Has a

23   verbal offer from Josh Golomb to start operations in

24   Sacramento.  Josh is starting up a company that provides

25   healthcare education in schools.  Doesn't know Josh Golomb, but

Matthew Hamel - Cross

1   Josh found d/b/a leader in Sacramento area and contacted

2   Julio."

3           Do you see that?

4   A.  Yes, I see that.

5   Q.  So is this consistent with what we saw earlier, where there

6   is a reference by Mr. Quinones to thinking about going to a

7   start-up in Sacramento?

8   A.  Yes.  And to be clear, before -- the start-up is based in

9   San Francisco; but Mr. Quinones the whole time knew he was

10  going to be based himself in Sacramento, so --

11  Q.  Great.  Thank you very much for clearing that up.  I

12  appreciate it.

13          Let's go, then, to the response above.  So now

14  Mr. Thiry gets looped in.  Mike Staffieri, March 31, 2017,

15  "Julio recap.  Importance high.  See below for more holistic

16  update on Julio.  Ray is quite bullish on his ability to close

17  him in the DVP role."  Do you see that?

18  A.  Yes, ma'am.

19  Q.  What does Mr. Thiry respond to that?

20  A.  Would you like me to read it?

21  Q.  Yes, please.

22  A.  "Seems to me we should hop on that and not discuss Denver

23  stuff.  Correct, you are enthusiastic."

24  Q.  Okay.  And he's writing that to Mike Staffieri?

25  A.  Probably.  I mean, it doesn't say it here; but from the

Matthew Hamel - Cross

1 │ context of the emails around it, yes.

2 │ *Q.* Because if we go up to the next response, Mr. Staffieri

3 │ says back to Mr. Thiry, "Correct.  He should get DVP offer this

4 │ week, so I will keep everyone posted."

5 │       Do you see that?

6 │ *A.* Yes, ma'am.

7 │ *Q.* And then we'll look at one more document, A802.  And is

8 │ this a letter to Julio Quinones from DaVita, making him an

9 │ offer?  And it's dated April 7, 2017.

10 │ *A.* It looks -- I've never seen this before, but it looks like

11 │ that.  Yes.

12 │       *MS. BROOKS:*  Your Honor, we would move A802 into

13 │ evidence.

14 │       *MR. VIGEN:*  No objection.

15 │       *THE COURT:*  It's admitted.

16 │       (Exhibit A802 admitted.)

17 │ *BY MS. BROOKS:*

18 │ *Q.* So then asking you again, Agent Hamel, now that you've had

19 │ a chance to refresh yourself on some of these contemporaneous

20 │ documents, is it true that once Mr. Quinones informed Mr. Thiry

21 │ that he was thinking about leaving DaVita, a bidding war

22 │ started between DaVita and what they were willing to offer him

23 │ and Hazel and what Hazel was willing to offer him?

24 │ *A.* I don't think my answer changes.  I wouldn't consider it a

25 │ bidding war.

Matthew Hamel - Cross

1   *Q.*  Okay.  Why don't you -- you're right.  I shouldn't

2   characterize it for you.  What would you call what was going on

3   at this point between DaVita and Hazel vis-a-vis both of them

4   trying to compete for Julio Quinones?

5   *A.*  I would -- trying to characterize it in one word would be

6   difficult, but I would say that DaVita was given the

7   opportunity to put options in front of Mr. Quinones.  And

8   Mr. Golomb made certain concessions to DaVita, including not

9   offering him all of the compensation he would have otherwise

10  and other things that I think we've seen in other documents.

11  So, again, not a bidding war; but there was some options put in

12  front of him from DaVita.

13  *Q.*  And isn't it true, sir, that if Mr. Quinones hadn't told

14  Mr. Thiry that he was thinking of leaving DaVita, DaVita would

15  have been deprived of the opportunity of putting those offers

16  on the table for Mr. Quinones?

17  *A.*  I don't think I generally agree, because at some point --

18  if Mr. Quinones has an offer in hand for Hazel Health, for

19  instance, there is going to be a point where he has to say, I'm

20  leaving.  Even if that conversation is, I'm leaving today, that

21  conversation happens, and DaVita has the opportunity at that

22  point to then say, Don't go.  We've got X, Y, and Z that you

23  might be a great fit for and better compensation, whatever the

24  case might be.  So -- I guess that's my answer.

25  *Q.*  Okay.  Thank you.  One more question -- I'm not going to

Matthew Hamel - Cross

 1    say one more question.  One more topic in this area.

 2           Let's go back to your 302, page 4, in case you need to

 3    refresh your recollection.

 4    A.  Yes, ma'am.

 5    Q.  And the second to the last paragraph.  Isn't it true that

 6    you learned as part of your investigation that Mr. Quinones was

 7    not aware of any agreement between executives at DaVita and/or

 8    Hazel not to hire executive-level employees away from the other

 9    company?

10    A.  He was not aware one way or another; that's correct.

11    Q.  And isn't it true that Mr. Quinones ended up going to

12    Hazel?

13    A.  For about a month in 2017, yes, ma'am.

14    Q.  And, in fact, the reason he ended up not staying at Hazel

15    is that the Sacramento opportunity fell through; isn't that

16    right?

17    A.  Generally speaking, yes.  He was -- part of the reason he

18    was coming on board at Hazel was to run a business opportunity

19    that the company had within the Sacramento public school

20    district.  Hazel Health, generally speaking, was a telehealth

21    company within schools.  And from my understanding, that

22    opportunity fell through in some way -- I don't know the

23    details -- and because of that, Mr. Quinones' role at the

24    company became a little bit more up in the air.

25    Q.  And so he left and went to another company?

Matthew Hamel - Cross

1    *A.*  Partly based on that and partly, as I understand it,

2    because he came across another opportunity that was good for

3    him.

4    *Q.*  Okay.

5           *MS. BROOKS:*  Your Honor, is this a good stopping

6    point?

7           *THE COURT:*  Yes.

8           *JUROR:*  Fifteen minutes?

9           *THE COURT:*  Okay.

10          (Recess at 2:51 p.m.)

11          (In open court at 3:11 p.m.)

12          *THE COURT:*  All right.  Ms. Brooks, go ahead.

13          *MS. BROOKS:*  Thank you, Your Honor.

14   *BY MS. BROOKS:*

15   *Q.*  Whenever you're ready, Agent Hamel.

16   *A.*  All set.  Thank you.

17   *Q.*  Okay.  Great.  In addition to interviewing Mr. Quinones

18   about Hazel, you also interviewed a Mr. Woods, Nick Woods, who

19   was the co-founder of Hazel; is that right?

20   *A.*  Yes, ma'am.

21   *Q.*  And you would have interviewed him I believe on March 5,

22   2021.  Does that sound about right?

23   *A.*  About right.  I don't remember the exact day.

24   *Q.*  Okay.  Let's -- to make it easier, let's get your 302 on

25   the screen.

Matthew Hamel - Cross

1  *A.*  Sure.

2  *Q.*  And if we look at the top, it's Nick    Wood's interview.

Do you see that?

4  *A.*  Yes, ma'am.

5        *MS. BROOKS:*  Okay.  And at the bottom -- let's get the

6  date of the interview.  There we go.

7  *BY MS. BROOKS:*

8  *Q.*  March 5, 2021; does that look right?

9  *A.*  That looks right.

10 *Q.*  Your understanding is that Mr. Woods was the co-founder of

11 Hazel Healthcare; does that sound right?

12 *A.*  Yes, ma'am.

13 *Q.*  Okay.  And just to cut to the chase, you learned as part of

14 your investigation by interviewing Mr. Woods that the

15 co-founder of Hazel -- and we're going to go to page 5, the

16 very last paragraph, in case you need to refresh your

17 recollection -- Mr. Woods, the co-founder of Hazel, could not

18 recall any conversations for or against hiring from DaVita with

19 Mr. Golomb since Mr. Quinones had been hired; is that right?

20 *A.*  I don't recall him saying that, but that is what it says

21 here.  Yes.

22 *Q.*  Is that what it says in the 302 that you were an author of?

23 *A.*  Yes, ma'am.

24 *Q.*  Okay.  And -- which is why it's good to have 302s; right?

25 *A.*  Yes, ma'am.

Matthew Hamel - Cross

1    Q.  Then, also, you learned from Mr. Woods that Mr. Golomb

2    never expressed hesitation in hiring DaVita employees, at least

3    as far as Mr. Woods was aware; correct?

4    A.  I don't recall that.

5    Q.  Okay.  Is that what it says in your 302?

6    A.  Yes.  That is what it says here.

7    Q.  Do you have any reason to believe you wrote that down

8    inaccurately?

9    A.  No, I don't.

10   Q.  And after Mr. Woods made that representation to you, is it

11   correct that the interview was terminated and he was --

12   Mr. Woods was told to keep the nature of the interview

13   confidential?

14          And we can show the last line, please.

15   A.  The only reason I'm hesitating is the order that things are

16   laid out in these summary 302s are not always, I asked this; he

17   said this; I asked this; he said this.  So, generally speaking,

18   yes; but -- I don't know the exact order of how that played

19   out.

20   Q.  But if we had a recording, we'd know exactly; is that

21   right?

22   A.  I suppose that's true.  Yes.

23   Q.  Thank you.  Let's go next to your interview of Kristian

24   Lau, also of Hazel.  You interviewed Mr. Lau on March 4, 2021;

25   is that right?

Matthew Hamel - Cross

1   A.   That sounds correct.  Yes.

2   Q.   There we go.  It's on the screen already.  And Mr. Lau --

3   you interviewed Mr. Lau.  And in addition to you and

4   Agent Butcher being there, were prosecutors for the Division,

5   Mr. Vigen and Mr. Mariano, there?

6   A.   Yes, they were.

7   Q.   Did you learn during the course of your investigation and

8   interview of Mr. Lau that he had began working at DaVita in

9   2005?  Does that sound right?

10  A.   Yes, that sounds right.

11  Q.   And then he left DaVita in 2011 and went to the University

12  of California Berkeley to study business; is that right?

13  A.   I don't remember that, but I can refresh my memory.

14  Q.   Let's see here.  On page 1 --

15  A.   Yes, I see that there.

16  Q.   There we go.  Does that refresh your recollection as to the

17  fact that Mr. Lau was at DaVita in 2005, and in 2011 he went to

18  University of California Berkeley to study business?

19  A.   Again, I I don't recall him saying that; but I have no

20  reason to believe this is inaccurate.

21  Q.   Okay.  Then let's go down to the next paragraph.  In

22  approximately April of 2017, did you learn that Mr. Lau was

23  recruited by Josh Golomb to work for Hazel Health?

24  A.   I didn't learn about it in 2017.

25  Q.   I'm sorry.  That was a really poorly worded question.

Matthew Hamel - Cross

1    A.   Okay.

2    Q.   Let me try it again.

3    A.   Okay.

4    Q.   During your interview on March 4, 2021 --

5    A.   Got it.

6    Q.   -- did you learn that Mr. Lau in April of 2017 had been

7    recruited by Josh Golomb to come and work for Hazel Health?

8    A.   Yes, ma'am.

9    Q.   And that Mr. Lau had known Mr. Golomb because they had both

10   worked together at DaVita; right?

11   A.   Yes, ma'am.

12   Q.   Now, when Mr. Lau joined Hazel then in 2017, Hazel was

13   still a very small company; is that right?

14   A.   When Mr. Lau joined?

15   Q.   Yes.  If we look --

16   A.   Yes.  I would say that's accurate based on other interviews

17   I've done in the April 2017 timeline that I'm familiar with, it

18   was pretty small.

19   Q.   And then if we go to page 2, the third paragraph that

20   begins with "Quinones," did you learn as part of your interview

21   with Mr. Lau that Mr. Quinones had left Hazel very shortly

22   after starting there because he had found a job opportunity in

23   the Sacramento area close to where he lived, and it was for a

24   healthcare organization and something Mr. Quinones felt like he

25   just could not pass up?

Matthew Hamel - Cross

1   *A.*   Yes.  I believe I actually referenced that in my testimony

2   just before the break.

3   *Q.*   Okay.  Thank you.  So -- but Mr. Lau confirmed that?

4   *A.*   Yes, I think that's fair to say.  I don't remember him

5   saying this; but, again, no reason to doubt what is written

6   there.

7   *Q.*   And you mentioned on direct examination -- you told us

8   about an Arlene Villa-Howells.  Do you remember that?

9   *A.*   Yes, ma'am.

10  *Q.*   And did you discuss with Mr. Lau about Arlene

11  Villa-Howells?  We'll go to the next paragraph there.

12          Did you discuss with Mr. Lau the hiring of Arlene

13  Villa-Howells from DaVita to Hazel?

14  *A.*   Yes, ma'am.

15  *Q.*   And, in fact, Mr. Lau interviewed Ms. Villa-Howells for her

16  position at Hazel?

17  *A.*   Again, I -- sorry to be a broken record.  I don't remember

18  him saying that; but I don't have any reason to doubt it, as

19  it's written.

20  *Q.*   Okay.  Thank you.  Please, if it doesn't refresh your

21  recollection, please let me know, because then I think it comes

22  in as past recollection recorded.  So -- do you have any

23  recollection to believe that that's not accurate?

24  *A.*   No reason to believe that this is not accurate.  No.

25  *Q.*   And then he talked about interviewing Ms. Villa-Howells

Matthew Hamel - Cross

1  Howells.

2          Now, let's go down to the second of the last

3  paragraph, "Lau had" -- no, one more down.  There we go.

4          Is it true that you learned from Mr. Lau that he had

5  complete autonomy in reaching out to potential candidates for

6  open job positions at Hazel?

