1
        IN THE UNITED STATES DISTRICT COURT
2
          FOR THE DISTRICT OF COLORADO

3
Civil Action No. 21-cr-00229-RBJ

4
UNITED STATES OF AMERICA,

5
     Plaintiff,

6
vs.

7
1. DAVITA INC., and
2. KENT THIRY,

8
     Defendants.
9
_____

10
                    **REPORTER'S TRANSCRIPT**
              TRIAL TO JURY – DAY SEVEN
11
_____
12

13
        Proceedings before the HONORABLE R. BROOKE JACKSON,

14
Senior Judge, United States District Court for the District of

15
Colorado, continuing at 8:58 a.m., on the 12th day of April,

16
2022, in Courtroom A902, United States Courthouse, Denver,

17
Colorado.

18

19

20

21

22

23

24
            THERESE LINDBLOM, Official Reporter
            901 19th Street, Denver, Colorado 80294
25
        Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

1

**A P P E A R A N C E S**

2          MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE

3   CLINGAN, ANTHONY WILLIAM MARIANO, and TERENCE ANDREW PARKER,
    Attorneys at Law, U.S. Department of Justice, Antitrust
    Division, Washington Criminal II Section, 450 5th Street N.W.,

4   Washington, DC, 20530, appearing for the Government.

5          JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius
    LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103,

6   appearing for Defendant DaVita.

7          JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP,
    1225 17th Street, Suite 2600, Denver, Colorado, 80220,

8   appearing for Defendant DaVita.

9          THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn
    LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201,

10  appearing for Defendant Thiry.

11         JUANITA ROSE BROOKS, Attorney at Law, Fish &
    Richardson, 12860 El Camino Real, Suite 400, San Diego,

12  California, 92130, appearing for Defendant Thiry.

13         JEFFREY E. STONE, Attorney at Law, McDermott Will &
    Emery LLP, 444 West Lake Street, Suite 4000, Chicago, Illinois,

14  60606, appearing for Defendant Thiry.

15                          *   *   *   *   *

16                      **P R O C E E D I N G S**

17         (In open court at 8:58 a.m.)

18         *THE COURT:*  Good morning.

19         (Jury in at 9:04 a.m.)

20         *THE COURT:*  Good morning, ladies and gentlemen.  How

21  are my buddies this morning?  Doing well.  Excellent.

22         Let's go.

23         *MR. MARIANO:*  Good morning.  Anthony Mariano for the

24  United States.

25         Before we call our first witness today, we wanted to

Elliot Holder - Direct

1   offer Government Exhibit 587, which are a set of stipulations

2   into evidence.

3           *THE COURT:*  587?

4           *MR. MARIANO:*  Yes, Your Honor.

5           *THE COURT:*  This is another one where you're tricking

6   me because my list goes from 586 to 588.

7           *MR. MARIANO:*  This one also might be on page 30.  But

8   that was the case yesterday.

9           *THE COURT:*  Ah, there we are.

10          Is there an objection to 587?

11          *MR. MELSHEIMER:*  There is not, Your Honor.

12          *THE COURT:*  Okay.  Admitted.

13          (Exhibit 587 admitted.)

14          *MR. MARIANO:*  The United States calls Elliot Holder.

15          *THE COURT:*  Good morning.

16                  (**ELLIOT HOLDER, GOVERNMENT'S WITNESS, SWORN**)

17                              **DIRECT EXAMINATION**

18  *BY MR. MARIANO:*

19  *Q.*  Good morning.

20  *A.*  Good morning.

21  *Q.*  Could you please state and spell your name for the record.

22  *A.*  Yeah.  Elliot Holder.  E-L-L-I-O-T, H-O-L-D-E-R.

23  *Q.*  Where do you live, Mr. Holder?

24  *A.*  I live in Salt Lake City, Utah.

25  *Q.*  Where are you from originally?

Elliot Holder - Direct

1    A.   Originally from Australia.

2    Q.   Can you describe your educational background.

3    A.   Yeah.  I did about a year and a half at LDS Business

4    College in Utah and then transferred to Brigham Young

5    University, where I got my degree in business, finance.

6    Q.   Where do you work today?

7    A.   I work at a company called Smile Brands.

8    Q.   And what's your position at Smile Brands?

9    A.   Yeah.  I'm a director of payer strategy and growth.

10   Q.   And where did you work prior to working at Smile Brands?

11   A.   I worked at DaVita.

12   Q.   When were you first hired at DaVita?

13   A.   I believe it was June of 2013.

14   Q.   Where did you work before DaVita?

15   A.   I had a short stint at a private equity group based out of

16   Utah called The Acclaim Group, and that was about six months

17   right out of undergrad.

18   Q.   So you were starting at DaVita just a few months out of

19   college; right?

20   A.   Correct.

21   Q.   What position were you hired for at DaVita?

22   A.   Yeah.  It was called the Redwoods Leadership Development

23   Program, so I was a Redwoods analyst.

24   Q.   What's the Redwoods program?

25   A.   Yeah.  It was a program set up at DaVita to attract top

Elliot Holder - Direct

1   talent out of undergrad colleges -- or college, targeting

2   trying to give exposure to candidates right out of college for

3   leadership training, development, kind of like a fast-track

4   throughout their careers to kind of give them exposure and

5   opportunity.

6   Q.  And by the time you left DaVita, what was your position at

7   that time?

8   A.  Yeah.  I was a senior manager on the same team that I

9   joined with.

10  Q.  So you were employed at DaVita from roughly 2013 through

11  2021; right?

12  A.  Correct.  Yeah.

13  Q.  During those eight or so years, did you have

14  responsibilities with respect to hiring and recruitment?

15  A.  Yeah, absolutely.

16  Q.  What were those responsibilities?

17  A.  Yeah.  At any point during that time, my team had between

18  five and thirteen analysts and other folks on our team.  I was

19  responsible for making sure that we were fully staffed and that

20  we had, you know, the adequate number of people to support the

21  functions of our team.

22  Q.  And did you develop an understanding of how companies like

23  DaVita recruit employees like yourself?

24  A.  Yeah.  Absolutely.

25  Q.  What kinds of methods would DaVita use?

Elliot Holder - Direct

1    *A.*   Yeah.   There are quite a few.   Some of the main ones were

2    social media, like LinkedIn.   We would post and advertise on

3    LinkedIn.   Personal networks were a big one, too.   Sometimes we

4    would use outside recruiting firms, if there were positions

5    that were especially tough to fill.   So, yeah, a mix of

6    different means.

7    *Q.*   When you talk about external recruiting firms and using

8    your network, that's proactive solicitation; right?

9    *A.*   Correct.

10   *Q.*   During your experience at DaVita, have you seen candidates

11   leave DaVita and go to work at other companies?

12   *A.*   Yeah.   Absolutely.

13   *Q.*   How did your management generally react to those

14   departures?

15   *A.*   They were definitely bummed about it.   You know, it's never

16   a good thing if somebody left our team.   They -- it really

17   depended on kind of how they left, too, you know, depending on

18   if it was -- we would say solicited or unsolicited, depending

19   on -- we would prefer if the candidate was -- somebody reached

20   out over LinkedIn or something like that was usually better

21   than somebody kind of going out and looking.   But either way.

22   *Q.*   So you said solicited, unsolicited.   That's been a term

23   that has been used in front of the jury a lot.   Can you

24   clarify, if an employee was to leave DaVita, what was the

25   preference for how that employee would leave?

1   *A.*   Yeah.  We preferred -- we preferred, you know, it being

2   somebody that reached out to them first over LinkedIn or other

3   places.

4   *Q.*   Rather than them going out and looking for a job

5   affirmatively?

6   *A.*   Yeah, that's right.

7   *Q.*   So let me direct your attention to 2016.  You were still

8   employed by DaVita at that time; right?

9   *A.*   Correct.

10  *Q.*   And what was your job title then?

11  *A.*   I believe at the time I was a senior analyst.

12  *Q.*   A senior analyst.  Can you give the jury a sense of where

13  in the chain of command that might fall?

14  *A.*   Yeah.  So I joined out of college as a Redwood analyst on

15  that leadership development program.  So my jobs on that path

16  were Redwood analyst, and then I got promoted to analyst, and

17  then it goes senior analyst, manager, and then from there

18  sometimes senior manager, and then director.  So senior

19  analyst, I was kind of the middle on the rung, at least in my

20  team in terms of responsibilities.

21  *Q.*   I think you stopped at the top level of director.  Are

22  there folks above director?

23  *A.*   Yes, definitely.  Senior director, vice president, and then

24  there is, I guess, you could do senior vice president and so

25  forth.

Elliot Holder - Direct

1    *Q.*  All the way up to the C suite; right?

2    *A.*  Correct.

3    *Q.*  So your position, is that sort of a lower-level position,

4    mid-level, senior-level position?

5    *A.*  I thought of it as mid-level, in the sense that, you know,

6    I would coach and kind of train and develop those below me.  So

7    we had two kind of levels, Redwood analysts that would come in

8    out of college and then, you know, actual analysts.  And so I

9    was a senior analyst on the team, so I was kind of right below

10   manager.  So a lot of times I would be acting as manager on the

11   team.

12   *Q.*  And do you recall approximately what your salary was at

13   this time, again, 2016?

14   *A.*  Yeah.  I want to say it was probably close to -- about

15   $70,000 a year.

16   *Q.*  Around this time, did you consider any jobs outside of

17   DaVita?

18   *A.*  Yes.

19   *Q.*  What position were you considering?

20   *A.*  I want to say it was either a senior analyst or manager

21   position.

22   *Q.*  With what company?

23   *A.*  Oh, sorry.  With Radiology Partners.

24   *Q.*  Would this have been a step up from your current DaVita

25   position?

Elliot Holder - Direct

1    A.   I believe so.  Yeah.

2    Q.   So can you briefly summarize for the jury your experience

3    being considered for a job at RAD Partners?

4    A.   Yeah.  I connected with a recruiter over LinkedIn -- a

5    recruiter from Radiology Partners.  We went to kind of the

6    typical initial phone call.  It was just like a brief little

7    call to kind of get to know me.  And I believe she connected me

8    with somebody that was on the leadership team at Radiology

9    Partners for, like, an initial phone screen.  And then after

10   that, it was -- I think I had three or four interviews at the

11   company itself.  Yeah.

12   Q.   And did you ever receive a formal offer from RAD Partners?

13   A.   I -- not really.  No.

14   Q.   Do you know why not?

15   A.   Yeah.  At the time they asked me to make sure that my

16   leadership or my bosses were comfortable before they would

17   extend me an official offer.

18   Q.   And how did you feel about that?

19   A.   I remember just -- it was really weird.  I felt pretty

20   anxious at the time, I remember.  I was younger, obviously, in

21   my career; and so I was really nervous about telling my bosses

22   anything.  Yeah -- yeah.

23   Q.   So you said you were nervous.  What in particular was

24   making you nervous so that you were unwilling to tell your

25   boss?

Elliot Holder - Direct

1    *A.* Just jeopardizing, you know, my place at DaVita, I guess.

2    Kind of giving up two opportunities.  In case the position with

3    Radiology Partners didn't work out, I didn't want my bosses at

4    DaVita knowing, obviously, that I was looking around.  And so,

5    you know, when they required me and kind of asked me to let my

6    bosses know -- yeah, it was -- I'm not going to lie.  Back

7    then, especially being younger, I was super anxious.  And I

8    remember talking to my brother about it.  Yeah, just a little

9    intimidated.  Yeah.

10   *Q.* And how did this process with RAD Partners ultimately end?

11   *A.* I eventually pulled out -- I withdrew, I should say.

12   Sorry.

13   *Q.* So I want to walk you step by step through the process that

14   you went through.  Do you recall how RAD Partners first came to

15   your attention?

16   *A.* Yeah.  It was over LinkedIn.

17   *Q.* And were you interested in pursuing a job opportunity with

18   RAD Partners?

19   *A.* Yeah, absolutely.

20   *Q.* Why?

21   *A.* A lot of reasons.  It was -- it was kind of a -- it seemed

22   like a newer company, so there was a lot of potential for

23   growth within the company.  It was also based in LA, so it was

24   a close -- it was a close fit, meaning, you know, I wouldn't

25   have to drive too much further from where I was going to DaVita

Elliot Holder - Direct

1    at the time.  So geographically, it worked out well.  Again, a

2    lot of potential, it being kind of earlier stages.  Obviously,

3    pay.  There was a potential for a pay bump or a pay increase,

4    which, you know, living in LA at the time, it was pretty

5    expensive, so that was a big thing too.

6    *Q.*  So after -- well, let me clarify.  You said you connected

7    with RAD Partners on LinkedIn?

8    *A.*  Correct.

9    *Q.*  Do you recall who had reached out to whom?

10   *A.*  I honestly do not recall.

11   *Q.*  So after you connected with them, what happened next?

12   *A.*  Yeah.  Had the initial conversation with the Radiology

13   Partners recruiter, just -- I think it was like a brief call.

14   And then she passed me on to somebody from RAD Partners

15   leadership just for another phone screen.  And then from there,

16   I think it worked really well, so they invited me to -- on site

17   to the company, where I met with three or four people.

18          *MR. MARIANO:*  So let's start with Government

19   Exhibit 218.

20          And we'll move for admission pursuant to stipulation.

21          *THE COURT:*  Okay.  Admitted.

22          (Exhibit 218 admitted.)

23   *BY MR. MARIANO:*

24   *Q.*  Mr. Holder, is this an email thread ending August 28, 2016,

25   between you and Belinda Reynaga?

Elliot Holder - Direct

1    *A.*   Yes.

2    *Q.*   So let's start with the first email chronologically.  Can

3    you read that?

4    *A.*   Yeah.  The one showing on the screen?

5    *Q.*   Yes.

6    *A.*   "Hi Elliot.  It was great talking to you earlier.  Please

7    send me your most updated resumé when you have a moment, and I

8    will begin coordinating a phone interview."

9    *Q.*   This is from Belinda Reynaga; correct?

10   *A.*   Correct.

11   *Q.*   Who is Belinda Reynaga?

12   *A.*   She was a recruiter at Radiology Partners at that time.

13   *Q.*   So let's take a look at the next email in the chain.  How

14   do you respond?

15   *A.*   I responded, you know, with enthusiasm.  I was excited

16   about it.  I thanked her for her time, I attached my resumé,

17   and said I was excited to hear from her.

18   *Q.*   And then looking at that top email, how does she respond

19   back to you?

20   *A.*   Yeah.  She thanked me.  She said she sent over my resumé to

21   the head of corporate development and said, "somebody will be

22   in contact with you soon."

23   *Q.*   And what happened next?

24   *A.*   I believe somebody reached out to me -- I think before

25   that, though, there was somebody had sent me -- I think it was

Elliot Holder - Direct

1    a manager on the team -- had sent me a couple questions, like a

2    questionnaire to answer first.

3              MR. MARIANO:  Sure.  Let's take a look at Government

4    Exhibit 221, and I'll move for admission pursuant to

5    stipulation.

6              THE COURT:  Admitted.

7              (Exhibit 221 admitted.)

8    BY MR. MARIANO:

9    Q.  Is this an email thread ending September 9, 2016, between

10   you and Alex Won?

11   A.  Yes.

12   Q.  I think you mentioned there were questions you had to

13   answer before the on-site interview; is that right?

14   A.  Correct.

15   Q.  Is this what you were referring to?

16   A.  Yes.

17   Q.  So looking at that first email from Alex Won, can you

18   summarize that?

19   A.  Yeah.  It's him asking me a bunch of questions prior to

20   scheduling the interviews.

21   Q.  And certain portions of the email in that first email

22   are bolded.  Are those your responses to the questions?

23   A.  Yes, they are.

24   Q.  So let me walk through that email.  Alex Won writes, "We

25   have some follow-up questions prior to the on-site interview

Elliot Holder - Direct

1    scheduled for next week."  Do you see that?

2    A.   Yes.

3    Q.   And can you read the first question?

4    A.   "Is your direct leadership aware that you are looking for

5    other opportunities?"

6    Q.   And how do you respond?

7    A.   "No."

8    Q.   And the next question is, "Have you interviewed or made

9    contact with other companies?"  Do you see that?

10   A.   Yes.

11   Q.   And what's your response?

12   A.   "No."

13   Q.   And the last question, "Do you have any offers from other

14   companies?"  Do you see that?

15   A.   Yes.

16   Q.   And what was your response there?

17   A.   "No."

18   Q.   Did you know why these questions were being asked before an

19   interview?

20   A.   The third -- the second and third I thought were -- I had

21   kind of seen before.  I feel like it's pretty normal.  You

22   know, if a company -- or if I kind of recruited with a company

23   in college, they would always -- they would ask, you know, do

24   you have offers with anybody else, to know how competitive they

25   needed to be.  So the third and fourth, I was kind of gauging

Elliot Holder - Direct

1    why; but the first I had no idea.

2    Q.  Were your answers truthful?

3    A.  Yes.  Absolutely.

4    Q.  And what was your reaction to receiving these questions?

5    A.  The second and third, again, I was kind of thrown off; but

6    the first one gave me kind of a lot of panic.

7    Q.  So let's take a look back at that first question.  Your

8    response, you said "no," it's bolded and underlined; right?

9    A.  Yeah.

10   Q.  And why did you do that?

11   A.  I just remember at the time -- this is really dumb but I

12   remember thinking that if I underlined it, that it would

13   emphasize that they didn't know.  So they would say, okay, they

14   really don't know.  Let's -- I don't know.  It's dumb, but I

15   figured that bolding and underlining it would really emphasize

16   that they didn't know.

17   Q.  Did you want to keep your job search confidential?

18   A.  Oh, yeah.  100 percent.

19   Q.  Why was that important to you?

20   A.  Well, I just figured that -- I mean, if my leadership found

21   out, I don't know, it would kind of jeopardize my future or my

22   career path.

23   Q.  What do you mean by that?

24   A.  Yeah.  I mean, if my bosses knew that, you know, I was

25   actively shopping around or looking at other opportunities,

Elliot Holder – Direct

1  they would be hesitant to say, well, let's invest in this

2  person and give them more responsibility and -- yeah.

3  Q.  Did you think you should be allowed to keep your job search

4  confidential?

5  A.  Yeah.  100 percent.

6  Q.  Why?

7  A.  I have never been asked -- I don't know, I just figured it

8  was assumed that I could.

9  Q.  You said you've never been asked.  Have you engaged in job

10  searches with other companies?

11  A.  Yeah.  Absolutely.

12  Q.  And has this type of request ever come up?

13  A.  No.

14  Q.  So that first question mentions your direct leadership.

15  What did you understand that to refer to?

16  A.  I thought of it as probably -- I had two directors at the

17  time, so both of my directors and then my vice president.

18  Q.  And who were those people at the time?

19  A.  It was Paul Martinchuk, Doug Saqui, and Nic Eliason.

20  Q.  So I think you mentioned earlier you ultimately did

21  interview.  Do you recall who you met with at the interview?

22  A.  Not everybody.  I know that I met with -- it was Alex Won,

23  from the email; and then there was another person, Keegan

24  Scanlon.  The others, I don't recall.

25  Q.  And who is Keegan Scanlon?

Elliot Holder - Direct

1   *A.*   I believe he was the head of the department at that time.

2   *Q.*   How do you think the interview went?

3   *A.*   It went really well.  Yeah.

4   *Q.*   Did you get any feedback from RAD Partners on how they

5   thought the interview went?

6   *A.*   Yeah.  I sent the typical cliche thank you note and whatnot

7   after.  And then I got a note back from Keegan, maybe somebody

8   else, saying, Hey thanks, you know, we were excited to meet

9   with you, things look good, that kind of note.  So I felt good

10  at the time.

11  *Q.*   After your experience having met with them, were you still

12  interested in a job at RAD Partners?

13  *A.*   Yeah.  Absolutely.

14  *Q.*   So what happened after the interview?

15  *A.*   Yeah.  We exchanged notes, kind of like the -- the thank

16  you and, you know -- you know, they expressed excitement.  And

17  then they mentioned kind of next steps, and so I was kind of

18  awaiting what would happen before I kind of got an offer.

19          *MR. MARIANO:*  Let's go to Government Exhibit 224, and

20  we'll move for admission pursuant to stipulation.

21          *THE COURT:*  Admitted.

22          (Exhibit 224 admitted.)

23  *BY MR. MARIANO:*

24  *Q.*   Is this an email thread ending September 20, 2016, between

25  you and Keegan Scanlon?

Elliot Holder - Direct

1    A.   Yes, it is.

2    Q.   Let's look at the second and third page of this email.

3    Can you sort of walk the jury through the back and forth

4    through September 15.

5    A.   Yeah.  September -- yeah.  Basically, Keegan had reached

6    out and said, you know, he wanted to talk over the phone to

7    discuss next steps.  I responded that I was tied up for the

8    next couple of days and then picked a specific day that I could

9    chat.  And then I said, you know, I want to make sure that I

10   can prepare accordingly for this next call, so I asked him for

11   a little bit more context around what he meant by "next steps."

12   And then --

13   Q.   Well, let me ask -- let's look at that September 16,

14   7:13 a.m. email from Keegan Scanlon.

15   A.   Yep.

16   Q.   That's his response to what you just said, asking -- you're

17   asking about the anticipated next steps; right?

18   A.   Yep.

19   Q.   Can you read his second paragraph?

20   A.   Yeah.  "I wanted to understand your interest in the

21   position further and talk through steps you will need to take

22   to notify your leadership about your interest in a role at

23   Radiology Partners to move forward.  I can also provide more

24   insight on my experience going through this process when I left

25   DaVita."

Elliot Holder - Direct

1    *Q.*  So this was a little different, because before it was just

2    a question; right?

3    *A.*  Correct.

4    *Q.*  What was your response to getting this email about

5    notifying your leadership?

6    *A.*  I just remember again at the time, just being real anxious

7    that I didn't want them to find out.  Yeah, it just -- I

8    started to panic a little bit.

9    *Q.*  Had you ever been asked to do that as part of any prior job

10   search?

11   *A.*  No.

12   *Q.*  What about any job search since this time?

13   *A.*  No.

14   *Q.*  Let's take a look at your response, then, on the first

15   page.  Can you read the second paragraph of your response.

16   *A.*  Yeah.  "I'm still very interested in the opportunity.  To

17   be transparent with you, I'm a little confused on the point

18   about notifying DaVita leadership.  I prefer to wait until a

19   formal offer has been made.  And by reading your email, it

20   sounds like we could be close.  At that point, I'm more than

21   happy to talk to leadership here at DaVita."

22   *Q.*  So you said you wanted to wait until a formal offer was

23   made.  Why did you say that?

24   *A.*  I've always been taught to make sure you have something in

25   writing.  You know, I've been burned before on kind of going

Elliot Holder - Direct

1 | off of promises. But not only that, I just -- I didn't want to

2 | jeopardize both roles, and so kind of jumping into something

3 | new and then kind of jeopardizing -- kind of risking the

4 | current position that I had, so I just wanted to make sure that

5 | I had it in writing, like, in a firm way so --

6 | Q. Did you understand from your interactions with RAD Partners

7 | whether you would be allowed to wait until a formal offer was

8 | made before notifying your boss?

9 | A. My understanding was that I had to tell my current

10 | leadership before I received a firm offer.

11 | Q. Did you talk to anyone else at the time about your reaction

12 | to receiving this email?

13 | A. Yeah. I talked to my older brother. He -- I look to him

14 | as kind of like a mentor in jobs, and so I bounce ideas and

15 | advice any time I'm considering a job change. So I talked to

16 | him pretty actively throughout this whole thing.

17 | MR. MARIANO: Sure. Let's go to Government

18 | Exhibit 627, and we'll just show this to the witness.

19 | BY MR. MARIANO:

20 | Q. Mr. Holder, is this an email thread between you and Matthew

21 | Hamel dated -- or ending April 8, 2022?

22 | A. Yes.

23 | Q. Further down in the chain, is this an email chain between

24 | you and Mitch Holder ending September 18, 2016?

25 | A. Yes.

Elliot Holder - Direct

1    *Q.* And your email to Mr. Holder is about -- to your brother,

2    Mr. Holder, is about 30 minutes after that email from

3    Mr. Scanlon; is that right?

4    *A.* That's right.

5         *MR. MARIANO:* Your Honor, we'd move for admission of

6    Government Exhibit 627.

7         *MR. MELSHEIMER:* Your Honor, objection.  Hearsay.

8         *MR. MARIANO:* Your Honor, may I respond?

9         *THE COURT:* Yeah, of course.

10        *MR. MARIANO:* I think this is a present-sense

11   impression.  I just established this is within 30 minutes of

12   receiving the email, and he offers his reaction to it.

13        *THE COURT:* You've actually already established that;

14   correct?

15        *MR. MARIANO:* Yes.

16        *THE COURT:* Then the document is cumulative; right?

17        *MR. MARIANO:* I established the timeline.  I didn't

18   establish the contents.

19        *THE COURT:* Let's see if you can do it without the

20   document.

21   *BY MR. MARIANO:*

22   *Q.* Mr. Holder --

23        We can pull this document down for now.

24        Mr. Holder, do you remember what you conveyed to your

25   brother about this email?

Elliot Holder - Direct

1    *A.*  Yeah.  I remember him telling him that it felt -- it was

2    shady, and I am pulling out.  It felt really weird, so --

3    *Q.*  And why did you reach out to your brother about that?

4    *A.*  To be honest, up until that point I had kind of gone the

5    route by myself.  And then I just remember being a little --

6    really anxious at the time, and so I wanted to bounce ideas off

7    somebody.  And so I looked at my older brother as -- he's a lot

8    more mature in his career.  And so -- yeah, I just remember

9    being intimidated, and so I wanted to bring him in and kind of

10   get his thoughts on it.  And so -- yeah.  It's -- yeah.

11   *Q.*  And what was your brother's reaction?

12   *A.*  Yeah, he agreed.  He said --

13            *MR. MELSHEIMER:*  Your Honor --

14            I'm sorry, Mr. Holder.

15            I object to the hearsay.

16            *THE COURT:*  Sustained.

17            *MR. MELSHEIMER:*  Sorry.

18   *BY MR. MARIANO:*

19   *Q.*  Mr. Holder, did you in fact pull out of the process with

20   RAD Partners?

21   *A.*  Yes.

22            *MR. MARIANO:*  Let's take a look at Government

23   Exhibit 226.

24            We'll move for admission pursuant to stipulation.

25            *THE COURT:*  It's admitted.

Elliot Holder - Direct

1        (Exhibit 226 admitted.)

2    *BY MR. MARIANO:*

3    *Q.*  Is this an email thread ending October 5, 2016, between you

4    and Keegan Scanlon?

5    *A.*  Yes, it is.

6    *Q.*  So let's take a look at the first email in this thread.

7    That's from you to Keegan Scanlon; right?

8    *A.*  Yeah.

9    *Q.*  And can you read what you wrote.

10   *A.*  "Dear Keegan, Thank you so much for your consideration as

11   well as your help and guidance throughout the interview process

12   these last couple of weeks.  Unfortunately, at this time I must

13   withdraw myself from further consideration in this process.

14   Various circumstances in my professional life have changed,

15   causing me to align with a different path.  I hope to stay in

16   touch and wish you all the best with your future endeavors."

17   *Q.*  What was the reason that you withdrew from consideration of

18   RAD Partners?

19   *A.*  100 percent because of their requirement to tell my

20   leadership.

21   *Q.*  You write in this email that circumstances in your

22   professional life changed.  Why did you write that?

23   *A.*  Yeah, I -- I remember at the time, I just didn't want to

24   kind of drag it on and kind of get into the specifics of

25   saying, hey, this kind of feels like a weird situation, to kind

Elliot Holder - Direct

1    of prolong it out.  And so I just wanted to be kind of curt and

2    keep it professional, so not as to kind of dig into it more,

3    because I was already feeling anxious.  I just wanted to step

4    away from it completely.  Yeah.

5    Q.  At any point in this process did you ever tell your

6    supervisors at DaVita that you were looking for another job?

7    A.  No.

8    Q.  And do you know why RAD Partners was requiring you to talk

9    to your boss at DaVita before they would give you an offer?

10   A.  No.  I had no idea.

11   Q.  I think you said earlier that a job at RAD Partners would

12   have been a way to advance your career; is that right?

13   A.  Yeah, I think so.

14   Q.  Was that important to you?

15   A.  Yeah.  Absolutely.

16   Q.  Why?

17   A.  For a lot of reasons.  Like I mentioned before, salary was

18   obviously a big thing.  Living in LA, I know an increase in

19   comp was kind of big on my mind at that point.  Two, kind of

20   project -- advancing my career I think was really important.

21   So I knew I would be at DaVita for a couple of years, and

22   switching to a new company where I saw kind of potential and

23   they were a younger company, as well -- kind of all the reasons

24   I mentioned before.

25   Q.  So let me sort of break those down.  You mentioned salary.

Elliot Holder - Direct

1   Maybe it's obvious, but why was the ability to increase your

2   salary important to you?

3          MR. MELSHEIMER:  Your Honor, I'm going to object as

4   cumulative and asked and answered.

5          THE COURT:  Yeah.  He's answered that question.  And

6   it is obvious.  You were right about that.

7   BY MR. MARIANO:

8   Q.  Mr. Holder, can you describe what you had done in your

9   career to this point to sort of build your resumé and get to a

10  point where you would be a competitive candidate at RAD

11  Partners?

12  A.  Yeah.  Absolutely.  Yeah, I -- I mean, my first couple of

13  years when I moved out to LA for the job, I remember coming to

14  work really early.  I mean, at a lot of points -- I would put

15  in long hours, especially I feel like a lot more than others on

16  my team.  So I worked really hard to make myself competitive.

17  I remember coming in a lot of times at 6:00 a.m. and staying

18  late.  It was my first job, so I wanted to make sure I did a

19  really good job.  And, yeah, I just -- I feel like I worked

20  really hard to position myself well for opportunities.

21  Q.  So let me ask you about a different recruitment experience

22  that you had.  Prior to RAD Partners, had you considered a job

23  with another company outside of DaVita?

24  A.  Yes, I had.

25  Q.  And what was that company?

Elliot Holder – Direct

1    *A.*   It was SCAN Health Plan.

2    *Q.*   What is SCAN Health Plan?

3    *A.*   They're an insurance payer located just south of where we

4    were in LA.  Yeah.

5    *Q.*   And do you recall approximately when you were considering a

6    job with them?

7    *A.*   Yeah.  I believe it was in 2015 sometime.  I don't remember

8    the exact month.

9    *Q.*   And what was the result of your consideration with them?

10   *A.*   Yeah.  I received an offer.  But at the last minute, you

11   know, I felt like I wanted to stay at DaVita; and I used that

12   offer to -- I hate the word -- but leverage getting an increase

13   in pay at DaVita.  So I ended up staying at DaVita.

14   *Q.*   So why were you comfortable in 2015 talking to your bosses

15   about this other job opportunity?

16   *A.*   The situation was a little bit different.  Two reasons.

17   One, I mean, I mean, I had the actual offer with comp.  You

18   know, I felt like I had something firm that I could hold onto.

19   And then the other was, I had a little bit of coaching or kind

20   of help from one of my prior DaVita bosses, who I kind of

21   looked to as a mentor.  And he wasn't kind of the DaVita mold.

22   He had left DaVita and was kind of walking me through the

23   process, so I felt like I had somebody that could kind of guide

24   me and help me through.  So those two reasons.

25   *Q.*   So you said you tried to leverage this offer.  What was the

Elliot Holder - Direct

1    outcome of that?

2    *A.*   Yeah.   DaVita wanted to retain me, and so they offered me

3    an increase in my compensation to stay.

4    *Q.*   And when -- when DaVita offered you that increased

5    compensation, was that before or after you had received the

6    other offer?

7    *A.*   After.

8    *Q.*   So let me go back, then, to the experience with RAD

9    Partners.   Did RAD Partners ever indicate what your

10   compensation would be?

11   *A.*   No, they did not.

12   *Q.*   Were you interested in knowing what your potential

13   compensation package would be?

14   *A.*   Yeah.   Absolutely.

15   *Q.*   If you had received an offer from RAD Partners, would you

16   have considered it?

17   *A.*   Yeah.   100 percent.

18   *Q.*   Even if you hadn't gone to work at RAD Partners, would

19   receiving a job offer from them have had any other benefits for

20   you?

21   *A.*   Yeah, definitely.   I mean, the immediate one that comes to

22   mind is, obviously, I could have -- I could have, well,

23   leveraged that offer like I did before.   Or if I -- you know, I

24   started interviewing at other companies, I could have, again,

25   used that as leverage with other companies.   Just the standard

Elliot Holder - Cross

1    stuff, I guess.

2    Q.   And who was the CEO of DaVita when you were going through

3    this process with RAD Partners?

4    A.   Kent Thiry.

5            MR. MARIANO:   Thank you, Mr. Holder.   Nothing further.

6            THE COURT:   Mr. Melsheimer, cross-examination.

7            MR. MELSHEIMER:   May it please the Court.

8                            **CROSS-EXAMINATION**

9    BY MR. MELSHEIMER:

10   Q.   Good morning, Mr. Holder.

11   A.   Good morning.

12   Q.   You and I have never met.   I'm Tom Melsheimer, and I

13   represent Mr. Thiry.   I'm going to ask you a few questions.   Is

14   that all right?

15   A.   Yeah.   Absolutely.

16   Q.   You've never testified in court before, I bet?

17   A.   No.

18   Q.   Okay.   It's a little nerve-wracking, isn't it?

19   A.   You can probably tell.

20   Q.   I'm going to try to turn that nerve-wracking down a little

21   bit.   I want to start where you ended, which is, before your

22   discussions with Radiology Partners, you did explore a job

23   opportunity with a different company called SCAN Health; right?

24   A.   Correct.

25   Q.   That was around 2015?

Elliot Holder - Cross

1    A.   Yep, that's right.

2    Q.   When you first started exploring that opportunity, you

3    didn't tell anyone at DaVita; right?

4    A.   Correct.

5    Q.   And it started -- that conversation with that possible

6    company started with some informal discussions that you had

7    with a pal of yours at SCAN Health; is that right?

8    A.   Yeah, that's right.

9    Q.   And did you actually have a formal interview with the folks

10   at SCAN Health?

11   A.   I don't know if -- again, it was -- it was my friend that

12   worked at the company at the time, and so he connected me with

13   somebody.   And we had multiple kind of at-length conversations.

14   So I don't know if you would describe it as formal or not,

15   but -- but -- yeah.

16   Q.   Well, you had a friend there; and this friend sort of eased

17   it for you to have these conversations about this potential

18   opportunity.   Is that a fair way of putting it?

19   A.   Yeah.   That's right.

20   Q.   Now, you did tell Mr. Badal, who was your former supervisor

21   at DaVita, about this opportunity; right?

22   A.   Correct.

23   Q.   Now, you said that he had left DaVita when you told him;

24   but isn't it true that, actually, he was still working with a

25   DaVita organization called DaVita HealthCare Partners at that

Elliot Holder - Cross

1    time?

2    *A.* Yeah, that's right.  DaVita -- in my mind, I mean, he had

3    left our team, and I -- even though we had acquired HealthCare

4    Partners at the time, it was still pretty separate.  And so --

5    yeah.  So in one way, yes; but also at the same time, you know,

6    I didn't see him around our team or kind of our building, even.

7    So I thought of it as separate.

8    *Q.* Well, and that's fair.  And you're saying you thought of it

9    as separate; but you understood that DaVita had acquired

10   HealthCare Partners.  And Mr. Badal was still working in the

11   DaVita family, so to speak, and even -- he had a DaVita

12   email; right?

13   *A.* For the email, I have no idea.  But, yeah, technically,

14   DaVita, yeah, did acquire HealthCare Partners.

15   *Q.* He was -- this Mr. Badal fellow was a relatively senior

16   person at DaVita; right?

17   *A.* I would say so.  Yeah.

18   *Q.* And he offered after you reached out to him to reach out to

19   your supervisors and tell them about this opportunity that you

20   had with SCAN Health; right?

21   *A.* Correct.

22   *Q.* He followed through on your behalf and reached out to your

23   supervisors and sent them a message about this opportunity that

24   you might have at SCAN Health; right?

25   *A.* That's right.

Elliot Holder - Cross

1    *Q.*  That was pretty nice of him to do that; right?

2    *A.*  Yeah.  I mean, at the time -- yeah.  I remember kind of --

3    when he had sent that email -- I mean, we had had lunch that

4    day, and Bob and I had -- he was the one that recruited me

5    initially to DaVita, so I felt like we had a pretty good

6    relationship.  Yeah.

7    *Q.*  So it was kind of him to do that; fair?

8    *A.*  Sure.  Yeah.

9    *Q.*  You hoped that he would -- when you reached out to him

10   about this opportunity, you sort of hoped -- you weren't sure,

11   but you hoped that he would react this way and try to sort of

12   mentor you through this process; right?

13   *A.*  To be honest, when I met with -- I remember meeting with

14   Bob; and I had just mentioned to him that I had an offer with

15   another company.  I didn't -- and I didn't really know what I

16   wanted to do at the time.  And so he kind of suggested -- he

17   kind of guided me through some things.  But, yeah.

18   *Q.*  He wasn't angry?

19   *A.*  No.

20   *Q.*  He was supportive; right?

21   *A.*  Yeah.

22   *Q.*  In fact, a couple of days after Mr. Badal reached out to

23   your supervisors, you in fact had a discussion with your

24   supervisors about this SCAN Health opportunity; fair?

25   *A.*  That's right.

Elliot Holder - Cross

1    *Q.*  You told them what you thought was a ballpark number of

2    what your compensation might be if you took that job at SCAN

3    Health; right?

4    *A.*  I don't remember saying the ballpark number; but, yeah, we

5    had discussed the potential opportunity at SCAN, for sure.

6    *Q.*  You said that you were leveraging it, and you were kind of

7    hesitant about that term.  But people do that; right?  They go

8    to their employers and say, you know, I've got this opportunity

9    I think might be better.  What can you offer me in return?

10   That's kind of what is going on, isn't it?

11   *A.*  Yeah.  That's right.

12   *Q.*  What happened after you did that was, that they came back

13   and showed you how much they cared about you at DaVita; right?

14   *A.*  Yeah.  Yeah, that's right.  I mean, to be fair too, I

15   mean -- yeah, that's right.

16   *Q.*  So they offered you a 10 percent raise; right?

17   *A.*  I don't recall the specific amount, but that sounds right.

18   *Q.*  You were offered an additional bonus; right?

19   *A.*  I believe so.  Yeah.

20   *Q.*  And you were also offered some career development

21   opportunities, which I suspect were important to you as a young

22   man sort of just starting out in your career; right?

23   *A.*  Yeah.

24   *Q.*  You were offered exposure to some special projects; right?

25   *A.*  Yes.  That's correct.

Elliot Holder - Cross

1   *Q.*  You were offered the ability to interface with other

2   leadership in the company that might assist and aid your

3   career; is that fair?

4   *A.*  Correct.

5   *Q.*  So you started at DaVita through what you called this

6   Redwoods program.  That's a pretty prestigious program; right?

7   *A.*  Correct.

8   *Q.*  Through that program, you got exposed to DaVita's business

9   and received some special training that people outside the

10  program didn't receive; right?

11  *A.*  Correct.

12  *Q.*  That program was focused on developing young professionals

13  like yourself into potentially future leaders within DaVita;

14  right?

15  *A.*  Correct.

16  *Q.*  This whole episode with SCAN Health worked out so well that

17  you actually sent an email to your old supervisor, Mr. Badal,

18  and you thanked him for how well it had worked out; right?

19  *A.*  Yes.

20  *Q.*  You told him that you had learned a lot through the

21  process; right?

22  *A.*  I believe so.

23  *Q.*  And that's normal; right?  You're new to this, and that

24  ended up being a healthy and helpful process for you, as just

25  one part of your career building.  Do I have that about right?

Elliot Holder - Cross

1    *A.*   Yeah.  That's right.

2    *Q.*   You told him that you were certain that there were no

3    bitter feelings about you going to your DaVita supervisors with

4    this opportunity; right?

5    *A.*   I don't recall, to be honest.

6           *MR. MELSHEIMER:*  Well, let me show you Exhibit A670,

7    and let's just show it to the witness.

8    *BY MR. MELSHEIMER:*

9    *Q.*   Take a look at this email from you to Mr. Badal.  Just

10   read it to yourself, sir.  Let me know when you're through

11   reading it.

12   *A.*   Yep.

13   *Q.*   So it's true, isn't it, that you told Mr. Badal that you

14   were certain there were no lingering bitter feelings about this

15   whole situation at DaVita; right?

16   *A.*   Right.

17   *Q.*   You were sure to be very cordial and respectful in the

18   process; right?

19   *A.*   Yep.

20   *Q.*   It was also -- something you learned as a result of this,

21   was that you learned how valued you were at DaVita; fair?

22   *A.*   Yeah.  It's fair.  Yeah, I -- I want emphasize, too, that

23   I -- like I mentioned before, it was a good reminder -- earlier

24   in my career, I kind of felt pretty anxious about my value at

25   the company, so, hence, putting in the long hours and whatnot.

Elliot Holder - Cross

1    So -- but, yeah, you're right, it was good to kind of have them

2    match.

3    Q.  Well, sir, my son's about to start a new job.  I'm going to

4    give him that same advice, to show up early and work late.

5    That's what you did; right?

6    A.  Yep.

7    Q.  Is it fair to say that you might not have learned how much

8    you were valued at DaVita if you hadn't gone through this

9    interaction back in 2015?

10          MR. MARIANO:  Objection.  Speculation.

11          THE COURT:  Overruled.

12          THE WITNESS:  Sorry.  Could you repeat the question?

13   BY MR. MELSHEIMER:

14   Q.  Yes, sir.  I'm asking you, is it fair to say that you might

15   not have learned back in 2015 how valuable and valued you were

16   at DaVita if you hadn't gone through this process with them?

17   A.  Yeah.  I mean -- sorry.  I'm not sure I understand the

18   question.  So you're saying that I wouldn't have understood how

19   valued I was if this didn't happen?

20   Q.  You might not have learned when you did in June of 2015 of

21   just how valued you were at the company if you hadn't gone

22   through this communication with your boss?

23   A.  Yeah.  I mean, it was -- yeah, I think that's right.

24   Q.  Now, you're a little bit more senior now -- although it's

25   hard to tell, I guess.  Mr. Holder, you're a little bit more

Elliot Holder - Cross

1    senior in your career now; right?

2    *A.*   Correct.

3    *Q.*   How old a man are you?

4    *A.*   33.

5    *Q.*   Did you say 33?

6    *A.*   Correct.

7    *Q.*   Okay.  So now that you've had a bit more experience in the

8    business world, would you say that this is the sort of thing

9    you might want one of your junior employees to come to you

10   about if you were -- if they found themselves in a similar

11   situation?

12   *A.*   Not necessarily.  I mean, if -- meaning, if they had an

13   offer with another company or --

14   *Q.*   Well, if they were looking for advice about what to do with

15   an offer from another company, wouldn't you try to cultivate

16   with the people that work with you a kind of openness, to where

17   they would feel comfortable coming to you and saying, Hey,

18   Elliot, what do you think about this?

19   *A.*   Yeah.  I mean, would want them to feel comfortable.  But at

20   the same time -- yeah.  Not expect it; but, yeah.

21   *Q.*   So I want to talk about a couple other times.  And this is

22   the word you used, sir, so I'm using it because I heard you say

23   it.  This concept of leveraging.  So you had a couple other

24   opportunities that you leveraged with your bosses at DaVita;

25   isn't that right?

Elliot Holder - Cross

1   *A.*  You mean the opportunity with SCAN?

2   *Q.*  Some other opportunities that you had that you went and

3   were very open with your bosses about.

4   *A.*  I -- to be honest, I don't recall, but --

5   *Q.*  Okay.  Let me see if I can refresh your recollection on

6   that.  And this is a while back, of course?

7   *A.*  Yes.

8   *Q.*  It's hard to remember all of this stuff, isn't it?

9   Especially in front of all of these people that you just met;

10  right?

11  *A.*  Yes.

12  *Q.*  So you thought about getting an MBA at Brigham Young

13  University; right?

14  *A.*  That's correct.

15  *Q.*  And you openly discussed your desire to get an MBA with

16  Mr. Martinchuk and others at DaVita; right?

17  *A.*  That's right.

18  *Q.*  Do you recall telling Mr. -- is it Mr. Saqui --

19  *A.*  Saqui.

20  *Q.*  And he was one of your supervisors; right?

21  *A.*  Correct.

22  *Q.*  You told him in April of 2019 that you were planning to

23  leave DaVita to go get an MBA at Brigham Young University;

24  right?

25  *A.*  Correct.

Elliot Holder - Cross

1    *Q.*  Do you recall that when you told your -- Mr. Saqui and

2    Mr. Eliason about that, about your intentions, do you recall

3    putting a plan together for them to look at on what it would

4    take for you to stay at DaVita and not go to Brigham Young

5    University to get your MBA at that time?

6    *A.*  Yeah.  I remember having a conversation with them and

7    talking about my ideas.  I was playing around with the idea of

8    getting an MBA, and I -- I kind of floated -- we had ongoing

9    discussions with everybody on the team.  And they liked to know

10   everybody's, you know, plan for the next couple of years,

11   saying -- you know, so they could obviously staff ahead of time

12   and figure out if people were planning to leave, and so forth.

13   So just in that usual rotation, they had asked me, you know,

14   are you thinking about an MBA?  What are your plans?  And so we

15   discussed that.  I mean -- and so kind of the same with

16   everybody on the team, figuring out, you know, what my

17   future -- it's like the what are your five-year plans kind of

18   on the team type question.

19   *Q.*  I'm going to show you just for your recollection,

20   Mr. Holder, this -- an email that you sent to Mr. Saqui on

21   May 6, 2019.  And just take a look at it, familiarize yourself

22   with it, and then I want to ask you a question or two to see if

23   this refreshes your recollection.

24        Just let me know when you're finished reading, sir.

25   *A.*  Sure.  Okay.

Elliot Holder - Cross

1    *Q.*   There is a little bit at the bottom.  Did you take a look

2    at that, as well?

3    *A.*   Yep.

4    *Q.*   All right.  So one of the things that you wanted to do if

5    you weren't going to go get your MBA is you wanted to learn

6    about some things that might be available to you at DaVita;

7    right?

8    *A.*   Yeah.  I -- yeah.  I would kind of phrase it more that -- I

9    was thinking of getting my MBA, and I just remember Doug coming

10   to me and saying, you know, What would it take?  You know, that

11   he met with leadership, and they wanted to know what it would

12   take to retain me, and to put together a proposal.  So that's

13   what I did.

14   *Q.*   You put together a proposal that included an adjustment to

15   your current compensation; right?

16   *A.*   That's correct.

17   *Q.*   You wanted to see your base salary go from 112,000 to

18   $117,000; right?

19   *A.*   Correct.

20   *Q.*   And you wanted to see your bonus go from 25,000 to 30,000;

21   right?

22   *A.*   Yep.

23   *Q.*   You had conversations with Mr. Eliason about that in May of

24   2019.  And in June, you were deciding what you wanted to do;

25   right?  Because you had to decide if you were going to go ahead

Elliot Holder - Cross

1    and sign up for those classes at BYU; right?

2    A.   That's right.

3    Q.   In fact, what ended up happening was, DaVita agreed to give

4    you the raise and bonuses you were looking for; and you decided

5    to stay at DaVita instead of going to get your MBA at that

6    time.  Right?

7    A.   That's right.

8    Q.   There was no pushback from the folks at DaVita about the

9    idea of getting an MBA.  They understood that was -- could have

10   been good for you; right?

11   A.   That's right.  Yeah.

12   Q.   In fact, as I understand it -- tell me if this is right --

13   one of your supervisors actually wrote you a letter of

14   recommendation to the folks at BYU about getting you into that

15   MBA program; right?

16   A.   That's right.

17   Q.   You made a choice at that time to let DaVita know about

18   your plan of an MBA degree, and then to see how they would

19   respond, they responded --

20        MR. MARIANO:  Objection.  Asked and answered.

21        THE COURT:  Overruled.

22   BY MR. MELSHEIMER:

23   Q.   It's always hard when it's in the middle of a question,

24   Mr. Holder.  I'm going to start over.

25        You made a decision to tell your supervisors about the

Elliot Holder - Cross

1    MBA possibility, you discussed with them things that you would

2    want to see if you were going to stay at DaVita, they delivered

3    on those things, and you decided to stay instead of get your

4    MBA.  Is that fair?

5    A.  Yeah, it is.  The slight tweak would be, I discussed my

6    plans for an MBA.  And they said, you know, what would it take

7    for you to stay, and so -- but, yeah, that's right.

8    Q.  It's also true that over time you would occasionally let

9    the folks at DaVita know that you had been contacted by a

10   recruiter about an employment opportunity; right?

11   A.  Yeah.  It -- sorry.  To clarify, what do you mean by

12   "folks"?

13   Q.  Well, that sometimes you would -- and I'm not fussing at

14   you about this at all.

15   A.  Sure, sure.

16   Q.  Sometimes you would go to your supervisor and say, Hey,

17   I've got people reaching out to me about jobs that might pay

18   more; right?

19   A.  Yeah.  I mean, we -- it was pretty commonplace talk.  We

20   would all, you know, talk about how many times we were getting

21   spam by recruiters from social media and stuff.  And so even my

22   supervisors would mention, you know, how often they get

23   solicited or so forth, but --

24   Q.  Okay.  I want to go to the Radiology Partners recruitment

25   of you, sir.  And let's just be clear, you did not like -- you

Elliot Holder - Cross

1    thought it was strange, unusual, made you uncomfortable -- you

2    did not like this idea that you were going to have to -- that

3    you believed you were going to have to go to your supervisor

4    and tell them you were looking for a job at Radiology Partners.

5    You didn't like that?

6    A.   No.

7    Q.   Right?

8    A.   Yeah.  That's correct.

9    Q.   And I'm trying to push you off that one bit, sir.

10   A.   Sure.

11   Q.   Okay.  I want to talk a little bit about, though, about the

12   process.  So as I understand it, the Radiology Partners folks

13   reached out to you and solicited you while you were at DaVita;

14   right?

15   A.   Correct.

16   Q.   They solicited you via something called LinkedIn, that

17   we've heard about; right?

18   A.   That's right.

19   Q.   You've got a LinkedIn profile; don't you, sir?

20   A.   Correct.

21   Q.   I looked at it before we came into court today -- I don't

22   know if you can tell that I looked at it or not.  It probably

23   says someone from Winston Strawn looked at your profile.  That

24   was me.

25   A.   I haven't checked it, but I appreciate it.

Elliot Holder - Cross

1  *Q.*  Okay.  Full disclosure.  But that's what is available on

2  LinkedIn; right?  People can go and look at your background,

3  what you've done, and it's -- and they can learn about what

4  your skills and talent and experience is; right?

5  *A.*  Correct.

6  *Q.*  Do you remember telling the government in one of your

7  interviews with them that you recalled that Radiology Partners

8  had sort of a revolving door of employees in their leadership?

9  *A.*  I honestly don't remember -- I may have.  I don't recall.

10  *Q.*  Can we show -- I'd like to show you some notes of an

11  interview that were taken on July 23, 2021, just to you, sir.

12  I'm going to show you a couple of sentences of that and ask --

13  just read it to yourself.  It's --

14         Just read that to yourself, sir; and then I'm going to

15  ask you a question about it.

16         Let me know when you're finished.

17  *A.*  Okay.

18  *Q.*  So do you recall telling the government that Radiology

19  Partners had a -- something of a revolving door of employees,

20  especially within senior leadership?

21  *A.*  Again, I don't recall saying it; but I could have, for

22  sure.

23  *Q.*  To frame the chronology here, sir, this is about a year

24  after you had those discussions with the folks at DaVita that

25  led to you getting a raise, a promotion, and other things;

Elliot Holder - Cross

1    right?

2    *A.*   Correct.

3    *Q.*   You actually didn't respond to Radiology Partners'

4    solicitation until August of that year, as I understand it?

5    *A.*   I -- the time -- I'm sorry.  The timeline is -- that could

6    be correct.

7    *Q.*   You're not exactly sure.

8    *A.*   Yeah, I -- yeah.  Sorry.

9    *Q.*   So when you did respond to the solicitation for Radiology

10   Partners, the recruitment process continued; right?

11   *A.*   Correct.

12   *Q.*   You actually interviewed with the folks at Radiology

13   Partners; right?

14   *A.*   Correct.

15   *Q.*   Just so we're clear -- do you still live in Los Angeles?

16   *A.*   I do not.  No.

17   *Q.*   Too expensive?

18   *A.*   That's right.

19   *Q.*   Right.  But back at the time you did?

20   *A.*   Correct.

21   *Q.*   That's where Radiology Partners is; right?

22   *A.*   Correct.

23   *Q.*   Just to be clear, DaVita is based here in Denver.  But when

24   you worked for them, you lived in Los Angeles; right?

25   *A.*   Correct.  Yeah, that was back when -- yeah, when

Elliot Holder - Cross

1    headquarters were in LA, at DaVita.

2    *Q.*   Good point.   Headquarters were in LA; then they were moved

3    to Denver?

4    *A.*   Correct.

5    *Q.*   You met with multiple folks at Radiology Partners during

6    the recruitment process; right?

7    *A.*   Correct.

8    *Q.*   You met with I think you said Basak Ertan; right?

9    *A.*   That sounds familiar.

10   *Q.*   Do you know she's the wife of Dr. Gabriel, one of the

11   founders of Radiology Partners?

12   *A.*   I did not.   No.

13   *Q.*   You also met with this gentleman, Keegan Scanlon?

14   *A.*   Right.

15   *Q.*   Keegan Scanlon had also been at DaVita; right?

16   *A.*   I remember hearing that he had been at DaVita, but -- yeah.

17   *Q.*   You didn't know him while he was at DaVita, but you learned

18   that he had worked for DaVita before going to work for

19   Radiology Partners.   Correct?

20   *A.*   Correct.

21   *Q.*   I'm sorry.   I couldn't hear your answer.

22   *A.*   Correct.   Yeah.   Sorry.

23   *Q.*   Mr. Scanlon sort of became your point of contact in this

24   whole process; right?

25   *A.*   I don't know -- I think it was -- there was another -- I

Elliot Holder - Cross

1    think it was Alex Won that I communicated with quite frequently

2    too.  But him and Keegan; correct.

3    Q.  Well, we saw this email -- I won't bring it up, sir, if

4    you can recall it -- but Government Exhibit 224.  Mr. Scanlon

5    told you that he wanted to provide more insight into his

6    experience in going through the process of leaving DaVita and

7    going to Radiology Partners.  Do you remember that?

8    A.  Yeah.

9    Q.  I want to talk to you about your decision not to move

10   forward with Radiology Partners.  On October 2, 2016 --

11             Let's pull up this exhibit, Government Exhibit 226.

12             You withdrew from consideration; right?

13   A.  That's correct.

14   Q.  Now, you told him that various circumstances in your

15   professional life had changed; right?

16   A.  Correct.

17   Q.  Now, you told us a moment ago that that really was not

18   true; right?

19   A.  Correct.

20   Q.  But do you recall telling the government, sir, that there

21   was some truth to that statement in your email?

22   A.  I don't recall.  I -- I just remember at the time, I mean,

23   as -- the email I sent to my brother 20 minutes after, it was

24   because of weird or shady circumstances that I pulled out.

25   Q.  Okay.  I'm going to show you some more notes of an

Elliot Holder - Cross

1    interview that you gave to the government on December 16, 2021,

2    at page 3.  And just read that to yourself, sir; and let me

3    know when you're finished.

4    *A.*  Okay.

5    *Q.*  So two parts to this.  Do you recall telling the government

6    that there was some truth to this, because you thought you were

7    in a pretty good spot at DaVita and that you were well

8    respected internally?

9    *A.*  Yeah, I definitely was -- I thought I worked hard and that

10   I was represented at DaVita, but I don't think it -- that was

11   any reason why I wrote that business circumstances had changed

12   to Keegan.  I think it was, again, 100 percent because of the

13   situation.  I would have tried to have gotten, like, an actual

14   offer if I could have.

15   *Q.*  Understood.  And I don't want to -- I want to make sure

16   we're getting the full picture here.  You thought the situation

17   of having to notify your supervisors -- as it was explained to

18   you, you thought that was going to be a bad situation that made

19   you anxious; right?

20   *A.*  I didn't know, you know, how the situation would -- but,

21   yeah, definitely made me anxious.  Yeah.

22   *Q.*  You were bothered by it?

23   *A.*  Yeah.

24   *Q.*  Fair statement.  So Mr. Scanlon reached out to you after

25   you sent him this email.

Elliot Holder - Cross

1          And if we could pull up Government Exhibit 226, which

2    I believe has already been admitted.

3          Just look at the top part of this email, sir.  This

4    is October 5, 2016.  He says, "Elliot, are you available to

5    talk sometime today?  I would like to understand what happened

6    to change your mind."  Do you see that?

7    A.   I do.  Yes.

8    Q.   Did you ever follow up with him?

9    A.   Not to my recollection.  I -- yeah.  No.

10   Q.   Did anyone ever tell you not to follow up with him?

11   A.   No.  I don't -- I don't believe so.  My brother might have,

12   like, given me some guidance at the time; but, no.

13   Q.   Well, it's good to have a brother for some advice; isn't

14   it, sir?

15   A.   Yes, absolutely.

16   Q.   Now, you got your -- in fact, after this email from

17   Mr. Scanlon in October of 2016, you actually ended up with a

18   promotion at DaVita; right?

19   A.   That's right.

20   Q.   And that was just one of several promotions you received

21   over the course of the next few years at DaVita; right?

22   A.   Correct.

23   Q.   You ended up working at DaVita through the beginning of the

24   pandemic and all the way until 2021; right?

25   A.   Correct.

Elliot Holder - Redirect

1    *Q.*  You ended up going to work for another company called

2    Smile?

3    *A.*  Yes.   Smile Brands.

4    *Q.*  Smile Brands is a dental company, in some respects?

5    *A.*  Correct.

6    *Q.*  You had the kind of skills that would make you attractive

7    to another company in the healthcare field that was totally

8    different than what you were doing at DaVita; right?

9    *A.*  Correct.

10           *MR. MELSHEIMER:*  May I have just a moment, Your Honor?

11           That wasn't so bad, was it?

12           *THE WITNESS:*  No.

13           *MR. MELSHEIMER:*  Thank you, sir.  No further

14   questions.

15           *THE COURT:*  Redirect.

16           *MR. MARIANO:*  Yes, Your Honor.

17                        **REDIRECT EXAMINATION**

18   *BY MR. MARIANO:*

19   *Q.*  Mr. Holder, at the end of cross-examination you were asked

20   about a promotion you received in late 2016; right?

21   *A.*  Correct.

22   *Q.*  How if at all do you think that promotion would have been

23   affected if you had told your boss you were looking for a job

24   at RAD Partners?

25           *MR. MELSHEIMER:*  Your Honor, objection.  Calls for

1256
Elliot Holder - Redirect

1   speculation.

2          *THE COURT:*  Sustained.

3   *BY MR. MARIANO:*

4   *Q.*  Let me ask a different question.  Was the promotion you

5   received in 2016 in any way related to your exploring a job

6   with RAD Partners?

7   *A.*  No, I don't believe so.  I think -- like I mentioned, I

8   worked really hard while I was on the team, so any promotion --

9   I received, you know, quite a few promotions; and that was from

10  working really hard and putting in long hours and leading the

11  team well.  I feel like they also knew that I was -- believed

12  that I was going to be staying at DaVita for a long time, and

13  so they invested and promoted me, as well.

14  *Q.*  Let me move to a different topic that came up on cross.

15  Defense counsel asked about other times you negotiated with

16  your boss at DaVita based on different opportunities that you

17  had; right?

18  *A.*  Yeah.

19  *Q.*  And one of those was about potential MBA; correct?

20  *A.*  Yes.

21  *Q.*  Is there any difference in your mind between an educational

22  opportunity and a job opportunity with another company?

23  *A.*  Yeah.  100 percent.

24  *Q.*  How so?

25  *A.*  Well, education, I mean, on our team, it was kind of

Elliot Holder - Redirect

1    assumed that everybody was going to get an MBA or take a

2    different route at some point.  It was kind of the assumed next

3    steps.

4    Q.  Is there any risk that you would be assuming by talking to

5    your boss about a potential MBA?

6    A.  No.  Yeah, it was pretty commonplace.

7    Q.  Defense counsel also asked if you would want some of your

8    employees to tell you if they were looking for another job;

9    right?

10   A.  Correct.

11   Q.  Let me ask you a really simple question:  When an employee

12   is conducting a job search, whose decision should it be what

13   they tell their boss and when?

14   A.  100 percent theirs.

15   Q.  Would you ever require one of your employees to tell you

16   that they were looking for a job before they had an offer?

17   A.  No.

18   Q.  Why not?

19   A.  A lot of reasons.  Just -- I don't know, it -- it just

20   seems like it would put added pressure -- I mean, I wouldn't

21   want them to feel like -- like they -- I don't know.  It

22   just -- yeah.  Just intuitively.  I don't know.

23           MR. MARIANO:  Thank you, Mr. Holder.  Nothing further.

24           THE COURT:  Questions from the jury?

25           Yes.  Okay.

1258

1        (Hearing commenced at the bench.)

2        *THE COURT:*  14.

3        *MR. MARIANO:*  No objection.

4        *MS. LEWIS:*  No objection.

5        *MR. MELSHEIMER:*  No objection.

6        *THE COURT:*  42.

7        *MR. MELSHEIMER:*  No objection.

8        *THE COURT:*  Thank you.

9        (Hearing continued in open court.)

10        *THE COURT:*  The jurors have a couple of questions --

11  actually, more than a couple -- for you.

12        Question:  Do you have an immunity or a no-prosecution

13  agreement with the government?

14        *THE WITNESS:*  No.  I don't believe so.

15        *THE COURT:*  Do you have any agreement with the

16  government?

17        *THE WITNESS:*  No.

18        *THE COURT:*  Question:  Why was it preferred that

19  DaVita employees who left were solicited versus seeking out

20  another job on their own?

21        *THE WITNESS:*  Sorry.  Could you repeat that, Judge?

22        *THE COURT:*  Why was it preferred that DaVita employees

23  who left were solicited versus seeking out another job on their

24  own?

25        *THE WITNESS:*  Yeah, it -- we wanted to make sure

1   that -- especially on our team, my superiors preferred that

2   again, it was unsolicited, meaning our team wasn't going out

3   looking for opportunities, because they wanted to make sure

4   that, you know, everybody on the team was happy and doing a

5   good job.  And so, you know, any time somebody did leave, it

6   was preferred if it was unsolicited -- meaning, again, somebody

7   had reached out to our team first, and they hadn't reached out.

8   It just kind of, when we -- when we relayed it to leadership,

9   it had a more positive note that, again, there was nothing that

10  we could have done to keep them.

11          *THE COURT:*  Next question:  How would you describe the

12  DaVita culture?

13          *THE WITNESS:*  Yeah, that's a big question.  DaVita

14  definitely has a pretty strong culture.  Again, everything

15  in -- at the company has kind of a synonym or like a different

16  name.  And so -- but, definitely, yeah, it -- let me think

17  about that.  Sorry.  Yeah, very intentional culture, which,

18  again, was a big attraction for me when I joined out of

19  college.  You know, they had core values and a lot of firm

20  beliefs that they stand by, which I think is a very positive

21  thing.  Culture is mixed in with, you know, the day-to-day; and

22  so you see it on a daily basis.

23          Depending on which team you're on, you know, it varies

24  a little bit, in the sense that our team was kind of more of a

25  business function of -- let me think of how to phrase that --

```
 1    but, yeah, the culture is definitely -- you see it every day.
 2    It's there.  We -- you know, DaVita would emphasize the core
 3    values and abiding by those.  We were graded in our performance
 4    metrics.  There was two sides, there was performance, and then
 5    there was, like, how you did on the DaVita culture.  And, you
 6    know, did you abide by all seven core values, and were you
 7    hitting those?  And so they -- they weighed them at times kind
 8    of like air and water, pretty equally; so they were pretty well
 9    integrated.
10         But, yeah.  I mean, sometimes the culture could be
11    overwhelming at times.  But a lot of good principles, I think.
12         THE COURT:  Question:  What do you think the reaction
13    would have been from your supervisor if you had told him about
14    the RAD Partners before having an offer?
15         THE WITNESS:  I don't know, to be honest.  I think
16    without an actual offer, I don't know if -- I'm trying to play
17    out the situation on my end.
18         If I received the offer -- or if I told them before
19    receiving the offer, I think there would be no -- candidly
20    speaking, I think there would have been a little bit of
21    frustration, again, that I kind of presented another -- that I
22    was looking again after, you know, a year and a half after the
23    first opportunity at SCAN, you know, that I was looking to
24    leave again, or that I was, you know, looking outside.  I think
25    the promotion that I got right after to manager definitely
```

 1    wouldn't have happened, because they would have seen that, you

 2    know, I'm not invested in the team long-term, and so that

 3    wouldn't have happened.  I think they would have potentially

 4    tried to match it, because, again, I was working hard at the

 5    time.

 6         During my time at DaVita, my team had, you know, like

 7    an 80 percent turnover in terms of people; and so I was kind of

 8    like the core piece on the team.  So that's -- so they probably

 9    would have tried to retain me, I would imagine.  But -- you

10    know --

11         THE COURT:  During your career, when you have been

12    serious about exploring new job opportunities, what steps have

13    you taken?

14         THE WITNESS:  Yeah.  Exploring new opportunities, one

15    is, I look to my older brother for kind of guidance.  I mean, I

16    don't know if that's the very first step.  But, obviously -- I

17    don't know if this is redundant -- but kind of making sure that

18    my -- my resumé is updated, LinkedIn profile, that I'm

19    positioned well, I have the right skills.  And then I look at

20    what companies would be advantageous to jump to or to move to

21    in terms of progressing my career, looking good on my resumé

22    and making sure that there is adequate opportunities for

23    growth.  I wouldn't join a company if, you know, I had -- it

24    felt like a lateral move or, you know, it wasn't going to

25    progress my career.

1          And then, like I said, kind of bouncing that off of

2    family or my older brother and kind of -- earlier on, I did so,

3    seeing if it was a wise choice in his and my family's mind.

4          THE COURT:  Question:  What are all the different ways

5    you learn about jobs at other companies?

6          THE WITNESS:  I would say LinkedIn is a big one.  I

7    would say through my personal network.  I feel like I have a

8    pretty broad network, that I'm always talking with friends and

9    peers about opportunities, companies that they have joined.  So

10   that kind of opens my mind in terms of what opportunities are

11   out there.  And then, again, through family.  You know, I have

12   three brothers, and so -- they're all in the business world,

13   and my dad.  And so -- so I would say through those primary

14   means.  Then I guess news and media, you know, companies that

15   are performing well; companies that aren't, you know,

16   obviously, targeting and staying away from.  So --

17         THE COURT:  Question:  Do you consider further

18   education and a job at a different company the same in terms of

19   career advancement?

20         THE WITNESS:  Sorry, Judge.  Could you repeat that?

21         THE COURT:  Do you consider further education and a

22   job at a different company the same in terms of career

23   advancement?

24         THE WITNESS:  No.  Not -- not necessarily.  I am -- I

25   think they all have their own value, definitely.  I think it's

1    always been my goal at one point to join a different company

2    because -- or to get an MBA, one of the two -- because they

3    offer new skill sets and knowledge.  I mean, I think staying at

4    one company has its value, for sure.  But I think there is

5    things that you're not going to learn unless you go to a new

6    field.  Right?  The grass is always greener.  But if you're

7    taking an MBA or new role at a different company, I think it's

8    offering a new skill set or a new perspective on things.  So I

9    see them as different.

10            *THE COURT:*  Any other questions?

11            (No response.)

12            Follow-up?

13            *MR. MARIANO:*  Nothing further from the United States.

14            *MR. MELSHEIMER:*  Your Honor, nothing from Mr. Thiry.

15   Thank you.

16            *THE COURT:*  Thank you, Mr. Holder.  You're excused and

17   free to go.

18            *THE WITNESS:*  Thank you.

19            *THE COURT:*  That's your last witness?

20            *MS. LEWIS:*  Yes, Your Honor, it is.

21            *THE COURT:*  So the government rests?

22            *MS. LEWIS:*  We rest the case in chief, yes, Your

23   Honor.

24            *THE COURT:*  All right.  This is probably a good time

25   to take the morning break, how much time would you like, folks?

1    *JUROR:*  Ten minutes.

2    *THE COURT:*  I'm going to warn you, it might be a

3    little more, because I have some business to negotiate with the

4    lawyers.

5    You'll take as long as you can get.

6    *JUROR:*  You bet.

7    *THE COURT:*  All right.  We'll come for you.

8    (Jury out at 10:25 a.m.)

9    *THE COURT:*  I'd like to take a short break myself, and

10   then I'll hear your motions.

11   (Recess at 10:25 a.m.)

12   (In open court at 10:28 a.m.)

13   *THE COURT:*  Let's go ahead without them, and that will

14   make it easier.

15   *MS. CLINGAN:*  Actually, Your Honor, with the Court's

16   indulgence, there is one matter I wanted to bring up with the

17   Court.

18   *THE COURT:*  That's okay.  Let's wait until everybody

19   gets back.

20   (In open court at 10:28 a.m.)

21   *THE COURT:*  All right.  Ms. Clingan, you wanted to

22   bring something up before the motion.

23   *MS. CLINGAN:*  I do, Your Honor, with an apology.  So I

24   hope I don't sidetrack this too long.  But I took the Court's

25   admonitions yesterday concerning Mr. Thurman very seriously.

1265

1    And so before I proceed any further, I want to be clear, I am

2    not seeking to revisit the Court's ruling, which was very

3    clear.  But I did want to apologize to the Court because I did

4    a terrible job explaining the circumstances surrounding

5    Mr. Thurman.  And in doing so, I clearly left the Court with

6    the impression that I had broken a promise to defense counsel.

7    And so I just want to clear the air on that.

8            As we told defense counsel, we initially had

9    anticipated calling Mr. Thurman as a rebuttal witness.

10   However, on Friday, defense counsel elicited some testimony on

11   topics that we just had not anticipated arising in our case in

12   chief.

13           And so we immediately alerted defense counsel in

14   realtime that we now intended to call Mr. Thurman in order to

15   respond to those new topics.  And when we conferred, I

16   explained our position, that the changed circumstances of the

17   open door on these topics had caused us to move Mr. Thurman to

18   our case in chief.  It was certainly never my intention to be

19   playing games with defense counsel or to renege on an agreement

20   that I had made with them, but simply to respond to a

21   development in trial.  And in doing so, I believed that I had

22   been candid, cordial, and timely with defense counsel, just as

23   I sought to do every step of this case.

24           So I wanted to just apologize to the Court yesterday

25   for my poor explanation on these issues.

1266

1    THE COURT:  Okay.  No apology needed, but thank you.

2    All right.  Who wants to make a motion on behalf of

3    the defendants?

4    MR. WALSH:  Your Honor, I will.  Would you like me to

5    use the lectern?

6    THE COURT:  Yes, sir.

7                        **RULE 29 ARGUMENT**

8    MR. WALSH:  Your Honor, on behalf of both defendants,

9    I would move for a judgment of acquittal on all three counts

10   under Rule 29(a) of the Federal Rule of Criminal Procedure.  I

11   would ask -- we would like and plan to file a brief in support

12   of this motion and propose that we file it tomorrow morning.

13   Let me focus on a couple of arguments here.

14   First of all, the government has failed to prove its

15   case because the evidence at trial has shown that the three

16   nonsolicitation agreements -- or alleged agreements -- in the

17   Indictment are not market allocation agreements as a matter of

18   law.  Therefore, the agreements are not *per se* illegal as

19   charged in the Indictment; and the Indictment must be

20   dismissed.  That's a legal question for the Court.

21   In addition --

22   THE COURT:  That's the question that the Court

23   addressed on the motion to dismiss.

24   MR. WALSH:  That's correct, Your Honor.  And our

25   argument today is that the evidence as presented in the

1   government's case in chief has demonstrated that these

2   agreements ultimately -- that the government has failed to

3   prove that these are, in fact, market allocation agreements and

4   that they caused cessation or the end of meaningful competition

5   for employees among these companies.  And I can go into further

6   depth on that in a moment.

7          The second part of my argument is that for each of the

8   three counts, the evidence is insufficient for any reasonable

9   jury to find that the government has proved all of the

10  elements.  And my focus there for the purpose of this verbal

11  argument is that -- is on the intent and motive element that

12  the Court has articulated, both in its motion to dismiss order,

13  but also in every one of its jury instructions -- of the

14  Court's proposed jury instructions.

15         Let me turn to the first question, what is, I think,

16  the legal question regarding *per se* treatment of the agreements

17  that are alleged in this case.

18         Obviously, as the Court well knows, the Court has a

19  gatekeeping function that has to be exercised before sending

20  the case to the jury.  In its motion to dismiss order, the

21  Court explained that only those no-hire and nonsolicitation

22  agreements that allocate the market are *per se* unreasonable.

23  And like the situation in the case *Bogan v. Hodgkins* in the

24  Second Circuit, which the Court has relied upon, the -- the

25  Court at this point must conclude that as a matter of law, the

1   nonsolicitation agreements alleged here do not and cannot

2   allocate the market.

3           Let me be specific about that, if I may.  The court in

4   *Bogan* focused on a number of factors in concluding that the

5   restraint in that case -- which was an actual no-hire agreement

6   among competitors -- was that -- relied on the fact that there

7   was no indication the agreements -- excuse me.  It wasn't

8   actually a no-hire; it was a nonsolicitation -- that hiring was

9   possible between the companies.  That is exactly the same

10  situation here.

11          The evidence throughout the trial on all three counts

12  demonstrates that these were not bars on hiring among these

13  companies but, rather, nonsolicitation agreements.  And

14  depending -- and we'll come to this in a moment -- by count,

15  that there may have been a notice requirement, there may not

16  have been a notice requirement.

17          In fact, secondly, the evidence shows time and time

18  again that the notice provision, to the extent it did exist,

19  actually caused competition between DaVita and other companies

20  and did not prevent DaVita employees from moving to the other

21  companies or, you know, broader set of companies, for that

22  matter, in the market -- in the -- in the world at large.  I

23  won't use the word "market," Your Honor.

24          Moreover, every witness or many witnesses have

25  testified that during the alleged conspiracy periods on each of

1    these different counts, employees did in fact move back and

2    forth between the companies in question.

3            Now, the Court has rightly noted that the fact that

4    there may have been some movement back and forth is not in and

5    of itself sufficient to demonstrate that there was not a market

6    allocation agreement.  But, here, there is such substantial

7    movement that has been testified to over the course of this

8    case on each of these three different counts, in combination

9    with the fact that this is a nonsolicitation agreement and not

10   a no-hire agreement, so as to elevate the importance of that

11   evidence.

12           Moreover, witnesses have consistently testified both

13   on questioning from government counsel and defense counsel that

14   the competition for employees at -- that were located at

15   DaVita, in all three counts, and even SCA at -- in Count 1 was

16   intense.

17           Moreover, witnesses have specifically testified that,

18   ultimately, employees' mobility was not limited in any

19   meaningful way.  Indeed, in case after case, the people that

20   the government advances as purported victims here have either

21   actually moved to the other company that was in count by count

22   the alleged counterparty in the conspiracy or were competed for

23   by DaVita and received promotions and raises at DaVita.

24           I would note, Your Honor, two things.  Even from the

25   testimony of the single witness that the government presented

1   here in this case -- Mr. Holder, we just heard from --

2   Mr. Holder testified that he went to his bosses in 2015 and

3   presented an opportunity that he had received from another

4   company, at which point they competed to keep him and gave him

5   a raise and a promotion.  And then in addition to that, in

6   response to questions from the jury, Mr. Holder specifically

7   testified that he believed that had he gone with the Radiology

8   Partners discussions to his bosses, that they likely would have

9   competed for him and tried to retain him, because he was, I

10  think he said, the linchpin or the person who was sticking

11  around in the midst of a large turnover in the particular

12  division he was in.

13          So his testimony ultimately shows that he made a

14  choice not to advance, perhaps, as he said, because he had just

15  done the same thing with another outside opportunity just a

16  year before.  He chose not to proceed with Radiology Partners,

17  rather -- even though there was in his mind the likelihood that

18  DaVita would have competed.

19          THE COURT:  Well, that's part of what he said; isn't

20  it, Mr. Walsh?

21          MR. WALSH:  It is part of what he said, Your Honor.  I

22  think certainly the point that I am making is that when you

23  look over the panoply of alleged victims that have been

24  presented by the government, we have a single witness who

25  testified for the jury.  That witness by himself cannot

1    establish that there was market allocation here.  And for that

2    reason, combined with the other -- what I'll call the *Bogan*

3    factors that I've articulated, we believe that the Court should

4    find that the government has failed to establish that there was

5    market allocation in these three schemes and that the -- there

6    was -- that there was a cessation or an end to meaningful

7    competition between these three companies for employees.

8    Clearly, there was not a cessation of meaningful competition.

9            If you'd like, Your Honor, I can turn now to the sort

10   of the count-by-count sufficiency of the evidence points,

11   unless the Court would like to ask any questions about our

12   position on the *per se* issue.

13           THE COURT:  No.  Go ahead.

14           MR. WALSH:  All right.  From each of the three counts,

15   no reasonable jury could find that the evidence is

16   insufficient -- excuse me -- no reasonable jury could find that

17   the evidence is sufficient and that the government has proved

18   its case beyond a reasonable doubt as to each of the elements.

19   First of all, and most importantly, defendants have -- they

20   cannot show that there was cessation of meaningful competition,

21   which is the argument I just made.

22           Secondly, defendant -- they cannot show and have not

23   shown that the defendants entered into the alleged agreement

24   with the intent or purpose of allocating the market for

25   employees, as charged in the three counts and as the Court has

1       articulated.

2               Moreover, there is a genuine question as to the

3       existence of any agreement at all between Golomb and Thiry,

4       which means the government has not proven beyond a reasonable

5       doubt that there was such an agreement in Count 2.  And for

6       that reason alone, that count should be dismissed.

7               Moreover, there is -- the government has failed to

8       prove the existence of agreement and its terms as charged in

9       Count 3 between Mr. Whitney and Mr. Thiry, the Radiology

10      Partners and DaVita count.

11              Let me start -- let me start with the intent issue

12      broadly as to each.  The very first witness that the government

13      called was Mr. Kogod, who testified in the course of his

14      testimony that, at the core, this was just a very personal

15      issue.  He did not offer testimony to indicate that this was a

16      market allocation scheme by any party -- by Mr. Thiry, DaVita,

17      or anyone else.

18              Moreover, there is no affirmative evidence that the --

19      Mr. Hayek and Mr. Thiry on Count 1 entered into the agreement

20      with intent to allocate employees or markets.

21              Mr. Hayek, in fact, specifically testified that he did

22      not believe the agreement in Count 1 was going to lead to the

23      cessation of competition for employees between the two

24      companies.  He also testified he did not believe he was harming

25      employees.  And there were example after example of employee --

1    how employees were actually helped by the agreement because of

2    competition by DaVita to retain them.

3          Moreover, the agreement was discussed openly and

4    transparently, both within DaVita and SCA.  And there simply is

5    not adequate evidence to prove beyond a reasonable doubt that

6    there was intent -- an intent or purpose to allocate the market

7    between the two companies.

8          Let me turn to Count 2 that I touched on just a moment

9    ago.  I think it's really important for the Court to focus on

10   the fact that no percipient witness with direct knowledge of

11   the alleged agreement testified in this case.  Instead, we had

12   the testimony of Agent Hamel, putting into evidence text

13   messages and emails that are at best ambiguous as to whether

14   there was an agreement and at best ambiguous as to whether

15   Mr. Golomb was offering his thoughts on how he might proceed.

16         For that reason, ambiguity here is conclusive -- a

17   conclusive reason that the Court cannot and -- should find that

18   the jury cannot find the government has proved its case beyond

19   a reasonable doubt.

20         And, you know, a couple of things that are important

21   there.  What we've heard about with respect to Hazel Health and

22   DaVita is not a single actual victim or person that was

23   affected and, moreover, people who did move.  People like Julio

24   Quinones, who we've heard quite a bit about.

25         Again, in addition to the fact that there is

1    insufficient evidence to prove beyond a reasonable doubt any

2    intent or purpose between Mr. Thiry and Mr. Golomb, there is

3    actually a genuine question.  And the government simply has not

4    proven beyond a reasonable doubt that there was, in fact, an

5    agreement.

6         On Count 3, similarly, it's important to recall that

7    Mr. Whitney testified that there was never a meeting of the

8    minds on the ground rules email that we have spent so much

9    time on.  Instead, he's -- all he said was that he agreed,

10   represented that he was not going to recruit DaVita employees

11   he didn't believe were otherwise looking for opportunities.

12        Your Honor, that is a thin reed for the government of

13   the United States to rely on as proof beyond a reasonable doubt

14   of a market allocation scheme, a federal felony and a violation

15   of the Sherman Act.  Instead, Mr. Whitney testified that his

16   intent was quite different than allocating the market and,

17   rather, that he intended to maintain his relationship with

18   Mr. Thiry, while not hindering his ability to hire people he

19   wanted to hire from DaVita.  And, in fact, he indicated that he

20   could not think of an example of a person that he wanted to

21   hire from DaVita that he was unable to hire from DaVita as a

22   result of any conversations he had with Mr. Thiry.

23        Moreover, there is no evidence that any of the alleged

24   conspirators in this case had the intent to -- to use the

25   vernacular -- keep DaVita employees at DaVita and keep the

 1    other company -- SCA employees at SCA in the case of Count 1.

 2    To the contrary, the evidence is replete throughout the record

 3    that employees were moving back; and the government has been

 4    unable to show any significant impact on competition between

 5    these companies in reality.

 6         If we go through -- and I'll just cite a couple of

 7    examples here to -- this is not a comprehensive list.

 8         Give me just one moment, Your Honor.

 9         -- of employees that the government at various times

10    has been advancing as potential -- potentially impacted

11    employees.  In case after case, the evidence has in fact proven

12    to the contrary.

13         Excuse me, Your Honor.  Let me see if I can get those

14    notes.

15         THE COURT:  Mr. Walsh, you're making a fine closing

16    argument; but that's not what we're here for.  We're here to

17    talk about a very distinct and rarely granted motion to

18    dismiss.

19         MR. WALSH:  I understand that, Your Honor.

20         I guess my point is to emphasize to the Court that we

21    believe strongly -- both defendants -- that this evidence fails

22    as a matter of law.

23         And I would point the Court specifically to its motion

24    to dismiss order, to -- and the argument that there simply has

25    not been evidence sufficient to establish a market allocation

1    conspiracy sufficient for this case to be a *per se* violation

2    and for the case to go to the jury as a *per se* case.  If it

3    can't, it should be dismissed.

4         THE COURT:  Will you at least agree that there is

5    evidence that there was a nonsolicitation agreement and a

6    tell-your-boss feature as to each of the three alleged

7    conspirators?

8         MR. WALSH:  Your Honor, I think the evidence actually

9    as presented varies.  In Count 1, the evidence -- Mr. Hayek,

10   Mr. Rucker testified to -- we would not be arguing that there

11   was insufficient evidence to show an agreement in that count.

12   In Count 2, I do believe there is insufficient evidence to

13   prove beyond a reasonable doubt the existence of an agreement

14   between Mr. Thiry and Mr. Golomb.  As to Count 3, as I

15   mentioned just a moment ago, there is a -- there is, I think,

16   clearly no evidence beyond a reasonable doubt to establish a

17   notice requirement in that agreement.

18        THE COURT:  Well, doesn't it depend on which evidence

19   you believe?  The ground rules didn't have the tell-your-boss

20   element as a required piece; but Mr. Holder testified that the

21   tell-your-boss rule is what kept him from continuing his

22   negotiations with RAD Partners.

23        MR. WALSH:  Well, Your Honor, as I mentioned a moment

24   ago, you know, we -- I would argue that Mr. Holder's testimony

25   is somewhat to the contrary, that he made a decision not to

 1   proceed because of his personal circumstances.  But, again,

 2   Your Honor, I see the point you're making.  And I don't mean to

 3   get into a full closing argument discussion.  I do think it's

 4   important that the Court understands the position of the

 5   defense on each of these, and we'll file a written motion to

 6   articulate them.  But we believe that --

 7          THE COURT:  You don't want a ruling today?  You want

 8   me to wait until you have filed your written motion?

 9          MR. WALSH:  We would like to make a record with the

10   written motion, Your Honor.  If you would like us to file it

11   later today, we can do that, as well.

12          THE COURT:  I didn't say I want you to file it at all,

13   but you need to do what you need to do.

14          MR. WALSH:  Yes.

15          THE COURT:  My question is, do you want me to wait on

16   this motion you're making until you have filed your written

17   motion?  Yes or no?

18          MR. WALSH:  I think the answer to that is yes, Your

19   Honor.

20          THE COURT:  All right.  Are you finished?

21          MR. WALSH:  I am, Your Honor.

22          THE COURT:  Thank you.

23          MR. WALSH:  Thank you.

24          THE COURT:  Response.

25          Here is a new face.

```
 1              MR. STONE:  Your Honor, I apologize.  On behalf of
 2    Mr. Thiry, could I just be heard for a moment before the
 3    government?
 4              THE COURT:  Who are you?
 5              MR. STONE:  I'm Jeffrey Stone.  I'm counsel of record
 6    in this case.
 7              THE COURT:  Oh.  Mr. Walsh stood up and said he was
 8    speaking for both defendants.
 9              MR. STONE:  He was, and I adopt Mr. Walsh's argument.
10    But there is maybe one additional argument I would like to put
11    before the Court on behalf of Mr. Thiry.
12              THE COURT:  All right.  Mr. Stone.
13              MR. STONE:  So, Judge, when we were -- again, for the
14    record, Jeffrey Stone on behalf of Mr. Thiry.
15              Your Honor, when we were sitting around last night
16    talking about who was going to get to make this argument, we
17    drew straws; and I drew the short straw.
18              THE COURT:  So that tells me already that you don't
19    think much of the argument.
20              MR. STONE:  No.  Actually, I thought a lot about it.
21              MR. MELSHEIMER:  He's stealing my line from the other
22    hearing.  I just want to note that.
23              THE COURT:  It sounds like a Melsheimer line.  But
24    it's like the fellow who gets up to start a speech but saying,
25    I'm not very good at public speaking.  That's not the best
```

1    start.

2           *MR. STONE:*  I'll say two things.  One, I'm not very

3    good at public speaking.  And, two, comparing me to

4    Mr. Melsheimer, whether it's you or Mr. Melsheimer doing it, I

5    take that as a compliment.

6           *THE COURT:*  Okay.

7           *MR. STONE:*  So, Judge, the argument that I want to

8    present to you is a legal argument on the issue of the

9    applicability of the *per se* standard.

10          I was here during the oral arguments; I participated

11   in the briefing; I've read every one of your rulings; I've been

12   here for every minute of the case; I know how you feel about

13   the applicability of the *per se* standard.

14          Our argument --

15          *THE COURT:*  I'm not sure you do, but -- there is no

16   way to know how I feel.  You can know what I read -- what I

17   wrote.

18          *MR. STONE:*  And that's fair.  Knowing the intent and

19   purpose, you're right, Your Honor, is very difficult.

20          The issue here is whether or not the record that is

21   now before you allows you to conclude, as the Supreme Court has

22   said, that the conduct that's been alleged and now demonstrated

23   is so thoroughly pernicious that there is no possibility that

24   it could have a pro-competitive benefit.

25          *THE COURT:*  Unfortunately, Mr. Stone, I've already

1    crossed that bridge.

2         *MR. STONE:*  I understand, Your Honor.  And you

3    admonished us yesterday that nobody wants to retry this case;

4    and so on behalf of Mr. Thiry and on behalf of DaVita, I do

5    want to -- I do want to make the point that I don't think that

6    the record that's been developed will stand scrutiny to suggest

7    that a *per se* standard is appropriate.

8         You have noted, courts have noted, it's not really in

9    dispute, that a *per se* standard is a draconian standard.  You

10   asked questions of Mr. Vigen during the oral argument on the

11   motion to dismiss:  Are you asking me to enter a directed

12   verdict here?  You got it exactly right.  The application of

13   the *per se* standard imposes extreme burdens on the defendants.

14        There are three ways, I would submit, that you can get

15   to a conclusion that a *per se* standard is appropriate for

16   conduct.  Congress could speak, which clearly hasn't happened;

17   the courts could speak in the well-developed judicial evolution

18   that the Supreme Court has alluded to as recently as last term

19   in the *NCAA v. Austin*.  Respectfully, that careful judicial

20   evolution has not occurred.

21        *THE COURT:*  Well -- and, respectfully, as you say, and

22   as I wrote in my order denying your motion to dismiss, I think

23   it has.  I think that you and I are two ships passing in the

24   night on that issue.

25        As I said, yes, a *per se* rule has not been applied

1  specifically to a nonsolicitation agreement, with the exception

2  of the Ohio case.  But, yes, too, a *per se* rule has been

3  applied to horizontal market allocations agreements.  That is,

4  as they say, set in stone.  The question is, is this agreement

5  one of those?

6        *MR. STONE:*  That's exactly right, Judge.  We are not

7  ships passing in the night.  We're probably on different decks

8  of the ship, but we're on the same ship.

9        You put your finger on it.  The *Cooperative Theaters*

10  case -- which was the Ohio case you were referring to -- was

11  not a case that existed in the employment domain.  It was not a

12  case that dealt with nonsolicits.  It was not a case that lines

13  up with what we now have as the facts that have been developed

14  in this case.

15        What you had at the time of the motion to dismiss --

16  and you -- you know, you were ruling correctly on the

17  Indictment as alleged, and you gave the government great

18  deference.  We now stand in a very different place in the

19  development of the law.

20        The record that the appellate court will have to

21  review when they scrutinize the record and say, has Congress

22  acted?  Have the courts spoken to this position?  Or is this a

23  case of first impression that is so clear, so thoroughly

24  pernicious in the evidence that's been developed that, yes, it

25  is appropriate -- notwithstanding the due process problems of

 1    notice, it's appropriate on this record to say, anybody could

 2    have known that this behavior was so thoroughly pernicious,

 3    that it was not only criminal, but criminal so that it would

 4    not get the rule of reason standard, which the government

 5    acknowledges does not allow a criminal case to go forward under

 6    their own guidelines, but is so thoroughly pernicious that this

 7    draconian standard should apply.

 8            There has never been a case in U.S. jurisprudence that

 9    any of us have been able to find that either addresses the

10    question theoretically at the time of the Indictment or,

11    certainly, based on the facts that we now see.

12            THE COURT:  All right.  Thank you.

13            MR. STONE:  Thank you, Judge.  I appreciate the

14    indulgence.

15            THE COURT:  Response.

16            MS. LEWIS:  Mr. Parker will be making remarks for the

17    government.

18            MR. PARKER:  Good morning, Your Honor.  Terence Parker

19    on behalf of the United States.

20            I finally got out of the bullpen, and Mr. Stone sent

21    me straight to the dugout.

22            THE COURT:  You're the law guy.  The rest of them are

23    the facts people.

24            MR. PARKER:  Exactly, Your Honor.

25            I think to start, just to respond briefly to

 1    Mr. Walsh's point, the key dispute here seems to be the intent

 2    element, that second element.  And since intent is a classic

 3    jury question, and we're taking all of the evidence in the

 4    light most favorable to the United States at this point, then

 5    the appropriate sort of course of business here is to allow the

 6    jury to decide it.

 7              I'm happy to go count by count, element by element.

 8    If Your Honor has questions, I can pause here and respond to

 9    you.  But I think Your Honor sort of has made the point that I

10    don't know that we need a ton of argument on this at this

11    point.

12         *THE COURT:*  Intent, as has been said by me and many

13    judges before me and will be said by many judges after me, is

14    something as to which there is rarely much if any direct

15    evidence.

16              For example, it would be direct evidence if Mr. Thiry

17    were to testify and say, Well, as a matter of fact, I intended

18    to allocate the market.  Now, that's not going to happen.  It

19    never happens, or almost never happens.  And so intent is

20    something that one has to infer from the direct evidence.  It

21    is a matter of circumstantial evidence in almost every case,

22    and it is rare for a judge to supplant a jury when it comes to

23    determining what someone's intent was or was not.  That's what

24    you're saying?

25         *MR. PARKER:*  Yes, Your Honor.

1           THE COURT:  I agree with that.

2           MR. PARKER:  And we'll just reserve our right to

3    respond to their brief, I think.

4           THE COURT:  Okay.

5           MR. PARKER:  Thank you.

6           THE COURT:  All right.  Then do you folks need a break

7    before we proceed?  Or are you going to get up and rest?

8           MR. MELSHEIMER:  Well, I'd love to rest, Your Honor;

9    but it's not the kind of rest I think the Court has in mind.

10   We're going to give a brief opening, and then we're going to

11   put on Dr. Cremieux, and then we'll see what happens.

12          THE COURT:  Okay.  That's fine.  Do you folks need any

13   break before we bring the jurors back in?

14          MR. MELSHEIMER:  Maybe just a couple of minutes to

15   make sure that everything is set up, but there is not much to

16   set up.  It won't take more than two minutes.

17          THE COURT:  Okay.  Take your time.  Let us know when

18   you're ready for the jury.

19          MR. MELSHEIMER:  Thank you, Your Honor.

20          Your Honor, if we could take up something in regards

21   to Dr. Cremieux, his slides.

22          THE COURT:  Okay.

23          MR. MELSHEIMER:  They're not my objections.

24          MR. VIGEN:  Tom, do you mind --

25          MR. MELSHEIMER:  Which ones do you want pulled up?

1    MR. VIGEN:  Let's start with 34, Judge, please.

2    MR. MELSHEIMER:  That's a good sign, Judge.  We're

3  starting with 34.

4    THE COURT:  That means the first 33 are all right?

5    MR. VIGEN:  Unfortunately not.

6    THE COURT:  All right.  Mr. Vigen.  34.

7    MR. VIGEN:  So, Your Honor, we would object that it's

8  not proper to opine on the ultimate issue that's before the

9  jury with respect to there being no meaningful end to

10  competition.

11    We have no problem with the expert discussing employee

12  movements.  That's the purpose of his expertise, apparently, is

13  to opine on that or give those facts to the jury.  But then to

14  take the next step and tell them what result to reach we

15  believe is improper.

16    THE COURT:  It isn't the slide that's improper; it's

17  what he might do with it.  Right?

18    MR. VIGEN:  Well, I think it's one and the same.

19  That -- if he does say that there is no meaningful end to

20  competition, we believe that is a step too far and an issue for

21  the jury to decide, not for the expert to --

22    THE COURT:  No.  I didn't think that was your point at

23  all.

24    MR. MELSHEIMER:  That's not the rule, Your Honor, I

25  don't believe.

1286

1       THE COURT:  That's not the rule.

2       MR. VIGEN:  Okay.  Thank you, Your Honor.

3       MR. MELSHEIMER:  See how easy that was?

4       THE COURT:  But if he crosses the line into what I

5   said is not the market, you can anticipate that I will stop it.

6       MR. MELSHEIMER:  Your Honor, I have anticipated the

7   unpleasantness that would ensue for quite some time, so we are

8   not going to do that.

9       THE COURT:  I didn't think you would, Mr. Melsheimer.

10  What you would do is use what I said the market was and figure

11  out a way to make it work for you.

12      MR. MELSHEIMER:  That's what we're trying to do, Your

13  Honor.

14      THE COURT:  I figured you would.  All right.

15      MR. MELSHEIMER:  I'm ready to proceed.

16      THE COURT:  Yeah.  Got it.

17      (Jury in at 11:05 a.m.)

18      THE COURT:  All right.  Have a seat.  I neglected to

19  do one thing yesterday that I should have done.  And that is to

20  ask you, sir, did you have a nice time at the baseball game?

21      JUROR:  Yes, I did.  Great time.

22      THE COURT:  You know that's the only game the Rockies

23  have lost so far.

24      JUROR:  Yes.  Did you watch yesterday?

25      THE COURT:  Did I watch?

1    *JUROR:*  It was on late --

2    *THE COURT:*  No, I didn't get to watch it; but I heard

3    that on the radio as I was driving home.

4    *JUROR:*  In this moment in time, they're leading the

5    west, so --

6    *THE COURT:*  All right.

7    You might remember, ladies and gentlemen, that at the

8    very beginning, I told you that lawyers could reserve their

9    right to make an opening statement to a later point in the case

10   if they wished to do so.  In fact, Mr. Melsheimer, one of the

11   lawyers for the defendant Mr. Thiry, made that decision and

12   reserved his opening statement.  And so he will now make his

13   opening statement on behalf of his client, Mr. Thiry; and then

14   we'll proceed with the defendants' witnesses.

15   Sir.

16                         **OPENING STATEMENT**

17   *MR. MELSHEIMER:*  May it please the Court.

18   Ladies and gentlemen of the jury, we have spent a

19   little over a week together now, so it may seem a little odd

20   for me to be giving an opening statement sort of halfway

21   through things -- or, actually, towards the end.  But as the

22   judge has said, we have reached a new stage in the case.

23   At the end of the day Friday, before you left, you may

24   recall that the judge told you to keep an open mind because you

25   hadn't heard all the evidence yet.  Now, you've heard all of

1    the evidence the government could muster in its case in chief;

2    and you've heard our cross-examinations, where we tried to do

3    what Mr. Dodds said in opening, and that is to add context, to

4    show additional facts, to tell the complete story, and we tried

5    to do that.  Because context matters, and the truth can only be

6    fully understood when you have all the information.  That's why

7    we're here.

8         And I suspect we all have had the experience of

9    reading a story or watching a movie and not really knowing what

10   it's all about until we reach the end, because the full story,

11   the complete picture, isn't before us.

12        So the judge has permitted you to ask questions of the

13   witnesses.  And that is an ancient practice, but it doesn't

14   happen with every judge, so you are very lucky.  But we also

15   are lucky, because your questions -- they've been thoughtful

16   and insightful -- and it's helped us guide the kind of

17   questions we want to ask.  That is to say, to the extent your

18   questions have revealed your thinking about this case, that is

19   the most valuable asset in this courtroom.  Because if we

20   understand your questions, then we can show and point to

21   evidence to help answer them.

22        Now, recall, as the judge said a week ago, you're the

23   judges of the facts.  Not me, not the government, not the

24   judge.  You're the only judges of the facts in this courtroom,

25   and that's why we stand up when you enter the courtroom.  Even

 1    the judge stands up, because you are the masters of the facts.

 2              And perhaps as early as tomorrow -- perhaps as early

 3    as tomorrow, we'll stand up again when you retire to deliberate

 4    about the case after you've heard the closing arguments.

 5              So I want to visit with you very briefly today about

 6    the evidence you'll hear about -- the evidence I'm going to

 7    present to you -- we are going to present to you -- when we

 8    call just one witness.  And I hope that's good news, because it

 9    means we're getting to the end of the case.

10              But before I do that, I want to remind you of

11    something that the judge told you way back on Monday.  And that

12    is, we -- Mr. Thiry, and DaVita -- we don't have the burden to

13    prove anything.  The burden of proof is always on the

14    government.

15              Now, you may remember in Ms. Brooks' *voir dire*, jury

16    selection, that she gave the example of, how do you disprove

17    that you had an intent to do something?  And we all know that

18    the core issue in this case -- and you'll hear about it in

19    great detail from the judge.  He will tell you what the issues

20    are, of course -- but it's the issue of intent, whether there

21    was the necessary intent to allocate a market.

22              And because of the way our system is set up, we don't

23    have to disprove the government's allegation, because how would

24    you ever do that?  And that's the example that Ms. Brooks gave

25    when she was speaking to you last Monday.  So in a criminal

1    case, what the law has said for hundreds of years is the

2    government has to prove everything.  And not just a little bit,

3    not just maybe, not just probably, not just likely, but they

4    have to prove it beyond any reasonable doubt.  And that makes

5    sense, because, again, how in the world would anyone disprove

6    the issue of intent, which is at the core of the arguments the

7    government has brought in this case?  So that is why the burden

8    in this case is so exacting and so high.

9         Now, although we have no burden, we are going to call

10   a single witness, because he's different.  This is a different

11   kind of witness.  And I think this witness will put a lot of

12   the evidence you have heard into a better context so you can

13   complete the picture.  He did a lot of work, conducted a lot of

14   analysis to shine a light on the government's case by using

15   real-world data and objective facts.

16        So that witness is a man named Dr. Pierre Cremieux.

17   He's an economist.  He has a Ph.D. in economics, and he

18   specializes in the study of labor markets and antitrust, or

19   Sherman Act economics.  The slide that you'll see -- you'll see

20   it again in a minute -- has some of his credentials.  He's the

21   only economist you'll hear from in this case.  And he's the

22   only person, the evidence will show, who has analyzed and

23   studied the objective data that can assist you in making the

24   decision you'll have to make as jurors.

25        So Dr. Cremieux is going to tell you that he's applied

 1   something called the scientific method.  Now, you may remember

 2   the scientific method from way back in elementary school; and

 3   that is a way of testing something to see if it holds water.

 4   And Dr. Cremieux in just a few minutes is going to tell you

 5   that he identified a hypothesis, which in this case was the

 6   allegation that the government has made; he tested that

 7   hypothesis using data; and then, finally, he's going to either

 8   tell you whether his analysis accepted or rejected that

 9   analysis.  And he's going to show you what the government has

10   to prove and how the data -- the scientific data, the objective

11   facts shows that they haven't done that.

12          So what has he done specifically?  Well, he's

13   specifically reviewed data regarding the actual movement of

14   employees between these companies.  He's going to look at that,

15   show that to you, and tell you what that means from the basis

16   of economics.

17          He looked at the turnover rate -- that is to say, how

18   many people are leaving the companies that we've heard about,

19   specifically, DaVita?  And he looked at compensation data --

20   that is to say, the salaries of the people that were working at

21   DaVita.  So he's going to show you that there was actual

22   movement between DaVita and these three companies, and he's

23   going to show you that that movement that he observed in the

24   data is not the kind of movement you'd expect to see in an

25   allocated market.

1    Now, you may recall at the very beginning of jury

2    selection, the judge gave you a preliminary instruction that

3    included an example about two auto companies selling competing

4    products -- two companies selling competing products.  In the

5    judge's example that he gave, those two companies agreed not to

6    compete for customers who purchased that product.  The judge

7    went on to say that such an agreement might eliminate

8    compensation that might otherwise reduce prices for that

9    product.

10    So in a similar way, what Dr. Cremieux did is he

11    looked at prices for labor.  And the price for labor, which is

12    really an economist way of talking about salaries -- right --

13    how much you pay to get someone to work.  And what he concludes

14    is, is that if you had a market allocation agreement with the

15    intent to allocate, you would expect to see the salaries go

16    down because of the elimination of competition; but he's going

17    to show you that the salaries went up.

18    He'll also talk to you about the turnover at DaVita,

19    and how if there was an agreement to allocate employees among

20    these three counts with one company in each count and that

21    somehow the employees were trapped at DaVita, that turnover

22    would go down -- he would expect to see turnover go down during

23    the period of the alleged market allocation agreement.  He's

24    going to show you data that shows just the opposite; in other

25    words, turnover increased, which is the opposite of what you'd

1293

1    expect to see in an allocated market.

2          So that's what you're going to hear in a minute.

3    You're going to hear Dr. Cremieux with objective data using the

4    scientific method, as opposed to witnesses who may have come in

5    with no personal knowledge, witnesses who have axes to grind,

6    or witnesses who have promises from the prosecution not to be

7    prosecuted.

8          So keep your questions coming.  We welcome it.  We

9    will do our best to answer all of them, either through

10   Dr. Cremieux or in the closing.  And I think what you'll see at

11   the end is the evidence will demonstrate that Mr. Thiry did not

12   act with an illegal purpose and intent.  He did not act

13   consistent with what the government has charged in this

14   Indictment.

15         So perhaps later today or in the morning, the case

16   will be concluded, and we believe that the evidence presented

17   by both sides will show you that the proper verdict as

18   understood by the legal instructions the Court will give you --

19   the proper verdict for you for Mr. Thiry on all three counts is

20   not guilty, not guilty, and not guilty.

21         Thank you for your time.

22         *THE COURT:*  All right.  Thank you.

23         Now, the defense may call its first witness.

24         *MR. MELSHEIMER:*  Your Honor, the defense calls -- the

25   defense calls Dr. Pierre Cremieux.

1    *THE COURT:*  All right.

2    (**PIERRE CREMIEUX, DEFENDANTS' WITNESS, SWORN**)

3    *THE COURT:*  All right.  Thank you.

4    *MR. MELSHEIMER:*  May it please the Court.

5    **DIRECT EXAMINATION**

6    BY MR. MELSHEIMER:

7    *Q.*  Dr. Cremieux, can you please introduce yourself to the

8    jury.

9    *A.*  Yes.  Good morning.  My name is Pierre Cremieux.

10   *Q.*  Can you tell the jury what you were asked to do in this

11   case.

12   *A.*  Yes.  So what I was asked to do is to analyze the question

13   at issue here, which is whether the economic evidence -- which

14   I will show you in a few minutes -- supports the idea that --

15   or the allegation that there is an agreement between DaVita and

16   three companies -- SCA, Hazel, and Radiology Partners -- to

17   allocate a market for employees, as has been alleged.

18   *Q.*  Dr. Cremieux, is it possible to test whether this kind of

19   agreement actually exists by looking at data?

20   *A.*  Yes.  I would argue not only that it's possible, but that

21   it's necessary.  It's one of the important ways that the

22   allegation can be tested.

23   *Q.*  How is it possible to test this kind of allegation?

24   *A.*  Well, it's possible because if there was an allocation of

25   labor, then there should be some telltale signs of it, in the

Pierre Cremieux - Direct

 1    way in which we see employees move, the way in which we see the

 2    response -- the competitive response.  So there is a way to use

 3    data to check it out and see whether, in fact, the movements

 4    that I observed and the nature of competition that I observed

 5    is consistent with one of the two possibilities, either that

 6    there was an allocation of labor or that there wasn't.

 7            MR. MELSHEIMER:  Your Honor, might we publish the

 8    demonstratives to the jury at this time, as we move forward?

 9            THE COURT:  Surely.  Yes.

10            Now, you're going to have it marked as an exhibit.

11    What exhibit?

12            MR. MELSHEIMER:  Demonstrative Exhibit 1, Your Honor.

13            THE COURT:  Is that all of them, or is that just the

14    first one?

15            MR. MELSHEIMER:  Your Honor, with the Court's

16    pleasure, we can number them each slide, or we can just call

17    them defendants' Demonstrative Exhibit 1, however you'd like

18    to --

19            THE COURT:  How many slides are there?

20            MR. MELSHEIMER:  I believe there are about 50.

21            THE COURT:  All right.  Let's put exhibits on them.

22    And you tell me where you start, and we'll mark them with 50

23    sequential numbers.

24            MR. MELSHEIMER:  Thank you, Your Honor.  So we'll

25    start with defendants' Demonstrative Exhibit 1, which will be

Pierre Cremieux – Direct

1      this slide.

2             THE COURT:  Okay.

3             MR. MELSHEIMER:  Or would you --

4             THE COURT:  I consider demonstrative exhibits and

5      exhibits to be equal.  If you want to call them a different

6      number, you can; but they're going to be admitted or not

7      admitted and go to the jury.

8             MR. MELSHEIMER:  Your Honor, let me suggest that we

9      call this next one B540, which is the next number.

10            THE COURT:  B540.  So you're going to go from B540 to

11     B590.

12            MR. MELSHEIMER:  Approximately, Your Honor.  Yes.

13            THE COURT:  Is there any objection?

14            MR. VIGEN:  No objection.

15            THE COURT:  All right.  Those are admitted.

16            (Exhibit B540-590 admitted.)

17            So we'll start with B540, then.

18            MR. MELSHEIMER:  Thank you, Your Honor.

19     BY MR. MELSHEIMER:

20     Q.  The jury is now looking at what you described as the

21     question to be analyzed.  This is the question you analyzed in

22     your work, Doctor?

23     A.  That's right.

24     Q.  You talked about data that can be observed.  Can you just

25     describe briefly what kind of data can be observed in the kind

Pierre Cremieux - Direct

1    of analysis that you're doing?

2    A.   Yes.  So the data that can be observed is data that, as I

3    mentioned, is going to reflect the compensation, the turnover,

4    and more generally, the competitive landscape.  Those are the

5    data that I use.  What I mean by turnover is two things.  One

6    is the general turnover at the company but also the ways in

7    which labor was moving from one company to the other -- from

8    DaVita to SCA, and vice versa; from DaVita to Hazel; and from

9    DaVita to Radiology Partners.

10   Q.   After reviewing the data, what conclusion did you reach?

11   And this would be B541.

12   A.   Yeah.  So the conclusion I reached is that -- again, I'm an

13   economist.  So based on the economic evidence, I don't see the

14   economic evidence as supporting the allegation that there was

15   an agreement entered into between DaVita, SCA, Radiology

16   Partners, and Hazel with the intent or purpose to allocate

17   labor.

18   Q.   We'll get into the work that you did and your conclusions

19   in some more detail, but can we first talk about your

20   background?

21   A.   Sure.

22   Q.   Are you a professional economist?

23   A.   Yes, I am.

24   Q.   How long have you been an economist?

25   A.   For about 35 years.

1298
Pierre Cremieux - Direct

1    Q.   What is the study of economics?

2    A.   Well, it's the analysis of all movements that have to do

3    with money in one way or the other; but, more specifically,

4    it's the use of data to study those kinds of movements.

5    Q.   Do you have any areas of specialty in the field of

6    economics?

7    A.   Yes.  So when you do your Ph.D., you have to pick what we

8    call fields.  And so -- you have to pick two, so I picked two

9    fields.  One of them was labor economics, which is the study of

10   people within the economy and workers, in particular.  And I

11   also picked what is called industrial organization, which

12   really means just the way in which firms operate.  So how do

13   firms make decisions?  So workers on one side, firms on the

14   other seemed like a good combination to me.

15   Q.   Do you also specialize in something called antitrust

16   economics?

17   A.   Yes.  So antitrust economics, which you can think of as

18   competition, is another area -- and it's kind of a subset of

19   industrial organization -- that really deals not in general

20   with how firms work, but specifically how they compete.

21   Q.   Dr. Cremieux, we have in front of the jury B542, which is a

22   summary of your educational and -- well, a summary of your

23   educational background.  Can you narrate for the jury your

24   educational background, starting with college.

25   A.   Yes.  I started by getting a BA at the University of

Pierre Cremieux - Direct

1  Maryland.  And then after that, I went to the other coast and

2  got first a master's and then a Ph.D. in economics still from

3  the University of California Berkeley.

4  Q.  What did you do after you got your Ph.D.?

5  A.  I moved back to the East Coast again, but a little further

6  north.  I went to Montreal and taught -- I was hired there as a

7  professor at the University of Quebec in Montreal.

8  Q.  What did you teach at the University of Quebec in Montreal?

9  A.  A wide variety of classes.  But, certainly, I taught

10  industrial organization and labor, which are my two

11  specialties, as well as microeconomics, which is another more

12  broader area for younger students, dealing with how firms work

13  and how workers -- how workers participate in the economy.

14  Q.  Did you teach at other colleges or universities?

15  A.  Yes.  So shortly after getting tenure at the university, I

16  actually left and went into private consulting, the company

17  that I'm at now.  But I always liked teaching, so I continued

18  to teach both individual classes, where I would be invited as

19  an expert on a topic, or entire courses with, you know, exams

20  and all of that.

21  Q.  Are the universities at the right-hand portion of this

22  slide -- Harvard, Boston University, Yale, MIT, and Brandeis

23  and McGill -- are those the sum of the universities that you

24  have either taught classes at or assisted in teaching classes

25  at?

Pierre Cremieux - Direct

1    A.   Yes.  Either classes or courses, yes.  Yeah.

2    Q.   Have you published research in the field of labor

3    economics?

4    A.   Yes, I have.

5    Q.   How many articles?

6    A.   Maybe 20.

7    Q.   Is -- are those articles based generally on the analysis of

8    empirical scientific data?

9    A.   Yes, they are.

10   Q.   What does it mean for something to be empirical?

11   A.   It means that it's not -- it's not theoretical, it's not

12   something that you kind of think about and make up.  And there

13   are some economists who do that, so there is nothing wrong with

14   that, but that's not what I do.  I really am a statistician, so

15   I use data to try and analyze problems.  And then I -- if I

16   find the problem interesting and I have an interesting answer,

17   I publish it in a journal.

18   Q.   Has your work been published in what is called a

19   peer-reviewed journal?

20   A.   Yes.

21   Q.   What is a peer-reviewed journal?

22   A.   Well, it's a journal that has a process to make sure that

23   what is published is of high quality.  So what they do is, you

24   submit your article, and they send it to peers -- that's why

25   it's called peer-reviewed -- so professors or other economists,

Pierre Cremieux - Direct

1    who are going to look at your analysis, look at your data, and

2    determine whether they think it's worthy of publication.  Often

3    they're going to ask you for revisions.  They're going to send

4    it back to you with questions; you're going to answer the

5    questions; and, eventually, if you're lucky, it's going to get

6    published.

7    Q.  You mentioned you received a Ph.D. from the University of

8    California Berkeley.  As part of getting that Ph.D. did you

9    have to write a dissertation?

10   A.  Yes, I did.

11   Q.  What was the subject matter of your dissertation?  And are

12   we showing the first page of it in Demonstrative 543 -- B543?

13   A.  Yes, we are.  And the topic at the time -- the topic of my

14   dissertation is really kind of relevant to what we're doing

15   today, because it was studying the impact of what at the time

16   was airline deregulation on the wages of pilots, mechanics, and

17   flight attendants.  So the question --

18   Q.  How is that -- I'm sorry to interrupt you, sir.

19   A.  Okay.

20   Q.  How is that relevant to the work that you did in this

21   matter?

22   A.  Well, it's relevant in a number of ways.  First, it was an

23   empirical analysis.  So, again, I was looking at data.  I had

24   data on wages, on the compensation of these employees, first

25   thing.  Second, there was an event, which was deregulation,

Pierre Cremieux - Direct

1    which affected a lot of things, but it affected the workers, in

2    particular.  Just like here, there is an event, which is the

3    allegations that the government is making.  And there was also

4    the question of whether it affected wages.  Did it affect --

5    you know, did it affect the people who were close to the

6    events -- in this case, the workers?  So all of this is pretty

7    parallel, even though it's a completely different sector, to

8    the questions that I've been looking at today.

9    Q.  You mentioned that you left the University of Quebec after

10   getting tenure and went into private practice.  What firm did

11   you go work with?

12   A.  So I joined the company called Analysis Group.

13   Q.  What year did you join Analysis Group?

14   A.  1997.

15   Q.  What is Analysis Group?

16   A.  Well, it's a company that specializes in economic and

17   statistical analysis of various problems for clients who come

18   to us, whether in the private or the public sector.

19   Q.  What is your title or position at Analysis Group currently?

20   A.  Now I'm the president of the company.

21   Q.  How long have you been president of Analysis Group?

22   A.  About maybe five, six years.

23   Q.  Is Analysis Group a big company, a small company, or a

24   medium-sized company?

25   A.  Well, it got bigger.  Now it's a company of about 1,100

Pierre Cremieux - Direct

1    people.  We have offices in -- around the U.S., and we have an

2    office in Montreal, and a few in Europe, then an office in

3    China.

4    Q.  Is part of your work at Analysis Group to study questions

5    about labor markets?

6    A.  Yes, that's one of the things I've done over the years.

7    Q.  Do you work for clients in both the public and private

8    sector?

9    A.  Yes.  The company has a wide range of activities, both

10   public and private.

11   Q.  So I want to ask you about this case.  How much time have

12   you or members of your team worked in connection with this

13   engagement?

14   A.  Yes.  It's been thousands of hours.  Probably 3, 4, 5,000

15   hours.

16   Q.  How many people are on your team?

17   A.  Well, it depends on what we're doing.  It grows and shrinks

18   depending on the needs.  Right now, there is maybe four people,

19   five people who are really active.  But at times I've had as

20   many as, you know, 15 people, 20 people working, particularly

21   on the data aspects of what I'll show.

22   Q.  Can you give the ladies and gentlemen of the jury a

23   high-level overview of the work that you and your team

24   performed in this matter?

25   A.  Yes.  So I noticed you showed earlier the scientific

Pierre Cremieux - Direct

1    method, so that kind of frames the work that we do.  The first

2    is to really think carefully about what the hypothesis is that

3    I'm going to be testing and think about how it needs to be

4    articulated and try to think about what elements may be helpful

5    in figuring out the answer to the question that I'm posing.  So

6    that's an early task, is doing that.

7            Then the second is to think about what data we can use

8    to -- we can apply to the question to try to answer it best we

9    can.  And that's often the bulk of the work, because we have to

10   identify the data; you have to collect it; you've got to

11   understand it; often you've got to make sure it's right; you've

12   got to check it.  And then once you're comfortable that your

13   data is good, reliable data, the next step is to analyze it.

14   So that's where we do some statistics on the data, to try to

15   understand what is going on, and then draw a conclusion.

16   Q.  Has Analysis Group been paid for the work of you and your

17   team on this case?

18   A.  Yes, we have -- it has.

19   Q.  What does Analysis Group charge for your time?

20   A.  So for my time, it's $1,050 an hour.

21   Q.  Is that your standard rate?

22   A.  Yes, it is.

23   Q.  Approximately how much has your work and your team's work

24   cost in this matter?

25   A.  Well, I would say at this point I'm sure it's over a

Pierre Cremieux - Direct

1    million dollars.

2    Q.  Are the fees that Analysis Group charges in any way

3    dependent on the conclusions you reach?

4    A.  No, because we get paid -- you know, we record our hours,

5    so we get paid for the hours we work.  And we get paid as we

6    go.  We submit invoices; so, you know, we've gotten paid on a

7    lot of the work that we've already done.

8    Q.  Before we move on to your opinions, Doctor, let me ask you,

9    have you watched or read everything that has gone on in court

10   since we started?

11   A.  I believe I have, yes.

12   Q.  Were you personally here in court yesterday for the

13   testimony of a couple of witnesses?

14   A.  Yes, I was.

15   Q.  Were you also here in court this morning?

16   A.  Yes, I was.

17   Q.  Dr. Cremieux, I want to turn to the methodology you used

18   and how you did your work in this case.  Have you prepared some

19   slides to assist the jury going through your testimony?

20   A.  Yes, I have.

21   Q.  Let's look at the next slide, which is B544.  What is this?

22   A.  Well, so this is a slide that kind of gives you a -- a way

23   to follow through the various steps of the analysis that I've

24   done and explain to you how I think about a problem like this.

25           The first step is, identify the hypothesis, figure out

Pierre Cremieux - Direct

1    what it is that I'm trying to answer, what question is the

2    question at issue?  Then the second once I've identified the

3    hypothesis is to test it.  And the third is to accept or reject

4    the hypothesis.

5    Q.  So let's go through each of those steps, and let's start

6    with number one.

7    A.  I'm sorry.  Can I just add one thing?

8    Q.  Of course.

9    A.  Which is, you know, the reason why I refer to this as a

10   scientific method is because it's really important in my view

11   when you go about answering a question, you have to -- you have

12   to have a way to either prove it or disprove it.  But it's got

13   to be a real test, so that either you pass or you fail the test

14   in some ways.  So that's why I refer to this as a scientific

15   method.  It's been used for decades, probably centuries; it's

16   something that is used in science, as well -- I mean, in other

17   sciences, hard sciences, not just economics.  So I just wanted

18   to make that clear, that that's where this is coming from.

19   Q.  Thank you, Doctor.  So what's the first step?

20   A.  Well, to identify the hypothesis.  What's the question?

21   Q.  What's the second step?

22   A.  Second, test the question.  Figure out the answer.

23   Q.  And what's the last step?

24   A.  Once you figure the answer, share the result of that

25   answer.  Is it yes or no; did it pass or did it fail?

Pierre Cremieux - Direct

1   *Q.*  Let's go back to that first step of identifying the

2   hypothesis.  What's the hypothesis in this case that you

3   tested?

4   *A.*  Well, to trans -- what I'm doing is I'm really translating

5   the allegations into something that I can operationalize, where

6   I can actually test the question.  So my hypothesis is what the

7   government alleges.  The government says that DaVita and each

8   of SCA, Hazel, and RP entered into an agreement with the

9   purpose and intent of allocating the market for employees --

10  allocating labor.  So that's the question that I ask.  I try to

11  prove or disprove the allegation.

12          *MR. MELSHEIMER:*  So we'll note that as

13  demonstrative -- B544.

14  *BY MR. MELSHEIMER:*

15  *Q.*  Now, Dr. Cremieux, are there differences between the three

16  alleged agreements that affect your hypothesis?

17  *A.*  Yes, there are.  There are three counts.  There they are.

18  The first count -- the first, second, and third count differ in

19  a number of ways.  One of the ways they differ in is that

20  they're not about the same company.  So it's DaVita and SCA in

21  the first case for the first count, the second is DaVita and

22  Hazel, and the third is DaVita and RP.  So, obviously, the data

23  that I'm going to be using is going to be different for all

24  three of them.

25          It's also the case that the allegations about the

Pierre Cremieux - Direct

1    companies are not the same.  In the first case, it's an

2    allegation of an agreement not to solicit senior-level

3    employees; and the agreement is alleged to have gone both ways,

4    between SCA and DaVita.  Whereas, the second and third counts

5    have allegations which are about all employees, not just senior

6    employees, and are unilateral -- unidirectional.  So it's

7    really an allegation that there was an agreement not to hire

8    DaVita employees, not the other way around.

9          And then, finally, the periods aren't the same.  The

10   periods of the allegation aren't quite the same.

11         *MR. MELSHEIMER:*  One moment, Your Honor.

12         We'll note that as B545.

13   *BY MR. MELSHEIMER:*

14   *Q.*  Now, let's take a look at the next step you performed,

15   which is testing the hypothesis using data.  What kind of data

16   did you use?

17   *A.*  So I used three types of data.  I used data about -- data

18   from DaVita on employment and compensation; I used data from

19   LinkedIn, which we've heard quite a bit about, actually, in the

20   last few days; and I also used data from the government.

21   *Q.*  You mentioned that you looked at DaVita records.  Is it

22   unusual or typical for a company like DaVita to maintain the

23   sort of data that you looked at?

24   *A.*  No, it's not just -- not unusual; it's necessary.  I mean,

25   you can't -- you can't pay your employees if you don't know who

Pierre Cremieux - Direct

1  they are, so you have to keep track of who your employees are;

2  you've got to keep track of how much you're paying them; you've

3  got to keep track of when they're leaving.  So in the normal

4  course of business, every company has a record of who their

5  employees are, what they're paid, and that's the record that I

6  used.

7       MR. MELSHEIMER:  Okay.  So we'll note this as B546.

8  BY MR. MELSHEIMER:

9  Q.  You also mentioned some government data.

10 A.  That's right.  I think in one of the slides that was shown

11 to the jury earlier, there was some bars.  And some of the bars

12 were DaVita, and next to them -- I'll go back through them --

13 but the other bars were what I call the benchmark.  And that

14 benchmark is based on government data, meaning, it's based on

15 data on turnover and compensation that is published by the

16 government by the Bureau of Labor Statistics and which provides

17 year by year, by sector of the economy what the turnover and

18 what the compensation of different kind of employees are.  So I

19 used one of those series as a benchmark.

20 Q.  Let's go to B547 and talk a little bit more about LinkedIn

21 data.  Can you describe for the jury at a high level what that

22 data is.

23 A.  Yes.  So this is data that I'm sure many of us are already

24 familiar with.  It's -- it's data that is kept on the

25 platform -- so LinkedIn is a platform -- in which you can

Pierre Cremieux - Direct

1    enter -- by creating an account, you can enter your

2    information.  And it's really designed to enter your

3    professional information.

4    Q.  Is that sort of data used in economic research?

5    A.  Yes, it is now.  It's used in economic research.

6    Q.  Is it considered reliable?

7    A.  Yes, it is.

8    Q.  Why is it considered reliable?

9    A.  Well, it has a few characteristics that are particularly

10   valuable in general; and then it has some characteristics that

11   are particularly valuable in this case.  The characteristics

12   that are valuable in general is that it's self-reported, and

13   nobody is better placed to know what your professional path is

14   than yourself.  So there is not someone else guessing about

15   what your prior employment was or what your current employment

16   is or when you move; you're the one who is recording this.

17        The second is that it's very large.  So there are a

18   lot of people with LinkedIn accounts now.  And so that's very

19   nice for the work I want to do here, because it allows me to go

20   to LinkedIn and have a pretty good set of information about

21   what is going on at those companies.

22        The -- you know, the third is that -- I think as we've

23   heard from Mr. Lombardo yesterday and again this morning,

24   LinkedIn is really an important source of information for

25   employers and one that employees take care to make sure it's

Pierre Cremieux – Direct

1    accurate at the time where they're thinking of moving jobs.

2    And because what I'm interested in is things like turnover --

3    meaning, movements of people between companies -- this is a

4    time at which they're going to take particular care to make

5    sure that the record they've laid out there for the employers

6    to see about their professional experience is accurate.

7    Q.   Doctor, what is the difference between LinkedIn data and

8    the information people might put on their Facebook page or

9    Instagram?

10   A.   I mean, it's quite different.  On Facebook and Instagram,

11   you can kind of put whatever you want.  And some people may

12   like it, some people may not like it, but typically that's not

13   what you're going to send your employer or what you expect your

14   employer to first go to if you're looking for a job.  So even

15   though I understand that LinkedIn is a platform, so is

16   Facebook, so is Instagram, those are very different uses.  So

17   the fact that there is stuff on Facebook that maybe I don't

18   always believe, LinkedIn I would expect to be a source that is

19   going to be pretty accurate.

20        MR. MELSHEIMER:  That's B547.  Let's move on to B548.

21   BY MR. MELSHEIMER:

22   Q.   And I want to turn your attention to this issue of

23   allocating the market.  What does allocating the market mean to

24   you as an economist?

25   A.   Well, it's a very specific economic concept, which

Pierre Cremieux – Direct

1    basically means separating the market.  All right.  So a good

2    way to think about that is with an example.  If you think about

3    the city of Denver, as we see here, you could imagine that

4    there are, say, two companies that are selling vacuum cleaners,

5    and they're competing in Denver with each other to sell vacuum

6    cleaners.  So when you decide to buy a vacuum cleaner, you have

7    a choice.  You can either buy from company A, or you can buy

8    from company B.

9            MR. MELSHEIMER:  This is B548.  We'll move to B549.

10   BY MR. MELSHEIMER:

11   Q.  What are we showing now?

12   A.  Well, suppose that the two companies get together and

13   decide that instead of competing in Denver, what they're going

14   to do is one of the companies is going to take the western side

15   of the city and the other company is going to take the eastern

16   side of the city.  That's an allocation.  And the reason why as

17   economists we don't like allocations is because suddenly

18   competition here, if there are only two companies that people

19   can buy vacuum cleaners from, is gone.  Because either you live

20   on one side of the city and only company A is going to sell to

21   you, or you live on the other side of the city and only company

22   B is going to sell to you.  So you would expect the price of

23   vacuum cleaners to go up, because they don't have to compete

24   with each other.  So that's not a good thing by economist

25   standards.

Pierre Cremieux - Direct

1   *Q.*  I think you have just answered this, sir.  But do

2   agreements like the allocation agreement you described here on

3   B549, do they produce measurable effects that you can study?

4   *A.*  Yes, they do.  If you -- if I was to look at the price of

5   vacuum cleaners prior to the allocation and the price of vacuum

6   cleaners after the allocation, I'm probably going to find out

7   that the price of vacuum cleaners went up because competition

8   was decreased.

9   *Q.*  Now, the example of allocation you described involved

10  customers and territories.  But what the government has alleged

11  here is something different, dividing up employees.  What is

12  your understanding of what an allocation of employees means?

13  *A.*  Well, an allocation of employees is the same concept.  So I

14  put up a little picture here that shows you what I mean.

15          The allocation is in some ways expressed here by the

16  red bars.  Right?  If you think about any one of the little

17  characters here, in a market that is not allocated, they would

18  all be together, and they would be going to company A, B, C, or

19  D.  But if you allocate the market, you're stuck.  If the

20  market is allocated -- if the companies allocate the market,

21  you're stuck.  You're now in company A, company B, company C,

22  or company D, and that's it.  So the effect on that -- the

23  effect of that, the reason why this is an issue, is because

24  just like the vacuum cleaner price is going to go up, if now

25  the employees can't move, well, they can't bid their wages up.

Pierre Cremieux - Direct

1            And so it's exactly the symmetric issue.  In one case,

2   the price goes up; bad for consumers.  In the other case, the

3   wages go down; bad for employees.

4   Q.  Let's take a look at expectations here.

5            So this is B551.

6            Are there certain expectations you'd expect to see as

7   an economist if there was an agreement made as alleged here

8   with the intended purpose to allocate the market for employees?

9   A.  Yes.  There are.

10  Q.  What's the first thing you would expect to see?

11  A.  Well, in some ways, as illustrated with the previous slide

12  with the little red bars, what you would expect is an end to

13  meaningful competition.  If there is an allocation, competition

14  is going to cease.

15  Q.  What's the second expectation?

16  A.  Well, the second is that if you are stuck because of an

17  allocation, turnover should go down.  So if I see turnover go

18  down, then that's -- that's an issue.  I'm going to really want

19  to investigate that to see whether that's because there has

20  been an allocation.  And if there is, then there is a problem.

21  Q.  Is there a third expectation?

22  A.  Yes.  The third, which kind of goes with the reduced

23  turnover, is the reduced compensation.  If people are stuck at

24  the company, I would expect wages to go down.

25           So that is another test I can put my data through.  I

Pierre Cremieux - Direct

1    can look to see whether compensation went down.  If it did,

2    then I'm going to investigate why, trying to figure out whether

3    it's because of the allocation.

4    Q.  So let's start -- are we going to go through this chart in

5    multiple different ways as you're explaining the work that you

6    did, Doctor?

7    A.  Yes.  I mean, these are three different ways, three

8    different indicias, three different kind of what I call

9    telltale signs that I'm going to be looking for to see whether

10   I can demonstrate that there is -- or I can find evidence that

11   there is an allocation of labor.

12   Q.  So let's start with the first item on your list, end of

13   meaningful competition.  So remind the jury what you're talking

14   about here.

15   A.  So, here, I'm really looking at the companies at issue; and

16   I'm asking whether the movements of employees that I'm seeing

17   among these companies is unusual.  Is it something that gives

18   me pause, because it's not what I see with other companies?

19   And so I think, well, maybe something is going on here that

20   results -- is the result of an allocation of labor.

21   Q.  Did you analyze, Dr. Cremieux, the information regarding

22   the movement of employees between DaVita and the three other

23   companies while the alleged agreements were in place?

24   A.  Yes, I did.

25   Q.  Is the movement of employees during this time period an

Pierre Cremieux - Direct

1   indication or not of whether there was meaningful competition

2   between the companies?

3   A.  Well, yes, it can be.  If I were to find that the movement

4   is inconsistent with what I observed at other companies where

5   there has been no allegation of wrongdoing, then it could well

6   be that the depressed movement is because of the allocation.

7   So that's the way in which it is a test.

8   Q.  What data did you look at, sir?

9   A.  So what I did is I used what I referred to earlier as the

10  LinkedIn data.  And the reason is because, this is data that

11  gives me information about what people -- where people come

12  from and go to.  If you have a LinkedIn account, in it, you

13  list the different jobs that you've had.  So you can see that

14  if I go look at your profile, I can see where you've been and

15  where you are.  And that allows me to see what switches you've

16  made in your employment.

17           So if I go to DaVita -- people who have been at

18  DaVita, and I look at what happened to them -- or SCA or RP or

19  Hazel -- I'm going to be able to see how they moved.  So that's

20  the data I used.

21  Q.  So let's look first at SCA, sir.  Did you look at the

22  number of DaVita employees who went to SCA during the alleged

23  agreement and then from SCA to DaVita?

24  A.  I did.

25  Q.  Why are we looking at movement between the two companies,

Pierre Cremieux – Direct

1    as opposed to just one-way movement?

2    A.   Well, because that's the allegation.  Right?  The

3    allegation is that there was an allocation of labor that went

4    in both directions, with the employees from DaVita not going to

5    SCA and employees from SCA not going to DaVita as a result of

6    an agreement to allocate the labor.

7          MR. MELSHEIMER:   This is B552.

8    BY MR. MELSHEIMER:

9    Q.   The SCA agreement, is it your understanding that it's

10   alleged only to apply to senior-level executives?

11   A.   Yes, that's correct.

12   Q.   What movement did you observe between February 2012 and

13   July 2017?

14   A.   Yes.  I'm looking at that period, because it's the

15   allegation period, so that's why I'm interested in what is

16   happening then.  And what I see is one senior-level DaVita

17   employee to SCA and no senior-level SCA employees going to

18   DaVita.

19   Q.   So one person left from DaVita to SCA over a period of five

20   years -- this is February 2012 to July 2017.  Isn't that a

21   really low number?

22   A.   Well, it's the lowest whole number you can find.  It's one.

23   And so the question is -- which is what the test has to be --

24   is, is that unusual?  Is that something that worries me,

25   because it seems to be less than what I see with other

1318

Pierre Cremieux – Direct

1    companies?

2    *Q.*  So what did you do?

3    *A.*  So what I did is I started from all the companies that

4    hired at least one person from DaVita.  Right?  Because we know

5    SCA hired one person.  So I figured, okay, I'm going to look in

6    my LinkedIn data at all the companies that hired at least one

7    person from SCA -- sorry -- yeah.  Did I do it backwards?  One

8    person from DaVita.  My apologies.  Right?  So I know SCA hired

9    one; I'm going to see what other companies hired from DaVita.

10   *Q.*  And is that illustrated on B553?

11   *A.*  Yes, it is.

12   *Q.*  Explain what is described here, sir.

13   *A.*  So it turns out that if you do that, you find that over

14   that period, 460 companies hired at least one employee from

15   DaVita.  So now the test to see whether what SCA is doing

16   during that period is different and worrisome is, if you look

17   at these firms, how many people do they hire conditional on

18   hiring one?

19          And so what I did is I lined up all of the companies

20   from the ones who hired one -- and there were a bunch of

21   them -- that hired two, three, four, five, et cetera; and I

22   looked at, among those companies how many did I find that hired

23   only one, like SCA did?  And what I found is that of the 460,

24   if you take the median -- which is when you've ranked them like

25   that, the 230th firm -- firm No. 1 from 230 only hired one

Pierre Cremieux - Direct

1   person from DaVita, just like SCA.  In fact, you can go all the

2   way to 400 before you find a company out of the 460 that hired

3   more than one person from DaVita.

4           So from the data alone, what I'm finding is that the

5   fact that SCA hired one person from DaVita is consistent with

6   the vast majority of what other companies around the country

7   are doing.  They're also hiring one, and only one person.  Not

8   all of them; some have hired more; but the vast majority, 400

9   out of 460, have hired only one.

10  Q.  And is there any allegation that there was any agreement

11  between those other companies that just hired one person from

12  DaVita?

13  A.  Not that I know of.

14  Q.  So what does that tell you about the significance of one

15  between February 2012 and July of 2017?

16  A.  Well, it tells me that during the period of the alleged

17  conspiracy, the numbers show that what SCA is doing in terms of

18  hiring from DaVita is no different from what other companies

19  are doing in terms of hiring from DaVita.

20  Q.  Now, Doctor, did you look at what happened at SCA with

21  respect to hiring from DaVita between 2008 and 2012 before the

22  alleged agreement?

23  A.  I did.

24  Q.  What did you find?

25  A.  Well, what I found is that between 2008 and 2012, SCA

Pierre Cremieux - Direct

1   hadn't hired one; they had hired eight people from DaVita.

2   Q.  Same question.  Is that higher than what you'd expect to

3   see, lower, or normal?

4   A.  So during that period, if you look at other companies and

5   ask, how many people who hired from DaVita -- sorry --

6   conditional on hiring from DaVita, how many people did

7   companies hire?  Typically, they hired much less than eight.

8   So during -- I mean, there were some -- like, there was one

9   company I remember, Fresenius, that hired nine people.  So more

10  than SCA did during that period.  There was another, Genteva, I

11  think it was, that hired I think three people.  But typically,

12  they also just hired one person.

13         So during that period, 2008 to 2012 -- sorry -- SCA

14  had hired a relatively high number of DaVita employees.

15  Q.  Did you investigate why it's higher than what you might

16  expect to see?

17  A.  Yes, I did.

18  Q.  And did you -- do you have some examples from the testimony

19  to present to the jury to that -- that go to that issue?

20  A.  Yes, I do.  And, again, the question I'm trying to figure

21  out here is, during the alleged conspiracy period, SCA's

22  behavior is no different from the behavior that I observed of

23  the typical firm that is hiring DaVita employees.

24  Q.  So this is B -- I'm sorry, Doctor.  I didn't mean to

25  interrupt you.

Pierre Cremieux – Direct

1    A.   No.  Go ahead.

2    Q.   Were you finished?

3    A.   Okay.  I'll finish first.  So I was saying that during the

4    conspiracy period -- the alleged conspiracy period -- SCA's

5    behaving in a way that is similar in terms of hiring from

6    DaVita as other companies.  Before, it's hiring more people --

7    or, rather, at the high end of the hiring that I observed for

8    other companies, so the question is why.  My apologies.

9         MR. MELSHEIMER:  This is B554.

10   BY MR. MELSHEIMER:

11   Q.   What does this tell you about why that number may be higher

12   in the earlier period than in the period you observed during

13   the alleged conspiracy?

14   A.   So the reason why this testimony is useful to understand

15   what's happening in terms of the numbers is that in response to

16   a question of whether it is fair to say -- addressed to Andrew

17   Hayek, who is the CEO of SCA -- "Is it fair to say that by

18   2012" -- which is the beginning of the period -- "you had hired

19   about all of the DaVita people that you wanted to hire?"

20        His answer to that question is, "We hired more people

21   from DaVita than anywhere else, and there was a risk that SCA

22   would just become known as DaVita part two."

23        And at the end he says, "The risks of having more" --

24   "and it was important to us to have our own culture and our own

25   identity and do things our own way.  That was something we

Pierre Cremieux – Direct

1  thought about and we talked about, is the risk of having more

2  senior executives from DaVita."

3          In other words, this helps explain the data that we

4  observed from 2008 to 2012, which is, there had been a lot of

5  hiring from DaVita.  And it helps explain why SCA kind of

6  returned to the norm that I observed for other companies

7  between 2012 and 2017.

8  Q.  Did you see any other evidence that might explain why the

9  SCA hiring might have been eight before the alleged agreement

10  and one during it?

11  A.  Yes.  So there was another issue which was highlighted in

12  the testimony.  If you look at this question, the question is,

13  again, addressed to Mr. Hayek.  What you're talking about --

14  sorry -- "You're talking about what Mr. Mathis just said about

15  the DVPs from DaVita that were not successful in your

16  environment; isn't that right?

17          "That's correct.  We had hired at least a couple that

18  I can think of that were very good people.  They're very smart,

19  they had been successful in other environments, and they were

20  not successful in the SCA environment."

21          And so there, again, an explanation for the data

22  patterns that I see, which is there had been a wave of hiring

23  between 2008 and 2012, which then was followed by a return to

24  normal between 2012 and 2017.

25          *MR. MELSHEIMER:*  That is B555, that testimony.

Pierre Cremieux - Direct

1        Did you -- that slide with that testimony.

2   BY MR. MELSHEIMER:

3   Q.  Dr. Cremieux, did you see an end to meaningful competition

4   during the alleged agreement with SCA based on what you've

5   looked at?

6   A.  So I want to answer that question very precisely, which, is

7   I've done an analysis of the data.  So based on the data that I

8   have analyzed, I see no evidence that there has been a

9   meaningful suppression of competition -- a meaningful end to

10  competition.

11       MR. MELSHEIMER:  Your Honor, we're about to move to

12  the other side of this.  Is this a good time for a break?

13       THE COURT:  This is the perfect time.  Yes, sir.

14       How much time would you like today, folks?

15       JUROR:  Hour and fifteen.

16       THE COURT:  Hour and fifteen.  You got it.  1:15.

17       (Recess at 12:00 p.m.)

18       (In open court at 1:17 p.m.)

19       THE COURT:  Okay.

20       MR. MELSHEIMER:  May it please the Court, Your Honor.

21  BY MR. MELSHEIMER:

22  Q.  So we ended, Dr. Cremieux, with B555.  And let's go on to

23  556.

24       Let's look at SCA employees who went to DaVita.  What

25  is reflected here?

Pierre Cremieux – Direct

1    *A.*   Yes.  So we just finished looking at the movement of DaVita

2    employees to SCA.  And since there is a --

3    *Q.*   Bilateral?

4    *A.*   -- I'll say bidirectional allegation, I have to look at the

5    other side.  So I have to look at SCA employees and see where

6    they were going.

7         So you see here on the bottom line that zero

8    senior-level SCA employees went to DaVita.  And so I ask the

9    same question, which is, how does this look relative to other

10   movements that I observed of SCA employees?  So we know DaVita

11   now, and we look at everyone else.

12   *Q.*   Well, Dr. Cremieux, doesn't zero just prove that there was

13   no competition?

14   *A.*   Well, it's even smaller than one, it's clear, which is what

15   we had in the other direction.  So it doesn't prove it, but it

16   certainly is something to investigate.  The question is, what

17   is happening at the other companies?  Meaning, the way you can

18   think about it is, if in my data I have no labels, would I be

19   able to identify SCA, DaVita, RP, and Hazel as different from

20   others?  Right?  If there is something that happened there that

21   is different, they should be visible in the data without

22   labels.  And so here I'm comparing the zero, are there other

23   companies that look like that or not?

24   *Q.*   Well, let's look at what you found in B557.

25   *A.*   All right.  So I did a similar analysis, which is that I

Pierre Cremieux - Direct

1    started with the companies that hired senior-level employees

2    from SCA.  So, obviously, I'm eliminating all the companies

3    that didn't hire anybody from SCA, because there is a huge

4    number of companies in the country that didn't hire anybody

5    from SCA.  So of those 132 firms, I asked again, if you hire

6    from SCA, how many do you typically hire?

7         So if you think of the median, as I explained before,

8    you know, you line up the companies from one all the way up to

9    however many employees were hired from SCA by that company, you

10   line them up, what you find is that, there again, the median

11   firm -- the firm that is in the middle -- only hired one person

12   from SCA, as well as everyone before them.  So what this means

13   is that you have a lot of companies that are only hiring one

14   person from SCA.  Here, what you observe is that DaVita didn't

15   hire anybody from SCA.  And so, then, you continue the

16   investigation.

17   Q.  So did you also look as part of your investigation whether

18   SCA executives went to other healthcare firms during the same

19   period, just for the purpose of testing whether it was normal

20   or unusual?

21   A.  That's right.  So the second step is, okay, so I don't see

22   anybody being hired by DaVita from SCA.  Let's look at other

23   companies that have hired from SCA outside of the period.

24   Right?  So people who are going to be -- companies -- sorry --

25   that are going to be in my sample of 132; and let's see whether

1326

Pierre Cremieux – Direct

1  there are companies that similarly have hired no one during the

2  conspiracy period.

3  Q.  What did you find?

4  A.  What I find is -- I mean, I'm just giving some examples

5  here -- but I find that there are many companies that hire --

6  hire from SCA outside of the alleged conspiracy period but

7  didn't hire anyone during the alleged conspiracy period.  And

8  so what that tells me is that, again, SCA -- there is nothing

9  about SCA that I can put my finger on which would demonstrate

10  that it's behaving differently from other companies that have

11  had a relationship with SCA by hiring some of the senior SCA

12  employees.

13  Q.  Dr. Cremieux, how many SCA senior-level executives were

14  hired by DaVita between 2000 and 2012, the years before the

15  alleged agreement?

16  A.  Right.  So, again, there is another kind of way to think

17  about how this -- what this zero number means.  What was

18  happening before then?  Well, if you go from 2000 to 2012, you

19  find that there was one person hired from SCA by DaVita.  So

20  outside of the conspiracy period, 2000 to 2012, twelve years,

21  there was one person hired from SCA by DaVita.  2012 to -- 2012

22  to 2017, you have zero.  So one over a period of twelve years;

23  zero over a period of five years.  Nothing unusual about that.

24        So, again, in terms of finding evidence that would

25  demonstrate or would indicate that there is an allocation of

Pierre Cremieux - Direct

1    labor that makes SCA's relationship with DaVita different from

2    other companies, the data doesn't provide me with that.

3    Q.  So with respect to answering the questions about the end of

4    meaningful competition with respect to the SCA analysis, as you

5    did, what did you conclude?

6    A.  Well, so, same conclusion as for the other direction, the

7    hiring of -- by DaVita of SCA employees.  What I find is from

8    the data, I can't put my finger on something that would allow

9    me to say yes, I see here the telltale sign of an allocation of

10   labor.

11         MR. MELSHEIMER:  This is B559.

12   BY MR. MELSHEIMER:

13   Q.  Now, let's look at Hazel, Dr. Cremieux, which is B560.

14   Similar slide.  Walk us through it quickly, please.

15   A.  Yeah, so I've tried to make my slides kind of the same so

16   that you can follow.  It's going to be the same structure, the

17   same idea, the same approach.  So now, of course, instead of

18   looking at the movement of employees between DaVita and SCA,

19   we're looking at the movement of employees between DaVita and

20   Hazel.  And here, unlike with the DaVita/SCA, I'm looking at

21   both senior-level employees and non-senior-level employees,

22   because both are at issue.

23         And so I start with the observation that during the

24   alleged conspiracy period, what I find is two senior-level

25   DaVita employees hired by Hazel and two non-senior DaVita

Pierre Cremieux – Direct

1    employees hired by Hazel.

2    Q.   Now, Dr. Cremieux, you didn't look at the other direction

3    of Hazel people being hired by DaVita, because why?

4    A.   Well, because this is Count 2; and so for Count 2, it only

5    goes in one direction.  The allegation is that there was an

6    agreement with the purpose of allocating labor, which was

7    unidirectional, where Hazel had an agreement not to hire or --

8    you know, it's a nonsolicit, really -- but had a nonsolicit

9    agreement with DaVita.  The opposite is not an issue.

10   Q.   It's not a no-hire agreement?

11   A.   No.  I misspoke.  It's not a no-hire.  It's a nonsolicit

12   with an asterisk.

13   Q.   So the four people you identified, senior level and

14   non-senior, is it important for the jury to understand any

15   other number to put that number four in perspective?

16   A.   Yeah.  So two things.  First, a useful reminder that Hazel

17   is obviously a much smaller company.  It's about 150 employees

18   at the time, and so it's going -- it's not going to be hiring

19   dozens of employees.  But the other thing is, now let's go

20   through the exercise of seeing what is the number of

21   senior-level employees hired from DaVita by other companies

22   during the Hazel period?  So identical to what I did with the

23   DaVita/SCA analysis, but now I'm just changing the period,

24   because the period for Hazel is not just the same as it is for

25   DaVita.

Pierre Cremieux - Direct

1   *Q.*  So let's look at 561.  What does that reveal based on your

2   analysis, Doctor?

3   *A.*  Yes.  So not surprisingly, because the periods overlap,

4   what I find is that, again, if you look at companies that hired

5   from DaVita, the median company -- the typical company -- hired

6   only one person from DaVita.  So if anything, what we have here

7   is for Hazel, we have four hires -- well, actually, I shouldn't

8   say that.  It's one senior-level employee.  Because I'm looking

9   at senior-level employees, because I don't have the data for

10  the junior-level employees from the LinkedIn analysis.  So

11  focusing on the senior-level employees, I have one median --

12  the median is one, just like it was with the DaVita/SCA

13  analysis.  And, of course, Hazel hired two senior employees.

14  *Q.*  Given all that you just looked at, Doctor, does the data

15  support the idea that there was a cessation of meaningful

16  competition between DaVita and Hazel Health?

17  *A.*  Well, again, the data does not.  If you look at the other

18  companies that were on the previous slide -- I apologize -- if

19  you go back one slide.  There you go -- you see that you have

20  many other companies that hired two -- two employees from

21  DaVita, so there is nothing unusual about Hazel.  Which means,

22  again, I don't see affirmative evidence here that would allow

23  me to say there is an allocation of labor here, there is a

24  suppression of competition.

25  *Q.*  Let's take a look at Radiology Partners.  That's B563.

Pierre Cremieux - Direct

1   Remind us again what kind of employees you looked at for

2   Radiology Partners.

3   A.   So for Radiology Partners, I followed the same methodology.

4   I started with the number of employees -- sorry -- DaVita

5   employees who moved to Radiology Partners.  I separated senior

6   employees from non-senior employees because both were at issue

7   in the case.  And I don't look at the opposite, because the

8   allegation is only going one direction.

9   Q.   What did you find with respect to the numbers?

10  A.   So what I found, again, is you have this constant here that

11  is showing up in all three cases, that no matter what

12  allegation period you look at, the median -- the median company

13  that is hiring from DaVita typically hires one employee.  So,

14  again, you line them up; you go all the way through half of the

15  companies that you're examining; and you find that it's a

16  series of one.  In fact, it goes well beyond the median; but

17  the median is good enough in terms of kind of indicating that

18  that's typically what happens.

19       And in contrast, you can see here five employees hired

20  by RP.  And, again, it's not typical, because one is the

21  typical number; but you have other employers like Anthem,

22  Kaiser Permanente or UCHealth, which also hired five.  So it's

23  not out of the ordinary; it's just more hires than the typical

24  company.  Therefore, again, providing me here with no data

25  evidence that would allow me to support the allegation that

Pierre Cremieux - Direct

1    there is an allocation of labor that has resulted in a

2    reduction of employee movement.

3            *MR. MELSHEIMER:*  That's B564.

4    *BY MR. MELSHEIMER:*

5    *Q.*  So let's go again the way we've been doing it, Doctor.

6    Does the data support the idea that there was an end to

7    meaningful competition between DaVita and Radiology Partners,

8    as alleged by the government?

9    *A.*  No.  If anything, what I see is that Radiology Partners

10   hired more people from DaVita than is typical for other firms

11   that are also hiring from DaVita.

12   *Q.*  So if we go to B566, do we put all of these together with

13   respect to your conclusion about the end -- there not being

14   data to support the conclusion that there was an end to

15   meaningful competition?

16   *A.*  Yes.  And, again, this is my data-driven analytical results

17   based on a test -- as I explained with my scientific method, a

18   test to determine whether I could find evidence that would

19   allow me to empirically support the notion that there was a

20   reduction in movement and a cessation of competition as a

21   result of the allocation of labor.

22   *Q.*  Regarding the numbers that we've seen of actual employees

23   who moved, Doctor, are these numbers that you would expect to

24   see in the markets that you've described without an agreement

25   with the intent to allocate?

Pierre Cremieux - Direct

1    *A.*   Exactly.  In other words, there is nothing that allows me

2    to distinguish these three companies from the other companies

3    that are hiring from DaVita.

4    *Q.*   So if you go back to your first -- one of your first slides

5    here, what should we do with the box that says, "end of

6    meaningful competition"?

7    *A.*   Well, what I did in the slide is -- to be clear, I crossed

8    it out and said, well, no, in fact, what we see is we see

9    meaningful competition.  And by that what I mean very

10   specifically is that the data indicates that the degree of

11   competition between DaVita and SCA, DaVita and Hazel, DaVita

12   and RP is indistinguishable based on the data from the degree

13   of competition that I observed for other companies that were

14   hiring from DaVita.

15   *Q.*   Let's turn to the second item on your list, to test the

16   government's hypothesis, which you took as your hypothesis for

17   this case; right?

18   *A.*   That's right.

19   *Q.*   Turnover rates.  Can you remind us what this expectation is

20   and how it relates to the testing that you did, sir?

21   *A.*   Yes.  So, again, what I'm trying to do is I'm trying to

22   find evidence -- data-driven evidence -- that would allow me to

23   confirm the allegation that there is an allocation of labor and

24   a cessation of competition.  And so if there is an allocation

25   of labor, what I might observe is a reduction in turnover rate.

Pierre Cremieux - Direct

1   *Q.*  Why is that?

2   *A.*  Because if you remember the picture I had earlier with the

3   little figurines and the red bars in between, if, in fact,

4   there is an allocation of labor and that employees are stuck in

5   the company, I should see a reduction or an elimination,

6   potentially, of the movements -- of the movements from those

7   entities, because people are going to be stuck there.  So for

8   DaVita, specifically, I should observe -- I could observe a

9   reduction in turnover rate.  That's what I'm checking.

10  *Q.*  What data did you look at, Dr. Cremieux, to test that

11  hypothesis?

12  *A.*  So what I did is I used a combination of DaVita data and a

13  little bit of LinkedIn data.  So DaVita -- the DaVita data that

14  I used, which is really the key to this analysis -- is the

15  compensation data, saying in the regular course of business,

16  every company keeps track of its employees and the compensation

17  of its employees, and DaVita also has a -- a different data

18  set, which includes termination.  And so that tells you when

19  people have left the company.  And so I used those two, in

20  part, because when you do data analysis, it's always nice to be

21  able to check yourself.  And, here, I have two data sets that I

22  was able to use to figure out, when did people leave?  And that

23  gave me a measure of turnover.

24  *Q.*  Did you also look at data from the U.S. Census Bureau?

25  *A.*  Yes.  So you will see when I show you the bars that I'm

Pierre Cremieux – Direct

1    also using the benchmark here.  And I'll explain a little bit

2    more why in a minute.  But this benchmark is data from the

3    Bureau of Labor Statistics published by the government, which

4    provides also some turnover rates for different sectors of the

5    industry.  So I used a sector that is most relevant to me,

6    which is outpatient healthcare services; and I used that data

7    to provide a benchmark -- an anchor, if you will -- to the

8    analysis I'm doing specifically for DaVita.

9           MR. MELSHEIMER:  Okay.  We'll move from B568 to B569.

10   BY MR. MELSHEIMER:

11   Q.  And what is shown here under this slide entitled "DaVita

12   Turnover Rates Compared to Benchmark"?

13   A.  So let's forget the benchmark for now, because it's not on

14   the picture yet.  But what this shows is the average DaVita

15   turnover rate between 2009 and 2011.

16   Q.  Why did you pick that period of 2009 to 2011?

17   A.  Well, you can think of that as the prior period or the

18   pre-period.  It's the period during which there is no

19   allegation.  So, presumably, it's a period during which the

20   turnover rate is not affected by any allegation.  Since I'm

21   testing whether the allegation is affecting the turnover rate,

22   I need to compare what I see to something that I know is not

23   affected; and so that's what I'm doing here.  And so what I

24   find is that on average -- it varies year to year -- but on

25   average between 2009-2011 the turnover rate was 13 percent.

Pierre Cremieux – Direct

1          MR. MELSHEIMER:  So let's look at B570.

2     BY MR. MELSHEIMER:

3     Q.  What is B570, sir?

4     A.  So now that I have my turnover rate in the period that's

5     unaffected, I look at what the turnover rate is during the

6     period where there is an allegation that there was an

7     allocation of labor.  And what I find is during that turnover

8     rate, the rate is about the same.  It's a little higher.  It's

9     14.7; but, fundamentally, it's about the same.  And, remember,

10    that's what I'm testing, is whether it's gone down.  Because it

11    is an allocation of labor, my figurines are stuck; turnover

12    goes down; and as a result, it's a telltale sign of what an

13    allocation may do.  And here I don't see it go down.

14    Q.  What do you mean by "SCA period" in the bar to the right?

15    A.  Oh, that is the period that covers -- that the allegations

16    cover, 2012 to 2017.

17    Q.  But both of the blue bars are DaVita turnover rates; is

18    that correct?

19    A.  That's right.  It's both for DaVita before, if you will,

20    and during the conspiracy -- the alleged conspiracy period.

21         MR. MELSHEIMER:  Now, let's look at B571.

22    BY MR. MELSHEIMER:

23    Q.  We've added two gray bars here entitled "benchmark."  Can

24    you explain to the jury what this slide illustrates.

25    A.  Yes.  So I observed the turnover rate in the prior --

Pierre Cremieux – Direct

1    before and during, to go from 13 to 14.7.  And I say, well,

2    that's an increase -- at least it's not a decrease.  You could

3    say, well, maybe.  But in some ways, if in the rest of the

4    economy the turnover rate went much higher than that -- meaning

5    it moved from 13 percent to 20 percent -- well, there is

6    something going on at DaVita.  It's not following what the rest

7    of the economy is doing.  So even though it looks like an

8    increase, it could be a decrease.  So I have to check that and

9    make sure that's not the case.

10            So what I did is I looked at a benchmark, which is the

11   turnover rate in the outpatient healthcare sector as published

12   by the BLS.  And what I found is that that benchmark shows a

13   slight decrease, right, from 9.1 to 7.8.  So that reassures me

14   that the increase I observed at DaVita -- or at least the lack

15   of a decrease -- is sufficient.  It's real.  It's not like in

16   the rest of the economy there was something going on that would

17   make my interpretation incorrect.  Right?  So it's just to

18   confirm that, yes, between the prior period and the SCA period,

19   there has been no decrease in turnover.

20   Q.  Now, Dr. Cremieux, isn't DaVita's turnover rate high

21   relative to the national benchmark; or is that not the right

22   way to look at it?

23   A.  Well, I mean, if you look at the point estimates, meaning,

24   the actual values, you see that it's 13 percent versus

25   9.1 percent.  I mean, you know, I don't show here standard

Pierre Cremieux - Direct

1    deviations and things like that, because that doesn't -- that's

2    not something I care about.  The reason I don't care is because

3    there is a turnover rate at DaVita; there is a turnover rate in

4    the rest of the economy; I don't expect them to be the same.

5    That's not what I'm measuring.  What I'm interested in is to

6    see whether the movement of DaVita from the left to the right

7    of the chart you have in front of you is real or not.  So

8    that's what I'm using the benchmark for.

9          The fact that the movement in any given period is

10   different between the two doesn't matter.  I wouldn't expect

11   one company to be the same as the average of what is probably

12   thousands of companies in the country that are specific to

13   outpatient care.

14         *MR. MELSHEIMER:*  Let's move to B572 and the turnover

15   rate with respect to Hazel.

16   *BY MR. MELSHEIMER:*

17   *Q.*  Now, are you still looking at the same prior period of 2009

18   to 2011?

19   *A.*  Yes.  That's why the numbers are identical.

20   *Q.*  Now, the alleged agreement with Hazel didn't begin until

21   2017.  Why didn't you pick a different pre or prior period?

22   *A.*  Yes.  The reason is because I want to make sure that my

23   prior period is not affected by any of the three sets of

24   allegations.  So if I was to include for Hazel in my prior

25   period the years 2011 through 2017, that would be a problem.

Pierre Cremieux - Direct

1   Because since the Count 1 starts in 2012, it would be a period

2   that is necessarily unaffected.  I can't assume that it's

3   unaffected.  So I stick with the period that I know is

4   unaffected by any of the three conspiracies; and having done

5   that, I compare it three different times, depending on the

6   period that corresponds to the three sets of allegations.

7   Q.  So what did you observe here regarding DaVita's turnover

8   rate before the alleged agreement with Hazel and during it?

9   A.  So what I found is a very similar pattern.  In other words,

10  you can see that the benchmark is roughly flat in the economy,

11  there hasn't been much of a change.  So it means that the

12  movement I see for DaVita is not a decrease.  It's not -- there

13  is nothing -- I observed an increase from 13 to 16.7.  And

14  while the fact that it's an increase is not particularly

15  important, the fact that it's not a decrease is what is key to

16  my analysis.  So there, again, I don't have the sign that

17  I'm -- that I'm looking for to see whether there is evidence of

18  an allocation of labor having an impact on the turnover rate.

19  Q.  Is the increase in the turnover rate during the Hazel

20  period the opposite of what you would expect to see in the data

21  if the market had been allocated?

22  A.  Yes.  I would call it the absence of a decrease.  But I

23  agree, it's a -- you know, in terms of the point estimate, it's

24  an increase.  But the fact that it didn't go down means that it

25  provides me no evidence of what I would expect if there was an

Pierre Cremieux – Direct

1    allocation of labor.

2            *MR. MELSHEIMER:*  Let's go to B573, the Radiology

3    Partners period.

4    *BY MR. MELSHEIMER:*

5    *Q.*  What do you see here?

6    *A.*  So same analysis; same benchmark.  Hasn't changed.  Numbers

7    are identical.  Compared to now a slightly different period,

8    2013 to 2019; basically the same result.  I don't observe a

9    decline.

10   *Q.*  So the benchmark has gone down a little bit during the --

11   what we're calling the Radiology Partners period, down to

12   8 percent?

13   *A.*  Yes, that's right.  It's a slight decline.  Again, I don't

14   want to make too much of it statistically; but there is a

15   slight decline.  Most importantly, it means that the increase

16   that I see for DaVita from the prior to the RP period, at least

17   in terms of point estimates, from 13 to 15.6, is in fact not

18   a -- it's an increase.  It's not a decrease in real terms after

19   you control for what is happening in the rest of the economy

20   with the benchmark.

21   *Q.*  Is this the opposite of what you would expect to see in an

22   allocated market?

23   *A.*  Yeah.  Again, one of the telltale signs of an allocated

24   market would be a decrease in turnover, for the reasons I

25   explained before.

Pierre Cremieux – Direct

1          MR. MELSHEIMER:  So let's go back to the chart that we

2     started with.

3     BY MR. MELSHEIMER:

4     Q.   What did you conclude with respect to testing your

5     hypothesis, looking at reduced turnover rates?

6     A.   Well, my hypothesis was that if the -- let me start again.

7     As I test the allegation of an allocation of labor, I look at

8     turnover rate to see whether I see what I would expect, which

9     is a decrease in turnover rate.  And, instead, what I see is an

10    increase in turnover rate.  I call it an increase; again, what

11    matters is it's not a decrease.  Because that would have been a

12    concern if there had been a decrease, because it could have

13    meant that there was an allocation of labor.

14    Q.   So let's look at the third item on your checklist here that

15    you've reviewed, reduced compensation.  When you talk about

16    compensation in your analysis, are you talking about salary?

17    A.   That's right.

18    Q.   In an allocated market, would you expect to see

19    compensation increase or decrease?

20    A.   Well, I think, you know, to the point that I think I made

21    earlier, if, in fact, there is an allocation of labor with an

22    end to meaningful competition, then that means that -- just

23    like for the product market, if there is less competition, the

24    price goes up; in the labor market, if there is less

25    competition, the wage goes down.  And so I'm checking to see

Pierre Cremieux - Direct

1   whether I see, again, what I call a telltale sign of an

2   allocation of labor and a reduction in competition, which would

3   be expressed by an observation that the wages of the DaVita

4   employees has gone down.

5   Q.  As part of this analysis, Doctor, what sort of data did you

6   review?

7   A.  So there I relied on, again, the DaVita compensation data

8   and the termination data, as well as for the benchmark -- which

9   you'll see in a minute -- the government data.

10        MR. MELSHEIMER:  Let's look at B576.

11   BY MR. MELSHEIMER:

12   Q.  But before we do, did you prepare a graphic summarizing the

13   data that you reviewed?

14   A.  Yes.

15   Q.  What -- this is B576.  What does this blue bar on the left

16   illustrate?

17   A.  So this is the average median salary for senior-level

18   DaVita employees during the period 2008-2011.

19   Q.  Remind us why you picked this 2008 to 2011 period.

20   A.  Well, because, again, that's the period that is unaffected

21   by any of the three allegations.  And I should probably explain

22   that the reason why it's an average median salary, it's average

23   because it's averaged over the period 2008-2011.  And it's

24   median because in the same spirit as before, I was lining up my

25   companies, here I'm lining up the individuals -- not literally,

Pierre Cremieux - Direct

1    but figuratively -- I'm lining up the individuals from least

2    paid to highest paid, and I'm looking at what the median is, as

3    a representation of what is happening to the compensation of

4    the employees.

5    Q.  Dr. Cremieux, are you aware that a substantial part of

6    DaVita compensation for senior executives is also equity and

7    bonus?

8    A.  Yes, I am.

9    Q.  Does that change your analysis in any way?

10   A.  No.  So the -- no.  So the issues that with a benchmark,

11   you only have information of the salary; so I can't use salary

12   plus bonuses plus equity in my analysis.  That being said, I

13   checked to see what the ratio of salary to bonus was over time,

14   and it's pretty stable.  So it means that the salary is a very

15   good proxy for the total compensation of the employees.

16          MR. MELSHEIMER:  So let's look at B577.

17   BY MR. MELSHEIMER:

18   Q.  What does the darker blue bar on the right indicate?

19   A.  So as I did before for the turnover, same structure.  I

20   know what happened during the prior period.  I'm now looking at

21   what is happening to the DaVita employees during the SCA

22   period.  Did it go down?  Did it go up?  Remembering that a

23   decrease in compensation would be a worrisome sign, because it

24   would mean that maybe there is an allocation of labor that is

25   decreasing competition for employees and therefore depressing

Pierre Cremieux - Direct

1    their wages.

2    *Q.*  It looks like it went up.  If we go to B578, did you

3    calculate the percentage?

4    *A.*  Yes.  So it's just -- you know, the average median here

5    goes up by 13.5 percent.

6    *Q.*  What is an increase in DaVita's salary for senior

7    executives indicative of in terms of analyzing competition for

8    those kinds of employees?

9    *A.*  So I would put it a little differently.  I would say the

10   fact that I don't observe a decrease -- I agree with you, it's

11   an increase.  But the fact that I don't observe a decrease is

12   what is important here, because the decrease would be the

13   telltale sign of an allocation of labor that depresses

14   competition.  And so here I see an increase; but most

15   importantly, I don't see a decrease.

16          *MR. MELSHEIMER:*  Let's look at the next slide, B579.

17   *BY MR. MELSHEIMER:*

18   *Q.*  What is illustrated here on the right with the gray bars?

19   *A.*  So here, again, this is kind of just a check on the data --

20   a check on the DaVita data.  I want to make sure that I look at

21   what is happening in the rest of the economy.  For example, it

22   could be that 13.5 percent is really a decrease, because there

23   has been inflation.  And so in real terms, the people at the

24   company have suffered much more than others in the economy.  So

25   I needed to check that my benchmark is fairly stable, that

Pierre Cremieux – Direct

1  there is nothing in the economy that would skew my numbers when

2  I'm comparing the before and the after period at DaVita.  So

3  that's what I did, and that's why you see the two bars on the

4  right.

5  Q.  What do we see in B580?

6  A.  So what we see is that the movement in the rest of the

7  economy is basically the same as it is at DaVita.  In other

8  words, the benchmark went up by 11.5 percent; the increase at

9  DaVita was 13.5 percent; so it's roughly the same number, a

10  little higher at DaVita.  But most importantly, it means that

11  what I observed at DaVita, the increase, is real.  There is no

12  decrease in compensation at DaVita between the two periods and,

13  therefore, no telltale sign of a cessation of competition,

14  which would result in a decrease in competition.

15  Q.  Is this benchmark data something you obtained from the

16  government?

17  A.  Yes.  That comes from the Bureau of Labor Statistics.

18  Q.  So that is SCA.  Did you do a similar analysis for Hazel?

19  A.  Yes.  So, again, just trying to keep it as simple as we

20  can.  I did the same analysis, same structure, same idea three

21  times.  So we just went through SCA, now I did it for Hazel.

22  Meaning, the period is a little different, and then I did it

23  for RP, where, again, the period is a little different.

24       MR. MELSHEIMER:  So let's look at B581.

25

Pierre Cremieux - Direct

1    *BY MR. MELSHEIMER:*

2    *Q.*  If you can just -- given you've explained it already with

3    respect to SCA, why don't you quickly walk us through it with

4    respect to Hazel.

5    *A.*  Yeah.  So if you look at the light blue, at 119, and the

6    light gray, at 79, that's exactly the same, because my prior

7    period hasn't changed.  It's still my comparison, my -- the

8    period when there are no allegations.  The other two numbers

9    have changed a bit because the period has changed.  But,

10   fundamentally, what you see again is that the DaVita

11   compensation is following what you observed on the benchmark;

12   and there is no decline in the DaVita compensation relative to

13   what you see in the rest of the economy.  Which means there is

14   no evidence -- there is no affirmative evidence of any

15   allocation of labor, which I would expect to have an impact on

16   compensation.

17        *MR. MELSHEIMER:*  Let's move on to B582, which is

18   Radiology Partners.

19   *BY MR. MELSHEIMER:*

20   *Q.*  What did you observe?

21   *A.*  Yes.  For Radiology Partners, same approach, same idea.

22   119 under light blue, 79 under light gray, those haven't moved,

23   still in the prior period.  But now I'm comparing them with

24   slightly different numbers, because the RP period is not the

25   same as the SCA period or the Hazel period.  But you see that

Pierre Cremieux – Direct

1    the pattern is still the same, which is, you have slightly

2    greater increase at DaVita than you do for the benchmark.

3    Which means what I'm observing is not a decrease in

4    compensation, which, again, is what I would have looked for to

5    find evidence of an allocation of labor, which would depress

6    the compensation.

7    Q.   Dr. Cremieux, this is all salary data for senior-level

8    employees across all three companies?

9    A.   That's right.

10   Q.   Did you do a similar analysis for non-senior-level

11   employees during the periods of the Hazel and Radiology

12   Partners alleged agreement?

13   A.   No.   What I did is the senior-level employees, because

14   that's the data that I had, and particularly for the benchmark.

15   And so I know that this is true for the senior-level employees.

16   Q.   Now, can you give the jury any guidance based on your study

17   of the data about what that would reflect with respect to

18   non-senior-level employees at Hazel and Radiology Partners?

19   A.   Yes.   I think this actually informs for -- again, for Hazel

20   and Radiology Partners the entire story.   Because as I

21   understand it, most of the allegations are centered on the

22   senior-level employees.   So if we are to find an effect, that

23   effect should be most pronounced among the senior-level

24   employees.   And I don't see that effect among the senior-level

25   employees.   So even though I have not done the data analysis

Pierre Cremieux – Direct

1    because I don't have all the data that I would need to do so,

2    it gives me great confidence that the results I have here for

3    the senior-level employees would apply for the junior-level

4    employees at RP and Hazel, as well.

5            *MR. MELSHEIMER:*  Let's move to B583.

6    *BY MR. MELSHEIMER:*

7    *Q.*  Does the data that we've seen with respect to compensation

8    confirm or reject the government's allegation that there was an

9    agreement that had a purpose of ceasing meaningful competition

10   for the services of employees?

11   *A.*  Well, it rejects it, in that it provides no affirmative

12   evidence that I could use to confirm the allegation that the

13   agreement was for the purpose of allocating of laboring with

14   the implied reductions in competition.

15   *Q.*  Dr. Cremieux, before we wrap up, I want to summarize what

16   you've found for the jury.  Let's go back to your first few

17   slides.

18           What did you do first?

19   *A.*  So first, as I mentioned at the very beginning, I

20   identified the hypothesis; then I tested it; and then, finally,

21   based on that, I accepted or rejected the hypothesis.

22   *Q.*  And what did you conclude after all of this work?

23   *A.*  So the idea behind the approach is to find evidence -- to

24   try to prove in some ways the case for an allocation of labor,

25   trying to find signs in the data that would tell me, yes, there

Pierre Cremieux - Direct

1   is an allocation of labor going on.  What I found using three

2   different approaches -- looking at the companies, looking at

3   competition, looking -- looking at the companies, looking at

4   turnover, looking at compensation -- is that there was no

5   economic evidence to support the allegation that the government

6   is making that there was an agreement with the purpose of

7   allocating labor.

8           MR. MELSHEIMER:  That's B587.

9   BY MR. MELSHEIMER:

10  Q.  Dr. Cremieux, let me ask you this before I tender you for

11  cross-examination:  Were you trying to prove anything

12  affirmatively?

13  A.  Well, no.  What I was trying to do is I was trying to find

14  evidence that would support the government's allegation.

15  That's what I'm doing, fundamentally, is I'm thinking, as an

16  economist, I know that if there is an allocation of labor, that

17  that allocation of labor has an impact on competition, there

18  should be effects that I'm able to see in the data.  And so I

19  went about looking for those signs, to see whether I observed

20  decreased movement, decreased competition -- decreased

21  compensation, decreased turnover.  So that was my detective

22  work, if you will, to try to see if I could find evidence in

23  support of it.

24          And at least with those three approaches, which is the

25  ones I can think of to do that kind of investigation, I can't

Pierre Cremieux – Cross

1    find any data that would support the government's allegation.

2            *MR. MELSHEIMER:*  Thank you, Dr. Cremieux.

3            Your Honor, I tender the witness for

4    cross-examination.

5            *THE COURT:*  All right.

6                        **CROSS-EXAMINATION**

7    *BY MR. VIGEN:*

8    *Q.*  Good afternoon, Dr. Cremieux.  My name is William Vigen.

9    *A.*  Good afternoon.

10   *Q.*  Dr. Cremieux, you filed an expert report about a month ago

11   that explained the opinions you planned to testify about today;

12   is that right?

13   *A.*  That's correct.

14   *Q.*  And that expert report was filed with the Court?

15   *A.*  I believe so.  Yes.

16   *Q.*  Okay.  And you offered those opinions to a reasonable

17   degree of scientific certainty.  That's what you said in the

18   report; correct?

19   *A.*  Definitely.  Yes.

20   *Q.*  In your report, you explained that it was your opinion that

21   one senior-level employee moved from SCA to DaVita; correct?

22   *A.*  I believe that's true.  Yes.

23   *Q.*  But today you said that number was zero.

24   *A.*  Yes.

25   *Q.*  So a month ago you filed a report to a reasonable degree of

Pierre Cremieux - Cross

1    scientific certainty with the Court that said one person moved;

2    and now your opinion is, actually, it's zero?

3    A.  Correct.

4    Q.  So we'll go back to the rest of your opinions in a moment,

5    but I did want to discuss a little bit more how much the

6    defendants have paid you -- or paid Analysis Group to give

7    these opinions.  You mentioned that your hourly rate is $1,050?

8    A.  Correct.

9    Q.  When did you start working on this matter?

10   A.  I would say -- so this is April 2022, so it would have been

11   about a little more than a year ago, I would think.

12   Q.  And about how many hours have you billed personally to the

13   matter?

14   A.  I don't know.  I would say maybe 100, maybe 200.  I'm

15   guessing -- we keep track of these things, but I did not check

16   to see how many hours I spent on the case.

17   Q.  But total your team spent upwards of 5,000 hours?

18   A.  I would think about that.  Yes.

19   Q.  And you also said on direct examination that as a team, you

20   all were paid more than a million dollars, I believe is the way

21   you put it?

22   A.  Yeah.  I think the total of our invoices by Analysis Group

23   was more than a million dollars.  Yes.

24   Q.  How much more?

25   A.  That, I don't know.

Pierre Cremieux - Cross

1  Q.  Okay.  So just some quick math, a million dollars divided

2  by 5,000 hours is only $200 an hour; would you agree with me?

3  A.  That sounds right.

4  Q.  Okay.  And yet your rate is over $1,000 an hour?

5  A.  That's right.

6  Q.  So it's in total somewhere substantially more than a

7  million dollars, sir?

8  A.  Well, no.  Because, of course, not everybody on the team

9  has the same rate; and so you'd have to multiply the number of

10 hours by the rates.  And so I think the math you're doing

11 suggests to me that it -- it means that -- probably more than a

12 million bucks, but I don't know how much more.  If we billed

13 about 5,000 hours, I would expect that maybe it's a million and

14 a half, maybe a million-two, something like that.  But it's not

15 going to be my rate multiplied by 5,000 hours in one year.  I

16 don't work that hard.

17 Q.  And what's the lowest rate that members on your team

18 charged the defendants?

19 A.  I don't know.  We have -- you know, as I explained earlier,

20 a big chunk of the work is the data work.  And the analysts at

21 my firm are much more efficient than I am at this point with

22 data analysis; and they have much lower rates than I do, but I

23 don't know what the rate is.

24 Q.  Dr. Cremieux, you've been a professional economist since

25 1997?

Pierre Cremieux – Cross

1    *A.*  Yes, that's right.  At AG, yes.

2    *Q.*  And the vast majority of your income since 1997 has come

3    from expert litigation work; is that right?

4    *A.*  No, I wouldn't say that.  Because for a good part of my

5    career at AG -- I would say the first five or six years -- I

6    didn't do any expert work.  I was -- I was working on cases

7    that were not litigation cases, that were cases involving

8    mostly clinical -- mostly clinical work -- clinical questions.

9    So statistics, things like that.

10   *Q.*  So since 2002, the vast majority of your income has come

11   from expert litigation work; right?

12   *A.*  I would say probably more 2005, '6, something like that.

13   Yes.  I mean, certainly, the latter years, my activity has

14   been -- my activity as a consultant has been expert work.  That

15   being said, I also run a company, which has a significant

16   portion of its activity that has nothing to do with litigation.

17   *Q.*  And you've written an article titled -- I think I have this

18   right -- "Tips From the Experts:  Getting the Most Out of Your

19   Experts."  Do you recall writing that article?

20   *A.*  Vaguely.  That was ten, fifteen years ago, something like

21   that, maybe.

22   *Q.*  And that was published in the American Bar Association --

23   *A.*  I don't remember where it was published, but that's

24   possible.

25   *Q.*  And one of the tips for other testifying experts such as

Pierre Cremieux – Cross

1    yourself that you gave in that article is about how an expert

2    should present themselves to a jury.  Do you remember that?

3    A.   I don't, but it's possible.

4    Q.   Okay.  If I can show you Government Exhibit 520, and see if

5    this refreshes your recollection.

6         Sir, do you see where you mention, changing your tone

7    on direct and cross-examination can create an impression that

8    the expert is a hired gun rather than an independent and

9    objective authority?

10   A.   That's right.  I think that's very important.

11   Q.   And that was a tip that you were giving other testifying

12   experts to try to adhere to; correct?

13   A.   Absolutely.  I think as experts we should behave

14   identically, whether we are being interrogated by the party

15   that hired us or, in your case, by the person who is on the

16   other side.  I'm just trying to provide evidence that the jury

17   is then going to evaluate, and they can decide what they think

18   of the evidence that I'm providing.  That's right.

19   Q.   And you have testified at bench and jury trials,

20   arbitrations, and administrative proceedings previously;

21   correct?

22   A.   That's right.

23   Q.   And you've also been deposed in many civil litigations as a

24   hired expert?

25   A.   Yes, that's true.

1354

Pierre Cremieux - Cross

1   *Q.*  And a deposition is where you're under oath being

2   questioned by attorneys just like we're doing here today;

3   right?

4   *A.*  It's a little different.  I mean, it's typically in a

5   little conference room; and you have a camera that is recording

6   what you're doing.  And you answer whatever questions the

7   attorneys may have for you -- the opposing attorneys --

8   attorneys from the other side may have for you for whatever,

9   five or six, seven hours.

10  *Q.*  And that's under oath, as well?

11  *A.*  Of course, yeah.

12  *Q.*  You've actually been deposed as an expert in litigation at

13  least 20 times in your career?

14  *A.*  I would say more than that.  Yes.

15  *Q.*  More than that?

16  *A.*  Yes.

17  *Q.*  As many as 30 times?

18  *A.*  Yeah, probably more like 30.

19  *Q.*  Okay.  And one of the depositions that you gave was in a

20  case where you were retained as an expert by Duke University;

21  do you remember that?

22  *A.*  Yes, I do.

23  *Q.*  Okay.  Duke University in that case was the defendant;

24  right?

25  *A.*  Correct.

1355

Pierre Cremieux - Cross

1    *Q.*  And Duke was sued over an alleged no-poach agreement.  And

2    the allegation was that Duke University and the University of

3    North Carolina had entered into a no-poach agreement; is that

4    fair?

5    *A.*  That's exactly right.  Yes.

6    *Q.*  And just like in this case, you testified in the Duke

7    University no-poach agreement case on behalf of one of the

8    defendants; correct?

9    *A.*  Well, so there was no court testimony.  I was deposed in

10   that case, yes.

11   *Q.*  You gave testimony under oath in a deposition on behalf of

12   a defendant accused of a no-poach agreement?

13   *A.*  Correct.

14   *Q.*  Sir, how many trials have you actually testified in?

15   *A.*  I haven't really kept track, but much fewer than

16   depositions.  Because many cases settle; and so there is no

17   trial, as today.  So I would say maybe ten, maybe.

18   *Q.*  And your hourly rate you stated was $1,050.  Is it the same

19   or more for testimony on the stand?

20   *A.*  It's the same.

21   *Q.*  So you're being paid right now?

22   *A.*  Correct.

23   *Q.*  Okay.  And you've also been retained as an expert in many

24   matters, not just those where you were deposed or testified;

25   right?

Pierre Cremieux - Cross

1  A.  Correct.  I'm sorry.  Let me just -- I'm not sure what

2  you're referring to.  I've worked on many cases where I was not

3  the expert but supported another expert.  Is that what you're

4  referring to?

5  Q.  Right.  That you've been hired even if you didn't actually

6  give testimony.  So we just went over maybe 20 to 30

7  depositions, some trials; but you've been hired for engagements

8  where you did not testify at trial or were deposed?

9  A.  Well, those are typically not cases where I'm hired.  These

10 are cases -- so I really do -- in the context of that work, I

11 do two things.  One is what I'm doing today, which is I'm the

12 expert testifying; and I've been, you know, accepted as an

13 expert by the Court.  The other part of my work is, I'm not the

14 expert.  I'm part of the team that is doing the analytics and

15 doing the work and, you know, helping the expert do their work;

16 but then they're the ones that testify.  I'm just one of the

17 people who is trying to figure out what is going on and do the

18 analysis.

19 Q.  And I apologize if my question wasn't clear.  It was just

20 simply, you're hired on other matters, even if you don't end up

21 testifying or being deposed?

22 A.  Yes.  I'm just trying to explain that there are three

23 things that can happen.  One is I get hired -- rather, an

24 expert gets hired and asks me to support them.  That's one kind

25 of job.  The second job is, I could be hired as an expert, but

Pierre Cremieux – Cross

1   the case settles right away, and so I don't get deposed, I

2   don't testify, even if I may have done some work.  And the

3   third one is what I'm doing today, which is I'm hired as an

4   expert, and then the case goes all the way to trial, and here

5   we are today.

6   Q.  Okay.  Maybe I can get a little more specific.  In the last

7   four years, you noticed in your expert report that you had been

8   retained as an expert in 16 cases in the United States;

9   correct?

10  A.  I don't remember.  But if I say so, then, yes, that's

11  right.

12  Q.  Okay.  And in all of those cases, you were hired by either

13  a large corporation or a large institution; is that right?

14  A.  I don't know off the top of my head; but if I went back

15  through them, I could figure it out.  Yes, I've worked for a

16  number of institutions and corporations.  That's true.

17  Q.  So I'd now like to just clarify and ask about what you're

18  opining about and what you're not opining about, just so we're

19  all clear.

20  A.  Sure.

21  Q.  So you were asked by counsel for DaVita and Mr. Thiry to

22  evaluate certain economic evidence; right?

23  A.  Correct.

24  Q.  And as you told the jury, your analysis is based on the

25  data.  That was an exact quote I wrote down from your direct

Pierre Cremieux - Cross

1    testimony.

2    A.   Yeah.  I would say economic and data.  So economic and

3    statistical evidence, if you will.  But, yes, that's the basis

4    of my testimony.

5    Q.   And your opinion is simply that the data you evaluated is

6    not consistent with the existence of a labor market allocation

7    agreement; correct?

8    A.   Yes.  It's that the data just doesn't provide me evidence

9    that there is an allocation of labor and a cessation of

10   competition.  That's what the data show.

11   Q.   Okay.  So if it's based on a lack of evidence, I presume

12   that that means that you can't rule out that a labor market

13   agreement actually existed in fact in this case, can you?

14   A.   So just to be clear -- and I think this goes back to

15   something Mr. Melsheimer said when I was in the courtroom -- is

16   I am not proving that there is no agreement.  I'm looking for

17   proof that there is.  But I'm looking for proof or evidence

18   that would tell me there is here evidence of an allocation of

19   labor based on the data that I've analyzed.  So that's what I'm

20   doing.

21   Q.   So I just want to make sure I understand.  Your testimony

22   is that you can determine what was in Mr. Thiry's mind based on

23   data?

24   A.   No.

25   Q.   And what tells us more about what was in Mr. Thiry's mind,

Pierre Cremieux - Cross

1  the data or what Mr. Thiry said at the time?

2  A.  I don't have an opinion about that.  I mean, I'm really

3  just an economist.  So I stick to the stuff I know well, which

4  is data analysis and economics; and so that's what I do.  The

5  rest of the evidence -- which I know there is a lot of evidence

6  in every which direction.  I was in court for a couple of

7  days -- that's not for me to judge or for me to evaluate.

8  That's just something that I think someone else is going to

9  have to tangle with.

10        But I've done my analysis of the data.  I've looked

11  for a demonstration that there was an allocation of labor as

12  evidenced by hard data.  That's what I was looking for, and

13  that's what I didn't find.

14  Q.  And, Dr. Cremieux, what tells us more about what was on

15  Mr. Thiry's mind, the data or what Mr. Thiry did at the time?

16  A.  I think that's the same question.

17  Q.  Well --

18  A.  I'll be happy to answer it again.

19        MR. MELSHEIMER:  I'm going to object as this being

20  argumentative.  It's also subject to, I think, something the

21  Court has excluded.  But if this is going to open the door to

22  that, then we'll have some more questions.

23        THE COURT:  I'm thinking about that very thing.

24        MR. MELSHEIMER:  I was too.

25        THE COURT:  I figured you would be.  Have a seat.

Pierre Cremieux - Cross

1          MR. MELSHEIMER:  Thank you.

2          THE COURT:  At this point the objection is overruled.

3     BY MR. VIGEN:

4     Q.  Dr. Cremieux, your expert report lists a complete set of

5     materials that you considered for this particular assignment;

6     is that right?

7     A.  Yes, it does.

8     Q.  And that's in Appendix C to your report?

9     A.  If I had my report in front of me, I could tell you which

10    appendix it is.  But there is one appendix that has the data --

11    I mean, the documents I relied upon.  Yes.

12    Q.  And you list various data sources and public documents in

13    that list; correct?

14    A.  Correct.

15    Q.  Okay.  You separately listed out the documents that were

16    produced -- Bates-stamped documents that were produced to the

17    defendant in this case?

18    A.  Yes.  There is a series of those documents.  That's right.

19    Q.  And many of those documents were emails?

20    A.  There were some emails in there.  Yes.

21    Q.  Okay.  By my count you listed 58 such documents; does that

22    sound accurate?

23    A.  I really don't know, but I'm assuming you've counted it

24    right.

25    Q.  And did you review all of the documents produced in this

Pierre Cremieux - Cross

1   case or just a selection?

2   *A.*  All the documents?  Oh, definitely not all the documents --

3   I had access to all of the documents, but I certainly did

4   not -- I mean, I'm assuming there are millions of documents in

5   this case; so I have not read every document in the case.  No.

6   *Q.*  Okay.  So you had access to all of the documents; but you

7   only ended up considering for your opinion 58, excluding the

8   data and the public documents you list?

9   *A.*  I mean, that's a big exclusion, given that my analysis is

10   mostly an analysis of data.  So you're right, for me, what is

11   most relevant is the data that I analyzed, as I think is

12   demonstrated by my testimony today.  Now, it's also the case

13   that some of the context is useful to understand what is going

14   on.  For example, I provided some context with Mr. Hayek's

15   testimony on what might explain what was going on there; I

16   provided some other context.  But, generally speaking, data is

17   what I relied on.

18   *Q.*  I would just like to show you three examples.

19   *A.*  Uh-huh.

20        *MR. VIGEN:*  If we can please show Government

21   Exhibit 67-3, and this is in evidence.

22   *BY MR. VIGEN:*

23   *Q.*  Dr. Cremieux, do you see this email from Andrew Hayek to

24   Bridie Fanning, where he says that he is putting DaVita in

25   italics and "our agreement is we will only speak with senior

1   executives if they tell their boss they want to leave and are

2   looking"?

3   A.   That's right.

4   Q.   This document wasn't listed as one of the 58 that you

5   considered for your assignment, is it?

6   A.   Correct.   I can explain why, if you'd like; but you're

7   right.

8         MR. VIGEN:   If I can show you next Government

9   Exhibit 146.

10  BY MR. VIGEN:

11  Q.   And if we can direct you to Mr. Golomb's email to

12  Mr. Thiry on April 16, 2017, where he states, "You also have my

13  commitment we discussed that I'm going to make sure everyone on

14  my team knows to steer clear of anyone at DaVita"?   So this

15  document also wasn't listed as part of your 58 that you

16  considered in forming your opinion, is it?

17  A.   That's right.   My expertise really is not about reading

18  documents and figuring out which ones I believe, which ones I

19  don't.   I'm really just doing my data analysis and in some

20  instances trying to understand what I'm observing from movement

21  and why.

22  Q.   If I showed you the ground rules email from Rich Whitney

23  that you saw introduced at trial, this would be the same

24  answer, you didn't consider that email?

25  A.   Yeah.   I mean, again, I've seen just from being in court a

Pierre Cremieux - Cross

1    number of those documents.  What I'm looking for is empirical

2    evidence, a demonstration that there is an allocation of labor.

3    Q.   Okay.  I'd now like to talk about your opinion concerning

4    compensation data, the DaVita data that you compared to the

5    national -- you said a benchmark data from the Bureau of Labor

6    Statistics.

7    A.   That's right.

8    Q.   And you would agree, this is supposed to be an

9    apples-to-apples comparison for your analysis to be valid;

10   right?

11   A.   I don't know -- I don't know if you're using that as a

12   technical term.  But I think I understand what you mean, which

13   is that I used the benchmark as an anchor to make sure that

14   what I observe -- which is a slight increase in turnover and a

15   slight increase in compensation -- is not in fact a decrease,

16   because relative to the rest of the world, it's not adjusting

17   for that other movement.

18   Q.   And you find that DaVita's salary was actually -- before

19   the conspiracy period was actually higher than the industry

20   average; correct?

21   A.   Correct.

22   Q.   Substantially higher; would you agree?

23   A.   That's right.

24   Q.   In fact, you found that before the conspiracy period,

25   DaVita paid its employees 50 percent more than the national

Pierre Cremieux – Cross

1   industry benchmark that you used; right?

2   A.  That's right.  Yes.

3   Q.  I'd like to look a little bit more carefully at the

4   benchmark you selected.

5   A.  Sure.

6   Q.  And this is national data from the Bureau of Labor

7   Statistics that is focused on outpatient care centers.  Do I

8   have that right?

9   A.  Yes, that's right.

10  Q.  Okay.  And within that data, there is a subset of data that

11  you narrowed it down to called management occupations.  Do I

12  have that right?

13  A.  That's correct.

14          MR. VIGEN:  Okay.  If we can show the jury, please,

15  Government Exhibit 591.

16          And if we can start at the top, just so the witness

17  can see the whole document.

18  BY MR. VIGEN:

19  Q.  Sir, is this where you downloaded the data from the BLS

20  website?

21  A.  That looks right.

22  Q.  Okay.

23          THE COURT:  591 is not in evidence.

24          MR. VIGEN:  Could I show it to the jury for

25  demonstrative purposes, Your Honor?

1    THE COURT:  Not if it's not in evidence, you may not.

2    MR. VIGEN:  Okay.  I'd move this into evidence as data

3    that he relied on.

4    MR. MELSHEIMER:  We don't have any objection to, as I

5    understand it, Exhibit 591.

6    THE COURT:  Fine.  It's admitted.

7    But that's what you have to do, Mr. Vigen.

8    MR. VIGEN:  Thank you, Your Honor.

9    (Exhibit 591 admitted.)

10   BY MR. VIGEN:

11   Q.  Dr. Cremieux, am I right that you included all of the data

12   under the management occupations category?

13   A.  I'd have to go back to make sure you're picking exactly the

14   right series.  So I'm not sure looking at it now -- this was a

15   while back, and you're just showing me one page, so I can't say

16   with certainty.

17   MR. VIGEN:  Could we please show the witness

18   Government Exhibit 510.  This is just for the witness.

19   BY MR. VIGEN:

20   Q.  Dr. Cremieux, can we go down to in Appendix D, paragraph 7.

21   In paragraph 7, is that where you describe the data that you

22   pulled from?

23   A.  That's right.

24   Q.  And does that refresh your recollection that what we were

25   looking at before was the data that you had pulled from?

Pierre Cremieux - Cross

1    *A.*  Yes, except that -- I mean, the reason why I'm not

2    absolutely positive is because I'd have to actually go, you

3    know, click on the link, make sure that this is the same series

4    that I used.  But let's just keep going, and I'll see whether I

5    see anything there that makes me believe that we have the wrong

6    series.  But --

7    *Q.*  Okay.

8    *A.*  -- happy to move forward.

9    *Q.*  In your expert report, you used, quote, management

10   occupations, was the subset of data that you used?

11   *A.*  That's right.

12   *Q.*  Is that right?  Okay.

13          If we can go back to Government Exhibit 591, please.

14          And am I right that under "management occupations,"

15   that everything else in this 1100 series are subcategories

16   within management occupations?

17   *A.*  That -- as long as you've picked it all the way down to the

18   bottom, I would say, yes, that's right.

19   *Q.*  And one of the subcategories is -- right below management

20   occupations is top executives.  Do you see that?

21   *A.*  Yep.

22   *Q.*  You didn't analyze whether that subcategory would be a

23   better benchmark to use in your analysis, did you?

24   *A.*  No, because I don't think it would be.  I mean, I think,

25   again, it's important to remember what I'm using the benchmark

Pierre Cremieux - Cross

1    for.

2    Q.  And, sir, if we can go down and look at 11-3010.  That's

3    the administrative services and facilities managers

4    subcategory.  Did you analyze whether that category was at all

5    comparable to DaVita director level and above senior employees?

6    A.  No.  But, you see, the reason why is because one other

7    issue when you use a benchmark and you're trying to anchor a

8    series -- which is what I'm doing here -- you have to be

9    careful about the sample size of your benchmark.  The problem

10   here is, if you start looking at subcategories, what you're

11   going to do is you're going to introduce noise by reducing the

12   sample size.  So the big benefit of using the management

13   occupations as a whole, is that because you have nearly 54,000

14   observations from year to year, it's going to reduce the noise,

15   which for a benchmark is quite important, particularly given

16   the use that I'm making of the benchmark here, which is just to

17   anchor and confirm that the DaVita data I'm observing is not,

18   in fact, masking a decrease that I'm not picking up.

19   Q.  So, in other words, that's a limitation of this data.  You

20   can't drill down into these subcategories because it causes too

21   much noise?

22   A.  No.  I mean, for other applications, it could be a

23   limitation of the data.  Not for mine.  What I'm doing is

24   really using the benchmark to confirm that what I see with my

25   naked eyes -- which is that the compensation went up, not

Pierre Cremieux - Cross

1  down -- is not in fact an artifice which results from something

2  weird that would have been happening in the economy during that

3  time and which would make an increase really be a decrease

4  relative to my benchmark.

5          So it -- I don't want to diminish the importance of

6  the benchmark, but I also don't want to overstate it.  But it's

7  just a check to make sure that what I see -- which is an

8  increase in the compensation -- is not somehow nullified by

9  something that is happening in the economy that I didn't take

10  into account.  And just confirmed that, no, there was no such

11  concerns.

12  Q.  The data you use includes data from all outpatient care

13  companies nationwide; is that right?

14  A.  Yeah.  That's correct.

15  Q.  The data is not broken out by location; right?

16  A.  No, it's not.

17  Q.  So you also did not break out that data and analyze whether

18  a company that was included in the national benchmark data that

19  was maybe located in a rural area should be excluded; right?

20  A.  That's right.  Wouldn't make sense to do that.

21  Q.  And you also couldn't isolate companies that were located

22  in an urban area, such as a company like DaVita, where most of

23  its senior-level employees -- where they lived?

24  A.  You're right on all of these points.  And that's -- you're

25  correct.  And none of that matters, yes.

Pierre Cremieux - Cross

1    *Q.*  And this data is also not broken out by size of the

2    company; right?

3    *A.*  So, often there is a minimum size; but the data that is

4    here -- so whatever is included here, I'm including in my

5    benchmark.  And, again, one thing that is really important with

6    benchmarks is not to cherrypick.  Right?  Because look at how

7    many categories there are.  I could have checked every single

8    category and then picked one that kind of made my numbers look

9    better, so it's very dangerous to cherrypick.  So here I'm

10   really trying to stay completely objective and say, let's just

11   pick the most -- the benchmark that has the -- you know, that's

12   the most general.  Management occupations.  Let's not try to

13   get some smaller sample with some weird stuff going on in it.

14        So I really believe that that is the right way to do

15   this.  But I do understand your point, which is that I could

16   have kind of sliced and diced this to get to something that

17   would have been smaller and would have seemed more precise but,

18   instead of that would have been a bit of a cherrypicking

19   exercise.

20   *Q.*  Dr. Cremieux, using the benchmark that you did use, you

21   found that DaVita paid their senior employees 50 percent more

22   than the national benchmark; right?

23   *A.*  That's right.

24   *Q.*  Okay.  You understand as an economist that DaVita could

25   have paid their senior employees more because they worked in

Pierre Cremieux – Cross

1   cities like Denver, which are more expensive to live in than

2   rural areas; right?

3   A.  It's possible.

4   Q.  And cities might be getting more expensive over time

5   relative to rural areas; right?

6   A.  Well, now you're making some assumptions, but -- I mean,

7   anything in the world is possible, but I don't think that that

8   is actually demonstrated.  I think that you've had -- you know,

9   housing prices certainly have moved at different rates in

10  different locations, different regions.  But that's in part why

11  using a benchmark that is a global benchmark is the right thing

12  to do, because it kind of evens out all of these effects over a

13  large sample of people who are going to be exposed to different

14  factors.

15  Q.  Dr. Cremieux, DaVita could have paid their senior employees

16  more because they needed to if it was a more undesirable place

17  to work, as compared to the national average; correct?

18  A.  Well, my understanding of DaVita is that it's all over the

19  country.  And so since the benchmark is also all over the

20  country, I'm not sure I would agree with that.

21  Q.  And you covered this briefly on direct examination, but

22  your compensation and turnover analysis was limited to just

23  senior-level employees.  Right?

24  A.  That's right.

25  Q.  Okay.  But you understand that Count 2 covers all DaVita

Pierre Cremieux - Cross

1   employees?

2   *A.*   I do.

3   *Q.*   Same with Count 3?

4   *A.*   Yes.

5   *Q.*   Okay.  Were you here in the courtroom for Elliot Holder's

6   testimony?

7   *A.*   Yes, I was.

8   *Q.*   You understand that he was not a senior-level employee at

9   DaVita at the time he was applying to RAD Partners; right?

10  *A.*   That's right.

11  *Q.*   As an economist, what happened to him was an economic

12  effect; right?

13  *A.*   Well, so what happened to him -- what happened is to him an

14  economic effect, for sure.  What I'm testing is a bit

15  different.  What I'm testing is whether there is a cessation of

16  competition and whether there is an allocation of labor.  So

17  I'm certainly not testing whether the professional path of some

18  people has been modified.  What I'm testing is I think what the

19  allegation is.  The allegation is not that there were specific

20  individuals whose professional path was changed; what I'm

21  testing is whether there was an allocation of labor and a

22  cessation of competition.  So the two are not inconsistent with

23  each other; I don't disagree with you.

24  *Q.*   Dr. Cremieux, I'd like to move on to my final topic or end

25  how we started, which is discussing the employees that you

Pierre Cremieux – Cross

1    found moved from DaVita to SCA and Hazel and RAD Partners.

2              So, again, with respect to SCA, you couldn't identify

3    a single senior-level employee that moved from SCA to DaVita

4    during the conspiracy, could you?

5    A.   Let me -- just give me one second, because you're going to

6    ask me a number of different questions on this.  And I want to

7    make sure I'm not just doing this from memory, but, instead, I

8    have my slides in front of me so I get it right.

9              My apologies.  I'm sorry.  You're starting with which

10   movement?

11   Q.   From SCA to DaVita during the over five-year conspiracy

12   period.

13   A.   That's right.

14   Q.   You couldn't find a single person?

15   A.   That's correct.  Zero.

16   Q.   And I believe you testified on direct examination that you

17   found one before 2012?

18   A.   That's correct.

19   Q.   Okay.  By any chance was that Aaron Luther in 2011?

20   A.   Sorry.  I didn't hear the question.

21   Q.   Was that individual Aaron Luther in 2011?

22   A.   I haven't memorized -- I don't know.  I haven't memorized

23   the names of all of the people who are in those movements.  But

24   if you say that it is, then it might be.  I don't know.

25              MR. VIGEN:  If I can show you, please, Government

Pierre Cremieux – Cross

1    Exhibit 26, which is in evidence.

2    *BY MR. VIGEN:*

3    *Q.*  Sir, do you see this email from Michael Rucker to Javier

4    Rodriguez on September 2011, where he's complaining about the

5    hiring by DaVita of Aaron Luther?

6    *A.*  Just give me one second.

7           Yes, I see that.  I see that.

8    *Q.*  This is approximately three months before Andrew Hayek

9    reaches out to Mr. Thiry to talk about recruiting?

10   *A.*  That sounds about right.

11   *Q.*  I'd now like to talk about the one person that you did find

12   moved from DaVita to SCA during the charged conspiracy period.

13   *A.*  Yes.

14   *Q.*  Now, on direct examination you said prior to 2012 –– as

15   opposed to the one that you found during the five-year

16   period –– prior to 2012, found eight people moved from DaVita

17   to SCA; correct?

18   *A.*  Actually, you have to be precise.  From 2000 to 2008, there

19   were none.  And then from 2008, which I think is when Mr. Hayek

20   showed up, to 2012, there were eight.  And then from '12 to

21   '17, we're back to in this case one.

22   *Q.*  Okay.  So after Mr. Hayek joins SCA, you found an average

23   of two employees a year moved from DaVita to SCA in 2008, 2009,

24   2010, and 2011, for a total of eight; correct?

25   *A.*  Your math isn't quite right; but a little less than two,

Pierre Cremieux – Cross

1    yes.

2    Q.   Thank you.  And then in the next five years subsequent to

3    that, you only found one total?

4    A.   That's correct.

5    Q.   Okay.  And the eight for that four-year -- roughly

6    four-year period after Mr. Hayek joined SCA -- that eight that

7    you found is actually consistent with what you told the defense

8    attorneys last year, that, quote, Assuming that the rate of

9    departures from DaVita to SCA would have been the same during

10   2012 to 2017 but for the alleged conspiracy, roughly five

11   director-plus DaVita employees would have gone to SCA?

12   A.   That's right.

13   Q.   Do you remember that?

14   A.   That's right.  That's a very good window, by the way, in

15   what the scientific method is.  Right?  So, remember, what

16   we're trying to prove is, in some ways -- even though I

17   understand we're hired by the defendant, we are trying to prove

18   the allegation of the government.  Right?  So we start by

19   looking at the data.  And, obviously, as soon as we saw, gee,

20   there were eight people hired in the five years before, and now

21   there is one, well, if the only -- you know, if what we see is

22   a movement from eight to one, we want to understand why.  And

23   that's what kind of spurs us to say, is this an evidence of

24   allocation of labor and anticompetitive conduct, or is there an

25   alternative explanation?  That is exactly what testing the

Pierre Cremieux – Cross

 1   hypothesis is.

 2          So first step, let's look at the other companies that

 3   are not subject to the allegations; and let's see if they

 4   differ during the period.  So focusing on the one.  What we see

 5   is, they don't.  Okay.  But it's still the case that we went

 6   from eight to one so let's look at what happened.  Well, we

 7   know that before that it was zero, before 2008.  Then '8 to

 8   '12, we have eight.  And then we have this moment with the

 9   documents that I showed with Mr. Hayek's testimony saying,

10   we've hired enough people from DaVita.  We don't think the one

11   we've hired is doing so great.

12          And so the scientific method -- if you're trying to

13   prove something, you have to need that something to explain

14   what you see.  If you don't need that explanation, then you

15   have not proven it.  So if I don't need an allocation of labor

16   to explain what I'm observing and if, instead, I can explain it

17   without the assumption of an allocation of labor, then I can't

18   say that I have found evidence of an allocation of labor.  But

19   so you're right, the place where we start, we start with the

20   allegation.  And we push really hard to see, is there evidence

21   here that I can use, that I can identify, that would tell me

22   that there is an allocation of labor and a cessation of

23   competition?

24          So I'm glad you found that document, because that's

25   what we're supposed to do.

Pierre Cremieux - Cross

1   *Q.*   Okay.  And that answer -- I believe you testified or

2   referenced the testimony that you relied on from Mr. Hayek

3   about a few DaVita employees not working out; right?

4   *A.*   That's right.

5   *Q.*   And you're using that to explain why there was only one

6   hire; right?

7   *A.*   Well, I used that -- rather, I -- it's not that I used it;

8   it's that I observed that this was happening, again, in my

9   quest to see whether there was the need to -- there was the

10  need of anticompetitive conduct, of cessation of competition to

11  explain what I was observing.

12          *MR. VIGEN:*   If we could please show the witness

13  Government Exhibit 629.

14          And, Your Honor, I'd offer this.

15          *THE COURT:*   I don't know what it is.  What is it?

16          *MR. VIGEN:*   This is a transcript of Mr. Hayek's

17  testimony.

18          *MR. MELSHEIMER:*   Well, Your Honor, we'd object to the

19  transcript being an exhibit.  He can certainly ask him about

20  it, but it's inappropriate as an exhibit.

21          *THE COURT:*   Isn't the agreement with the court

22  reporter that you not do what you're doing?

23          *MR. VIGEN:*   Apologies, Your Honor.  I'll do this a

24  different way.

25          *THE COURT:*   Is this a certified part?

Pierre Cremieux - Cross

1          *MR. VIGEN:*  This is.

2          *THE COURT:*  Okay.  So you can do it.

3          *MR. VIGEN:*  Thank you, Your Honor.

4          *MR. MELSHEIMER:*  Just so I'm clear, Your Honor.  I

5    have no objection to him showing it.  My objection is that he

6    said it was going to be an exhibit.

7          *MR. VIGEN:*  That's fine, Your Honor.  I can just ask

8    him the question.

9    *BY MR. VIGEN:*

10   *Q.*  So, Dr. Cremieux, do you recall when Mr. Hayek was asked,

11   if a promising candidate was put in front of him from DaVita,

12   would you have excluded them just because they were at DaVita,

13   setting aside your agreement with Mr. Thiry?

14         And he said, "I think the merits -- setting aside the

15   agreement, I think the merits of the individual would be most

16   important."

17   *A.*  I see that.

18   *Q.*  Despite that testimony, your opinion hasn't changed; right?

19   *A.*  I'm not sure I understand -- let me just read it to

20   understand what -- I don't even see how it relates right now,

21   so let me just --

22         No, there -- I don't -- I don't see why it changes any

23   of my analysis, no, or conclusions.

24         *MR. VIGEN:*  If I could please show you Government

25   Exhibit 631.

Pierre Cremieux - Cross

1    *BY MR. VIGEN:*

2    *Q.*  Sir, do you recall this testimony from Dr. Fanning, where

3    she said -- when asked, "If you were starting on a blank slate,

4    where would DaVita have fallen in the realm of companies with

5    comparable talent?"

6          And she said, "It would have been a priority company."

7    Do you recall that?

8    *A.*  Yes, I see that.

9    *Q.*  And she was asked, "If you were starting on a blank slate,

10   would you have looked at DaVita to recruit?"

11   *A.*  I see that.  Yes.

12   *Q.*  And she says, it maybe was even -- would have been in the

13   top three companies she would have recruited from?

14   *A.*  Yeah.  I see that, as well.

15   *Q.*  In spite of Dr. Fanning's testimony, you still hold your

16   opinion as you have stated it today?

17   *A.*  Totally.  I mean, my understanding is that Dr. Fanning was

18   a recruiter, maybe contracted at SCA or employed at SCA.  I

19   can't remember.  But, obviously, that's not the decision maker.

20   So as the decision maker, Mr. Hayek says in 2012 -- with

21   senior-level employees, again, which is the allegation here --

22   I am not interested in hiring more people from DaVita, I

23   totally understand how the recruiter would say -- perhaps not

24   knowing that this is Mr. Hayek's feeling -- of course, I would

25   go to check to see if there are interesting people at DaVita.

Pierre Cremieux - Cross

1          The question -- and this is why my analysis --

2    database analysis is I think so important.  The question is,

3    ultimately, what changed?  Right?  Do we see evidence that

4    there is a change?  So the fact that the recruiter says this,

5    if simultaneously the CEO, who is going to make the decisions,

6    is saying, yeah, we're not interested in DaVita employees

7    anymore because we've hired quite a few between 2008, 2012,

8    then, yes, I don't see why that would change my opinion.

9    Obviously, it also doesn't change the data.  The data are what

10   they are.

11   Q.  Even with Mr. Hayek's testimony that he said he would have

12   looked at the individual DaVita person on their own merits,

13   that's still your testimony?

14   A.  Yeah.  I mean, I think -- I mean, first, if he had said

15   anything other than, when you have candidates, you look at them

16   on their own merits, it's obviously -- that's what CEOs should

17   do.  But, yes, it doesn't change anything, in that, ultimately,

18   the question is whether I see any evidence in the data that

19   would be a telltale sign of allocation of labor.  The answer to

20   that is, no, I don't.

21          And so as far as my part of the analysis is concerned

22   and my expertise, there is nothing falling under my expertise

23   that allows me to conclude that there is an allocation of labor

24   or a cessation of competition.  And that's ultimately what I

25   set out to test.  That's what I'm trying to figure out.  And my

Pierre Cremieux - Cross

1    conclusion was, no, there isn't -- there is no data, despite,

2    frankly, my best efforts at trying to find evidence of it.

3    Q.  I'd like to talk briefly about Hazel.  One of the people

4    you list as moving from DaVita to Hazel is Julio Quinones; is

5    that right?

6    A.  Again, I'm not positive.  I haven't memorized the names of

7    the people who end up being on my list so --

8            MR. VIGEN:  If we could please show the witness

9    Government Exhibit 510, just for the witness to refresh his

10   recollection.  And go to Exhibit 1.

11   BY MR. VIGEN:

12   Q.  Sir, is this what you submitted as part of your expert

13   report explaining the names of the individuals included in

14   the --

15   A.  Yes, thank you.  That's very helpful.

16   Q.  Does this refresh your recollection that Julio Quinones is

17   one of the people that you listed?

18   A.  Yes.  I think it's footnote 3.

19   Q.  And including Mr. Quinones, did you consider the timing of

20   his hiring and whether he had an offer from Hazel before

21   Mr. Golomb and Mr. Thiry had conversations about recruiting?

22   A.  So let me just say that -- and I think this was the point

23   you made earlier -- that this is something that I submitted a

24   while back.  And at the time we were still checking some data;

25   but I think we have had all of a week to produce the report,

Pierre Cremieux - Cross

1    because it was an unexpected request.  And so I think if you

2    look at the numbers that are here that I just circled, some of

3    these have changed.

4            And in the analysis that I've presented today, some of

5    the numbers were corrected based on additional, you know,

6    data -- additional documentary evidence we got on the timing of

7    the hiring.  And we made every effort in our analysis of -- who

8    I included in my analysis to make sure that I never

9    overstated -- make sure I get this right -- that I never

10   overstated the number of people hired during the alleged

11   conspiracy period.  So I want to make sure that that number --

12   if it's too small, well, I'm being conservative; if it's too

13   big, I might not observe a reduction in competition when, in

14   fact, there was one.  So I made sure that number was

15   conservative.

16           And then outside of the conspiracy period, I did the

17   opposite.  There are always borderline cases, and so for those

18   I made sure that those numbers did not omit anybody.  But

19   during the conspiracy period, I made sure that I did not

20   include anyone who did not belong.  And that's why there were

21   modifications to the number.  And that explains your first

22   question, which is why, did it go from two to one?

23   Q.  One to zero.

24   A.  Sorry.  One to zero, yes.

25   Q.  I apologize, Dr. Cremieux.  I'm not trying to cut you off,

Pierre Cremieux – Cross

1    but I am trying to get through these questions.

2    A.  You're right.  I'm sorry.

3    Q.  My question was simply, one of the people you listed is

4    Julio Quinones, included in your count who went from DaVita to

5    Hazel?

6    A.  If he's not one of the people that I ended up subtracting

7    from my sample, and I don't know whether he is or not.

8    Q.  Okay.

9    A.  That's why I was explaining that we had done some

10   additional checking since then.

11   Q.  Dr. Cremieux, you told the jury that four people went from

12   DaVita to Hazel within the conspiracy period; is that correct?

13   A.  That's correct.

14   Q.  Which four?

15   A.  Well, that's what I'm telling you.  I haven't memorized the

16   names, so I can't tell you with certainty the name of all four

17   of those employees.

18   Q.  This expert report also shows four; do you agree with me?

19   A.  Yes, you're right.  So for Hazel, there is no change in the

20   number.  You're right.  The number changed for SCA, from one to

21   zero.  And I think for Radiology Partners, it went from 30 to

22   28, because there were two that I determined afterwards had

23   dates that needed to be modified.  So, you're right.  You're

24   right.

25   Q.  And just to clarify the timeline on this, you started

Pierre Cremieux - Cross

1   working on this matter over a year ago?

2   A.  That's correct.

3   Q.  You filed this expert report naming this list of employees

4   a month ago; and in the time between that expert report and

5   now, you've still been modifying your conclusions?

6   A.  I mean -- let me just explain.  A month and a week ago --

7   so five weeks ago -- my team and I were suddenly told that we

8   needed to produce a report.  And so we had within a week to

9   produce a report, complete with exhibits, checking everything

10  we could possibly check to make sure that everything was right.

11  And so with apologies, the report had a couple of data points

12  that were not correct, and which I corrected since.  But I have

13  full confidence that what is in the presentation I made today

14  and the identification of the individuals that I did today is

15  correct.

16  Q.  I want to go back to Mr. Quinones as an example of one of

17  the -- as one of the four.  Did -- I'll ask my question,

18  whether your opinion considered the timing of his hiring and

19  whether he had an offer from Hazel before Mr. Golomb and

20  Mr. Thiry had conversations about recruiting.

21  A.  So we looked at those dates.  I don't remember the specific

22  for Mr. Quinones.

23  Q.  Did your opinion consider the documents that were

24  introduced as evidence that showed it was Mr. Quinones'

25  recruitment that caused Mr. Thiry and Mr. Golomb to reach the

Pierre Cremieux - Cross

1   alleged agreement?

2   *A.*   So I don't remember.

3   *Q.*   Finally, I'd like to talk about Radiology Partners.  As you

4   noted in your expert report, it was 30; today it's 28.  The

5   list of names there, 30 names, do you know which two dropped

6   off?

7   *A.*   So I think one is David Blank.  I remember that name, but I

8   don't remember who the second one was.  Sorry.  I remember

9   David Blank but --

10  *Q.*   We'll talk about Mr. Blank in a moment.

11  *A.*   Okay.

12  *Q.*   Before I go into the individual name -- and I won't cover

13  every name -- but I want to talk about a concept that --

14  *A.*   Good.

15  *Q.*   I do want to talk about a concept that I think you should

16  be familiar with as an antitrust economist, and that is a term

17  of art -- a term that antitrust economists such as yourself

18  use, and that's called cheating, in quotes.  That's a term

19  you've heard of?

20  *A.*   Yes.

21  *Q.*   Okay.  And the term "cheating" is used to describe what

22  sometimes happens after competitors reach agreements not to

23  compete; right?

24  *A.*   That's right.

25  *Q.*   So in a labor market allocation agreement, cheating may

Pierre Cremieux - Cross

1   look like an employee moving from one company to another;

2   right?

3   A.  Well, just to be clear about what we're talking about here.

4   If you had an agreement -- say, you and I had an agreement

5   which we said, you have a company, I have a company, and we're

6   not going to hire from each other -- so a no-hire agreement --

7   which is different from what we're dealing with here --

8   cheating would be me actually maybe through a third party

9   hiring from you and -- because it's someone I really liked

10  that's employed at your company.  That's what we refer to as

11  cheating in antitrust.  You've got an agreement, but then you

12  somehow kind of get around it.

13  Q.  If I can show you -- we'll go through a few names here, and

14  then that will be it.

15          Going back to your expert report with your list of

16  names, just so that you can be refreshed on who those are, the

17  first person on your list is Jeff Long.  Do you see that?

18  A.  Yes, I do.

19  Q.  Okay.  So, presumably, at that point in time your opinion

20  had not taken into account Rich Whitney's testimony that he

21  hired Jeff Long before he reached an agreement with Mr. Thiry;

22  right?

23  A.  Well, it depends whether -- I don't know whether this was

24  already in the documentary evidence or not, or whether this is

25  something that is recent, that you're referring to.

Pierre Cremieux - Cross

1  *Q.* I'm referring to Mr. Whitney's testimony to the jury, where

2  he explained that Jeff Long was hired before he reached an

3  agreement with Mr. Thiry.

4  *A.* Okay. So I don't think that we've made modifications

5  following that. So it might be that the -- and, again, I can't

6  be sure -- but DaVita to Radiology Partners, it means that

7  maybe -- I know I reduced the number from 30 to 28. So you're

8  saying it may be 27; that's possible. I don't know. I mean,

9  it doesn't change anything, because, fundamentally, if the

10 median company is hiring one, twenty-seven is much higher than

11 one. So there may be -- even if we disagree on the

12 interpretation of a couple people, it's not going to change

13 anything to the fundamental result that I've been discussing.

14 *Q.* You also list Cameron Cleeton. And presumably your opinion

15 did not take into account Mr. Gabriel's testimony that he

16 started talking to Mr. Cleeton about a job in January of 2014

17 but did not ultimately hire him until October 2014 because of

18 the agreement?

19 *A.* I'm sorry. Say that again. He started talking -- say that

20 again. Sorry. I missed that.

21 *Q.* Mr. Gabriel -- you listened to the whole trial; right?

22 *A.* Well, no. I was here today and yesterday, and I've read

23 much of the transcript. Yes.

24 *Q.* Okay. So Mr. Gabriel testified that he started talking to

25 Mr. Cleeton around January of 2014 but did not hire him until

1   October of 2014 because of the agreement; right?

2          MR. MELSHEIMER:  Your Honor, I'm going to object as

3   misstating Mr. -- Dr. Gabriel's testimony.

4          THE COURT:  I don't have a perfect memory of it.  You

5   guys have been ordering transcripts, so you tell me what he

6   said.

7   BY MR. VIGEN:

8   Q.  Do you recall that testimony, sir?

9   A.  I do not.

10  Q.  Okay.  If there was a ten-month delay in moving employers,

11  would you agree that that's an economic effect on an

12  individual?

13  A.  Certainly, yes, for that individual, it's an impact.  If

14  they would have -- if they had been hired sooner rather than a

15  few months later, yes, for that individual, it matters.

16  Q.  Now I'd like to talk about how you identified these

17  individuals.  You mentioned on direct examination that you used

18  LinkedIn data; is that right?

19  A.  Correct.

20  Q.  And you included as a direct transfer anybody that moved

21  from DaVita to RAD Partners who had up to a six-month gap on

22  their resumé on LinkedIn; is that right?

23  A.  Yes.  That's correct.

24  Q.  And --

25  A.  Actually, can I -- let me be precise.  Again, because I

Pierre Cremieux - Cross

1    want to make sure that I'm being conservative -- meaning that

2    I'm not going to miss evidence of an allocation of labor -- I

3    used a six-month gap during the allegation period and a

4    twenty-four-month gap outside of the allegation period.  And

5    the reason for that is because if I used a six-month -- if I

6    used a six-month gap during the allegation period, then I'm

7    less likely to count someone as a transfer.  Because if you

8    took eight months to go from one company to the next, I don't

9    count you as a transfer.  So it's going to reduce the number of

10   people during the conspiracy period.  Right?

11   *Q.*  Is --

12   *A.*  If I use a 24-month gap outside of the conspiracy period,

13   then it means I might overstate the number of transfers outside

14   of the conspiracy period.  So the reason to do that is because

15   I want to be conservative on both ends in different directions.

16   Because, again, I'm trying to find evidence of an allocation of

17   labor.  So I want to make sure I'm not overstating the

18   movements during the conspiracy periods, because that's when

19   plaintiffs are alleging there was little movement; and I want

20   to make sure I'm not understating movement outside of the

21   conspiracy period.

22       And the reason, by the way, why in those cases I have

23   these gaps is because LinkedIn is quite precise.  It's pretty

24   remarkable.  But often people report the year, and they don't

25   report the month.  So it's kind of a geeky thing; but if you

Pierre Cremieux - Cross

1    don't have the month, then you have to make an assumption about

2    when the move happened.  And you can imagine if someone moves

3    in December -- go from December of 2020 to January of 2021,

4    they're going to record it as one year; but if they moved from

5    January of 2020 to December of 2021, it would also be recorded

6    as one year.  And so you have to be really careful about not

7    biasing your results and overstating the movements during the

8    conspiracy period.  So that's why I used the six months, but

9    actually checked.  If I had used one month instead, it wouldn't

10   have changed anything.  But you're right that there is a gap

11   there.

12   Q.  Well, let's kick the tires on that.

13          If we can look at Government Exhibit 515.  This is

14   just for the witness.

15          This is -- this is what your LinkedIn data looks like;

16   is that right, sir?

17   A.  Yes, that's right.

18          MR. VIGEN:  Okay.  And if we can look at -- show the

19   witness Charles Lefevre -- like Brett Favre, but Lefevre.

20   BY MR. VIGEN:

21   Q.  And your data for this individual shows that he left DaVita

22   on April 1, 2015, and joined Radiology Partners on September 1,

23   2015?

24   A.  Let me take a look.  But, first, I do appreciate that you

25   picked Lefevre as the person --

Pierre Cremieux - Cross

1  *Q.*  Thank you.

2  *A.*  -- that you would like to emphasize.  It's very kind of

3  you.

4  *Q.*  Thank you.

5  *A.*  I'm sorry.  Say that again.  September 2015?

6  *Q.*  No.  He left DaVita on April 1, 2015, and he joined

7  Radiology Partners on September 1, 2015, according to the

8  LinkedIn data.

9  *A.*  Sorry.  I -- April 1, I see that.  Then what's the next

10  date you provided me with?

11  *Q.*  September 1 for the joined date of Radiology Partners.

12  *A.*  Wonderful.  Someone else is doing it.

13         That's right.  Yes, that's five months.

14  *Q.*  Okay.  And if we go back to your expert report, though,

15  because you used a six-month gap, you counted this individual

16  as a direct transfer in your list; right?

17  *A.*  Correct.

18  *Q.*  Okay.

19  *A.*  Correct.  I'd have to go back and check my data; but based

20  on the rule and what you're showing me, that looks right.

21  *Q.*  Despite the fact that you just testified that if you had

22  used a one-month gap, your numbers wouldn't have changed?

23  *A.*  Yes.  That's -- I mean, so this is Radiology Partners.  So

24  Radiology Partners, this is the company for which there are a

25  lot of movements -- 28 movements.  And so I may have

Pierre Cremieux - Cross

1   overstated -- I know it didn't change for SCA; I believe it

2   didn't change for Hazel; and I believe it was marginal, at

3   best -- my recollection was it didn't change at all, but you

4   may be right here that there is one person for whom it did make

5   a difference.

6   Q.   Do you know how many other similarly situated individuals

7   had gaps that you counted as a direct transfer?

8   A.   Well, since I told you there were none, and you found one,

9   I'll stick with one.  Because I really don't believe that there

10  are a significant number for whom this is true.

11       MR. VIGEN:   Can we go back, please, to Government

12  Exhibit 515, the LinkedIn data.

13       If we can show the witness Lawrence Hofman.

14  BY MR. VIGEN:

15  Q.   Does this show a two-month gap from when Mr. Hofman left

16  DaVita and joined Radiology Partners?

17  A.   Yes, it does.  So let me just emphasize that -- I may have

18  misspoken on the -- you know, the fact that it didn't change

19  anything; it may have changed a couple.  But know that this is

20  the right thing to do.  Right?  In other words, if I was to

21  only count movements when people have one day between the place

22  they went from and the place they went to, I'd be missing all

23  the smart people who decided between two jobs that they're

24  going to take a few days for themselves.

25       And so what I did here is I tried to come up with a

Pierre Cremieux – Cross

1  rule that was a reasonable rule and that, again, was

2  conservative because –– and it's unusual.  I made it asymmetric

3  between the conspiracy period and the –– the alleged conspiracy

4  periods and the non-conspiracy periods.  So you're right that,

5  you know, at the margin, you can change those rules.  Of

6  course, if I had changed the rule for the outside period to

7  make it six months, for example, well, that would have resulted

8  in me being much more aggressive on the –– on my hypothesis

9  testing.

10         So with data, you always have to make assumptions; and

11  I made the best possible assumption that I could.

12  Q.  Dr. Cremieux, the LinkedIn data you said as an economist

13  you viewed as fairly reliable; but you acknowledged it's

14  self-reported.  Right?

15  A.  Correct.

16  Q.  And you didn't double-check –– maybe you did.  I shouldn't

17  ask that question.  But the individual employees are putting in

18  these dates that you were relying on for your report; right?

19  A.  That's right.

20  Q.  Okay.  And you mentioned David Blank before.

21  A.  Yes.

22  Q.  Did he drop off your list because you found out that his

23  LinkedIn data was actually inaccurate?

24  A.  I think that's correct, that for him –– I don't know if

25  there was a typo in the entry or what happened; but, yes, the

Pierre Cremieux - Cross

1    date for him was inaccurate.

2            Let me just -- to give an order of magnitude, we had

3    11,233 observations in our LinkedIn data.  So I just want to

4    make sure I give some context for the discussion we're having.

5    But, yes, I believe that that was why we moved him off.

6    Q.  You mentioned 11,000; but when you were submitting your

7    expert report to the Court, you had narrowed that down to 30?

8    A.  No, because --

9    Q.  For Radiology Partners.

10   A.  Well, no.  Because, obviously, you have movements during

11   the period; and you have movements outside of the period.

12   Q.  Thirty within the period?

13   A.  For Radiology Partners specifically, yes.

14   Q.  Okay.  And David Blank was one of the people that you

15   included in your list to the Court but now is not included?

16   A.  That's right.

17   Q.  And that's because his LinkedIn data showed that he left

18   DaVita on March 1, 2016, and he started at Radiology Partners

19   on March 1, 2016?

20   A.  So, again, I don't remember the specifics for him.  But I

21   do remember that we modified it because we got some documentary

22   evidence after we had completed this analysis for the LinkedIn,

23   so I made the correction.

24   Q.  Did that documentary analysis come from our list of

25   cross-examination documents that you reviewed?

Pierre Cremieux - Cross

1   A.  Yeah.  It was from some of the documents that came in

2   through the trial.  Yes.

3   Q.  And LinkedIn data doesn't show if someone might have been

4   laid off by DaVita before they joined Radiology Partners;

5   right?

6   A.  No, that's right.  The LinkedIn -- typically, on LinkedIn

7   data, people don't volunteer whether -- if they've been laid

8   off.  That's right.

9   Q.  And so as a result, one of the people you list is Jennifer

10  Gouailhardou.  Does that sound familiar to you?

11          Let me go back --

12  A.  I'm sorry.  I don't have it in front of me.

13          MR. VIGEN:  Let's go back to the expert report,

14  please.  Government Exhibit 510, Exhibit 1.

15          THE WITNESS:  So I know that there is -- yes, this one

16  person, as you say this, whom we -- the other person we took

17  out was because she either was laid off or was an

18  underperformer.  But something came in through the documents

19  that was not obvious from the LinkedIn data and led us to make

20  a correction, which is why we end up with fewer people in

21  the --

22  BY MR. VIGEN:

23  Q.  And you only did that based on the documents that you

24  saw?

25  A.  Well, I did that based on the information I had.  Yes.

1  *Q.*  Okay.  And how many other people were affected by layoffs

2  or maybe had their information in LinkedIn wrong that you

3  included?

4  *A.*  None that I know of.

5       MR. VIGEN:  Okay.  No further questions, Your Honor.

6       MR. MELSHEIMER:  May we approach briefly?

7       THE COURT:  We need to take a break here.

8       MR. MELSHEIMER:  May we take a break, Your Honor?

9       THE COURT:  Yes.  How much time?

10      JUROR:  Fifteen.

11      THE COURT:  You got it.  Fifteen minutes.

12      (Jury out at 3:05 p.m.)

13      THE COURT:  The jury is excused.  What is it,

14  Mr. Melsheimer?

15      MR. MELSHEIMER:  Well, Your Honor, he was asking

16  several questions at the beginning about Mr. Thiry's intent.

17  If you recall, that was their very objection to a good chunk of

18  Dr. Cremieux's analysis about economic incentives.  And he

19  asked one question about it; he answered it; he asked another

20  one; I objected; you overruled it; he answered it.  And I think

21  it's now fair for us to be able to get into this evidence that

22  they tried so hard to keep out.

23      I'll try to keep it very short; but I think it's only

24  fair, given the admonition you gave them after the ruling --

25  the government after the ruling that, you know, no one should

 1    open the door about it.

 2              THE COURT:  Response.

 3              MR. VIGEN:  So, Your Honor, I'm reading from the slide

 4    that the witness was testifying to.  And his conclusion is that

 5    the economic evidence does not support the actual or intended

 6    allocation of a market for employees, so the hypothesis needs

 7    to be rejected.  So he is rejecting the idea that the defendant

 8    had the intent to allocate a market.  That's the whole purpose

 9    of his testimony.

10              And his testimony is based on data.  That's a fair

11    question to ask the witness, what tells us more about intent,

12    data or documents?  What happened?  I feel like that's a

13    very --

14              THE COURT:  Well, the point he's making is not that it

15    wasn't a fair question.  The point he's making is, by asking

16    questions about intent, after you convinced me to exclude

17    section 8 of his opinion, have you opened the door to it?

18              MR. VIGEN:  No, Your Honor, because that question

19    didn't go anywhere close to the market or any of those other

20    issues.  He was able to testify to other companies and their

21    hiring rates, and we didn't object.  This question went to,

22    fundamentally, what he did in his opinion, what he's here for

23    today; and that is to testify to what was in -- whether a

24    market allocation agreement existed and intended and using data

25    to do that.  So that doesn't open a door to an entire market

1    analysis from the expert.

2              THE COURT:  I disagree.  I think you opened the door.

3              You can go into section 8 now.

4         MR. MELSHEIMER:  Thank you, Your Honor.

5         THE COURT:  Let's take our 15-minute break.

6         (Recess at 3:08 p.m.)

7         (In open court at 3:28 p.m.)

8         MR. MELSHEIMER:  Before you bring the jury in, could I

9    ask one question for clarification?

10        THE COURT:  Every time somebody asks me for

11   clarification, it's like a polite way of saying, I want to

12   disagree with you.

13        MR. MELSHEIMER:  Not at all, Your Honor.  Not at all.

14   I couldn't agree with the Court more.

15        THE COURT:  I know what you're going to ask.

16        MR. MELSHEIMER:  Your Honor, I just want to make

17   clear.  The intent questions I believe open up -- you said

18   section 8 of the report.  That's the strategic partnership.

19   Section 7 is the economic incentives, and that's the stuff that

20   goes to the intent, and that's what I'd like to get into.

21        THE COURT:  I don't think so.  I think it's section 8

22   that talks about intent.

23        MR. MELSHEIMER:  Well, section -- well, again, section

24   8 talks about -- is the whole strategic partnership.

25        THE COURT:  Correct.  And that's where he was trying

 1    to talk about intent.

 2              *MR. MELSHEIMER:*  Well, Your Honor, respectfully, I

 3    think -- with respect to -- when he talks about all -- this is

 4    why I wanted to ask you this, Your Honor, because when he talks

 5    about all of the different companies that were available, he's

 6    talking about the fact that there would be no incentive or --

 7    for Mr. Thiry to have entered into the agreement.  And that's

 8    why -- I thought that's what Mr. Vigen's questions were

 9    designed to get to, because he wasn't talking about strategic

10    partnerships when he examined Dr. Cremieux on that issue.

11              *THE COURT:*  Section 7 is where we're getting into the

12    broad market issue, and I don't want to go there --

13              *MR. MELSHEIMER:*  I understand that.

14              *THE COURT:*  -- period.  Section 8 is specifically

15    where he's talking about DaVita and Thiry's intent, and he's

16    trying to explain that there might have been other objectives

17    that they were trying to accomplish.

18              Now, he can't talk about what was in Mr. Thiry's mind.

19    He can't do that.

20              *MR. MELSHEIMER:*  Understood, Your Honor.  I'll have a

21    very brief examination with Dr. Cremieux on -- with respect to

22    SCA and the hiring practices and the strategic partner issue,

23    which is in section 8.  I am happy to do that and will do that

24    quickly.

25              *THE COURT:*  Well, that's what he's opened the door to.

Pierre Cremieux - Redirect

1          MR. MELSHEIMER:  That's what we're going to -- thank

2     you for clarifying my mistake, Your Honor.

3          THE COURT:  All right.

4          (Jury in at 3:32 p.m.)

5          THE COURT:  Okay.  Redirect.

6          MR. MELSHEIMER:  May it please the Court.

7                      **REDIRECT EXAMINATION**

8     BY MR. MELSHEIMER:

9     Q.  Dr. Cremieux, just a few questions.  With respect to the

10    hiring between DaVita and SCA -- are you with me?

11    A.  Yes.

12    Q.  What did you observe with respect to any hiring practices

13    that SCA had with respect to companies like DaVita?

14    A.  So what I observed is that SCA in its documents identified

15    a number of companies that it considered its strategic

16    partners, one of which was DaVita.  So one of the questions I

17    investigated, given that I had the data, was to see whether

18    SCA's -- as a result of the strategic partnership, was SCA's

19    strategy to hire from those strategic partners or to not hire

20    from those strategic partners?  Because given that DaVita is

21    one of them, that seems informative as to whether there is a

22    difference between the behavior of SCA with DaVita versus the

23    behavior of SCA with its other strategic partners.

24         MR. MELSHEIMER:  So let's pull up B588.

25

1400

Pierre Cremieux - Redirect

 1   *BY MR. MELSHEIMER:*

 2   *Q.*  What is reflected in B588, sir?

 3   *A.*  So what is here is a list of some of the strategic partners

 4   that SCA had identified, meaning, in its strategic documents,

 5   it had mentioned these and some other companies as their

 6   strategic partners.  And what this showed is that it was a

 7   pretty common practice for them not to hire from their

 8   strategic partner.  In part because when you have strategic

 9   partnerships -- it's something we see often in economics.  If

10   you have a strategic partner business relationship, then you

11   don't want to upset your clients or your business partners by

12   soliciting their employees.

13   *Q.*  What --

14   *A.*  And so this was an additional piece of information that

15   seemed relevant.

16   *Q.*  What is reflected on B588, if you can summarize it for us

17   quickly.

18   *A.*  Yes.  So you see the name of the strategic partner, the

19   description of who they are, and then the number of

20   senior-level employees hired by SCA from those strategic

21   partners during the 2012-2017 period.  And as you can see --

22   again, as I try to find ways to distinguish DaVita from other

23   companies in terms of how SCA treated it, what I find here is

24   that in fact it's treating it very consistently with the way in

25   which it treats its other strategic partners.  It hired one

Pierre Cremieux - Redirect

1    person from DaVita; but it in fact typically did not hire from

2    its strategic partners.  Although that's not uniformly the

3    case, but there are still many strategic partners from whom it

4    chose not to hire.

5    Q.  You've taken the period of 2012 to 2017 to look at because

6    that's the alleged conspiracy period between SCA and DaVita?

7    A.  Correct.

8    Q.  Did you review any internal SCA presentations or documents

9    that you relied upon to identify DaVita as having a partnership

10   or strategic relationship or business relationship with SCA?

11   A.  Yes, I did.

12            MR. MELSHEIMER:  Can I have one moment, Your Honor.

13   BY MR. MELSHEIMER:

14   Q.  Dr. Cremieux, is B --

15            Let's pull up B589.

16            Is this one of the internal --

17            Actually, can you pull that down.

18            Hold on one second, Your Honor.

19            My apologies.  B589 -- just to be clear, Dr. Cremieux,

20   that yellow box, is that on the original document, as you

21   recall it?

22   A.  No.  I don't think I've seen that --

23   Q.  Well, let me just ask you this way:  Is that something you

24   and I put on there?

25   A.  I don't know what you did, but I did not put it on there.

1    No.

2    *Q.*  Thank you.  So B589, sir, is this one of the documents that

3    reflects the presence of DaVita as a strategic partner of SCA?

4    *A.*  Yes.  This is part of a larger document, which identifies,

5    among other things, its strategic partners.

6              *MR. MELSHEIMER:*  And if you could -- if you could go

7    to I think page 4 of that document, Mr. Barnes, that has the

8    actual DaVita logo.

9    *BY MR. MELSHEIMER:*

10   *Q.*  Dr. Cremieux, do you see the reference to DaVita HealthCare

11   Partners on this slide as being one of the strategic partners

12   of SCA?

13   *A.*  Yes.  Bottom right.

14             *MR. MELSHEIMER:*  Thank you, Dr. Cremieux.

15             *THE COURT:*  Questions from the jury for this witness?

16             Yes.  All right.

17             It's a big stack.  If you folks want to take another

18   break for a few minutes, you can.

19             (Hearing commenced at the bench.)

20             *THE COURT:*  43.

21             Is this one of yours?

22             *MR. DODDS:*  I just saw it on the bench, Your Honor.

23             *MR. MELSHEIMER:*  We don't have any objection to these,

24   Your Honor.

25             *THE COURT:*  No objection to No. 43?

1          MS. LEWIS:  No objection.

2          THE COURT:  44?

3          MS. LEWIS:  Your Honor, I think we would object to

4    No. 1.  That's invading the province of instructing the jury on

5    the law.  And we would also object to No. 11 on the back.

6          MR. MELSHEIMER:  I don't -- so we don't object to 1.

7    I don't think it's a legal question -- I don't think it -- I

8    don't think it's inappropriate.

9          THE COURT:  How about 11?

10         MR. MELSHEIMER:  We have no objection.

11         MR. DODDS:  Which one is 11?

12         MR. MELSHEIMER:  11.  I'm sorry.  I'm sorry, Your

13   Honor.  When you said 11, I was thinking of something else.

14   I'm sorry.

15         Yeah, I don't -- are you objecting to 11?

16         MS. LEWIS:  We are objecting to 11.

17         MR. DODDS:  I think that that's -- Your Honor has

18   already decided that for purposes of this case.

19         MR. MELSHEIMER:  Plus I don't know what he's going to

20   say.

21         MR. DODDS:  There is that.

22         THE COURT:  Let me look.

23         MR. DODDS:  Could we ask the question about the Dodds

24   market?

25         THE COURT:  All right.  I agree with you on 11.

1    MS. LEWIS:  Thank you, Your Honor.

2    MR. MELSHEIMER:  Well, you agree with us, too.  We

3    agreed.

4    THE COURT:  Joint objection.  Sustained.  I -- I don't

5    agree with you on No. 1, because he used the term "meaningful

6    competition," and so I think it's fair game for them to

7    define -- ask them to define what he meant.

8    MS. CLINGAN:  I think that's fair, Your Honor.  But I

9    think we would just like to be clear that we're asking him to

10   explain the term as he used it and not as they're going to see

11   that term in the jury instructions.

12   THE COURT:  I can do that.

13   MS. CLINGAN:  Thank you.

14   THE COURT:  I'll say that that one is rephrased.  Any

15   objection to that?

16   MR. MELSHEIMER:  How are you going to rephrase it?

17   THE COURT:  Do you think Mr. Melsheimer has done a

18   good job --

19   MR. MELSHEIMER:  Well, he can answer that.

20   THE COURT:  No.  I would rephrase it by saying, You've

21   used the term "meaningful competition."  How would you define

22   the "meaningful competition"?  What do you mean by that?

23   MS. CLINGAN:  What did he mean by that.

24   THE COURT:  As rephrased, your objection is withdrawn?

25   MS. LEWIS:  Yes, Your Honor.

1    MR. MELSHEIMER:  He's not going to make his 6 o'clock

2  flight, is he?

3    THE COURT:  Huh-uh.

4    So that takes care of 44.

5    MR. MELSHEIMER:  Your Honor, we're going to object to

6  No. 2, Did you ever meet with Mr. Thiry?

7    THE COURT:  On what ground?

8    MR. MELSHEIMER:  It's not relevant.  It may be -- I

9  don't know -- I think when he met with Mr. Thiry, it -- I

10  believe lawyers were always present, so I don't think it would

11  be --

12    MS. CLINGAN:  It's not our privilege to assert so --

13    MR. VIGEN:  There is no privilege in the fact of a

14  meeting.

15    MR. MELSHEIMER:  Well, it's generally, with the -- the

16  discovery into that is generally prohibited in a civil context.

17  I just don't --

18    THE COURT:  Objection is overruled.  But if the jury

19  follows up with a question about, What did you discuss?  That's

20  one way you get into the possible privilege issue.

21    MR. VIGEN:  Of course.

22    THE COURT:  46, no objection?

23    MS. LEWIS:  No objection.

24    THE COURT:  Here is 47.

25    MR. MELSHEIMER:  No objection to that.

1    THE COURT:  47, any objections?

2    MS. LEWIS:  No objection from us, Your Honor.

3    MR. MELSHEIMER:  No objection.

4    THE COURT:  48.

5    MS. LEWIS:  No objection from us, Your Honor.

6    MR. MELSHEIMER:  We're going to be here awhile.

7    THE COURT:  49.  Yeah, we're going to be here for a

8    while, because we're going to go over instructions.

9    MS. LEWIS:  We have very smart jurors.

10    THE COURT:  They're paying attention, and they're

11    trying hard.

12    MR. MELSHEIMER:  No objection.

13    THE COURT:  Okay.  You've seen 50, I think, haven't

14    you?

15    MS. CLINGAN:  No.

16    THE COURT:  Not yet?

17    MR. MELSHEIMER:  No objection.

18    THE COURT:  No objections to 49.

19    MR. MELSHEIMER:  Your Honor, on this one -- I would

20    just ask the question without the hypothesis.  I'm not sure if

21    that's part of the question.

22    THE COURT:  I'm willing to ask 51, but I'm also going

23    to delete the part about minorities, et cetera.

24    MR. MELSHEIMER:  I think that's fair, Your Honor.

25    MR. VIGEN:  No objection.

1        MS. LEWIS:  That's reasonable, Your Honor.

2        THE COURT:  You did a nice job.

3        MR. VIGEN:  I appreciate that after yesterday.

4        MR. MELSHEIMER:  I think it's just a comment.  So we'd

5   have the same objection here to not reading the hypothesis

6   there.

7        THE COURT:  This is No. 50?

8        MR. MELSHEIMER:  Yeah.  We read it.

9        THE COURT:  So you want me to take off the hypothesis

10  piece?

11       MR. MELSHEIMER:  Yeah.  I don't think -- I think the

12  juror is just letting us know that.  I don't think it's part of

13  the question.

14       THE COURT:  But you didn't object to any of the

15  hypothesis piece in 49.

16       MR. MELSHEIMER:  I did, Your Honor.  I think.

17       THE COURT:  49?

18       MR. MELSHEIMER:  I think anything that is not a

19  question should not be read.

20       THE COURT:  Do you agree?

21       MS. LEWIS:  May I just see what that one was again?

22       THE COURT:  You both said no objection to 49.

23       MR. MELSHEIMER:  I'm sorry, Your Honor.

24       MS. LEWIS:  I think it's necessary to understand the

25  context of the question, Your Honor, so I don't think we have

1    an objection to you reading it.

2         THE COURT:  You guys didn't object to the hypothesis

3    piece on the one where I struck the business about the

4    minorities either.

5         MR. MELSHEIMER:  Sorry, Your Honor.  I may have read

6    this too quickly.

7         THE COURT:  The juror is using the same language,

8    "hypothesis."

9         So he wants to see if his hypothesis is correct or not

10   correct.  Are you sure you don't want that answered?

11        MR. MELSHEIMER:  That's fine, Your Honor.

12        THE COURT:  Seems like you'd want that answered.

13        All right.  Now, we're back to 52 and 53.

14        MS. LEWIS:  It's fine.  No objection from us.

15        MR. MELSHEIMER:  This one doesn't appear to be --

16        THE COURT:  Okay.  So the government didn't object to

17   52.

18        MS. LEWIS:  Correct, Your Honor.

19        THE COURT:  The defendant isn't objecting to 53,

20   except they observe -- and they're correct -- that the last

21   partial sentence is not complete.

22        MR. MELSHEIMER:  We have no objection.

23        MS. LEWIS:  No objection, but I think we would agree

24   that that does not need to be read.

25        MR. MELSHEIMER:  I don't think I've looked at that

1    one; is that correct?

2              THE COURT:  54.

3              MS. LEWIS:  A lot of statisticians here.

4              MR. MELSHEIMER:  We have no objection to this one.

5              MS. LEWIS:  No objection.

6              THE COURT:  I don't think you've seen 54 yet.

7              You've looked at 55 and have no objection to 55.

8              MR. MELSHEIMER:  Thank you, Judge.  We have no

9    objection to that either.

10             THE COURT:  Now, before you leave me, you said to the

11   jury in your opening, we have only one witness.

12             MR. MELSHEIMER:  It was risky, wasn't it?

13             THE COURT:  But you don't speak for DaVita.  You speak

14   for Thiry; right?

15             MR. DODDS:  We're not calling anybody, Your Honor.

16             THE COURT:  Are you calling a rebuttal?  They have to

17   rebut what they presented.

18             MS. CLINGAN:  Can we give you an answer to that by the

19   end of the day?  Or do you need an answer right now?

20             THE COURT:  I don't need to have it right now, no,

21   but -- so, yes, you can --

22             MS. CLINGAN:  Thank you, Your Honor.

23             THE COURT:  But Thiry has decided not to testify?

24             MR. MELSHEIMER:  Correct.

25             THE COURT:  Okay.  So when we're finished with this

1   and we're done with the witness, I'm going to ask you if you

2   have any rebuttal.

3          MS. CLINGAN:  I'll have an answer by then.

4          THE COURT:  By then, it's 4:30.  And you want to say,

5   I want to think about it, you can say that, because we're going

6   to stop then -- there anyway.

7          MS. CLINGAN:  Not a problem, Your Honor.  Thank you.

8          MS. LEWIS:  Appreciate it.

9          MR. VIGEN:  Thank you, Your Honor.

10          (Hearing continued in open court.)

11          (Jury in at 3:57 p.m.)

12          THE COURT:  Doctor, we have a lot of questions for you

13   from our jurors.

14          THE WITNESS:  Wonderful.  I'll do my best.

15          THE COURT:  Question:  Do you or anyone at Analysis

16   Group, Inc., have a personal relationship with anyone who works

17   or has worked for the companies in this trial?

18          THE WITNESS:  No, not -- I mean, not that I know of.

19   There are 1,100 employees; but as far as I know, no, that's not

20   the case.

21          THE COURT:  Question:  When you say the -- the SCA

22   hiring period returned to normal in 2012, how did you define

23   normal?

24          THE WITNESS:  So if you remember when I was looking at

25   that, I was -- I commented on the median company and the fact

1411

1    that the median company during that time was -- had hired one

2    employee.  And so the question is whether the fact that I

3    observed -- let me be more precise.

4         Actually, can I bring up a slide --

5         THE COURT:  Sure.

6         THE WITNESS:  -- to answer the question?

7         THE COURT:  Yes.

8         THE WITNESS:  Would that be helpful?

9         So let's bring up -- could we bring up slide 21?

10        THE COURT:  I'm not sure which exhibit that is.  Does

11   somebody have that exhibit number?

12        MR. MELSHEIMER:  Yes, Your Honor.  Just one moment.

13        It is B553, Your Honor.

14        THE COURT:  Thank you.

15        THE WITNESS:  So if I understand the question

16   correctly, when I was -- early on in the -- in my testimony I

17   explained that when I think about the hires from DaVita by SCA

18   during the conspiracy period, one senior-level DaVita employee

19   was hired by SCA.  And I characterized that as being a return

20   to normal.  And so I understand the question as saying, well,

21   what do you mean "normal"?  How do you define "normal"?

22        And so I brought up this slide because you can see

23   that there were other firms that hired senior-level employees

24   from DaVita during that period.  So the question I asked is:

25   Is SCA's behavior different from that of other companies?  So I

1   defined "normal" as compared to other companies because I'm

2   looking for a sign that SCA is behaving differently from other

3   companies that don't have an allegation of allocation of labor.

4   And you can see from the slide that one senior-level DaVita

5   employee was hired by the median firm.  Meaning, of these 460

6   firms, in fact, 400 of them only hired one employee from

7   DaVita.  And strictly one; not more than one.

8          So when I'm saying the one senior-level DaVita

9   employee hired by SCA is a normal level of hires, what I'm

10  saying is, it's consistent with what I observe other firms

11  doing for which there is no allegation.  Does that make sense?

12        THE COURT:  Next question:  In the world of labor

13  economics, are nonsolicit or no-poaching agreements between

14  companies and their effect on the market of employees a hot

15  topic?

16        THE WITNESS:  Yes.  I mean, it's a topic that has been

17  written about.  And it's been written about for a long time,

18  for decades, with economists asking questions about whether

19  nonsolicit agreements of different shapes and sorts -- about

20  whether nonsolicit agreements have effects and if so, what kind

21  of effects?  And same thing I think for the no-poach agreement,

22  was the other question --

23        THE COURT:  Yeah.  The question was --

24        THE WITNESS:  Yeah, no-poach agreements.

25        THE COURT:  -- are those kind of agreements that we've

 1   been talking about in this case a hot current topic in your

 2   world of economics?

 3        *THE WITNESS:*  Yes.  They're topics that have been

 4   discussed for decades.  Yes.

 5        *THE COURT:*  Well, by a hot topic, I guess maybe the

 6   question is, is this something currently hot in economics?

 7        *THE WITNESS:*  Well, I mean, I wouldn't say that it's

 8   something where, you know, there are dozens of articles -- like

 9   COVID, in the clinical literature, that's a hot topic.  If you

10   look at the infectious disease, and 60 percent of every article

11   that is published is about COVID.  But that's not the case for

12   no-poach agreements or nonsolicit agreements; but it's

13   something that has been the subject of study.  So there are

14   articles that have been written about it.

15        I don't know that I would call it a hot topic, but

16   it's certainly one of the topics that labor economists have

17   been studying and thinking about.

18        *THE COURT:*  All right.  Question:  Can you explain in

19   more detail how comparing median values is a statistically

20   robust method.

21        Maybe I should read the rest of the question, because

22   it has a second sentence or a third here.

23        Is this a frequent framework?  Was there a significant

24   P value?  Does meaningful -- meaningful competition equal

25   statistically significant?

1                And I think the juror's referring to meaningful

2    because you used the term.  And there is another question I'll

3    get to later that also asks, what do you mean by meaningful?

4                *THE WITNESS:*  Yes.  That's a great question.

5                *THE COURT:*  So all of this started with the first

6    part, which was, can you explain in more detail how comparing

7    median values is statistically a robust method?  Is this a

8    frequent framework?  Was there a significant P value?  Does

9    meaningful mean statistically significant?  It's all sort of

10   one question.

11               *THE WITNESS:*  Yes.  So let me start with the first

12   part.

13               So when you try to summarize a set of numbers -- say,

14   compensation for people at a company -- you typically use what

15   we call a central tendency, where you're trying to figure out

16   what is happening on average to kind of characterize what is

17   happening at the company and see how it moves over time.  So

18   that's a central tendency.

19               There are really two ways to do that.  One of them is

20   to pick an average.  And I think we all know what an average

21   is.  We use it all the time in just regular life.  The other

22   one is to pick a median.  And a median is less often used,

23   because it's for a specific purpose.

24               So if you think about what we care about here, when we

25   think, for example -- when I think, for example, of

1   compensation, if you take the average compensation,

2   particularly when you're talking about senior employees, what

3   happens is you have people at the top who have disproportionate

4   compensation.  And if one of them leaves or one of them shows

5   up, it messes up your average.  Right?

6        Imagine that you have 20 people who all make -- I

7   don't know -- $100 a week or $100 a day, and then you have one

8   person who makes $1,000 a day.  So you look at the average.

9   And then the next month, you look at the same average but the

10  $1000-a-day person is gone.  Suddenly your average is going to

11  diminish and become 100 instead of being -- I should have

12  picked 10 instead of 20.  It's easier.  But, you know, 9 times

13  100, plus 1 times 1,000 is 1,900, divided by 10 is $190 on

14  average.

15       So if you used an average, you would find that your

16  average goes from 190 bucks to $100.  Why?  Because one person

17  left.  So if you use a median instead -- remember, line up your

18  people, $100, $100, $100, all the way to $1,000, because you

19  line them in order from smallest to largest -- the first month,

20  the average is 100.  Because if you count five people, the

21  fifth person is making $100.  If you take out the one making

22  $1,000 and you count again, what's the compensation of the

23  median person?  Five, still $100.  And so comparing medians is

24  much more robust when you're interested in what is happening to

25  the people, as opposed to what is happening to the company.

1          If you care what is happening to the company, then you
2     want to take the average, because to the company, it's very
3     meaningful that they've just saved $1,000 when the person left.
4     But, here, I'm interested in the people; so that's why I take
5     the median.
6          So that's the first question of, why use the median in
7     this analysis?
8          And then the second part is, does the median have a
9     statistical meaning?  Because often we -- you'll read in polls
10    and in statistics, X was different from Y, and the difference
11    was statistically significant.  Well, we see that all the time.
12         So for the median, there is no such concept as
13    statistical significance.  And the reason is because what
14    statistical significance means and the P value -- which was
15    mentioned in the question -- is how much variation is there on
16    my mean?
17         So to go back to the example before, I have nine
18    people making $100 -- or say I have ten people making $100.
19    The mean is 100, and everybody is making the same amount, so
20    the variance around that mean is zero.  Everybody is making
21    100.  So if you have a group where everybody is making 100 and
22    another group where everybody is making 90, the statistical
23    significance of the difference is really high.  Because I can
24    tell you, if you're in company A, you're making 100.  If you're
25    in company B, you're making 90.

1          But imagine now that in company A, you've got people

2    making $50, $100, and $150, and it's a distribution.  And in

3    the other company, you've got people making $90, $60, $70,

4    others are making 100, 120, 110, then you can see the two

5    distributions are going to overlap.  But if you're making $100,

6    I don't know if you're the average of the first company or if

7    you're at the higher end of the second company.

8          And so statistical significance of a difference simply

9    means that the separation in the means is bunched up.  So you

10   have a mean here; it's bunched up; a mean here; it's bunched

11   up; the two are different from each other.  I should have said

12   this:  If you take the two means, but now around the mean there

13   is more variance, suddenly the means get -- the means stay the

14   same -- my hands are in the same place -- but the variants get

15   bigger and they overlap.  And that means the difference now in

16   the position of my two hands is going to be less statistically

17   significant.

18         And the summary statistic for statistical significance

19   is the P value.  And so you may have seen P less than .05,

20   which is just an arbitrary standard we've used.

21         But coming back -- that's the theory.  That's how it

22   works.  Now, here I'm comparing the average of medians.

23   Because I'm taking average of medians, it is true that I could,

24   for example --

25         If we bring up slide 39.

1418

 1          -- I could look at the 13 percent change in the

 2    pre-period and see whether it's statistically different from

 3    the 9.1.

 4          *THE COURT:*  Which exhibit number, please?

 5          *MR. MELSHEIMER:*  B571, Your Honor.

 6          *THE COURT:*  Thank you.

 7          *THE WITNESS:*  So I could look to see whether they're

 8    statistically significantly different, and that would be based

 9    on whether the 13 percent in every year varied a lot and the

10    9 percent varied a lot, so they overlap -- like my answer

11    before -- in which case they may not be statistically

12    significant.  But that's not what I'm comparing.  I don't care

13    about that.

14          What I care about is that there was a growth in DaVita

15    compensation from 13 to 14.7.  And I don't even care about how

16    big that growth is; all that I care about is that it's not a

17    decline.

18          And so if my point estimate -- meaning, the central

19    tendency, 13 percent -- and my other point, 14.7, the second is

20    higher than the first, then I know with statistical certainty

21    that the second is higher than the first on average.  There may

22    be noise around it, but I know that it's higher than the first

23    on average.  The noise meaning that, in fact, they're not

24    different from each other; but I know that they're not

25    significantly declining.  So -- and that's what I'm testing.

1419

```
 1    So it's okay for me to use the median, because I don't need a

 2    statistical test, particularly given that the direction is up

 3    instead of down.

 4              I hope that answered the question.

 5              THE COURT:  Well, let's look at the last part of the

 6    question, because it comes up again in other questions.

 7              Does, quote, meaningful, close quote -- meaning

 8    meaningful competition -- which you used in your analysis as a

 9    phrase -- equal statistically significant?  And if not, what do

10    you mean by "meaningful competition"?

11              THE WITNESS:  So meaningful is different from

12    statistically significant.  And in my view, in this case, it's

13    more important; but I'll cover both.

14              So what I mean by meaningful here -- and if you think

15    about it, behind this allegation and the reason why we take

16    these -- as economists, we take allegations of market

17    allocation seriously is because there are people behind them,

18    and you want to make sure that there is no diminished

19    competition, because competition is what defines your ability

20    to have compensation at the level that you should.

21              So by meaningful here, what I mean is, that there is

22    nothing that is measurable, meaning, there is no detectable --

23    no detectable, identifiable decrease in competition -- yeah,

24    in -- competition.

25              So the question of whether there is an end of
```

1    meaningful competition really goes to the question of whether

2    we can detect a difference in the level of competition after

3    versus -- or with the allegation versus without.  And the

4    answer from my analysis is, no, we can't, which is why I put

5    the bar around -- or "no" next to the word, "is there an end to

6    meaningful competition?"  So that is the answer for meaningful.

7         And then "statistical" -- the notion of statistical

8    significance has to do with sampling.  So, specifically, if you

9    think about a political poll where they tell you that one

10   candidate is ahead of the other.  Well, they haven't asked

11   everybody; they can't.  So they usually have a sample of, say,

12   1,000 people.  And they ask 1,000 people, How are you going to

13   vote?  And then another 1,000, How are you going to vote?  And

14   then they compare -- sorry -- that's incorrect.  They ask

15   1,000, How you're going to vote?  And people answer either I'm

16   going to vote for candidate A or I'm going to vote for

17   candidate B.  And then they take the two averages, and they

18   say, There is a difference in the expected votes of 4 percent,

19   and the difference is statistically significant.

20        What that means is very simple.  It means that if I

21   was to take another sample of 1,000 people, drawn from the same

22   underlying population -- say, the U.S. population -- I would

23   have a result that would show me that the difference still

24   exists.  So the only reason for statistical significance is

25   when you have sampling, because that's where you want to make

1421

 1  sure that your result would hold true even if I had picked a

 2  different sample.  Because as a reader of the paper or, you

 3  know, website that is telling you about the results, you don't

 4  care what sample they pick.  You want to make sure that no

 5  matter what sample they pick, the result would remain the same.

 6  That's why statistical significance matters.

 7       Now, here, notice that what I'm using is the data from

 8  DaVita and the data from these other companies; so I'm not

 9  sampling.  And in that sense, the notion of statistical

10  significance is much less important than it would be if I was

11  sampling.

12       THE COURT:  Question:  Why didn't you include all

13  outpatient healthcare companies in your analysis of No. 1 on

14  the end of meaningful competition like you did for No. 2 on the

15  DaVita turnover rate?

16       THE WITNESS:  Can you repeat the question?

17       THE COURT:  Right.  There is a parenthetical that

18  says, In No. 1 you only included companies that had hired from

19  DaVita as a benchmark comparison to SCA, Hazel, and RAD

20  Partners.

21       So let me start over.  Why didn't you include all

22  outpatient healthcare companies in your analysis of No. 1 on

23  the, quote, end of meaningful competition, close quote, like

24  you did for No. 2 on the DaVita turnover rate?

25       THE WITNESS:  Yes.

1          *THE COURT:*  Do you understand?  They're talking about

2     those 1, 2, 3 on the one slide.

3          *THE WITNESS:*  Yes.  That's a very clear question.  So

4     I think if I understand correctly, that the question is, in the

5     first part of my testimony, I talked about movement from SCA

6     to -- from DaVita to SCA, DaVita to Hazel.  And what I did, to

7     determine whether or not that movement was within the range of

8     what I would expect, I compared it to the movement of the

9     median company that was hiring from that -- that had hired at

10    least one person from DaVita.

11         So my comparison -- which in the question you refer to

12    as my benchmark, which is a very good way to think about it.

13    Maybe I should have written it that way -- my benchmark is

14    other companies who hired from DaVita to see, well, how many

15    people do they hire?  But then in the second part, I'm looking

16    at something different.  I'm looking at a benchmark which is

17    all companies.

18         And so I think your question naturally is, well, look,

19    if you have all the companies, why didn't you use them in the

20    first part?

21         So I hope that's the right interpretation of the

22    question.

23         The reason is because in the first part of my

24    analysis, what I'm doing is observing that this hiring of a

25    DaVita employee from SCA, and I want to find what you call a

1    benchmark -- so I want to find a comparator to that company.

2    But if I was to talk -- to take all of the companies in the

3    U.S., the vast majority of them are not hiring at all from

4    DaVita.  Because even though they're in outpatient care, they

5    may not be interested in DaVita employees.  So the vast

6    majority of those companies in any given year are not going to

7    hire from DaVita.

8         But if I limit my sample to the ones where you observe

9    people coming from DaVita, then I have a comparator that is

10   useful.  Because for SCA, I'm observing they hired one; and I

11   can compare that with other companies that hired from DaVita --

12   so a smaller set -- and say, well, did they hire, one, two,

13   three, four, five?  Do they look like SCA?  Do they look

14   different?  So that's why I used companies that hired from

15   DaVita in the first part as my comparator.

16        My second exercise is different.  I'm not looking at

17   specific movements of specific people anymore.  I'm now looking

18   at what is happening at the company level.  So what is the

19   turnover overall at DaVita?  So my unit of observation now has

20   become the company, not the individual.  And when I observe

21   either turnover at a certain rate at DaVita or compensation at

22   a certain level at DaVita, I want a comparator; and that

23   comparator has to be other companies.

24        So that's why in the second part, I'm using a

25   benchmark which is really companies that are in the same sector

1424

1   as DaVita; the ones that DaVita is, in fact, looking at in its

2   own documents when it's setting its compensation.  I'm looking

3   at those companies to see whether the movement over time at

4   DaVita is a movement that makes sense and is correctly

5   interpreted, given the benchmark.

6          So the first one, it's about individual movements.  I

7   look at companies where I see individual movements, and I see

8   how many individual movements occurred.  Second, I'm looking at

9   turnover, which is an aggregate measure of what is happening at

10  the company overall.  I'm comparing it with a benchmark, where,

11  similarly, I'm using the entire company -- actually, the entire

12  sector as my comparator.

13         I hope that answers the question.

14         *THE COURT:*  Next question:  How did you control for

15  other factors that may have affected employee movement in the

16  market between allegation and pre-allegation years?

17         *THE WITNESS:*  Yes.  So that's a good question.  And I

18  think, just to rephrase, that the question is, I'm observing

19  for example --

20         Let's put a slide up.  Could you put slide 34 up?

21         *MR. MELSHEIMER:*  B566, Your Honor, for the record.

22         *THE COURT:*  Thank you.

23         *THE WITNESS:*  So, here, I have some -- I think the

24  question is, where you're seeing some before and after and

25  you're comparing them with each other -- sorry -- you're seeing

1    levels of hiring in the during period; how are you controlling

2    for other things that may be going on?

3          Because I'm comparing those levels with the -- what

4    the median company is doing during the same period of time,

5    that allows me to control -- they're affected by the same

6    macroeconomic conditions, and so that allows me to control

7    contemporaneously for what is going on.

8          Is that -- does that answer the question?

9          THE COURT:  I'm not sure.  The question says:  How did

10   you control for other factors that may have affected employee

11   movement in the market between allegation and pre-allegation

12   years?

13         THE WITNESS:  Okay.

14         THE COURT:  In other words, are there other factors in

15   the market that could explain the difference between the

16   pre-allegation and the allegation years?

17         THE WITNESS:  Yes.  So, actually -- so I did not

18   answer your question.  I apologize.  Let me try again.

19         So let's take the example of SCA, where you have eight

20   employees in the pre-years and one employee in the post-year.

21   Your question is, well, are you controlling for other things

22   that are going on?  So in that case, the answer is, yes, I am.

23   And the control is, as I try to understand why the difference

24   exists and test whether it's due to an allocation of labor, I

25   find from the documents that there is something that is

1426

1    changing at the company.  From 2000 to 2008, they don't hire at

2    all from DaVita.  From 2008 to 2012, with Mr. Hayek showing up,

3    they hire from DaVita, and they hire a number of people, more

4    than the typical company, from DaVita.  And then in 2012, there

5    are these documents that I showed you that say, hey, we've

6    hired enough people from DaVita, and they're not doing so

7    great.

8         And so those are the phenomena that happened over time

9    that help explain the pattern and that what I think you're

10   calling controls.

11        Now, for the others, I don't have a similar set of

12   facts to explain the differences; but the differences are not

13   particularly high.  I did not mention it in my testimony.  But

14   if you look at Hazel, I believe that nobody was hired by Hazel

15   from DaVita prior to the allegation period.  If you put aside

16   Golomb, who, obviously, came from DaVita; but he was the CEO.

17        And for Radiology Partners, I think there were four

18   senior hires and one junior hire in the pre-period, so much --

19   which I have not mentioned before -- but -- which is a much

20   lower level of hiring.  So there what you see is a significant

21   increase in the hiring during the alleged conspiracy period.

22   And so there is nothing there -- there is no facts there on the

23   ground that would lead me to think, hey, there is something

24   else going on here that would -- that has to be taken into

25   account.

1    THE COURT:  Okay.  Next.  And I think you've already,

2    perhaps, answered this.  This refers again to your term

3    "meaningful competition."  How would you describe meaningful

4    competition at the level of an individual employee of a

5    company.

6    THE WITNESS:  Yes.  So meaningful competition doesn't

7    mean that no employee will be affected.  We heard this morning

8    the testimony from somebody who was -- you know, who changed

9    their behavior based on what their perceived -- I mean, it's

10   unclear whether it's what they perceived the conditions to be

11   or whether it's something else; but from my perspective, it

12   doesn't matter.  That's for you to decide.  But meaningful

13   competition is really saying, is there a meaningful change?

14   So this is a case that has to do with the Sherman Act,

15   which I think was referenced by Mr. Melsheimer at the very

16   beginning.  The Sherman Act is about competition.  The issue

17   is -- the economic issue is, we want to make sure that

18   competition is not affected, but that, in general, the -- the

19   market looks the way it should, and the level of competition is

20   what it should be absent illegal behavior.  And what I'm

21   testing is that, is whether or not there is meaningful

22   competition or whether competition was reduced.

23   It doesn't mean that there isn't an individual

24   somewhere that was affected by the behavior; but that's not

25   what is at issue here, when you think about -- at least from an

1    economic standpoint.  I shouldn't comment beyond that -- when

2    you think about allocation of labor, because an allocation of

3    labor from an economic standpoint is a concern because of its

4    overall impact on competition.

5         THE COURT:  Question:  How does the individual

6    employee experience factor -- sorry.  How does the individual

7    employee experience factor into interpretations of the labor

8    market?

9         THE WITNESS:  Can you ask the question again?

10        THE COURT:  Sure.  How does the individual employee

11   experience factor into interpretations of the labor market?

12        THE WITNESS:  So employee experience results in --

13   well, can result in a change in their behavior.  So if you are

14   dissatisfied with your job or if you are satisfied with your

15   job, your behavior is going to be different.  And as

16   economists, what we do is we look at the overall effects of

17   those individual behaviors.  So even though the analysis that

18   I've done, for example, with this data is in part based on

19   individual behaviors -- meaning people switching jobs -- and in

20   part based on overall characteristics like compensation and

21   turnover, all of this is driven by the underlying experience

22   that people have at their jobs and, therefore, the behaviors

23   that result from those experiences.

24        THE COURT:  The next question:  What peer-reviewed

25   work or articles did you use to inform and guide your

1    statistical analyses?

2         THE WITNESS:  Well, so I cite to a number of

3    econometric textbooks in my report.  I haven't cited them here.

4    But econometrics is a subset of the field of statistics.  It's

5    one that deals with statistics applied to economics, and so

6    it's the one that is relevant for the kinds of analyses I was

7    doing here.

8         So a combination of more textbooks than peer-reviewed

9    literature, but the textbooks are -- it's what we teach the

10   students, so it better be right, because we write them for that

11   purpose.  But that's -- that's what I've used in my -- in my

12   work here.  And I should add that the statistics that I use

13   here are fairly simple.  Meaning, you know, there was no need

14   here to run regressions or to do statistical significance

15   tests.  I mean, these are things that I do routinely in my work

16   whether, it's in other cases like this or whether it's in my

17   academic work.

18        But I have a strong belief that you never want to

19   overcomplicate things if you don't have to.  And this was a

20   case where I felt that simple statistical analysis was the best

21   tool to try to uncover a cessation of competition or an

22   allocation of market.  So there is nothing statistically in

23   what I've done that I think anyone would consider

24   controversial.

25        When you start running regression analyses, you know,

 1    experts can disagree on how you should specify them, what

 2    variables you should include, et cetera.  But here, I didn't

 3    have to do that.  That was not necessary.

 4         THE COURT:  Question:  How many people at Analysis

 5    Group Inc. worked on this particular analysis?

 6         THE WITNESS:  I mean, in total, I'd probably say that

 7    25 or 30 people touched the case at one point or another.  We

 8    have people who specialize in Stata, for example, which is a

 9    programming language that we use to analyze data.  So we may

10    have someone who is going to come in, do some data analysis,

11    and then leave and go on other projects.  So I would say

12    between 20 and 30 people in total know of the case and have

13    touched it in one way or the other.

14         THE COURT:  Is it common for people in your field to

15    use LinkedIn data in peer-reviewed journal article

16    publications?

17         THE WITNESS:  So it is used in peer-reviewed journals.

18    It's a relatively recent phenomenon, because, you know, 40

19    years ago or 30 years ago, LinkedIn just wasn't a thing, and so

20    you couldn't use those data.  But for this kind of question,

21    which is employee movements, certainly, LinkedIn is a data set

22    that not only is being used but is being used increasingly to

23    understand movements of the labor force, because it has a great

24    benefit of not being specific to a company.  So you can see how

25    people move, you have a lot of information about them, and so

1    it's useful.

2         It's also hard to use, because you have to go get the

3    data one at a time.  And so we spent a lot of time downloading

4    profiles of people who worked at DaVita to look at, you know,

5    what company they were at before, what company they were at

6    after.  So it's labor intensive, but it's a very good source of

7    data.

8         THE COURT:  Question:  Who selected the data to use

9    for the analyses presented?

10        THE WITNESS:  Well, so certainly, ultimately, I did.

11   Meaning, you know, I have a team working with me, and I have a

12   number of other Ph.D. economists on my team, so I listened to

13   them very carefully, because they're very good.  But,

14   ultimately, since I'm the one who is going to testify, I have

15   to be the one who determines what data we use.  And so that's

16   why I decided that the DaVita data coming from the company,

17   together with the LinkedIn data so I could identify the

18   changes, and the government data which provided me benchmarks

19   were the three data sets I should use.

20        THE COURT:  Question:  How can you measure intent and

21   purpose using statistical analyses?

22        THE WITNESS:  So you -- so intent, we often think of

23   being in someone's head; and it's hard for data to go into

24   someone's head.  But, typically, your intent or purpose is

25   driven by something; and it's typically in economics driven by

 1      an incentive.  Which means that you will do something if it's

 2      to your advantage.  For example, you might allocate labor if

 3      you think that it's going to reduce turnover or if you think

 4      that it's going to reduce compensation for your employees,

 5      thereby allowing you to make more profits.

 6              So if you observe that the behavior for which you

 7      don't know the intent is not one that could lead to or not one

 8      that did lead to, but even could lead to, a decrease in

 9      compensation or a decrease in turnover, then it gets to the

10      issue of -- and I want to make sure that I stay within bounds,

11      Your Honor -- but it gets to the issue of whether you had a

12      reason to do something.

13              So do you have a reason to allocate labor?  Well,

14      yeah, the reason is to decrease compensation or decrease

15      turnover, if you can do it.  But if you're in an environment

16      where that is not possible, then it does inform you about the

17      purpose of whatever behavior you did, whatever behavior you

18      adopted.  The purpose, if it's not one where allocation of

19      labor would result in any benefits, must be different from an

20      allocation of labor.

21              THE COURT:  Question:  Why did you use different data

22      sets for the three main questions you assessed?  I think you've

23      already answered that question.

24              THE WITNESS:  I think so.  Yes.

25              THE COURT:  Next question:  How did you select the

1    data sets for the benchmarks?

2         *THE WITNESS:*  So the benchmark is the set of companies

3    in the country that are outpatient care centers.  You saw that

4    came up -- Mr. Vigen brought it up with the list of the

5    occupations.  That happens to be a -- that happens to be the

6    sector that DaVita itself looks at when it tries to anchor its

7    compensation.  In other words at DaVita, like many companies,

8    there is a desire to remain competitive in the market.  And so

9    to keep track of what other employers are paying, to try to

10   make sure that you're not falling behind -- because you don't

11   want to find out too late.  You want to make sure you're

12   providing competitive compensation -- and so at DaVita they

13   used a -- as one of the benchmark, this sector, the outpatient

14   care center sector.  And so it was natural for me to do the

15   same thing when I was looking for a benchmark to examine

16   turnover and compensation.

17        *THE COURT:*  Question: At what -- at one point in your

18   work for the defense did you establish that you should be --

19   that you would be testifying?

20        *THE WITNESS:*  So there is no -- I don't remember.  We

21   were hired about a little more than a year ago, and I don't

22   remember at what point it became clear that I would be the

23   testifier.  I just don't know, but I've known for a while that

24   I would eventually testify.

25        *THE COURT:*  Okay.  Well, with respect to that, ladies

1    and gentlemen, I have 13 questions here.  But some of the

2    questions, as you can see, because I have only gone over two of

3    them, have multiple questions within them.  I can press on with

4    the other eleven, or we can stop now and take it up in the

5    morning.  How do you feel?

6              *JUROR:*  Tomorrow.

7              *THE COURT:*  Tomorrow?  All right.  Have a nice

8    evening.

9              (Jury out at 4:39 p.m.)

10             *THE COURT:*  All right.  The jury has been excused for

11   the evening.

12             Doctor, I know that you had a 6 o'clock flight.  I was

13   told that.  You weren't going to make it regardless.

14             *THE WITNESS:*  I assumed that those were the 13

15   questions.  When you said those were the first two, I thought,

16   that's not possible.

17             *THE COURT:*  Well, this jury has been asking a lot of

18   questions --

19             *THE WITNESS:*  It's wonderful.

20             *THE COURT:*  -- and paying close attention.  And I

21   think you'll be tickled to see that one of the jurors even

22   undertook some of your lingo by expressing a hypothesis and

23   then having you resolve it, let's say.  But that's for

24   tomorrow.

25             The other reason that I wanted to stop, honestly, is

1   because I happen to know that one of the jurors was not feeling

2   good today.  And she pushed through, but I didn't want to

3   overdo her ability.

4          So you're excused.  Have a nice evening.  We'll see

5   you in the morning.

6          THE WITNESS:  Thank you.

7          THE COURT:  Now, other than jury instructions, does

8   either side have anything they want to put on the record before

9   we recess for that part of the case?  We're not going to recess

10  for jury instructions.

11         MS. LEWIS:  Nothing from the government, Your Honor.

12         MR. WALSH:  Not from the defense either, Your Honor.

13         MR. MELSHEIMER:  Your Honor, we -- we -- may it please

14  the Court.  We filed an offer of proof with respect to those

15  big binders that -- and I'm not expecting to change your mind

16  on that, Your Honor.  I just wanted to note for the record that

17  that -- that reflects what we would have introduced if the

18  Court had permitted it with respect to the business

19  relationships and strategic partnership.

20         THE COURT:  And do you want to remind all of us the

21  number of inches in those binders?

22         MR. MELSHEIMER:  Oh, I would.  No, Your Honor.  I

23  think the --

24         THE COURT:  They were voluminous.

25         MR. MELSHEIMER:  The binders speak for themselves,

1    Your Honor.

2          *THE COURT:*  All right.  Okay.  Folks, to all of you in

3    the gallery and to those attorneys who are not involved in the

4    instruction process, you're free to go.  But it's a public

5    proceeding.  You are welcome to stay and watch as --

6          Would you like a few minutes before we get into the

7    instruction conference?

8          *MS. LEWIS:*  Yes, Your Honor.  A five-minute break or

9    so would be great.

10          *MR. MELSHEIMER:*  May it please the Court.  May

11   Mr. Thiry be excused, Your Honor, for this?

12          *THE COURT:*  Yes, of course.

13          (Recess at 4:42 p.m.)

14          (In open court at 4:48 p.m.)

15          *THE COURT:*  Now, is the rest of your team gone?

16          *MS. LEWIS:*  They have abandoned us.  Yes, Your Honor.

17          *THE COURT:*  Mr. Vigen is gone?

18          *MS. LEWIS:*  But Mr. Parker is here.  So I have our

19   star player.

20          *THE COURT:*  Okay.  What about the fellow, Mr. Stone,

21   who appeared out of nowhere?  Oh, there he is.

22          *MR. STONE:*  Nowhere?

23          *THE COURT:*  Out of nowhere.  Suddenly there is a new

24   person.

25          *MR. STONE:*  You might have said I said nothing but out

1    of nowhere --

2         *MR. WALSH:*  Your Honor, I want to introduce Dan Crumb

3    also from Wilmer, who has been very involved in all of this.

4         *THE COURT:*  So in the case that I just finished trying

5    before your case, there were twelve plaintiffs.  You read about

6    it in the paper.  And I swear, every one -- maybe not every one

7    of the twelve had a different lawyer put on the direct.  And

8    these lawyers were coming out of the woodwork.  Showed up for

9    the one moment in the sun, did his or her thing, and then left,

10   never to be seen again.  It was different.

11                  **JURY INSTRUCTION CONFERENCE**

12        *THE COURT:*  All right.  What I've got in front of me

13   are hard copies of instructions.  And just for the record, as I

14   told you, I went through various iterations of jury

15   instructions.  We issued an order -- law clerk helped me with

16   that -- on the instructions, some of the issues.  Over the

17   weekend, one of my tasks was to try to pull it all together and

18   give you a set of instructions that are close to final.  And so

19   I've got what you got, and I've got that.

20        I've got a set here which has the government's

21   comments, which came in by email sometime between the end of

22   court yesterday and the beginning of court this morning.  I

23   didn't check to see exactly when.  And I think you have those

24   in redline form.

25        *MR. WALSH:*  We do, Your Honor.

 1            *THE COURT:*  And then I have the exact same set with

 2    the government's comments but with my law clerks' comments on

 3    the government's comments, which I have not had an opportunity

 4    to read yet.

 5            So we'll take it from the beginning, one by one, and

 6    make our record.  And what I need from you as we go through

 7    each instruction is to tell me whether you have an objection.

 8    And if you do, speak or forever hold your peace.

 9            Instruction No. 1, members of the jury.  An

10    introductory instruction.  Is there any objection?

11            *MS. LEWIS:*  No objection, Your Honor.

12            *MR. WALSH:*  No objection.

13            *MR. STONE:*  No objection, Your Honor.

14            *THE COURT:*  Instruction No. 2 is the burden of proof.

15    Is there any objection?

16            *MS. LEWIS:*  No objection, Your Honor.

17            *MR. WALSH:*  No objection.

18            *MR. STONE:*  No objection, Your Honor.

19            *THE COURT:*  Instruction No. 3, evidence in the case.

20    Is there any objection?

21            *MS. LEWIS:*  No objection, Your Honor.

22            *MR. WALSH:*  No objection.

23            *MR. STONE:*  No objection.

24            *THE COURT:*  We get on a roll, and then all of a sudden

25    we have a speed bump.  We're getting to those.

1      No. 4, credibility.  Any objection?

2           *MS. LEWIS:*  No objection, Your Honor.

3           *MR. WALSH:*  No objection, Your Honor.

4           *MR. STONE:*  No objection, Your Honor.

5           *THE COURT:*  Instruction No. 5, we need to take the

6      brackets off.  Other than that, is there any objection to

7      No. 5?

8           *MR. STONE:*  On behalf of Mr. Thiry, no objection.

9           *MR. WALSH:*  And not from DaVita either, Your Honor.

10     No objection.

11          *MS. LEWIS:*  No.

12          *THE COURT:*  Who is going to be our scrivener for the

13     final set?

14          *MS. LEWIS:*  We're happy to undertake that, Your Honor.

15          *THE COURT:*  Okay.  So what we need from you, then,

16     Ms. Lewis, is whatever final set comes from our conference here

17     and a verdict form, times twelve -- do you have copying

18     facilities?

19          *MS. LEWIS:*  We do, Your Honor.

20          *THE COURT:*  Times twelve so each juror can have one

21     set, times thirteen because I need a set, and then whatever

22     number of sets you folks want -- let me say, fourteen for me so

23     that my law clerks can have a set.  They're quite invested in

24     this case.

25          *MS. LEWIS:*  I'm sure.

1      MR. WALSH:  Your Honor, if the government would just

2  email us the electronic version, we can distribute within the

3  defense team.

4      THE COURT:  Okay.

5      MR. WALSH:  We don't want to run up the national

6  deficit.

7      THE COURT:  The fourteen, the jurors and my two, need

8  to be in hard copy.  You can do whatever you want with

9  yourselves.

10     All right.  So No. 5, no objection but we take the

11 brackets off.  Right?

12     MR. WALSH:  Yes, Your Honor.

13     MS. LEWIS:  Correct.

14     THE COURT:  No. 6, I'm not sure even applies anymore.

15 You haven't put in evidence of good character.

16     MR. WALSH:  Not separately, Your Honor.  Not what I

17 would -- we agree.  I don't think it applies any longer.

18     THE COURT:  So we pull No. 6?

19     MR. STONE:  Judge, we defer to you.  There has been

20 testimony about character coming out in the cross-examination,

21 mentorship and things like that.  I don't know if that rises to

22 the level of good character in your opinion; but maybe out of

23 an abundance of caution, you want to include this.

24     THE COURT:  Yes, there is evidence of character.

25 Your -- your former DaVita people, such as in particular,

```
 1    Mr. Whitney, but also Mr. Hayek and maybe others talked about
 2    his mentorship, his being smart, being a teacher or leader, et
 3    cetera.  It didn't seem to me that that's what this instruction
 4    was about.  I thought what this instruction was about was
 5    bringing in some witness specifically as a character witness.
 6         MR. STONE:  I think you're right, Judge.  That is
 7    typically the way that's used.  I'm really trying to be mindful
 8    of your admonition yesterday about trying to act in good faith
 9    and not make mistakes on the instructions.  So we will defer to
10    you.
11         I agree with you, Your Honor, this is not the typical,
12    we trotted in 15 people to say that he was a man of good
13    character, which is usually when this is invoked.
14         THE COURT:  And they're talking about reputation or
15    they're talking about their opinion, but you didn't do that.
16         MR. STONE:  Correct.
17         THE COURT:  And the government is objecting to this
18    instruction.  I'm inclined not to give it.  And you're saying
19    you'll defer to me, and your counterpart attorneys for DaVita
20    are saying they don't object to taking it out.
21         MR. STONE:  I'll save my power for some other
22    instructions, Your Honor.
23         THE COURT:  All right.  It's out.  So the numbering
24    system changes.
25         And, Ms. Lewis, look at it this way:  You just won
```

1442

1    something.

2         *MS. LEWIS:*  I'm delighted, Your Honor.  Thank you.

3         *THE COURT:*  You can put a notch on your gun if you

4    want.

5         No. 7, this is my redraft of your competing

6    instructions on grants of immunity.  Any objection?

7         *MR. WALSH:*  Your Honor, the defense would suggest that

8    after the word "under a grant of immunity" in the middle of the

9    paragraph, that the Court add "or another agreement with the

10   government such as a leniency or non-prosecution agreement."

11   And we offer that because there has been discussion about types

12   of agreements, and we think that would be clarifying and

13   potentially important.

14        *THE COURT:*  Okay.  I don't really disagree with that.

15   The very first sentence says, "A person may testify under a

16   grant of immunity" -- and then in parentheses it says, "an

17   agreement with the government such as a non-prosecution

18   agreement."

19        *MR. STONE:*  Judge, in the interest of efficiency,

20   maybe you should just add the words "leniency" in the

21   parenthetical in the first sentence.  So it would read, "An

22   agreement with the government such as a leniency or a

23   non-prosecution agreement," and that would cover the rest of it

24   all the way through.  Just to make it tighter and simpler.

25        *THE COURT:*  Mr. Walsh, do you agree with that?

1    *MR. WALSH:*  Yes.

2    *THE COURT:*  Do you object to that?

3    *MS. LEWIS:*  No objection, Your Honor.

4    *THE COURT:*  "Such as a leniency or a non-prosecution

5    agreement"?

6    *MR. WALSH:*  Correct, Your Honor.

7    *THE COURT:*  And then when you get to the later part,

8    where it talks about grant of immunity, you don't have to

9    redefine it?

10   *MR. WALSH:*  Correct.

11   *THE COURT:*  Everybody agree?

12   *MR. STONE:*  Correct.

13   *MS. LEWIS:*  Yes, Your Honor.

14   *THE COURT:*  What an agreeable bunch you are tonight.

15   *MR. WALSH:*  We're just getting warmed up, Your Honor.

16   *THE COURT:*  I was afraid of that.

17   Okay.  Instruction No. 8 is concerning the expert.

18   And the government is saying that the second half of the Tenth

19   Circuit pattern instruction is missing.  Could be.  I didn't

20   look at the Tenth Circuit pattern instructions specific to this

21   instruction; I just tightened it up a bit.  My apologies, Tenth

22   Circuit.  Maybe tightening up is an impolite thing to say.

23   I don't care if you put it back in.  It really doesn't

24   matter to me.

25   *MS. LEWIS:*  Your Honor, we would request its

1    inclusion.  We think it's important and it is, in fact, what

2    defendants themselves proposed when they originally proposed

3    this instruction.

4         MR. WALSH:  Your Honor, we don't object to this.  We

5    had previously stipulated to the full Tenth Circuit

6    instruction.  But one suggestion that we have is that on the

7    second sentence, it says, "In some cases such as this one,

8    scientific, technical, or other specialized knowledge" -- we

9    thought it might be simpler for the jury since there is really

10   only one expert here to say, "In some cases such as this one,

11   specialized knowledge may assist the jury," because he's not a

12   scientist in the traditional sense.  And we have at least one

13   scientist actually on the jury.

14        THE COURT:  I'm not inclined to mess with the Tenth

15   Circuit's lingo, unless you both agree.  I was willing to take

16   out the second paragraph, but I'm perfectly willing to put it

17   back in.  I'll change it to the way you want it, Mr. Walsh, if

18   the government doesn't have a problem with it.  Otherwise, I'll

19   stick with the Tenth Circuit language.

20        MS. LEWIS:  I think our preference would be to stick

21   with the Tenth Circuit language.

22        THE COURT:  Okay.  Let's do that.  So you can put that

23   in.  And I don't think you're objecting to that; you're just

24   suggesting a different wording.

25        MR. STONE:  On behalf of Mr. Thiry, we're fine with

1445

1    that, Judge.

2            *THE COURT:*  All right.  Instruction No. 9 concerns

3    Agent Hamel.  Any objection?

4            *MS. LEWIS:*  No objection, Your Honor.

5            *MR. STONE:*  So, Judge, we do suggest there be some

6    additional language, given the significance and emphasis of

7    Special Agent Hamel's testimony.  And we have some proposed

8    language, which I can read to you, and we can talk about it.

9            "I warn you that Agent Hamel's testimony was nothing

10   more than a summary of the evidence.  It is not to be taken as

11   truthful as to what the evidence is, because, again, that is

12   something you must determine from the evidence that has been

13   admitted in this case, both in the form of testimony of

14   witnesses and in the form of the numerous documents that you

15   have seen admitted in this case and that ultimately you will

16   have access to during your deliberations in the jury room."

17           The reason for that suggested instruction, which I

18   think is a very fair statement on the law, is that given the

19   prominence of Special Agent Hamel's testimony and the length

20   that it took and the somewhat unusual nature of the summary

21   testimony and the kinds of questions that he received from both

22   parties, we think this is a cautionary note and would be

23   appropriate guidance for the jury here.

24           Normally a summary witness comes in and says, I looked

25   at 42 phone records, and here is how they work going back and

1446

1    forth.  Or, here are the number of drug busts.  Or, here are

2    the number of stock transactions, summarizing a voluminous

3    amount of data.  This was really more of a recapitulation of

4    the evidence and a walk-through of the evidence.  Therefore, we

5    think a cautionary note about how to view that testimony is

6    appropriate.

7         MS. LEWIS:  We would object to that, Your Honor.  I

8    think Agent Hamel's testimony is precisely what the parties

9    agreed that it would be at the motions hearing many months

10   ago -- many weeks ago -- I have lost all track of time -- and

11   that he was merely on the government's direct of him

12   introducing certain documents and putting them in front of the

13   jurors as evidence.

14        I think, if anything, it was the defense in their

15   cross-examination that went well beyond the bounds by asking

16   him questions about witnesses who did not appear in this trial.

17   So we do not think it's appropriate to have a warning that his

18   testimony not be taken as truthful.  We think the Instruction

19   No. 4 adequately covers the fact that a witness's testimony who

20   is law enforcement doesn't mean it's more or less deserving of

21   weight.  So we think that adequately covers it, and the summary

22   instruction should be given.

23        THE COURT:  All right.  So let me read what the second

24   paragraph of Instruction No. 9 actually says.  Quote, Like any

25   witness, a summary witness's testimony is not binding on you.

1       A witness may have summarized certain pieces or certain types

2       of evidence, but, of course, you are the triers of fact.  It

3       will be ultimately up to you to decide what evidence to believe

4       or what parts of evidence to credit or discredit.  You do not

5       have to accept as true a summary witness's testimony in its

6       entirety or any part of it.  You can totally disregard his or

7       her testimony if you wish.  That is your prerogative as the

8       fact finder.  Summary testimony serves merely as a summary of

9       evidence that you will then evaluate and determine what weight,

10      if any, to give any of this evidence."

11              In my opinion, in substance, that's precisely what

12      Mr. Stone wishes to add, except that Mr. Stone's version of it

13      to me is more slanted against the witness than it needs to be.

14      I think all of the key points are there.  It's not binding;

15      it's up to them to decide what evidence to believe; you don't

16      have to accept as true his testimony; you can disregard his

17      testimony; it's your prerogative; it's merely a summary.  All

18      of those points are there.  And I don't think what Mr. Stone is

19      proposing to add changes the substance, but puts more of a

20      slant on it than I want to in an instruction.

21              So your request, Mr. Stone, is denied.  If that's an

22      important point to you, then you should submit a tendered

23      instruction that has your language in addition to this

24      language.

25              Are you objecting to any of this language?

1           MR. STONE:   No, Your Honor.   We don't object to this

2     language.

3           THE COURT:   Okay.   Well, it's up to you whether to

4     tender an additional instruction that has your addition to it.

5           MR. STONE:   Thank you.

6           THE COURT:   That's true for anything where the Court

7     is giving an instruction and somebody feels it is not what they

8     want.   You can always tender, and I'll mark it as tendered but

9     rejected.

10          MR. WALSH:   Thank you, Your Honor.

11          MR. STONE:   In the interest of winning a really small

12    point, we may want to delete the words "or her testimony,"

13    because I think there is only one summary witness, Mr. Hamel.

14          THE COURT:   Where are you looking at?

15          MR. STONE:   "You can totally disregard his or her

16    testimony if you wish."

17          THE COURT:   I'm okay with that.

18          MS. LEWIS:   No objection, Your Honor.

19          MR. STONE:   That's one.

20          THE COURT:   Yes.   You've got one now, and she's got

21    one.   You're tied.   That shows how neutral the Court is.   You

22    both get a star.

23          Okay.   No. 10 is on your 404(b) stuff.   Any objection?

24          MS. LEWIS:   No objection, Your Honor.

25          MR. WALSH:   Not from DaVita.

1    MR. STONE:  No objection, Judge.

2    THE COURT:  No. 11 is a separate crime is charged

3 against both defendants, et cetera.  Any objection?

4    MS. LEWIS:  No objection.

5    MR. WALSH:  No objection.

6    MR. STONE:  No objection.

7    THE COURT:  No. 12 is about DaVita's being a

8 corporation, speaks through its agents.  The fact that the

9 prosecution is brought in the name of the United States of

10 America doesn't give the government any greater consideration

11 than that to be given to the other parties.  Any objection?

12    MS. LEWIS:  No objection, Your Honor.

13    MR. WALSH:  No objection.

14    MR. STONE:  No objection.

15    THE COURT:  All right.  No. 13 is kind of a summary of

16 the three counts.  It's in place of, let's say, reading the

17 entire Indictment, but it summarizes the Indictment.  Any

18 objection?

19    MS. LEWIS:  No objection, Your Honor.

20    MR. WALSH:  Your Honor, we have a suggestion.  We

21 understand where the Court's -- has ruled on this; but,

22 nevertheless, we would like to add the phrase "across the

23 United States" after -- in three places here.  On -- in

24 paragraph that -- the paragraph that begins, "For Count 1,"

25 "DaVita and SCA's senior-level employees across the

1    United States."  That's at the very end of that paragraph.

2    Similarly, for Count 2, where it says, "To allocate the market

3    for DaVita's employees," we would like to include the words

4    "across the United States."  And then on the final Count 3

5    paragraph, similarly, "DaVita's employees across the

6    United States."

7            That's both consistent with the Indictment, Your

8    Honor, and I think at this point it's consistent with the

9    extensive evidence.  And it's not truly in dispute, I would

10   argue.

11           THE COURT:  Ms. Lewis.

12           MS. LEWIS:  Your Honor, I believe the Court has

13   already ruled that the inclusion of that language would

14   erroneously imply a national market, which is not what the

15   Indictment is certainly implying.

16           And I'm just checking the Indictment.  I don't think

17   the words "across the United States" appear in either Count 2

18   or 3, so we would oppose that.

19           THE COURT:  I don't have the Indictment in front of

20   me.  Do they or do they not?

21           MS. LEWIS:  Your Honor, they do include references to

22   the fact that these companies operate across the United States

23   in order to prove the interstate commerce element.  But, again,

24   I think Your Honor has ruled, when it's tied specifically to

25   the market, I think that creates confusion for the jurors that

1    Your Honor, again, has already ruled on.

2              *MR. WALSH:*  Your Honor --

3              *THE COURT:*  You drafted the Indictment.  I can read

4    the entire Indictment.  If you'd rather have me do that, I'll

5    do that.  But those are your words, at least in Count 1.

6              *MR. WALSH:*  And, Your Honor, in paragraph 10 of the

7    Superseding Indictment, the paragraph ends, "charged conspiracy

8    consists of" -- et cetera -- and ends, "by not soliciting each

9    other's senior-level employees across the United States."

10             *THE COURT:*  All right.  So Count 1, the Indictment

11   charges -- where are you wanting to put language in there?

12             *MR. WALSH:*  At the end of that paragraph, where it

13   says, "To allocate the market for DaVita and SCA's senior-level

14   employees across the United States, in violation of Section 1,"

15   which is a direct quote from paragraph 10 of the Indictment.

16             *THE COURT:*  So I don't want to introduce confusion

17   about the market into these instructions just because of the

18   government's careless language in putting in their interstate

19   commerce phrase.  On the other hand, it is their phrase.

20             I would be willing to put in after "senior-level

21   employees located across the United States" so that it's clear

22   that it modifies employees and not the market.  Acceptable?

23             *MR. STONE:*  That's acceptable to us, Judge.

24             *MR. WALSH:*  Yes, Your Honor.  Thank you.

25             *MS. LEWIS:*  Yes, Your Honor.  Thank you.

1      THE COURT:  That's in the first paragraph, Count 1

2  paragraph.

3      MR. WALSH:  Your Honor, I do want to note what the

4  Court does understand and that is, the defendants have an

5  objection to the limitation of the market that the Court has

6  undertaken, as reflected in our brief over the weekend.

7      THE COURT:  Oh, I understand that.

8      MR. WALSH:  And we're not -- by -- we're not

9  withdrawing that objection, as you can imagine.  And in later

10 instructions we may tender alternatives, but I want to make

11 sure that's clear.

12     THE COURT:  If the applicable market is all healthcare

13 companies, plus investment bankers, as you've tried to

14 advocate, then I'm wrong.  And if you lose, you'll have an

15 appellate issue.

16     MR. WALSH:  We understand.

17     THE COURT:  I get it.

18     MR. WALSH:  I think we can agree to disagree on this

19 one, Your Honor.

20     THE COURT:  Now, how about 2 and 3?  Does that -- do

21 those have the "across the United States" language?

22     MR. WALSH:  The Indictment does not, Your Honor.  For

23 consistency sake, we would advocate that it be there, because I

24 don't think there is a distinction between the three counts in

25 that regard.

1          MR. STONE:  I would also add to what Mr. Walsh said

2     that the evidence that has come in has involved employees

3     across the United States.  And if we were to do it in --

4          THE COURT:  I don't think the government would object

5     to this, the "located across the United States" as a modifier

6     to employees.

7          You don't care, do you?

8          MS. LEWIS:  Your Honor, we would prefer that it

9     reflect the language of the Indictment, if that is the route

10    that Your Honor is going on Count 1.  Counts 2 and Count 3 do

11    not have that.  We would not object if Your Honor simply wanted

12    to send the Indictment back to the jury.

13         MR. STONE:  We're fine with the Indictment going back.

14    But I do think the instruction, because it's going to conform

15    to the evidence, and you've got this anomaly, and you've got a

16    very smart jury asking a lot of questions, I wouldn't bet a lot

17    on it, but I would bet that we might get a question from the

18    jurors, well, why is that there in Count 1 and not in Counts 2

19    and 3?  I don't think it hurts anything, I don't see any

20    prejudice to the government.  I think it's accurate.

21         THE COURT:  We need to do it consistently, because

22    otherwise it will look weird.  You're going to say

23    "senior-level employees located across the United States," but

24    just "employees" and "employees."  That doesn't make sense to

25    me.  That's where you get the confusion.  Either you should

1    leave it out completely or put it in in all three.

2             MS. LEWIS:  We would be in favor of leaving it out,

3    Your Honor.

4             MR. WALSH:  And, obviously, Your Honor, we think it

5    should be in all three.

6             THE COURT:  I'm going to go with putting it in for all

7    three, to avoid confusion.

8             Other than that, is there any objection to 13?

9             MS. LEWIS:  None from us, Your Honor.

10            MR. STONE:  Not from Mr. Thiry.

11            MR. WALSH:  Nor from DaVita.

12            THE COURT:  14, the elements, is there an objection?

13            MS. LEWIS:  No objection, Your Honor.

14            MR. WALSH:  No objection, Your Honor.

15            MR. STONE:  No objection, Your Honor.  I just for the

16   record out of a ridiculous abundance of caution, I join

17   Mr. Walsh that we have a continuing objection on the standard

18   per se rule of reason issue that we talked about earlier today.

19            THE COURT:  Right.  But we're just talking about the

20   elements now.

21            MR. STONE:  Understood.

22            THE COURT:  The way I did this instruction is not the

23   way either side phrased the elements.  But now you're both

24   saying you don't object, but Mr. Stone wants to make sure that

25   he hasn't waived anything.

1            *MR. STONE:*  That's fair, Judge.

2            *THE COURT:*  All right.

3            *MR. WALSH:*  Your Honor, I think that should be counted

4   in a victory for the Court, so there is a three-way tie -- a

5   four-way tie.

6            *THE COURT:*  Thank you, Mr. Walsh.  How magnanimous of

7   you.

8            All right.  15 -- first of all, I'll start with the

9   government.  A little bit surprised that the government is

10  objecting to anything about 15.  That was your big victory in

11  this trial, but you found it irresistible.

12           *MS. LEWIS:*  Respectfully, Your Honor, I believe this

13  is the -- 15 is the conspiracy one, not the market allocation

14  one.  But I certainly don't want to --

15           *THE COURT:*  Oh.

16           *MS. LEWIS:*  Don't want to look a gift horse in the

17  mouth on any of the instructions, Your Honor.

18           *THE COURT:*  You're right.

19           *MS. LEWIS:*  But I would like to advocate for why that

20  language should be included in this instruction.

21           *THE COURT:*  It's right at the end there, No. -- on

22  page 18.

23           *MS. LEWIS:*  Yes, Your Honor.

24           *THE COURT:*  You want to add, "it does not matter

25  whether the conspiracy was carried out or succeeded or failed

1    or that one or more conspirators may not have lived up to some

2    aspect of the conspiracy, the agreement or mutual understanding

3    itself is the crime."

4           MS. LEWIS:  Yes, Your Honor.  We believe this is --

5           THE COURT:  And your authority is, this is the

6    standard instruction given in Sherman Act cases.  Says who?

7           MS. LEWIS:  Well, more than that, Your Honor, it's

8    what the Supreme Court has said in *Socony-Vacuum*, that the act

9    of violating the Sherman Act is not dependent on any other act

10   other than the act of conspiring.  It's consistent absolutely

11   with black letter law on conspiracy, that conspiracy is the

12   crime, even if the actual subject offense is never carried out.

13   For example, in the bank robbery case, even if you never make

14   it to the door, it's still a conspiracy to rob the bank.

15          So we do believe it is consistent; it is black letter

16   law in Sherman Act cases; it is an instruction that has been

17   given routinely by district courts across the country in

18   virtually --

19          THE COURT:  How do you know that?

20          MS. LEWIS:  I have looked at some of the instructions

21   of what we have pulled in our previous cases.  And it is in the

22   Penn instruction, the Usher instruction, there are any number

23   of cases.  And our appellate section looks at these issues very

24   closely and very carefully.

25          THE COURT:  Well, I wouldn't want to be out of step

```
 1   with what your routine instruction is.
 2           MS. LEWIS:  And I might also add, Your Honor, the
 3   importance of this is apparent because of the testimony that
 4   the defendants have elicited at trial, as well as, clearly,
 5   what their expert has been trying to testify to, which is to
 6   say that the conspiracy has been ineffective and that they
 7   didn't see the allocations having a, quote, impact, as well as
 8   the arguments Mr. Walsh made earlier today in his Rule 29,
 9   suggesting there was no allocation, ergo, you know, the jury
10   must acquit.
11           So that is sort of the nature of why we believe
12   factually, as well, this instruction is necessary to give the
13   jurors a proper understanding of what the law is in this area.
14           MR. WALSH:  Your Honor --
15           THE COURT:  His phrase doesn't have quite the
16   catchiness as Johnnie Cochran's phrase, does it?
17           MS. LEWIS:  Not quite, Your Honor.
18           THE COURT:  If there was no allocation, it doesn't
19   fit.
20           MR. WALSH:  Your Honor --
21           THE COURT:  That would never sell.
22           MR. WALSH:  Your Honor, if I could note a couple of
23   things on this instruction.  Obviously, we object to the
24   proposed addition.
25           First of all, the government previously stipulated to
```

1    a conspiracy instruction that's largely the same as what the

2    Court has here and did not include the government's proposed

3    additional language.

4          Secondly, the Court's instruction is consistent with

5    the conspiracy explained instruction from the ABA model

6    instructions in criminal antitrust cases; and we don't think

7    any additions are warranted.

8          And here I think is a really key --

9          THE COURT:  Well, wait a minute.  You say there is a

10   model conspiracy instruction in antitrust cases?

11         MR. WALSH:  A conspiracy explained instruction.

12         THE COURT:  She said it's routinely given with this

13   language.

14         MR. WALSH:  I don't believe that's what she's

15   referring to, Your Honor.  And I -- I want to focus also the

16   Court on what we think is the most problematic statement here,

17   is, "the agreement or mutual understanding itself is the

18   crime," which we believe would be misleading and also

19   inconsistent with the way the Court has structured the elements

20   in Instruction No. 14, which talks about the purpose of the

21   agreement being essential.

22         Moreover, I would note, we don't intend to argue that

23   the failure of the conspiracy meant that the purported

24   agreement wasn't a crime; but, rather, what this Court has

25   previously ruled, which is that evidence of lack of harm is

1    relevant to the question of whether the defendants entered into

2    an agreement to allocate the market.  That's in your order at

3    Docket 210.  So we think this is both unnecessary here and

4    actually affirmatively objectionable, especially in the context

5    of this case.

6              *MS. LEWIS:*  If I may respond, Your Honor.

7              So, number one, we had originally proposed this

8    language as part of the market allocation instruction; so

9    defendants have had this language for quite some time.

10   Obviously, Your Honor reordered the numerical instructions and

11   how they were coming in; and we thought it was appropriate to

12   add it to the conspiracy instruction.  Of course, if Your Honor

13   prefers to have it in the market allocation instruction, we

14   would be perfectly fine with that, which is where it does

15   appear in the ABA model jury instructions for criminal

16   antitrust cases.

17             *THE COURT:*  Why isn't Mr. Walsh exactly right when he

18   says that last sentence is inconsistent with my ruling?

19             *MS. LEWIS:*  Respectfully, Your Honor, it's not.  We

20   understand that Your Honor allowed a large portion of evidence

21   to come into the trial for the purpose of being considered as

22   it relates to intent.  But that's all the more reason why we

23   think it is necessary to properly instruct the jury that while

24   they can consider that for the intent and the existence of

25   these conspiracies, it is not in and of itself a defense to a

1    conspiracy crime, because the crime is the agreement itself.

2         THE COURT:  Mr. Stone, do you have something different

3    to say?

4         MR. STONE:  Very briefly, Judge.

5         I agree with Mr. Walsh.  That last sentence is

6    100 percent inconsistent with your ruling.  You take that

7    sentence back into the jury room, you read right out of the

8    case the ruling that you made starting with the motion to

9    dismiss and that you reaffirmed several times about intent and

10   purpose, the jurors believe that all they have to do is find an

11   agreement, which itself is the crime, for the tendered

12   instruction.  That's completely at odds with your philosophy of

13   how to instruct this jury.

14        MS. LEWIS:  And briefly on that point, Your Honor.  I

15   respectfully disagree with Mr. Stone on that.  What Your Honor

16   ruled in the motion to dismiss and what is apparent in the

17   instructions as well is that the conspiracy that has to exist

18   is one with the intent or purpose to allocate the market for

19   employees.  So it's in no way reading out what Your Honor has

20   ruled.  It is merely accurately informing them -- which, again,

21   was apparent in I think both Your Honor's preliminary

22   instruction and in the market allocation instruction -- that

23   they have to find something that is seeking to end meaningful

24   competition; not that it actually ends competition.  So finding

25   the existence of agreement with the requisite purpose is in no

1    way inconsistent and entirely consistent with conspiracy cases

2    and conspiracy crimes outside of the Sherman Act.

3              THE COURT:  All right.  Now, have you all been heard?

4              MR. WALSH:  Yes, Your Honor.

5              MS. LEWIS:  Yes, Your Honor.

6              THE COURT:  The Court finds that the last sentence of

7    the proposed addition must come out.  It at a minimum would

8    confuse the jury; and at worst, it is inconsistent with the

9    Court's ruling on the motion to dismiss.  But you can put the

10   first sentence in.

11             Onward.

12             Let's see.  Instruction No. 16, that's the one that

13   was your great success, Ms. Lewis.

14             MS. LEWIS:  Thank you, Your Honor.  We have no

15   objection to that instruction.

16             MR. WALSH:  Your Honor, as you would imagine, we have

17   a number of comments and objections to this instruction.

18             We understand where the Court's rulings have been;

19   but, nevertheless, for the record, and in a couple places very

20   much -- very much with an eye towards persuading the judge --

21   the Court, we'd like to raise a number of things.

22             First of all, on -- at the end of the paragraph with

23   the Court's example -- or hypothetical regarding companies

24   selling auto parts, we do not object to the example as a whole.

25   However, we do object to the last sentence, which says, "the

```
 1    same concept can be applied to a market for employees."

 2           And the reason for that is that the Court has already

 3    indicated on a couple of occasions that the customer allocation

 4    cases are different in kind -- even though they're in some

 5    ways -- they are things that the Court has looked to.  And, in

 6    fact, the Court has specifically said that the novelty of this

 7    case persuades the Court to depart from customer allocation

 8    instruction -- rather, instructions in customer allocation

 9    cases.  So for that reason, we would ask that that last

10    sentence come out.  We think the example as written is fine,

11    but we don't want the jury to be instructed that it's

12    completely the same situation.

13           MR. STONE:  Judge, I would only add that -- first of

14    all, I agree with Mr. Walsh.  Equating customer allocation

15    cases with the labor market, we strenuously object to that.

16    You've heard us on that.  I won't -- to use a bad word, I won't

17    belabor that point.

18           THE COURT:  Is a strenuous objection more important

19    than an objection?

20           MR. STONE:  I learned that from Special Agent Hamel

21    yesterday, the difference between agent and special agent.  I

22    take your point.  You're absolutely right.

23           The other concern that I have, though, seriously,

24    Judge, about this instruction is this -- the lead-in language,

25    "the same concept can be applied to a market for employees."
```

1    I'm not sure what the same concept refers to in the context of

2    a hypothetical.  We understand your hypothetical.  We're not

3    objecting to the terms of the hypothetical.

4          THE COURT:  In fact, your expert almost used my

5    hypothetical.  How clever of him.

6          MR. STONE:  Sometimes things happen, Judge.  But I --

7    on the point about the language of that same concept, I do

8    think if -- this has the potential to mislead the jury as to

9    what you're talking about, what they're being instructed on.

10          THE COURT:  Okay.

11          Response.

12          MS. LEWIS:  Yes, Your Honor.  We think that it's a

13   perfectly appropriate way to explain to the jurors.  I think

14   Your Honor already made the analogy in the preliminary

15   instruction, and we think that it's apt.  And we -- again, I

16   think we defer to Your Honor as that being an appropriate way

17   to convey to the jurors what they are looking at and how they

18   should apply it to the charges in this case.

19          THE COURT:  I agree with Ms. Lewis.

20          What's your next objection?

21          MR. WALSH:  Your Honor, in the next paragraph, where

22   the Court states, "the market, therefore, is senior-level

23   employees at each other's companies," obviously, we know where

24   the Court is on this point.  And we would object to that

25   language "at each other's companies," because we think it

1  actually improperly defines the market.  I've already noted

2  that.  And the -- and as we have briefed.

3       In addition, as we've also briefed, we believe that's

4  a question for the jury ultimately, the relevant market, under

5  the *Aspen Highlands* case.  Moreover -- well, I'm not going to

6  recite all of our arguments, Your Honor.  This is a place where

7  we feel strongly, and we do object, and we'll tender an

8  alternative instruction if the Court leaves this language in.

9       *THE COURT:*  I did, by the way, change my draft

10  instruction and used your language, "senior-level employees,"

11  instead of my language, which was "employment opportunities for

12  senior-level executives."

13       *MR. WALSH:*  Yes.  And --

14       *THE COURT:*  Ms. Lewis.

15       *MS. LEWIS:*  Thank you, Your Honor.

16       I think the Court has been clear in its rulings on

17  this.  And, you know, we believe it's an appropriate

18  instruction and one that accurately reflects the charges in the

19  Indictment.

20       *THE COURT:*  I agree with Ms. Lewis.

21       Next.

22       *MR. WALSH:*  Your Honor, at the paragraph that -- at

23  the end of the same paragraph -- excuse me -- the sentence that

24  says, "There are other companies in the healthcare industry and

25  other industries that potentially would hire these same

1    senior-level employees, but that is not the market that is the

2    subject of this case," our objection is the same as the one I

3    just articulated.

4         THE COURT:  Understood.  Overruled.

5         MR. WALSH:  And those are our objections to that

6    instruction.  We will tender an alternative instruction.

7         THE COURT:  Has everybody been heard on this now?

8         MS. LEWIS:  Yes, Your Honor.

9         THE COURT:  All right.  I obviously spent time and

10   thought crafting this instruction.  I think it's correct.  If

11   it's not correct, the Tenth Circuit will fix it.

12        No. 17, which I in part broke off from my original

13   draft of the market conspiracy instruction because I thought

14   that the second element on purpose and intent deserved its own

15   independent instruction, since that is really what the

16   defendant is defending upon.  Is there any objection?

17        MS. LEWIS:  Your Honor, we would request the addition

18   of the language that is shown in our proposed redline to this

19   Instruction No. 17.  We think it's, again, critically

20   important, because Your Honor did allow this evidence to come

21   in at trial, that the jury be properly instructed of how they

22   should and should not consider that evidence.

23        Again, I think this is something that, you know, the

24   language we're suggesting here is, number one, drawn from some

25   of the defendants' own proposals, as well as from Your Honor's

1    own orders, where you indicated that the purpose behind whether

2    or not the agreements were good for the company or even good

3    for the market as a whole was immaterial and that justification

4    evidence is not relevant to the charge that is at issue in this

5    case.

6          I think, again, critically important, this is an issue

7    that comes up time and time again in Sherman Act cases, people

8    and companies claiming that they have good reasons to do it

9    because they otherwise couldn't compete.  I think the Supreme

10   Court has been crystal clear in the authorities that we've

11   cited in our papers that that is the type of evidence that

12   cannot be considered.  You cannot consider the reasonableness

13   or the good intentions, whether somebody thought it was lawful,

14   whether they had a business justification, whether it was going

15   to bring economic benefit to some other part of the market.

16   Those are reasons that cannot, should not be considered in a

17   *per se* case.  That is from the Supreme Court and the Tenth

18   Circuit resoundingly.

19         And I would add that I think that the defendants have

20   clearly indicated that they intend to make that a centerpiece

21   of their arguments and their closing, and we think that the

22   jury must be properly instructed on that.

23         *THE COURT:*  Just a minute, please.

24         See, here is the problem, and it goes back to the

25   order on the motion to dismiss.  The government's theory of the

1    case has always been that it's a *per se* violation, end of case.

2    I didn't agree with that.  I said -- for better or for worse,

3    but certainly because I thought it was right -- that the

4    government has to prove that the defendant -- defendants

5    entered into the agreement to allocate -- entered into an

6    agreement or understanding to allocate the market and that they

7    intended to do so.

8          The language that you want to put in, to my mind,

9    conflates what is an illegal agreement with what was the

10   defendants' intent.  And I was trying to create an instruction

11   here that indicated that as the second element -- to which

12   nobody objects -- puts it, "the defendant knowingly entered

13   into a conspiracy with the purpose of allocating the market

14   with respect to that conspiracy."  That's an element; it's an

15   important element.  And if I put your language in the way

16   you've drafted it, to my mind, once again, you're trying to

17   read the intent element out of this case; and I won't do that.

18         So when you say, for example, "It is not a defense

19   that the parties may have acted with good motives," that's not

20   really right, because whether there was an intent to allocate

21   the market does involve the motive.  To say it's not a defense

22   that the parties may have acted with good motives, I'd say yes

23   and no.  The fact that a person robs a bank to feed his family

24   doesn't make the robbery legal.  I get that.  But, here, the

25   question is, did these defendants enter into these agreements

1    and understandings with the intent or purpose to allocate the

2    market?  And I'm not going to read that out of the case.

3              *MS. LEWIS:*  Certainly not, Your Honor.

4              *THE COURT:*  Your language, in effect, does that.

5              *MS. LEWIS:*  Respectfully, Your Honor, I don't believe

6    that it does.  I think that what this is addressing and is

7    speaking to this kind of conspiracy can have multiple purposes.

8    And as Your Honor rightly points out, that even if the two bank

9    robbers both want to feed their families, they still can't join

10   a conspiracy that has the purpose of robbing the bank.  And

11   it's the same here, that if there is some other reason why they

12   may also want to be entering this conspiracy, they can have

13   that other reason, but all this instruction is doing is

14   indicating that that in and of itself is not a justification,

15   it's not an excuse, the good intention that they wanted to do

16   business together, those are not reasons that excuse the other

17   purpose, which is what Your Honor is finding is necessary as

18   the intent in this case, does not excuse that.

19             *THE COURT:*  All right.  Here is my proposed language

20   in place of the government's proposed addition for you to

21   consider.  "If defendants entered into an agreement or

22   understanding with the intent to allocate the market, it is

23   immaterial whether such an agreement or understanding was

24   actually good for the company or even good for the market as a

25   whole.  If there was, in fact, a conspiracy as charged in each

1  count of the Indictment for the purpose of allocating the

2  market, it was illegal."

3        Ms. Lewis.

4        MS. LEWIS:  Your Honor, we certainly appreciate the

5  addition.  I feel I don't dare press my luck to continue to

6  press for any additional language in there.

7        THE COURT:  Is that another way of saying, you can

8  live with that language?

9        MS. LEWIS:  We can live with that language, Your

10 Honor.

11       MR. WALSH:  Your Honor, if it's all right, we -- the

12 proposal from the government was submitted this morning and has

13 three pages of single-spaced argument in favor of it.  If it's

14 all right, we would like to take this under consideration from

15 the Court.  And at the moment I would object, but we will look

16 at it and may come back to the Court with a counterproposal.

17       THE COURT:  All right.  Ms. Lewis, I'm going to read

18 that language again, because you're the scrivener, so take

19 notes.

20       In lieu of your language, which starts at the bottom

21 of page 23 and continues -- the underlined language -- please

22 add this paragraph instead:  "If defendants entered into an

23 agreement or understanding with the intent to allocate the

24 market, it is immaterial whether such an agreement or

25 understanding was actually good for the company or even good

1    for the market as a whole.  If there was, in fact, a conspiracy

2    as charged in each count of the Indictment for the purpose of

3    allocating the market, it was illegal."

4            Got it?

5            *MS. LEWIS:*  Yes --

6            *THE COURT:*  Want me to run it by you one more time?

7            *MS. LEWIS:*  If I may impress Your Honor just one more

8    time to make sure.

9            *THE COURT:*  "If defendants entered into an agreement

10    or understanding with the intent to allocate the market, it is

11    immaterial whether such an agreement or understanding was

12    actually good for the company or even good for the market as a

13    whole.  If there was, in fact, a conspiracy as charged in each

14    count of the Indictment for the purpose of allocating the

15    market, it was illegal."

16            *MS. LEWIS:*  Thank you, Your Honor.

17            *MR. WALSH:*  Your Honor, if I may -- we will take a

18    look at this.  I do want to bring to the Court's attention the

19    Court's order on -- prior order on jury instructions in

20    which -- and this is docket 210 at 3 again.  The Court there

21    indicated that, "Evidence of lack of harm or pro-competitive

22    benefits might be relevant to the question of whether the

23    defendants entered into an agreement to allocate the market and

24    did so with the intent to allocate the market, as charged in

25    the Indictment."

1    If this language were to come in, we would propose

2  that some -- we'll come back with a suggestion to you, but

3  that's the direction we're going.  Because the concern I have

4  got -- and I know I'm speaking for Defendant Thiry on this, as

5  well -- is that this will have the effect of instructing the

6  jury to ignore evidence that the Court has indicated might be

7  relevant to the underlying decision of whether the defendants

8  entered into the agreement with an intent.

9    THE COURT:  I don't think it instructs the jury to

10  ignore anything.  It instructs the jury that purpose and intent

11  are critical, and it gives you the ability to argue that in

12  closing.  But you come up with whatever you think you need to

13  come up with; and at a minimum, you can tender it.  And maybe

14  it will even convince me to change my mind.

15    MR. WALSH:  Thank you, Your Honor.

16    MR. STONE:  Your Honor, for the record, I agree with

17  Mr. Walsh.  We will work on the language.  But I think it would

18  be appropriate, since we are -- this is the heart of the

19  matter, it would be appropriate to include the intent and

20  purpose here to avoid the possibility that the jury gets

21  confused about what it takes to allocate the market.

22    THE COURT:  You weren't listening to what I dictated,

23  because both intent and purpose were in there.

24    MR. STONE:  I understand, Judge.  I understand.  We

25  will tender --

1       THE COURT:  Okay.  But, Ms. Lewis, remember, if you

2   talked me into something and you're wrong, you lose --

3       MS. LEWIS:  I am confident --

4       THE COURT:  -- even if you win.

5       MS. LEWIS:  I am confident in our legal positions that

6   they will be sustained on appeal, Your Honor.

7       THE COURT:  Well, both sides are equally confident

8   that they're right; and that's been the case from day one.

9       MS. LEWIS:  Understood, Your Honor.

10       THE COURT:  Now we get to Instruction 18, interstate

11   commerce.  Why are you even putting that as an element, let

12   alone disputing the language?

13       MS. LEWIS:  Your Honor, I don't dare argue with the

14   Supreme Court as to why it's an element, but it is.

15       THE COURT:  It's an element.  But if there is no

16   dispute about it, you don't normally instruct the jury on an

17   element that is not disputed.

18       MS. LEWIS:  Your Honor, respectfully.  We did ask the

19   defendants if they would stipulate to interstate commerce; we

20   did not get that stipulation; so here I am, Your Honor.  But

21   bear with me just one moment on this, because I think we have

22   actually had juries get hung up on interstate commerce before.

23   I think it's a little bit of a, you know, wonky concept,

24   perhaps, for the layperson.

25           So I think what we would say about this is that we

1   just have these minor changes to include the words "people" and

2   "funds," because, again, both are well-established points of

3   Sherman Act case law.  And, of course, the interstate commerce

4   power is clearly held by the Supreme Court to reach the

5   movement of people through interstate commerce.  We think it

6   just is a way of explaining it to jurors in a way that makes

7   sense in the concept of this case.

8           THE COURT:  What if we did something not only simple

9   but that makes sense?  We can always consider doing that --

10          MS. LEWIS:  Well, Your Honor --

11          THE COURT:  -- something that makes sense.  And what

12   makes sense to me would be to go all the way back to the

13   elements instruction --

14          MR. WALSH:  Your Honor, if I may.  We don't -- we

15   actually don't object to the change that Ms. Lewis is

16   suggesting.

17          THE COURT:  Well, hear me out, Mr. Walsh.  Unless

18   somebody -- are you going to argue that there wasn't interstate

19   commerce?  Is that part of your strategy?

20          MR. WALSH:  Your Honor, they think this is an element

21   of the crime and it should be instructed on.

22          THE COURT:  Yes.  So I'll put it right to you -- this

23   will flesh you out, Mr. Walsh.  The third element, "The

24   conspiracy occurred in the flow of or substantially affected

25   interstate trade or commerce," period.  "This element is not

disputed in this case," period. Yes or no?

*MR. WALSH:* Your Honor, we think it should be included -- that there should be an instruction on that, on the --

*THE COURT:* So you are going to argue that this isn't an interstate? Or you just think that maybe some juror might come up with it on his or her own and hang the jury? I mean, what is going on here, guys?

*MR. STONE:* Your Honor, we don't agree to instructing that it's stipulated. Sorry.

*THE COURT:* And you will not tell me why?

*MR. STONE:* Well, Judge, my client is facing extraordinary risk --

*THE COURT:* I know what your client is facing, Mr. Stone. I'm very well aware of that. Why won't you tell me why you want this -- you won't stipulate to it?

*MR. STONE:* Judge, I have seen juries hang and hang up, both as a prosecutor and as a defense lawyer, because --

*THE COURT:* We'll go with your version, Ms. Lewis.

*MS. LEWIS:* Thank you, Your Honor.

*THE COURT:* Do it your way.

Let's see. No. 19, on or about. Any objection?

*MS. LEWIS:* No objection, Your Honor.

*MR. WALSH:* No objection, Your Honor.

*MR. STONE:* No objection, Judge.

1          *THE COURT:*  No. 20, the defendants' theory of the

2    case.

3          *MS. LEWIS:*  Your Honor, we noted in this one that I

4    think there is -- the reference to "along with many other

5    employers all over the country," that seems to be a reference

6    to the Dodds market again.  We think there are other things in

7    here that are a little bit questionable; but we did not redline

8    this, given that it is the defense theory of the case.  We

9    don't necessarily agree that this should be given, but we

10   understand Your Honor is inclined to give it.  We would just

11   ask that it not reflect something that is legally improper that

12   Your Honor has already ruled on.

13         *THE COURT:*  Gentlemen?

14         What they want to do is to take out the words "along

15   with many other employers all over the country."

16         *MR. WALSH:*  Your Honor, this is -- we think this

17   should come in -- we think it should stay.  It's the defense

18   theory -- the -- we understand fully that what the Court's

19   position is on this.  And I think when we argue, I think there

20   is a very clear understanding that it is not going to be a

21   Dodds market argument.  Nevertheless, this is simply a correct

22   statement of what we think is relevant.  Some of this evidence

23   has been elicited by the government in their questioning of

24   witnesses.  We don't think it's inappropriate, and we think it

25   is a straightforward statement of the defense theory.

1        THE COURT:  So Mr. Thiry didn't testify.  But suppose

2   he had testified that, my intent was not to allocate the market

3   because I believed the market was all the companies in the

4   United States, any reason why he couldn't have testified to

5   that?

6        MS. LEWIS:  Your Honor, I wouldn't want to speculate

7   as to what he may or may not have testified to.  But,

8   certainly, we would indicate that if that testimony had come

9   in, we certainly would be asking for an instruction to indicate

10  that that is not the relevant market that we're talking about

11  in this Indictment.

12       THE COURT:  Yeah.  That isn't my point.  The point is,

13  he didn't want to testify -- or he's elected not to testify.

14  But in terms of what he intended, I'm inclined to let the

15  defendants state their theory.  Now, if they get up and start

16  arguing that the market isn't what I said it is, they won't be

17  happy with what happens next.

18       MR. WALSH:  We fully understand that, Your Honor.

19       MR. STONE:  Duly noted, Judge.  Understood.

20       THE COURT:  Do you have something else to say?  You're

21  standing up.

22       MR. STONE:  No, I'm good.

23       THE COURT:  20 stays the same.  Their theory of the

24  case, they can state it their way, as long as they aren't

25  obviously stating something that is inconsistent with the

 1   Court's instructions.  I don't think they are.

 2          21, any objection?

 3          *MS. LEWIS:*  No objection, Your Honor.

 4          *MR. WALSH:*  No objection, Your Honor.

 5          *THE COURT:*  22?

 6          *MS. LEWIS:*  No objection.

 7          *MR. WALSH:*  No objection, Your Honor.

 8          *MR. STONE:*  No objection, Judge.

 9          *THE COURT:*  Now, notably, one thing that isn't in this

10   set of instructions is statute of limitations.  You've never

11   pushed it.  That's gone; yes?

12          *MR. STONE:*  I think -- we are not pushing for that

13   instruction, Judge.

14          *THE COURT:*  So we have a set of instructions subject

15   to what somebody wants to tender; correct?

16          *MS. LEWIS:*  Yes, Your Honor.

17          *MR. WALSH:*  Correct.

18          *THE COURT:*  You've made your record.  Do you agree --

19          *MS. LEWIS:*  Yes, Your Honor.

20          *MR. WALSH:*  And to state what I've already said,

21   obviously, our position on the definition of the market is as

22   we've set forth in our briefing over the weekend.  We will

23   tender on the instructions that have --

24          *THE COURT:*  Yes, you've made your point.

25          *MR. WALSH:*  Thank you, Your Honor.

1           THE COURT:  Many times.  And well.  I just don't agree

2    with you.

3           MR. WALSH:  Yes.  We understand, Your Honor.

4           THE COURT:  Verdict form, you tendered one long ago;

5    and nobody seemed to object to it.  There is nothing to it,

6    really.

7           MS. LEWIS:  Yes, Your Honor, we filed that on ECF.  It

8    was stipulated.

9           MR. WALSH:  We stipulated, Your Honor.

10          THE COURT:  Okay.  Anything else tonight?

11          MR. WALSH:  No, Your Honor.  Thank you.

12          MS. LEWIS:  No, Your Honor.  Thank you.

13          MR. STONE:  Judge, anything on the logistics for

14   tomorrow that what we should be thinking about in terms of

15   timing?  Obviously, we have to get through the next eleven

16   questions for Dr. Cremieux.

17          THE COURT:  Then there will be an opportunity for you

18   to ask follow-up questions, then for the government to ask

19   follow-up questions, and then I'll ask if you have any other

20   witnesses.  I don't know if you will or not.  I know that Thiry

21   won't.  Mr. Melsheimer made that clear, but DaVita might.  I'll

22   ask the government if they have any rebuttal witnesses.  But

23   the rebuttal has to rebut whatever you put in your case, which

24   at this point is Cremieux.  And then the evidence will be

25   closed.

1          Somewhere in there, I'm going to rule on your motion

2    to dismiss, which I would have already done had it not been for

3    Mr. Walsh's request that I not.  But it is likely that I will

4    say something along the lines of, The first part of the motion

5    was decided at the motion to dismiss stage, and the second part

6    of the motion concerning intent is one that must be decided by

7    the jury.  But I will do the courtesy of considering what it is

8    you're going to file later --

9          MR. WALSH:  Thank you, Your Honor.

10         THE COURT:  -- to see if it changes my mind.  But,

11   frankly, considering all of the evidence in the light favorable

12   to the government, it's going to be difficult to dismiss any of

13   these counts.  That is not a comment on the strength of the

14   counts.  I have my own opinion on that, but that's not

15   relevant.

16         MR. WALSH:  Your Honor, I would note, in the spirit of

17   the disclosures that the parties have agreed to, that DaVita

18   after Dr. Cremieux does not anticipate any additional

19   witnesses.  I can't speak for Mr. Thiry.

20         MR. STONE:  Well, Judge, in the interest of not trying

21   to screw around with your schedule, I don't anticipate we're

22   going to have any other witnesses tomorrow.

23         THE COURT:  So I think you can plan on, once we finish

24   with the questions and any follow-up that you might have, we'll

25   be ready to instruct.  Maybe with a -- you know, an

 1    excuse-the-jury session to finish up on the motion to dismiss.

 2            *MR. STONE:*  Judge, if I could just say on the motion

 3    to dismiss, we know you've wrestled with this hard, you and

 4    your -- what you've described as limited staff.  We know we

 5    filed a lot of papers on.  And we do appreciate the

 6    consideration.  I hope you understand why we feel so strongly

 7    about this and why we have argued so strenuously.  Not only

 8    because it's important; we believe in good faith we're right.

 9    But we do on behalf of Mr. Thiry want to thank you for the time

10    and the consideration, the consideration you gave me at the

11    podium this morning.  So I just wanted to say that.

12            *THE COURT:*  Well, thank you, Mr. Stone.

13            *MR. STONE:*  Thank you, Judge.

14            *THE COURT:*  All right.  Have a nice evening, folks.

15            (Recess at 6:03 p.m.)

16                            **I N D E X**

17    **Item**                                                     **Page**

18
      Rule 29 Argument                                          1267
19    Jury Instruction Conference                               1438
      Opening Statement By Mr. Melsheimer                       1288
20

21    **Witness**                                                  **Page**

22        ELLIOT HOLDER
              Direct Examination By Mr. Mariano               1210
23            Cross-examination By Mr. Melsheimer             1235
              Redirect Examination By Mr. Mariano            1256
24        PIERRE CREMIEUX
              Direct Examination By Mr. Melsheimer           1295
25            Cross-examination By Mr. Vigen                  1350
              Redirect Examination By Mr. Melsheimer         1400

```
 1                      GOVERNMENT'S EXHIBITS

 2   Exhibit        Offered   Received  Refused  Reserved  Withdrawn

 3   218                      1218
     221                      1220
 4   224                      1224
     226                      1230
 5   587                      1210
     591                      1366
 6

 7                      DEFENDANTS' EXHIBITS

 8   Exhibit        Offered   Received  Refused  Reserved  Withdrawn

 9   B540-590                 1297

10

11                      REPORTER'S CERTIFICATE

12        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
13
          Dated at Denver, Colorado, this 12th day of May, 2022.
14

15       _____

16            Therese Lindblom,CSR,RMR,CRR

17

18

19

20

21

22

23

24

25
```