7  A.  I don't remember him saying that.

8  Q.  Does that -- did I read exactly -- let me get it right --

9  A.  You did read exactly what is there.  Yes.

10 Q.  Okay.  Thank you.  So did you in your 302 write, "Lau had

11 complete autonomy in reaching out to potential candidates for

12 open job positions at Hazel"?

13         MR. VIGEN:  Your Honor, this goes against your ruling.

14 Reading directly from the 302.

15         THE COURT:  I don't agree.  Overruled.

16 BY MS. BROOKS:

17 Q.  Did you in fact put that in your 302, Agent Hamel?

18 A.  Yes.

19 Q.  And do you have any --

20 A.  Can I clarify one thing?

21 Q.  Yes.  Of course.

22 A.  I did sign it, so I agree with what was in it.  I wasn't

23 the one that drafted the initial 302.  Based on the order of

24 the signatures on the first page, you can see that

25 Mr. Butcher -- Agent Butcher drafted it --

Matthew Hamel - Cross

1   *Q.*   Okay.

2   *A.*   -- and then I signed on with him.

3   *Q.*   Okay.  Do you have any reason to believe that that's not an

4   accurate statement, however?

5   *A.*   No.

6   *Q.*   Okay.  Then, in addition, did you learn in your interview

7   with Mr. Lau that Mr. Golomb did not have to -- did not have to

8   approve which candidates Mr. Lau reached out to?

9   *A.*   I don't remember him saying that.  I do see it here,

10  though.

11  *Q.*   Okay.  Just for the record, is it true that you learned

12  your -- whether you recall or not -- in the 302, does it say

13  that Golomb did not have to approve which candidates Lau

14  reached out to?

15  *A.*   Yes, that's what it says in the 302.

16  *Q.*   Thank you.

17          One more from Hazel.  Jeannie Chen, did you in fact

18  talk to Ms. Chen?

19  *A.*   Yes, ma'am.  We did.

20  *Q.*   And did you interview -- so now I found out -- I learned

21  something today.  So if your name goes first, does that mean,

22  then, you wrote the 302?

23  *A.*   That -- it means that we both wrote it, but that I would

24  have -- in this case, my name is first, so I would have put it

25  into the system first, and Special Agent Butcher would have

Matthew Hamel - Cross

1    signed on with me.

2    Q.  Okay.  Great.  So if it's the two of you, you kind of do a

3    check for each other to make sure it's accurate?

4    A.  I would say that's fair.

5    Q.  So did you interview Jeannie Chen on March 5, 2021?

6    A.  Yes.

7    Q.  And Ms. Chen had been at DaVita since the summer of 2009,

8    until she left to join a company call Interchange.  Does that

9    sound right to you?

10   A.  I don't recall her telling us that, but I do see that

11   written here.

12   Q.  And then she was recruited to join Hazel in 2017; does that

13   sound right?

14   A.  That sounds correct.

15   Q.  Now, did you learn from Ms. Chen that Mr. Quinones had

16   already been hired away from DaVita to come to Hazel by the

17   time Ms. Chen joined Hazel?  Does that sound right?  It's on

18   page 2.

19   A.  Yes, that sounds correct.

20   Q.  Okay.  In fact, Ms. Chen, you learned, knew Mr. Quinones by

21   reputation when he was at DaVita and that he was considered a

22   strong operator and a nice person.  Does that sound right?

23   A.  Generally speaking, that sounds correct about Mr. Quinones.

24   Yes.

25   Q.  Okay.  And that he was -- he -- the fact that Mr. Quinones

Matthew Hamel - Cross

1   was at Hazel was one of the reasons that Ms. Chen was attracted

2   to Hazel?

3   *A.*  I don't recall her saying that; but, again, I see that it's

4   written here, along with that she didn't recall it being a

5   selling point that Mr. Golomb used to bring her aboard.

6   *Q.*  Okay.  In other words, that at least in the 302 --

7   according to your 302, Mr. Quinones' presence at Hazel was a

8   factor in Ms. Chen joining the company?

9   *A.*  That's what is written here.  Yes.

10  *Q.*  Okay.  Did Ms. Chen also tell you, though, that in general,

11  people at DaVita and other of Ms. Chen's employers did not want

12  to lose good employees?  Do you recall her telling you that?

13  *A.*  I don't recall her telling me that.

14       *MS. BROOKS:*  Okay.  Let's go to the bottom of page 3.

15  It should be the very -- there we go.  "In general," all the

16  way at the bottom.  It's going to go over onto page 4.

17  *BY MS. BROOKS:*

18  *Q.*  Do you recall Ms. Chen telling you that, "In general,

19  people at DaVita or other of Chen's employers did not want to

20  lose good employees"?

21  *A.*  I still don't recall her telling me that.  I do see it

22  written here.

23  *Q.*  But that is what it says in your 302; is that right?

24  *A.*  Yes, ma'am.

25  *Q.*  And is that an irrational -- did you during the course of

Matthew Hamel - Cross

1   your interviews and investigation in this case find that

2   employers were happy to lose good employees?

3   *A.*   No.   Employers were not happy to lose good employees.

4   *Q.*   Okay.   Thank you.

5             In addition, Ms. Chen explained to you that -- now,

6   she was head of -- at Hazel, head of clinical ops and people.

7   Do you remember that?

8   *A.*   I don't.

9   *Q.*   You don't?   Okay.   Because I was going to ask you if you

10  know what being the head of people means as far as recruiting

11  is concerned.

12  *A.*   In that particular context, I don't.

13  *Q.*   But in her -- in her role as head of clinical ops and

14  people -- and we'll go to page 4 -- that -- did you learn

15  during the course of your investigation that Ms. Chen did not

16  have any recollection of any company being identified as a

17  place to avoid with regard to recruitment, whether it was a

18  former employer or otherwise?   Do you recall that?

19  *A.*   Yes, I do.

20  *Q.*   And, in fact, she was never under the impression that a

21  current DaVita employee could not be solicited; correct?

22  *A.*   Correct.

23  *Q.*   And, in fact, she could not think of any person that

24  Mr. Golomb wanted to recruit but could not; correct?

25  *A.*   I don't recall that.

Matthew Hamel - Cross

1          MS. BROOKS:  Okay.  Let's go to page 4.  It's going to

2    start with, "Chen recalled that many people reached out" --

3    there we go.

4    BY MS. BROOKS:

5    Q.  And is it true, Agent Hamel, that at least according to

6    Ms. Chen, she could not think of any person that Mr. Golomb

7    wanted to recruit but could not?  Do you see where it says --

8    A.  I see where he says that, yes.  I still don't recall her

9    saying that, but I do see that it's written here.

10   Q.  Do you have any reason to believe that's not accurate?

11   A.  No, ma'am.

12   Q.  And, lastly, Ms. Chen informed you that she -- she herself

13   knew people at DaVita that she would have loved to bring to

14   Hazel, and she was not prevented from reaching out if she

15   wanted to do so.  Is that right?

16   A.  Again, I don't remember her saying that; but I do see it

17   written here.

18   Q.  Okay.  And, again, you were present at the interview;

19   correct?

20   A.  Yes, ma'am.

21   Q.  And you -- at the time of the interview and at the time

22   that you helped prepare this 302, you used all of your training

23   and skills to try to make it as accurate as possible; correct?

24   A.  Yes, ma'am.

25   Q.  You certainly understand that the head of operations and

1    people, the fact that they -- that they weren't aware of any

2    restrictions, that's a critical point in this case; right?

3    A.   I suppose so.

4    Q.   And Ms. Chen informed you she was not prevented from

5    reaching out, including to people at DaVita, if she had wanted

6    to do so.

7    A.   That's --

8            THE COURT:  You've made that point.

9            MS. BROOKS:  Oh, I did?  Sorry, Your Honor.  I

10   couldn't remember how far I got in that paragraph.

11           Let's move on.

12   BY MS. BROOKS:

13   Q.   Let's go to Dennis Kogod briefly, Agent Hamel.  You were

14   here when Mr. Kogod was called as the first witness at the

15   trial; is that right?

16   A.   Yes, ma'am.

17   Q.   Now, you were the one that first reached out to Mr. Kogod

18   back in 2020; correct?

19   A.   I think that's true.

20   Q.   And I really don't know the answer to this.  How did you

21   get in touch with him?  Did you leave a voicemail; did you

22   leave a card; how did that work?

23   A.   I do not recall exactly how I got in touch with him.  I've

24   made a lot of calls and knocked on a lot of doors for this

25   case.  And Mr. Kogod, I'm not sure.

Matthew Hamel - Cross

1    *Q.* All right.  Well, we do have a record of how he ended up

2    getting back to you.

3             So let me show you B529.  And this is not yet in

4    evidence.  But it's an email string between you and Mr. Kogod's

5    lawyer, a Michael Ronickher; do you see that?

6    *A.* Yes, I do.

7             *MS. BROOKS:*  Your Honor, we would move B529 into

8    evidence.

9             *MR. VIGEN:*  Your Honor, I object to -- based on

10   hearsay and relevance, given the timing of the email.

11            *THE COURT:*  All right.  Well, I'm going to have to

12   look at it.

13            *MS. BROOKS:*  Would Your Honor like a hard copy to see

14   the whole document?

15            *THE COURT:*  No.

16            Objection is sustained.

17            *MS. BROOKS:*  Your Honor, may I make an offer of proof?

18   This is an important document for us for foundation purposes.

19            *THE COURT:*  After court you can.

20            *MS. BROOKS:*  Thank you, Your Honor.

21   *BY MS. BROOKS:*

22   *Q.* Let me ask you this, Agent Hamel:  Did you learn in the

23   course of your investigation that Mr. Kogod was eager to

24   cooperate and be as helpful as possible?

25   *A.* You put quotes around "eager" when you said that.  I don't

Matthew Hamel – Cross

1    recall that word being used; but I do know that Mr. Kogod was

2    willing to cooperate and answer questions for us.  Yes.

3           MS. BROOKS:  Okay.  Let me show you what I just had up

4    there -- I'm not going to try to move it into evidence -- B529

5    and see if it refreshes your recollection.

6           Let's blow up the email you got from Mr. Ronickher

7    on September 18, 2020.

8    BY MS. BROOKS:

9    Q.  It's addressed to you and Agent Butcher; is that correct?

10   A.  Yes.

11   Q.  And does this refresh your recollection that Mr. Kogod was

12   eager to cooperate and be as helpful as possible?

13   A.  I can see that his attorney wrote the word "eager."  Again,

14   I don't -- I know that Mr. Kogod, generally speaking, was

15   willing to cooperate with the government.  Yes.

16   Q.  And did you then -- do you recall thanking Mr. Kogod's

17   attorney for getting back to you so quickly?

18   A.  Yes, I did thank the attorney for getting back to me.

19   Q.  Is it common in your investigation for people to be eager

20   to talk to you?

21   A.  I guess it kind of depends on the person.  I'd like to

22   think I'm kind of easy to talk to.  So, you know, in a lot of

23   cases yes.

24   Q.  Okay.  Then eventually what happened is that you put

25   Mr. Kogod's counsel and Mr. Kogod in touch with Ms. Megan Lewis

Matthew Hamel - Cross

1   and Bill Vigen from the Division; correct?

2   A.  Yes, that's correct.

3   Q.  And so eventually what happened is that there were multiple

4   interviews of Mr. Kogod; is that right?

5   A.  Over time, yes, we have interviewed Mr. Kogod more than

6   once.

7   Q.  And I think we already have in evidence -- I don't want to

8   beat a dead horse here -- that Mr. Kogod was eventually given

9   what is called a non-prosecution agreement; is that correct?

10  A.  I believe it wasn't a non-prosecution agreement, but a

11  declination letter for Mr. Kogod.  I could be wrong but --

12  Q.  What is the difference between a declination letter and a

13  non-prosecution agreement?

14  A.  That's a great question.  I don't know.

15  Q.  Okay.

16  A.  I just do -- I know that they're different.

17  Q.  What is the difference between a special agent and an

18  agent?

19  A.  I do know the answer to that.

20  Q.  Good.  What is it?

21  A.  An agent of the government is someone that can do things on

22  behalf of the government.  Right?  You're an agent of the

23  government.  As a special agent, we are empowered to do

24  specific things on behalf of the government.  So in this case,

25  as an FBI special agent, I'm empowered to investigate certain

Matthew Hamel - Cross

1    violations of federal law.  So the "special" is a -- a

2    restricting term, when combined with agent.

3    Q.  Thank you.  I've always wanted to know that, so thank you

4    very much.

5         Now, before Mr. Kogod was brought into this court to

6    testify, you and the Division were given reason to believe that

7    Mr. Kogod did not have the best reputation for truthfulness;

8    correct?

9    A.  I don't believe so.

10   Q.  Well, at the time -- you mentioned earlier today talking to

11   a Ms. William -- Bill Hughson.  Do you remember that?

12   A.  Bill Hughson.  Yes, I do.

13   Q.  And you interviewed Mr. Hughson on September 15, 2020;

14   correct?

15   A.  I don't recall the date.

16        MS. BROOKS:  All right.  Let's pull up the 302, then,

17   for Bill Hughson.

18   BY MS. BROOKS:

19   Q.  And we see his name at the top, William Hughson?

20   A.  Yes, ma'am.

21   Q.  If we go down to the bottom, we see the date of

22   September 15, 2021; do you see that?

23   A.  Yes.  2021, I do.

24   Q.  And also present at that interview was prosecutor for the

25   Division, Sarah Clingan, and also prosecutor for the Division,

Matthew Hamel - Cross

1    Anthony Mariano; is that right?

2    A.   Yes.  Ms. Clingan and Mr. Mariano were there.

3    Q.   And during the course of your investigation, you learned

4    that Mr. Hughson has worked with Mr. Kogod; correct?

5    A.   Yes.

6    Q.   At DaVita?

7    A.   Yes, ma'am.

8    Q.   And, in fact, at one point, Mr. Kogod was Mr. Hughson's

9    boss; correct?

10   A.   I don't recall if Mr. Kogod was directly Mr. Hughson's

11   boss -- actually, I take that back.  Yes, we did.

12   Q.   And you learned during the course of your investigation

13   that -- at least according to Mr. Hughson -- that based on a

14   number of interactions he had had with Dennis Kogod, he did not

15   have a high opinion of him; correct?

16   A.   Generally speaking, yes.  I think that's true.

17   Q.   He believed him to be disrespectful; correct?

18   A.   I don't recall if he used that word; but, yes.

19          MS. BROOKS:  Let's go to page 4 of Mr. Hughson's

20   interview.  And highlight at the bottom here -- there we go.

21   BY MS. BROOKS:

22   Q.   "Hughson thought Kogod was disrespectful."  Is that right?

23   A.   That is written here, but it's not in quotations.  So one

24   thing to note, if I'm writing a summary of my interaction with

25   a witness, it may take them ten sentences to describe

Matthew Hamel - Cross

1  something, and I want to make sure I get all of that down.  He

2  might not have used the word "disrespectful," but that is what

3  he was describing to me.

4  Q.  Okay.  So he might have had kind of a colloquy --

5  A.  Sure.

6  Q.  -- as to how Dennis Kogod behaved, and you sort of

7  short-handed it that he thought Kogod was disrespectful?

8  A.  If he's talking about interactions and things like that.

9  I'm not going to shorten a full set of experiences down to "he

10 was disrespectful."  But if he was describing -- he's trying to

11 describe a person, and it comes to disrespectful, I might write

12 "disrespectful."

13 Q.  And that he was a person of low integrity?

14 A.  Yes, that's what is written.

15 Q.  That, in fact -- if we go to page 5, top of page 5 -- that

16 Mr. Kogod had lied to people at DaVita; correct?

17 A.  Mr. Hughson thought Mr. Kogod had lied.

18 Q.  Yes.  This is all according to Mr. Hughson, obviously, that

19 Mr. Hughson believed that Mr. Kogod had lied to people at

20 DaVita; correct?

21 A.  Yes.  I recall that.

22 Q.  That Mr. Kogod, according to Mr. Hughson, had

23 misrepresented in a number of cases to paint himself in a

24 positive light; correct?

25 A.  Yes.

Matthew Hamel - Cross

1    Q.   And, in fact, he relayed to you that Mr. Kogod had lied to

2    Mr. Thiry about he and Mr. Hughson; correct?

3    A.   Correct.

4    Q.   And unfortunately at the time, Mr. Thiry believed Mr. Kogod

5    over Mr. Hughson; correct?

6    A.   I don't know if that's true or not, but I think that's my

7    general understanding of what happened.

8    Q.   Well, as a result of what Mr. Kogod said to Mr. Thiry,

9    didn't, according to Mr. Hughson, he lose his entire bonus for

10   a year?

11   A.   Something to that effect, yeah.   I think he got it back

12   after a conversation.

13   Q.   That he -- he, Mr. Hughson, went and talked to Mr. Thiry;

14   and he eventually got his bonus back, according to Mr. Hughson?

15   A.   That's my recollection.   Yes.

16   Q.   Now, after you heard Mr. Hughson say all of these things

17   about Mr. Kogod --

18   A.   Uh-huh.

19   Q.   -- did you go back to Mr. Kogod and confront him with that?

20   A.   I can't recall.

21   Q.   Would there probably have been a 302 if you had?

22   A.   I'd say that's true.   Yes.

23   Q.   So if we don't have one showing that, would it be a safe

24   assumption that you did not have that conversation?

25   A.   I would say probably.

Matthew Hamel - Cross

1    *Q.*  Just a couple more points on Mr. Kogod.  You were here

2    present when he testified what seems like a lifetime ago, but I

3    think it was only a little over a week ago; do you recall that?

4    *A.*  Six days ago.  Yes, ma'am.

5    *Q.*  Okay.  And do you remember that I asked Mr. Kogod, "Do you

6    agree or disagree, sir, that you" -- Mr. Kogod -- "have said

7    that you had a difficult time finding employment in the same

8    industry after leaving DaVita and you attribute that difficulty

9    to Mr. Thiry?"

10          And Mr. Kogod answered, "I don't agree with that, no."

11          Do you recall that?

12   *A.*  Do I recall that line of questioning?

13   *Q.*  Yes.  Yes, that Q and A.

14   *A.*  Yes.

15   *Q.*  Okay.  Let's look at what he said to you during his

16   interview on October 23, 2020 --

17          Actually, I'm going to correct myself.  This is just

18   Agent Butcher.  Okay.  So to be fair, the 302 is just written

19   by Agent Butcher; but as the case agent, you would review these

20   302s.  You already said that; right?

21   *A.*  I don't think I did already say that; but, yes, that's

22   true.

23   *Q.*  Okay.  And if we go to the last page, at least according to

24   Agent Butcher, "Kogod described" -- there we go -- "Kogod

25   described his time at DaVita as a good run."

Matthew Hamel - Cross

1     And that is in quotes; right?

2   *A.*  Yes, it is.

3   *Q.*  "Kogod liked the people he worked with."  And then he

4   represented to Agent Butcher, "Kogod had a difficult time

5   finding employment in the same industry after leaving DaVita,

6   which he" -- Mr. Kogod -- "attributed to Mr. Thiry."  Is that

7   right?

8   *A.*  That's what is written here.  Again, you pointed out,

9   wasn't here for this interview; so I don't know.

10  *Q.*  Do you have any reason to believe this is not an accurate

11  representation?

12  *A.*  No.  But I think one thing to note, depending on how you

13  read that last sentence, he might attribute having the

14  difficulty in finding employment to Mr. Thiry.  He also might

15  be attributing to -- his departure from DaVita to Mr. Thiry.

16  So, again, I wasn't there; I don't know what point was trying

17  to be made; but I think that's important context.

18  *Q.*  Okay.  Good.  So it either could be that he was blaming

19  Mr. Thiry for he, Mr. Kogod's, departure from DaVita; correct?

20  *A.*  Attributing, yes.  I don't know if blame --

21  *Q.*  You're right.  Attributing his departure from DaVita to

22  Mr. Thiry.  That's one way to interpret that term; right?

23  *A.*  Yes, ma'am.

24  *Q.*  Another way to attribute it is he was attributing his

25  difficulty in finding employment in the same industry --

Matthew Hamel - Cross

1   attributing it to Mr. Thiry.  That's another way to interpret

2   it?

3   A.  Yes, ma'am.

4   Q.  Or it could be both, he was attributing his leaving DaVita

5   to Mr. Thiry and attributing his difficulty in finding a new

6   job in the same industry to Mr. Thiry?

7   A.  That's possible.

8   Q.  Now, going back to Mr. Hughson for a moment --

9        Well, no, we're sticking with Mr. Kogod, but it has to

10  do with Mr. Hughson.

11       Let's put GX279, which is in evidence, up on the

12  screen, if we could.

13       Now, this is an email from Mr. Hughson to Mr. Thiry.

14  And I want to do the third bullet point, where it says, "As

15  someone who myself believes I suffered retribution because of

16  perceived" -- in quotes -- "disloyalty, I understand the risk

17  that I would be asking people to accept.  I know you" -- he's

18  talking about Mr. Thiry -- "would never do that, but

19  unfortunately I don't believe the same is true of others."

20       Do you see that?

21  A.  Yes, I do.

22  Q.  When you interviewed Mr. Hughson, he was shown this exact

23  email, was he not?

24  A.  I believe so, yes.

25  Q.  And Mr. Hughson explained who he was talking about when he

Matthew Hamel - Cross

1    said that he had fear of retribution from not Mr. Thiry, but

2    others.

3    A.   I'm sorry.  Can you repeat that question?

4    Q.   Sure.  Let's pull up the 302 on Mr. Hughson dated

5    September 15, 2021.  Let's go to page 9.  Let's blow up the

6    middle paragraph.

7         Did you learn from Mr. Hughson that the retribution --

8    at least according to him, Mr. Hughson -- the retribution

9    Mr. Hughson suffered at DaVita related specifically to Kogod,

10   as did the perceived disloyalty and risks referenced in the

11   email?

12   A.   Yes.  That's my general recollection.

13   Q.   And do you have any reason to believe that that was written

14   down incorrectly?

15   A.   No, ma'am.

16   Q.   Did you ever go back to Mr. Kogod and confront him with

17   what Mr. Hughson had said about he, Mr. Kogod, being involved

18   in retribution for perceived disloyalty?

19   A.   I can't recall one way or another whether we brought that

20   up with Mr. Kogod.

21   Q.   Sticking now with Mr. Hughson.  You mentioned Mr. Hughson

22   in another context, which is that -- as CEO of IntegraMed.

23   That he left DaVita and he went to IntegraMed; is that right?

24   A.   After a stop at DeVry.  Yes.

25   Q.   Okay.  And, now, to be clear, Mr. Hughson is not part of

Matthew Hamel - Cross

1    this Indictment.  Mr. Hughson and IntegraMed are not either in

2    Count 1, Count 2, or Count 3; is that right?

3    *A.*  They are not charged in the Indictment, if that's what

4    you're asking.

5    *Q.*  That's a much better way to put it.  Let me try it again.

6    Is it true, Agent Hamel, that Mr. Hughson and IntegraMed are

7    not charged in the Indictment?

8    *A.*  That's true.

9    *Q.*  But Mr. Hughson was, once again, interviewed by you.  And

10   it looks like it was -- this one is just you on there.

11          So let's pull up the September 28, 2021, interview --

12   I'm sorry.  It's September 15, 2021.  So let's pull up the 302.

13          Present at the interview was you, Ms. Clingan, and

14   Mr. Mariano; is that right?

15   *A.*  Yes, ma'am.

16   *Q.*  And you were, if we go down to the bottom, the only agent.

17   So is it safe to assume that you're the one that prepared this

18   302?

19   *A.*  That is safe to say.

20   *Q.*  Now, in talking about the understanding between Mr. Hughson

21   and IntegraMed and Mr. Thiry and DaVita, if we go to page 7 --

22   "in Hughson's mind" -- this paragraph.  There we go.

23          So Mr. Hughson shared with you, at least according to

24   him, what was in his mind as to his understanding with DaVita;

25   is that correct?

Matthew Hamel - Cross

1    *A.*   Yes, he did.

2    *Q.*   And according to Mr. Hughson, in his mind, when he told

3    Mr. Thiry he would not proactively recruit into DaVita, it

4    meant that he would not cold call DaVita employees about open

5    jobs; correct?

6    *A.*   Correct.

7    *Q.*   But that didn't bother Mr. Hughson; right?

8    *A.*   I believe Mr. Hughson talked about his arrangement with

9    Mr. Thiry in a sense that he felt he could work around what he

10   committed to.

11   *Q.*   Exactly.  In fact, he thought using his personal network to

12   get information out into DaVita was a way around the not

13   proactively recruiting; right?

14   *A.*   I think that's fair.

15   *Q.*   He thought he would have a connection within one degree of

16   separation with anyone at a senior enough level to have

17   Mr. Hughson involved in the recruitment; right?

18   *A.*   I don't remember that specific part there.

19   *Q.*   Could you go ahead and look on the screen.  That might

20   refresh your recollection.

21   *A.*   My general recollection of the interview is that he thought

22   he could work around the commitments he made.  I see that it's

23   written there, and I have no reason to doubt it.

24   *Q.*   Okay.  You see that it's written that, "Hughson thought he

25   would have a connection within one degree of separation with

Matthew Hamel - Cross

1    anyone at a senior enough level to have Hughson involved in the

2    recruitment."  Correct?

3    A.  Yes, ma'am.  It's written there.

4    Q.  "And Mr. Hughson would put information out into his network

5    that he was looking for someone, and he would get information

6    back about possible candidates."  Correct?

7    A.  Yes, I see that written there, as well.

8    Q.  And you have no reason to believe you wrote that down

9    wrong; is that right, Agent Hamel?

10   A.  Yeah.  That's fair.

11   Q.  Okay.  And to Mr. Hughson putting it out there in the

12   DaVita network, he did not consider that proactive recruitment;

13   is that right?

14   A.  Correct.

15   Q.  And then he even described for you the direct hires that

16   he, Mr. Hughson, made from DaVita to IntegraMed after reaching

17   this understanding with Mr. Thiry; correct?

18   A.  That sounds familiar.  I can't remember discussing that

19   particularly.

20   Q.  No problem.  We'll go to page 9 at the bottom of it.  Start

21   with, "Hughson made four hires."

22           So Mr. Hughson -- and then we'll have to go to the

23   next page so we can complete that paragraph.

24           "Mr. Hughson described for you" --

25           I'll wait until it's all up on the screen.  There we

Matthew Hamel - Cross

1   go.

2          Mr. Hughson described for you how he made four hires

3   direct from DaVita to IntegraMed -- a Lisa Dawe, a Jason

4   Weddingfeld, a Margaret Benson, and a Liz Rodriguez; correct?

5   A.  Correct.

6   Q.  And then -- and I'm not going to do it, but he then went

7   person by person that I just named and described how he came to

8   recruit them from DaVita to IntegraMed; is that right?

9   A.  Yes.  I think that's correct.

10  Q.  And then if we go to page 11, he described -- second to the

11  last paragraph -- he described that there were roughly ten

12  others from DaVita who he recruited but he didn't end up

13  hiring; right?

14  A.  Yes.

15  Q.  And he named a Pooja Goel; is that right?  And I hope I'm

16  pronouncing that correctly.

17  A.  Yeah.  I am assuming you are.

18  Q.  P-U-J-A [sic] is the first name, and G-O-E-L is the second

19  name.

20  A.  Yeah, I see that written there.

21  Q.  A Lynn Robinson?

22  A.  Yes.

23  Q.  A Kristin Torres-Mowat?

24  A.  Again, I don't remember specifically speaking about any of

25  these; but I do see them written there.  Yes.

Matthew Hamel - Cross

1   Q.   LeAnne Zumwalt?

2   A.   Yes.

3   Q.   Basak Ertan?

4   A.   Yes, ma'am.

5   Q.   And, of course, we learned that Basak Ertan, while she

6   didn't end up at IntegraMed, ended up at Radiology Partners;

7   right?

8   A.   Correct.

9   Q.   Kim Martinez; correct?

10   A.   Yes, ma'am.

11   Q.   A Mark Pierce; correct?

12   A.   Yes.

13   Q.   Well, it looks like he even tried to recruit Josh Golomb;

14   do you see that?

15   A.   I do.

16   Q.   A Mischa Palecek; correct?

17   A.   Yes, ma'am.

18   Q.   And a Cassie McLean; is that right?

19   A.   Yes.

20   Q.   Then you showed -- if we go to page 12, you showed some

21   emails to Mr. Hughson.  And, again, I don't want to reinvent

22   the wheel, because you showed some of them to the jury.  But

23   when you showed him the emails --

24        If you go down to the second to the last, where it

25   says, "There was no doubt."

Matthew Hamel - Cross

 1          Despite those emails that were going back and forth,

 2   Mr. Hughson relayed to you that there was no doubt in his mind

 3   that IntegraMed was actively speaking to DaVita employees at

 4   the time of those emails; correct?

 5   A.   I see -- I don't recall him telling me that, but I do see

 6   it here.  Yeah.

 7   Q.   Do you have any reason to believe it's not accurate?

 8   A.   No.  I think that speaks to Mr. Hughson's stance generally,

 9   that he could work around the commitment that he made.

10   Q.   Okay.  Just a couple more areas to cover, that you talked

11   about on your direct.

12          You talked about a Steven Priest and a company called

13   Spero.  Do you remember that?

14   A.   Yes, ma'am.

15   Q.   Okay.  And let's look at your first interview of

16   Mr. Priest -- you interviewed him twice, does that sound right?

17   Once on July 15, 2021, and once on January 6, 2022?

18   A.   I do remember the January 6 date specifically.  The other

19   one, I don't remember.  But, yes, I talked to him twice.

20   Q.   Well, let's go -- the one -- you remember the one on

21   January 6, 2022.  It's a lot longer, so let's just go with that

22   one, because you kind of covered some of the same stuff you

23   covered the first time.  So we'll put it up on the screen.

24          And is it true, sir, that if we go to page 3, the

25   first full paragraph, you --

Matthew Hamel - Cross

1          Oh, and let me be clear.  Also, so Steve Priest and

2    this company, Spero, they are not charged in this Indictment;

3    is that right?

4    A.   That's correct.

5    Q.   But I think you told us earlier today that there was some

6    kind of a no-poach or something between Spero and DaVita?

7    A.   I don't believe I said anything about the existence of it.

8    We talked about documents, and I talked about Mr. Priest.

9    Q.   Okay.  You talked about documents.  Then let's see what

10   Mr. Priest says about them.

11          You learned during the course of your investigation

12   that Mr. Priest, when he was still at DaVita, interacted with

13   Mr. Thiry on at least a monthly basis; is that right?

14   A.   That sounds right.

15   Q.   In fact, sometimes spoke on the phone once a week and

16   exchanged emails constantly; correct?

17   A.   I mean, that sounds familiar to me.  I don't remember the

18   exact words but --

19   Q.   And Mr. Priest, at least according to Mr. Priest, described

20   for you Mr. Thiry's recruiting philosophy, that he wanted to

21   recruit great employees and build a great team.  Do you

22   remember that?

23   A.   Not specifically, but that sounds familiar.

24   Q.   And Mr. Priest came away or said -- I'm going to get it

25   exactly right.  "Mr. Priest was not aware of any sensitivity

Matthew Hamel - Cross

1   about recruiting from specific companies into DaVita."

2          This is while he was still at DaVita; right?

3   A.  That's correct.

4   Q.  "Since leaving DaVita" -- let's stay on that same page,

5   down at the bottom.  "Since leaving DaVita," at least according

6   to Mr. Priest, "his relationship with Mr. Thiry has been

7   positive, cordial, and friendly."  Correct?

8   A.  That's what is written here.  Yes.

9   Q.  And in that same interview, on page 4, Mr. Priest --

10          Under the Jim Andrews -- there we go.  The paragraph

11  down from there -- oh, wait, no.  I'm sorry.  We'll do both.

12          So Mr. Priest is discussing how a Jim Andrews left

13  DaVita to join Spero.  And Spero is spelled S-P-E-R-O; is that

14  right?

15  A.  The spelling?

16  Q.  Yes.  S-P-E-R-O.

17          So Mr. Priest describes to you how Jim Andrews left

18  DaVita to join Spero as the chief revenue cycle employee; is

19  that right.

20  A.  Yes.

21  Q.  And at least according to Mr. Priest, he could not recall

22  any conversations with Mr. Thiry about the proper way for him

23  to recruit employees from DaVita; correct?

24  A.  True.  I don't -- I want to draw a distinction, though.  I

25  think you're inferring that these two paragraphs are connected,

Matthew Hamel - Cross

1    and I don't know that that's the case.

2    Q.  Okay.  That's fair.

3            Let's go to the emails where it looks like

4    Mr. Priest is concerned about some kind of nonsolicit.  So

5    let's go to page 5.

6            And do you recall showing the jury just today some

7    emails where it looked like Mr. Priest was concerned about

8    some type of a nonsolicit?  Do you remember that?

9    A.  Yes.

10   Q.  And, in fact, in one of them it said that Mr. Priest said

11   he would not recruit anyone at DaVita; do you recall that?

12   A.  Yes, I do.

13   Q.  Now, you discussed that very document with Mr. Priest; did

14   you not?

15   A.  Yes.

16   Q.  Okay.  Let's see what Mr. Priest told you about it.

17           That second paragraph.  Thank you.  Right there.

18           Isn't it true, Agent Hamel, that Mr. Priest -- at

19   least according to Mr. Priest, when he was talking about not

20   recruiting anyone at DaVita, that was based on his intention to

21   follow his own contractual nonsolicit agreement; right?

22   A.  Generally speaking, yes.  He also told us that certain

23   stipulations that they put in place within that conversation he

24   had with Mr. Thiry -- namely, notification of people at

25   DaVita -- he told us that that was above and beyond what his

Matthew Hamel - Cross

1    personal nonsolicit called for.

2    Q.  Okay.  So he had his own concerns about his own personal

3    nonsolicit; correct?

4    A.  Correct, he did.

5    Q.  But then there was this additional issue about heads-up to

6    DaVita from recruiting someone from there; right?

7    A.  Yes, ma'am.

8    Q.  Now, you talked about that with Mr. Priest.  And let's go

9    down to the paragraph that starts with, "Priest and Thiry had a

10   telephone call."  And right about a third or fourth of the way

11   down, "Priest encouraged his own employees to have real

12   conversations with their supervisors about their future at the

13   company."  Did he tell you that?

14   A.  Yes, that he encouraged them.

15   Q.  And you're aware that DaVita has that same policy of

16   encouraging their employees to be open in discussing their

17   future at the company; right?

18   A.  I don't know if it's a policy; but, generally speaking,

19   yes, I understand that that is encouraged.

20   Q.  And that gives DaVita an opportunity to compete in a

21   meaningful way to try to get them to stay if they're thinking

22   of leaving; fair?

23   A.  I think DaVita's able to compete to keep their employees

24   whether that conversation happens early or whether the employee

25   chooses to have that conversation once they have an offer in

Matthew Hamel - Cross

1    hand from some outside competitor and they have a conversation

2    from the boss that says, you know, I have this offer.  I'm on

3    my way out.  I think DaVita's ability to present other

4    opportunities to that employee are there whether or not that

5    conversation happens early or it happens late.

6    Q.  But if DaVita has no idea that an employee wants to leave

7    until the employee is already gone, then the ship has sailed;

8    fair, Agent Hamel?

9    A.  I don't know that that's possible.  The employee has to

10   tell someone that they're leaving at some point.  And at that

11   point, DaVita would have the opportunity to put other options

12   on the table for that employee.

13   Q.  Okay.  Now, let's get back to your investigation.  And I

14   shouldn't have strayed asking your opinion on employment

15   considerations.

16        But let's see what Mr. Priest actually thought about

17   whether there was this requirement of notifying -- that the

18   person at DaVita having to notify their superior.

19        Let's go to paragraph 7 -- the page 7 and the

20   paragraph that begins with, "It was not Priest's" --

21        Isn't it true that -- at least according to

22   Mr. Priest -- it was not his understanding he could only

23   consider people at DaVita if they informed their supervisor of

24   their intention to look at outside opportunities?  That was not

25   his understanding; correct?

Matthew Hamel - Cross

1    A.   That is what is written here, yes.  I believe that's fair.

2    Q.   And, in fact, he could not recall the requirement that a

3    candidate tell their supervisor of their intention and also

4    letting -- I'm not even sure how to read this.  I'll just read

5    it and see if we can make sense of it.

6         "He could not recall the requirement that a candidate

7    tell their supervisor of their intention and also letting

8    Priest know that the conversation happened being a part of

9    Priest's telephone conversation with Thiry."

10        That's quite a mouthful there.  Do you -- let me see

11   if I'm getting -- if I'm understanding it right.  He could not

12   recall a requirement that the candidate tell their supervisor

13   of their intention and then report back to Mr. Priest that they

14   had done that.  He couldn't recall that as being a requirement;

15   correct?

16   A.   He couldn't recall that as being part of his conversations

17   with Mr. Thiry.

18   Q.   In fact, he, Mr. Priest -- at least according to him and

19   your investigation -- never asked any DaVita candidates going

20   forward if they notified their supervisor of their intention to

21   leave DaVita.

22   A.   I don't recall.  But I will note that Mr. Priest was clear

23   with us that he had no intention of hiring any more once he had

24   those conversations with Mr. Thiry.  He talked about it in a

25   way that Spero was growing, and they didn't need any more

Matthew Hamel - Cross

1    DaVita people.  So he kind of said what Mr. Thiry wanted to

2    hear and then moved on.  So to your question --

3    Q.  Really?  Because let's look, then, at what he told you on

4    that same page, page 7, the paragraph that begins, "When

5    Priest" --

6         Didn't, actually, Mr. Priest -- and I can understand,

7    Agent Hamel, if you -- you've interviewed a lot of people.  So

8    let's look at what you wrote at the time --

9    A.  Sure.

10   Q.  -- that Mr. Priest said to you.  Didn't Mr. Priest

11   represent to you that when his nonsolicitation agreement ended,

12   his view was that he could recruit and hire whomever he wanted

13   out of DaVita?

14   A.  Yes, he did say that.

15   Q.  And didn't he in fact represent to you that since that

16   time, Spero hired many DaVita employees, and Priest did not

17   call anyone at DaVita to notify them.  Correct?

18   A.  Yes.  Correct.

19   Q.  All right.  Just a couple more.

20        You were asked by Mr. Walsh whether or not you ever

21   interviewed a Jung Lee.

22   A.  Yes, ma'am.

23   Q.  Do you recall that?

24   A.  Yes.

25   Q.  And the answer was, you hadn't?

Matthew Hamel - Cross

1    *A.*  Personally, no.

2    *Q.*  Okay.  So we don't -- well, are you aware --

3              *MR. VIGEN:*  Your Honor, objection.  Asked and

4    answered.

5              *THE COURT:*  Yes.  You keep asking the same questions

6    over and over.  Let's go to something new.

7              *MS. BROOKS:*  I am, Your Honor.  It was a segue to

8    another, but I'll get right there.

9    *BY MS. BROOKS:*

10   *Q.*  You did, however, interview an Andrew Kay; correct?

11   *A.*  Yes, ma'am.

12   *Q.*  And you were here when Ms. Fanning showed a series of

13   emails with Mr. Kay, where he kind of reached out with

14   interest in coming to -- getting interviewed by SCA, and she

15   ended up kind of shutting that down.  Do you recall that?

16   *A.*  Yes, ma'am.

17   *Q.*  Now, you know what Mr. Kay's version of that is; correct?

18   *A.*  Yeah.  We've talked to Mr. Kay.

19   *Q.*  You interviewed him on February 4, 2021; is that right?

20   *A.*  Again, dates -- it's a while ago, but that sounds about

21   right.

22   *Q.*  Let's pull it up.  There is Andrew Kay.  He was interviewed

23   by Agent Butcher and you, as well as -- it doesn't list who,

24   but some attorneys from the Antitrust Division; is that right?

25   *A.*  Yes, ma'am.

Matthew Hamel - Cross

1   *Q.* And Mr. Kay, at least according to him -- well, let's set
2   the table here.
3          Ms. Fanning had told him, "We are unable to consider
4   you at this time and hopefully you will understand that these
5   partnerships are of the utmost importance to us."  Do you
6   remember that email that Ms. Fanning discussed with us?
7   *A.* I don't remember the exact words, but if you're reading
8   from the email --
9   *Q.* Well, in your 302, you actually showed Mr. Kay that
10  email.  Do you remember that?  Page 4.  And it was -- I'm
11  sorry -- page -- it should be page 3.  My bad.  Okay.  Page 3,
12  "Kay was shown an email."  Do you see that?
13  *A.* I see that.
14  *Q.* And -- nope, it is on page 4.  It's another email.  Let's
15  go to page 4 at the top.  "Kay was shown an email dated
16  4/26/2016 from Fanning."  Do you see that?
17  *A.* I do.
18  *Q.* After Ms. Fanning said, you know, we can't talk -- I want
19  to get her words right -- we are unable to consider you at this
20  time.  According to Mr. Kay, he never inquired further about
21  what the partnership was she was referring to, and he sort of
22  left it at that.  Do you recall?
23  *A.* I'll make one contextual comment.
24  *Q.* Sure.
25  *A.* The way this 302 is written, I don't know specifically

Matthew Hamel - Cross

1   which email we were asking about at the time, based on the

2   paragraph that you've highlighted here.

3   Q.  Okay.  That's fair.  Let's look.  It says, "Kay was shown

4   an email dated April 26, 2016, from Fanning.  Kay did not think

5   much of this email when he received it, as he was not

6   necessarily set on working for SCA."

7        Is that what you learned from Mr. Kay?

8   A.  Generally speaking, that's true.  Mr. Kay wasn't set --

9   like, that wasn't his only place that he was looking.  But he

10  did have interest in SCA, and that's why he reached out.

11  Q.  And the way we know which email it's talking about is

12  because, at least according to this 302, "Kay did not know how

13  to interpret" -- quote -- "DaVita and SCA have a strategic

14  partnership" -- unquote -- "and at present was still not aware

15  that such a relationship existed."  Do you recall that?

16  A.  Do I recall the quote or him saying that?

17  Q.  Him talking about that email.  Just so we can --

18  A.  I do.  Yes, ma'am.

19  Q.  Very good.  Now, in that same year, Mr. Kay did inform

20  DaVita that he was thinking -- or looking at other

21  opportunities; right?

22  A.  I don't recall him saying that to us.  It's possible he

23  did.

24  Q.  Let's look on page 1 and see what happened to Mr. Kay in

25  approximately 2016.  What happened to Mr. Kay after the

Matthew Hamel - Cross

1   reach-out to SCA?

2   A.  After -- chronologically, it's -- he was promoted within

3   DaVita.

4   Q.  And he was promoted to a divisional vice president position

5   in the Dallas area; is that right?

6   A.  Yes, ma'am.

7   Q.  And, in fact, Mr. Kay informed you that at the time there

8   was not -- this is all on page 1, right underneath -- let's --

9   there we go.

10          "That at the time there was not a division vice

11   president position with oversight of Dallas, and there were

12   only four directors in the area, but a district vice president

13   role with oversight of Dallas opened up during that time."

14   A.  Do you mind if I read this?

15   Q.  Absolutely.  Take your time.

16          Actually, because I'm going on too long, let me cut it

17   short and show what happened when Mr. Kay told his supervisor.

18   So let's go --

19          THE COURT:  You already asked if he could read it.

20          MS. BROOKS:  Oh, yes.  I'm sorry, Your Honor.

21          THE WITNESS:  Thank you, Your Honor.

22   BY MS. BROOKS:

23   Q.  Would you like us to show you the whole page, that way --

24   because I'm going to ask you about the whole page, Agent Hamel.

25   Would that work?

Matthew Hamel - Cross

1   *A.*   That's fine.

2   *Q.*   There we go.  Can you read that okay?

3   *A.*   Yes.

4   *Q.*   Okay.  Please take your time.

5   *A.*   Okay.  Thank you.

6   *Q.*   Okay.  So we're just trying to get in a position here --

7   *A.*   Sure.

8   *Q.*   Mr. Kay it looks like interviewed for and was promoted to

9   divisional vice president position in the Dallas area, and this

10  is approximately 2016.

11  *A.*   Yes.

12       *MS. BROOKS:*  Okay.  Now let's go to page 3 and go to

13  the bottom.

14  *BY MS. BROOKS:*

15  *Q.*   Now, is it true that you learned from Mr. Kay that he was

16  transparent with his supervisor, an Asha Marwah, at DaVita

17  about his desire to advance his career with or without DaVita?

18  *A.*   Yes.  Not necessarily his intention to leave, but his

19  intention to advance his career, whether that's with DaVita or

20  elsewhere.

21  *Q.*   And he did -- Mr. Kay did not recall being obliged to tell

22  his supervisor his intent; correct?

23  *A.*   I don't remember him saying that, but I do see it written

24  here.

25  *Q.*   You have no reason to believe that's not accurate?

Matthew Hamel - Cross

1    A.   Correct.

2    Q.   Okay.  And he felt inclined to tell his supervisor, as he

3    did not want to surprise anyone or put his ongoing operations

4    at risk should he depart DaVita; right?

5    A.   I think that's fair.  Yes.

6    Q.   And he thought his conversation with Marwah may have

7    benefited him and may have been the catalyst for the structural

8    reorganization that opened up a DVP position physically located

9    in Dallas, as he was considered a high performer?

10        MR. VIGEN:  Your Honor, objection.  This is getting a

11   little repetitive, unfortunately.

12        THE COURT:  I can't hear you.

13        MR. VIGEN:  Your Honor, cumulative under 403 and

14   repetitive.

15        THE COURT:  It's getting pretty cumulative.

16        MS. BROOKS:  Okay.  Your Honor, I'm almost done.

17        THE COURT:  Sustained.

18        MS. BROOKS:  Thank you.

19        Let's move on to page 5.

20   BY MS. BROOKS:

21   Q.   Now, isn't it true, sir, that Mr. Kay read of the

22   Indictment of SCA?  Do you see that?

23        MR. VIGEN:  Objection, Your Honor.  Relevance.

24        THE COURT:  Sustained.

25        MS. BROOKS:  Okay.  Get let's get to the heart of it.

Matthew Hamel - Redirect

1  Isn't it true, sir -- let's leave that paragraph blown up,

2  please.

3  *BY MS. BROOKS:*

4  *Q.*  Isn't it true that Mr. Kay, according to Mr. Kay, did not

5  consider himself a victim of a non-poach agreement, as events

6  unfolded well for him by staying at DaVita?

7  *A.*  He did not consider himself a victim; that's true.

8  *Q.*  Because events unfolded well for him by staying at DaVita;

9  correct?  That's what he told you?

10  *A.*  Yes.  Yes, ma'am.

11       *MS. BROOKS:*  Thank you.  If I could have one moment,

12  Your Honor.

13       Thank you.  No further questions, Your Honor.

14       *THE COURT:*  Redirect.

15                  **REDIRECT EXAMINATION**

16  *BY MR. VIGEN:*

17  *Q.*  Agent Hamel, did you try to interview Josh Golomb?

18  *A.*  Yes, sir.

19  *Q.*  And why didn't you speak with him?

20  *A.*  Well, initially, it's because he had an attorney.  And at

21  that point, I turn those conversations over to justice

22  department attorneys to talk to his attorneys and flesh out how

23  that might work.

24  *Q.*  And what is your understanding of why Mr. Golomb -- why you

25  didn't end up ultimately speaking with Mr. Golomb?

1   *A.*  Ultimately, my understanding is that Mr. Golomb wanted full

2   immunity for any conduct before he would sit down with us at

3   all; and the justice department was not prepared to give him

4   that.

5   *Q.*  Give him that without what?

6   *A.*  Give him full immunity without first talking to him and

7   hearing what he had to say.

8          *MR. VIGEN:*  Ruth, can we please show Defense Exhibit

9   B474.

10  *BY MR. VIGEN:*

11  *Q.*  Agent Hamel, is this the letter that was shown to you that

12  Ms. Fanning received with respect to her non-prosecution in

13  this case?

14  *A.*  Yes.

15  *Q.*  What's the date of that letter?

16  *A.*  February 25, 2022.

17  *Q.*  Did you talk to Dr. Fanning prior to February 25, 2022?

18  *A.*  Many times.

19  *Q.*  Approximately how many times before she received this

20  letter did you talk to her?

21  *A.*  Ten to fifteen, probably.

22         *MR. VIGEN:*  If we can show Agent Hamel Defense

23  Exhibit B477.

24  *BY MR. VIGEN:*

25  *Q.*  And is this the similar letter to Mr. Kogod?

Matthew Hamel – Redirect

1    *A.*  Yes, sir.

2    *Q.*  What is the date of this email —— this letter?

3    *A.*  March 11, 2022.

4    *Q.*  And did you interview Mr. Kogod prior to the issuance of

5    this letter?

6    *A.*  Yes, we did.

7    *Q.*  Is there a reason you would want to talk to somebody first

8    before giving them immunity?

9    *A.*  Yeah.  It's important for us to understand their story and

10   what they're telling to us so that, one, we know it, and, two,

11   we can compare it to contemporaneous documents that we have

12   from the time in question of the events we're talking about.

13   *Q.*  So speaking of contemporaneous documents as compared to

14   what the witness tells you, was Mr. Kogod's interview

15   consistent or inconsistent with the documents that you

16   reviewed?

17   *A.*  Consistent.

18          *MR. WALSH:*  Objection.

19          *MS. BROOKS:*  Objection.  There was no interview.

20          *THE COURT:*  Kogod.

21          *MS. BROOKS:*  Kogod, I'm sorry.  I thought you said

22   Golomb.  My apologies.  Withdrawn.

23   *BY MR. VIGEN:*

24   *Q.*  Was Mr. Kogod's interview consistent or inconsistent with

25   the documents that you had reviewed as part of the

Matthew Hamel - Redirect

1    investigation?

2    *A.*   Consistent.

3    *Q.*   Did you find Mr. Kogod credible when you interviewed him?

4    *A.*   I did.

5    *Q.*   Why did you find him credible?

6    *A.*   I think we kind of hit it on the head, that the -- the

7    events as he described them to us matched up not only with

8    documents that were contemporaneous to the things going on, but

9    they also matched other witness statements that we have taken

10   over the last three years.  So that's generally the reason.

11   *Q.*   I'd like to talk about your interview of Mr. William

12   Hughson and what he said about Dennis Kogod.  What primarily

13   was Mr. Hughson upset about with Mr. Kogod in terms of

14   Mr. Hughson leaving DaVita?  Can you explain what you learned

15   in your investigation with respect to that?

16   *A.*   I don't remember all of the details.  But, generally

17   speaking, Mr. Hughson was upset that he thought Mr. Kogod

18   blamed him for performance issues in one of the business units;

19   and Mr. Hughson didn't think that was fair or accurate.

20   *Q.*   I'd like to talk about just briefly Mr. Julio Quinones and

21   his interactions with Josh Golomb.  Did Julio Quinones'

22   recruitment by Josh Golomb happen before or after Mr. Thiry and

23   Mr. Golomb talked about Golomb recruiting from DaVita?

24   *A.*   It kind of happened before and after.  Mr. Quinones'

25   initial recruitment or conversations with Hazel Health spurred

 1    the conversations between Mr. Golomb and Mr. Thiry.  And I

 2    would say the decision they came to did impact Mr. Quinones'

 3    eventual hiring.

 4    *Q.*  Okay.  Last, Agent Hamel, there was some concluding

 5    comments about Andy Kay.  Did your investigation reveal whether

 6    Mr. Kay had an offer from SCA to use when he was negotiating

 7    his raise or salary increase from DaVita?

 8    *A.*  No, he did not.

 9              *MR. VIGEN:*  Thank you.

10              *THE COURT:*  Members of the jury, do you have any

11    questions for the witness?  Yes.

12              (Hearing commenced at the bench.)

13              *THE COURT:*  Okay.  32.  Both sides.

14              *THE WITNESS:*  Your Honor, do you mind if I use the

15    restroom.  Thank you, sir.

16              *MS. CLINGAN:*  Should we review -- they review one, and

17    we will review one.

18              *THE COURT:*  If you can handle it.  What number is that

19    one?  32?

20              *MR. VIGEN:*  No objection to 33.

21              *MR. WALSH:*  No objection for us.

22              *THE COURT:*  Okay.  What about 32?

23              *MS. CLINGAN:*  It's a long one.

24              *THE COURT:*  Here is 34 while they're still looking at

25    32.

1          MR. VIGEN:  Your Honor, on 32 --

2          MR. WALSH:  No objection on that one.

3          THE COURT:  What's your objection to No. 6?

4          MR. VIGEN:  Relates to the charging decisions and the

5    timing and how those are brought.

6          MR. WALSH:  We --

7          THE COURT:  The question is, At what stage of the

8    government's investigation is the Indictment brought?  In other

9    words, when was the Indictment brought?  What's wrong with

10   that?

11         MS. CLINGAN:  If that's how you read the question,

12   that's fine.

13         MS. LEWIS:  I think we may want the witness instructed

14   that he's not to answer the question in the process.  Timing

15   would be the only objection.

16         THE COURT:  Okay.

17         MR. WALSH:  And, Your Honor, we may need to have

18   another objection to that one.  We need to take a look at it.

19         THE COURT:  Still on 32?

20         MR. WALSH:  Yeah.  Still on 32.

21         THE COURT:  What about 34?  No objection?

22         MR. WALSH:  All right.  That's the --

23         THE COURT:  I wrote 34 twice, so call this second one

24   34A.  Now -- I'll just change it to 35, that's what I'll do.

25   That's easy to do.

1    All right.  Now, what's your deal on 32?

2         MR. WALSH:  On No. 5, we would object.

3         THE COURT:  What's the objection?

4         MR. WALSH:  Just that it will get into matters that

5    are well beyond what is at issue in the case.  It may involve

6    other companies and -- I mean, candidly --

7         THE COURT:  So what?  You're not representing other

8    companies.

9         MR. WALSH:  True.

10        THE COURT:  So what's your objection?

11        MR. WALSH:  Just that it ends up being irrelevant.

12   That's the concern there, I think, Your Honor.

13        THE COURT:  I don't think so.

14        MR. WALSH:  Okay.

15        THE COURT:  Overruled.

16        Now, you should have 35.  Here is 35.  Here is 36.

17        MS. CLINGAN:  Fine.

18        MR. VIGEN:  No objection to 36.

19        MR. DODDS:  I'm not sure what No. 1 means, but that

20   isn't the basis for an objection.

21        THE COURT:  Here is 36.

22        MR. WALSH:  No objection.

23        THE COURT:  Any objections to 36?  No.  What about 35,

24   you haven't told me about that one yet.

25        MS. LEWIS:  No objection.

1        MR. WALSH:  No objection.

2        MS. LEWIS:  I think we would object to both of these

3   as going to deliberative process and charging decisions of the

4   FBI.

5        THE COURT:  Well, the second question is the same one

6   as No. 6, except more specific.  At what point in the evidence

7   collection process did the Division feel they had enough to

8   move forward?  I guess when they filed the Indictment; right?

9        MS. LEWIS:  If there is a process-based version, I

10  think of No. 1, then I think that would be fine.  But I think,

11  again, we just want to be cautious that the witness is not

12  understanding the question as asking --

13       THE COURT:  No. 1, your objection is sustained.

14  No. 2, I don't know why you're concerned about that.

15       MR. VIGEN:  Sure.

16       MS. LEWIS:  We'll withdraw the objection.

17       THE COURT:  Okay.  Here is 37, 38.

18       MS. CLINGAN:  That's fine.

19       MR. WALSH:  We have one objection.

20       MS. CLINGAN:  I have the same question.

21       MR. WALSH:  No objections to those, Your Honor.

22       THE COURT:  38.

23       MR. WALSH:  To 38.

24       THE COURT:  Both sides.

25       MR. WALSH:  I don't think there is anything on the

1    back.

2         *MS. CLINGAN:*  No objection to that.  We would object

3    to the last question, Your Honor, the very last one.

4         *MR. WALSH:*  Yes.

5         *THE COURT:*  Okay.  Now, what are you objecting to?

6         *MS. LEWIS:*  I think both parties object to the very

7    last question on this one.

8         *THE COURT:*  About Hughson?

9         *MS. LEWIS:*  I think the one about the testimony is

10   fine, but the charging --

11        *MR. WALSH:*  The very last one, Your Honor.

12        *THE COURT:*  You don't mind, Why won't Bill Hughson

13   testify?

14        *MS. LEWIS:*  We don't mind.

15        *THE COURT:*  Do you know?

16        *MR. WALSH:*  If he knows.

17        *THE COURT:*  I don't understand why Hughson -- okay.

18   Objection to that sustained.  Objection by the government,

19   sustained.

20        *MR. WALSH:*  We would actually join that one.

21        *THE COURT:*  Ah, one thing we agreed on.  I should --

22   4:24.  I'm going to mark the time.  I'll say joint objection.

23   Sustained.

24        *MR. WALSH:*  If you'd like, Your Honor, we'll file

25   briefs explaining why we both agree.

 1           *THE COURT:*  It would be all right with me if you

 2    stopped filing these midnight things, especially during the

 3    weekend.

 4           Okay.  I think I've got them all.

 5           Oh.  One more witness, yes?

 6           *MR. VIGEN:*  He is the victim.  We've held him since

 7    Friday.

 8           *THE COURT:*  Who is it?

 9           *MR. VIGEN:*  Elliot Holder.

10           *THE COURT:*  You could have put him on -- okay.  What a

11    way to end the case.

12           (Hearing continued in open court.)

13           *THE COURT:*  We have a lot of questions for you.

14           *THE WITNESS:*  Thick stack of paper, Your Honor.

15           *THE COURT:*  You know, we had the weekend, and I think

16    they got more energy over there.  They're really going at it

17    today.

18           No, you've been great every day.  I'm just teasing.

19           Okay.  Here we go.  Question:  In one of the texts

20    from Golomb on April 8, he says, quote, We all accept, close

21    quote, referring to working with Mr. Thiry, DaVita.  Who do you

22    interpret "we" to refer to?

23           *THE WITNESS:*  If it's the text I'm thinking of, he

24    says something along the lines of, "we all accept stuff that we

25    wouldn't otherwise because he goes full buckets," or whatever

1    he says.  The "we," I think he's referring to other DaVita

2    executives who have left the company and now are competing with

3    DaVita for talent.

4              THE COURT:  Question:  Why did Mr. Hayek of SCA have

5    two agreements with the government?

6              THE WITNESS:  I'm not sure.  I wasn't a part of

7    negotiating those agreements, so I'm not sure.

8              THE COURT:  Okay.  Question:  Did the government

9    interview Javier Rodriguez?  And if not, why not?

10             THE WITNESS:  We did not, because Mr. Rodriguez did

11   not want to sit down with us.

12             THE COURT:  Question:  At what stage in your

13   investigation of a person and their role in the case do you

14   interview them?

15             THE WITNESS:  It can vary.  I mean, as you're working

16   through a case and -- at the beginning, you might have an

17   allegation, so you'll want to talk to the person making the

18   allegation.  And then as you collect documents and you do other

19   witness interviews, you're going to learn new things, and that

20   might require you to go back to someone and ask follow-on

21   questions.  You might way late in the case develop new

22   information that suggests you need to talk to someone you have

23   never reached out to before, and it's a month before trial, or

24   whatever the case might be.  Short version, it varies.

25             THE COURT:  Okay.  This next question, I'm going to

1    explain a bit.  The question reads, At what stage in the

2    government's investigation is the Indictment brought against

3    Mr. Thiry and DaVita?

4         What I don't want you to do, because it's private to

5    the internal operation of the Division over here, is talk about

6    how the Division does its investigation, as such.  But I

7    interpret the question as meaning, at what point -- when in an

8    investigation do you decide to pursue an Indictment?

9         THE WITNESS:  Again, I know this isn't a great answer,

10   but it varies.  As we're going through and we're talking to

11   witnesses and we're collecting documents and text messages and

12   all of that, we're putting together this puzzle of different

13   evidence from different places.  And if the government

14   generally feels that we can prove beyond a reasonable doubt in

15   court that something violated a federal law, that's when we'll

16   bring it to the grand jury.

17        THE COURT:  Okay.  Next, For the individuals that were

18   not interviewed, was this because the FBI didn't request the

19   interviews or because the person didn't respond or agree?

20        THE WITNESS:  That varied.  There were definitely

21   people that I reached out to, some multiple times, trying to

22   ask and talk through whether they'd be willing to sit down with

23   us.  Guy Seay comes to mind.  I reached out to him, left him a

24   voicemail, and he never called me back.  There were other

25   people that we didn't reach out to, so we didn't interview

1  them.  Depends on the person.

2        THE COURT:  And the next follow-up question is, If it

3  was an FBI decision, why were these interviews not desired or

4  requested?

5        THE WITNESS:  Again, I think that's contextual to the

6  particular person that we're thinking about.  So I -- it's hard

7  for me to say one blanket answer to that.

8        THE COURT:  Question:  Prior to COVID, was it common

9  to record interviews conducted by the FBI?

10        THE WITNESS:  COVID has impacted a lot of things.  I

11  don't think it's impacted our general recording policies.  I

12  think I said earlier that our kind of standard operating

13  procedure is not to record.  We record them through our notes

14  and in our summary memos, but COVID hasn't impacted that

15  element.

16        THE COURT:  Question:  Did COVID and doing virtual

17  interviews change policies or practices around recording

18  interviews?

19        THE WITNESS:  Policies and practices around recording,

20  no.  The virtual interviews definitely changed things, but not

21  from that perspective.

22        THE COURT:  Okay.  And related question, How often

23  does the FBI record interviews?

24        THE WITNESS:  Hard for me to say kind of blanket how

25  often.  I've done it in maybe 5 percent, 10 percent.  That's a

1  ballpark.

2      THE COURT:  Well, if you do it once in a while, how do

3  you decide to record or not record?

4      THE WITNESS:  It's context of the investigation, I

5  would say, and how we think the interview might go.  So, for

6  instance, if I -- I don't want to speak about this case -- but

7  just generally, if I think a witness -- based on what we know

8  from other people and the document and everything else, if I

9  think a witness might lie to me, I might consider recording

10 that interview.

11     THE COURT:  And another related question, If it isn't

12 a standard practice to record, why?  Why isn't it a standard

13 practice?

14     In other words, the juror is curious.  Recording seems

15 kind of obvious.

16     THE WITNESS:  Sure.

17     THE COURT:  So he or she is asking, you know, what's

18 the story here?

19     THE WITNESS:  Blanket standard practice, I don't know

20 why that's the case.  It has been since ten years ago when I

21 came in, and it's the rules I operate under.

22     THE COURT:  That's the way we've always done it;

23 that's the answer?

24     THE WITNESS:  It's not a good answer, but it's the

25 answer.

1          *THE COURT:*  Okay.  All right.  Next -- I guess you've

2    answered this already, but I want you and everybody to

3    understand that a lot of the jurors are seeing the same points

4    as important to them.

5          Why were many of the individuals involved in the many

6    emails and texts that we've seen throughout the trial not

7    interviewed by the FBI?

8          *THE WITNESS:*  I think I did speak to it a little bit.

9          *THE COURT:*  You spoke to Mr. Seay, and you said he

10   didn't return your call.

11         *THE WITNESS:*  That's correct, Your Honor.

12         *THE COURT:*  They've heard a lot about a bunch of

13   people that apparently weren't interviewed, and they're

14   wondering why.

15         *THE WITNESS:*  Yeah, I -- I'm happy to answer about any

16   one of them in particular, but I think it's context dependent.

17   Another example, Radiology Partners.  Right?  There is a lot of

18   people on these emails.  We talked about Alex Won today.  We

19   spoke to Rich Whitney and Anthony Gabriel and Basak Ertan and

20   Keegan Scanlon.  And so we talked to a lot of people at the

21   company and felt we had with their statements and the documents

22   that we had an accurate picture of what was going on there.

23   So -- I mean, I think that's kind of a broad idea of how we

24   make our decision.

25         *THE COURT:*  Question:  Why are they not testifying as

1    witnesses?  Some of these people, if you didn't interview them,

2    how come they weren't called in as witnesses?

3         THE WITNESS:  I personally don't make the decisions on

4    who is and is not a witness, so I don't know.

5         THE COURT:  Although, I will tell the folks, there is

6    a standard instruction that is often given in cases that no

7    party is required to bring in every possible person who might

8    know something.  You can tell how long you'd be here if we

9    heard from everybody.  But your question, nevertheless, is a

10   fair question.

11        Next question, What triggered the FBI's and the

12   Division's investigation of DaVita and Kent Thiry?

13        THE WITNESS:  Specific to DaVita and Mr. Thiry, it

14   came as a result of information I developed during an

15   interview.  It was not at the same time that the whole case was

16   opened -- the case was opened before that -- but we learned in

17   the summer -- yeah, summer of 2019 specific to Mr. Thiry and

18   DaVita.

19        THE COURT:  So what you're saying is, you were

20   interviewing somebody about something --

21        THE WITNESS:  Correct.

22        THE COURT:  -- and that gave you cause to start

23   looking at DaVita?

24        THE WITNESS:  Yes, sir.

25        THE COURT:  Well, I'm not going to ask again, why

1    aren't interviews recorded?  You can get only so much blood out

2    of a turnip; right?

3         All right.  Again, this one is a little bit like a

4    previous one.  At what point in the evidence collection process

5    did the Division and the FBI feel that they had enough to move

6    forward with charging and indicting Mr. Thiry and DaVita?

7         *THE WITNESS:*  We did charge and indict him in the

8    summer of -- let me get this right -- summer of 2021, I

9    believe.  My dates could be off.  But, obviously, that's --

10   without getting into too much detail about internal

11   deliberation, that's a process that takes a number of months to

12   get to that point.  So sometime in the months leading up to

13   that indictment date.

14        *THE COURT:*  I think you've answered this one.  What

15   was the genesis of your investigation?

16        *THE WITNESS:*  I've answered it specifically to DaVita

17   and Mr. Thiry.  The overall case under which I was working was

18   opened in the fall of 2018, and that was related to a company

19   you've heard about, USPI and that -- agreements that USPI had,

20   one of those is Surgical Care Affiliates, that you've heard

21   about.

22        *THE COURT:*  Question:  What does it mean that the FBI

23   tried to interview witnesses but wasn't able to?

24        *THE WITNESS:*  It can mean a variety of different

25   things.  Mr. Seay's example, I reached out to him, never got a

1185

 1    call back.  And Mr. Golomb's example, there was communication

 2    between attorneys; and they couldn't settle on whatever terms

 3    they wanted to interview under.  Others might answer my phone

 4    call and just say no.  That's a possible thing, too.  Because

 5    every interview I do is voluntary.  Yeah.

 6         THE COURT:  So if you call and say you're an FBI

 7    agent, I want to talk to you, they say, no, thank you, you take

 8    that as, that's it?

 9         THE WITNESS:  Yes, sir.  It's not always so polite;

10    but, yes.

11         THE COURT:  They call you various things?

12         THE WITNESS:  They call me various things.  I've had

13    doors slammed in my face, yes.

14         THE COURT:  Yeah, well, judges get called various

15    things, too.

16         THE WITNESS:  I'm sure they do.

17         THE COURT:  Okay.  What is a chief wisdom officer?

18         THE WITNESS:  A chief wisdom officer -- I've never

19    worked at DaVita, but my understanding is that it was a person

20    with overall responsibility for culture and training and

21    development of employees at DaVita, generally speaking.

22         THE COURT:  Who was the chief wisdom officer?

23         THE WITNESS:  I know of two of them.  One of them was

24    Steve Priest that we talked about.  He left to start Spero

25    Health.  Another one I know of, who I don't think is there

 1   anymore either, is Doug Vlchek, but --

 2        THE COURT:  This will sound similar.  What are some

 3   reasons why witnesses who were interviewed would not testify?

 4        THE WITNESS:  Why they would not testify?  Those

 5   decisions on who does and doesn't testify are generally not my

 6   call, so that's internal deliberation to the justice

 7   department.  I think, generally speaking, we try to put on

 8   witnesses that are clear and concise and can tell you, the

 9   jury, here is what we know happened and without keeping you

10   here for four weeks instead of two.

11        THE COURT:  Why did the Division not interview Jung

12   Lee, Craig McKessar, or Guy Seay?

13        THE WITNESS:  Guy Seay, we've talked about.  Tried to,

14   and didn't get a call back.  As far as Jung Lee and Craig

15   McKessar, I do not recall why we did not interview them.

16        THE COURT:  Question:  Why wasn't Josh Golomb

17   interviewed?

18        THE WITNESS:  Josh Golomb was not interviewed because

19   he through his attorneys told us that he would only sit down

20   with us if he had a full immunity agreement.  We, as the

21   investigative team, were not willing to give him a full

22   immunity agreement until we heard what he had to say, which can

23   be done through what is called a no-direct-use letter.  It

24   basically says, the government can't use anything directly

25   against you that you say to us in this one particular

 1     interview.  So it gives him an opportunity to tell his story

 2     and not give the government evidence that they can directly use

 3     against him as a witness or a potential subject.

 4            THE COURT:  But that didn't happen?

 5            THE WITNESS:  That did not happen.  Mr. Golomb was not

 6     willing to interview under those terms.

 7            THE COURT:  What is the word that the defense is

 8     using, quote, proffer, close quote, question mark?

 9     Quaffer (ph), question mark?

10            I am so delighted to hear them ask, because these

11     people throw around lingo like there is no tomorrow.  What's a

12     proffer?

13            THE WITNESS:  A proffer is P-R-O-F-F-E-R.  And a

14     proffer is basically attorneys offering information in some

15     way.  So I called it alternatively advocacy presentation.

16     Mr. Golomb's attorneys were providing information on behalf of

17     their client to the government.  That's a proffer.

18            THE COURT:  A proffer as to what the attorney thinks

19     the witness might say?

20            THE WITNESS:  Might say.  That's correct, sir.

21            THE COURT:  Question:  Why won't Bill Hughson testify?

22            THE WITNESS:  I don't know that he wouldn't have.

23     I -- but we -- I say "we" -- the attorneys made the decision

24     not to call him.

25            THE COURT:  Okay.  That's all the questions that I'm

1    able to ask you at this point.

2            Ladies and gentlemen, do you have any more?

3            Yes.

4            (Hearing commenced at the bench.)

5            MS. LEWIS:  No objection.

6            MR. WALSH:  Objection, Your Honor.

7            THE COURT:  Basis.

8            MS. BROOKS:  Mr. Thiry has a constitutional right --

9            MS. LEWIS:  We would probably join in the objection if

10   there is a personal inference.

11           THE COURT:  I think I agree.  But let me just explore

12   it a bit more.  Of course, he has a right not to testify; he

13   has a right not to be interviewed; but why wouldn't you give

14   him the opportunity to be interviewed if he wanted to?

15           MR. WALSH:  The difficulty, Your Honor, is that

16   because he wasn't interviewed, the implication would be that he

17   had chosen to remain silent, so that would be an improper

18   inference.

19           MS. CLINGAN:  I'm afraid we're walking ourselves into

20   an appellate issue with that one.

21           THE COURT:  Joint objection?

22           MS. LEWIS:  Yes.

23           MR. WALSH:  Another one.

24           MS. LEWIS:  Mark the time.

25           MR. WALSH:  We're on a roll, Your Honor.

1       *THE COURT:*  No. 40.  Smile.

2             *MS. BROOKS:*  I can't read it.

3             *MS. LEWIS:*  I think it says, Has USPI been indicted?

4    If not, why not?

5             *MS. CLINGAN:*  We're fine with that.

6             *MS. LEWIS:*  I think we would object to that.

7             *THE COURT:*  She says you're fine with it, and you say

8    you object.

9             *MS. LEWIS:*  She's joking.  We object.

10            *MR. WALSH:*  We don't.

11            *THE COURT:*  What's the reason for your objection?

12            *MS. LEWIS:*  The objection is relevance, and it calls

13   into question the Division's prosecutorial decision-making.

14            *THE COURT:*  Maybe it -- maybe that decision-making

15   should be called into question.

16            *MS. LEWIS:*  Respectfully, Your Honor --

17            *THE COURT:*  That's what he would say.

18            *MS. LEWIS:*  Not for the province of the jury.

19            *THE COURT:*  I'll tell them that because of you, we

20   can't ask these questions.  Fair enough?

21            *MS. LEWIS:*  Thank you, Your Honor.

22            *THE COURT:*  Your objection is sustained.

23            *MS. LEWIS:*  Thank you, Your Honor.

24            *MR. WALSH:*  Thank you, Your Honor.

25            (Hearing continued in open court.)

1    THE COURT:  All right.  Remember when I said that

2 there are questions that I can't ask, even if they're good

3 questions?  And those were two of those.  Sorry.

4         Any other questions?

5         (No response.)

6         Follow-up to the jury's questions, Mr. Vigen?

7    MR. VIGEN:  No, Your Honor.

8    THE COURT:  And Mr. Walsh or Ms. Brooks.

9    MR. WALSH:  Nothing from DaVita, Your Honor.

10    MS. BROOKS:  Nothing, Your Honor.  Thank you.

11    THE COURT:  All right.  Thank you.

12    THE WITNESS:  Thank you, sir.

13    THE COURT:  Thank you, ladies and gentlemen.  That

14 will conclude our day today.  And 9 o'clock.  I've got a

15 hearing at 8:30, but it won't take half an hour, assuming that

16 everybody shows up on time.  So we should be good to go at

17 9 o'clock.

18         We're getting there.  They have one more witness.

19         (Jury out at 4:47 p.m.)

20    THE COURT:  All right.  The jury has been excused for

21 the evening.  Before we get to things that I would like to talk

22 about, is there anything that you would like to put on the

23 record this evening?

24         Start with the government.

25    MS. LEWIS:  Nothing for the government, Your Honor.

1      MR. WALSH: Nothing for DaVita.

2      MR. MELSHEIMER: Your Honor, at some point I'd like to

3   talk about the logistics for tomorrow with the opening and the

4   defense case and how that's going to go.

5      THE COURT: Go ahead.

6      MR. MELSHEIMER: Okay. So they've got Mr. Holder;

7   there will be examination of him. We're going to have a motion

8   at the close of the government's case. I don't know how the

9   Court prefers to handle that, whether there will be argument on

10  that, that's -- you're going to tell us that. Then I would

11  give the opening statement for Mr. Thiry, which I think you'll

12  be pleased to learn will be brief; and then we will put on our

13  witnesses.

14      Based on the testimony today, we're probably going to

15  adjust that to some extent. We had to disclose the witnesses

16  at noon; but I think in light of some of the testimony, we may

17  revise that. We'll huddle up and let them know as soon as

18  possible. It's a fluid situation. And then, obviously, at

19  some point, Your Honor, we'd like a little bit more guidance

20  about Dr. Cremieux. And I would just point out --

21      THE COURT: You're going to get that.

22      MR. MELSHEIMER: I would mention again, we heard all

23  of the testimony about the compensation, which is part of my

24  issue with what we'd like him to talk about.

25      THE COURT: All right. Okay. I have three things --

1   that's one them -- but I'll start with *Curtis* advisement.

2          Since most of you don't practice locally, you may not

3   know what that means.  Furthermore, it's a reference to a state

4   court case.  But I think around these parts, many judges and

5   lawyers understand what a *Curtis* advisement is.

6          For those who don't know, it is an occasion for the

7   judge to discuss with the defendant whether or not the

8   defendant wishes to take the stand and testify.  I give no

9   advice on that.  That's not my role, but my role is to explain

10  what the options are and what the potential risks are.

11         Does anybody have an objection if I give a *Curtis*

12  advisement to Mr. Thiry?

13         *MS. LEWIS:*  No objection, Your Honor.

14         *MR. MELSHEIMER:*  No objection.

15         *MR. WALSH:*  No objection, Your Honor.

16         *THE COURT:*  So, Mr. Thiry, as you know, and it's been

17  discussed in this case more than once, you may -- you don't

18  have to stand up, but you may if you want.  You don't have to.

19  Just be comfortable.  All right.  Talking to a federal judge

20  doesn't make anybody comfortable.  I understand that.  Even my

21  wife would second that.

22         You have a right to testify if you wish.  And if you

23  do, you take the oath like every other witness, sworn to tell

24  the truth.  And you'll be asked questions by your lawyers,

25  DaVita's lawyers, the government lawyers, and potentially the

 1    jurors.

 2         You have a right not to testify.  That's an absolute

 3    right you have, and it can't be held against you in any way.

 4    It's a decision that's personal to you and that you have to

 5    make.

 6         Now, you should listen to the advice of your

 7    lawyers -- that's why you have lawyers -- and the points that

 8    they make.  Whether they think you should testify or shouldn't

 9    testify, should be taken very seriously; but in the end, it's

10    your decision, not theirs.

11         If you testify, then, of course, in response to

12    questions that are asked by whomever, you have the floor, so to

13    speak, to tell your story.  And maybe you would consider that a

14    positive.  I don't know.  If you testify, however, you can

15    assume that the government at least will try to use their right

16    of cross-examination to help their case in some way.  Now,

17    whether they can effectively do that, that's a different issue.

18    Not for me to say.  But they can try to bring out through your

19    testimony things that they haven't brought out or haven't been

20    able to bring out, possibly, through other witnesses.  That's

21    one thing they can too.

22         They can try to convince the jury through their

23    cross-examination that you are not someone who should be

24    believed, to attack your credibility.  That's another thing

25    they could do.  When they can do those things successfully,

1     whether -- if that's a risk, it's a risk worth taking, that's

2     for you to decide.

3              If your lawyers say to you, Mr. Thiry, we don't think

4     you should testify.  We don't think it's in your best

5     interests.  But after considering their advice carefully, you

6     think, well, I want to testify.  It's my case; it's my right;

7     then that's the decision you make.  Or if they were to say, we

8     think you should testify.  But after considering their advice

9     you decide, no, I want to exercise my right to remain silent,

10    that's your choice too.

11             Do you understand what I'm saying?

12             *DEFENDANT THIRY:*  Yes, Your Honor.

13             *THE COURT:*  Do you have any questions about what I've

14    just said?

15             *DEFENDANT THIRY:*  No, Your Honor.

16             *THE COURT:*  Does anybody think that the advisement so

17    far has been inaccurate or incomplete?

18             *MS. LEWIS:*  No, Your Honor.

19             *MR. WALSH:*  No, Your Honor.

20             *THE COURT:*  All right.  Have you made a decision yet

21    whether you wish to testify or not?  And before you answer, you

22    don't have to have made that decision yet.  You don't have to

23    make that decision until whatever other witnesses the defense

24    calls have been called and it's either you testify or the

25    defense case rests.  I'm just asking now, have you made the

1    decision yet?

2          DEFENDANT THIRY:  No, Your Honor.

3          THE COURT:  All right.  That's fine.  You think about

4    it.  Probably at some point tomorrow you're going to have to

5    make that decision, but not tonight.

6          And, of course, I'm aware that in the draft

7    instructions that were submitted by the parties -- which I have

8    very substantially revised -- they didn't know either; and so

9    they put in an instruction that said both ways, that emphasize

10   your right not to testify or that said that you did testify and

11   you should be considered like every other witness.  And we'll

12   adjust according to what your decision is.  Okay?

13         DEFENDANT THIRY:  Thank you, Your Honor.

14         THE COURT:  All right.

15         Now, that's what I wanted to say with respect to a

16   Curtis advisement.

17         Second, I have submitted some jury instructions to

18   you.  I sent that out by email to all of you right before the

19   end of the lunch hour, I think.  So I want you to take a look

20   at those, because we're going to have to go through them one by

21   one and make a record, not only on those, but on any other

22   instructions that you want to tender.

23         My mind is open at this point to considering other

24   instructions as well as modification of instructions.  I will

25   say only that I have read everything you've submitted so far

1    about jury instructions; I have issued an order about jury

2    instructions; and the set of instructions I sent out today was

3    not as I said once before, willy-nilly.  It's something that

4    I've thought about and spent time on, even over the weekend;

5    but the door is not yet closed on that.

6          The instructions are extremely important.  I'll tell

7    you that for two reasons -- and I've said this to you before --

8    one reason is, in my experience -- and I've been involved in

9    hundreds of cases as a judge now, and I talk to these people

10   afterwards almost every time -- they take the instructions very

11   seriously.  If anybody thinks that a jury is going to decide a

12   case based on sympathy, bias, or prejudice regardless of the

13   instructions, my experience is, it has never happened that I'm

14   aware of in my career.

15         The other reason that they're so important is because

16   that is where you get caught by the Court of Appeals.  It's

17   pretty rare for the Court of Appeals to overrule a judge on

18   evidentiary rulings or to say that the evidence didn't support

19   the verdict.  They do that sometimes; but that's, in my

20   experience, unusual.  If they find something in an instruction,

21   however, that is materially wrong, that is a way for the Court

22   of Appeals to explain a reversal and remand.  You don't want

23   that, I don't think.  This case is hard enough to put together

24   and try once, let alone more than once.  You're aware because

25   you keep citing me to it over and over, the antitrust case in

1    front of Judge Brimmer.  And you're aware they tried it for

2    seven or eight weeks, got a hung jury.  They tried it a second

3    time for several more weeks and got another hung jury.  I don't

4    think that's what you want, and I don't think what you want is

5    to get your verdict whatever it is reversed on appeal.

6          So be very careful not to advocate for an instruction

7    that you don't sincerely believe is correct.  You don't want to

8    win the battle -- the battle is convincing a judge who knows

9    less about the antitrust law than you do, to give an

10   instruction that's wrong, and you say, ah, we got that one,

11   good for us -- and lose the war.  Because the people upstairs

12   don't have to make lickety-split decisions like we do down

13   here.  They can ruminate on it for months and figure out

14   whether an instruction is wrong.  So don't underestimate the

15   importance of the instructions.

16         Third thing, because Mr. Melsheimer correctly and

17   understandably wants to know what I'm going to say about Mr. --

18   I should say -- Dr. Cremieux.  The Court has read -- I have

19   read his report.  I read first your summary of what he was

20   going to say, and then I intimidated you into coming up with a

21   report, which he did; and I've read that too.  I have read what

22   you've written about it, your objections to it, your responses,

23   and I've listened to his testimony this morning and your

24   arguments afterwards.

25         The only substantive part of the report that there is

1    no objection to anymore is part 4.  Parts 1, 2, and 3 are

2    background stuff.  Part 4, there was an objection from the

3    government, but it was withdrawn.  But the government is

4    objecting to parts 5, 6, 7, and 8.

5            With respect to 5 -- that is where he uses the

6    so-called differences-in-differences approach to compare

7    turnover rate at DaVita to a national benchmark for turnover

8    rates of executives.  And he says that during the periods in

9    question, DaVita's turnover rate increased relative to the

10   benchmark.  And his conclusion that he draws is that that

11   increase is inconsistent with the suppression of turnover that

12   would be expected if there were a labor market allocation

13   agreement.

14           I didn't find Mr. Vigen's cross-examination of the

15   witness to be effective.  Mr. Vigen was trying to convince this

16   expert witness that he had misapplied the

17   differences-in-differences approach.  However, when Mr. Vigen

18   challenged him with quotations from authoritative literature

19   that was cited in his report, every time he explained why

20   Mr. Vigen was misinterpreting what his opinion was and what the

21   alleged inconsistency with literature was.

22           Time after time, the expert was saying to Mr. Vigen,

23   You don't understand.  What I'm trying to say is something

24   really simple.  I think Mr. Vigen is an extraordinarily

25   intelligent person, he's done a lot of preparation for this,

1199

```
 1    but he wasn't convincing in his argument.
 2           Now, what do I think of Dr. Cremieux's Section 5?  I
 3    don't understand frankly how a comparison of DaVita's general
 4    turnover rate during a period of time to a benchmark --
 5    although probably correctly applying a
 6    differences-in-differences approach -- is all that germane to
 7    our case, because our case -- and the defendants are always
 8    trying to look for a way to get around my rulings -- but our
 9    case concerns alleged market allocation in three relatively
10    small markets.
11           And how, for example, this alleged nonsolicitation,
12    tell-your-boss rule as between DaVita and SCA is consistent or
13    inconsistent with these company-wide and national benchmark
14    statistics doesn't make a great deal of sense to me.  To me,
15    that is where the apples and oranges might be, not where
16    Mr. Vigen was suggesting that they were.  But that is something
17    that can be and, as Mr. Vigen somewhat showed, will be the
18    subject of cross-examination.  A good cross-examination of
19    Dr. Cremieux on Section 5 I think could raise a question in a
20    juror's mind as to how much weight they should be giving to
21    that particular opinion.  But that is not a reason under
22    Rule 702 or *Daubert* to exclude the opinion entirely.
23           I find that it -- the opinion is sufficiently reliable
24    and based on expert credentials and a proven method that has
25    been adopted by Circuit Courts and District Courts to pass
```

1200

1    muster in terms of being heard.  And then we'll see as

2    advocates how well the government can go about the

3    cross-examination task.

4             So the Court denies the objection as to Section 5.

5             Same with respect to Section 6.  That's another

6    differences-to-differences approach, this time having to do

7    with salaries, comparing DaVita's salaries to the benchmark.

8    Interestingly enough, according to Dr. Cremieux, DaVita's

9    salaries consistently were in the range of 50 percent higher

10   than the average executives on a national basis; and yet we

11   heard about one former DaVita executive this afternoon who was

12   telling the government that DaVita's compensation to executives

13   in his opinion was below average.  Well, the jurors can listen

14   to that and decide what they think.

15            The point here is that Dr. Cremieux says that

16   DaVita -- DaVita's executive salaries in relation to the

17   benchmark were slightly higher -- and I mean slightly higher --

18   during the conspiracy period than they were otherwise; and that

19   is not something that he would expect to find if there was a

20   labor market allocation agreement in effect.

21            Again, I question personally whether that really

22   applies very well in a situation where you have such small

23   market allocation agreements alleged as we have in this case;

24   but that in my view is a subject for cross-examination.  His

25   methodology is reliable, to the extent that the conclusion is

 1    relevant.  And you can do what you want with your

 2    cross-examination and your argument to convince the jury that

 3    it isn't relevant.  But it passes muster under 702, in my view;

 4    and he can express those opinions.

 5           Mr. Melsheimer's fervent entreaty to me --

 6    notwithstanding I don't agree -- that he can express the

 7    opinions in this trial that are announced in Section 7 of his

 8    report for two reasons.  One, and most important, in Section 7

 9    of his report, it is my interpretation that he is talking about

10    allocating the market for senior executives of DaVita and SCA

11    in the context of national markets and that he doesn't believe

12    that the numbers of companies and organizations that can both

13    hire from DaVita and SCA or Hazel or RP, or vice versa, is a

14    market that can be allocated, that the labor allocation

15    agreement doesn't make sense in that context.

16           The problem is, that is not the context of the case,

17    based on the ruling I've made.  And it is confusing,

18    misleading, and just plain wrong, in my view, for him to be

19    giving those opinions.

20           And, secondly, to the extent that what the defendants

21    want the jury to understand is that there are all kinds of

22    companies in the healthcare field and even in other industries

23    that have senior executives who are attractive and can be

24    recruited or can be the source of employment opportunities.

25    The defendants have made that point -- I think it's more or

1    less an irrelevant point in this case, but they've made that

2    point.  And it is not something that a lay jury needs an expert

3    to put some sort of expertise or special imprimatur on.

4        With respect to Section 8, I have three reasons as to

5    why I don't think that that opinion qualifies under Rule 702.

6    First of all, you have Dr. Cremieux attempting to explain what

7    the intent of Thiry was, what the intent of DaVita was in

8    entering into these agreements and understandings.  I don't

9    think an expert witness has any ability to tell the jury what

10   these people intended.  As I said earlier today, the one person

11   in the room who knows what they intended is Mr. Thiry on the

12   DaVita side and possibly Mr. Hayek, Mr. Whitney, and the absent

13   Mr. Golomb on the other side.  It's up to the defense and to

14   Mr. Thiry, in particular, as to whether he wants to testify

15   about that or not.  He doesn't have to, but I don't think the

16   expert can fill in that gap as to what his intent was.

17       Secondly, when we're talking about all of these

18   strategic partnerships that have been the focus of a lot of

19   attention, possible deals between DaVita and SCA that might be

20   of benefit to them, and maybe their executives don't want to

21   ruffle the feathers of each other, because it might chill or

22   quash these potential strategic partnership deals, the jury has

23   already gotten that information.  They don't need an expert to

24   tell them about that.

25       And, third, I don't think it's correct in any event

 1   that a unilateral self-interested business initiative to

 2   retrain -- to refrain from soliciting is the issue in the case.

 3           Think back to the government's example of the bank

 4   robber.  There might be a perfectly benign reason that someone

 5   wants to rob a bank -- to get money to feed his family -- but

 6   the fact that there is an independent reason that is legal and

 7   explainable for the bank robbery doesn't make it legal.  And

 8   you could say the same thing in this case.

 9           It might be in the self-interest of any company to

10   raise prices, but that doesn't mean they can get together with

11   the other company and fix the prices.  So I don't think the

12   logic of his Section 8 holds water, so to speak.

13           So those are my rulings on the *Daubert* and Rule 702

14   issues as to what Cremieux can and cannot talk about.

15           Of course, if the government were to open the door,

16   I'd have to reconsider; but those are my rulings.

17           Now, we've talked about *Curtis*, we've talked about

18   jury instructions, we've talked about Cremieux, is there

19   anything else?

20           *MR. WALSH:*  Not for the defense at this time, Your

21   Honor.

22           *MS. LEWIS:*  Not from the government either.  Thank

23   you, Your Honor.

24           *THE COURT:*  When you look at the jury instructions

25   that matter -- I know you've -- you've disputed about some that

1    don't really matter much.  I don't know why you're disputing

2    about the form of the interstate commerce instruction, for

3    example.  I don't even know why that is a dispute.  It's

4    obvious that these people were conducting business in

5    interstate commerce.  You disputed about how to word the prior

6    inconsistent statement instruction.  I mean, what can I say?

7            But when you get to the important instructions on the

8    market -- well, there is an instruction on what the elements

9    are, one, two, and three.  I've rephrased how those elements

10   are to be described, in what words.  And then when you get to

11   the instruction that I sent you before on the market, which

12   really relates to the first and the second element -- the

13   first, did DaVita enter into a market allocation agreement?

14   The second, was it their intent to enter into a market

15   allocation agreement -- I've taken and split that instruction,

16   as you will see, because part of it really relates to the

17   second element and part of it really relates to the first

18   element.

19           I noted the government's -- the defendants' objection

20   to my draft instruction.  And you will see that I went along

21   with them on their first redline because I didn't think it

22   really mattered, but it matters to them.  I don't think it

23   matters to the government, and it doesn't matter to me.  But I

24   didn't go along with the -- not yet, at least -- on the second.

25   So you'll see that.

1               Good night.  Have a very nice evening.

2              (Recess at 5:15 p.m.)

3                      **I N D E X**

4    **Item**                                     **Page**

5

6      PIERRE CREMIEUX
     Cross-examination By Mr. Vigen     923
  JEFFREY LOMBARDO
7         Direct Examination By Mr. Mariano    961
     Cross-examination By Mr. Walsh    971
8         Redirect Examination By Mr. Mariano  1002
     Recross-examination By Mr. Walsh    1003
9      MATTHEW HAMEL
     Direct Examination By Mr. Vigen     1012
10        Cross-examination By Mr. Walsh     1075
     Cross-examination By Ms. Brooks    1103
11        Redirect Examination By Mr. Vigen   1170

12                  GOVERNMENT'S EXHIBITS

13   Exhibit     Offered  Received  Refused  Reserved  Withdrawn

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---------|---------|----------|---------|----------|-----------|
| 20 and 21 | | 1060 | | | |
| 85 | | 1069 | | | |
| 103 | | 1063 | | | |
| 113 | | 1017 | | | |
| 114-121 | | 1019 | | | |
| 123-128 | | 1019 | | | |
| 129 | | 1024 | | | |
| 130-132 | | 1042 | | | |
| 133 | | 1036 | | | |
| 134 | | 1037 | | | |
| 136 | | 1038 | | | |
| 146 | | 1026 | | | |
| 219 | | 1071 | | | |
| 223 | | 1072 | | | |
| 227 | | 1073 | | | |
| 228 | | 966 | | | |
| 238 | | 1069 | | | |
| 247 and 248 | | 1070 | | | |
| 251 | | 1061 | | | |
| 256 | | 1044 | | | |
| 258 | | 1046 | | | |
| 286 | | 1025 | | | |
| 293-296 | | 1021 | | | |

1       (Exhibits Continued)

2    Exhibit      Offered    Received   Refused   Reserved   Withdrawn

3    297                     1023
     298-310                 1029
4    311                     1035
     324                     1019
5    325                     1021
     326                     1023
6    327                     1029
     328                     1035
7    329                     1037
     330                     1042
8    338                     1014
     341                     1091
9    452                     1054
     528                     1064
10   536                     1085
     621                     1055
11   624                     1057
     626                     1059

12

13                      DEFENDANTS' EXHIBITS

14   Exhibit      Offered    Received   Refused   Reserved   Withdrawn

15   A015                    1118
     A018                    1121
16   A459                    1084
     A802                    1124
17   B495                     995
     B496                     995
18   B497                     987
     B498                     988
19   B539                    1004
     B539                    1004

20

21                      REPORTER'S CERTIFICATE

22          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
23
            Dated at Denver, Colorado, this 8th day of May, 2022.
24

25
                              _____
                              Therese Lindblom,CSR,RMR,CRR